S. Frank Harrell – SBN 133437
sharrell@lynberg.com
Tamara M. Heathcote – SBN 193312
theathcote@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants COUNTY OF ORANGE,
DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ,
DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER,
DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and
DEPUTY JUSTIN GUNDERSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE,<br>DEPUTY CHAD RENEGAR,<br>individually and as a peace officer,<br>DEPUTY JOEL GONZALEZ,<br>individually and as a peace officer,<br>DEPUTY KEVIN PAHEL, individually<br>and as a peace officer, DEPUTY<br>BRANDON BILLINGER, individually<br>and as a peace officer, DEPUTY<br>MARK BORBA, individually and as a<br>peace officer, DEPUTY JAMESON<br>GOTTS individually and as a peace<br>officer, DEPUTY JUSTIN<br>GUNDERSON, individually and as a<br>peace officer, and DOES 1-10.<br><br>Defendants. | CASE NO. 8:19-cv-01514-DOC-DFM<br><br>*Assigned for All Purposes to:*<br>*Hon. David O. Carter, Courtroom 9D*<br><br>*Assigned for Discovery Purposes to:*<br>*Hon. Douglas F. McCormick, Courtroom 6B*<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE**<br><br>*Trial Date: January 19, 2021*<br>*Second Amended Complaint filed: December 10, 2019* |

**1**

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

# **<u>TABLE OF CONTENTS</u>**

I.      PRELIMINARY STATEMENT ..............................................................................1

II.     FACTUAL BACKGROUND ............................................... 2

III.    PLAINTIFF'S EX PARTE SHOULD BE DENIED ....................................... 16

IV.     TRANSCRIPTS FROM THE SEPTEMBER 2, 2020
        COURT HEARING, THE DEPOSITION TRANSCRIPT
        OF CHAD RENEGAR AND PRIOR COURT RULINGS
        ARE NECESSARY TO DETERMINE THE TRUTH OF
        WHAT TRANSPIRED DURING HEARINGS
        ATTENDED BY PLAINTIFF'S COUNSEL ................................................ 18

V.      PLAINTIFF FAILS TO SET FORTH COMPELLING
        EVIDENCE OF ACTUAL BIAS OR PREJUDICE......................................... 19

VI.     CONCLUSION ................................................................................... 20

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

1

<u>TABLE OF AUTHORITIES</u>

2

Pages

3

**Cases**

4

Brokaw v. Mercer County,
    235 F.3d 1000 (7th Cir. 2000) .................................................................19

5

6

Freeman v. Schointuck,
    192 F.R.D. 187 (D. Md. 2000) ..................................................................4

7

In re Convergent Techs. Sec. Litig.,
    108 F.R.D. 328 (N.D. Cal. 1985)............................................................3, 4

8

9

Laddcap Value Partners, LP v. Lowenstein Sandler P.C.,
    859 N.Y.S.2d 895 (2007) ..........................................................................4

10

MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.,
    2014 WL 12754932 (C.D. Cal. 2014) ......................................................4

11

12

Mission Power,
    supra, 883 F. Supp. ...................................................................16, 17, 19

13

People v. Fagan,
    483 N.Y.S.2d 489 (1984)...........................................................................4

14

**Rules**

15

Fed. R. Civ. P. 34................................................................................................11

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

On January 21, 2018, the Orange County Sheriff's Department received middle - of – the - night "911" complaints that a man was attacking a woman at a County - owned campground. Law enforcement responded to the scene and encountered one Jeremy Holloway – who had just been released on probation following his latest conviction on felony charges.

Holloway denied the allegations against him. As Holloway's female victim had fled the scene, no arrest was made.

But Holloway pressed his luck by threatening the campground witnesses against him as soon as officers departed the scene. When deputies returned in response to frightened campers' latest "911" calls, Holloway was subdued and arrested. After warrants subsequently issued for Holloway's arrest, he responded by: (1) filing this pestiferous litigation, and (2) by fleeing California for the East Coast.

Since its inception, Plaintiff's counsel, Narine Mkrtchyan, has inexplicably chosen a needlessly combative approach in this litigation. Her written and spoken words are frankly unacceptable – on any level. Defense counsel and their clients have been yelled at, cursed at and generally treated in a manner that brings shame to the legal profession. Frivolous objections to non-controversial discovery have been a routine feature of Ms. Mkrtchyan's practice in this case. When the defense seeks to defuse and discuss matters, Ms. Mkrtchyan simply erupts with more yelling and verbal abuse.

Ms. Mkrtchyan finally gave the defense the proof they needed to seek judicial assistance when she began cursing and shouting at a ***videotaped*** deposition. In response, Magistrate Judge Douglas F. McCormick issued a remarkably restrained admonition – particularly given the outrageous video conduct he witnessed. (Order, Dkt. No. 73, p. 2) (the subject "deposition was, to put it mildly, a train wreck. And responsibility for that result lies predominantly with Plaintiff's counsel.")  The

**1**

1   Magistrate Judge concluded by reminding "all counsel" that professionalism and
2   common courtesy matter in the legal profession. (Order, Dkt. No. 73, pp. 2 and 4)
3   (going forward, "I expect, as I told counsel during the July 9 telephone conference,
4   that all counsel should comport themselves in the deposition the same as if they were
5   in the courtroom. . ..I trust that my remarks on July 9 and this subsequent ruling will
6   cause [future] depositions to be conducted without the rancor that was exhibited on
7   July 7 [at the subject deposition].")

8       Incredibly, Ms. Mkrtchyan has ignored the Court's directive. Multiple
9   discovery motions are now either pending (or about to be filed) where the defense has
10  been forced, once again, to seek judicial relief from Ms. Mkrtchyan's frivolous
11  objections to non-controversial discovery – and her continued shouting and cursing in
12  videotaped deposition proceedings. In an apparent effort to avoid being rightly called
13  to account for violation of Magistrate Judge McCormick's civility directives, Ms.
14  Mkrtchyan has now filed this ex parte application seeking a new bench officer – one
15  that Mkrtchyan evidently hopes will applaud (or at least ignore) her ongoing discovery
16  misconduct.

17      As is her custom, Ms. Mkrtchyan cites no law and no relevant facts to support
18  her latest request. Thus, Mkrtchyan's latest filing should be recognized as what it is –
19  yet another example of the type of unprofessional name-calling and mud-slinging in
20  which she seems to specialize. Accordingly, as set forth in further detail below, this
21  frivolous ex parte application should be forcefully denied.

22  **II.    FACTUAL BACKGROUND**

23      Plaintiff's operative Complaint in this case is difficult to read or understand. In
24  an effort to unearth and verify whatever facts and evidence Plaintiff contends support
25  his claims, Orange County has embarked on needed discovery. In response, Plaintiff's
26  counsel should have responded with cooperation and professionalism as both sides
27  thereafter exchanged relevant information – just as the law provides. As stated by one
28  court:

2

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

The discovery system depends absolutely on good faith and common sense from counsel. The courts, sorely pressed by demands to try cases promptly and to rule thoughtfully on potentially case dispositive motions, simply do not have the resources to police closely the operation of the discovery process. The whole system of civil adjudication would be ground to a virtual halt if the courts were forced to intervene in even a modest percentage of discovery transactions. That fact should impose on counsel an acute sense of responsibility about how they handle discovery matters. ***They should strive to be cooperative, practical and sensible,*** and should turn to the courts (or take positions that force others to turn to the courts) only in extraordinary situations that implicate truly significant interests.

[¶] These are not simply the sentiments of an idealistic and frustrated magistrate. ***They are the law.***

In re Convergent Techs. Sec. Litig., 108 F.R.D. 328, 330–31 (N.D. Cal. 1985) (emphasis added); see, id. (when there is a "breakdown" in "what is supposed to be the self-executing system of pretrial discovery . . . the spirit of Rule 26. . .has been violated. So has the spirit of Rule 1, which declares that the purpose of the Federal Rules of Civil Procedure is 'to secure the just, speedy, and inexpensive determination of every action' ".)

Plaintiff's counsel, Narine Mkrtchyan, has repeatedly chosen to ignore the forgoing principles. For example, when early deposition testimony unfolded in a manner not to her liking, Plaintiff's counsel repeatedly erupted – on the ***video*** record – in a manner which stretches the limits of the English language to adequately describe. After reviewing the video in question, Magistrate Judge Douglas F. McCormick was rightly moved to issue a remarkably restrained admonition to Plaintiff's counsel. (Order, Dkt. No. 73, p. 2)(the subject "deposition was, to put it mildly, a train wreck. And responsibility for that result lies predominantly with Plaintiff's counsel.") In support of his ruling, the Magistrate Judge noted Ms. Mkrtchyan's tone during the subject deposition was "increasingly bellicose" as the day went on. (Order, Dkt. No. 73, p. 3). Specifically, Ms. Mkrtchyan spoke in a "raised. . .voice several times", made personal attacks on others and erupted in profane outbursts when she was displeased with witness testimony. (Id.) As the Court rightly noted:

3

1       If anything, the video recording is worse than the cold transcript. For the most

2       part, Renegar and his counsel are largely subdued. Plaintiff's counsel is

3       anything but. Not only does she raise her voice, but it appears to me that she

4       slaps the conference room table at least twice. Her tone of voice ranges from

5       exasperated to indignant. She appears to lose her temper several times. I am

6       confident that none of these antics would have been permitted to persist in any

7       courtroom in the federal courthouse in Orange County.

8   (Id.)

9       The Court's findings and admonitions in this case came with good reason.

10  "Offensive and abusive language by attorneys in the guise of zealous advocacy is

11  plainly improper, unprofessional, and unacceptable. . .." Laddcap Value Partners, LP

12  v. Lowenstein Sandler P.C., 859 N.Y.S.2d 895 (2007); see, id.("An attorney who

13  demonstrates a lack of civility, good manners and common courtesy taint the image of

14  the legal profession and, consequently, the legal system, which was created and

15  designed to resolve differences and disputes in a civil manner."); People v. Fagan, 483

16  N.Y.S.2d 489 (1984)(noting that "while the correct resolution of civil disputes is

17  indeed an important goal of our legal system, it may fairly be said that society's

18  primary interest in the resolution of civil disputes is that they be settled in a peaceful,

19  orderly, and impartial manner.")

20      All courts agree with these common sense principles. See, e.g., Freeman v.

21  Schointuck, 192 F.R.D. 187, 189 (D. Md. 2000) ("No one expects the deposition of a

22  key witness in a hotly contested case to be a non-stop exchange of pleasantries.

23  However, it must not be allowed to become an excuse for counsel to engage in acts of

24  rhetorical road rage against a deponent and opposing counsel."); MAG Aerospace

25  Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at *1 (C.D. Cal. 2014) ("A

26  deposition is a judicial proceeding that should be conducted with the solemnity and

27  decorum befitting its importance. Lawyers participating in depositions should comport

28  themselves in a professional and dignified manner. When lawyers behave otherwise, it

4

---

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO<br>DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

1  reflects poorly on the entire judicial process.")

2      One would suppose that the Court's civility order would have led Ms.

3  Mkrtchyan to reflect on her past conduct in this case – and to move forward in a new

4  spirit of professionalism. The Court's order properly called on Ms. Mkrtchyan to do

5  just that. (Order, Dkt. No. 73, pp. 2 and 4)(going forward, "I expect, as I told counsel

6  during the July 9 telephone conference, that all counsel should comport themselves in

7  the deposition the same as if they were in the courtroom. . ..I trust that my remarks on

8  July 9 and this subsequent ruling will cause [future] depositions to be conducted

9  without the rancor that was exhibited on July 7 [at the subject deposition].")

10     But Ms. Mkrtchyan has plainly chosen another course of conduct. None of the

11  Court's warnings and admonitions have moved Mkrtchyan to alter her deposition

12  conduct. Instead, if anything, Ms. Mkrtchyan's conduct during Plaintiff's deposition

13  reached ***a startling series of new lows***.

14     Plaintiff's deposition transcript is peppered with cringeworthy verbal outbursts,

15  many of which featured personal attacks on defense counsel and their clients. It all

16  started with strange, antagonistic murmuring:

17  **Page 49**

18  4 Q BY MR. HARRELL: Are your parents still
   5 living?

19  6 A Yes.
   7 Q Both of them?

20  8 A Yes.
   9 Q What is your father's name?

21  10 MS. MKRTCHYAN: Objection. Relevance.
   11 THE WITNESS: Joseph Holloway.

22  12 MS. MKRTCHYAN: **It's pathetic. I can't believe**

23  13 **these people.**

24  (Transcript, 49:4-13)(emphasis added.) (Plaintiff's Deposition, attached to Declaration of Tamara M.
   Heathcote ("Heathcote Decl.") as Exhibit "A".)

25

26     Ms. Mkrtchyan eventually erupted at defense counsel when he legitimately
   attempted to follow up on the reasons, if any, for Plaintiff's "emotional distress"

27  claims arising out of the subject arrest incident:

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

**Page 140**
18 Q BY MR. HARRELL: You do understand that law
19 enforcement has a responsibility to respond to
20 complaints of criminal conduct. That's part of their
21 job.
22 You understand that; right?
23 A As much as I can, being a civilian.
24 Q And you understand, sir, that there was a
25 complaint of criminal conduct at the campground before

**Page 141**
1 law enforcement appeared at your tent; true?
2 MS. MKRTCHYAN: Vague and ambiguous.
3 THE WITNESS: I understand that now.
4 MS. MKRTCHYAN: Vague and ambiguous as to time.
5 Q BY MR. HARRELL: Do you hold it against law
6 enforcement for responding to the complaint of criminal
7 conduct at the campground, or do you think they just
8 should have ignored it?
9 MS. MKRTCHYAN: How do you object to this type of
10 **nonsense**?
11 THE WITNESS: This is --
12 MS. MKRTCHYAN: Argumentative. Objection. Vague
13 and ambiguous.
14 THE WITNESS: Yeah, I can't answer that question.
15 MS. MKRTCHYAN: Wait a minute. Let me finish my
16 objection.
17 Argumentative. Vague and ambiguous.
18 Irrelevant.
19 Q BY MR. HARRELL: We're going to read it back
20 for you, sir.
21 And, ma'am, you're free to have a running
22 objection if that's what you would like to have.
23 MS. MKRTCHYAN: No. I have an objection to your
24 line of questioning because you are asking the
25 argumentative questions. Badgering the witness. That

**Page 142**
1 is not likely to lead to admissible evidence. Okay?
2 And if you are going to interrupt this and I
3 am going to call the magistrate and find out why is
4 this question that right now you're posing three times
5 is important.
6 The law enforcement has a job to do. No. Law
7 enforcement has a job to do, but **your clients** did not
8 have a right to **beat the hell out of my client.**
9 MR. HARRELL: No. No.
10 MS. MKRTCHYAN: And if you, as an attorney, have no

**6**

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

11 sense of understanding and **common sense** as to what
12 happened, this is a victim of **police brutality**, and you
13 keep badgering him? You think that your clients have
14 not committed **a crime here**? So go after them, not my
15 client.
16 And he's not going to tolerate this type of
17 **nonsense** from a defense counsel who doesn't even bother
18 to wear his mask when we have a coronavirus. Okay?
19 Seriously.
20 MR. HARRELL: Ma'am, you're --
21 MS. MKRTCHYAN: It just bothers me that **you have no**
22 **sense of common sense and compassion.** Someone is
23 sitting in front of you who was beat up by your **moron**
24 clients. Okay? Your clients, **your criminal clients**
25 who are wearing a badge and are using that badge to

**Page 143**
1 **commit crimes, including falsifying reports.**
2 And you are going to sit here and tell this
3 guy, who was a victim of police brutality, that he does
4 not understand the job of the law enforcement? Yes, he
5 understands, but the job of law enforcement is not to
6 go and **beat the hell out of people**.
7 And you, as an attorney, your job is not just
8 to do your job, defend these kind of criminals, but to
9 do it with some **degree of compassion**. Okay? If you do
10 not have compassion, **maybe you should not be an**
11 **attorney at all.**
12 That's why this country is in **this deep shit**
13 that we are. Okay? **People like you and people like**
14 **your clients.** That's all I've got to say.[1]
15 The bottom line is that you know what? I'm
16 going to take as many breaks as I want, and I may stop
17 this deposition because you're continuing to badger
18 this guy, who is a victim. He's a victim that your
19 clients have ruined the life of, and you're telling him
20 what is the job of law enforcement?
21 MR. HARRELL: Where are you going, ma'am?
22 MS. MKRTCHYAN: I am taking a break because you
23 need to take five minutes to understand what it means
24 to be, you know -- to have **common sense and compassion**,
25 you know.

**Page 144**
1 MR. HARRELL: Okay. Well, you take your break.
2 Try to pull yourself together.

---

[1] If only it were so.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

3 MS. MKRTCHYAN: No, but because you do not have a
4 clear understanding of what is the United States
5 Constitution and what this country's flag is all about.
6 Someone is sitting in front of you who has served you,
7 your country, and you're badgering him with **nonsense,**
8 **stupid questions.**
9 MR. HARRELL: Okay. We're off the record while
10 plaintiff's counsel tries to pull herself together.
11 THE VIDEOGRAPHER: We're now going off the record.
12 The time is 1:10 p.m.
13 (Recess.)

(Transcript, 140:18 – 144:13)(emphasis added.) (Exhibit "A".)

Events at Plaintiff's deposition reached a crescendo of sorts when defense

counsel  attempted to focus on Plaintiff's "false arrest" claim. As Ms. Mkrtchyan is

are aware, the Defendant deputies contend that they had good cause to suspect

Plaintiff of physically abusing a female companion at the time they first confronted

him.

Indeed, eyewitness "911" reports by other campers advised officers that Mr.

Holloway had physically attacked a female in his campsite tent. For example,

Plaintiff's neighbor at the campground, one Brian Fuerbach, testified to his disturbing

observations of Mr. Holloway's misconduct as follows:

**Page 15**
23      Q.       Okay. So if we are going to establish for
24      purposes of this deposition, your[] [campsite number] was 63 and
25      **plaintiff's was 65. . ..**

**Page 16**
3       A.       Yes. . ..

(Transcript, 15:23 – 16:3)(emphasis added.)[2] (Deposition of Brian Fuerbach attached to the

_____

[2] Plaintiff's campsite number was "65":

17 Q You had a campsite number there; right?
18 A Yes.
19 Q What was your campsite number?
20 A 65.

**8**

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

Heathcote Decl. as Exhibit "B".)

**Page 87**
```
1        Q.      Okay. All right. So -- but even though
2        that mid-afternoon you arrived, you saw the two
3        tents, you did not see or have any contact with
4        the -- with the plaintiff Jeremy?
5        A.       No, because he wasn't -- wasn't there as
6        far --
7        Q.      He wasn't there. And you did not see any
8        female there either?
9        A.      No.
10       Q.      Okay. So the whole time you were there
11       this afternoon until 2:00 a.m., nothing, aside from
12       that dog barking inside of the tent, brought the
13       attention of that campsite to you until 2:00 a.m.
14       or 3:00 a.m. when you called 911?
15       A.       It was about around 2:00 a.m.
16       Q.      Right. So -- but what I'm saying is that
17       nothing else happened about this campsite until
18       you -- you heard this altercation?
19       A.       It appeared to be unoccupied as far as
20       anybody there.
21       Q.      Okay. And you obviously could not tell
22       when the occupant came back and the truck -- when
23       the truck came back and parked?
24       A.      2:00 a.m.
25       Q.      Oh, you saw the truck actually come in at
```

**Page 88**
```
1        2:00?
2        A.       We heard the door slam and the -- it woke
3        us up, and my wife thought something hit our
4        camper, so I looked out, and there was two door
5        slams, it was like boom, boom, and then we
6        realized, oh, it's the neighbor's back, and then we
7        heard talking, a woman talking.
```

(Transcript, 87:1 – 88:7)  (Exhibit "B".)

**Page 16**
```
21       Q.      Okay. So now when -- at night you know
22       that you called 911. I wanted to have you tell me
23       little bit in your own words what did you hear that
24       night, you know, that prompted you to call 911.
```

(Transcript, 160:17-20)  (Exhibit "B".)

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

25    A.      **I heard a bunch of expletives, yelling, and**

**Page 17**
1      **then I heard fist blows being landed on somebody,**
2      **which I believe was a woman because she said she**
3      **was. . ..**
20    Q.      Okay. Sure. So you were sleeping, but the
21    sounds of the noise and disturbance was loud enough
22    to awaken you, is that what you're telling me?
23    A.      Yes.
24    Q.      Okay. And then you're telling me
25    expletives, et cetera, but when you peaked out of

**Page 18**
1      the window, could you see the people who were
2      actually yelling and doing this, you know, involved
3      in the disturbance?
4      A.      **No. We could just see the tent moving, and**
5      **a woman saying, "No, no, no" --**
6      Q.      Uh-huh.
7      A.      **-- "Please stop. I'm just a girl."**
8      Q.      So you could -- okay.
9      A.      Yelled out, "Stop."
10    Q.      Okay. But you could -- you're telling me
11    you could hear and you could see --
12    A.      Oh, yeah.
13    Q.      -- from your [RV] window that this is the tent
14    where the disturbance was occurring?
15    A.      Yes.
16    Q.      Okay. So when you called 911, it was still
17    dark outside; right? How was the lighting at the
18    campground? Can you describe to me?
19    A.      It was dark.
20    Q.      This was around what time do you recall?
21    Was it 3:00 o'clock in the morning? 4:00 o'clock
22    in the morning?
23    A.      It was 3:00 o'clock approximately.

**Page 19**
1      Q.      But could you see actually the people
2      outside of the tent or were they inside of the
3      tent?
4      A.      They were inside.
5      Q.      Did you open your [RV] window to hear or, you
6      know, see better?
7      A.      Yes.
8      Q.      And so you peaked out, you peaked out of
9      the window. What could you tell me when you did
10    that? What else could you hear when you did that?

**10**

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

11    A.         The -- **the blows** that -- **the fist blows**
12    being landed on somebody you could clearly hear
13    that. . ..

**Page 23**
11    Q.       Okay. And when you were watching this,
12    obviously, since you called 911, you were hoping
13    that they would find the female victim; right?
14    A.        Yes.
15    Q.       Did you see [law enforcement] actually locate the female
16    victim from that campsite, of the plaintiff's
17    campsite, No. 65 next to yours?
18    A.        No.
19    Q.       Did you ever -- prior to sheriffs coming,
20    did you ever see a woman leave that campsite?
21    A.        No. We only heard, and then we heard the
22    tent unzip and somebody running away through the
23    gravel.

(Transcript, 16:21 – 23:23)(emphasis added.)[3]  (Exhibit "B".)

        For his part, Plaintiff disputes Mr. Fuerbach's incriminating testimony. He has not only denied any female companion was with him at the campsite, he has denied having a girlfriend of any type since 2007 (when his spouse evidently divorced him):

**Page 46**
10 Q Okay. When is the last time that you were in
11 a social relationship with someone who you considered
12 to be a partner?
13 MS. MKRTCHYAN: Objection. Relevance. Privacy.
14 THE WITNESS: That would have been when I divorced
15 my wife. That would have been 2007.
16 Q BY MR. HARRELL: Okay. Have you ever had a
17 girlfriend since 2007?
18 A I have not.

(Transcript, 46:10-18)  (Exhibit "A".)

        Accordingly, in order to test Plaintiff's assertions, the defense has served a <u>Fed. R. Civ. P.</u> 34 request for Mr. Holloway's social media posts, which might disclose his

---

[3] It is ironic, to say the least, that Plaintiff's counsel has evidently been too busy calling Plaintiff's counsel a "sexist" to develop any coherent response to Mr. Fuerbach's compelling testimony that Plaintiff brought the subject arrest incident on himself by beating a woman.

**11**

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

contacts with the woman Mr. Fuerbach observed Plaintiff abuse on the night of the incident.

***Following*** dispatch of Defendant's request, however, Plaintiff appears to have ***deleted*** his Facebook posts, as well as his entire Facebook account. The defense rightly seeks to question Plaintiff regarding his handling of his Facebook account ***following Defendant's request for access to it.*** The following transcript contains the relevant deposition inquiry:

**Page 258**
6 Q Okay. Now, sir, you are aware that we have
7 requested your social media postings, including from
8 Facebook; true?
9 A **Yes, I am aware.**
10 Q Are you prepared to turn those over to us?
11 MS. MKRTCHYAN: No. Objection. First of all,
12 attorney-client privilege. Attorney work product.
13 So he's instructed not to answer that question
14 because that's not his purview.
15 Q BY MR. HARRELL: Sir, do you have any problem,
16 you personally, turning over your Facebook postings to
17 us?
18 MS. MKRTCHYAN: Objection. You are instructed not
19 to answer. You're instructed not to answer.
20 Q BY MR. HARRELL: Sir, you have become aware
21 that we are asking for your Facebook postings; true?
22 MS. MKRTCHYAN: Asked and answered. Move on.
23 Instructing not to answer. This is attorney-client
24 privilege. He would not be able to answer that
25 question really without disclosing attorney-client

**Page 259**
1 privileged communications. Therefore, move on,
2 Counsel.
3 Q BY MR. HARRELL: Sir, you did take some action
4 after you learned that we were seeking your Facebook
5 postings; true?
6 MS. MKRTCHYAN: Instruct you not to answer any of
7 that.
8 That's, again, attorney-client privilege, and
9 he will not be able to answer that question without --
10 without discussing and -- without sharing attorney-
11 client privileged communications.
12 Therefore, you're instructed not to answer.

**12**

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

13 Q BY MR. HARRELL: Sir, after you learned that
14 we were seeking your Facebook postings, you switched
15 your account to private; right?
16 MS. MKRTCHYAN: Again, objection.
17 You're instructed not to answer.
18 And, Counsel, are you going to continue going
19 into attorney-client privileged communications?
20 Q BY MR. HARRELL: Sir, after you learned that
21 we were after -- are you instructing him not to answer?
22 MS. MKRTCHYAN: Yes. Yes. And I'm asking you to
23 move on with this line of questioning because it goes
24 into attorney-client privileged communications. What I
25 instructed my client, what he did or did not do, it's

**Page 260**
1 none of your business frankly, and that is
2 attorney-client privilege.
3 So if you continue with this line of
4 questioning, I'm going to stop this deposition.
5 Q BY MR. HARRELL: Sir, after you learned that
6 we wanted to see your Facebook postings, you did more
7 than switch it to private; you closed and deleted your
8 entire account; true?
9 MS. MKRTCHYAN: Objection. Objection. You know
10 what? We are going to stop this because you are going
11 into areas where it's attorney-client privilege. It's
12 none of your business what he did and did not do at
13 what instructions.
14 MR. HARRELL: It is. When he destroys evidence, it
15 is.
16 MS. MKRTCHYAN: Oh, really? Oh, really? What
17 evidence? You giving me some -- here, this is your
18 evidence.
19 Do you want me to show you what evidence
20 you've given me? I'm going to show it to you. Here.
21 Here. It's nonsense.

**[At this point, as depicted on video, Plaintiff's counsel continues shouting and throws voluminous papers across the deposition table in the direction of defense counsel and deposition staff ]**

(Transcript, 258:6 - 260:21)  (Exhibit "A".)

   As you stood and began menacingly throwing papers about, Ms. Mkrtchyan's *__own co-counsel__*, Mr. Beck, was also plainly alarmed by her enraged tirade. He attempted to stop Mkrtchyan's misconduct. But he too was unsuccessful:

**Page 260**
22 MR. BECK: **Hey, don't.**
23 MS. MKRTCHYAN: No. That's nonsense. I want them
24 to see that someone, a victim of police brutality, is
25 going to become part of your police reform. This is

**Page 261**
1  your evidence. Okay?
2 If you have any decent question for my client,
3 you can go ahead. But this is -- I'm doing this for
4 the record, and I will do this for you to satisfy your
5 nonsense questionnaire, you know.
6 Go ahead. That is your evidence, which is
7 junk. Okay? Junk.
8 And if you continue badgering my client,
9 again, as a victim of police brutality, this is
10 I will stop this deposition, and we'll go, and we will
11 not resume it without permission of a magistrate.
12 Okay?
13 **I have a right to tell my client what to do**
14 and what not to do. It's none of your business. Okay?
15 If you have a legitimate question about your junk
16 evidence, go ahead and ask it. That's the only
17 question, you know, you are permitted to ask.
18 MR. HARRELL: **Are you saying that you told your**
19 **client to destroy evidence that we were asking for?**
20 MS. MKRTCHYAN: **It's attorney-client privilege,**
21 Counsel. Okay? Attorney-client privilege.
22 When you come and disclose to me what you told
23 your clients in lying at their depositions to cover up
24 their criminal activities to avoid criminal prosecution
25 by U.S. Attorney's office, which I will ensure will

**Page 262**
1 happen at some point, then we'll disclose my
2 communications with my client.
3 But at this point your **Facebook nonsense**, this
4 stuff, this **Facebook nonsense** that you have been
5 showing me as your supplemental disclosure, this is all
6 you've got? For this case against my client? Then
7 you're really in good shape.
8 So -- but I'm instructing you not to answer
9 any questions that relates to attorney-client
10 privileged communications, and we will move on from the
11 subject. Otherwise, I'm going to stop this deposition.
12 MR. HARRELL: Let me just make my record, and if
13 you'd like to make an instruction not to answer, you're

**14**

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

14 free to do that. But let me just get my record out
15 there.
16 Q Sir --
17 MS. MKRTCHYAN: You're not going to ask him any
18 other questions about this.
19 MR. HARRELL: **Let me just make my record.**
20 MS. MKRTCHYAN: You're not. You make your record
21 without dealing with my client. Okay? I already told
22 you that's attorney-client communications.
23 MR. HARRELL: **If I may make my record and you make**
24 **your objections, and we'll see where we go.**
25 MS. MKRTCHYAN: I already made my objections.

**Page 263**
1 You're not allowed to ask another question of this to
2 my client.
3 Q BY MR. HARRELL: Sir, after you learned that
4 we were seeking --
5 MS. MKRTCHYAN: We're getting up. No. Let's get
6 up. Because you know what? You're continuing to ask
7 the same question going into attorney-client privileged
8 communications. Thank you.
9 So if you're not going to move onto another
10 topic that does not infringe upon my client's right to
11 privilege, I will stay here.
12 Do you have another question?
13 MR. HARRELL: **I was trying to get my question out,**
14 **and somebody interrupted.**
15 MS. MKRTCHYAN: Well, because you are asking the
16 same exact question. I already know what question
17 you're asking, because you are already assuming
18 something of my client. So I'm not going to let that
19 happen. Okay?
20 So we're going to take a break. Let's take a
21 break, and you think about what is attorney-client
22 privilege, and then we'll go forward.
23 THE VIDEOGRAPHER: We are now going off the record.
24 The time is 4:14 p.m.
25 (Recess.)

**Page 264**
1 THE VIDEOGRAPHER: We are now back on the record.
2 The time is 4:24 p.m.
3 Q BY MR. HARRELL: Sir, you have now deleted
4 your Facebook account; true?
5 MS. MKRTCHYAN: Objection. Vague and ambiguous.
6 Calls for speculation.
7 If you can answer that question -- do you feel

**15**

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO
DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

8 comfortable answering that question? Do you understand
9 that question?
10 THE WITNESS: Yes, I do.
11 MS. MKRTCHYAN: Okay.
12 THE WITNESS: Yes, I did recently delete my
13 Facebook account.
14 Q BY MR. HARRELL: And you did that for a
15 reason; true?
16 A It was making me upset.
17 Q Sir, you deleted your Facebook account because
18 you didn't want us to have access to it; true?
19 MS. MKRTCHYAN: Objection.
20 THE WITNESS: Nothing to hide on Facebook.
21 MS. MKRTCHYAN: It's argumentative. Wait a minute.
22 Objection. It's argumentative.
23 Q BY MR. HARRELL: Sir?
24 MS. MKRTCHYAN: **You are instructed not to answer to**
25 **a question like that.**

(Transcript, 260:22 – 264:25)  (Exhibit "A".)

  As the needed pre-cursor for a Motion to call Ms. Mkrtchyan to account for her violation of Magistrate Judge McCormick's civility order, the defense emailed meet and confer correspondence to Plaintiff's counsel on September 7, 2020. (Correspondence, Ex. "C"). It can hardly be a coincidence that Ms. Mkrtchyan filed the instant, supposed "emergency" <u>ex parte</u> application – seeking removal of the author of the civility order in issue – within hours of receipt of defense counsel's meet and confer correspondence.

## III. <u>PLAINTIFF'S EX PARTE SHOULD BE DENIED</u>

  At the outset, Plaintiff's ex parte demonstrates an unfortunate indifference to the disruption such filings create for the judicial system.  <u>See</u>, <u>Mission Power</u>, <u>supra</u>, 883 F. Supp. at 493 ("'Ex parte applications have reached epidemic proportions in the Central District.'  Judge Rymer warned us of this in 1989….  Since then the abusive use of ex parte motions has worsened.  This abuse is detrimental to the administration of justice and, unless moderated, will increasingly erode the quality of litigation and present ever-increasing problems for the parties, their lawyers, and for the court.").  Apart from being disruptive, Ms. Mkrtchyan's <u>ex parte</u> also fails to meet the

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

1  requirements for extraordinary relief.  As all litigants were instructed by the court in

2  Mission Power: "What showing is necessary to justify ex parte relief?  First, the

3  evidence must show that the moving party's cause will be irreparably prejudiced if the

4  underlying motion is heard according to regular noticed motion procedures."

5  Mission Power, 883 F.Supp. at 493.

6       Here, Plaintiff's moving papers fail to satisfy Mission Power.  As an initial

7  matter, Ms. Mkrtchyan does not set forth a single sentence identifying the "prejudice"

8  she will sustain if this application is not heard on an "emergency" basis. As stated by

9  the Court in Mission Power:

10          Safeguards that have evolved over many decades are built into the

11          Federal Rules of Civil Procedure and the Local Rules of this court.

12          The rules contemplate that regular noticed motions are most likely to

         produce a just result.  This is because they give the adversary an

13          opportunity to prepare a thorough opposition (and, if needed, an

         opportunity for oral argument) according to a predesigned,

14          consistent timetable.  As Judge Rymer noted: Timetables for the

15          submission of responding papers and for the setting of hearings are

         intended to provide a framework for the fair, orderly, and efficient

16          resolution of disputes.  Ex parte applications throw the system out of

17          whack.  They impose an unnecessary administrative burden on the

         court and an unnecessary adversarial burden on opposing counsel

18          who are required to make a hurried response under pressure, ***usually***

19          ***for no good reason***.  [Citation].

20  Mission Power, 883 F.Supp. at 491-492 (emphasis added).

21       The procedures for ex parte applications just discussed cannot be unknown to

22  Ms. Mkrtchyan who holds herself out to be an attorney with "over 14 years " of

23  experience who has "handled multiple . . . civil rights cases in the Central District."

24  (Declaration of Narine Mkrtchyan, Ex Parte Application, p. 12:17-20).  Even so,

25  Mkrtchyan makes no effort to detail the nature of her supposed "emergency" need to

26  remove a federal court bench officer from supervision over discovery in this case.

27  Thus, Ms. Mkrtchyan's ex parte fails for this threshold reason alone. See, Mission

28  Power, 883 F.Supp. at 492 ("It is rare that a lawyer's credibility is more on the line,

17

more vulnerable, than when he or she has created this kind of interruption.  Lawyers must understand that filing an ex parte motion, whether of the pure or hybrid type, is the forensic equivalent of standing in a crowded theater and shouting, 'Fire!' There had better be a fire.").

## IV. <u>TRANSCRIPTS FROM THE SEPTEMBER 2, 2020 COURT HEARING, THE DEPOSITION TRANSCRIPT OF CHAD RENEGAR AND PRIOR COURT RULINGS ARE NECESSARY TO DETERMINE THE TRUTH OF WHAT TRANSPIRED DURING HEARINGS ATTENDED BY PLAINTIFF'S COUNSEL</u>

Defendants vehemently disagree with Plaintiff's counsel's portrayal of the actions taking place during the prior hearings in this action, including the most recent hearing of September 2, 2020.  The only method to determine the truth of what actually transpired is for this Court to review the prior discovery orders in this matter and to listen to the tapes or read the transcripts of the various discovery hearings conducted in this matter.  (<u>See</u>, Dkt. Nos. 39, 67, and 73, and hearings conducted on or about January 7, 2020, March 9, 2020, July 9, 2020 and September 2, 2020.)  The transcript from the September 2, 2020 hearing has been ordered by counsel for defense and is expected to be completed by tomorrow at which time, this transcript can be provided to this Court for review.

For now, one needs look no further than the joint stipulation to continue the discovery cut-off date and trial date to see the disingenuous nature of Plaintiff's claims of "bias".  In this joint stipulation, which was drafted by counsel for Plaintiff, the reasons for the request were set forth as follows:

- The national emergency regarding the Coronavirus has significantly affected the parties' ability to finish fact discovery and prepare for trial (Dkt. No. 80, p. 2:6-7);

- In July-August Plaintiff conducted 11 depositions of Defendants and non-party witnesses that has uncovered new information that requires

18

1    additional discovery (Dkt. No. 80, p. 2:7-8); and

2    • The parties are unable to compel attendance of witnesses for presently set

3    trial due to the Coronavirus (Dkt. No. 80, p. 2:9-10).

4    Noticeably lacking from this joint stipulation is the current, dreamed-up reason

5    for seeking a continuance – i.e., Magistrate Judge McCormick claimed "incomplete

6    and biased discovery rulings thus far have put the Plaintiff in a position to seek and

7    receive an extension of the discovery deadlines," (Ex Parte, Declaration of Narine

8    Mkrtchyan, p. 16:21-22.)

9    **V.    PLAINTIFF FAILS TO SET FORTH COMPELLING EVIDENCE OF**

10    **ACTUAL BIAS OR PREJUDICE**

11    Plaintiff's own papers concede that " '[r]ecusal under §455(b)(1) is requested

12    only if actual bias or prejudice is proved by compelling evidence.' ". (Ex Parte, p.

13    5:18-20)(citing, Brokaw v. Mercer County, 235 F.3d 1000, 1025 (7th Cir. 2000) ).

14    And, "'judicial rulings alone almost never constitute a valid basis for a bias or

15    partiality motion.' " (Ex Parte, p. 5:20-22)(citing, Liteky v. United States, 510

16    U.S.540, 555, (1994) ). Inexplicably, Plaintiff's Ex Parte then discusses his vanilla

17    grievances with certain un-remarkable discovery rulings by the Magistrate Judge –

18    which, as Ms. Mkrtchyan candidly concedes, almost never constitute a valid basis for

19    partiality. (Id.)  Nothing in Plaintiff's Ex Parte shows any improper "bias" or

20    "partiality" by Magistrate Judge McCormick, and for good reason – there has been

21    none.

22    One must question why, after at least ten (10) months of hearings with

23    Magistrate Judge McCormick, Plaintiff's counsel has waited until now to bring this ex

24    parte application.  The reason is patently obvious.  Even the most naïve observer

25    would conclude that that Plaintiff's counsel is attempting to stall the ruling on

26    Defendants' planned "Motion to Dismiss Plaintiff's Case for Violation of the Court's

27    Civility Order" (see, Correspondence, Ex. "C"). Ms. Mkrtchyan plainly seeks removal

28    of the author of the civility order she violated in the misguided hope that some judge,

**19**

1  somewhere will permit her antics to continue.

2       If more were needed, Plaintiff's counsel also seeks to stall Defendants' planned

3  Motion to Compel production of documents (see, Correspondence, Ex. "D"), as well

4  as rulings two pending Motions to Compel Interrogatory Responses (see, Dkt. Nos. 75

5  and 76). Plainly, none of this misguided maneuvering should be rewarded by the

6  Court.

7  **VI.   CONCLUSION**

8       Based on the above, Defendants respectfully request that Plaintiff's improper

9  and altogether baseless ex parte application be denied.

10  DATED:  September 9, 2020                    Respectfully Submitted,
                                                **LYNBERG & WATKINS**
11                                               A Professional Corporation

12                                      By:  */s/ Tamara Heathcote*
                                             _____
13                                           **S. FRANK HARRELL**
                                             **TAMARA HEATHCOTE**
14                                           Attorneys for Defendants
                                             County of Orange, Deputy Chad Renegar,
15                                           Deputy Joel Gonzalez, Deputy Kevin
                                             Pahel, Deputy Brandon Billinger, Deputy
16                                           Mark Borba, Deputy Jameson Gotts and
                                             Deputy Justin Gunderson

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

## <u>DECLARATION OF TAMARA M. HEATHCOTE</u>

I, Tamara M. Heathcote do declare and state as follows:

1.     I am an attorney at law duly authorized to practice before this Court and I am a partner at Lynberg & Watkins, a Professional Corporation, attorneys of record for Defendant County of Orange ("County"). I have personal knowledge of the following facts and, if called as a witness, I could and would testify competently thereto.

2.     Attached hereto as Exhibit "A" is a true and correct copy of the pertinent portions of the deposition of Plaintiff, Jeremy Holloway.

3.     Attached hereto as Exhibit "B" is a true and correct copy of the pertinent deposition testimony of Brian Fuerbach.

4.     Attached hereto as Exhibit "C" is a true and correct copy of Defendant's meet and confer dated September 7, 2020 sent to Plaintiff's counsel, Narine Mkrtchyan.

5.     Attached hereto as Exhibit "D" is a true and correct copy of Defendant's meet and confer dated August 14, 2020 sent to Plaintiff's counsel, Narine Mkrtchyan.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed on September 9, 2020 at Orange, California.

_____/s/ Tamara Heathcote_____
Tamara M. Heathcote, Esq.

4852-4837-8058, v. 1

DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE

EXHIBIT A

# In The Matter Of:

*Jeremy Holloway vs*
*County of Orange*

---

*Jeremy Holloway*
*August 14, 2020*

---

*Carroll Sells Court Reporting Service*
*4132 Katella Avenue*
*Suite 101*
*Los Alamitos, CA  90720*
*562.799.9100*

Original File 081420JH.txt

**Min-U-Script® with Word Index**

**Jeremy Holloway - August 14, 2020**

1         When did your marriage to Karlie Holloway

2    start?  Your best estimate, please.

3         A    Best estimate, 2003.

4         Q    When did your marriage to Karlie Holloway end?

09:57  5    Your best estimate, please.

6         A    2007.

7         Q    Okay.  And do you have any children?

8         A    Yes, I do.

9         Q    How many children?

09:57  10   A    One.

11        Q    The name of your child is?

12        A    Kailin Holloway.

13        Q    Spelling?

14        A    K-A-I-L-I-N.

09:57  15   Q    And Kailin Holloway's date of birth is what?

16        A    12/13/06.

17        Q    And Kailin Holloway is a child that you had

18   with Karlie Holloway?

19        A    Yes, it is.

09:58  20   Q    Okay.  Kailin Holloway lives where now?

21        A    I do not know.

22        Q    Does she live in the state of California?

23        A    I do not know.

24        Q    When is the last time you had any contact with

09:58  25   Kailin Holloway?

**Jeremy Holloway - August 14, 2020**

1        MS. MKRTCHYAN:  Objection.  Relevance.  Privacy.

2            You're instructed not to answer.

3        MR. HARRELL:  Mark it.

4        Q    How about Karlie Holloway?  Where does she

09:58  5  live at the present time?

6        A    I do not know.

7        Q    Okay.  Do you have any type of partner at the

8   present time?

9        A    I do not.

09:58  10   Q    Okay.  When is the last time that you were in

11  a social relationship with someone who you considered

12  to be a partner?

13       MS. MKRTCHYAN:  Objection.  Relevance.  Privacy.

14       THE WITNESS:  That would have been when I divorced

09:59  15  my wife.  That would have been 2007.

16       Q    BY MR. HARRELL:  Okay.  Have you ever had a

17  girlfriend since 2007?

18       A    I have not.

19       Q    Okay.  Let me ask you this:  Did -- where were

09:59  20  you born?

21       A    Nashville, Tennessee.

22       Q    Okay.  Did you complete high school?

23       A    Yes, I did.

24       Q    Where?

09:59  25   A    I went to five different high schools.

Jeremy Holloway - August 14, 2020

1      Q      Where is the high school that you graduated

2  from?

3      A      Orange.

4      Q      Orange, what?

09:59  5      A      California.

6      Q      Which high school in the city of Orange?

7      A      Richland.

8      Q      Is that a public school or a private school?

9      A      That is a public school.

09:59  10      Q      Richland High School in Orange, California?

11      A      Yes.

12      Q      And when did you complete high school?

13      A      '94.  1994.

14      Q      Do you have any education after high school?

10:00  15      A      Yes, I do.

16      Q      Where?

17      A      I went to the Art Institute after I completed

18  my military service.

19      Q      The Art Institute?

10:00  20      A      Of California.

21      Q      Did you obtain any type of certificate or

22  degree from the Art Institute of California?

23      A      No, I did not finish.

24      Q      When was your course of study at the Art

10:00  25  Institute of California?

**Jeremy Holloway - August 14, 2020**

1     A     Approximately 2002.

2     Q     Now, are they online?  Do they have a campus?

3     A     That is a campus on the border of Costa Mesa

4 and Santa Ana on Flower Avenue.

10:00 5     Q     When did you move to Orange County?

6     A     I've lived in Orange County since

7 approximately 1980.

8     Q     Okay.  So you moved here when you were about

9 how old?

10:01 10     A     About four or five.  Don't remember.

11     Q     Okay.  What were the names of the four or five

12 high schools that you attended?

13     A     I went to Saddleback High School, Santa Ana;

14 Alisal High School, A-L-I-S-A-L; North High School;

10:01 15 Orange High School; Richland High School.

16     Q     Okay.  Why, in your mind, did you attend four

17 or five high schools?

18     MS. MKRTCHYAN:  Objection.  Relevance.

19        Do you feel comfortable discussing that?

10:02 20     THE WITNESS:  Yes.  It's just moving.

21     MS. MKRTCHYAN:  Okay.

22     THE WITNESS:  I had moved to Salinas to live with

23 my father for two years.  I didn't feel comfortable at

24 Alisal.  I went to North High.  Didn't work out living

10:02 25 with my father.  Moved back with my mom to Orange, and

**Jeremy Holloway - August 14, 2020**

1   there I ended up at Richland due to just I started the

2   school late at Orange and ended up doing the

3   independent studies.

4       Q    BY MR. HARRELL:  Are your parents still

10:02  5   living?

6       A    Yes.

7       Q    Both of them?

8       A    Yes.

9       Q    What is your father's name?

10:02  10      MS. MKRTCHYAN:  Objection.  Relevance.

11      THE WITNESS:  Joseph Holloway.

12      MS. MKRTCHYAN:  It's pathetic.  I can't believe

13  these people.

14      Q    BY MR. HARRELL:  Where does he live at the

10:03  15  present time?

16      A    I do not know.

17      Q    What is your mother's name?

18      A    Loretta Tafoya.

19      Q    How do you spell the last name?

10:03  20      A    T-A-F-O-Y-A.

21      Q    Where does your mother live at the present

22  time?

23      A    Corona, California.

24      Q    Are you in contact with your mother at the

10:03  25  present time?

**Jeremy Holloway - August 14, 2020**

```
 1        A     Yes.
 2        Q     Are you in contact with your father at the
 3   present time?
 4        A     No, I am not.
10:03  5   Q     Is there a reason why?
 6        MS. MKRTCHYAN:  Objection.  Relevance.  Privacy.
 7             You are instructed not to answer questions
 8   that are private and nobody should have a right to
 9   learn.  Thank you.
10:03  10   MR. HARRELL:  Mark it.
11        Q     Do you have any brothers or sisters?
12        A     Yes, I do.
13        Q     How many?
14        A     One brother, one sister.
10:04  15   Q     What's your brother's name?
16        A     Joseph Holloway.
17        Q     How about your sister?  What's her name?
18        A     Misty Henderson.
19        Q     Are you in contact with your brother, Joseph
10:04  20   Holloway?
21        MS. MKRTCHYAN:  Objection.  Relevance.  Privacy.
22             You're instructed not to answer.
23        MR. HARRELL:  Mark it.
24        Q     Are you in contact with your sister, Misty
10:04  25   Henderson?
```

**Jeremy Holloway - August 14, 2020**

1    Q    Well, sir, you've already told us that you do

2  sometimes experience anger and upset when you think

3  about the incident; true?

4    MS. MKRTCHYAN:  Misstates the testimony.  Misstates

01:05  5  the testimony.

6    THE WITNESS:  Yes, I did say -- I did say that.

7    (Ms. Heathcote entered the deposition

8    proceedings.)

9    Q    BY MR. HARRELL:  Right.  So now we move on.

01:05  10  We try.  I'm trying to figure out why you're angry and

11  upset when you think about the incident from time to

12  time.

13    Do you understand?

14    A    Is that the question?  Why I'm upset?

01:05  15    Q    Sir, please respond to the question that I

16  just asked you.

17    A    Why am I upset?

18    Q    No.  That's not what I asked you, sir.

19    MS. MKRTCHYAN:  Badgering the witness.

01:05  20    Q    BY MR. HARRELL:  Please listen.  I know you're

21  trying.  I know you're new to the process.  I'll guide

22  you through it.  I'll try.  Just step by step by step.

23    MS. MKRTCHYAN:  You're badgering the witness.

24    Q    BY MR. HARRELL:  Do you understand that now

01:06  25  I'm trying to find out why you say that you're angry

**Jeremy Holloway - August 14, 2020**

```
 1    and upset from time to time when you think about the
 2    incident?  Do you understand?
 3         MS. MKRTCHYAN:  Objection.  Asked and answered.
 4    Badgering the witness.  Argumentative.
 5         Q    BY MR. HARRELL:  Sir?
 6         MS. MKRTCHYAN:  Do you understand his question?
 7         THE WITNESS:  I believe he's asking me why I'm
 8    angry about the incident.
 9         MS. MKRTCHYAN:  Right.
10         Q    BY MR. HARRELL:  No, sir.  That's a question
11    that I haven't asked you.
12         MS. MKRTCHYAN:  Well, then, make more clear
13    questions rather than argue with the deponent, you
14    know.
15         Q    BY MR. HARRELL:  Sir --
16         MS. MKRTCHYAN:  Nonsense of all type of
17    proportions.
18         Q    BY MR. HARRELL:  You do understand that law
19    enforcement has a responsibility to respond to
20    complaints of criminal conduct.  That's part of their
21    job.
22              You understand that; right?
23         A    As much as I can, being a civilian.
24         Q    And you understand, sir, that there was a
25    complaint of criminal conduct at the campground before
```

**Jeremy Holloway - August 14, 2020**

1    law enforcement appeared at your tent; true?

2         MS. MKRTCHYAN:  Vague and ambiguous.

3         THE WITNESS:  I understand that now.

4         MS. MKRTCHYAN:  Vague and ambiguous as to time.

01:07 5        Q    BY MR. HARRELL:  Do you hold it against law

6    enforcement for responding to the complaint of criminal

7    conduct at the campground, or do you think they just

8    should have ignored it?

9         MS. MKRTCHYAN:  How do you object to this type of

01:07 10   nonsense?

11        THE WITNESS:  This is --

12        MS. MKRTCHYAN:  Argumentative.  Objection.  Vague

13   and ambiguous.

14        THE WITNESS:  Yeah, I can't answer that question.

01:07 15        MS. MKRTCHYAN:  Wait a minute.  Let me finish my

16   objection.

17             Argumentative.  Vague and ambiguous.

18   Irrelevant.

19        Q    BY MR. HARRELL:  We're going to read it back

01:07 20   for you, sir.

21             And, ma'am, you're free to have a running

22   objection if that's what you would like to have.

23        MS. MKRTCHYAN:  No.  I have an objection to your

24   line of questioning because you are asking the

01:07 25   argumentative questions.  Badgering the witness.  That

**Jeremy Holloway - August 14, 2020**

 1   is not likely to lead to admissible evidence.  Okay?

 2          And if you are going to interrupt this and I

 3   am going to call the magistrate and find out why is

 4   this question that right now you're posing three times

01:08  5   is important.

 6          The law enforcement has a job to do.  No.  Law

 7   enforcement has a job to do, but your clients did not

 8   have a right to beat the hell out of my client.

 9      MR. HARRELL:  No.  No.

01:08 10      MS. MKRTCHYAN:  And if you, as an attorney, have no

11   sense of understanding and common sense as to what

12   happened, this is a victim of police brutality, and you

13   keep badgering him?  You think that your clients have

14   not committed a crime here?  So go after them, not my

01:08 15   client.

16          And he's not going to tolerate this type of

17   nonsense from a defense counsel who doesn't even bother

18   to wear his mask when we have a coronavirus.  Okay?

19   Seriously.

20      MR. HARRELL:  Ma'am, you're --

21      MS. MKRTCHYAN:  It just bothers me that you have no

22   sense of common sense and compassion.  Someone is

23   sitting in front of you who was beat up by your moron

24   clients.  Okay?  Your clients, your criminal clients

01:08 25   who are wearing a badge and are using that badge to

**Jeremy Holloway - August 14, 2020**

```
 1    commit crimes, including falsifying reports.
 2          And you are going to sit here and tell this
 3    guy, who was a victim of police brutality, that he does
 4    not understand the job of the law enforcement?  Yes, he
 5    understands, but the job of law enforcement is not to
 6    go and beat the hell out of people.
 7          And you, as an attorney, your job is not just
 8    to do your job, defend these kind of criminals, but to
 9    do it with some degree of compassion.  Okay?  If you do
10    not have compassion, maybe you should not be an
11    attorney at all.
12          That's why this country is in this deep shit
13    that we are.  Okay?  People like you and people like
14    your clients.  That's all I've got to say.
15          The bottom line is that you know what?  I'm
16    going to take as many breaks as I want, and I may stop
17    this deposition because you're continuing to badger
18    this guy, who is a victim.  He's a victim that your
19    clients have ruined the life of, and you're telling him
20    what is the job of law enforcement?
21       MR. HARRELL:  Where are you going, ma'am?
22       MS. MKRTCHYAN:  I am taking a break because you
23    need to take five minutes to understand what it means
24    to be, you know -- to have common sense and compassion,
25    you know.
```

**Jeremy Holloway - August 14, 2020**

1      MR. HARRELL:  Okay.  Well, you take your break.

2  Try to pull yourself together.

3      MS. MKRTCHYAN:  No, but because you do not have a

4  clear understanding of what is the United States

01:10   5  Constitution and what this country's flag is all about.

6  Someone is sitting in front of you who has served you,

7  your country, and you're badgering him with nonsense,

8  stupid questions.

9      MR. HARRELL:  Okay.  We're off the record while

01:10  10  plaintiff's counsel tries to pull herself together.

11      THE VIDEOGRAPHER:  We're now going off the record.

12  The time is 1:10 p.m.

13          (Recess.)

14      THE VIDEOGRAPHER:  We are now back on the record.

01:23  15  The time is 1:23 p.m.

16      Q    BY MR. HARRELL:  Sir, do you hold it against

17  law enforcement that they responded to the complaint of

18  criminal conduct at the campground, or do you think

19  they should have just ignored that?

01:23  20      MS. MKRTCHYAN:  Objection.  Vague and ambiguous.

21  Argumentative.

22      THE WITNESS:  I don't hold any kind of grudge on

23  any kind of cop completing any kind of call that

24  dispatch gives to them.

01:24  25      Q    BY MR. HARRELL:  Okay.  So as you sit here

**Jeremy Holloway - August 14, 2020**

1  now, you understand why law enforcement was at the

2  campground; true?

3      A    At my campsite or the campground?

4      MS. MKRTCHYAN:  Vague and ambiguous.

01:24  5      Q    BY MR. HARRELL:  The campground.

6      A    I understand why they were at the campground.

7      Q    Okay.  You do believe that law enforcement had

8  no reason to focus on you the first time they went to

9  the campground on the date of the incident; true?

01:24 10      MS. MKRTCHYAN:  Vague and ambiguous.  Vague and

11  ambiguous.  Argumentative.

12      Q    BY MR. HARRELL:  True?

13      MS. MKRTCHYAN:  Do you understand the question?

14      THE WITNESS:  Yes, there's no evidence for them to

01:24 15  have any interactions with me.

16      Q    BY MR. HARRELL:  Okay.  Now, you are also

17  angry and upset about a search that was done of your

18  property?

19      A    Yes.  They searched my property without

01:24 20  consent, and they did it in a manner that was just

21  rude.  They just dumped my stuff, moved stuff around,

22  never asked any kind of permission.  At this point they

23  don't even know my name.

24      Q    So, sir, at the time of the incident, and

01:25 25  focusing on the first time law enforcement responded to

Jeremy Holloway - August 14, 2020

1    first appearance at your campsite, the conclusion that

2    you drew was everybody in the adjacent campsites was

3    now awake because of that noise; true?

4        A    Correct.

01:41  5    Q    Okay.  And you made that assumption about your

6    neighbors who you believe to have been involved in the

7    fight?

8        A    Yes.

9        Q    And so you went -- appeared outside of their

01:41 10    tent, and you say what?

11        A    No.  I was in my own -- in front of my own

12    tent.  I didn't go anywhere near their campsite.  I

13    didn't go to no one's campsite, ever.

14        Q    All right.  So you wanted to confront the

01:41 15    neighbors that had been involved in the fight that you

16    were being blamed for; right?

17        A    Confront?  No.  Just saying, "Hey, why didn't

18    you guys go out?"  I was letting them know, "Hey, why

19    wouldn't you guys do anything?  Nobody said nothing and

01:41 20    I was" --

21        Q    That's what I was going to ask you.

22            So you're at your tent.

23            The neighbors that were involved in the fight

24    are how far away from you?

01:42 25        A    A good 20 feet, 30 feet.

**Jeremy Holloway - August 14, 2020**

1       Q     Okay.  And they're inside of their tent;
2   right?
3       A     I believe so.
4       Q     And you believed that they were awake; right?
01:42  5       A     I'm guessing they were awake based on, like I
6   said, my dog is barking.  You had five people rummaging
7   through, you know, being loud.
8       Q     All right.  And so based on that assumption,
9   you decided to speak to them?
01:42  10      A     Yes.
11      Q     And you say what?
12      A     And I ask why didn't they come out.  They
13  heard everything going on.  Why didn't they come out
14  and stop?
01:42  15      Q     Okay.
16      A     Instead, they let me take the blame.
17      Q     You had a campsite number there; right?
18      A     Yes.
19      Q     What was your campsite number?
01:43  20      A     65.
21      Q     And so these neighbor campers that were
22  involved in the fight, what campsite number are they?
23      A     66.
24      MS. MKRTCHYAN:  Did you know these numbers at the
01:43  25  time or you learned it after?

**Jeremy Holloway - August 14, 2020**

```
 1          THE WITNESS:  Learned it after.
 2          Q    BY MR. HARRELL:  All right.  Well, whenever
 3    you learned it, we want to --
 4          A    As of now, I know this.  That night, no, I did
 5    not.
 6          Q    All right.  Well, that's fine, you know.  I
 7    want the best of your knowledge now to see if we can
 8    find them, see what the situation is.
 9               So when you address your neighbors from the
10    vantage point of you standing at your tent, you make a
11    statement to the effect of "Why didn't you come out and
12    stop this?  Instead, you let me take the blame"; right?
13          A    Uh-huh.
14          Q    Yes?
15          A    That's what I said.  Yes.
16          Q    Okay.  I can see you.
17          A    I got it.  I got it.  Nobody saw.  Got it.
18          Q    You have to have actual words.
19          A    I didn't know what this was.  I didn't know
20    what you were doing.
21          Q    It's, like, I need some words.
22          A    I got you.
23          Q    And what tone of voice were you speaking in?
24          A    Probably a little bit rattled.  I mean, it's
25    scary to get stopped by cops like that.  Especially
```

EXHIBIT B

1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4    JEREMY HOLLOWAY,                    )
                                         )
5                    Plaintiff,          )
                                         )
6        vs.                             )  Case No. 8:19-
                                         )  cv-01514-DOC-DFM
7    COUNTY OF ORANGE, DEPUTY CHAD )
     RENEGAR, individually and as   )
8    a peace officer, DEPUTY JOEL   )
     GONZALEZ, individually and as  )
9    a peace officer, DEPUTY KEVIN  )
     PAHEL, individually and as a   )
10   peace officer, DEPUTY BRANDON  )
     BILLINGER, individually and    )
11   as a peace officer, DEPUTY     )
     MARK BORBA, individually and   )
12   as a peace officer, DEPUTY     )
     JAMESON GOTTS, individually    )
13   and as a peace officer,        )
     DEPUTY JUSTIN GUNDERSON,       )
14   individually and as a peace    )
     officer, and DOES 7-10,        )
15                                  )
                     Defendants.    )
16   _____)

17

18            VIDEOTAPED ZOOM DEPOSITION OF

19                   BRIAN FUERBACH

20                 Orange, California

21              Friday, July 10, 2020

22

23

24   Reported by:  Marie Wilson
                   CSR No. 13480
25   LitiCourt Job No.:  202889

```
 1    north side of the -- the north side of your RV or

 2    west side --

 3         A.   Correct.

 4         Q.   -- east side?

 5         A.   Yes.                                        10:09:38

 6         Q.   Okay.

 7         A.   The passenger side of my RV.

 8         Q.   Right.  So the opposite side of this blue

 9    tent?

10         A.   Precisely.                                  10:09:45

11         Q.   Okay.  So did you have any contact with the

12    person in this blue tent?

13         A.   No.  There was nobody there.

14         Q.   Okay.  And for the record, I'll represent

15    to you that this blue tent is the tent where Jeremy  10:09:55

16    Holloway was staying that night, the plaintiff, and

17    it was, you know, campsite 65, okay?  So for our

18    purposes, for the purposes of this deposition, I'm

19    going to reference this blue tent where the

20    plaintiff was, okay?                                 10:10:14

21         A.   Yes.

22         Q.   Okay.  So -- but you did not have any

23    interaction with the person in this blue tent when

24    you arrived on that day?

25         A.   No.                                         10:10:23
```

```
 1        Q.   Okay.  And the people there, the others on

 2    the other side of your RV, who were they?  Were

 3    they female?  Male?  Do you remember who they were,

 4    description of those people?

 5        A.   There were females and males.            10:10:36

 6        Q.   How many do you remember?

 7        A.   I don't recall.

 8        Q.   Were they also in a tent or was it -- or

 9    were they in a truck?  How were they --

10        A.   They were in a tent.                      10:10:53

11        Q.   Okay.  All right.  So let me show you

12    another thing, a map of the -- aerial map of the --

13    yeah, I'm trying to share screen and it takes time

14    to actually open up stuff, but here is -- I'm going

15    to show you the aerial view of the campground just   10:11:24

16    to, kind of -- okay.

17             Do you see what is on my screen?

18        A.   Yes.

19        Q.   Okay.  So we have here, you know, Trabuco

20    Canyon, et cetera, so we can see 65, 63, 61 right    10:11:44

21    next to each other.  Do you see that?

22        A.   Yes.

23        Q.   Okay.  So if we are going to establish for

24    purposes of this deposition, yours was 63 and

25    plaintiff's was 65, 61 would have been to your       10:11:57
```

```
 1    other right -- or left, to your other side of the

 2    campsite; correct?

 3        A.   Yes.

 4        Q.   Okay.  And, presumably, from the video, the

 5    other side would have been 61, the campground --     10:12:11

 6    campsite 65; right?  I guess my question was not

 7    clear.

 8             What I meant when we talked about you had

 9    an interaction with people on the other side of

10    your RV, that would have been 61; right?            10:12:28

11        A.   But you said I was in 65?

12        Q.   You were 63.

13        A.   63.  Then yes, that would be correct.

14        Q.   Okay.

15        A.   As far as interaction, I think -- it wasn't 10:12:44

16    an interaction other than waving hello.

17        Q.   Got it.  Got it.  So you didn't really have

18    any communication really, just -- just, like,

19    waving and --

20        A.   Yeah, yeah.                                 10:12:55

21        Q.   Okay.  So now when -- at night you know

22    that you called 911.  I wanted to have you tell me

23    little bit in your own words what did you hear that

24    night, you know, that prompted you to call 911.

25        A.   I heard a bunch of expletives, yelling, and 10:13:15
```

1    then I heard fist blows being landed on somebody,

2    which I believe was a woman because she said she

3    was.

4        Q.  Okay.  Where were you -- where were you

5    located when you heard that?                        10:13:42

6        A.  Well, there is that -- there is a window

7    that is on the side of the RV which is

8    approximately two-by-five feet, and you can see it

9    in the picture that you showed.

10       Q.  Uh-huh.                                      10:13:58

11       A.  That is -- that is a dinette/bed, and that

12   is where I was sitting, looking out the window with

13   it opened right there, both my wife and I.

14       Q.  So you're talking about this window?

15       A.  Yes.                                         10:14:15

16       Q.  Okay.  So this is a window.  You were --

17   you were -- but you were sleeping, right, at the

18   time?

19       A.  We were awoken by --

20       Q.  Okay.  Sure.  So you were sleeping, but the  10:14:29

21   sounds of the noise and disturbance was loud enough

22   to awaken you, is that what you're telling me?

23       A.  Yes.

24       Q.  Okay.  And then you're telling me

25   expletives, et cetera, but when you peaked out of   10:14:39

Brian Fuerbach                                                    7/10/2020

1   the window, could you see the people who were

2   actually yelling and doing this, you know, involved

3    in the disturbance?

4        A.   No.   We could just see the tent moving, and

5   a woman saying, "No, no, no" --                         10:14:57

6        Q.   Uh-huh.

7        A.   -- "Please stop.  I'm just a girl."

8        Q.   So you could -- okay.

9        A.   Yelled out, "Stop."

10       Q.   Okay.  But you could -- you're telling me    10:15:09

11   you could hear and you could see --

12       A.   Oh, yeah.

13       Q.   -- from your window that this is the tent

14   where the disturbance was occurring?

15       A.   Yes.                                          10:15:19

16       Q.   Okay.  So when you called 911, it was still

17   dark outside; right?  How was the lighting at the

18   campground?  Can you describe to me?

19       A.   It was dark.

20       Q.   This was around what time do you recall?     10:15:32

21   Was it 3:00 o'clock in the morning?  4:00 o'clock

22   in the morning?

23       A.   It was 3:00 o'clock approximately.

24       Q.   Okay.

25       A.   I'm not actually sure.                        10:15:42

1      Q.  But could you see actually the people

2   outside of the tent or were they inside of the

3   tent?

4      A.  They were inside.

5      Q.  Did you open your window to hear or, you      10:15:50

6   know, see better?

7      A.  Yes.

8      Q.  And so you peaked out, you peaked out of

9   the window.  What could you tell me when you did

10   that?  What else could you hear when you did that?   10:16:05

11      A.  The -- the blows that -- the fist blows

12   being landed on somebody you could clearly hear

13   that.

14      Q.  Okay.  So you could -- you could clearly

15   hear that.  So -- all right.  When you called the    10:16:21

16   dispatch, did you tell them where the disturbance

17   was coming from?

18      A.  I think we were unclear on which campsite

19   number it was, but we knew which number we were and

20   so we provided that information.                     10:16:40

21      Q.  Okay.

22      A.  And I believe when they first came, they

23   went to our opposite side, the neighbors --

24      Q.  Okay.  All right.

25      A.  -- that sits --                               10:16:53

1      Q.   All right.  So -- but when you called them,

2   you couldn't give them, you know, where -- what

3   number, what place was it.  Did you tell them the

4   general location of the campsite where you believe

5   the noise was coming from?                          10:17:06

6      A.   Yes.

7      Q.   Okay.  Did you come out of your tent

8   ever -- I mean your RV, your RV to verify what you

9   heard -- what you heard and what you saw?

10     A.   No.                                          10:17:18

11     Q.   Okay.  Then how many minutes it took from

12  your call until the police arrived, the sheriffs

13  arrived?

14     A.   You know, I don't recall.

15     Q.   Do you remember the dispatch calling you    10:17:36

16  back again within seconds asking for more

17  information about the location of the campsite?

18     A.   Yes.

19     Q.   Do you remember your wife talking to them?

20     A.   Yes.                                         10:17:50

21     Q.   And she was telling them, you know, that it

22  was to the right of your RV but she was looking --

23  trying to look at the map and she was speculating

24  about -- did you have a map there with you when you

25  were camping?  Sorry, strike that.  Did you have a   10:18:06

```
 1   map with you at the location?

 2       A.  I don't recall.

 3       Q.  Okay.  So -- but you do remember generally

 4   the dispatch calling and trying to get a more clear

 5   picture of the location of the campsite?          10:18:20

 6       A.  Yes.  I recall they had problems finding

 7   the site.

 8       Q.  Okay.  And then when they arrived, the

 9   sheriffs arrived, they spoke to you; right?

10       A.  No.                                        10:18:32

11       Q.  They did not?  You don't remember?

12       A.  When they first -- the first time they

13   came, no, they didn't speak with us.

14       Q.  No?  Okay.

15            So they never came to you and tried to find  10:18:43

16   out where you heard or saw the situation, the

17   disturbance?

18       A.  Not that I recall.

19       Q.  Okay.  So what happened next?  So they --

20   you know, did you hear them actually come then, the  10:18:57

21   sheriffs coming?

22       A.  Yes.

23       Q.  And you said that they went to the other

24   side of your RV, you know, thinking that that was

25   where the disturbance was occurring; right?         10:19:09
```

1      A.   Yes.

2      Q.   So what happened then?  What did you hear

3  happen next and what could you hear from your RV?

4      A.   We actually didn't hear much when they went

5  over to the next-door neighbor.  I don't recall       10:19:25

6  that encounter.  It wasn't until they came into our

7  view, which was out of that window on the

8  dinette/bed.

9      Q.   Okay.  So you could not see actually when

10 the sheriffs contacted the plaintiff next to your     10:19:44

11 campsite?

12     A.   Oh, no, we could see that.

13     Q.   You could see that?  Okay.

14          So tell me what you could see when the

15 sheriffs came and contacted the person next to your   10:19:55

16 campsite, which we've established is 65 and where

17 the plaintiff was, what could you see and hear?

18     A.   They asked him to step out of the tent and

19 he was combative and didn't want to, but he

20 eventually did and they questioned him and they       10:20:17

21 left.

22     Q.   And when you said -- could you see them

23 from your window?

24     A.   Yes.

25     Q.   Yes.  Okay.                                  10:20:31

```
 1          So combative in what way?  Was he verbally
 2   abusive or was he saying words that you can
 3   remember?
 4      A.  Just why you -- why do you -- why are you
 5   guys hassling me type of -- and I'm paraphrasing.   10:20:47
 6      Q.  Okay.  Very good.
 7          And then how long do you -- can you give an
 8   estimate they were there?
 9      A.  Probably about -- an estimate would be
10   about five to 10 minutes.                           10:21:03
11      Q.  Okay.  And when you were watching this,
12   obviously, since you called 911, you were hoping
13   that they would find the female victim; right?
14      A.  Yes.
15      Q.  Did you see them actually locate the female  10:21:18
16   victim from that campsite, of the plaintiff's
17   campsite, No. 65 next to yours?
18      A.  No.
19      Q.  Did you ever -- prior to sheriffs coming,
20   did you ever see a woman leave that campsite?        10:21:34
21      A.  No.  We only heard, and then we heard the
22   tent unzip and somebody running away through the
23   gravel.
24      Q.  Okay.  But you could not see that?
25      A.  No.                                           10:21:51
```

Brian Fuerbach                                                                          7/10/2020

1       Q.   You did not see that?

2       A.   No.

3       Q.   So you cannot tell me under oath that you

4    actually saw with your eyes that a female came out

5    of this blue tent next to your site?              10:22:00

6       A.   No.

7       Q.   Okay.  So -- all right.  So the sheriffs

8    searched him -- I mean, obviously, they were there,

9    you didn't see them locate a female and they left;

10   right?                                             10:22:16

11      A.   They did.

12      Q.   So -- but you don't remember them trying to

13   talk to you prior to them leaving?

14      A.   No.

15      Q.   Okay.  So did you see them go to other      10:22:25

16   campsites after that?

17      A.   No, I did not.

18      Q.   And when they came, did they park their

19   cars right across on this roadway here?

20      A.   Yes.                                        10:22:41

21      Q.   How many cars would you remember parked

22   there when they came first?

23      A.   Just one, I believe.

24      Q.   Okay.  All right.  So they left and

25   plaintiff -- what happened to plaintiff if you can   10:22:52

```
 1    I don't know what time he arrived.  Why?  Why would

 2    you like to know that?

 3        A.  Because we were concerned about his dog,

 4    which was locked in a tent, and no vehicle there

 5    and so we kept looking out, that's how I know that    11:37:15

 6    there was nobody at that site, and then at about

 7    2:00 a.m. in the morning we were awoken by door

 8    slams.

 9        Q.  Okay.  So you're saying that the truck and

10    the camp -- I mean, the tents were there earlier in    11:37:28

11    the mid-afternoon when you arrived?

12        A.  I never saw the truck until -- until about

13    2:00 a.m.

14        Q.  Okay.  I see.  But the tents were there

15    when you arrived?                                       11:37:41

16        A.  Yes.  The camp was established.

17        Q.  And there was a dog locked in the -- in one

18    of the tents?

19        A.  Yeah.

20        Q.  And she was barking?                           11:37:49

21        A.  Yeah.

22        Q.  Okay.  Did you see that dog after when the

23    sheriffs arrived and arrested Mr. Holloway, the

24    plaintiff?

25        A.  Yes.                                            11:38:00
```

1     Q.  Okay.  All right.  So -- but even though

2   that mid-afternoon you arrived, you saw the two

3   tents, you did not see or have any contact with

4   the -- with the plaintiff Jeremy?

5     A.  No, because he wasn't -- wasn't there as       11:38:15

6   far --

7     Q.  He wasn't there.  And you did not see any

8   female there either?

9     A.  No.

10     Q.  Okay.  So the whole time you were there       11:38:21

11   this afternoon until 2:00 a.m., nothing, aside from

12   that dog barking inside of the tent, brought the

13   attention of that campsite to you until 2:00 a.m.

14   or 3:00 a.m. when you called 911?

15     A.  It was about around 2:00 a.m.                  11:38:37

16     Q.  Right.  So -- but what I'm saying is that

17   nothing else happened about this campsite until

18   you -- you heard this altercation?

19     A.  It appeared to be unoccupied as far as

20   anybody there.                                        11:38:53

21     Q.  Okay.  And you obviously could not tell

22   when the occupant came back and the truck -- when

23   the truck came back and parked?

24     A.  2:00 a.m.

25     Q.  Oh, you saw the truck actually come in at      11:39:06

```
 1    2:00?

 2         A.  We heard the door slam and the -- it woke

 3    us up, and my wife thought something hit our

 4    camper, so I looked out, and there was two door

 5    slams, it was like boom, boom, and then we          11:39:22

 6    realized, oh, it's the neighbor's back, and then we

 7    heard talking, a woman talking.

 8         Q.  Uh-huh, I see.

 9         A.  And just normal talking, and so we went

10    back to sleep.                                      11:39:38

11         Q.  And normal talking was, you know --

12         A.  It led to the fight.

13         Q.  And normal talking was by who?  Is it male?

14    Female?

15         A.  Both male and female.                      11:39:49

16         Q.  And you could -- but you did not actually

17    look out of your window and see them; right?

18         A.  Yes, we did.

19         Q.  You did?

20         A.  In the direction of the tent, and then we  11:39:57

21    determined that it was the neighbor.

22         Q.  Right.  No, I'm just trying to establish

23    did you actually see the people talking.

24         A.  No.  They were in the tent.

25         Q.  Okay.  All right.  Anything else you wanted 11:40:09
```

```
 1   to share with me?

 2       A.  No, that's probably about it.

 3       Q.  Okay.  So the attorney for Orange County

 4   has the right to ask you questions, too, but -- and

 5   I may follow up again.                         11:40:29

 6           So I will ask the defense counsel if she

 7   has any questions for you.

 8           MS. HEATHCOTE:  I do not have any

 9   questions.  Thank you.

10           MS. MKRTCHYAN:  Okay.  All right.  So thank  11:40:38

11   you, Mr. Fuerbach.  The trial in this case is set

12   in November.  Either party -- either party has the

13   right to call you as a witness, so I ask you --

14   that you are in town.  It's going to be a trial in

15   the federal court, Ronald Reagan building, I         11:40:56

16   suppose, unless it gets continued for whatever

17   reason, but I just want you to be aware of that,

18   and, you know, be in town, but you can contact me,

19   be in touch with me, or defense counsel to know

20   about scheduling and stuff like that.  I appreciate  11:41:10

21   your time today.

22           What will happen is that a transcript will

23   be prepared of your testimony today, and I'm going

24   to ask the court reporter to send that transcript

25   to you.  If you might, please -- it's a short        11:41:23
```

EXHIBIT C

# LYNBERG & WATKINS

WWW.LYNBERG.COM

**LOS ANGELES**

1150 S. Olive Street
Eighteenth Floor
Los Angeles, CA 90015
Tel 213-624-8700
Fax 213-892-2763

**ORANGE COUNTY**

1100 Town & Country Road
Suite #1450
Orange, CA 92868
Tel 714-937-1010
Fax 714 937-1003

**SAN DIEGO**

8880 Rio San Diego Drive
Suite #1045
San Diego, CA 92108
Tel 619-814-2169
Fax 619-356-4968

**CENTRAL COAST**

731 South Lincoln Street
Suite C
Santa Maria, CA 93458
Tel 805-623-5863
Fax 805-314-2661

REPLY TO: **ORANGE COUNTY**

*September 7, 2020*

***VIA EMAIL***

Narine Mkrtchyan, Esq.
MKRTCHYAN LAW
655 N. Central Ave, Suite 1700
Glendale, CA 91203

> Re: ***Jeremy Holloway v. County of Orange, et al.***
> Dates of Alleged Loss:   January 21, 2018
> Our File No.:                  1793-0267
> United States District Court, Central District of California
> Case No.: 8:19-cv-01514-DOC-DFM

Dear Counsel:

Through this correspondence, we are extending an offer to meet and confer pursuant to C.D. Cal. L.R. 37-1 regarding your conduct during Plaintiff Jeremy Holloway's recent deposition. As you are aware, "the purpose of a deposition is to find out what the witness thinks, saw, heard or did." Mazzeo v. Gibbons, 2010 WL 3020021, at *2 (D. Nev. 2010). A questioning attorney (in this case us) can only discharge their responsibilities to their client if the attorney representing the witness (in this case you) follows the basic rules governing federal deposition practice – rules which have already been emphasized by our Magistrate Judge in this case. (Order, Dkt. No. 73, p. 3, n. 3)("all counsel should comport themselves in the deposition the same as if they were in the courtroom.  The Advisory Committee notes to Rule 30 make that expectation explicit: '[i]n general, counsel should not engage in conduct during a deposition that would not be allowed in the presence of a judicial officer.' ").

Unfortunately, during Plaintiff's deposition, you repeatedly violated the Court's order by "engag[ing] in conduct . . .that would not be allowed in the presence of a judicial officer' ". (Order, Dkt. No. 73, p. 3, n. 3). Your conduct during Plaintiff's deposition consequently made our efforts "to find out what [Mr. Holloway] thinks, saw, heard or did" impossible. Mazzeo v. Gibbons, 2010 WL 3020021, at *2 (D. Nev. 2010).

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

Given your conduct, the appropriate result now is dismissal of Plaintiff's case. See, Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992) ("[P]ursuant to [Rule] 41(b), the district court may dismiss an action for failure to comply with **_any order_** of the court.")(emphasis added); Loop AI Labs Inc. v. Gatti, 2017 WL 934599, at *15 (N.D. Cal. 2017), aff'd, 742 F. App'x 286 (9th Cir. 2018)(dismissal ordered where "Plaintiff's actions evince a persistent belief that it is above any obligation to obey the Court's orders. . .or rules.")

Even if the Court permits this action to survive (and it should not), the defense is entitled to a renewed deposition of Plaintiff, supervised by a special master, in which you will be required to follow the basic rules already enunciated by our Magistrate Judge. See, e.g., Hernandez v. Lynch, 2019 WL 6998774, at *2 (C.D. Cal. 2019)("Federal Rule of Civil Procedure Rule 53(a) permits the appointment of a special master to address pretrial matters . . .."); id. at *4 ("the Court finds that the Special Master was correct to conclude that Plaintiffs' counsels' conduct was improper and impeded Defendants from conducting a fair deposition and pursuing relevant lines of inquiry. In light of this, it was **_proper to order new depositions_** of the Named Plaintiffs.")(emphasis added.)

The needed re-do of Plaintiff's deposition should be funded by you – as it is your misconduct which necessitates judicial supervision. See, e.g., IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *6 (S.D. Cal. 2017)(counsel for the deponent "must reimburse [the noticing party] for reasonable travel, attorney's fees, court reporting and any facility costs for this renewed deposition.") We now detail our position in the following subsections.

## I.    VIOLATION OF THE COURT'S CIVILITY ORDER

Put most charitably, your conduct during Plaintiff's deposition fell far below the standards of professionalism and civility which are required of counsel in federal court proceedings. The repeated outbursts and antics I witnessed during Plaintiff's deposition are frankly unlike anything I have ever seen. And your latest deposition outbursts are part of a troubling and persistent pattern of misconduct in this case. Our Magistrate Judge has already found as much. (Order, Dkt. No. 73, p. 2)(the Renegar "deposition was, to put it mildly, a train wreck. And responsibility for that result lies predominantly with Plaintiff's counsel.")

As you will recall, the Magistrate Judge noted your tone during the Renegar deposition was "increasingly bellicose" as the day went on. (Order, Dkt. No. 73, p. 3). You spoke in a "raised. . .voice several times", made personal attacks on others and erupted in profane outbursts when you were displeased with witness testimony. (Id.) As the Court rightly noted:

If anything, the video recording is worse than the cold transcript. For the most part, Renegar and his counsel are largely subdued. Plaintiff's counsel is anything

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

but. Not only does she raise her voice, but it appears to me that she slaps the conference room table at least twice. Her tone of voice ranges from exasperated to indignant. She appears to lose her temper several times. I am confident that none of these antics would have been permitted to persist in any courtroom in the federal courthouse in Orange County.

(Id.)

The Court's findings and admonitions in this case come with good reason. "Offensive and abusive language by attorneys in the guise of zealous advocacy is plainly improper, unprofessional, and unacceptable. . .." Laddcap Value Partners, LP v. Lowenstein Sandler P.C., 859 N.Y.S.2d 895 (2007); see, id.("An attorney who demonstrates a lack of civility, good manners and common courtesy taint the image of the legal profession and, consequently, the legal system, which was created and designed to resolve differences and disputes in a civil manner."); People v. Fagan, 483 N.Y.S.2d 489 (1984)(noting that "while the correct resolution of civil disputes is indeed an important goal of our legal system, it may fairly be said that society's primary interest in the resolution of civil disputes is that they be settled in a peaceful, orderly, and impartial manner.")

All courts agree with these common sense principles. See, e.g., Freeman v. Schointuck, 192 F.R.D. 187, 189 (D. Md. 2000)("No one expects the deposition of a key witness in a hotly contested case to be a non-stop exchange of pleasantries. However, it must not be allowed to become an excuse for counsel to engage in acts of rhetorical road rage against a deponent and opposing counsel."); MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at *1 (C.D. Cal. 2014)("A deposition is a judicial proceeding that should be conducted with the solemnity and decorum befitting its importance. Lawyers participating in depositions should comport themselves in a professional and dignified manner. When lawyers behave otherwise, it reflects poorly on the entire judicial process.")

One would assume that the Court's prior civility order would have led you to reflect on your past conduct in this case – and to move forward in a new spirit of professionalism. The Court's order plainly called for you to do just that. (Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..I trust that my remarks on July 9 and this subsequent ruling will cause [future] depositions to be conducted without the rancor that was exhibited on July 7 [at the Renegar deposition].")

But you have plainly chosen another course of conduct. None of the Court's warnings and admonitions have moved you to alter your deposition conduct. Instead, if anything, your conduct during Plaintiff's deposition reached ***a startling series of new lows***.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

Plaintiff's deposition transcript is peppered with your cringeworthy verbal outbursts, many of which featured personal attacks on me and my clients. It all started with strange, antagonistic murmuring:

**Page 49**

4 Q BY MR. HARRELL: Are your parents still
5 living?
6 A Yes.
7 Q Both of them?
8 A Yes.
9 Q What is your father's name?
10 MS. MKRTCHYAN: Objection. Relevance.
11 THE WITNESS: Joseph Holloway.
12 MS. MKRTCHYAN: **It's pathetic. I can't believe**
13 **these people.**

(Transcript, 49:4-13)(emphasis added.)

Given the Court's prior admonitions, I probably should have adjourned the deposition proceedings when your caustic murmuring first started. I should have sought appointment of a special master then and there. But, in my defense, I have frankly never had any problem getting along with people. I thought my interaction with you would be no different, and that I would consequently be able to do my job in a peaceful, professional environment.

But I was mistaken.

Rather than work with me as a fellow member of the federal bar, you quickly chose to unleash the same type of raised voice outbursts and snarling personal attacks that led the Court to issue its previous written civility admonishment.

The name-calling began with your announcement that I am not a "normal human being" – at least in your view:

**Page 90**

4 Q BY MR. HARRELL: Okay. So when the officer
5 indicated that he had officer safety concerns and
6 that's why he wanted to --
7 A Yeah.
8 Q -- pat you down, you understood that the
9 officer wanted to do a pat-down search to see if you
10 had any weapons on you; right?

4

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

11 A   I understand he wanted to violate my civil
12 rights.
13 Q   I understand, sir. That's kind of more
14 something for your lawyer to say in front of a jury.
15 My question has another focus.
16 Here, we're going to read it back for you.
17 MS. MKRTCHYAN: Well, objection. Argumentative.
18 Vague and ambiguous. Badgering the witness. Asked and
19 answered. And your **condescension** is on the record,
20 too. So if you continue like this, we'll take as many
21 breaks as possible. So just behave yourself as a
22 **normal human being**.
23 MR. HARRELL: Well, ma'am, one of the great things
24 about our country is I don't have to respond to any of
25 that.

**Page 91**

1 MS. MKRTCHYAN: Of course, you will not have to.
2 MR. HARRELL: I'm not going to.
3 MS. MKRTCHYAN: Of course, not to, because you just
4 have, you know, absolutely **no respect** for any other
5 attorney. The level of **arrogance** that I see is just
6 **horrendous**. So anyway --
7 MR. HARRELL: Right, ma'am. **We're not going to**
8 **have a train wreck today.** The magistrate judge has
9 already got his eye on you and for good reason.
10 MS. MKRTCHYAN: Very good. You are defaming my
11 name. So continue with that type of attitude. Train
12 wreck. Okay.

(Transcript, 90:4 – 91:12)(emphasis added.)


I was not the only victim of your many outbursts. At another point, you lashed out
when your client rightly declined to agree with your attempted "coaching" of his
deposition answers:

**Page 138**

21 MS. MKRTCHYAN: . . .Your goal -- what is your goal
22 today? I don't understand.
23 MR. HARRELL: My goal is to get through these
24 questions.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

**Page 138**

1 Q Well, sir, you've already told us that you do
2 sometimes experience anger and upset when you think
3 about the incident; true?
4 MS. MKRTCHYAN: **Misstates the testimony. Misstates**
5 **the testimony.**
6 THE WITNESS: **Yes, I did say -- I did say that. . ..**

**Page 140**

15 Q BY MR. HARRELL: Sir --
16 MS. MKRTCHYAN: **Nonsense of all type of**
17 **proportions.**

(Transcript, 138:21 – 140:17)(emphasis added.)


        And then you erupted at me when I legitimately attempted to follow up on the
reasons, if any, for Plaintiff's "emotional distress" claims arising out of the subject arrest
incident. Your outburst also featured more rank "coaching" of your client:

**Page 140**

18 Q BY MR. HARRELL: You do understand that law
19 enforcement has a responsibility to respond to
20 complaints of criminal conduct. That's part of their
21 job.
22 You understand that; right?
23 A As much as I can, being a civilian.
24 Q And you understand, sir, that there was a
25 complaint of criminal conduct at the campground before

**Page 141**
1 law enforcement appeared at your tent; true?
2 MS. MKRTCHYAN: Vague and ambiguous.
3 THE WITNESS: I understand that now.
4 MS. MKRTCHYAN: Vague and ambiguous as to time.
5 Q BY MR. HARRELL: Do you hold it against law
6 enforcement for responding to the complaint of criminal
7 conduct at the campground, or do you think they just
8 should have ignored it?
9 MS. MKRTCHYAN: How do you object to this type of
10 **nonsense**?

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

11 THE WITNESS: This is --
12 MS. MKRTCHYAN: Argumentative. Objection. Vague
13 and ambiguous.
14 THE WITNESS: Yeah, I can't answer that question.
15 MS. MKRTCHYAN: Wait a minute. Let me finish my
16 objection.
17 Argumentative. Vague and ambiguous.
18 Irrelevant.
19 Q BY MR. HARRELL: We're going to read it back
20 for you, sir.
21 And, ma'am, you're free to have a running
22 objection if that's what you would like to have.
23 MS. MKRTCHYAN: No. I have an objection to your
24 line of questioning because you are asking the
25 argumentative questions. Badgering the witness. That

**Page 142**

1 is not likely to lead to admissible evidence. Okay?
2 And if you are going to interrupt this and I
3 am going to call the magistrate and find out why is
4 this question that right now you're posing three times
5 is important.
6 The law enforcement has a job to do. No. Law
7 enforcement has a job to do, but **your clients** did not
8 have a right to **beat the hell out of my client.**
9 MR. HARRELL: No. No.
10 MS. MKRTCHYAN: And if you, as an attorney, have no
11 sense of understanding and **common sense** as to what
12 happened, this is a victim of **police brutality**, and you
13 keep badgering him? You think that your clients have
14 not committed **a crime here**? So go after them, not my
15 client.
16 And he's not going to tolerate this type of
17 **nonsense** from a defense counsel who doesn't even bother
18 to wear his mask when we have a coronavirus. Okay?
19 Seriously.
20 MR. HARRELL: Ma'am, you're --
21 MS. MKRTCHYAN: It just bothers me that **you have no**
22 **sense of common sense and compassion.** Someone is
23 sitting in front of you who was beat up by your **moron**
24 clients. Okay? Your clients, **your criminal clients**
25 who are wearing a badge and are using that badge to

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

**Page 143**

1 **commit crimes, including falsifying reports.**
2 And you are going to sit here and tell this
3 guy, who was a victim of police brutality, that he does
4 not understand the job of the law enforcement? Yes, he
5 understands, but the job of law enforcement is not to
6 go and **beat the hell out of people**.
7 And you, as an attorney, your job is not just
8 to do your job, defend these kind of criminals, but to
9 do it with some **degree of compassion**. Okay? If you do
10 not have compassion, **maybe you should not be an**
11 **attorney at all.**
12 That's why this country is in **this deep shit**
13 that we are. Okay? **People like you and people like**
14 **your clients.** That's all I've got to say.[1]
15 The bottom line is that you know what? I'm
16 going to take as many breaks as I want, and I may stop
17 this deposition because you're continuing to badger
18 this guy, who is a victim. He's a victim that your
19 clients have ruined the life of, and you're telling him
20 what is the job of law enforcement?
21 MR. HARRELL: Where are you going, ma'am?
22 MS. MKRTCHYAN: I am taking a break because you
23 need to take five minutes to understand what it means
24 to be, you know -- to have **common sense and compassion**,
25 you know.

**Page 144**

1 MR. HARRELL: Okay. Well, you take your break.
2 Try to pull yourself together.
3 MS. MKRTCHYAN: No, but because you do not have a
4 clear understanding of what is the United States
5 Constitution and what this country's flag is all about.
6 Someone is sitting in front of you who has served you,
7 your country, and you're badgering him with **nonsense,**
8 **stupid questions.**
9 MR. HARRELL: Okay. We're off the record while
10 plaintiff's counsel tries to pull herself together.
11 THE VIDEOGRAPHER: We're now going off the record.

---

[1] If only it were so.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

12 The time is 1:10 p.m.
13 (Recess.)

(Transcript, 140:18 – 144:13)(emphasis added.)

Our put-upon court reporter repeatedly asked you to cease your commentary so as to permit read-backs when they were needed to frame questions. But you showed the court reporter no professional courtesy or respect either:

**Page 241**

18 Q BY MR. HARRELL: So we're just going to read
19 the question back. How about respond to my question,
20 and then I'll do as I've done any number of times
21 today. I will move on after I get an answer to the
22 question.
23 MS. MKRTCHYAN: Well, your question is vague and
24 ambiguous. If you don't want a paraphrase, I will
25 instruct him not to answer because it's not a proper --

**Page 242**

1 it's not a fair question, and you know it.
2 MR. HARRELL: Okay. Let's everybody be as quiet as
3 we can and let the court reporter read.
4 MS. MKRTCHYAN: Well, you know, there's going to be
5 an instruction not to answer unless you paraphrase that
6 type of vague and ambiguous question that is assuming
7 facts not in evidence.
8 MR. HARRELL: It sounds like to me that you're
9 losing the quiet game. So let's everybody be --
10 MS. MKRTCHYAN: Excuse me.
11 MR. HARRELL: -- as quiet --
12 MS. MKRTCHYAN: Excuse me.
13 MR. HARRELL: Let's everybody be as quiet as they
14 can.
15 MS. MKRTCHYAN: Excuse me. You are not my
16 grandfather, as much as you wish you were.

(Transcript, 241:18 – 242:16)(emphasis added.)

At this point, _**your co-counsel**_, Mr. Beck, plainly sympathized with the court reporter's legitimate request for silence during read-backs, and he felt the need to

9

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

admonish you to _**be quiet as well**_. But Mr. Beck fared no better with you than I did. You interrupted Mr. Beck and quarreled with him too:

18 MR. BECK: Enough. That's enough. That's enough.
19 MS. MKRTCHYAN: That's the most **sexist attitude** I
20 can get from a man saying be quiet. Okay.
21 MR. BECK: This is not moving this deposition
22 forward and --
23 MS. MKRTCHYAN: **No**, but that's the most **dumbest**
24 question [sic] I've ever heard.
25 MR. BECK: **Enough.**

(Transcript, 241:18 – 242:25)(emphasis added.)

As you are aware, nothing I said or did during Plaintiff's deposition had anything to do with your gender. Even so, you repeatedly (and unfairly) attacked me as being a "sexist" bigot for no good reason:

**Page 116**

16 MR. HARRELL: . . .[P]ull yourself together.
17 MS. MKRTCHYAN: Excuse me. I have a right to
18 object. Who the hell do you think you are? I have a
19 right to object.
20 MR. HARRELL: Make legal objections.
21 MS. MKRTCHYAN: I am making the objections the way
22 I understand. If you have a problem with my
23 objections, you can take it up later. Okay? There you
24 go.
25 MR. HARRELL: Ma'am, you've got to pull yourself

**Page 117**

1 together.
2 MS. MKRTCHYAN: Okay. You have yet to see me
3 too -- I mean seriously, this is the **sexist**,
4 condescending attitude, Counsel, and you are really
5 behaving just like this with any female attorney that
6 is younger than you? I'm sorry. If no one told you
7 outright that that's **sexist** attitude, I will. I'm not

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

8 afraid.
9 And I will tell you that your behavior from
10 this morning and even before then, your letters,
11 your -- you know, your harassing letters towards me
12 have been infused with condescending attitude.
13 Who do you think you are? Who do you think
14 you are? I know who I am, but you need to know your
15 place. Okay? I am a female young attorney, and you
16 have no right to do this to me or my client.
17 You're badgering the witness. Let's go over
18 the questions. You have to ask only appropriate
19 questions, and you are not.

(Transcript, 116:16 – 117:19)(emphasis added.)

"Sexist" seemed to be your go-to response any time I tried to get answers to the
legitimate question I posed (rather than re-draft my question in the manner you
wrongfully demanded):

**Page 56**

12 Q BY MR. HARRELL: Sir, have you received a bill
13 from the VA, to your knowledge, for your medical
14 treatment since the incident happened? Yes, no, or I
15 don't know?
16 MS. MKRTCHYAN: **Or has your lawyer** -- see --
17 MR. HARRELL: Ma'am, **with respect, that's not my**
18 **question**. So you'll have an opportunity later if
19 you're so inclined to ask whatever you want to ask.
20 Right now my question has a limited focus that does not
21 involve you, with all due respect.
22 MS. MKRTCHYAN: Well, excuse me. If it's
23 attorney-client privilege, then it is involving me.
24 MR. HARRELL: Ma'am.
25 MS. MKRTCHYAN: So -- and you know what? Your

**Page 57**

1 attitude -- I really do not appreciate this
2 condescending attitude, unprofessional, **sexist** attitude
3 that you're coming up across from the very beginning
4 this morning. I'm not going to tolerate that.
5 From the very beginning, you've been this
6 hostile, you know, person, you know. So I'm not going

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

7 to tolerate that.
8 I'm instructing him not to answer because the
9 **answer presupposes attorney-client privilege**. Okay?
10 He is -- he has -- his attorney has received billing
11 records. He has not received it. So, therefore, his
12 answer is irrelevant. So --
13 MR. HARRELL: Are you done?
14 One of the reasons, ma'am, why we have a
15 camera here today is because we need one with you.
16 You've already proven that. The magistrate judge
17 characterized your conduct as, and I quote, "a train
18 wreck."
19 MS. MKRTCHYAN: Okay.
20 MR. HARRELL: And that's being charitable.
21 MS. MKRTCHYAN: And excuse me.
22 MR. HARRELL: We have a camera here today --
23 MS. MKRTCHYAN: Train wreck.
24 MR. HARRELL: -- so that you can see --
25 MS. MKRTCHYAN: Very good.

**Page 58**

1 MR. HARRELL: -- that **nobody has raised their voice**
2 here today.
3 MS. MKRTCHYAN: Very good, Counsel. Very good.
4 MR. HARRELL: Your comment about me being a
5 **sexist** --
6 MS. MKRTCHYAN: Okay. I'm taking a break because I
7 don't need this type of attitude.
8 MR. HARRELL: -- is what we call in the trade a
9 lie --
10 MS. MKRTCHYAN. Okay. Until you finish, I'm going
11 to take a break.
12 MR. HARRELL: -- and you need to get control of
13 yourself.
14 MS. MKRTCHYAN: Well, thank you.
15 MR. HARRELL: You need to pull yourself together --
16 MS. MKRTCHYAN: Maybe you need to pull yourself
17 together.
18 MR. HARRELL: -- and it needs to happen now.
19 MS. MKRTCHYAN: We're going to break until you
20 bring yourself to normal condition because you are
21 being rude and unprofessional, and you have no right to
22 condescend me like that. Thank you.
23 Let's go.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

(Transcript, 56:12 – 58:23)(emphasis added.)

In short, I did not use "sexist" language to anyone during Plaintiff's deposition. To the contrary, I tried to show courtesy and respect to everyone in the deposition room – just as the Magistrate Judge has directed.

For example, I repeatedly extended every courtesy to your client, Mr. Holloway. First of all, I explained why I was asking the personal background questions that defense attorneys (like me) ask of almost all plaintiffs (like Mr. Holloway). I did that to help address your client's visible discomfort with this portion of the proceedings. I also did that as a matter of common courtesy and respect:

**Page 29**

20 Q BY MR. HARRELL: Sure. Sure, sir. I have a
21 list of things that I go through, not just with you,
22 but with everybody that comes into this room -- okay --
23 on the other side of the lawsuit that I'm trying to
24 find out who they are --
25 A Okay.

**Page 30**

1 Q -- so I can go back and I can tell my client
2 this is who they are, this is what they say, this is
3 the road they've traveled, this is what their
4 grievances are. It's just gathering information is all
5 that we're doing here today.
6 Do you understand?
7 A **Yes, I do.**
8 Q And if ever at any time, if I ask a question
9 and you just don't feel good about it, **please, speak
10 up. We'll see if there's a workaround.** We'll see if
11 there's something that we can do.
12 Okay? Do you understand?
13 A **That sounds good.**

(Transcript, 29:20 – 30:13)(emphasis added.)

When there was a brief pause in deposition questioning, I explained the reason for my momentary silence. Again, I did that to help address your client's comfort with the proceedings. I also did that as a matter of common courtesy and respect

**13**

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

(notwithstanding your "coaching" interruptions):

**Page 158**

6 Q Okay. **Thanks for giving me time to jot things**
7 **down.**
8 So when you got back to your campsite, you had
9 some questions that included why didn't these neighbors
10 speak up and identify themselves as the people that had
11 been involved in the quarrel; true?
12 MS. MKRTCHYAN: Objection. Vague and ambiguous.
13 **Misstates the testimony.**
14 THE WITNESS: I asked them, **yeah**, straight up. I
15 asked them why.

(Transcript, 158:6-15)(emphasis added.)

When your client seemed confused by my request for an audible answer to my questions, I again explained the need for my request. Here too, I explained matters to help address your client's comfort level. I also did that as a matter of common courtesy and respect:

**Page 161**

9 Q. . .So when you address your neighbors from the
10 vantage point of you standing at your tent, you make a
11 statement to the effect of "Why didn't you come out and
12 stop this? Instead, you let me take the blame"; right?
13 A Uh-huh.
14 Q Yes?
15 A That's what I said. Yes.
16 Q Okay. I can see you.
17 A I got it. I got it. Nobody saw. Got it.
18 Q **You have to have actual words.**
19 A I didn't know what this was. I didn't know
20 what you were doing.
21 Q It's, like, **I need some words.**
22 A **I got you.**

(Transcript, 161:9-22)(emphasis added.)

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

Again, I generally have no problem getting along with people of all types, including your client. The transcript shows as much – over and over again. Against this backdrop, your inflammatory, unprovoked personal attacks on my character, including your smear claim that I am some type of "rude", "sexist" bigot, are baseless and sanctionable.

Again, they are belied by the cold deposition transcript and by the video record of the proceedings. Your character attacks on me are yet another violation of the Magistrate Judge's standing order in this case requiring civility, verbal self-control and professionalism. See, e.g., Rywkin v. New York Blood Ctr., 1998 WL 633810, at *1 (S.D.N.Y. 1998)(counsel representing the deponent "made *ad hominem* attacks on opposing counsel . . ..This conduct clearly is sanctionable."); id. (counsel representing the deponent "insinuated, without support, that opposing counsel's conduct was racially motivated. This conduct clearly is sanctionable."); Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)(counsel for the deponent "was disrespectful and personally attacked [questioning] counsel in a way that is wholly unsuitable for a deposition or any other litigation proceeding. . ..These types of comments would have no place in a courtroom, and they accordingly have no place in a deposition proceeding."); (Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..")

Events at Plaintiff's deposition reached a crescendo of sorts when I attempted to focus on your client's "false arrest" claim. As you are aware, my law enforcement clients contend that they had good cause to suspect Plaintiff of physically abusing a female companion at the time they first confronted him.

Indeed, eyewitness "911" reports by other campers advised officers that Mr. Holloway had physically attacked a female in his campsite tent. For example, Plaintiff's neighbor at the campground, one Brian Fuerbach, testified to his disturbing observations of Mr. Holloway's misconduct as follows:


**Page 15**

23    Q.    Okay. So if we are going to establish for
24    purposes of this deposition, your[] [campsite number] was 63 and
25    **plaintiff's was 65. . ..**

**Page 16**

3    A.    Yes. . ..

(Transcript, 15:23 – 16:3)(emphasis added.)[2]

---

[2] Plaintiff's campsite number was "65":

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

**Page 87**

1       Q.       Okay. All right. So -- but even though
2       that mid-afternoon you arrived, you saw the two
3       tents, you did not see or have any contact with
4       the -- with the plaintiff Jeremy?
5       A.       No, because he wasn't -- wasn't there as
6       far --
7       Q.       He wasn't there. And you did not see any
8       female there either?
9       A.       No.
10      Q.       Okay. So the whole time you were there
11      this afternoon until 2:00 a.m., nothing, aside from
12      that dog barking inside of the tent, brought the
13      attention of that campsite to you until 2:00 a.m.
14      or 3:00 a.m. when you called 911?
15      A.       It was about around 2:00 a.m.
16      Q.       Right. So -- but what I'm saying is that
17      nothing else happened about this campsite until
18      you -- you heard this altercation?
19      A.       It appeared to be unoccupied as far as
20      anybody there.
21      Q.       Okay. And you obviously could not tell
22      when the occupant came back and the truck -- when
23      the truck came back and parked?
24      A.       2:00 a.m.
25      Q.       Oh, you saw the truck actually come in at

**Page 88**

1       2:00?
2       A.       We heard the door slam and the -- it woke
3       us up, and my wife thought something hit our
4       camper, so I looked out, and there was two door
5       slams, it was like boom, boom, and then we

---

17 Q You had a campsite number there; right?
18 A Yes.
19 Q What was your campsite number?
20 A 65.

(Transcript, 160:17-20)

16

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

6       realized, oh, it's the neighbor's back, and then we
7       heard talking, a woman talking.

(Transcript, 87:1 – 88:7)

**Page 16**

21     Q.     Okay. So now when -- at night you know
22     that you called 911. I wanted to have you tell me
23     little bit in your own words what did you hear that
24     night, you know, that prompted you to call 911.
25     A**.**     **I heard a bunch of expletives, yelling, and**

**Page 17**

1       **then I heard fist blows being landed on somebody,**
2       **which I believe was a woman because she said she**
3       **was. . ..**
20     Q.     Okay. Sure. So you were sleeping, but the
21     sounds of the noise and disturbance was loud enough
22     to awaken you, is that what you're telling me?
23     A.     Yes.
24     Q.     Okay. And then you're telling me
25     expletives, et cetera, but when you peaked out of

**Page 18**

1       the window, could you see the people who were
2       actually yelling and doing this, you know, involved
3       in the disturbance?
4       A.     **No. We could just see the tent moving, and**
5       **a woman saying, "No, no, no" --**
6       Q.     Uh-huh.
7       A.     **-- "Please stop. I'm just a girl."**
8       Q.     So you could -- okay.
9       A.     Yelled out, "Stop."
10     Q.     Okay. But you could -- you're telling me
11     you could hear and you could see --
12     A.     Oh, yeah.
13     Q.     -- from your [RV] window that this is the tent
14     where the disturbance was occurring?
15     A.     Yes.
16     Q.     Okay. So when you called 911, it was still
17     dark outside; right? How was the lighting at the
18     campground? Can you describe to me?

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

19      A.      It was dark.
20      Q.      This was around what time do you recall?
21      Was it 3:00 o'clock in the morning? 4:00 o'clock
22      in the morning?
23      A.      It was 3:00 o'clock approximately.


**Page 19**

1       Q.      But could you see actually the people
2       outside of the tent or were they inside of the
3       tent?
4       A.      They were inside.
5       Q.      Did you open your [RV] window to hear or, you
6       know, see better?
7       A.      Yes.
8       Q.      And so you peaked out, you peaked out of
9       the window. What could you tell me when you did
10      that? What else could you hear when you did that?
11      A.      The -- **the blows** that -- **the fist blows**
12      being landed on somebody you could clearly hear
13      that. . ..

**Page 23**
11      Q.      Okay. And when you were watching this,
12      obviously, since you called 911, you were hoping
13      that they would find the female victim; right?
14      A.      Yes.
15      Q.      Did you see [law enforcement] actually locate the female
16      victim from that campsite, of the plaintiff's
17      campsite, No. 65 next to yours?
18      A.      No.
19      Q.      Did you ever -- prior to sheriffs coming,
20      did you ever see a woman leave that campsite?
21      A.      No. We only heard, and then we heard the
22      tent unzip and somebody running away through the
23      gravel.

(Transcript, 16:21 – 23:23)(emphasis added.)[3]

---

[3] It is ironic, to say the least, that you have evidently been too busy calling me a "sexist" to develop any coherent response to Mr. Fuerbach's compelling testimony that Plaintiff brought the subject arrest incident on himself by beating a woman.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

For his part, Plaintiff disputes Mr. Fuerbach's incriminating testimony.[4] He has not only denied any female companion was with him at the campsite, he has denied having a girlfriend of any type since 2007 (when his spouse evidently divorced him):

───────────────────────

[4] **Page 64**

20 Q Okay. So let's talk about the 24 hours
21 running up to the incident, the contact that you had
22 with law enforcement.
23 Where were you at that time?
24 A I was camping at O'Neill Park.
25 Q Okay. And how long had you been camping at

**Page 65**

13 At the time of the incident, how long had you
14 been camping at O'Neill Park for that stay?
15 MS. MKRTCHYAN: Asked and answered.
16 THE WITNESS: That stay. Like I said, I believe I
17 checked in the day before.
18 Q BY MR. HARRELL: Okay. So at the time of the
19 incident, you had been at your campsite at O'Neill Park
20 for about 24 hours?
21 A Yeah. I could say that. Approximate
22 24 hours.
23 Q Okay. When you checked into your campsite,
24 were you with anyone else?
25 A I was not.

**Page 66**

1 Q Did anyone join you at your campsite before
2 the incident?
3 A Nobody.
4 Q Okay. So in the entire 24-hour period of time
5 before the incident, before your contact with law
6 enforcement, your testimony is you weren't in the
7 company of a guest?
8 A Correct.
9 Q Did you have a girlfriend at the time of the
10 incident?
11 A I did not.

(Transcript, 45:17 – 51:4)

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

**Page 46**

10 Q Okay. When is the last time that you were in
11 a social relationship with someone who you considered
12 to be a partner?
13 MS. MKRTCHYAN: Objection. Relevance. Privacy.
14 THE WITNESS: That would have been when I divorced
15 my wife. That would have been 2007.
16 Q BY MR. HARRELL: Okay. Have you ever had a
17 girlfriend since 2007?
18 A I have not.

(Transcript, 46:10-18)

Accordingly, in order to test Plaintiff's assertions, the defense has served a <u>Fed. R. Civ. P.</u> 34 request for Mr. Holloway's social media posts, which might disclose his contacts with the woman Mr. Fuerbach observed Plaintiff abuse on the night of the incident.

***Following*** dispatch of Defendant's request, however, Plaintiff appears to have ***deleted*** his Facebook posts, as well as his entire Facebook account. The defense rightly seeks to question Plaintiff regarding his handling of his Facebook account ***following Defendant's request for access to it.*** The following transcript contains the relevant deposition inquiry:

**Page 258**

6 Q Okay. Now, sir, you are aware that we have
7 requested your social media postings, including from
8 Facebook; true?
9 A **Yes, I am aware.**
10 Q Are you prepared to turn those over to us?
11 MS. MKRTCHYAN: No. Objection. First of all,
12 attorney-client privilege. Attorney work product.
13 So he's instructed not to answer that question
14 because that's not his purview.
15 Q BY MR. HARRELL: Sir, do you have any problem,
16 you personally, turning over your Facebook postings to
17 us?
18 MS. MKRTCHYAN: Objection. You are instructed not
19 to answer. You're instructed not to answer.
20 Q BY MR. HARRELL: Sir, you have become aware

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

21 that we are asking for your Facebook postings; true?
22 MS. MKRTCHYAN: Asked and answered. Move on.
23 Instructing not to answer. This is attorney-client
24 privilege. He would not be able to answer that
25 question really without disclosing attorney-client

**Page 259**
1 privileged communications. Therefore, move on,
2 Counsel.
3 Q BY MR. HARRELL: Sir, you did take some action
4 after you learned that we were seeking your Facebook
5 postings; true?
6 MS. MKRTCHYAN: Instruct you not to answer any of
7 that.
8 That's, again, attorney-client privilege, and
9 he will not be able to answer that question without --
10 without discussing and -- without sharing attorney-
11 client privileged communications.
12 Therefore, you're instructed not to answer.
13 Q BY MR. HARRELL: Sir, after you learned that
14 we were seeking your Facebook postings, you switched
15 your account to private; right?
16 MS. MKRTCHYAN: Again, objection.
17 You're instructed not to answer.
18 And, Counsel, are you going to continue going
19 into attorney-client privileged communications?
20 Q BY MR. HARRELL: Sir, after you learned that
21 we were after -- are you instructing him not to answer?
22 MS. MKRTCHYAN: Yes. Yes. And I'm asking you to
23 move on with this line of questioning because it goes
24 into attorney-client privileged communications. What I
25 instructed my client, what he did or did not do, it's

**Page 260**
1 none of your business frankly, and that is
2 attorney-client privilege.
3 So if you continue with this line of
4 questioning, I'm going to stop this deposition.
5 Q BY MR. HARRELL: Sir, after you learned that
6 we wanted to see your Facebook postings, you did more
7 than switch it to private; you closed and deleted your
8 entire account; true?
9 MS. MKRTCHYAN: Objection. Objection. You know
10 what? We are going to stop this because you are going

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

11 into areas where it's attorney-client privilege. It's
12 none of your business what he did and did not do at
13 what instructions.
14 MR. HARRELL: It is. When he destroys evidence, it
15 is.
16 MS. MKRTCHYAN: Oh, really? Oh, really? What
17 evidence? You giving me some -- here, this is your
18 evidence.
19 Do you want me to show you what evidence
20 you've given me? I'm going to show it to you. Here.
21 Here. It's nonsense.

**[ At this point, as depicted on video, Plaintiff's counsel continues shouting and throws voluminous papers across the deposition table in the direction of defense counsel and deposition staff ]**

(Transcript, 258:6 - 260:21)

As you stood and began menacingly throwing papers about, ***your own co-counsel***, Mr. Beck, was also plainly alarmed by your enraged tirade. He attempted to stop your misconduct. But he too was unsuccessful:

**Page 260**

22 MR. BECK: **Hey, don't.**
23 MS. MKRTCHYAN: No. That's nonsense. I want them
24 to see that someone, a victim of police brutality, is
25 going to become part of your police reform. This is

**Page 261**

1 your evidence. Okay?
2 If you have any decent question for my client,
3 you can go ahead. But this is -- I'm doing this for
4 the record, and I will do this for you to satisfy your
5 nonsense questionnaire, you know.
6 Go ahead. That is your evidence, which is
7 junk. Okay? Junk.
8 And if you continue badgering my client,
9 again, as a victim of police brutality, this is
10 I will stop this deposition, and we'll go, and we will
11 not resume it without permission of a magistrate.
12 Okay?
13 **I have a right to tell my client what to do**
14 and what not to do. It's none of your business. Okay?

**22**

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

15 If you have a legitimate question about your junk
16 evidence, go ahead and ask it. That's the only
17 question, you know, you are permitted to ask.
18 MR. HARRELL: **Are you saying that you told your**
19 **client to destroy evidence that we were asking for?**
20 MS. MKRTCHYAN: **It's attorney-client privilege,**
21 Counsel. Okay? Attorney-client privilege.
22 When you come and disclose to me what you told
23 your clients in lying at their depositions to cover up
24 their criminal activities to avoid criminal prosecution
25 by U.S. Attorney's office, which I will ensure will

**Page 262**
1 happen at some point, then we'll disclose my
2 communications with my client.
3 But at this point your **Facebook nonsense**, this
4 stuff, this **Facebook nonsense** that you have been
5 showing me as your supplemental disclosure, this is all
6 you've got? For this case against my client? Then
7 you're really in good shape.
8 So -- but I'm instructing you not to answer
9 any questions that relates to attorney-client
10 privileged communications, and we will move on from the
11 subject. Otherwise, I'm going to stop this deposition.
12 MR. HARRELL: Let me just make my record, and if
13 you'd like to make an instruction not to answer, you're
14 free to do that. But let me just get my record out
15 there.
16 Q Sir --
17 MS. MKRTCHYAN: You're not going to ask him any
18 other questions about this.
19 MR. HARRELL: **Let me just make my record.**
20 MS. MKRTCHYAN: You're not. You make your record
21 without dealing with my client. Okay? I already told
22 you that's attorney-client communications.
23 MR. HARRELL: **If I may make my record and you make**
24 **your objections, and we'll see where we go.**
25 MS. MKRTCHYAN: I already made my objections.

Page 263
1 You're not allowed to ask another question of this to
2 my client.
3 Q BY MR. HARRELL: Sir, after you learned that
4 we were seeking --
5 MS. MKRTCHYAN: We're getting up. No. Let's get

23

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

6 up. Because you know what? You're continuing to ask
7 the same question going into attorney-client privileged
8 communications. Thank you.
9 So if you're not going to move onto another
10 topic that does not infringe upon my client's right to
11 privilege, I will stay here.
12 Do you have another question?
13 MR. HARRELL**: I was trying to get my question out,**
14 **and somebody interrupted.**
15 MS. MKRTCHYAN: Well, because you are asking the
16 same exact question. I already know what question
17 you're asking, because you are already assuming
18 something of my client. So I'm not going to let that
19 happen. Okay?
20 So we're going to take a break. Let's take a
21 break, and you think about what is attorney-client
22 privilege, and then we'll go forward.
23 THE VIDEOGRAPHER: We are now going off the record.
24 The time is 4:14 p.m.
25 (Recess.)


Page 264
1 THE VIDEOGRAPHER: We are now back on the record.
2 The time is 4:24 p.m.
3 Q BY MR. HARRELL: Sir, you have now deleted
4 your Facebook account; true?
5 MS. MKRTCHYAN: Objection. Vague and ambiguous.
6 Calls for speculation.
7 If you can answer that question -- do you feel
8 comfortable answering that question? Do you understand
9 that question?
10 THE WITNESS: Yes, I do.
11 MS. MKRTCHYAN: Okay.
12 THE WITNESS: Yes, I did recently delete my
13 Facebook account.
14 Q BY MR. HARRELL: And you did that for a
15 reason; true?
16 A It was making me upset.
17 Q Sir, you deleted your Facebook account because
18 you didn't want us to have access to it; true?
19 MS. MKRTCHYAN: Objection.
20 THE WITNESS: Nothing to hide on Facebook.
21 MS. MKRTCHYAN: It's argumentative. Wait a minute.
22 Objection. It's argumentative.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020


23 Q BY MR. HARRELL: Sir?
24 MS. MKRTCHYAN: **You are instructed not to answer to**
25 **a question like that.**

(Transcript, 260:22 – 264:25)


All of the forgoing inquiry – relating to ***destruction of requested evidence*** -- is facially relevant to my clients' developing ***spoliation claim*** in this lawsuit. As noted by our Magistrate Judge (in another case), a spoliation remedy requires factual support – which is just what I was attempting to elicit during Plaintiff's deposition:


Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or reasonably foreseeable litigation. Reinsdorf v. Skechers U.S.A., Inc., 296 F.R.D. 604, 625 (C.D. Cal. 2013). The bare fact that evidence has been altered or destroyed 'does not necessarily mean that the party has engaged in sanction-worthy spoliation.' Ashton v. Knight Transp., Inc., 772 F. Supp. 2d 772, 799-800 (N.D. Tex. 2011). Courts typically apply the following test to determine whether to impose sanctions for spoliation, requiring the party seeking sanctions to establish: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with ***a 'culpable state of mind'*** and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Reinsdorf, 296 F.R.D. at 626; see also Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). . ..[¶] ***The party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim.*** Reinsdorf, 296 F.R.D. at 626.

Star Envirotech, Inc. v. Redline Detection, LLC, 2015 WL 9093561, at *5 (C.D. Cal. 2015)(McCormick, M.J.)(emphasis added.)


In its prior civility order, the Court rightly took a dim view of your decision to slam your hand down on the deposition table. (Order, Dkt. No. 73, p. 3)(admonishing you for "slap[ping] the conference room table at least twice."). Your outburst during the forgoing spoliation inquiry – which featured ***throwing documents*** in my direction (and in the direction of court reporting / video staff) – represents an even more serious refusal to listen to (or care about) the Court's orders requiring civility and professionalism in this case. (See, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..")

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

If there were any doubt on the issue, you made your contempt for the Court's previous civility orders explicit during another one of your window-rattling deposition outbursts:

**Page 275**

7  MS. MKRTCHYAN: . . .I will walk away. Okay?
8  And my client is not going to come back for another
9  deposition.
10 MR. HARRELL: Maybe the judge will have the final
11 word on that, ma'am.
12 MS. MKRTCHYAN: Well, you know what? I'm sorry. A
13 lot of the things right now are still up in the air in
14 this country. **So whether you have a judge saying**
15 **something** or the president saying something, **it really**
16 **doesn't matter anymore. Okay?**
17 MR. HARRELL: It doesn't matter to you what the
18 judge says?
19 MS. MKRTCHYAN: Right now what I care is my client
20 being badgered by you and your condescending behavior
21 toward me.
22 MR. HARRELL: Ma'am, are you saying it doesn't
23 matter to you what the judge says?
24 MS. MKRTCHYAN: At this point all I care is what
25 the books say. **I don't care what one specific judge**

**Page 276**

1 **says or does not do.** Nobody is above the law.

(Transcript, 275:7 – 276:25)

From your conduct alone, even the most naïve observer would conclude that the Court's prior directive requiring professionalism and civility means nothing to you. But you made your contempt for the Court's civility orders **_explicit_** during the forgoing outburst. (Transcript, 275:7 – 276:25)("A lot of the things right now are still up in the air in this country. **So whether you have a judge saying something** or the president saying something, **it really doesn't matter anymore. Okay?. . ..___I don't care what one specific judge says_ . . .."**)(emphasis added.)[5]

---

[5] All this illustrates your evidently fervent wish to drag this country into a darker age without learned judges, court orders or fixed law. It is worth remembering that the rule of law is part of our society's response to the Jacobins — the most radical and ruthless of the political groups formed in the wake of the French Revolution, who (in association with Robespierre) instituted the 1793–4 "Reign of Terror". During the Terror, judges,

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

To state the obvious, indifference to court orders rightly has consequences for attorneys who take an oath to uphold respect for the law. These consequences can include a contempt citation. See, e.g., Business and Professions Code § 6068(b)(it is the duty of an attorney to "maintain the respect due to the courts of justice and judicial officers."); Chula v. Superior Court In & For Orange Cty., 109 Cal. App. 2d 24, 39 (1952)("counsel, however zealous in his client's behalf, has, as an officer of the court, a paramount obligation to the due and orderly administration of justice, and ***at all times*** should maintain a respectful attitude toward the court. A disavowal of intentional disrespect or wrongful intent is no defense to a contempt order.")(emphasis added.); People v. Chong, 76 Cal. App. 4th 232, 245 (1999)(upholding contempt finding against attorney who "challenged the court's authority.")

The consequences for your "I don't care" view of the Court's standing civility order also include dismissal of Plaintiff's case. Given the Court's prior warnings, and its extant civility order which you have chosen to ***repeatedly violate***, the Court can (and should) order dismissal. See, Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992) ("[P]ursuant to [Rule] 41(b), the district court may dismiss an action for failure to comply with ***any order*** of the court.")(emphasis added); Loop AI Labs Inc. v. Gatti, 2017 WL 934599, at *15 (N.D. Cal. 2017), aff'd, 742 F. App'x 286 (9th Cir. 2018)(dismissal ordered where "Plaintiff's actions evince a persistent belief that it is above any obligation to obey the Court's orders. . .or rules."); Lee v. Walters, 172 F.R.D. 421, 436 (D. Or. 1996) ("[Rule] 37(b)(2) . . . authorizes a variety of non-monetary sanctions against the party who fails to obey a court order, such as designating facts as proven, prohibiting

---

attorneys and citation to law itself were all banished in favor of *ad hoc* "street justice". Left unchecked, Robespierre and the Terror he unleashed featured roving mobs of Jacobins performing almost instant executions of random groups of unfortunates.

Jacobinism later, of course, also took hold in revolutionary Russia and China — all with disastrous results. As all three cases demonstrate, once reliance on judicially expressed rules of conduct is abandoned, no one is safe from the resulting downward spiral into chaos. Centuries of judicial opinions have taken note. See, e.g., College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 690 (1999)(denouncing a "proposition that . . .might well have dropped from the lips of Robespierre, but surely not from those of Madison, Jefferson, or Hamilton. . .."); People ex rel. Thorne v. Hays, 4 Cal. 127, 133–34 (1854)(noting "the days of the [early French] Republic, when Robespierre. . .[brought] bloody scenes of tumult and revolution. . ..") For this reason, among others, our society requires respect for trained judges and the considered orders they issue; Jacobin - like pronouncements pulled out of nowhere will not do.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

certain matters from being introduced into evidence, striking pleadings, dismissing the action, or even entering a judgment by default.") Dismissal is particularly appropriate where, as here, "the Court has issued unambiguous warnings that a refusal to correct course and abide by the local rules, standing orders, court orders, and Federal Rules would result in sanctions." Loop AI Labs Inc. v. Gatti, 2017 WL 934599, at *12 (N.D. Cal. 2017), aff'd, 742 F. App'x 286 (9th Cir. 2018); (see, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..")

Even if the Court permits this matter to proceed (and it should **_not_**), the defense is entitled to some safeguards to help ensure that what happened at Plaintiff's deposition is not repeated again. For starters, we need a re-do of Plaintiff's deposition under the supervision of a retired Magistrate Judge (at your expense). Apart from the forgoing repeated breaches of the Court's civility order, the following rule violations illustrate the need for your constant supervision by a bench officer.

## II.     SPEAKING OVER OTHERS

For starters, the defense is entitled to have a deposition transcript which they can actually use at trial. Your constant interruptions during the deposition make Plaintiff's deposition transcript essentially unusable. Part of the problem is your interruptions while questions were being asked or answers were being given. There is no practical way to edit your videoed interruptions out of the middle of someone else's attempt to ask (or answer) questions.

The following deposition excerpts (featuring your interruptions of both me and your client) are illustrative:

**Page 95**

22 Q You understood that law enforcement is called
23 to the scene of problems --
24 MS. MKRTCHYAN: **Vague and ambiguous.**
25 Q BY MR. HARRELL: -- and they are asked to try

**Page 96**
1 and resolve the problems; right?
2 MS. MKRTCHYAN: Vague and ambiguous.

(Transcript, 95:22 – 96:2)(emphasis added)

**Page 263**

3 Q BY MR. HARRELL: Sir, after you learned that
4 we were seeking --

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

5 MS. MKRTCHYAN: **We're getting up. No.** Let's get
6 up. Because you know what? You're continuing to ask
7 the same question going into attorney-client privileged
8 communications. Thank you.
9 So if you're not going to move onto another
10 topic that does not infringe upon my client's right to
11 privilege, I will stay here.
12 Do you have another question?
13 MR. HARRELL: **I was trying to get my question out,**
14 **and somebody interrupted.**
15 MS. MKRTCHYAN: Well, because you are asking the
16 same exact question. I already know what question
17 you're asking, because you are already assuming
18 something of my client. So I'm not going to let that
19 happen. Okay?

(Transcript, 263:3 - 19)(emphasis added)


**Page 114**

8 Q You were calm and cool the entire time of the
9 incident?
10 MS. MKRTCHYAN: Asked and answered.
11 THE WITNESS: Yes.
12 Q BY MR. HARRELL: You used restrained,
13 respectful words throughout the entire incident; right?
14 A I will say I cussed a couple times. . ..

20 Q Do you make it your practice to use curse
21 words when you're angry and upset?
22 MS. MKRTCHYAN: Argumentative.
23 THE WITNESS: I wasn't angry --
24 MS. MKRTCHYAN: **Argumentative**
25 THE WITNESS: -- or upset. I was frustrated.

(Transcript, 114:8 - 25)(emphasis added)


I thereafter tried to get a usable deposition answer from your client (without your interruption). But you wrongful blocked my efforts:


**Page 115**

1 MS. MKRTCHYAN: Let me object. Okay? This is
2 going --

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

3 Q BY MR. HARRELL: Do you make it your practice
4 to use curse words when you're angry and upset?
5 MS. MKRTCHYAN: Asked and answered. Badgering the
6 witness.
7 Are you going to continue doing the same thing
8 over and over again? You asked, and he answered.
9 Q BY MR. HARRELL: Do you make it your practice,
10 sir, to use --
11 MS. MKRTCHYAN: **Don't answer that.**
12 (Discussion off the record.)
13 (The following record was read:
14 "Q Do you make it your practice, sir,
15 to use --")
16 MS. MKRTCHYAN: Okay. Asked and answered. I'm
17 **instructing not to answer** that question.
18 Q BY MR. HARRELL: Do you make it your practice,
19 sir, to use curse words when you're angry and upset?
20 MS. MKRTCHYAN: **I'm instructing you not to answer**.
21 MR. HARRELL: Mark it.

(Transcript, 115:1 - 21)(emphasis added.)

**Page 194**

17 Q BY MR. HARRELL: If we hear the word "guess,"
18 that causes problems.
19 Okay?
20 A Okay.
21 Q So let me ask you --
22 MS. MKRTCHYAN: Are you going to let me to make the
23 record clear, Counsel?
24 MR. HARRELL: Well, **if I can just get my question**
25 **out**, and then we'll see what happens next.

(Transcript, 194:17 - 25)(emphasis added.)

In federal cases, "[i]t is inappropriate for counsel to . . . *__interrupt__* . . .opposing counsel during a deposition. . . .Courts have characterized such conduct as 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of meaningful testimony and disrupt the orderly flow of a deposition." <u>Luangisa v. Interface Operations,</u> 2011 WL 6029880, at *7 (D.Nev. 2011)(emphasis added.) It is also improper for you to interrupt your own client's answer. <u>See</u>, <u>Claypole v. Cty. of Monterey</u>, 2016 WL 145557, at *3 (N.D. Cal. 2016)(sanctions ordered in response to "extremely long speaking objections, coaching witnesses, [and] *__cutting off witnesses__* . . ..")(emphasis added.); <u>see</u>, <u>Claredon Nat'l</u> <u>Ins. Co. v. Foley & Bezek, LLP</u>, 2001 WL 1223486, at * 1 n.2 (C.D.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

Cal. 2001)(constant interference during a deposition is a " 'blatant and egregious' discovery violation[ ].") As the forgoing excerpts illustrate, you violated this rule repeatedly at Plaintiff's deposition. (See, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..")

## III.    IMPROPER INSTRUCTIONS NOT TO ANSWER

You also improperly instructed Plaintiff not to answer questions throughout the deposition. As you are aware, Fed. R. Civ. P. 30 states that counsel "may instruct a deponent not to answer **only** when necessary to preserve a **privilege**, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." (emphasis added.) Your many instructions not to answer questions were not to enforce a court order, and the vast majority were not to preserve a "privilege" as Rule 30 permits. See, IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *2 (S.D. Cal. 2017) ("Instructing a deponent not to answer a question on any grounds not delineated in Rule 30(c)(2) can be grounds for sanctions under Rule 30(d)(2).")

"In general, objections during depositions are noted for the record but the deposition proceeds and testimony is taken subject to any objection." Horowitz v. Chen, 2018 WL 4560697, at *3 (C.D. Cal. 2018)(citations omitted.); see, In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig., 2010 WL 4942645, at *9 (C.D. Cal. 2010) ("An attorney may **not** instruct a witness not to answer a question on the ground that it has been asked and answered, is vague and ambiguous or is irrelevant")(emphasis added.)

The following deposition excerpts are illustrative of the problem I repeatedly confronted:

**Page 97**

1 Q Okay. Was it important to you to help
2 show the officers that you posed no threat to
3 them?
4 THE WITNESS: Do we scale off on a matter of
5 importance at that situation? Because **I have a few**
**6 more things that were important**, like my life. I felt
7 threatened. That was important to me at that moment.
8 Whether these guys were going to shoot me like they do
9 a lot of other people, that was important to me.
10 Q BY MR. HARRELL: Sir, was it -- with regret,
11 I'm going to ask it again.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

12 You're answering questions that I haven't
13 asked you.
14 A Okay.
15 Q My question has another focus.
16 MS. MKRTCHYAN: Vague and -- okay. First of all,
17 argumentative.
18 MR. HARRELL: So with regret, we're going to read
19 it back.
20 MS. MKRTCHYAN: Well, objection. Argumentative.
21 You are badgering the witness. If you don't like the
22 answers, seriously, I'm not going to let you badger my
23 client if you don't like the answer. **This is**
24 **hilarious.**
25 So if you don't understand the question, you

**Page 98**
1 need to ask for clarification. Okay? But --
2 (The following record was read:
3 "Q Okay. Was it important to you to help
4 show the officers that you posed no threat to
5 them?")
6 MS. MKRTCHYAN: Vague and ambiguous. Relevance.
7 Calls for speculation. **What he is thinking at the time**
8 **is irrelevant**, and more importantly, he already
9 answered the question.
10 So, I'm, you know, **instructing you not to**
11 **answer.** There was an answer to that already.
12 If you're going to continually ask him --
13 MR. HARRELL: Whoa. Stop. You state legal
14 objections, and then we move on.
15 MS. MKRTCHYAN: If you're going to ask -- okay. If
16 you're going to ask the same question over and over
17 again, I'm going to keep objecting, and I'm going to
18 **instruct him not to answer.**

(Transcript, 97:1 – 98:18)(emphasis added.)

First of all, your claim that "[w]hat [Plaintiff] is thinking at the time is irrelevant" is flatly wrong. "[T]he purpose of a deposition is to find out what the witness ***thinks***, saw, heard or did." Mazzeo v. Gibbons, 2010 WL 3020021, at *2 (D. Nev. 2010)(emphasis added). Plaintiff's mindset when he was interacting with the peace officers he now sues is therefore directly relevant to the issues Mr. Holloway raises. See, Fed. R. Civ. P. 26.

In any event, an instruction not to answer based on "relevance" is not permissible. See, IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *3 (S.D.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

Cal. 2017)("Mr. Mays also objected on grounds of relevance and instructed Mr. King not to answer questions regarding a consultant for Plaintiff named Julie Dixon, who apparently performed project manager services for Plaintiff. Although the relevance of this line of questioning . . . is unclear, it was improper for Mr. Mays to instruct Mr. King not to answer on grounds of relevance. . ..The instruction not to answer this line of questioning was improper and impeded and frustrated the fair examination of the deponent.")(record citations omitted)

Also, Plaintiff – at your encouragement – combatively failed to answer the question he was asked – i.e., "was it important to you to help show the officers that you posed no threat to them?" Instead, and consistent with your own outbursts, Plaintiff evaded the question and made an off-point speech denouncing law enforcement. See, MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at *1 (C.D. Cal. 2014)("the witness appears to have been highly evasive and unwilling to simply answer a question. . .. The end result was essentially a filibuster . . .."); Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)(counsel for the deponent "was disrespectful and personally attacked [questioning] counsel in a way that is wholly unsuitable for a deposition or any other litigation proceeding. . ..These types of comments would have no place in a courtroom, and they accordingly have no place in a deposition proceeding. . .. To make matters worse, the Court's review of the deposition transcript strongly suggests that [counsel for the deponent's] ***antagonistic behavior emboldened [the witness] to be uncooperative***, rendering the deposition nearly wholly ineffective.")(emphasis added.)

Your instruction not to answer based on an "asked and answered" objection is frivolous. "Not only was the objection . . . unfounded as the question had not been answered . . . but that determination is also one for the Court to make rather than counsel during the deposition." Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018); see, Lund v. Matthews, 2014 WL 517569, at *4-6 (D. Neb. 2014) (awarding sanctions where counsel instructed the witness not to answer on the basis of an "asked and answered" objection). As noted above, "[i]t is inappropriate for counsel to . . . assert groundless objections [or] improperly object. . .." Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011) "Courts have characterized such conduct as 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of meaningful testimony and disrupt the orderly flow of a deposition." Id. The Luangisa Court's opinion could have been written to address the deposition transcript at issue here.

Plaintiff's deposition transcript is replete with additional examples of improper instructions not to answer:

**Page 114**

8 Q You were calm and cool the entire time of the
9 incident?

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020


10 MS. MKRTCHYAN: Asked and answered.
11 THE WITNESS: Yes.
12 Q BY MR. HARRELL: You used restrained,
13 respectful words throughout the entire incident; right?
14 A I will say I cussed a couple times. . ..

20 Q Do you make it your practice to use curse
21 words when you're angry and upset?
22 MS. MKRTCHYAN: Argumentative.
23 THE WITNESS: I wasn't angry --
24 MS. MKRTCHYAN: **Argumentative**
25 THE WITNESS: -- or upset. I was frustrated.

**Page 115**

1 MS. MKRTCHYAN: Let me object. Okay? This is
2 going --
3 Q BY MR. HARRELL: Do you make it your practice
4 to use curse words when you're angry and upset?
5 MS. MKRTCHYAN: Asked and answered. Badgering the
6 witness.
7 Are you going to continue doing the same thing
8 over and over again? You asked, and he answered.
9 Q BY MR. HARRELL: Do you make it your practice,
10 sir, to use --
11 MS. MKRTCHYAN: **Don't answer that.**
12 (Discussion off the record.)
13 (The following record was read:
14 "Q Do you make it your practice, sir,
15 to use --")
16 MS. MKRTCHYAN: Okay. Asked and answered. I'm
17 instructing not to answer that question.
18 Q BY MR. HARRELL: Do you make it your practice,
19 sir, to use curse words when you're angry and upset?
20 MS. MKRTCHYAN: I'm **instructing you not to answer**.
21 MR. HARRELL: Mark it.

(Transcript, 114:8 – 115:21)(emphasis added.)


        Your instruction not to answer based on an "asked and answered" objection is
frivolous. See, Lund v. Matthews, 2014 WL 517569, at *4-6 (D. Neb. 2014) (awarding
sanctions where counsel instructed the witness not to answer on the basis of an "asked
and answered" objection). And this is particularly so since I was attempting to obtain a

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

**_usable answer_** that did not include your interruption **_in the middle of your client's answer_**.

Plaintiff – emboldened by your antagonism -- also did not answer the question, which asked about his "practice" as regards his use of profanity. Instead, Plaintiff answered a question no one had asked him – i.e., how he was feeling at the time of the incident. See, Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)(counsel for the deponent "was disrespectful and personally attacked [questioning] counsel in a way that is wholly unsuitable for a deposition or any other litigation proceeding. . ..To make matters worse, the Court's review of the deposition transcript strongly suggests that [counsel for the deponent's] **_antagonistic behavior emboldened [the witness] to be uncooperative_**, rendering the deposition nearly wholly ineffective.")(emphasis added.)[6]

At times, you even ordered your client to remain silent so you could start testifying for him:

**Page 135**

4 Q. Do you believe that officers were
5 outside of your tent for no reason?
6 MS. MKRTCHYAN: **He would not know**. Calls for
7 speculation. Vague and ambiguous. And asked and
8 answered.
9 So I'm **instructing you not to answer** the same
10 question.
11 THE WITNESS: Okay.
12 MR. HARRELL: Mark it.

(Transcript, 135:4-12)(emphasis added.)

---

[6] As you became more combative and obstructive, so did Plaintiff:

4 Q BY MR. HARRELL: Okay. So when the officer
5 indicated that he had officer safety concerns and
6 that's why he wanted to --
7 A Yeah.
8 Q -- pat you down, you understood that the
9 officer wanted to do a pat-down search to see if you
10 had any weapons on you; right?
11 A **I understand he wanted to violate my civil**
12 **rights.**
13 Q I understand, sir. That's kind of more
14 something for your lawyer to say in front of a jury.
15 My question has another focus.

(Transcript, 90:4-15)(emphasis added.)

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

Plaintiff seeks "emotional distress" damages in this case. The defense is therefore entitled to find out _**why**_ Plaintiff is upset, including _**what**_ about the incident supposedly upsets him. See, e.g., Kelley v. Schlumberger Technology Corp., 849 F.2d 41, 44 (1st Cir.1988) (jury instructions correctly stated that plaintiff can only recover for emotional distress if "a reasonable person in the plaintiff's position would have been seriously distressed" under the circumstances); Pichowicz v. Hoyt, 2000 WL 1480445, at *3 (D.N.H. 2000)(limiting damages where court finds "a reasonable, normally constituted person would not suffer compensable severe emotional distress under the circumstances of this case.")

The threshold defense inquiry in cases of this type is _**what Plaintiff believes**_ happened during the subject incident, which is something _**only he**_ can answer. Rather than allow me to gather this relevant information, you reformulated my question, answered the reformulated question for your client and instructed him not to answer based on "relevance" and "asked and answered" objections.

None of this is acceptable. First of all, "answering" for your client is wrong. See, Claypole v. Cty. of Monterey, 2016 WL 145557, at *3 (N.D. Cal. 2016)(sanctions ordered in response to "extremely long speaking objections, coaching witnesses, cutting off witnesses and _**even answering for them**_.")(emphasis added.)

Re-phrasing my deposition questions in a manner to your liking is also wrong. See, Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)("Additionally, [Chen's counsel] frequently made speaking objections to coach Chen and _**re-phrase Mannion's questions**_ to elicit more favorable responses. . .. [Chen's counsel] used his speaking objections to coach Chen on what issues to address.")(emphasis added.); BNSF Ry. Co. v. San Joaquin Valley Ry. Co., 2009 WL 3872043, at *4 (E.D. Cal. 2009) ("counsel for the witness being deposed is prohibited from acting as an intermediary [by] interpreting questions. . ..") Indeed, even " 'cluing' the witness to ask the questions to be rephrased" is wrong. MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at *1 (C.D. Cal. 2014)("Counsel stepped up the attempt to disrupt any worthwhile examination by . . .'cluing' the witness to ask the questions to be rephrased. . ..")

And your instruction not to answer was, once again, frivolous. See, In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig., 2010 WL 4942645, at *9 (C.D. Cal. 2010) ("An attorney may not instruct a witness not to answer a question on the ground that it has been asked and answered, is vague and ambiguous or is irrelevant").

**Page 37**

7 Q Okay. For what period of time did you work
8 with Apex Company doing copy repair?

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

9 A That would have been through 2016. That
10 overlapped with self-employed. I was doing both.
11 Q Okay. When did your work with Apex start?
12 A 2015. . ..

**Page 38**

12 MS. MKRTCHYAN: Just I don't understand, Counsel,
13 why are you going that back in time? What is your -- I
14 mean, the guy doesn't remember. Would you remember?
15 Maybe yes. Maybe not. What is the relevance of him
16 telling you his employment that going far back ahead --
17 back?
18 MR. HARRELL: Okay. Thank you for all that.
19 Q Sir, for what period of time --
20 MS. MKRTCHYAN: Well, are you going to answer?
21 **Because I can instruct him not to answer. If something**
22 **I believe is irrelevant to your case**, to your defenses,
23 I can ask -- you know, going back that far, I just
24 don't believe that's relevant.
25 You know, what is relevant is maybe five years

**Page 39**

1 before the incident employment history or one year
2 before the incident. But you're going 2012 and before
3 then, and **he doesn't even remember.**
4 MR. HARRELL: Ma'am --
5 MS. MKRTCHYAN: So **do you have an offer of proof**?
6 MR. HARRELL: Ma'am, **maybe the time to meet and
7 confer is at another time and place.** Why don't you let
8 me ask my questions. You make your objections. If you
9 feel the need to instruct your client not to answer on
10 a relevance objection based on his employment history,
11 then I suppose you will do that.
12 MS. MKRTCHYAN: Uh-huh.
13 MR. HARRELL: And then we have our remedy.
14 MS. MKRTCHYAN: Okay.
15 MR. HARRELL: So let me get my questions out there.
16 Let's state objections. **Let's conduct ourselves like
17 we're in court as best as we can.**
18 MS. MKRTCHYAN: Uh-huh.
19 Q BY MR. HARRELL: And my next question, sir,
20 is, sir, for what period of time were you employed by
21 Apex?

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

22 MS. MKRTCHYAN: So here is the issue. **I'm going to**
23 **instruct you not to answer anything that is beyond**
24 **2012**. Okay?
25 THE WITNESS: All right.

(Transcript, 37:7 – 39:25)(emphasis added.)

Basic background information, such as Plaintiff's employment history, is relevant and discoverable. See, Hunt v. Walmart Store, Inc., 2019 WL 1057199, at *1 (E.D.Mich. 2019) ("Many of Defendant's discovery requests are clearly relevant, including basic biographical information such as name, address, **_occupation_**, etc. . ..")(emphasis added.); Call v. Shaw Jewelers, 1999 U.S. Dist. LEXIS 636 (E.D. Va. 1999) (noting that "[q]uestions as to an individual's...employment history...are basic identifying questions"; Court orders the material disclosed); DeNardo v. ABC, Inc., 51 P.3d 919, 924 (Alas. 2002) ("[Defendant] is correct that information regarding [plaintiff's] prior . . . employers might have been helpful in determining which jurisdictions to search for his criminal and litigation history"; Case dismissed for plaintiff's failure to provide same); Grant v. Target Corp., 281 F.R.D. 299, 311 (S.D.Ohio 2012)(the defense asked plaintiff "to state the name and address of all employers by whom he has been employed before, during, and since his employment with Target ended, the positions in which he was employed, the dates of employment, the identity of individuals to whom he reported in each job, the salary and/or compensation provided in such position, the benefits provided by such employer, whether he participated in such benefit programs, whether he was counseled or disciplined, and if his employment ended, the reason why. . . .. Mr. Grant is hereby required to answer all of the[se] questions . . ..")

Further, consuming valuable deposition time with a shrill demand that I "meet and confer" with you on a non-controversial topic is improper. And your instruction not to answer was, once again, frivolous. See, IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *2 (S.D. Cal. 2017)("Counsel for DPT attempted to question Mr. King regarding vehicle sensors. Rather than simply interposing an objection, attorney Mays **_demanded an explanation_** of the relevance of the line of questioning from counsel for DPT. When counsel for DPT **_properly refused to engage_** with Mr. Mays on the issue, Mr. Mays instructed his client not to answer solely on the basis of relevance.")(emphasis added.); In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig., 2010 WL 4942645, at *9 (C.D. Cal. 2010) ("An attorney may not instruct a witness not to answer a question on the ground that it . . .is irrelevant").

## IV.    CONSTANT DISRUPTIVE COMMENTS

Plaintiff's deposition is replete with off-putting interjections that often amounted to needless attempted quarrels over nothing:

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

**Page 75**

9 Q Do you believe that you have a clear memory of
10 what happened during the incident?
11 A I have a very clear memory.
12 MS. MKRTCHYAN: Argumentative. Excuse me.
13 Argumentative. **Vague and ambiguous.** Clear memory.
14 **Do you understand the question?**
15 THE WITNESS: **Yes.**
16 MS. MKRTCHYAN: Okay.

(Transcript, 75:9-16)(emphasis added.)

**Page 101**

11 Q And so you did not agree with the officer's
12 request to pat you down; true?
13 A I never said no, but I never said yes. I just
14 kept asking, "Why are they here?" And that's what I
15 just kept repeating. And I was getting frustrated with
16 them because they would not answer me.
17 Q Okay.
18 MS. MKRTCHYAN: **Why are you interrupting?**
19 Q BY MR. HARRELL: So when the officer says --
20 MS. MKRTCHYAN: Excuse me. Let him finish --
21 Q BY MR. HARRELL: -- says, "I would like to
22 do" --
23 MS. MKRTCHYAN: Excuse me. Hello?
24 Q BY MR. HARRELL: -- "a pat-down search" --
25 "I'd like to do a pat-down search."

**Page 102**

1 MS. MKRTCHYAN: This is not going to work. **If**
2 **you're going to continue interrupting my client, this**
3 **is not going to work.** He was answering your question.
4 **Do not interrupt my client.**
5 **Did you finish your answer?**
6 THE WITNESS: **As far as what he's answering, I**
7 **think.**

(Transcript, 101:11-102:7)(emphasis added.)

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

**Page 139**

1 Q Well, sir, you've already told us that you do
2 sometimes experience anger and upset when you think
3 about the incident; true?
4 MS. MKRTCHYAN: **Misstates the testimony. Misstates**
5 **the testimony.**
6 THE WITNESS: **Yes, I did say -- I did say that.**

(Transcript, 139:1-6)(emphasis added.)

**Page 154**

9  Q The first time law enforcement responds to
10 your tent, during that interaction, at some point you
11 tell Deputy Renegar that the people that they're
12 looking for, the people that are actually fighting, are
13 located at another campsite next to you?
14 A Yes.
15 Q And you identify these people as being the man
16 and the woman that were quarreling?
17 A **Yes.**
18 MS. MKRTCHYAN: **Misstates the testimony.**

(Transcript, 154:9-18)(emphasis added.)

**Page 158**

6  Q . . .
8 So when you got back to your campsite, you had
9 some questions that included why didn't these neighbors
10 speak up and identify themselves as the people that had
11 been involved in the quarrel; true?
12 MS. MKRTCHYAN: Objection. Vague and ambiguous.
13 **Misstates the testimony.**
14 THE WITNESS: I asked them, **yeah**, straight up. I
15 asked them why.

(Transcript, 158:6-15)(emphasis added.)

**Page 194**

17 Q BY MR. HARRELL: If we hear the word "guess,"

40

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

18 that causes problems.
19 Okay?
20 A Okay.
21 Q So let me ask you --
22 MS. MKRTCHYAN: Are you going to let me to make the
23 record clear, Counsel?
24 MR. HARRELL: Well, **if I can just get my question
25 out, and then we'll see what happens next.**


**Page 195**


1 MS. MKRTCHYAN: Well, he made a demonstration, and
2 I wanted to make a record.
3 MR. HARRELL: Right. But he also told us --
4 MS. MKRTCHYAN: It's your deposition. Fine.
5 MR. BECK [Plaintiff's co-counsel]: Narine, **you got this thing on videotape.**
6 MS. MKRTCHYAN: I understand. But what if that
7 **video gets destroyed**? How am I going to know if that
8 video is not **going to get destroyed**? . . ..[7]

(Transcript, 194:17 – 195:8)(emphasis added.)


In federal cases, "[i]t is inappropriate for counsel to engage in extensive and ***unnecessary colloquy***. . .or utilize any opportunity ***to interrupt and argue*** with opposing counsel during a deposition." Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011). This is particularly so where, as here, there is nothing legitimate to argue about. Id. ("Courts have characterized such conduct as 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of meaningful testimony and disrupt the orderly flow of a deposition.") Here too, your failure to abide by basic deposition principles wrongfully interfered with my ability to conduct a meaningful deposition. (See, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..")

---

[7] Given Plaintiff's apparent destruction of his Facebook account to frustrate its production in discovery, the irony of this outburst is also one of the defining characteristics of Plaintiff's litigation team: loudly accuse others of wrongdoing that you yourself are guilty of. Freud called this tactic "projection." The rest of us call it hypocrisy.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

## V.      ALTERNATIVE STRESSORS / LOCATION OF WITNESSES

Plaintiff seeks "emotional distress" damages in this case. Given Plaintiff's
"emotional distress" claims, he "is placing his mental condition at issue in this case, and
[the defense] is entitled to explore ***any evidence*** . . .which may be relevant to such a
claim." Walker v. Northwest Airlines Corp., 2002 WL 32539635, at *4
(D.Minn.2002)(emphasis added).

Courts have made this point over and over again – a plaintiff, like Mr.
Holloway, who seeks compensation for their "emotional distress" opens the door to
discovery of potential alternative causes for their "distressed" condition. See, e.g., Doe
v. City of Chula Vista, 196 F.R.D. 562, 569 (S.D. Cal. 1999) ("[plaintiff] elected to seek
monetary relief from the defendants to compensate her for 'emotional pain, suffering,
loss of self esteem, and mental anguish'; consequently, [plaintiff] is relying on her
emotional state to make her case ... But to insure a fair trial, particularly on the element
of causation, the court concludes that defendants should have access to evidence that
[plaintiff's] emotional state was caused by something else. Defendants must be free to
test the truth of [plaintiff's] contention that she is emotionally upset because of the
defendants' conduct. Once [plaintiff] has elected to seek such damages, she cannot
fairly prevent discovery into evidence relating to the element of her claim."); Fox v.
Gates Corp., 179 F.R.D. 303, 306 (D. Colo. 1998) (defendant is entitled to discovery
whenever "the information. . . is relevant to whether the emotional distress which
plaintiff claims to have suffered as a result of defendant's conduct can be attributed in
whole, or in part, to some other stressor in her life."); see also, Vinson v. Superior Court,
43 Cal. 3d 833, 839-840 (1987)("In the case at bar, plaintiff haled defendants into court
and accused them of causing her various mental and emotional ailments. Defendants
deny her charges. As a result, the existence and extent of her mental injuries is
indubitably in dispute. In addition, by asserting a causal link between her mental
distress and defendants' conduct, plaintiff implicitly claims it was not caused by
[another] mental condition, thereby raising the question of alternative sources for the
distress. We thus conclude that her mental state is in controversy.")

Given Plaintiff's demand for "emotional distress" damages, Plaintiff's evident
estrangement from his family is a legitimate area for discovery. Even so, you wrongly
blocked any inquiry into this relevant subject matter:

**Page 45**

17 Q And Kailin Holloway is a child that you had
18 with Karlie Holloway?
19 A Yes, it is.
20 Q Okay. Kailin Holloway lives where now?
21 A I do not know.
22 Q Does she live in the state of California?
23 A I do not know.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

24 Q When is the last time you had any contact with
25 Kailin Holloway?


**Page 46**

1 MS. MKRTCHYAN: Objection. Relevance. Privacy.
2 **You're instructed not to answer.**
3 MR. HARRELL: Mark it.


**Page 50**

2 Q Are you in contact with your father at the
3 present time?
4 A No, I am not.
5 Q Is there a reason why?
6 MS. MKRTCHYAN: Objection. Relevance. Privacy.
7 You are instructed not to answer questions
8 that are private and nobody should have a right to
9 learn. Thank you.
10 MR. HARRELL: Mark it. . ..

19 Q Are you in contact with your brother, Joseph
20 Holloway?
21 MS. MKRTCHYAN: Objection. Relevance. Privacy.
22 You're instructed not to answer.
23 MR. HARRELL: Mark it.
24 Q Are you in contact with your sister, Misty
25 Henderson?


**Page 51**

1 MS. MKRTCHYAN: Same objection.
2 You are instructed not to answer it based on
3 privacy.
4 MR. HARRELL: Mark it.

(Transcript, 45:17 – 51:4)(emphasis added.)

One would suppose that Plaintiff's evident estrangement from his family qualifies as an "alternative stressor" for damages purposes. Defendants are at least entitled to explore the point in discovery in preparing their defense. See, e.g., Walker v. Northwest Airlines Corp., 2002 WL 32539635, at *4 (D. Minn. 2002) (". . .where a plaintiff puts his emotional condition into issue in the litigation, *__he effectively waives his right to privacy__* . . .. Here, Plaintiff has placed his medical condition at issue by claiming emotional distress damages.")(emphasis added and citations omitted.); Mathie v. Fries, 935 F. Supp. 1284, 1304 (E.D.N.Y. 1996) ("In the determination of the monetary

43

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

damages to be awarded to the plaintiff [under Section 1983] for the considerable emotional distress sustained as a result of the sexual abuse, the Court must be careful not to compensate the plaintiff for the non-related distress."), aff'd, 121 F.3d 808 (2d Cir. 1997); York v. AT&T, 95 F.3d 948, 957-958 (10th Cir. 1996) ("Because York chose to raise a claim of emotional distress, it was entirely appropriate for the court to allow the defendants to introduce evidence of alternate or multiple causes of such distress. The jury must be permitted to consider such relevant evidence of causation where damages are claimed for emotional distress. Moreover, it would be inequitable to allow the plaintiff to introduce selected evidence on the matter but to disallow the defendants to present evidence supporting their theories of causation.")

### VI.    COACHING

You often told Plaintiff how to testify through suggestive comments and leading "objections":

**Page 62**

19 Q Okay. Well, let's talk about the incident.
20 The date of the incident that you had with the
21 sheriff's department was when?
22 A Would have been January 20th, I believe.
23 Q Of what year?
24 A 2017.
25 Q Okay. And –

**Page 63**

1 MS. MKRTCHYAN: **2018.**
2 Q BY MR. HARRELL: -- where did you live on that
3 date?
4 A **Was it 2018?**
5 MR. HARRELL: **Counsel, what do we call that, what**
6 **you just did?**

(Transcript, 62:19-63:6)(emphasis added.)

As you are aware, what you "just did" is called "coaching". It is not permissible in a deposition. See, Mazzeo v. Gibbons, 2010 WL 3020021, at *2 (D. Nev. 2010)(noting the "clearly established legal rules" for conduct during a deposition, including the requirement "that lawyers are not supposed to coach or change the witness's own

44

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

words . . .."); (See, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..") But coaching was a regular go-to response to my questions.

Examples of your misconduct are not in short supply:

**Page 141**

5 Q BY MR. HARRELL: Do you hold it against law
6 enforcement for responding to the complaint of criminal
7 conduct at the campground, or do you think they just
8 should have ignored it?
9 MS. MKRTCHYAN: How do you object to this type of
10 **nonsense**?
11 THE WITNESS: This is --
12 MS. MKRTCHYAN: Argumentative. Objection. **Vague**
13 **and ambiguous.**
14 THE WITNESS: **Yeah, I can't answer that question.**

(Transcript, 141:5-14)(emphasis added.)

Coaching of this type is wrong. See, Mazzeo v. Gibbons, 2010 WL 3020021, at *2 (D. Nev. 2010)(noting the "clearly established legal rules" for conduct during a deposition, including "mak[ing] speaking, coaching, suggestive objections which violate Rule 30(c)(2).");  Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011)("Deposition testimony should be that of the deponent, not a version edited or glossed by the deponent's lawyer through coaching or speaking objections.") "Courts have characterized such conduct as 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of meaningful testimony and disrupt the orderly flow of a deposition." Luangisa, 2011 WL 6029880, at *7.

Your coaching included undisguised requests for Plaintiff to "not remember" when you felt it best for your case:

**Page 317**

8  Q. . .How many photographs of the bruising that
9 you've talked about to your ribs and back -- how many
10 photographs of that were taken?
11 MS. MKRTCHYAN: **Do you remember**? If you recall.
12 THE WITNESS: Taken 50 photographs.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020


13 MS. MKRTCHYAN: Altogether?
14 THE WITNESS: Of everything.
15 MS. MKRTCHYAN: Right. But he's asking
16 specifically of this area, **if you remember.**
17 THE WITNESS: I have -- I mean --
18 MS. MKRTCHYAN: **If you remember**. . ..

**Page 318**

4 MS. MKRTCHYAN: He's asking, **if you remember**, how
5 many of each side. But if you don't remember, **you can**
6 **say "I don't remember."**
7 THE WITNESS: **I don't remember** the exact number.
8 MS. MKRTCHYAN: **Exactly.**

(Transcript, 317:8-318:8)(emphasis added.)


Needless to say, coaching of this type is wrong. <u>See, Mazzeo v. Gibbons</u>, 2010 WL 3020021, at *2 (D. Nev. 2010)(noting the "clearly established legal rules" for conduct during a deposition, including the recognition "that speaking objections such as 'if you remember,' 'if you know,' 'don't guess,' 'you've answered the question,' and 'do you understand the question' are designed to coach the witness and are improper."); <u>Cotton v. City of Eureka</u>, 2010 WL 2889498, at *1-3 (N.D. Cal. 2010) (noting that an attorney had violated Rule 30(c)(2) when she "interposed improper coaching objections and improper speaking objections")

Your coaching even crossed the line to ***<u>outright testimony</u>*** on behalf of your client:

**Page 56**


12 Q BY MR. HARRELL: Sir, have you received a bill
13 from the VA, to your knowledge, for your medical
14 treatment since the incident happened? Yes, no, or I
15 don't know?
16 MS. MKRTCHYAN: **Or has your lawyer** -- see --
17 MR. HARRELL: Ma'am, with respect, that's not my
18 question. So you'll have an opportunity later if
19 you're so inclined to ask whatever you want to ask.
20 Right now my question has a limited focus that does not
21 involve you, with all due respect.
22 MS. MKRTCHYAN: Well, excuse me. If it's
23 attorney-client privilege, then it is involving me.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020


24 MR. HARRELL: Ma'am.
25 MS. MKRTCHYAN: So -- and you know what? Your

**Page 57**

1 attitude -- I really do not appreciate this
2 condescending attitude, unprofessional, sexist attitude
3 that you're coming up across from the very beginning
4 this morning. I'm not going to tolerate that.
5 From the very beginning, you've been this
6 hostile, you know, person, you know. So I'm not going
7 to tolerate that.
8 I'm instructing him not to answer because the
9 answer presupposes attorney-client privilege. Okay?
10 **He is -- he has -- his attorney has received billing**
11 **records.** He has not received it. So, therefore, his
12 answer is irrelevant. So –

(Transcript, 56:12-57:12)(emphasis added.)

Your decision to "answer" deposition questions which were directed to your client is wrong. See, Claypole v. Cty. of Monterey, 2016 WL 145557, at *3 (N.D. Cal. 2016)(sanctions ordered in response to "extremely long speaking objections, coaching witnesses, cutting off witnesses and ***even answering for them***.")(emphasis added.); Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011) ("Deposition testimony should be that of the deponent, not a version edited or glossed by the deponent's lawyer through coaching or ***speaking objections***.")(emphasis added.); (See, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..")

Re-phrasing my questions into something you felt best served your case is also improper. See, Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)("Additionally, [Chen's counsel] frequently made speaking objections to coach Chen and ***re-phrase Mannion's questions*** to elicit more favorable responses. . .. [Chen's counsel] used his speaking objections to coach Chen on what issues to address."); BNSF Ry. Co. v. San Joaquin Valley Ry. Co., 2009 WL 3872043, at *4 (E.D. Cal. 2009) ("[C]ounsel for the witness being deposed is prohibited from acting as an intermediary [by] ***interpreting questions***. . ..")(emphasis added.); (See, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..")

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

## VII.   SANCTIONS

We could go on and on -- and on some more. There is certainly much more that can be said about your misconduct. But the nature of the many problems with your conduct during Plaintiff's deposition should have been clear pages ago. Plaintiff's deposition was yet another "train wreck" performance on your part. Your misconduct repeatedly violated the Court's civility order as well as basic, long-settled rules governing how federal depositions are supposed to proceed.

As noted above, the appropriate remedial result now is dismissal of Plaintiff's case. See, Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992) ("[P]ursuant to [Rule] 41(b), the district court may dismiss an action for failure to comply with ***any order*** of the court.")(emphasis added); Loop AI Labs Inc. v. Gatti, 2017 WL 934599, at *15 (N.D. Cal. 2017), aff'd, 742 F. App'x 286 (9th Cir. 2018)(dismissal ordered where "Plaintiff's actions evince a persistent belief that it is above any obligation to obey the Court's orders. . .or rules.")[8]

The need for dismissal here is only heightened and exacerbated by your conduct during our last discovery hearing with Magistrate Judge McCormick just last week. As the transcript we ordered will reflect, you saw fit to show a complete lack of civility to our Magistrate Judge which featured insults and verbal outrages of a type I have never witnessed in a court proceeding. Your raised voice tirade was *non compos mentis* – to an astonishing degree.[9] Before you abruptly hung up on the judge, it became plain – once again -- that you have no respect for our judge, his orders or our

---

[8] At this point, Plaintiff's "beef is against [his lawyer] not the court's ruling on the case.... 'Holding the client responsible for the lawyers' deeds ensures that both clients and lawyers take care to comply. If the lawyers' neglect protected the client from ill consequences, neglect would become all too common.' " Bakery Mach. & Fabrication, Inc., v. Traditional Baking, Inc., 570 F.3d 845, 848–49 (7th Cir. 2009). " '[T]here is certainly nothing novel [or unjust] about holding clients responsible for the conduct of their attorneys, even conduct they did not know about.' " Thorpe v. Ancell, 367 F.App'x 914, 923 (10th Cir. 2010); see also, Bd. of Trustees of Pipe Fitters' Ret. Fund, Local 597 v. Commercial Cooling & Heating, Inc., 2019 WL 2269959, at *16–18 (N.D. Ill. 2019)("the proper remedy for an innocent client whose lawyer inexcusably misses deadlines and/or otherwise fails in required obligations is a suit against the attorney for malpractice. Keeping a suit alive on the theory that a party should not be penalized for the omissions of his chosen attorney – which is Mr. Johnson's belated, unsupported theory – would be visiting the sins of the lawyer on the blameless opponent.")

[9] "Train wreck" – the descriptor used by the Court in its prior order – frankly does not do your most recent misconduct justice. Neither does "car crash" or "dumpster fire". In a case already punctuated by meltdowns, you went full Nagasaki at our last hearing.

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

judicial system. In such an unhinged environment, my clients have no hope of obtaining a "just, speedy, and inexpensive determination" of this action. Fed. R. Civ. P. 1.

Even if Plaintiff's case somehow survives, sanctions are plainly required here – for multiple reasons. See, Rywkin v. New York Blood Ctr., 1998 WL 633810, at *1 (S.D.N.Y. 1998)(deponent's counsel "(1) repeatedly directed plaintiff not to answer questions on inappropriate grounds, (2) made frivolous privilege objections and then foreclosed questioning by opposing counsel, (3) made speaking objections that suggested to the witness the answer she should give, (4) made *ad hominem* attacks on opposing counsel, and (5) insinuated, without support, that opposing counsel's conduct was racially motivated. This conduct ***clearly is sanctionable***.")(emphasis added.); see, Claypole v. Cty. of Monterey, 2016 WL 145557, at *3 (N.D. Cal. 2016)(sanctions ordered in response to "extremely long speaking objections, coaching witnesses, cutting off witnesses and even answering for them."); Funk v. Town of Paradise, 2011 WL 2580357, at *2 (E.D. Cal. 2011) (sanctioning counsel for "appalling" behavior where counsel "repeatedly interrupted the proceedings, interjected editorial comments, and coached or suggested information to the witnesses")[10]

These sanctions should include monetary compensation for the County's costs incurred at Plaintiff's first attempted deposition. Fed. R. Civ. P. 30(d)(2) provides: "The court may impose an appropriate sanction — including the reasonable expenses and attorney's fees incurred by any party — on a person who impedes, delays, or frustrates the fair examination of the deponent." See, Horowitz v. Chen, 2018 WL 4560697, at *5 (C.D. Cal. 2018)("The Court finds that monetary sanctions in the form of attorney's fees and costs are warranted. [Defense / deponent's counsel's] behavior through coaching, breaks, and frequent unprofessional comments wasted a large portion of Chen's deposition time and forced Plaintiffs to seek the Court's intervention. A monetary sanction is warranted to make Plaintiffs whole.")

The Court's sanctions order should also include:

1. The costs associated with Plaintiff's renewed deposition. See, Hernandez v. Lynch, 2019 WL 6998774, at *4 (C.D. Cal. 2019)("the Court finds that the Special Master was correct to conclude that Plaintiffs' counsels' conduct was improper and impeded Defendants from conducting a fair deposition and pursuing relevant lines of inquiry. In light of this, it was proper to order new depositions of the Named Plaintiffs."); IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *6 (S.D. Cal. 2017)("Plaintiff must reimburse DPT for

---

[10] "Rule 30(d)(2) sanctions do not require a finding of bad faith." IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *2 (S.D. Cal. 2017); see, Robinson v. The Chefs' Warehouse, 2017 WL 1064981 *2 (N.D. Cal. 2017)(same).

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

reasonable travel, attorney's fees, court reporting and any facility costs for this _**renewed**_ deposition.")(emphasis added.)

2. If the Magistrate Judge is otherwise engaged, appointment of a special master to supervise Plaintiff's renewed deposition (at Plaintiff's expense). See, Hernandez v. Lynch, 2019 WL 6998774, at *2 (C.D. Cal. 2019)("Federal Rule of Civil Procedure Rule 53(a) permits the appointment of a special master to address pretrial matters . . ..")

3. An order limiting Plaintiff's counsel's verbal statements at Plaintiff's deposition to matters permitted by Rule 30. See, IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *6 (S.D. Cal. 2017)(ordering a renewed deposition where "[o]bjections to questions are limited to the following: 'Objection as to form.' Witnesses may not be instructed not to answer any questions unless necessary to enforce a privilege. . . ."); MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at *1–2 (C.D. Cal. 2014)(limiting errant counsel's non-privilege based speaking objections at renewed deposition and finding that such "objections will be preserved and shall not be waived even though they are not asserted. Specifically, counsel shall not assert any objection that a question is vague, lacks foundation, calls for hearsay, etc."); see also, Mewborn v. Abbott Labs., 2019 WL 8060095, at *7 (C.D. Cal. 2019)("Plaintiff's counsel is encouraged to limit the number of evidentiary objections and must state each objection concisely . . . without further explanation or other extraneous statements."); id. ("Neither counsel shall . . . admonish the other; or make any remarks or comments about the other's behavior, . . facial expressions, conduct, knowledge of the law . . .and so forth."); Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011)("[i]t is inappropriate for counsel to engage in extensive and unnecessary colloquy, assert groundless objections, improperly object, or utilize any opportunity to interrupt and argue with opposing counsel during a deposition.")

4. An order that "[n]either shall any counsel interrupt or speak over any other counsel or the deponent." Mewborn v. Abbott Labs., 2019 WL 8060095, at *7 (C.D. Cal. 2019)

/ / /

/ / /

/ / /

/ / /

Re: Meet and Confer re Plaintiff's deposition
September 9, 2020

      The defense has been excused from the meet-and-confer requirement, and the Informal Discovery Conference requirement as regards your conduct at Plaintiff's deposition. <u>See</u>, <u>C.D. Cal. L.R.</u> 37-1. Even so, we send this correspondence to show all concerned, including you, just how hard we are trying to avoid what is about to happen.

      Please provide your ***<u>agreement to dismiss</u>*** this tainted action by close of business tomorrow. And please make sure that your dismissal acknowledgment is ***<u>in writing.</u>***

*Sincerely,*

**S. FRANK HARRELL**

SFH/ dm

cc:    Tamara Heathcote, Esq.

EXHIBIT D

*August 14, 2020*

**VIA EMAIL**

Narine Mkrtchyan, Esq.
MKRTCHYAN LAW
655 N. Central Ave, Suite 1700
Glendale, CA 91203

    Re: ***Jeremy Holloway v. County of Orange, et al.***
       Dates of Alleged Loss: January 21, 2018 and May 24, 2018
       Our File No.:     1793-0267
       United States District Court, Central District of California
       Case No.: 8:19-cv-01514-DOC-DFM

Dear Ms. Mkrtchyan,

The time has come for the parties to meet and confer in good faith, pursuant to C.D. Cal. L.R. 37-1, regarding Plaintiff's responses to Defendants' written discovery propounded to date. Defendants are in receipt of Plaintiff's responses to Defendant County of Orange's Fiest Set of Requests for Production. Unfortunately, many of Plaintiff's responses are inadequate, unresponsive and evasive. They lack the type of straightforward candor required in federal court proceedings. Moreover, Plaintiff's responses are peppered with largely frivolous objections which should be withdrawn. Defendants tender this correspondence to promote informal resolution of the matters raised below. See, C.D. Cal. L.R. 37-1

## INTRODUCTION

Plaintiff's responses to Defendants' written discovery requests miss the general point of discovery in the federal courts. By rule, the scope of discovery is intentionally broad. See, Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . ..."). The term "relevant" is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978); see, Grant v. Target Corp., 281 F.R.D. 299, 309 (S.D.Ohio 2012)(information discoverable if it "may be relevant" to a claim or defense).

Discovery rules are designed to result in full pre-trial disclosure of each party's position, including the strengths and weaknesses of their respective cases. See, United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958)(the purpose of discovery is to "make trial less a game of blind man's bluff and more a fair contest with the basic issues and

facts disclosed to the fullest practicable extent."); <u>Conn. General Life Insurance Co. v.
New Images of Beverly Hills</u>, 482 F.3d 1091, 1095 (9th Cir. 2007) (upholding
terminating sanctions where the court found, <u>inter alia</u>, that party's discovery responses
"approached contumaciousness," appearing "calculated to prevent [propounding party]
from learning and proving the truth.")

As such, discovery is intended to produce either an atmosphere of mutual
understanding conducive to informed settlement -- or a fully informed, focussed trial on
the merits. <u>See</u>, <u>Hickman v. Taylor</u>, 329 U.S. 495, 501 (1947)("The various instruments
of discovery now serve . . . to narrow and clarify the basic issues between the parties, and
and . . . as a device for ascertaining the facts, or information as to the existence or
whereabouts of facts, relative to those issues. Thus civil trials in the federal courts no
longer need be carried on in the dark. The way is now clear . . . for the parties to obtain
the fullest possible knowledge of the issues and facts before trial."); <u>Ragge v.
MCA/Universal</u>, 165 F.R.D. 601, 603 (C.D. Cal. 1995)("Generally speaking, the purpose
of discovery is to remove surprise from trial preparation so the parties obtain evidence
necessary to evaluate and resolve their dispute."); <u>Jadwin v. Cty. of Kern</u>, 2008 U.S.
Dist. LEXIS 119828, at *6 (E.D.Cal. 2008) (discovery rules are "to be given a broad and
liberal interpretation in the interest of according to the parties the fullest knowledge of
the facts and of clarifying and narrowing the issues.")(citation omitted.)

In short, the baseline principles that should animate any party's responses to written
discovery are openness, completeness and candor. <u>See</u>, <u>Hansel v. Shell Oil Corp.</u>, 169
F.R.D. 303, 305 (E.D. Pa. 1996) ("Parties must provide true, explicit, responsive,
complete and candid answers to [discovery]."); <u>Hunter v. International Systems &
Controls Corp.</u>, 56 F.R.D. 617, 631 (W.D.Mo. 1972) ("Parties like witnesses are required
to state the truth, the whole truth and nothing but the truth in answering written
[discovery].") Unfortunately, these qualities are largely absent from Plaintiff's discovery
responses in this case.


## PLAINTIFF JEREMY HOLLOWAY'S RESPONSES TO DEFENDANT
## COUNTY OF ORANGE'S REQUESTS FOR PRODUCTION
## (SET ONE)


## REQUEST NO. 1

This request seeks Plaintiff's medical records relating to the incident of which he
complains. This material is relevant and discoverable given Plaintiff's claims for medical
expenses and personal injuries. <u>See</u>, <u>St. John v. Napolitano</u>, 274 F.R.D. 12, 17 (D.D.C.
2011)(a defendant is entitled to production of medical records that have "a logical
connection to the plaintiff's claims of injury.")

Even so, Plaintiff's response does not produce his medical records. It simply says
medical records will be forthcoming. It also refers the defense to Plaintiff's "Initial
Disclosures", which itself does not purport to include a complete production of Plaintiff's
medical records. None of this evasion is acceptable.

The time for production of Plaintiff's incident related medical records is now. Plaintiff's
claim -- to the effect that he is still "thinking over" his response -- is evasive and beside
the point. After waiting patiently for Plaintiff's promised cooperation, the defense is
entitled to a substantive response to its damages inquiry now – not later during trial.
See, Martin v. Easton Pub. Co., 85 F.R.D. 312, 315 (E.D. Pa. 1980)("In Interrogatory
Eleven defendants explore the factual basis of plaintiff's contention that the Company's
pregnancy policy was discriminatory. Plaintiff responded that she had not completed
discovery on this issue and reserved the right to answer more fully at a future date. That
time has come. Plaintiff shall answer this interrogatory with specificity or will be
barred from offering testimony or evidence relating to this claim at trial."); see also,
United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958)(the purpose of
discovery is to "make trial less a game of blind man's bluff and more a fair contest with
the basic issues and facts disclosed to the fullest practicable extent."); Conn. General
Life Insurance Co. v. New Images of Beverly Hills, 482 F.3d 1091, 1095 (9th Cir. 2007)
(upholding terminating sanctions where the court found, inter alia, that party's discovery
responses "approached contumaciousness," appearing "calculated to prevent
[propounding party] from learning and proving the truth.")

Plaintiff's vague attempt to incorporate other documents into his response is also
defective. Under Rule 34, a response to a document request must be organized, candid
and clear. See, e.g., Grant v. Target Corp., 281 F.R.D. 299, 312–13 (S.D.Ohio 2012)
("At this point, [plaintiff] has produced a number of documents to Target, but he has
never indicated which requests these documents were responsive to, making it difficult
for Target and this Court to know to which requests for production of documents Mr.
Grant responded and to which he did not. . ..[Plaintiff] is therefore ordered to respond, in
writing, to all of Target's requests for production of documents . . .. and to organize and
label his documents so that each document corresponds to the categories in the
requests.")

Consistent with these principles, Plaintiff must provide a supplemental written response
agreeing to produce his medical records along with a clearly labelled production of the
records themselves.

**REQUEST NO. 2**

This request seeks Plaintiff's medical records relating to a pre-incident contact he had
with the Orange County Sheriff's Department. This material is relevant and discoverable
given Plaintiff's claims for medical expenses and personal injuries in this matter. See,
St. John v. Napolitano, 274 F.R.D. 12, 17 (D.D.C. 2011)(a defendant is entitled to
production of medical records that have "a logical connection to the plaintiff's claims of
injury.")

Plaintiff's medical history, including his pre-incident medical history, is relevant and
discoverable. Indeed, Plaintiff has placed his health history in issue by virtue of his
"emotional distress" claims. Given Plaintiff's "emotional distress" claims, he "is placing
his mental condition at issue in this case, and [the defense] is entitled to explore any

evidence, ___*including Plaintiff's medical records*___, which may be relevant to such a claim." Walker v. Northwest Airlines Corp., 2002 WL 32539635, at *4 (D.Minn.2002)(emphasis added.) Courts have made this point over and over again – a plaintiff, like Mr. Holloway, who seeks compensation for their "emotional distress" opens the door to discovery of potential alternative causes for their condition. See, e.g., Schoffstall v. Henderson, 223 F.3d 818, 823 (8th Cir.2000) (finding that plaintiff's claims of "emotional distress" damages placed her medical condition at issue, thereby making her medical records relevant and discoverable); Doe v. City of Chula Vista, 196 F.R.D. 562, 569 (S.D. Cal. 1999) ("[plaintiff] elected to seek monetary relief from the defendants to compensate her for 'emotional pain, suffering, loss of self esteem, and mental anguish'; consequently, [plaintiff] is relying on her emotional state to make her case ... But to insure a fair trial, particularly on the element of causation, the court concludes that defendants should have access to evidence that [plaintiff's] emotional state was caused by something else. Defendants must be free to test the truth of [plaintiff's] contention that she is emotionally upset because of the defendants' conduct. Once [plaintiff] has elected to seek such damages, she cannot fairly prevent discovery into evidence relating to the element of her claim."); Fox v. Gates Corp., 179 F.R.D. 303, 306 (D. Colo. 1998) (defendant is entitled to discovery whenever "the information. . . is relevant to whether the emotional distress which plaintiff claims to have suffered as a result of defendant's conduct can be attributed in whole, or in part, to some other stressor in her life."); see also, Vinson v. Superior Court, 43 Cal. 3d 833, 839-840 (1987)("In the case at bar, plaintiff haled defendants into court and accused them of causing her various mental and emotional ailments. Defendants deny her charges. As a result, the existence and extent of her mental injuries is indubitably in dispute. In addition, by asserting a causal link between her mental distress and defendants' conduct, plaintiff implicitly claims it was not caused by [another] mental condition, thereby raising the question of alternative sources for the distress. We thus conclude that her mental state is in controversy.")

The time for production of Plaintiff's incident related medical records is now. Plaintiff's claim -- to the effect that he is still "thinking over" his response -- is evasive and beside the point. The defense is entitled to a substantive response to its damages question now – not later during trial. See, Martin v. Easton Pub. Co., 85 F.R.D. 312, 315 (E.D. Pa. 1980)("In Interrogatory Eleven defendants explore the factual basis of plaintiff's contention that the Company's pregnancy policy was discriminatory. Plaintiff responded that she had not completed discovery on this issue and reserved the right to answer more fully at a future date. That time has come. Plaintiff shall answer this interrogatory with specificity or she will be barred from offering testimony or evidence relating to this claim at trial."); see also, United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958)(the purpose of discovery is to "make trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent."); Conn. General Life Insurance Co. v. New Images of Beverly Hills, 482 F.3d 1091, 1095 (9th Cir. 2007) (upholding terminating sanctions where the court found, inter alia, that party's discovery responses "approached contumaciousness," appearing "calculated to prevent [propounding party] from learning and proving the truth.")

Plaintiff's vague attempt to incorporate other documents into his response is also defective. Under Rule 34, a response to a document request must be organized, candid and clear. See, e.g., Grant v. Target Corp., 281 F.R.D. 299, 312–13 (S.D.Ohio 2012) ("At this point, [plaintiff] has produced a number of documents to Target, but he has never indicated which requests these documents were responsive to, making it difficult for Target and this Court to know to which requests for production of documents Mr. Grant responded and to which he did not. . ..[Plaintiff] is therefore ordered to respond, in writing, to all of Target's requests for production of documents . . .. and to organize and label his documents so that each document corresponds to the categories in the requests.")

Consistent with these principles, Plaintiff must provide a supplemental written response agreeing to produce his medical records along with a clearly labelled production of the records themselves.

## REQUEST NO. 3

Plaintiff's medical bills related to the incident are relevant and discoverable – particularly since he seeks recovery for medical expenses in this case. Plaintiff states that all his medical billings will be provided. But this has not happened. Plaintiff's reference to his jumbled "initial disclosures" is a non-starter. Plaintiff must give a clear, candid response to the County's inquiry. See, e.g., Grant v. Target Corp., 281 F.R.D. 299, 312–13 (S.D.Ohio 2012) ("At this point, [plaintiff] has produced a number of documents to Target, but he has never indicated which requests these documents were responsive to, making it difficult for Target and this Court to know to which requests for production of documents Mr. Grant responded and to which he did not. . ..[Plaintiff] is therefore ordered to respond, in writing, to all of Target's requests for production of documents . . .. and to organize and label his documents so that each document corresponds to the categories in the requests.") Consistent with these principles, Plaintiff must provide a supplemental written response agreeing to produce his medical records along with a clearly labelled production of the records themselves.

Plaintiff needs to serve a clearly – worded supplemental response together with all responsive documents.

## REQUEST NO. 4

Plaintiff's medical bills related to his pre-incident contact with the OCSD are relevant and discoverable – unless Plaintiff plainly states that he makes no claim for recovery of these expenses. To date, he has declined to do so. Instead, Plaintiff states that all his medical billings will be provided. But this has not happened. Plaintiff's reference to his jumbled initial disclosures is a non-starter. See, e.g., Grant v. Target Corp., 281 F.R.D. 299, 312–13 (S.D.Ohio 2012) ("At this point, [plaintiff] has produced a number of documents to Target, but he has never indicated which requests these documents were responsive to, making it difficult for Target and this Court to know to which requests for production of documents Mr. Grant responded and to which he did not. . ..[Plaintiff] is therefore ordered to respond, in writing, to all of Target's requests for production of

documents . . .. and to organize and label his documents so that each document corresponds to the categories in the requests.") Consistent with these principles, Plaintiff must provide a supplemental written response agreeing to produce his medical records along with a clearly labelled production of the records themselves.

Plaintiff needs to serve a clearly – worded supplemental response together with all responsive documents.

## REQUEST NO. 7

The request for production seeks medical records relating to Plaintiff's physical and mental health history. These records are relevant and discoverable given the nature of Plaintiff's damages claims in this case.

Plaintiff has placed his health history in issue by virtue of his "emotional distress" claims in this case. Given Plaintiff's "emotional distress" claims, he "is placing his mental condition at issue in this case, and [the defense] is entitled to explore any evidence, ***including Plaintiff's medical records***, which may be relevant to such a claim." Walker v. Northwest Airlines Corp., 2002 WL 32539635, at *4 (D.Minn.2002)(emphasis added.) Courts have made this point over and over again – a plaintiff, like Mr. Holloway, who seeks compensation for their "emotional distress" opens the door to discovery of potential alternative causes for their condition. See, e.g., Schoffstall v. Henderson, 223 F.3d 818, 823 (8th Cir.2000) (finding that plaintiff's claims of "emotional distress" damages placed her medical condition at issue, thereby making her medical records relevant and discoverable); Doe v. City of Chula Vista, 196 F.R.D. 562, 569 (S.D. Cal. 1999) ("[plaintiff] elected to seek monetary relief from the defendants to compensate her for 'emotional pain, suffering, loss of self esteem, and mental anguish'; consequently, [plaintiff] is relying on her emotional state to make her case ... But to insure a fair trial, particularly on the element of causation, the court concludes that defendants should have access to evidence that [plaintiff's] emotional state was caused by something else. Defendants must be free to test the truth of [plaintiff's] contention that she is emotionally upset because of the defendants' conduct. Once [plaintiff] has elected to seek such damages, she cannot fairly prevent discovery into evidence relating to the element of her claim."); Fox v. Gates Corp., 179 F.R.D. 303, 306 (D. Colo. 1998) (defendant is entitled to discovery whenever "the information. . . is relevant to whether the emotional distress which plaintiff claims to have suffered as a result of defendant's conduct can be attributed in whole, or in part, to some other stressor in her life."); see also, Vinson v. Superior Court, 43 Cal. 3d 833, 839-840 (1987)("In the case at bar, plaintiff haled defendants into court and accused them of causing her various mental and emotional ailments. Defendants deny her charges. As a result, the existence and extent of her mental injuries is indubitably in dispute. In addition, by asserting a causal link between her mental distress and defendants' conduct, plaintiff implicitly claims it was not caused by [another] mental condition, thereby raising the question of alternative sources for the distress. We thus conclude that her mental state is in controversy.")

Plaintiff's claims that "privacy" and "privilege" considerations somehow entitle him to keep his medical history secret is frivolous in light of his monetary demands in this case.

Once an "emotional distress" plaintiff, like Holloway, advances a damages claim, the
defense is entitled to his medical records to determine whether any of them (or a
combination of them) reflect viable alternative stressors. See, e.g., Walker v. Northwest
Airlines Corp., 2002 WL 32539635, at *4 (D. Minn. 2002) ("while the Court is mindful of
the privacy issues involved in the discovery of medical records, the Court also favors
the broad contours of discovery. Medical and psychological records often reflect a
person's well-being, the manner in which he or she perceives a course of events, and
external circumstances that may be contributing to the harms complained of in a
lawsuit. Furthermore, where a plaintiff puts his emotional condition into issue in the
litigation, ***he effectively waives his right to privacy*** in any relevant and unprivileged
medical records. . .. Here, Plaintiff has placed his medical condition at issue by claiming
emotional distress damages. As such, ***Plaintiff may not maintain a claim of privacy
in his medical records***, and ***Northwest is entitled to obtain and review
them***.")(emphasis added and citations omitted.); Fox v. Gates Corp., 179 F.R.D. 303,
306 (D. Colo. 1998) ("Defendant is entitled to discovery of plaintiff's psychotherapy
records. Defendant is also ***entitled to discovery of plaintiff's other medical records*** .
. . as the information contained in those records is not privileged and is relevant to
whether the emotional distress which plaintiff claims to have suffered as a result of
defendant's conduct can be attributed in whole, or in part, to some other stressor in her
life.")(emphasis added.); see also, Mathie v. Fries, 935 F. Supp. 1284, 1304 (E.D.N.Y.
1996) ("In the determination of the monetary damages to be awarded to the plaintiff
[under Section 1983] for the considerable emotional distress sustained as a result of the
sexual abuse, the Court must be careful not to compensate the plaintiff for the non-
related distress."), aff'd, 121 F.3d 808 (2d Cir. 1997); York v. AT&T, 95 F.3d 948, 957-
958 (10th Cir. 1996) ("Because York chose to raise a claim of emotional distress, it was
entirely appropriate for the court to allow the defendants to introduce evidence of
alternate or multiple causes of such distress. The jury must be permitted to consider
such relevant evidence of causation where damages are claimed for emotional distress.
Moreover, it would be inequitable to allow the plaintiff to introduce selected evidence on
the matter but to disallow the defendants to present evidence supporting their theories
of causation.")[1]

Plaintiff's attempted "objections" are otherwise valueless on their face. "The party that
resists discovery has the burden to show why the discovery request should be denied. .
.." Robertson v. Catholic Community Services of Western Washington, 2020 WL
1819842, at *3 -4 (W.D.Wash. 2020). Thus, Plaintiff's failure to offer any details or

---

[1]Plaintiff's statement that the response to this interrogatory is "private," and that he did not "consent
to producing 5 years of private medical history" by filing this lawsuit also represents a bizarre failure to
read Defendants' operative Answer. Causation *is* an issue in this case – whether Plaintiff acknowledges
the point or not. (See, e.g., Defendants' second affirmative defense regarding causation of Plaintiff's
injuries, Defendants' twenty-third affirmative defense regarding the proportionality of damages to
correspond to fault of Defendants, Plaintiff's forty-first affirmative defense regarding superseding and
intervening causes of alleged damages).

explanation for his objections renders them a legal nullity. See, Walker v. Lakewood Condo. Owners Ass'n, 186 F.R.D. 584, 587 (C.D. Cal. 1999) ("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all."); Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc., 2007 U.S. Dist. LEXIS 19442 (D. Nev. 2007)("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all.")(citations omitted).

Plaintiff needs to serve a clearly – worded supplemental response together with all responsive documents.

**REQUEST NO. 8**

This request for production seeks tax records relating to Plaintiff's loss of income claim. These records are relevant and discoverable. See, Poulos v. Naas Foods, Inc., 959 F.2d 69, 75 (7th Cir. 1992)("[Plaintiff] was properly compelled to produce his tax returns. [Plaintiff] himself put the level and sources of his income at issue . .."); Lind v. Canada Dry Corp., 283 F. Supp. 861, 865 (D. Minn. 1968)("Defendant's seventh request is for copies of plaintiff's income tax returns, since one of the items of damage claimed by plaintiff is loss of earnings. This matter is too well settled to require substantial argument. [Citations omitted]. Plaintiff is required to produce his income tax returns or copies thereof, at least for the four years [in issue] and following, and if he does not have the same, plaintiff is required to procure copies from the Federal and State governments or deliver authorizations to defendant's attorney to allow him to obtain such."); Taylor v. Atchison, T. & S. F. R. Co., 33 F.R.D. 283, 286 (W.D. Mo. 1962)("In this cause plaintiff claims loss of wages and earnings, past and future. Earnings and wages for a reasonable time before and after plaintiff's alleged injury would therefore be admissible evidence or information calculated to lead to admissible evidence. Such portions of plaintiff's income tax returns as relate to wages and earnings and which cover a reasonable period before and after the alleged injury are therefore relevant. The information sought is of a type normally unobtainable  by the defendant from other sources and presumably is within the exclusive knowledge of the plaintiff.")

Plaintiff's lack of income – if this is his situation – is also independently admissible. "The case law is clear that once a plaintiff makes claims of emotional distress, the defendant is allowed to explore ***any*** alternative or contributing causes to that emotional distress." Kakeh v. United Planning Org., 587 F.Supp.2d 125, 128 (D.D.C. 2008)(emphasis added.); see, Lewis v. District of Columbia, 793 F.2d 361, 363 (D.C. Cir. 1986) (holding that jury would be aided "in measuring fairly the extent of damages" by evidence of other potential causes of plaintiff's emotional suffering not attributable to defendant); Rettiger v. IBP, Inc., 1999 U.S. Dist. LEXIS 7536 (D. Kan. 1999)("The case law recognizes that a plaintiff claiming emotional distress opens the door to evidence of other probable causes of her distress.")

Plaintiff's attempted "objections" are valueless on their face. "The party that resists discovery has the burden to show why the discovery request should be denied. . .." Robertson v. Catholic Community Services of Western Washington, 2020 WL 1819842, at *3 -4 (W.D.Wash. 2020). Thus, Plaintiff's failure to offer any details or explanation for his objections renders them a legal nullity. See, Walker v. Lakewood Condo. Owners Ass'n, 186 F.R.D. 584, 587 (C.D. Cal. 1999) ("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all."); Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc., 2007 U.S. Dist. LEXIS 19442 (D. Nev. 2007)("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all.")(citations omitted).

Plaintiff needs to serve a clearly – worded supplemental response together with all responsive documents.

**REQUEST NO. 23**

The request seeks documents relating to Plaintiff's other arrests / contacts with law enforcement. This information is relevant and discoverable for multiple reasons.

For starters, Plaintiff claims that due to this incident, he suffered great "emotional distress" – and he seeks money for his claimed "emotional trauma". Defendants are entitled to refute these claims by demonstrating that whatever "emotional distress" Plaintiff experienced as a result of the incident in this case is actually traceable to other criminal court proceedings against him – some of which likely culminated in arrest warrants and convictions.

"The case law is clear that once a plaintiff makes claims of emotional distress, the defendant is allowed to explore **_any_** alternative or contributing causes to that emotional distress." Kakeh v. United Planning Org., 587 F.Supp.2d 125, 128 (D.D.C. 2008)(emphasis added.); see, Lewis v. District of Columbia, 793 F.2d 361, 363 (D.C. Cir. 1986) (holding that jury would be aided "in measuring fairly the extent of damages" by evidence of other potential causes of plaintiff's emotional suffering not attributable to defendant; Rettiger v. IBP, Inc., 1999 U.S. Dist. LEXIS 7536 (D. Kan. 1999)("The case law recognizes that a plaintiff claiming emotional distress opens the door to evidence of other probable causes of her distress.")

Arrests and criminal convictions have been repeatedly recognized as a potential alternative source for claimed "emotional distress" at trial. See, e.g., Kakeh v. United Planning Organization, Inc., 587 F.Supp.2d 125, 128 (D.D.C. 2008)(arrest for child abuse admitted at trial: "Plaintiff seeks damages for his emotional distress caused by the termination of his employment and alleges that he suffered 'humiliation, embarrassment, loss of self-esteem, and has otherwise been damaged psychologically and emotionally by Defendant's actions.' . . ..The case law is clear that once a plaintiff makes claims of emotional distress, the defendant is allowed to explore **_any_** alternative or contributing causes to that emotional distress. . ..In short, a plaintiff seeking damages

for emotional distress essentially 'opens the door' to intense scrutiny of his psychological status _**and history**_.")(emphasis added.); <u>Udemba v. Nicoli</u>, 237 F.3d 8, 15 (1st Cir. 2001)(affirming trial court finding that plaintiff's arrest was admissible: "[T]he [arrest] evidence was specially relevant to a contested issue in the case, namely, the extent of damages attributable to emotional distress."); <u>Lewis v. District of Columbia</u>, 793 F.2d 361, 363 (D.C. Cir. 1986)(plaintiff's "prior arrest" admitted on finding that "the jury . . . would be aided by this evidence in measuring fairly the extent of damages."); <u>Chamberlin v. City of Albuquerque</u>, 2005 WL 2313515, at *2 (D.N.M. 2005)("Because [plaintiff's] _**uncharged misconduct**_, drug and alcohol use, and mental illness is relevant to rebut [his] claim of damages, the Court will allow [the defense] to introduce certain specific instances of[plaintiff's] prior conduct as described in this opinion and order.")(emphasis added.); <u>Bell v. Gonzales</u>, 2005 U.S. Dist. LEXIS 37879 (D.D.C. 2005)(plaintiff's arrest for solicitation of prostitution admitted: "Evidence that an event other than [the incident at bar] could have caused [plaintiffs] emotional suffering is highly probative on the issue of damages. . ..")

As stated by the District of Columbia Circuit:

> Lewis commenced this action in district court against various police officers and the District of Columbia; his complaint stated common law and constitutional claims for relief. Before trial, Lewis filed a motion in limine to preclude the introduction of evidence of his history of drug use and his _**prior arrests.**_ The trial judge heard pretrial argument on the motion, ruled the evidence admissible, and carefully instructed the jury on its use. . ..Rule 404(b) bars the admission of evidence of past 'bad acts' to show that the actor acted in conformity therewith  in the present instance, but allows the introduction of such evidence for other purposes. The jury instruction in this case articulated explained that the evidence in question was admitted only for 'other purposes.' The trial judge specifically instructed the jury that the evidence of Lewis' drug use and arrests 'was not admissible to prove Mr. Lewis' bad character or . . . to show that he acted in conformity therewith.'. . . .Rather, the court instructed, the jury could consider the evidence only for . . .limited purposes: . . .[including], to measure _**'the extent of any damages [that] proximately resulted from any wrongful actions of the defendant'. ..**_Accordingly, we hold that the _**prior arrest . . . evidence was admissible**_ under Rule 404(b).

<u>Lewis v. District of Columbia</u>, 793 F.2d 361, 363 (D.C. Cir. 1986)(emphasis added.)

Here, Plaintiff is free to argue that his other arrests were a stress free experience, and that all of his claimed "emotional distress" is traceable to the force used against him during the OCSD incident of which he complains. But the jury is plainly entitled to evaluate the issue itself, with access to evidence of alternative sources for Plaintiff's claimed "emotional distress" damages. Having asserted a claim for damages attributable to emotional distress, Plaintiff is in no position to seek to deprive Defendants of the opportunity to defend themselves against such a claim. See, <u>Fritsch v. City of</u>

Chula Vista, 196 F.R.D. 562, 569 (S.D. Cal. 1999) ("Plaintiff elected to seek monetary relief from the defendants to compensate her for emotional pain, suffering, loss of self esteem, and mental anguish, consequently, [plaintiff] is relying on her emotional state to make her case . . . But to insure a fair trial, particularly on the element of causation, the court concludes that defendants should have access to evidence that [plaintiff's] emotional state was caused by something else.  Defendants' must be free to test the truth of [plaintiff's] contention that she is emotionally upset because of the defendant's conduct.").

But there is more. Under a long line of decisions from the Ninth Circuit and elsewhere, Plaintiff's arrest / conviction history is also relevant to Plaintiff's motives for filing this suit and his bias against the law enforcement officers he encountered during the subject incident. See, Heath v. Cast, 813 F.2d 254, 259 (9th Cir. 1987)("Evidence of [plaintiff's] prior arrest, and of his brother's prior misdemeanor convictions, were probative of their bias against the Newport Beach police and of Heath's motive in bringing this action. The jurors, as sole triers of fact and credibility, were entitled to hear the evidence and decide the extent of that bias."); Pittsley v. Warish, 927 F.2d 3, 9-10 (1st Cir. 1991) ("In this case, the charges against [plaintiff] for gun possession and the other motor vehicle violations were probative in demonstrating motive and bias given that Officer Warish arrested [plaintiff] and testified against her at trial which led to her conviction on the motor vehicle charges. . .."; Plaintiff's criminal conviction properly admitted at trial.); see also, United States v. Marzano, 537 F.2d 257, 264 (7th Cir. 1976)(Under Rule 404(b) "[e]vidence of prior illegal acts...is admissible to show bias" against law enforcement.)

In short, Plaintiff is free to contend that his prior law enforcement incidents did not impact his view of law enforcement, and that he has a supportive and respectful view of law enforcement both now, and at the time of the subject incident. But the OCSD contends otherwise, and seeks to establish that Plaintiff's negative arrest history made him biased against law enforcement *ab initio* -- coloring his attitude and conduct during the subject incident and acting as a motivating factor in the filing of the present lawsuit.  The Ninth Circuit, and courts nationwide have rightly found that this factual dispute is for resolution by the jury in this case – and it is therefore an inappropriate subject for pre-trial discovery. See, e.g., Hunt v. Walmart Store, Inc., 2019 WL 1057199, at *1 (E.D.Mich. 2019)("Many of Defendant's discovery requests are ***clearly relevant***, including basic biographical information such as name, address, occupation, etc., *see* Interrogatory #1, #3; [and] ***Plaintiff's criminal history*** (relevant to possible impeachment under Fed.R.Civ.P. 608(b) ), *see* Interrogatory #2. . ..")(emphasis added).

Plaintiff's attempted "objections" are valueless on their face. "The party that resists discovery has the burden to show why the discovery request should be denied. . .." Robertson v. Catholic Community Services of Western Washington, 2020 WL 1819842, at *3 -4 (W.D.Wash. 2020). Thus, Plaintiff's failure to offer any details or explanation for his objections renders them a legal nullity. See, Walker v. Lakewood Condo. Owners Ass'n, 186 F.R.D. 584, 587 (C.D. Cal. 1999) ("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all."); Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc., 2007 U.S. Dist. LEXIS 19442 (D. Nev.

2007)("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all.")(citations omitted).

Plaintiff needs to serve a clearly – worded supplemental response together with all responsive documents.


## REQUEST NO. 39

This request seeks copies of Plaintiff's paychecks starting from six months prior to the incident of which he complains. This request is facially relevant to Plaintiff's "lost wages" claim.

Additionally, Plaintiff's lack of income – if this is his situation – is also independently admissible. "The case law is clear that once a plaintiff makes claims of emotional distress, the defendant is allowed to explore ***any*** alternative or contributing causes to that emotional distress." Kakeh v. United Planning Org., 587 F.Supp.2d 125, 128 (D.D.C. 2008)(emphasis added.); see, Lewis v. District of Columbia, 793 F.2d 361, 363 (D.C. Cir. 1986) (holding that jury would be aided "in measuring fairly the extent of damages" by evidence of other potential causes of plaintiff's emotional suffering not attributable to defendant); Rettiger v. IBP, Inc., 1999 U.S. Dist. LEXIS 7536 (D. Kan. 1999)("The case law recognizes that a plaintiff claiming emotional distress opens the door to evidence of other probable causes of her distress.")

Plaintiff needs to serve a clearly – worded supplemental response together with all responsive documents.


## REQUEST NO. 46

This request seeks documents relating to the terms of Plaintiff's probation at the time of the incident. The terms of Plaintiff's probation are admissible as an alternative stressor. "The case law is clear that once a plaintiff makes claims of emotional distress, the defendant is allowed to explore ***any*** alternative or contributing causes to that emotional distress." Kakeh v. United Planning Org., 587 F.Supp.2d 125, 128 (D.D.C. 2008)(emphasis added.); see, Lewis v. District of Columbia, 793 F.2d 361, 363 (D.C. Cir. 1986) (holding that jury would be aided "in measuring fairly the extent of damages" by evidence of other potential causes of plaintiff's emotional suffering not attributable to defendant); Rettiger v. IBP, Inc., 1999 U.S. Dist. LEXIS 7536 (D. Kan. 1999)("The case law recognizes that a plaintiff claiming emotional distress opens the door to evidence of other probable causes of her distress.")

The terms of Plaintiff's probation is also relevant to his bias against law enforcement and Plaintiff's motives for filing this suit. See, Heath v. Cast, 813 F.2d 254, 259 (9th Cir. 1987); see also, United States v. Marzano, 537 F.2d 257, 264 (7th Cir. 1976)(Under Rule 404(b) "[e]vidence of prior illegal acts...is admissible to show bias" against law

enforcement.) And the terms of Plaintiff's probation also are relevant as to the deputies right to stop and question Plaintiff.

Plaintiff needs to serve a clearly – worded supplemental response together with all responsive documents.

**REQUEST NOS. 48-51**

These requests seek Plaintiff's social media history during the time frame relevant to huis claims. A party's messages to and from an Internet social media site (e.g., Facebook, LinkedIn, Twitter, Instagram) — including "locked" pictures, blogs, personal profiles, chat logs and lists of "friends" — are "documents" that must be produced for discovery purposes. See, E.E.O.C. v. Simply Storage Mgmt., LLC, 270 F.R.D. 430, 435-436 (S.D. Ind. 2010)(immaterial that site is "locked" or "private"). Social media sites are not immune from discovery simply because they may contain some material that is not publicly accessible. See, Mailhoit v. Home Depot USA, Inc. (CD CA 2012) 285 F.R.D. 566, 570 (C.D. Cal. 2012)(generally, social networking site content is neither privileged nor protected by any right of privacy).

Plaintiff needs to serve a clearly – worded supplemental response together with all responsive documents.

Pursuant to Local Rule 37-1, Defendants seek a pre-motion conference in order to address the forgoing issues. Please advise as to your availability during the required deadline window. Additionally, please make sure to bring Plaintiff's supplemental responses, along with responsive documents to our meeting.

Thank you for your anticipated attention to the forgoing. We look forward to a productive conference.

*Sincerely,*

**S. FRANK HARRELL**

SFH/ dm

cc:     Tamara Heathcote, Esq.

S. FRANK HARRELL, ESQ.
Off: 714-937-1010        Fax: 714-937-1003

LYNBERG&WATKINS
1100 W. Town & Country Rd., Suite 1450
Orange, California 92868
www.lynberg.com          www.linkedin.com

The information in this email (and any attachments hereto) is confidential and may be protected by legal privileges and work product immunities. If you are not the intended recipient, you must not use or disseminate the information. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work product privilege. If you have received this email in error, please immediately notify me by 'Reply' command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Lynberg & Watkins for any loss or damage arising in any way from its use.

Case Name:  Holloway v. County of Orange, et al.
Case No.: 8:19-cv-01514 DOC (DFMx)

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action.  My business address is 1100 W. Town & Country Rd., Suite 1450, Orange, California 92868.

On **September 9, 2020**, I served the foregoing document(s) described as:
**DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO DISQUALIFY MAGISTRATE JUDGE FOR BIAS AND PREJUDICE** on the interested parties by transmitting true copies thereof via US mail as follows:

Narine Mkrtchyan, Esq.
MKRTCHYAN LAW
1010 North Central Avenue, Suite 204
Glendale, CA 91202
narine57@gmail.com
(818) 388-7022

☐ **BY MAIL**: As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, I deposited such envelope in the mail at Orange, California.

☒ **BY E-SERVE:** The above listed document(s) were electronically served via the USDC Central District's CM/ECF system and the Notice of Electronic Filing (NEF) indicates the registered party and/or attorney were served with the above documents.

☐ **BY ELECTRONIC MAIL:**  I caused all of the pages of the above-entitled document to be sent to the recipient(s) noted at the respective email address(es) indicated.

☐ **BY FACSIMILE:**  I caused all of the pages of the above-entitled document to be sent to the recipient(s) noted via facsimile at the respective telephone numbers indicated above.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **September 9, 2020**, at Orange, California.

_Olivia Banke_
**Olivia Banke**