S. Frank Harrell – SBN 133437
Sharrell@lynberg.com
Tamara M. Heathcote – SBN 193312
theathcote@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants COUNTY OF ORANGE,
DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ,
DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER,
DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and
DEPUTY JUSTIN GUNDERSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY HOLLOWAY, | CASE NO. 8:19-cv-01514-DOC-DFM |
| Plaintiff, | *Assigned to:*<br>*Hon. David O. Carter, Courtroom 9D* |
| vs. | *Assigned for Discovery Purposes to:*<br>*Hon. Douglas F. McCormick, Courtroom 6B* |
| COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10. | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS; DECLARATION OF TAMARA M. HEATHCOTE; EXHIBITS** |
| | **Date:   December 8, 2020**<br>**Time:   10:00 a.m.**<br>**Dept.:  6B** |
| Defendants. | *Trial Date: January 19, 2021*<br>*Second Amended Complaint filed: December 10, 2019* |

**1**

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 8, 2020 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 6B of the above-captioned court located at 411 West 4th Street, Santa Ana, California 92701, Defendants County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts, and Deputy Justin Gunderson ("Defendants") will, and hereby do, move the Court for an order dismissing this matter for violation of this Court's civility order. (See, Order, Dkt. No. 73, p. 3, n. 3, Ex. "A")(going forward, "all counsel should comport themselves in the deposition the same as if they were in the courtroom.  The Advisory Committee notes to Rule 30 make that expectation explicit: '[i]n general, counsel should not engage in conduct during a deposition that would not be allowed in the presence of a judicial officer.' "); (id., pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..I trust that my remarks on July 9 and this subsequent ruling will cause [future] depositions to be conducted without the rancor that was exhibited on July 7 [at a previous deposition].")

Defendants' dismissal motion is made under Fed. R. Civ. P. 41(b), Fed. R. Civ. P. 37(b)(2) and the Court's inherent power to manage proceedings over which it presides. See, e.g., Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992)("[P]ursuant to [Rule] 41(b), the district court may dismiss an action for failure to comply with ***any order*** of the court.")(emphasis added); Lee v. Walters, 172 F.R.D. 421, 436 (D. Ore. 1996) ("[Rule] 37(b)(2) . . . authorizes a variety of non-monetary sanctions against the party who fails to obey a court order, such as . . . dismissing the action . . ..");  Chambers v. NASCO, Inc., 501 U.S. 32, 62 (1991)(courts have inherent ///

**2**

power to "dismiss an action or claim of a party that fails to . . . obey an order of the court.")

**PLEASE TAKE FURTHER NOTICE** that Defendants will, and hereby do, seek monetary sanctions against Plaintiff and/or Plaintiff's counsel of record, Narine Mkrtchyan, for costs incurred in the taking of the deposition of Plaintiff, in the videotaping cost for the deposition of Plaintiff, in the preparation and litigation of this Motion and in the pre - Motion meet and confer process.  These costs are, and will be, not less than $26,670.82. (<u>See</u>, Heathcote Decl., ¶ 9.)

Alternatively, if for any reason dismissal cannot be had, **PLEASE TAKE ADDITIONAL NOTICE** that Defendants will, and hereby do, further move the Court for ancillary relief as follows:

1. A renewed Plaintiff's deposition together with the costs associated with Plaintiff's renewed deposition. <u>See</u>, <u>IPS Grp., Inc. v. Duncan Sols., Inc.</u>, 2017 WL 3457141, at *6 (S.D. Cal. 2017)("Plaintiff must reimburse DPT for reasonable travel, attorney's fees, court reporting and any facility costs for [a] ***renewed*** deposition.")(emphasis added.)

2. The cost associated with a special master to supervise Plaintiff's renewed deposition (at Plaintiff's expense). <u>See</u>, <u>Hernandez v. Lynch</u>, 2019 WL 6998774, at *2 (C.D. Cal. 2019)("<u>Federal Rule of Civil Procedure</u> Rule 53(a) permits the appointment of a special master to address pretrial matters . . ..")

3. An order limiting Plaintiff's counsel's verbal statements at Plaintiff's deposition to matters permitted by Rule 30. <u>See</u>, <u>Luangisa v. Interface Operations</u>, 2011 WL 6029880, at *7 (D.Nev. 2011)("[i]t is inappropriate for counsel to engage in extensive and unnecessary colloquy, assert groundless objections, improperly object, or utilize any opportunity to interrupt and argue with opposing counsel during a deposition.")

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

4.  An order that "[n]either shall any counsel interrupt or speak over any other counsel or the deponent." <u>Mewborn v. Abbott Labs.</u>, 2019 WL 8060095, at *7 (C.D. Cal. 2019).

Defendants' Motion is based upon this Notice, the attached Memorandum of Points and Authorities, the Declaration of Tamara M. Heathcote and accompanying Exhibits, and upon such other and further matters as may properly come before the Court.

This Motion follows the <u>Local Rule</u> 7-3 conference which occurred via an exchange of written correspondence. (<u>See</u>, Correspondence, Exs. "C" and "D", Heathcote Decl., ¶ ¶ 4 and 5.) The exchange of correspondence was unsuccessful in resolving the issues presented herein. (<u>Id.</u>)

DATED:  November 4, 2020                    Respectfully submitted,

**LYNBERG & WATKINS**

By: _____
**S. FRANK HARRELL**
**TAMARA HEATHCOTE**
Attorneys for Defendants
County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson

**4**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1
2

# **TABLE OF CONTENTS**

3
4

I.      PRELIMINARY STATEMENT ...................................................................1

II.     THE COURT SHOULD DISMISS PLAINTIFF'S CASE
        FOR REPEATED VIOLATION OF ITS DEPOSITION
        CONDUCT ORDER. ....................................................................................4

        A.      Plaintiff's Counsel Repeatedly Insulted Defense
                Counsel, His Clients and the Court............................................4

        B.      Speaking Over / Interrupting Others.........................................24

        C.      Constant Disruptive Comments .................................................27

        D.      Witness Coaching.......................................................................30

        E.      Dismissal Is The Appropriate Response to Violation
                Of This Court's Deposition Conduct Order...............................34

III.    DISMISSAL IS APPROPRIATE TO ADDRESS
        PLAINTIFF'S COUNSEL'S DISRESPECT TO THE
        JUDICIARY. ..............................................................................................41

IV.     ALTERNATIVELY, THE COURT SHOULD ORDER A
        SUPERVISED REPEAT OF PLAINTIFF'S DEPOSITION
        AT PLAINTIFF'S COUNSEL'S EXPENSE AND
        ANCILLARY SANCTIONS. ....................................................................50

        A.      Improper Instructions Not to Answer. ......................................50

        B.      Alternative Stressors / Location of Witnesses ..........................59

        C.      Monetary Sanctions And Ancillary Relief ...............................62

V.      CONCLUSION ..........................................................................................65

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

121 F.3d 808 (2d Cir. 1997) ...............................................................................62

Adriana Intl. Corp. v. Lewis & Co.,
   913 F.2d 1406 (9th Cir. 1990) ......................................................................39

Alexander v. Sharpe,
   245 A.2d 279 (Me.1968) ...............................................................................46

Baca v. Ewing,
   402 Fed. Appx. 286 (9th Cir. 2010).............................................................36

Bakery Mach. & Fabrication, Inc., v. Traditional Baking, Inc.,
   570 F.3d 845 (7th Cir. 2009) ........................................................................41

Barnes v. United States,
   241 F.2d 252 (9th Cir. 1956) ........................................................................46

Bd. of Trustees of Pipe Fitters' Ret. Fund, Local 597 v. Commercial Cooling & Heating, Inc.,
   2019 WL 2269959 (N.D. Ill. 2019) .............................................................41

Bloom v. State of Ill.,
   391 U.S. 194 (1968)......................................................................................48

BNSF Ry. Co. v. San Joaquin Valley Ry. Co.,
   2009 WL 3872043 (E.D. Cal. 2009).....................................................34, 56

Bonds v. Daley,
   2018 WL 2405903 (E.D. Ky. 2018) .............................................................29

Buss v. W. Airlines, Inc.,
   738 F.2d 1053 (9th Cir. 1984) ......................................................................36

Carey v. King,
   856 F.2d 1439 (9th Cir. 1988) ......................................................................36

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

<u>Chambers v. NASCO, Inc.</u>,
  501 U.S. 32 (1991)........................................................................2, 35, 44

<u>Claredon Nat'l Ins. Co. v. Foley & Bezek, LLP</u>,
  2001 WL 1223486 n.2 (C.D. Cal. 2001) ..............................................26

<u>Claypole v. Cty. of Monterey</u>,
  2016 WL 145557 (N.D. Cal. 2016) ....................................26, 33, 56, 62

<u>College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.</u>,
  527 U.S. 666 (1999)..............................................................................40

<u>Com. of Pa. v. Local Union 542, Int'l Union of Operating Engineers</u>,
  552 F.2d 498 (3d Cir. 1977) ...........................................................34, 45

<u>Cotton v. City of Eureka</u>,
  2010 WL 2889498 (N.D. Cal. 2010) ....................................................32

<u>Crawford v. JPMorgan Chase Bank, N.A.</u>,
  242 Cal. App. 4th 1265 (2015) .............................................................49

<u>Davis v. Superior Court of State of Cal.</u>,
  846 F.2d 1382 (9th Cir. 1988) ...................................................16, 26, 46

<u>DeNardo v. ABC, Inc.</u>,
  51 P.3d 919 (Alas. 2002) ......................................................................58

<u>Doe v. City of Chula Vista</u>,
  196 F.R.D. 562 (S.D. Cal. 1999) ..........................................................59

<u>Ferdik v. Bonzelet</u>,
  963 F.2d 1258 (9th Cir. 1992) .....................................................2, 34, 36

<u>Fox v. Gates Corp.</u>,
  179 F.R.D. 303 (D. Colo. 1998) ...........................................................60

<u>Freeman v. Schointuck</u>,
  192 F.R.D. 187 (D. Md. 2000) ...............................................................5

<u>Funk v. Town of Paradise</u>,
  2011 WL 2580357 (E.D. Cal. 2011)......................................................62

**3**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

Ghazali v. Moran,
    46 F.3d 52 (9th Cir. 1995) ........................................................36

G-K Properties v. Redevelopment Agency of the City of San Jose,
    577 F.2d 645 (9th Cir. 1978) ....................................................35

Gordon v. United States,
    592 F.2d 1215 (1st Cir.1979)....................................................48

Grant v. Target Corp.,
    281 F.R.D. 299 (S.D.Ohio 2012)..............................................58

Grider v. Irvin,
    2007 WL 4441214 (W.D.Ky. 2007) .........................................37

Gueye v. U.C. Health,
    2014 WL 4984173 (S.D. Ohio 2014) ....................37, 45, 46, 49

Halaco Engineering Co. v. Costle,
    843 F.2d 376 (9th Cir. 1988) ..............................................35, 41

Halas v. Consumer Servs.,
    16 F.3d 161 (7th Cir. 1994) ......................................................36

Harris v. United States,
    382 U.S. 162 (1965)..................................................................48

Hayes v. Skywest Airlines, Inc.,
    2017 WL 6551112 (D. Colo. 2017).........................................30

Henderson v. Duncan,
    779 F.2d 1421 (9th Cir. 1986) ..................................................36

Hernandez v. Lynch,
    2019 WL 6998774 (C.D. Cal. 2019) ...........................3, 63, 64

Horowitz v. Chen,
    2018 WL 4560697 (C.D. Cal. 2018) ...............................passim

Hume v. Superior Court,
    17 Cal.2d 506 (1941) ................................................................46

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

Hunt v. Walmart Store, Inc.,
   2019 WL 1057199 (E.D.Mich. 2019)....................................................58

Illinois v. Allen,
   397 U.S. 337 (1970).............................................................45, 46

In re Buckley,
   10 Cal.3d 237 (1973) ...............................................................46

In re Dellinger,
   502 F.2d 813 (7th Cir. 1974) .......................................................34

In re Gustafson,
   650 F.2d 1017 (9th Cir. 1981) ..................................................34, 46

In re Maurice,
   167 B.R. 114 (Bankr. N.D. Ill. 1994) ..........................................37, 49

In re Oliphant,
   2020 WL 247547 (W.D.N.C. 2020) ....................................................48

In re Oliver,
   333 U.S. 257 (1948)................................................................48

In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA)
   Litig.,
   2010 WL 4942645 (C.D. Cal. 2010) .........................................51, 57, 59

Int'l Union, United Mine Workers of Am. v. Bagwell,
   512 U.S. 821 (1994)................................................................48

IPS Grp., Inc. v. Duncan Sols., Inc.,
   2017 WL 3457141 (S.D. Cal. 2017)...............................................passim

Jorgensen v. Cassiday,
   320 F.3d 906 (9th Cir.2003) ........................................................38

Kelley v. Schlumberger Technology Corp.,
   849 F.2d 41 (1st Cir.1988)..........................................................56

Laddcap Value Partners, LP v. Lowenstein Sandler P.C.,
   859 N.Y.S.2d 895 (2007)..............................................................5

5

Lee v. Walters,
   172 F.R.D. 421 (D. Ore. 1996) .......................................................................2, 35, 50

Lichtman v. Zelenkofske Axelrod & Co.,
   No. C.A. 98-6555, 2001 WL 1160007 (E.D. Pa. 2001) ...........................................47

Loop AI Labs Inc. v. Gatti,
   2017 WL 934599 (N.D. Cal. 2017) ..................................................................41, 50

Luangisa v. Interface Operations,
   2011 WL 6029880 (D.Nev. 2011) .......................................................................passim

Lund v. Matthews,
   2014 WL 517569 (D. Neb. 2014) .......................................................................53, 54

MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.,
   2014 WL 12754932 (C.D. Cal. 2014) ...........................................6, 53, 57, 64

Malone v. U.S. Postal Service,
   833 F.2d 128 (9th Cir. 1987) .............................................................................36

Maness v. Meyers,
   419 U.S. 449 (1975)..........................................................................................34

Martinez v. Dep't of Transportation,
   238 Cal. App. 4th 559 (2015) ............................................................................6, 38

Mathie v. Fries,
   935 F. Supp. 1284 (E.D.N.Y. 1996) ........................................................................61

Maus v. Ennis,
   513 F. App'x 872 (11th Cir. 2013)..........................................................3, 37, 47, 48

Mayberry v. Pennsylvania,
   400 U.S. 455 (1971)..........................................................................................45

Mazzeo v. Gibbons,
   2010 WL 3020021 (D. Nev. 2010) ....................................................................passim

McCaffity v. Hurst-Euless-Bedford Indep. Sch. Dist.,
   98 F.3d 1339 (5th Cir. 1996) ............................................................................3, 46

**6**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

McKenna v. Nestle Purina PetCare Co.,
  2011 WL 14418 (S.D.Ohio 2011) .......................................................... 37

Mewborn v. Abbott Labs.,
  2019 WL 8060095 (C.D. Cal. 2019) ......................................... 3, 4, 64, 65

National Hockey League v. Metropolitan Hockey Club,
  427 U.S. 639 (1976) ................................................................................ 49

Payne v. Exxon Corp.,
  121 F.3d 503 (9th Cir. 1997) .................................................................. 39

People ex rel. Thorne v. Hays,
  4 Cal. 127 (1854) ..................................................................................... 40

People v. Fagan,
  483 N.Y.S.2d 489 (1984) .................................................................... 5, 65

Pichowicz v. Hoyt,
  2000 WL 1480445 (D.N.H. 2000) ......................................................... 56

Robinson v. The Chefs' Warehouse,
  2017 WL 1064981 (N.D. Cal. 2017) ...................................................... 63

Rywkin v. New York Blood Ctr.,
  1998 WL 633810 (S.D.N.Y. 1998) .................................................. 16, 62

Sacher v. United States,
  343 U.S. 1 (1952) ..................................................................................... 45

Serra-Lugo v. Consortium-Las Marias,
  271 F.3d 5 (1st Cir. 2001) ...................................................................... 41

Shillitani v. United States,
  384 U.S. 364 (1966) ................................................................................ 48

Star Envirotech, Inc. v. Redline Detection, LLC,
  2015 WL 9093561 (C.D. Cal. 2015) ...................................................... 22

Thompson v. Housing Auth. of Los Angeles,
  782 F.2d 829 (9th Cir. 1986) .................................................................. 35

7

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

Thorpe v. Ancell,
   367 F.App'x 914 (10th Cir. 2010)....................................................................41

Torres–Vargas v. Pereira,
   431 F.3d 389 (1st Cir.2005).............................................................................34

United Artists Corp. v. La Cage Aux Folles, Inc.,
   771 F.2d 1265 (9th Cir. 1985) ........................................................................36

United States v. Abascal,
   509 F.2d 752 (9th Cir.) ...................................................................................47

United States v. Kahaluu Const,
   857 F.2d 600 (9th Cir. 1988) ..........................................................................36

United States v. Lumumba,
   794 F.2d 806 (2d Cir.1986) .......................................................................38, 46

United States v. Marshall,
   371 F.3d 42 (2d Cir.2004) ...............................................................................45

United States v. Martin,
   251 F. App'x 979 (6th Cir. 2007).....................................................................48

United States v. Martin-Trigona,
   759 F.2d 1017 (2d Cir. 1985) ..........................................................................29

United States v. Offutt,
   145 F. Supp. 111 (D.D.C 1956)........................................................................47

United States v. Peoples,
   698 F.3d 185 (4th Cir. 2012) ...........................................................................48

United States v. Sanchez Hernandez (In re Gates),
   600 F.3d 333 (4th Cir. 2010) ...........................................................................48

United States v. Seale,
   461 F.2d 345 (7th Cir.1972) ............................................................................48

United States v. Thoreen,
   653 F.2d 1332 (9th Cir.1981) ..........................................................................48

**8**

Valley Engineers Inc. v. Electric Engineering Co.,
    158 F.3d 1051 (9th Cir. 1998) ...........................................................50

Vinson v. Superior Court,
    43 Cal. 3d 833 (1987) ........................................................................60

Walker v. Northwest Airlines Corp.,
    2002 WL 32539635 (D.Minn.2002) ...........................................59, 61

York v. AT&T,
    95 F.3d 948 (10th Cir. 1996) ............................................................62

Young v. United States ex rel. Vuitton et Fils S.A.,
    481 U.S. 787 (1987) ...........................................................................46

Yourish v. California Amplifier,
    191 F.3d 983 (9th Cir. 1999) ............................................................36

**Statutes**

18 U.S.C. § 401 ...........................................................................................48

Business and Professions Code § 6068(b) .................................................45

Cal. Code Civ. Pro. § 1209(a)(1) ..............................................................45

**Rules**

Fed. R. Civ. P. 1 ...........................................................................................3

Fed. R. Civ. P. 26 .......................................................................................52

Fed. R. Civ. P. 30 ................................................................................50, 64

Fed. R. Civ. P. 30(c)(2) ..............................................................................51

Fed. R. Civ. P. 30(d)(2) ........................................................................51, 63

Fed. R. Civ. P. 30(d)(3) ..............................................................................50

Fed. R. Civ. P. 34 .......................................................................................18

Fed. R. Civ. P. 37(b)(2) ................................................................................2

**9**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

Fed. R. Civ. P. 41(b) ............................................................................ 2, 34, 35

Fed. R. Civ. P. 53(a) ................................................................................... 3, 64

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

This case is part of the legal aftermath of Plaintiff Jeremy Holloway's decision to beat a female companion on January 28, 2018. (See, e.g., Fuerbach Declaration, ¶¶ 6-11, Ex. "E"). Violence against women seems to be a troubling and persistent feature of Holloway's life. Specifically, another female has now obtained a Superior Court restraining order against Holloway. And at least two Superior Court warrants have now issued for Holloway's arrest on a variety of criminal charges. As best as the defense can determine, Holloway has responded to all these state court orders by fleeing California altogether and he now evidently hides out somewhere on the East Coast. In the meantime, Holloway has filed this pestiferous lawsuit claiming that law enforcement improperly abused *__him__* in some manner during their all too frequent encounters.

Plaintiff's operative Complaint is frankly difficult to read or understand. In an effort to unearth and verify whatever facts and evidence Holloway contends support his many claims, the Orange County Defendants have attempted to conduct discovery in this case. Unfortunately, Plaintiff's counsel, Narine Mkrtchyan, has fought what should be non-controversial discovery requests at every opportunity – often in quite strident terms.

Attending depositions with Ms. Mkrtchyan in this case has posed particular challenges. Too often, Ms. Mkrtchyan has chosen to offer chaotic, unprofessional on-the-record outbursts that are wholly inappropriate in federal court proceedings. What happens off-the-record, and outside the presence of the Court, is frankly even more chilling. These outbursts have frankly made it impossible for defense counsel to properly represent their clients or for justice to be done.

After its recent review of one pertinent transcript, the Court rightly directed all

**1**

1   counsel in this litigation, including Ms. Mkrtchyan, to conduct themselves at all future

2   depositions as though they were in a courtroom. (Order, Dkt. No. 73, p. 3, n. 3, Ex.

3   "A")(going forward, "all counsel should comport themselves in the deposition the

4   same as if they were in the courtroom.  The Advisory Committee notes to Rule 30

5   make that expectation explicit: '[i]n general, counsel should not engage in conduct

6   during a deposition that would not be allowed in the presence of a judicial officer.'");

7   (id., pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9

8   telephone conference, that all counsel should comport themselves in the deposition the

9   same as if they were in the courtroom. . ..I trust that my remarks on July 9 and this

10  subsequent ruling will cause [future] depositions to be conducted without the rancor

11  that was exhibited on July 7 [at a previous deposition].")

12          The Court's oral ruling and its written civility order should have frankly been

13  the end of the matter. But Ms. Mkrtchyan has been demonstrably hostile to the

14  Court's civility directives. She narcissistically says and does what she pleases –

15  regardless of the Court's well founded civility and professionalism requirements. The

16  two most recent examples of the resulting chaos in this case are: (i) Ms. Mkrtchyan's

17  repeated outbursts during defense counsel's attempted deposition examination of

18  Plaintiff Holloway (See, Plaintiff's Depo., Ex. "B"), and (ii) Ms. Mkrtchyan's

19  repeated insults directed at the Court during the September 2, 2020 discovery hearing

20  in this matter. (See, Order, Dkt. No. 86, Ex. "G").

21           The consequences for defying a federal court order are (or should be) known

22  to all attorneys. See, e.g., Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir.

23  1992)("[P]ursuant to [Rule] 41(b), the district court may dismiss an action for failure

24  to comply with ***any order*** of the court.")(emphasis added); Lee v. Walters, 172 F.R.D.

25  421, 436 (D. Ore. 1996) ("[Rule] 37(b)(2) . . . authorizes a variety of non-monetary

26  sanctions against the party who fails to obey a court order, such as . . . dismissing the

27  action . . ..");  Chambers v. NASCO, Inc., 501 U.S. 32, 62 (1991)(courts have inherent

28

2

power to "dismiss an action or claim of a party that fails to . . . obey an order of the court.")

Dismissal is particularly appropriate here, given Ms. Mkrtchyan's September 2, 2020 decision to raise her voice at the Court, insult the Court and hang up on the Court (after being repeatedly directed not to do so). Indeed, given Ms. Mkrtchyan's decision to defy and insult the Court (and its orders), even the most naïve observer would conclude this case has now become the type of rogue litigation which has no proper place on any court's active docket. See, e.g., Maus v. Ennis, 513 F. App'x 872, 874–75 (11th Cir. 2013)(ordering dismissal following allegations that "Judge Presnell had shown 'prejudice and bigotry' against [plaintiff]" where "no reasonable person could conclude that the court's references . . .were evidence of bias, prejudice, or a lack of impartiality."); McCaffity v. Hurst-Euless-Bedford Indep. Sch. Dist., 98 F.3d 1339 (5th Cir. 1996)("*ad hominem* attacks on district court judges will not be tolerated.")

Ms. Mkrtchyan's startling hostility to Court civility directives has already cost Defendants the ability to obtain a "just, speedy, and inexpensive determination" of their contentions in this case. Fed. R. Civ. P. 1. There is no realistic hope of a turn-around and no good reason for the situation to be allowed to deteriorate further. For these reasons, and as set forth in further detail below, the Court should grant Defendants' Motion and dismiss this tainted action as prayed.[1]

/ / /

/ / /

---

[1] Given Plaintiff's counsel's refusal to engage in civil discourse, the defence requested to be excused from the Court's IDC requirement and requested the ability to file this Motion without the usual meet and confer requirements. (Transcript, p. 31:8-17., Ex. "F"). The Court granted Defendants' request. (Id.; see also, Meet and Confer Correspondence, Exs. "C" and "D").

**3**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

## II.   THE COURT SHOULD DISMISS PLAINTIFF'S CASE FOR REPEATED VIOLATION OF ITS DEPOSITION CONDUCT ORDER.

Consistent with their obligation to their clients, defense counsel attempted to take Plaintiff Jeremy Holloway's deposition on August 14, 2020. "[T]he purpose of a deposition is to find out what the witness thinks, saw, heard or did." Mazzeo v. Gibbons, 2010 WL 3020021, at *2 (D. Nev. 2010). However, a questioning attorney (in this case defense counsel) can only discharge their responsibilities to their clients if the attorney representing the witness (in this case Ms. Mkrtchyan) follows the basic rules governing federal deposition practice – rules which have already been emphasized by this Court. (See, Order, Dkt. No. 73, p. 3, n. 3, Ex. "A")(going forward, "all counsel should comport themselves in the deposition the same as if they were in the courtroom.  The Advisory Committee notes to Rule 30 make that expectation explicit: '[i]n general, counsel should not engage in conduct during a deposition that would not be allowed in the presence of a judicial officer.' ").

Unfortunately, during Holloway's deposition, Ms. Mkrtchyan repeatedly violated the Court's order by "engag[ing] in conduct . . .that would not be allowed in the presence of a judicial officer' ". (Order, Dkt. No. 73, p. 3, n. 3, Ex. "A"). Plaintiff's counsel's conduct during Plaintiff's deposition consequently made defense counsel efforts "to find out what [Mr. Holloway] thinks, saw, heard or did" impossible. Mazzeo v. Gibbons, 2010 WL 3020021, at *2 (D. Nev. 2010). As set forth

### A.   Plaintiff's Counsel Repeatedly Insulted Defense Counsel, His Clients and the Court

Put most charitably, Ms. Mkrtchyan's conduct during Holloway's deposition fell far below the standards of professionalism and civility which are required of counsel in federal court proceedings. Ms. Mkrtchyan's latest deposition outbursts are part of a troubling and persistent pattern of misconduct in this case. The Court has already rightly found as much. (Order, Dkt. No. 73, p. 2, Ex. "A")(the July 7, 2020

**4**

Renegar "deposition was, to put it mildly, a train wreck. And responsibility for that result lies predominantly with Plaintiff's counsel.") Following review of the video record, the Court found that Plaintiff's counsel's tone during the Renegar deposition was "increasingly bellicose" as the day went on. (Order, Dkt. No. 73, p. 3, Ex. "A"). Ms. Mkrtchyan spoke in a "raised. . .voice several times", made personal attacks on others and erupted in profane outbursts when she was displeased with witness testimony. (Id.) As the Court rightly noted:

> If anything, the video recording is worse than the cold transcript. For the most part, Renegar and his counsel are largely subdued. Plaintiff's counsel is anything but. Not only does she raise her voice, but it appears to me that she slaps the conference room table at least twice. Her tone of voice ranges from exasperated to indignant. She appears to lose her temper several times. I am confident that none of these antics would have been permitted to persist in any courtroom in the federal courthouse in Orange County.

(Id.)

The Court's findings and admonitions following the Renegar deposition came with good reason. "Offensive and abusive language by attorneys in the guise of zealous advocacy is plainly improper, unprofessional, and unacceptable. . .." Laddcap Value Partners, LP v. Lowenstein Sandler P.C., 859 N.Y.S.2d 895 (2007); see, id.("An attorney who demonstrates a lack of civility, good manners and common courtesy taint the image of the legal profession and, consequently, the legal system, which was created and designed to resolve differences and disputes in a civil manner."); People v. Fagan, 483 N.Y.S.2d 489 (1984)(noting that "while the correct resolution of civil disputes is indeed an important goal of our legal system, it may fairly be said that society's primary interest in the resolution of civil disputes is that they be settled in a peaceful, orderly, and impartial manner.")

All courts agree with these common sense principles. See, e.g., Freeman v. Schointuck, 192 F.R.D. 187, 189 (D. Md. 2000)("No one expects the deposition of a key witness in a hotly contested case to be a non-stop exchange of pleasantries.

**5**

1  However, it must not be allowed to become an excuse for counsel to engage in acts of

2  rhetorical road rage against a deponent and opposing counsel."); <u>MAG Aerospace</u>

3  <u>Indus., Inc. v. B/E Aerospace, Inc.</u>, 2014 WL 12754932, at *1 (C.D. Cal. 2014)("A

4  deposition is a judicial proceeding that should be conducted with the solemnity and

5  decorum befitting its importance. Lawyers participating in depositions should comport

6  themselves in a professional and dignified manner. When lawyers behave otherwise, it

7  reflects poorly on the entire judicial process."); <u>Martinez v. Dep't of Transportation</u>,

8  238 Cal. App. 4th 559, 566 (2015) ("The law, like boxing, prohibits hitting below the

9  belt. . .. The rule . . . manifests itself by prohibiting irrelevant *ad hominem* attacks.")

10           One would assume that the Court's civility order would have led Ms.

11  Mkrtchyan to reflect on her past conduct in this case – and to move forward in a new

12  spirit of professionalism. The Court's order plainly called for her to do just that.

13  (Order, pp. 2 and 4, Ex. "A")(going forward, "I expect, as I told counsel during the

14  July 9 telephone conference, that all counsel should comport themselves in the

15  deposition the same as if they were in the courtroom. . ..I trust that my remarks on

16  July 9 and this subsequent ruling will cause [future] depositions to be conducted

17  without the rancor that was exhibited on July 7 [at the Renegar deposition]."

18           Ms. Mkrtchyan, however, has plainly chosen another course of conduct. None

19  of the Court's warnings and admonitions have moved counsel to alter her deposition

20  misconduct. Instead, if anything, the conduct during Holloway's deposition reached ***a***

21  ***startling series of new lows***.  Plaintiff's deposition transcript is peppered with

22  cringeworthy verbal outbursts, many of which featured personal attacks on defense

23  counsel and his clients. It all started with strange, antagonistic murmuring:

24       Q     BY MR. HARRELL: Are your parents still living?
     A     Yes.

25       Q     Both of them?
     A     Yes.

26       Q     What is your father's name?

27       MS. MKRTCHYAN: Objection. Relevance.

28

THE WITNESS: Joseph Holloway.

MS. MKRTCHYAN: **It's pathetic. I can't believe these people.**

(Plaintiff Depo., 49:4-13, Ex. "B")(emphasis added.)

Rather than work with defense counsel as a fellow member of the federal bar, Ms. Mkrtchyan quickly chose to unleash the same type of raised voice outbursts and snarling personal attacks that led the Court to issue its oral and written civility directives.  The name-calling began with Ms. Mkrtchyan's vocal announcement that defense counsel is not a "normal human being" – at least in her view:

> Q      BY MR. HARRELL: Okay. So when the officer indicated that he had officer safety concerns and that's why he wanted to –
>
> A      Yeah.
>
> Q      -- pat you down, you understood that the officer wanted to do a pat-down search to see if you had any weapons on you; right?
>
> A      I understand he wanted to violate my civil rights.
>
> Q      I understand, sir. That's kind of more something for your lawyer to say in front of a jury.  My question has another focus.  Here, we're going to read it back for you.
>
> MS. MKRTCHYAN: Well, objection. Argumentative. Vague and ambiguous. Badgering the witness. Asked and answered. And your **condescension** is on the record, too. So if you continue like this, we'll take as many breaks as possible. So just behave yourself as a **normal human being**.
>
> MR. HARRELL: Well, ma'am, one of the great things about our country is I don't have to respond to any of that.
>
> MS. MKRTCHYAN: Of course, you will not have to.
>
> MR. HARRELL: I'm not going to.
>
> MS. MKRTCHYAN: Of course, not to, because you just have, you know, absolutely **no respect** for any other attorney. The level of **arrogance** that I see is just **horrendous**. So anyway --
>
> MR. HARRELL: Right, ma'am. **We're not going to have a train wreck today.** The magistrate judge has already got his eye on you and for good reason.
>
> MS. MKRTCHYAN: Very good. You are defaming my name. So continue with that type of attitude. Train wreck. Okay.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1  (Plaintiff Depo., 90:4 – 91:12)(emphasis added.)

2         Defense counsel was not the only victim of Ms. Mkrtchyan's many outbursts.

3  At another point, she lashed out at her own client when he rightly declined to agree

4  with counsel's attempted "coaching" of his deposition answers:

5         MS. MKRTCHYAN: . . .Your goal -- what is your goal today? I don't understand.

6         MR. HARRELL: My goal is to get through these questions.

7         Q    Well, sir, you've already told us that you do sometimes experience anger and upset when you think about the incident; true?

8         MS. MKRTCHYAN: **Misstates the testimony. Misstates the**

9  **testimony.**

       THE WITNESS: **Yes, I did say -- I did say that.**

10  **. . .**

11         Q    BY MR. HARRELL: Sir --

       MS. MKRTCHYAN: **Nonsense of all type of proportions.**

12

13  (Plaintiff Depo., 139:1-6 and 140:15-17, Ex. "B")(emphasis added.)

14         Ms. Mkrtchyan then erupted at defense counsel when he legitimately attempted

15  to follow up on the reasons, if any, for Plaintiff's "emotional distress" claims arising

16  out of the subject arrest incident. The outburst also featured rank "coaching" of

17  Plaintiff:

18         Q    BY MR. HARRELL: You do understand that law enforcement has a responsibility to respond to complaints of criminal

19  conduct. That's part of their job.

       You understand that; right?

20         A    As much as I can, being a civilian.

21         Q    And you understand, sir, that there was a complaint of criminal conduct at the campground before law enforcement appeared at

22  your tent; true?

23         MS. MKRTCHYAN: Vague and ambiguous.

24         THE WITNESS: I understand that now.

       MS. MKRTCHYAN: Vague and ambiguous as to time.

25         Q    BY MR. HARRELL: Do you hold it against law

26  enforcement for responding to the complaint of criminal conduct at the campground, or do you think they just should have ignored it?

27         MS. MKRTCHYAN: How do you object to this type of

28

8

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1   **nonsense**?

2          THE WITNESS: This is --

3          MS. MKRTCHYAN: Argumentative. Objection. Vague and ambiguous.

4          THE WITNESS: Yeah, I can't answer that question.

5          MS. MKRTCHYAN: Wait a minute. Let me finish my objection. Argumentative. Vague and ambiguous. Irrelevant.

6          Q  BY MR. HARRELL: We're going to read it back for you, sir. And, ma'am, you're free to have a running objection if that's what you would like to have.

7

8          MS. MKRTCHYAN: No. I have an objection to your line of questioning because you are asking the argumentative questions. Badgering the witness. That is not likely to lead to admissible evidence. Okay?

9

10

11         And if you are going to interrupt this and I am going to call the magistrate and find out why is this question that right now you're posing three times is important.

12

13         The law enforcement has a job to do. No. Law enforcement has a job to do, but **your clients** did not have a right to **beat the hell out of my client.**

14

15         MR. HARRELL: No. No.

16         MS. MKRTCHYAN: And if you, as an attorney, have no sense of understanding and **common sense** as to what happened, this is a victim of **police brutality**, and you keep badgering him? You think that your clients have not committed **a crime here**? So go after them, not my client.

17

18

19         And he's not going to tolerate this type of **nonsense** from a defense counsel who doesn't even bother to wear his mask when we have a coronavirus. Okay?  Seriously.

20

21         MR. HARRELL: Ma'am, you're --

22         MS. MKRTCHYAN: It just bothers me that **you have no sense of common sense and compassion.** Someone is sitting in front of you who was beat up by your **moron** clients. Okay? Your clients, **your criminal clients** who are wearing a badge and are using that badge to **commit crimes, including falsifying reports.**

23

24

25         And you are going to sit here and tell this guy, who was a victim of police brutality, that he does not understand the job of the law enforcement? Yes, he understands, but the job of law enforcement is not to go and **beat the hell out of people**.

26

27

28

**9**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

And you, as an attorney, your job is not just to do your job, defend **these kind of criminals**, but to do it with some degree of compassion. Okay? If you do not have compassion, **maybe you should not be an attorney at all.**

That's why this country is in **this deep shit** that we are. Okay? **People like you and people like your clients.** That's all I've got to say.[2]

The bottom line is that you know what? I'm going to take as many breaks as I want, and I may stop this deposition because you're continuing to badger this guy, who is a victim. He's a victim that your clients have ruined the life of, and you're telling him what is the job of law enforcement?

MR. HARRELL: Where are you going, ma'am?

MS. MKRTCHYAN: I am taking a break because you need to take five minutes to understand what it means to be, you know -- to have **common sense and compassion**, you know.

MR. HARRELL: Okay. Well, you take your break. Try to pull yourself together.

MS. MKRTCHYAN: No, but because you do not have a clear understanding of what is the United States Constitution and what this country's flag is all about.  Someone is sitting in front of you who has served you, your country, and you're badgering him with **nonsense, stupid questions.**

MR. HARRELL: Okay. We're off the record while plaintiff's counsel tries to pull herself together.

THE VIDEOGRAPHER: We're now going off the record. The time is 1:10 p.m.

(Recess.)

(Plaintiff Depo., 140:18 – 144:13, Ex. "B")(emphasis added.)

The put-upon court reporter repeatedly asked Ms. Mkrtchyan to cease her commentary so as to permit read-backs when they were needed to frame questions. But Ms. Mkrtchyan showed the court reporter no professional courtesy or respect either:

Q     BY MR. HARRELL: So we're just going to read the question back. How about respond to my question, and then I'll do as I've done any number of times today. I will move on after I get an

---

[2] If only it were so.

**10**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

answer to the question.

     MS. MKRTCHYAN: Well, your question is vague and ambiguous. If you don't want a paraphrase, I will instruct him not to answer because it's not a proper -- it's not a fair question, and you know it.

     MR. HARRELL: Okay. Let's everybody be as quiet as we can and let the court reporter read.

     MS. MKRTCHYAN: Well, you know, there's going to be an instruction not to answer unless you paraphrase that type of vague and ambiguous question that is assuming facts not in evidence.

     MR. HARRELL: It sounds like to me that you're losing the quiet game. So let's everybody be --

     MS. MKRTCHYAN: Excuse me.

     MR. HARRELL: -- as quiet --

     MS. MKRTCHYAN: Excuse me.

     MR. HARRELL: Let's everybody be as quiet as they can.

     MS. MKRTCHYAN: Excuse me. You are not my grandfather, as much as you wish you were.

(Plaintiff Depo., 241:18 – 242:16, Ex. "B")

At that point, ***<u>Plaintiff's co-counsel</u>***, Mr. Beck, appeared to sympathize with the court reporter's legitimate request for silence during read-backs, and he felt the need to ask Ms. Mkrtchyan to ***<u>be quiet as well</u>***. But Plaintiff's counsel interrupted Mr. Beck and quarreled with him too:

     MR. BECK: Enough. That's enough. That's enough.

     MS. MKRTCHYAN: That's the most **sexist attitude** I can get from a man saying be quiet. Okay.

     MR. BECK: This is not moving this deposition forward and --

     MS. MKRTCHYAN: **No**, but that's the most **dumbest** question [sic] I've ever heard.

     MR. BECK: **Enough.**

(Plaintiff Depo., 242:18 – 242:25, Ex. "B")(emphasis added.)[3]

Plainly, nothing said by defense counsel had anything to do with Ms.

---

[3] In the wake of Plaintiff's counsel's civility violations, Mr. Beck seems to have prudently decided to direct his efforts elsewhere. He has vanished from the case.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1  Mkrtchyan's gender.  Even so, Ms. Mkrtchyan repeatedly (and unfairly) attacked

2  defense counsel as being a "sexist" bigot for no good reason:

3          MR. HARRELL: . . .[P]ull yourself together.

        MS. MKRTCHYAN: Excuse me. I have a right to object. Who

4  the hell do you think you are? I have a right to object.

        MR. HARRELL: Make legal objections.

5          MS. MKRTCHYAN: I am making the objections the way I

6  understand. If you have a problem with my objections, you can take it up

later. Okay? There you go.

7          MR. HARRELL: Ma'am, you've got to pull yourself together.

8          MS. MKRTCHYAN: Okay. You have yet to see me too -- I mean

9  seriously, this is the **sexist**, condescending attitude, Counsel, and you are

really behaving just like this with **any female attorney** that is younger

10  than you? I'm sorry. If no one told you outright that that's **sexist** attitude,

11  I will. I'm not afraid.

        And I will tell you that your behavior from this morning and even

12  before then, your letters, your -- you know, your harassing letters

towards me have been infused with condescending attitude.

13          Who do you think you are? Who do you think you are? I know

14  who I am, but you need to know your place. Okay? I am a female young

attorney, and you have no right to do this to me or my client. You're

15  badgering the witness. Let's go over the questions. You have to ask only

16  appropriate questions, and you are not.

17  (Plaintiff Depo., 116:16 – 117:19, Ex. "B")(emphasis added.)

18      "Sexist" seemed to be Ms. Mkrtchyan's go-to response any time defense

19  counsel tried to get answers to the legitimate question posed (rather than re-draft the

20  question in the manner she wrongfully demanded):

21          Q    BY MR. HARRELL: Sir, have you received a bill from the

VA, to your knowledge, for your medical treatment since the incident

22  happened? Yes, no, or I don't know?

23          MS. MKRTCHYAN: **Or has your lawyer** -- see –

24          MR. HARRELL: Ma'am, **with respect, that's not my question**.

So you'll have an opportunity later if you're so inclined to ask whatever

25  you want to ask.

26          Right now my question has a limited focus that does not involve

you, with all due respect.

27          MS. MKRTCHYAN: Well, excuse me. If it's attorney-client

28

12

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

privilege, then it is involving me.

MR. HARRELL: Ma'am.

MS. MKRTCHYAN: So -- and you know what? Your attitude -- I really do not appreciate this condescending attitude, unprofessional, **sexist** attitude that you're coming up across from the very beginning this morning. I'm not going to tolerate that.

From the very beginning, you've been this hostile, you know, person, you know. So I'm not going to tolerate that.

I'm instructing him not to answer because the **answer presupposes attorney-client privilege**. Okay?

He is -- he has -- his attorney has received billing records. He has not received it. So, therefore, his answer is irrelevant. So --

MR. HARRELL: Are you done?

One of the reasons, ma'am, why we have a camera here today is because we need one with you. You've already proven that. The Magistrate Judge characterized your conduct as, and I quote, "a train wreck."

MS. MKRTCHYAN: Okay.

MR. HARRELL: And that's being charitable.

MS. MKRTCHYAN: And excuse me.

MR. HARRELL: We have a camera here today --

MS. MKRTCHYAN: Train wreck.

MR. HARRELL: -- so that you can see --

MS. MKRTCHYAN: Very good.

MR. HARRELL: -- that **nobody has raised their voice** here today.

MS. MKRTCHYAN: Very good, Counsel. Very good.

MR. HARRELL: Your comment about me being a **sexist** --

MS. MKRTCHYAN: Okay. I'm taking a break because I don't need this type of attitude.

MR. HARRELL: -- is what we call in the trade a lie --

MS. MKRTCHYAN. Okay. Until you finish, I'm going to take a break.

MR. HARRELL: -- and you need to get control of yourself.

MS. MKRTCHYAN: Well, thank you.

MR. HARRELL: You need to pull yourself together --

MS. MKRTCHYAN: Maybe you need to pull yourself together.

MR. HARRELL: -- and it needs to happen now.

MS. MKRTCHYAN: We're going to break until you bring

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1         yourself to normal condition because you are being rude and

2         unprofessional, and you have no right to condescend me like that. Thank

3         you.

              Let's go.

4   (Plaintiff Depo., 56:12 – 58:23, Ex. "B")(emphasis added.)

5         In short, "sexist" language was not used toward anyone during Plaintiff's

6   deposition. To the contrary, defense counsel showed courtesy and respect to everyone

7   in the deposition room – just as the Court has directed.

8         For example, defense counsel repeatedly extended every courtesy to Plaintiff,

9   Mr. Holloway. First of all, defense counsel explained why he was asking the personal

10   background questions that defense attorneys ask of almost all plaintiffs (like Mr.

11   Holloway). This was done to help address Plaintiff's visible discomfort with that

12   portion of the proceedings. Defense counsel also did that as a matter of common

13   courtesy and respect:

14         Q    BY MR. HARRELL: Sure. Sure, sir. I have a list of things

15         that I go through, not just with you, but with everybody that comes into

16         this room -- okay -- on the other side of the lawsuit that I'm trying to

      find out who they are --

17         A    Okay.

18         Q -- so I can go back and I can tell my client this is who they are,

      this is what they say, this is the road they've traveled, this is what their

19         grievances are. It's just gathering information is all that we're doing

      here today.

20         Do you understand?

21         A   **Yes, I do.**

      Q    And if ever at any time, if I ask a question and you just

22         don't feel good about it, **please, speak up. We'll see if there's a**

      **workaround.** We'll see if there's something that we can do.

23         Okay? Do you understand?

24         A   **That sounds good.**

25   (Plaintiff Depo., 29:20 – 30:13, Ex. "B")(emphasis added.)

26         When there was a brief pause in deposition questioning, defense counsel also

27

28

**14**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

explained the reason for his momentary silence. Again, he did that to help address

Plaintiff's comfort with the proceedings and also as a matter of common courtesy and

respect (notwithstanding Ms. Mkrtchyan's latest "coaching" interruptions):

> Q      Okay. **Thanks for giving me time to jot things down.**
> So when you got back to your campsite, you had some questions
> that included why didn't these neighbors speak up and identify
> themselves as the people that had been involved in the quarrel; true?
> MS. MKRTCHYAN: Objection. Vague and ambiguous.
> **Misstates the testimony.**
> THE WITNESS: I asked them, **yeah**, straight up. I asked them
> why.

(Plaintiff Depo., 158:6-15, Ex. "B")(emphasis added.)

When Plaintiff seemed confused by a request for an audible answer to

questions, defense counsel again explained the need for his request. Here too, he

explained matters to help address Plaintiff's comfort level and also as a matter of

common courtesy and respect:

> Q. . .So when you address your neighbors from the vantage point
> of you standing at your tent, you make a statement to the effect of "Why
> didn't you come out and stop this? Instead, you let me take the blame";
> right?
> A      Uh-huh.
> Q      Yes?
> A      That's what I said. Yes.
> Q      Okay. I can see you.
> A      I got it. I got it. Nobody saw. Got it.
> Q      **You have to have actual words.**
> A      I didn't know what this was. I didn't know what you were
> doing.
> Q      It's, like, **I need some words.**
> A      **I got you.**

(Plaintiff Depo., 161:9-22, Ex. "B")(emphasis added.)

Against this backdrop, Ms. Mkrtchyan's inflammatory, unprovoked personal

attacks on defense counsel's character, including her smear claim that Mr. Harrell is

**15**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1  some type of "rude", "sexist" bigot, are baseless and cringeworthy on their face.

2  Again, these comments are belied by the cold deposition transcript and by the video

3  record of the proceedings. Ms. Mkrtchyan's character attacks are yet another violation

4  of the Court's standing order in this case requiring civility, verbal self-control and

5  professionalism. These qualities are all required in a courtroom. See, e.g., Davis v.

6  Superior Court of State of Cal., 846 F.2d 1382 (9th Cir. 1988)(counsel properly held

7  in contempt for disparaging his attorney opponent in open court: "Davis turned to

8  defense counsel who had barely completed an objection and as the court opened its

9  mouth to sustain the objection, blurted out" disparaging comments "in a sarcastic and

10  contemptuous tone. . ..")

11       Verbal self-control and professionalism are also required at depositions. See,

12  e.g., Rywkin v. New York Blood Ctr., 1998 WL 633810, at *1 (S.D.N.Y.

13  1998)(counsel representing the deponent "made *ad hominem* attacks on opposing

14  counsel . . ..This conduct clearly is sanctionable."); id. (counsel representing the

15  deponent "insinuated, without support, that opposing counsel's conduct was racially

16  motivated. This conduct clearly is sanctionable."); Horowitz v. Chen, 2018 WL

17  4560697, at *4 (C.D. Cal. 2018)(counsel for the deponent "was disrespectful and

18  personally attacked [questioning] counsel in a way that is wholly unsuitable for a

19  deposition or any other litigation proceeding. . ..These types of comments would have

20  no place in a courtroom, and they accordingly have no place in a deposition

21  proceeding."); (Order, pp. 2 and 4, Ex. "A")(going forward, "I expect, as I told

22  counsel during the July 9 telephone conference, that all counsel should comport

23  themselves in the deposition the same as if they were in the courtroom. . ..)

24       Events at Plaintiff's deposition reached a crescendo of sorts when defense

25  counsel attempted to focus on Plaintiff's "false arrest" claim. The law enforcement

26  Defendants in this case contend that they had good cause to suspect Plaintiff of

27  physically abusing a female companion at the time they first confronted him.

28

**16**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1               Indeed, eyewitness "911" reports by other campers advised officers that

2  Mr. Holloway had physically attacked a female in his campsite tent. (See, e.g.,

3  Fuerbach Declaration, ¶¶ 6-11, Ex. "E")[4] For his part, Plaintiff disputes Mr.

4  Fuerbach's incriminating testimony.[5] He has not only denied any female companion

5  was with him at the campsite, he has denied having a girlfriend of any type since 2007

6  (when his spouse evidently divorced him):

7

8  [4] It is ironic, to say the least, that Ms. Mkrtchyan has evidently been too busy calling
defense counsel a "sexist" to develop any coherent response to Mr. Fuerbach's

9  compelling testimony that Plaintiff brought the subject arrest incident on himself by
beating a woman.

10  [5]     Q    Okay. So let's talk about the 24 hours running up to the incident, the

11  contact that you had with law enforcement.

             Where were you at that time?

12          A    I was camping at O'Neill Park.

13          Q    Okay. And how long had you been camping at

14 . . .

          Q    At the time of the incident, how long had you been camping at O'Neill

15  Park for that stay?

16          MS. MKRTCHYAN: Asked and answered.

          THE WITNESS: That stay. Like I said, I believe I checked in the day before.

17          Q    BY MR. HARRELL: Okay. So at the time of the incident, you had been

18  at your campsite at O'Neill Park for about 24 hours?

19          A    Yeah. I could say that. Approximate 24 hours.

          Q    Okay. When you checked into your campsite, were you with anyone

20  else?

          A    I was not.

21 . . .

22          Q    Did anyone join you at your campsite before the incident?

          A    Nobody.

23          Q    Okay. So in the entire 24-hour period of time before the incident, before

24  your contact with law enforcement, your testimony is you weren't in the company of a

    guest?

25          A    Correct.

26          Q    Did you have a girlfriend at the time of the incident?

27          A    I did not.

  (Plaintiff's Depo., 45:17 – 51:4, Ex. "B")

28

17

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

Q     Okay. When is the last time that you were in a social
relationship with someone who you considered to be a partner?

MS. MKRTCHYAN: Objection. Relevance. Privacy.

THE WITNESS: That would have been when I divorced my wife.
That would have been 2007.

Q     BY MR. HARRELL: Okay. Have you ever had a girlfriend
since 2007?

A     I have not.

(Plaintiff Depo., 46:10-18, Ex. "B")

Accordingly, in order to test Plaintiff's assertions, the defense served a <u>Fed. R.</u>
<u>Civ. P.</u> 34 request for Mr. Holloway's social media posts, which might disclose his

contacts with the woman Mr. Fuerbach observed Plaintiff abuse on the night of the

incident. (<u>See</u>, Motion to Compel, Dkt. No. 100). ***Following*** dispatch of Defendant's

request, however, Plaintiff appears to have ***deleted*** his Facebook posts, as well as his

entire Facebook account. The defense rightly sought to question Plaintiff regarding his

handling of his Facebook account ***following Defendant's request for access to it.*** The

following transcript contains the relevant deposition inquiry:

Q     Okay. Now, sir, you are aware that we have requested your
social media postings, including from Facebook; true?

A     **Yes, I am aware.**

Q     Are you prepared to turn those over to us?

MS. MKRTCHYAN: No. Objection. First of all, attorney-client
privilege. Attorney work product.

So he's instructed not to answer that question because that's not
his purview.

Q     BY MR. HARRELL: Sir, do you have any problem, you
personally, turning over your Facebook postings to us?

MS. MKRTCHYAN: Objection. You are instructed not to answer.
You're instructed not to answer.

Q     BY MR. HARRELL: Sir, you have become aware that we
are asking for your Facebook postings; true?

MS. MKRTCHYAN: Asked and answered. Move on.  Instructing
not to answer. This is attorney-client privilege. He would not be able to

**18**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

answer that question really without disclosing attorney-client privileged communications. Therefore, move on, Counsel.

       Q     BY MR. HARRELL: Sir, you did take some action after you learned that we were seeking your Facebook postings; true?

       MS. MKRTCHYAN: Instruct you not to answer any of that.

       That's, again, attorney-client privilege, and he will not be able to answer that question without -- without discussing and -- without sharing attorney-client privileged communications.

       Therefore, you're instructed not to answer.

       Q     BY MR. HARRELL: Sir, after you learned that we were seeking your Facebook postings, you switched your account to private; right?

       MS. MKRTCHYAN: Again, objection.  You're instructed not to answer.  And, Counsel, are you going to continue going into attorney-client privileged communications?

       Q     BY MR. HARRELL: Sir, after you learned that we were after -- are you instructing him not to answer?

       MS. MKRTCHYAN: Yes. Yes. And I'm asking you to move on with this line of questioning because it goes into attorney-client privileged communications. What I instructed my client, what he did or did not do, it's none of your business frankly, and that is attorney-client privilege.  So if you continue with this line of questioning, I'm going to stop this deposition.

       Q     BY MR. HARRELL: Sir, after you learned that we wanted to see your Facebook postings, you did more than switch it to private; you closed and deleted your entire account; true?

       MS. MKRTCHYAN: Objection. Objection. You know what? We are going to stop this because you are going into areas where it's attorney-client privilege. It's none of your business what he did and did not do at what instructions.

       MR. HARRELL: It is. When he destroys evidence, it is.

       MS. MKRTCHYAN: Oh, really? Oh, really? What evidence? You giving me some -- here, this is your evidence.  Do you want me to show you what evidence you've given me? I'm going to show it to you. Here.  Here. It's nonsense.

     **[At this point, and as depicted on video, Ms. Mkrtchyan continued shouting and threw voluminous papers across the deposition table in the direction of defense counsel and deposition staff]**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

(Plaintiff Depo., 258:6 - 260:21, Ex. "B")

As Ms. Mkrtchyan stood and began menacingly throwing papers about, ***her own co-counsel***, Mr. Beck, was also plainly alarmed by her enraged tirade. He attempted to stop the misconduct. But he too was unsuccessful:

> MR. BECK: **Hey, don't.**
>
> MS. MKRTCHYAN: No. That's nonsense. I want them to see that someone, a victim of police brutality, is going to become part of your police reform. This is your evidence. Okay?
>
> If you have any decent question for my client, you can go ahead. But this is -- I'm doing this for the record, and I will do this for you to satisfy your nonsense questionnaire, you know.
>
> Go ahead. That is your evidence, which is junk. Okay? Junk.  And if you continue badgering my client, again, as a victim of police brutality, this is I will stop this deposition, and we'll go, and we will not resume it without permission of a magistrate. Okay?
>
> **I have a right to tell my client what to do** and what not to do. It's none of your business. Okay? If you have a legitimate question about your junk evidence, go ahead and ask it. That's the only question, you know, you are permitted to ask.
>
> MR. HARRELL: **Are you saying that you told your client to destroy evidence that we were asking for?**
>
> MS. MKRTCHYAN: **It's attorney-client privilege,** Counsel. Okay? Attorney-client privilege.
>
> When you come and disclose to me what you told your clients in lying at their depositions to cover up their criminal activities to avoid criminal prosecution by U.S. Attorney's office, which I will ensure will happen at some point, then we'll disclose my communications with my client.  But at this point your **Facebook nonsense**, this stuff, this **Facebook nonsense** that you have been showing me as your supplemental disclosure, this is all you've got? For this case against my client? Then you're really in good shape.
>
> So -- but I'm instructing you not to answer any questions that relates to attorney-client privileged communications, and we will move on from the subject. Otherwise, I'm going to stop this deposition.
>
> MR. HARRELL: Let me just make my record, and if you'd like to

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1    make an instruction not to answer, you're free to do that. But let me just

2    get my record out there.

3        Q      Sir --

     MS. MKRTCHYAN: You're not going to ask him any other

4    questions about this.

5        MR. HARRELL: **Let me just make my record.**

     MS. MKRTCHYAN: You're not. You make your record without

6    dealing with my client. Okay? I already told you that's attorney-client

     communications.

7        MR. HARRELL: **If I may make my record and you make your**

8    **objections, and we'll see where we go.**

     MS. MKRTCHYAN: I already made my objections.  You're not

9    allowed to ask another question of this to my client.

10       Q  BY MR. HARRELL: Sir, after you learned that we were

     seeking --

11       MS. MKRTCHYAN: We're getting up. No. Let's get up. Because

12   you know what? You're continuing to ask the same question going into

     attorney-client privileged communications. Thank you.

13       So if you're not going to move onto another topic that does not

14   infringe upon my client's right to privilege, I will stay here.

     Do you have another question?

15       MR. HARRELL: **I was trying to get my question out, and**

16   **somebody interrupted.**

     MS. MKRTCHYAN: Well, because you are asking the same

17   exact question. I already know what question you're asking, because you

18   are already assuming something of my client. So I'm not going to let that

     happen. Okay?

19       So we're going to take a break. Let's take a break, and you think

20   about what is attorney-client privilege, and then we'll go forward.

     THE VIDEOGRAPHER: We are now going off the record.  The

21   time is 4:14 p.m.

22   (Recess.)

     THE VIDEOGRAPHER: We are now back on the record.  The

23   time is 4:24 p.m.

24       Q      BY MR. HARRELL: Sir, you have now deleted your

     Facebook account; true?

25       MS. MKRTCHYAN: Objection. Vague and ambiguous.  Calls for

26   speculation.

27       If you can answer that question -- do you feel comfortable

28
---
**21**

1   answering that question? Do you understand that question?

2       THE WITNESS: Yes, I do.

    MS. MKRTCHYAN: Okay.

3       THE WITNESS: Yes, I did recently delete my Facebook account.

4       Q       BY MR. HARRELL: And you did that for a reason; true?

        A       It was making me upset.

5       Q       Sir, you deleted your Facebook account because you didn't

6   want us to have access to it; true?

        MS. MKRTCHYAN: Objection.

7       THE WITNESS: Nothing to hide on Facebook.

8       MS. MKRTCHYAN: It's argumentative. Wait a minute.

    Objection. It's argumentative.

9       Q BY MR. HARRELL: Sir?

10      MS. MKRTCHYAN: **You are instructed not to answer to a**

    **question like that.**

11

12  (Plaintiff's Depo., 260:22 – 264:25, Ex. "B")

13      All of the forgoing inquiry – relating to ***destruction of requested evidence*** -- is

14  facially relevant to Defendants' developing ***spoliation claim*** in this lawsuit. As noted

15  by this Court (in another case), a spoliation remedy requires factual support – which is

16  just what defense counsel was attempting to elicit during Plaintiff's deposition. <u>See</u>,

17  <u>Star Envirotech, Inc. v. Redline Detection, LLC</u>, 2015 WL 9093561, at *5 (C.D. Cal.

18  2015)("Spoliation is the destruction or significant alteration of evidence, or the failure

19  to preserve property for another's use as evidence, in pending or reasonably

20  foreseeable litigation.")

21      In its prior civility order, the Court rightly took a dim view of Ms. Mkrtchyan's

22  decision to slam her hand down on the deposition table. (Order, Dkt. No. 73, p. 3, Ex.

23  "A")(admonishing Plaintiff's counsel for "slap[ping] the conference room table at

24  least twice."). Ms. Mkrtchyan's outburst during the forgoing spoliation inquiry –

25  which featured ***throwing documents*** in defense counsel's direction (and in the

26  direction of court reporting / video staff) – represents an even more serious refusal to

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

listen to (or care about) the Court's orders requiring civility and professionalism in this case. (See, Order, pp. 2 and 4, Ex. "A")(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..)

If there were any doubt on the issue, Plaintiff's counsel made her contempt for the Court's previous civility orders explicit during another one of her chaotic deposition outbursts:

> MS. MKRTCHYAN: . . .I will walk away. Okay?
> And my client is not going to come back for another deposition.
> MR. HARRELL: Maybe the judge will have the final word on that, ma'am.
> MS. MKRTCHYAN: Well, you know what? I'm sorry. A lot of the things right now are still up in the air in this country. **So whether you have a judge saying something** or the president saying something, **it really doesn't matter anymore. Okay?**
> MR. HARRELL: It doesn't matter to you what the judge says?
> MS. MKRTCHYAN: Right now what I care is my client being badgered by you and your condescending behavior toward me.
> MR. HARRELL: Ma'am, are you saying it doesn't matter to you what the judge says?
> MS. MKRTCHYAN: . . .At this point all I care is what the books say. **I don't care what one specific judge says or does not do.** Nobody is above the law.

(Plaintiff Depo., 275:7 – 276:25, Ex. "B")

From Plaintiff counsel's conduct alone, even the most naïve observer would conclude that the Court's prior directive requiring professionalism and civility means nothing to her. But she made her contempt for the Court's civility orders ***explicit*** during the forgoing outburst. (Plaintiff Depo., 275:7 – 276:25, Ex. "B")("A lot of the things right now are still up in the air in this country. **So whether you have a judge saying something** . . . **it really doesn't matter anymore.** Okay?. . ..***I don't care what one specific judge says . . ..***")(emphasis added.)

23

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

## B.   <u>Speaking Over / Interrupting Others</u>

Ms. Mkrtchyan's conduct at Plaintiff's deposition violated the Court's good

conduct order in a myriad of other ways – including by repeatedly interrupting while

they were speaking. And interruptions matter. For starters, the defense is entitled to

have a deposition transcript which they can actually use at trial. Ms. Mkrtchyan's

constant interruptions during the deposition made Plaintiff's deposition transcript

essentially unusable. Part of the problem was her interruptions while questions were

being asked or answers were being given. There is no practical way to edit her

videoed interruptions out of the middle of someone else's attempt to ask (or answer)

questions.

The following deposition excerpts (featuring Ms. Mkrtchyan's interruptions of

both defense counsel and her client) are illustrative:

> Q      You understood that law enforcement is called to the scene
> of problems --
> MS. MKRTCHYAN: **Vague and ambiguous.**
> Q      BY MR. HARRELL: -- and they are asked to try and
> resolve the problems; right?
> MS. MKRTCHYAN: Vague and ambiguous.

(Plaintiff Depo., 95:22 – 96:2, Ex. "B")(emphasis added)

> Q      BY MR. HARRELL: Sir, after you learned that we were
> seeking --
> MS. MKRTCHYAN: **We're getting up. No.** Let's get up.
> Because you know what? You're continuing to ask the same question
> going into attorney-client privileged communications. Thank you.
> So if you're not going to move onto another topic that does not
> infringe upon my client's right to privilege, I will stay here.
> Do you have another question?
> MR. HARRELL: **I was trying to get my question out, and**
> **somebody interrupted.**
> MS. MKRTCHYAN: Well, because you are asking the same
> exact question. I already know what question you're asking, because you
> are already assuming something of my client. So I'm not going to let that

**24**

1    happen. Okay?

2    (Plaintiff Depo., 263:3 – 19, Ex. "B")(emphasis added)

3              Q      You were calm and cool the entire time of the incident?
4              MS. MKRTCHYAN: Asked and answered.
              THE WITNESS: Yes.
5              Q      BY MR. HARRELL: You used restrained, respectful words
6    throughout the entire incident; right?
              A      I will say I cussed a couple times. . ..
7              Q      Do you make it your practice to use curse words when
8    you're angry and upset?
              MS. MKRTCHYAN: Argumentative.
9              THE WITNESS: I wasn't angry --
10              MS. MKRTCHYAN: **Argumentative**
              THE WITNESS: -- or upset. I was frustrated.
11

12    (Plaintiff Depo., 114:8 – 25, Ex. "B")(emphasis added)

13              Defense counsel thereafter tried to get a usable deposition answer from Plaintiff

14    (without Ms. Mkrtchyan's interruption). But Ms. Mkrtchyan wrongful blocked these

15    efforts:

16              MS. MKRTCHYAN: Let me object. Okay? This is going --
17              Q      BY MR. HARRELL: Do you make it your practice to use
18    curse words when you're angry and upset?
              MS. MKRTCHYAN: Asked and answered. Badgering the
19    witness.
              Are you going to continue doing the same thing over and over
20    again? You asked, and he answered.
              Q      BY MR. HARRELL: Do you make it your practice, sir, to
21    use --
              MS. MKRTCHYAN: **Don't answer that.**
22              (Discussion off the record.)
23              (The following record was read:
24              "Q Do you make it your practice, sir, to use --")
              MS. MKRTCHYAN: Okay. Asked and answered. I'm **instructing**
25    **not to answer** that question.
26              Q      BY MR. HARRELL: Do you make it your practice, sir, to
27

28                                          25
                   DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
              VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
                                  FOR MONETARY SANCTIONS

1  use curse words when you're angry and upset?
2       MS. MKRTCHYAN: **I'm instructing you not to answer**.
3       MR. HARRELL: Mark it.

4  (Plaintiff Depo., 115:1 – 21, Ex. "B")(emphasis added.)

5       Q    BY MR. HARRELL: If we hear the word "guess," that
6  causes problems.  Okay?
     A    Okay.
7       Q    So let me ask you --
8       MS. MKRTCHYAN: Are you going to let me to make the record
clear, Counsel?
9       MR. HARRELL: Well, **if I can just get my question out**, and
10  then we'll see what happens next.

11  (Plaintiff Depo., 194:17 – 25, Ex. "B")(emphasis added.)

12       During trial, counsel may not unreasonably interrupt their opponent. <u>See</u>,
13  <u>e.g.</u>, <u>Davis v. Superior Court of State of Cal.</u>, 846 F.2d 1382 (9th Cir. 1988)(trial court
14  properly "admonished counsel not to interrupt each other. . ..") "It is [also]
15  inappropriate for counsel to . . . ***interrupt*** . . .opposing counsel during a deposition. .
16  ..Courts have characterized such conduct as 'Rambo litigation tactics' designed to
17  interfere with or prevent the elicitation of meaningful testimony and disrupt the
18  orderly flow of a deposition." <u>Luangisa v. Interface Operations,</u> 2011 WL 6029880, at
19  *7 (D.Nev. 2011)(emphasis added.) It is also improper for counsel to interrupt their
20  own client's answer. <u>See</u>, <u>Claypole v. Cty. of Monterey</u>, 2016 WL 145557, at *3
21  (N.D. Cal. 2016)(sanctions ordered in response to "extremely long speaking
22  objections, coaching witnesses, [and] ***cutting off witnesses*** . . ..")(emphasis added.);
23  <u>Claredon Nat'l</u> <u>Ins. Co. v. Foley & Bezek, LLP</u>, 2001 WL 1223486, at * 1 n.2 (C.D.
24  Cal. 2001)(constant interference during a deposition is a " 'blatant and egregious'
25  discovery violation[ ].") As the forgoing deposition excerpts illustrate, Ms. Mkrtchyan
26  violated this rule repeatedly at Plaintiff's deposition – a separate violation of this
27  Court's good conduct order. (<u>See</u>, Order, pp. 2 and 4, Ex. "A")(going forward, "I

28

26

1   expect, as I told counsel during the July 9 telephone conference, that all counsel

2   should comport themselves in the deposition the same as if they were in the

3   courtroom. . ..")

4        C.      **Constant Disruptive Comments**

5        Plaintiff's deposition is suffused with off-putting interjections that often

6   amounted to needless attempted quarrels over nothing:

7        Q      Do you believe that you have a clear memory of what
        happened during the incident?
8        A I have a very clear memory.
        MS. MKRTCHYAN: Argumentative. Excuse me.
9   Argumentative. **Vague and ambiguous.** Clear memory. **Do you
10  understand the question?**
        THE WITNESS: **Yes.**
11       MS. MKRTCHYAN: Okay.

12  (Plaintiff Depo., 75:9-16, Ex. "B")(emphasis added.)

13
14       Q.     And so you did not agree with the officer's request to pat
        you down; true?
15       A      I never said no, but I never said yes. I just kept asking,
        "Why are they here?" And that's what I just kept repeating. And I was
16  getting frustrated with them because they would not answer me.
        Q      Okay.
17       MS. MKRTCHYAN: **Why are you interrupting?**
        Q      BY MR. HARRELL: So when the officer says --
18       MS. MKRTCHYAN: Excuse me. Let him finish --
        Q      BY MR. HARRELL: -- says, "I would like to do" --
19       MS. MKRTCHYAN: Excuse me. Hello?
        Q      BY MR. HARRELL: -- "a pat-down search" -- "I'd like to
20  do a pat-down search."
        MS. MKRTCHYAN: This is not going to work. **If you're going
21  to continue interrupting my client, this is not going to work.** He was
        answering your question.  **Do not interrupt my client. Did you finish
22  your answer?**
        THE WITNESS: **As far as what he's answering, I think.**

23  (Plaintiff Depo., 101:11-102:7, Ex. "B")(emphasis added.)

24
25
26
27
28

**27**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1    Q    Well, sir, you've already told us that you do sometimes
2    experience anger and upset when you think about the incident; true?
         MS. MKRTCHYAN: **Misstates the testimony. Misstates the**
3    **testimony.**
         THE WITNESS: **Yes, I did say -- I did say that.**
4
5    (Plaintiff Depo., 139:1-6, Ex. "B")(emphasis added.)

6    Q    The first time law enforcement responds to your tent,
7    during that interaction, at some point you tell Deputy Renegar that the
     people that they're looking for, the people that are actually fighting, are
8    located at another campsite next to you?
         A    Yes.
9        Q    And you identify these people as being the man and the
10   woman that were quarreling?
         A    **Yes.**
11       MS. MKRTCHYAN: **Misstates the testimony.**
12
13   (Plaintiff Depo., 154:9-18, Ex. "B")(emphasis added.)

14   Q . . .  So when you got back to your campsite, you had some
15   questions that included why didn't these neighbors speak up and identify
     themselves as the people that had been involved in the quarrel; true?
16       MS. MKRTCHYAN: Objection. Vague and ambiguous.
17   **Misstates the testimony.**
         THE WITNESS: I asked them, **yeah**, straight up. I asked them
18   why.
19   (Plaintiff Depo., 158:6-15, Ex. "B")(emphasis added.)

20   Q    BY MR. HARRELL: If we hear the word "guess," that
21   causes problems. Okay?
         A    Okay.
22       Q    So let me ask you --
23       MS. MKRTCHYAN: Are you going to let me to make the record
     clear, Counsel?
24       MR. HARRELL: Well, **if I can just get my question out, and**
25   **then we'll see what happens next.**
         MS. MKRTCHYAN: Well, he made a demonstration, and I
26   wanted to make a record.
27       MR. HARRELL: Right. But he also told us --

28                                    28
―――――――――――――――――――――――――――――――――――――――――――――――――――
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

MS. MKRTCHYAN: It's your deposition. Fine.

MR. BECK [Plaintiff's co-counsel]: Narine, **you got this thing on videotape.**

MS. MKRTCHYAN: I understand. But what if that **video gets destroyed**? How am I going to know if that video is not **going to get destroyed**? . . ..[6]

(Plaintiff Depo., 194:17 – 195:8, Ex. "B")(emphasis added.)[7]

Repeated disruptive comments of this sort are not permitted in a federal courtroom. See, e.g., United States v. Martin-Trigona, 759 F.2d 1017, 1025 (2d Cir. 1985)(contempt proper where party "resorted to repeated interruptions and diversions involving irrelevant matters in an effort to confound and confuse" issues "and to stall the proceedings.") Similarly, "[i]t is inappropriate for counsel to engage in extensive and ***unnecessary colloquy***. . .or utilize any opportunity ***to interrupt and argue*** with opposing counsel during a deposition." Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011). This is particularly so where, as here, there is nothing legitimate to argue about. Id. ("Courts have characterized such conduct as 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of meaningful

---

[6] Given Plaintiff's apparent destruction of his Facebook account to frustrate its production in discovery, the irony of this outburst is also one of the defining characteristics of Plaintiff's litigation team: loudly accuse others of wrongdoing that you yourself are guilty of. Freud called this tactic "projection." The less scientifically-schooled among us call it hypocrisy.

[7] Ms. Mkrtchyan's dark insinuation that defense counsel would "destroy" the video of Plaintiff's deposition represents yet another form of incivility. See, Bonds v. Daley, 2018 WL 2405903, at *17 (E.D. Ky. 2018), report and recommendation adopted, 2018 WL 2376559 (E.D. Ky. 2018), aff'd, 2019 WL 2647494 (6th Cir. 2019)("Particularly troubling is the fact that Plaintiff's discovery dispute stemmed from . . . Plaintiff's baseless concern that opposing counsel would destroy the recording.")

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1   testimony and disrupt the orderly flow of a deposition.") Here too, Ms. Mkrtchyan's

2   failure to abide by basic deposition principles wrongfully interfered with defense

3   counsel's ability to conduct a meaningful deposition – and it violated this Court's

4   good conduct order. (See, Order, pp. 2 and 4, Ex. "A")(going forward, "I expect, as I

5   told counsel during the July 9 telephone conference, that all counsel should comport

6   themselves in the deposition the same as if they were in the courtroom. . ..")

7        **D.**   **Witness Coaching**

8        Ms. Mkrtchyan often told Plaintiff how to testify through suggestive comments

9   and leading "objections":

10       Q Okay. Well, let's talk about the incident.  The date of the

11     incident that you had with the sheriff's department was when?
         A    Would have been January 20th, I believe.

12       Q   Of what year?
         A    2017.

13       Q   Okay. And –

14     MS. MKRTCHYAN: **2018.**

15       Q   BY MR. HARRELL: -- where did you live on that date?
         A   **Was it 2018?**

16     MR. HARRELL: **Counsel, what do we call that, what you just**

17  **did?**

18  (Plaintiff Depo. 62:19-63:6, Ex. "B")(emphasis added.)

19
20       As Ms. Mkrtchyan is aware, what she "just did" is called "coaching". Needless

21  to say, witness coaching is not allowed in a courtroom. See, e.g., Hayes v. Skywest

22  Airlines, Inc., 2017 WL 6551112, at *1 (D. Colo. 2017), aff'd, 789 F. App'x 701 (10th

23  Cir. 2019)(contempt proper where trial attorney's secretary "communicat[ed] or

24  attempt[ed] to communicate with [a trial] witness, through both words and body

25  language, in a manner which appeared intended to direct the witness not to answer any

26  questions about [an] exhibit."); (Order, pp. 2 and 4, Ex. "A")(going forward, "I

27  expect, as I told counsel during the July 9 telephone conference, that all counsel

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1  should comport themselves in the deposition the same as if they were in the

2  courtroom. . . .")

3     Coaching is also not permissible at a deposition. <u>See</u>, <u>Mazzeo v. Gibbons</u>,

4  2010 WL 3020021, at *2 (D. Nev. 2010)(noting the "clearly established legal rules"

5  for conduct during a deposition, including the requirement "that lawyers are not

6  supposed to coach or change the witness's own words . . . .") But coaching was a

7  regular go-to response to defense counsel's questions. Examples of Ms. Mkrtchyan's

8  misconduct are not in short supply:

9     Q     BY MR. HARRELL: Do you hold it against law
10    enforcement for responding to the complaint of criminal conduct at the
       campground, or do you think they just should have ignored it?
11       MS. MKRTCHYAN: How do you object to this type of
12    **nonsense**?
       THE WITNESS: This is --
13       MS. MKRTCHYAN: Argumentative. Objection. **Vague and**
14    **ambiguous.**
       THE WITNESS: **Yeah, I can't answer that question.**
15

16 (Plaintiff's Depo., 141:5-14, Ex. "B")(emphasis added.)

17    Needless to say, witness coaching of this type is wrong. <u>See</u>, <u>Mazzeo v.</u>

18 <u>Gibbons</u>, 2010 WL 3020021, at *2 (D. Nev. 2010)(noting the "clearly established

19 legal rules" for conduct during a deposition, including "mak[ing] speaking, coaching,

20 suggestive objections which violate Rule 30(c)(2).")); <u>Luangisa v. Interface</u>

21 <u>Operations,</u> 2011 WL 6029880, at *7 (D.Nev. 2011)("Deposition testimony should be

22 that of the deponent, not a version edited or glossed by the deponent's lawyer through

23 coaching or speaking objections.") "Courts have characterized such conduct as

24 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of

25 meaningful testimony and disrupt the orderly flow of a deposition." <u>Luangisa</u>, 2011

26 WL 6029880, at *7.

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

Ms. Mkrtchyan's coaching included undisguised requests for Plaintiff to "not remember" when she felt it best for her case:

> Q       . . . How many photographs of the bruising that you've talked about to your ribs and back -- how many photographs of that were taken?
> MS. MKRTCHYAN: **Do you remember**? If you recall.
> THE WITNESS: Taken 50 photographs.
> MS. MKRTCHYAN: Altogether?
> THE WITNESS: Of everything.
> MS. MKRTCHYAN: Right. But he's asking specifically of this area, **if you remember.**
> THE WITNESS: I have -- I mean --
> MS. MKRTCHYAN: **If you remember**.
> ...
> MS. MKRTCHYAN: He's asking, **if you remember**, how many of each side. But if you don't remember, **you can say "I don't remember."**
> THE WITNESS: **I don't remember** the exact number.
> MS. MKRTCHYAN: **Exactly.**

(Plaintiff Depo., 317:8-318:8, Ex. "B")(emphasis added.)

Needless to say, coaching of this type is wrong. See, Mazzeo v. Gibbons, 2010 WL 3020021, at *2 (D. Nev. 2010)(noting the "clearly established legal rules" for conduct during a deposition, including the recognition "that speaking objections such as 'if you remember,' 'if you know,' 'don't guess,' 'you've answered the question,' and 'do you understand the question' are designed to coach the witness and are improper."); Cotton v. City of Eureka, 2010 WL 2889498, at *1-3 (N.D. Cal. 2010) (noting that an attorney had violated Rule 30(c)(2) when she "interposed improper coaching objections and improper speaking objections")

Ms. Mkrtchyan's coaching even crossed the line to ***outright testimony*** on behalf of her client:

> Q       BY MR. HARRELL: Sir, have you received a bill from the VA, to your knowledge, for your medical treatment since the incident happened? Yes, no, or I don't know?

32

MS. MKRTCHYAN: **Or has your lawyer** -- see –

MR. HARRELL: Ma'am, with respect, that's not my question. So you'll have an opportunity later if you're so inclined to ask whatever you want to ask.

Right now my question has a limited focus that does not involve you, with all due respect.

MS. MKRTCHYAN: Well, excuse me. If it's attorney-client privilege, then it is involving me.

MR. HARRELL: Ma'am.

MS. MKRTCHYAN: So -- and you know what? Your attitude -- I really do not appreciate this condescending attitude, unprofessional, sexist attitude that you're coming up across from the very beginning this morning. I'm not going to tolerate that.

From the very beginning, you've been this hostile, you know, person, you know. So I'm not going to tolerate that. I'm instructing him not to answer because the answer presupposes attorney-client privilege. Okay?

**He is -- he has -- his attorney has received billing records.** He has not received it. So, therefore, his answer is irrelevant. So –

(Plaintiff Depo., 56:12-57:12, Ex. "B")(emphasis added.)

Ms. Mkrtchyan's decision to "answer" deposition questions which were directed to her client was wrong. See, Claypole v. Cty. of Monterey, 2016 WL 145557, at *3 (N.D. Cal. 2016)(sanctions ordered in response to "extremely long speaking objections, coaching witnesses, cutting off witnesses and ***even answering for them***.")(emphasis added.); Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011) ("Deposition testimony should be that of the deponent, not a version edited or glossed by the deponent's lawyer through coaching or ***speaking objections***.")(emphasis added.); (See, Order, pp. 2 and 4, Ex. "A")(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..")

Re-phrasing questions into something Ms. Mkrtchyan felt best served her case

**33**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1   is also improper. See, Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal.

2   2018)("Additionally, [Chen's counsel] frequently made speaking objections to coach

3   Chen and ***re-phrase Mannion's questions*** to elicit more favorable responses. . ..

4   [Cen's counsel] used his speaking objections to coach Chen on what issues to

5   address."); BNSF Ry. Co. v. San Joaquin Valley Ry. Co., 2009 WL 3872043, at *4

6   (E.D. Cal. 2009)("[C]ounsel for the witness being deposed is prohibited from acting

7   as an intermediary [by] ***interpreting questions***. . ..")(emphasis added.); (See, Order,

8   pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone

9   conference, that all counsel should comport themselves in the deposition the same as

10   if they were in the courtroom. . ..")

11   **E.    Dismissal Is The Appropriate Response to Violation Of This Court's**

12   **Deposition Conduct Order.**

13   The Supreme Court has emphasized that a court order must be obeyed unless

14   (or until) it is vacated or amended pursuant to the proper judicial process. See, Maness

15   v. Meyers, 419 U.S. 449, 458–59 (1975). An attorney's "remedy for error by [a]

16   district judge [is] by mandamus or appeal from final judgment in the case being tried,

17   not by disobedience." In re Gustafson, 650 F.2d 1017, 1020 (9th Cir. 1981); see, In re

18   Dellinger, 502 F.2d 813, 816 (7th Cir. 1974)("[L]awyers are required to obey even

19   incorrect orders; the remedy is on appeal.")

20   "[A] party's disregard of a court order is a paradigmatic example of extreme

21   misconduct." Torres–Vargas v. Pereira, 431 F.3d 389, 393 (1st Cir.2005); see, Com.

22   of Pa. v. Local Union 542, Int'l Union of Operating Engineers, 552 F.2d 498, 509 (3d

23   Cir. 1977)("That [errant counsel] may have been polite, respectful, and perhaps

24   subdued in his disobedience is irrelevant.") It is well established that violation of a

25   court's order has consequences.

26   "Pursuant to [Fed. R. Civ. P.] 41(b), the district court may dismiss an action for

27   failure to comply with ***any order*** of the court." Ferdik v. Bonzelet, 963 F.2d 1258,

28

**34**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1  1260-61 (9th Cir. 1992)(emphasis added); <u>see</u>, <u>Thompson v. Housing Auth. of Los</u>

2  <u>Angeles</u>, 782 F.2d 829, 831 (9th Cir. 1986) (stating "we have repeatedly upheld the

3  imposition of the sanction of dismissal for failure to comply with pretrial procedures

4  mandated by local rules and ***court orders***.")(emphasis added.) "Dismissal under a

5  court's inherent powers is justified . . . in response to abusive litigation practices . .

6  .and to insure the orderly administration of justice and the ***integrity of the court's***

7  ***orders***." <u>Halaco Engineering Co. v. Costle</u>, 843 F.2d 376, 380 (9th Cir.

8  1988)(emphasis added.)

9     In fact, the Ninth Circuit "encourage[s]" dismissal whenever "counsel or a

10 party has acted willfully or in bad faith in failing to comply . . . with ***court orders***

11 enforcing rules or in flagrant disregard of those rules and orders." <u>G-K Properties v.</u>

12 <u>Redevelopment Agency of the City of San Jose</u>, 577 F.2d 645, 647 (9th Cir. 1978). As

13 the Ninth Circuit has explained:

14     Here the court dismissed the plaintiffs' action with prejudice.
       It acted properly in so doing. ***We encourage such orders.***
15     Litigants who are willful in halting the discovery process act
       in opposition to the authority of the court and cause
16     ***impermissible prejudice*** to their opponents. It is even more
       important to note, in this era of crowded dockets, that they
17     also deprive other litigants of an opportunity to use the
       courts as a serious dispute settlement mechanism.

18

19 <u>Id</u>. (emphasis added.)[8]

20     Courts in this Circuit have followed the Ninth Circuit's directive – over and

21

22 _____

   [8] A federal court's dismissal power arises from a variety of sources. <u>See</u>, <u>Lee v.</u>
23 <u>Walters</u>, 172 F.R.D. 421, 436 (D. Ore. 1996) ("[Rule] 37(b)(2) . . . authorizes a variety
   of non-monetary sanctions against the party who fails to obey a court order, such as
24 designating facts as proven, prohibiting certain matters from being introduced into
   evidence, striking pleadings, dismissing the action, or even entering a judgment by
25 default."); <u>Fed.R.Civ.P.</u> 41 (b)(authorizing dismissal of an action "for failure of the
   plaintiff to ...comply with any order of the court."); <u>Chambers v. NASCO, Inc.</u>, 501
26 U.S. 32, 62 (1991)(courts have inherent power to "dismiss an action or claim of a
   party that fails to . . . obey an order of the court.")

27
                                        35
28 _____
   DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
   VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
   FOR MONETARY SANCTIONS

1    over again. See, e.g., Baca v. Ewing, 402 Fed. Appx. 286, 287 (9th Cir. 2010)("The

2    district court did not abuse its discretion by dismissing the action . . . because Baca

3    failed to comply with [a local rule]."); Yourish v. California Amplifier, 191 F.3d 983,

4    986-87 (9th Cir. 1999)(dismissal with prejudice affirmed where plaintiff failed to file

5    an amended complaint per the court order within the time directed by the court);

6    Ghazali v. Moran, 46 F.3d 52, 53-54 (9th Cir. 1995) (dismissal for noncompliance

7    with local rule); Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992)

8    (dismissal for failure to comply with an order requiring amendment of complaint);

9    Carey v. King, 856 F.2d 1439, 1440-41 (9th Cir. 1988) (dismissal for failure to

10   comply with local rule requiring *pro se* plaintiffs to keep court apprised of address);

11   Malone v. U.S. Postal Service, 833 F.2d 128, 130 (9th Cir. 1987) (dismissal for failure

12   to comply with court order); Henderson v. Duncan, 779 F.2d 1421, 1424 (9th Cir.

13   1986) (dismissal for failure to comply with local rules). Buss v. W. Airlines, Inc., 738

14   F.2d 1053, 1054 (9th Cir. 1984)("[T]he district court dismissed the complaint because

15   of plaintiff's failure to comply with court orders and failure to comply with local rules

16   in a number of respects that delayed the preparation of the case for trial."; Dismissal

17   affirmed.)[9]

18          All of which brings us to the Court's civility order in this case. Specifically, the

19   Court directed all parties to conduct themselves in deposition proceedings as though

20   they were in Court. (Order, Dkt. No. 73, p. 3, n. 3, Ex. "A")(going forward, "all

21   counsel should comport themselves in the deposition the same as if they were in the

22
     _____

23   [9] See, United States v. Kahaluu Const, 857 F.2d 600, 603 (9th Cir. 1988) (dismissal is
     authorized whenever the violation is "due to willfulness, bad faith, or fault of the
24   party."); but see, United Artists Corp. v. La Cage Aux Folles, Inc., 771 F.2d 1265 (9th
     Cir. 1985)(dismissal for failure to respond to interrogatories without finding of
25   willfulness or bad faith); Halas v. Consumer Servs., 16 F.3d 161, 165 (7th Cir. 1994)
26   ("The simple failure to comply is enough, notwithstanding a complete lack of
     culpability on [the party's] part.").

27
                                             36
28   _____
     DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
     VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
                    FOR MONETARY SANCTIONS

courtroom.  The Advisory Committee notes to Rule 30 make that expectation explicit:
'[i]n general, counsel should not engage in conduct during a deposition that would not
be allowed in the presence of a judicial officer.' "); (id., pp. 2 and 4)(going forward, "I
expect, as I told counsel during the July 9 telephone conference, that all counsel
should comport themselves in the deposition the same as if they were in the
courtroom. . ..I trust that my remarks on July 9 and this subsequent ruling will cause
[future] depositions to be conducted without the rancor that was exhibited on July 7
[at a previous deposition].")

    And standards of professionalism and civility are so basic to the proper
functioning of the judicial system that dismissal of litigation is appropriate to address
civility violations – ***even in the absence of a prior court order*** requiring civility.[10]
See, e.g., Maus v. Ennis, 513 F. App'x 872, 878 (11th Cir. 2013)("The district court
did not abuse its discretion when it imposed a default judgment against Ennis as a
sanction for his disrespectful conduct . . .. [He] accus[ed] Ornstein of being a 'bigot'
and a 'racist.' As such, the district court did not abuse its discretion for entering a
default judgment, in part, as a sanction for Ennis's disrespectful behavior."); Gueye v.
U.C. Health, 2014 WL 4984173, at *5 (S.D. Ohio 2014)(ordering dismissal on the
grounds that even a "pro se litigant is not excused from the requirement to show
appropriate courtesy and respect to opposing counsel. A pro se litigant is not entitled
to make unfounded ad hominem attacks on opposing counsel."); In re Maurice, 167
B.R. 114, 127 (Bankr. N.D. Ill. 1994), as amended (Mar. 31, 1994), subsequently aff'd

---

[10] Even "[a] pro se litigant is not excused from the requirement to show appropriate
courtesy and respect to opposing counsel. A pro se litigant is not entitled to make
unfounded ad hominem attacks on opposing counsel." Gueye v. U.C. Health, 2014
WL 4984173, at *5 (S.D. Ohio 2014); see, McKenna v. Nestle Purina PetCare Co.,
2011 WL 14418, at *4 (S.D.Ohio 2011). A pro se litigant is also not entitled to harass
his opponent. See, e.g., Grider v. Irvin, 2007 WL 4441214, at *4 (W.D.Ky. 2007).

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1  sub nom. Matter of Maurice, 69 F.3d 830 (7th Cir. 1995)("the appropriate sanction

2  against the Debtor is dismissal of this case with prejudice . . ..[Debtor's counsel's]

3  pleadings filed in this matter show discourtesy to opposing counsel and parties, he

4  makes disparaging personal remarks and displays acrimony. He litigates neither

5  civilly nor respectfully."); see also, United States v. Lumumba, 794 F.2d 806, 809 (2d

6  Cir.1986)(courts have broad power to punish attorneys for "disrespectful remarks to . .

7  .opposing counsel, or other parties."); Martinez v. Dep't of Transportation, 238 Cal.

8  App. 4th 559, 566 (2015)("The law, like boxing, prohibits hitting below the belt. . ..

9  The rule . . . manifests itself by prohibiting irrelevant *ad hominem* attacks.")

10         Here, Ms. Mkrtchyan's conduct at Plaintiff's deposition represents a shocking

11  violation of the legal profession's civility standards. Indeed, the defense struggles to

12  find adequate descriptors to sum up what took place. The facts, though, are plain for

13  all to see. Ms. Mkrtchyan accused her defense attorney opponent of being a "sexist"

14  bigot – ***repeatedly*** – without any grounds for doing so. She raised her voice

15  ***repeatedly***, interrupted ***repeatedly***, stormed out of the deposition on multiple

16  occasions and even threw papers about the room. Even after being reminded of the

17  Court's civility order, Ms. Mkrtchyan continued with her chaotic outbursts, *ad*

18  *hominem* smears and menacing behavior. As noted above, such ***repeated*** misconduct

19  (over many hours) would warrant dismissal – even without the Court's prior civility

20  order, and even if the misconduct were committed by a *pro se* litigant. The fact that

21  Ms. Mkrtchyan is a licensed attorney, and her misconduct occurred after the Court

22  ***ordered*** all parties to conduct themselves in a civil manner makes dismissal the

23  appropriate response.[11]

24  _____

25  [11] As noted above, the violation justifying dismissal "must be due to the 'willfulness,

26  bad faith, or fault' of the party." Jorgensen v. Cassiday, 320 F.3d 906, 912 (9th

27  Cir.2003). "Disobedient conduct not shown to be outside the control of the litigant is sufficient to demonstrate willfulness, bad faith, or fault." Id. Here, Ms. Mkrtchyan

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1    This is particularly so given that Ms. Mkrtchyan has a pattern of "train wreck"

2  behavior at depositions which the Court's order was rightly intended to end. (See, e.g.,

3  Order, Dkt. No. 73, p. 2, Ex. "A")(the July 7, 2020 Renegar "deposition was, to put it

4  mildly, a train wreck. And responsibility for that result lies predominantly with

5  Plaintiff's counsel."); see, Payne v. Exxon Corp., 121 F.3d 503, 508 (9th Cir.

6  1997)("The district court may properly consider all of a party's discovery misconduct

7  in weighing a motion to dismiss, including conduct which has been the subject of

8  earlier sanctions."); Adriana Intl. Corp. v. Lewis & Co., 913 F.2d 1406, 1411-1412

9  (9th Cir. 1990) ("In evaluating the propriety of sanctions, we look at all incidents of a

10  party's misconduct.")

11    No one can have any confidence that Ms. Mkrthchyan's conduct will

12  improve – or that the defense can ever engage in the type of professional partnership

13  with Ms. Mkrthchyan on which our litigation system depends to do justice. The

14  Court's July 9, 2020 oral civility directives have not moved Ms. Mkrthchyan to

15  change course. (Order, Dkt. No. 73, pp. 2 and 4, Ex. "A")(going forward, "I expect, as

16  I told counsel during the July 9 telephone conference, that all counsel should comport

17  themselves in the deposition the same as if they were in the courtroom. . ..") The

18  Court's subsequent written civility order has also not moved Ms. Mkrthchyan to

19  change course. (Id.)(going forward, "I trust that my remarks on July 9 and this

20  subsequent ruling will cause [future] depositions to be conducted without the rancor

21  that was exhibited on July 7 [at the Renegar deposition].")

22    Ms. Mkrthchyan plainly does not care what this Court says or does on civility

23  issues, and if there were any real doubt on the point she removed it during one of her

24  many window-rattling outbursts during Plaintiff's deposition:

25  _____

26  plainly had a choice to be civil at Plaintiff's deposition. But, as is her custom, Ms.

27  Mkrtchyan simply said and did whatever she pleased.

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

MR. HARRELL: Ma'am, are you saying it doesn't matter to you what the judge says?

MS. MKRTCHYAN: . . .At this point all I care is what the books say. **I don't care what one specific judge says or does not do.** Nobody is above the law.

(Plaintiff Depo., 276: 20 - 25, Ex. "B")[12]

If more were needed, Ms. Mkrthchyan further emphasized her hostility to this Court's civility requirements through her shocking misconduct at the September 2, 2020 discovery hearing in this case. As was the case at Plaintiff's deposition, Ms. Mkrthchyan raised her voiced, interrupted the Court and accused the Court of being a "sexist" -- ***repeatedly*** – and without any legitimate reason for doing so. (Transcript, Ex. "F").

As Ms. Mkrthchyan has no respect for the Court's office or its lawful orders,

---

[12] All this illustrates Plaintiff's counsel's evidently fervent wish to drag us all into a darker age without learned judges, court orders or fixed law. It is worth remembering that the rule of law is part of our society's response to the Jacobins — the most radical and ruthless of the political groups formed in the wake of the French Revolution, who (in association with Robespierre) instituted the 1793–4 "Reign of Terror". During the Terror, judges, attorneys and citation to law itself were all banished in favor of *ad hoc* "street justice". Left unchecked, Robespierre and the Terror he unleashed featured roving mobs of Jacobins performing almost instant executions of random groups of unfortunates.

Jacobinism later, of course, also took hold in revolutionary Russia and China — all with disastrous results. As all three cases demonstrate, once reliance on judicially expressed rules of conduct is abandoned, no one is safe from the resulting downward spiral into chaos. Centuries of judicial opinions have taken note. See, e.g., College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 690 (1999)(denouncing a "proposition that . . .might well have dropped from the lips of Robespierre, but surely not from those of Madison, Jefferson, or Hamilton. . ..."); People ex rel. Thorne v. Hays, 4 Cal. 127, 133–34 (1854)(noting "the days of the [early French] Republic, when Robespierre. . .[brought] bloody scenes of tumult and revolution. . ..") For this reason, among others, our society requires respect for trained judges and the considered orders they issue; wild Jacobin - like chaos will not do.

**40**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1   even the most naïve observer would conclude that the defense does not stand a chance

2   of being able to represent their clients in this case without more unfair delay,

3   disruption and expense. In such circumstances, dismissal is the appropriate answer.

4   See, e.g., Halaco Engineering Co. v. Costle, 843 F.2d 376, 380 (9th Cir.

5   1988)("Dismissal under a court's inherent powers is justified . . . in response to

6   abusive litigation practices . . .and to ***insure the orderly administration of justice*** and

7   the integrity of the court's orders.")(emphasis added.); Loop AI Labs Inc. v. Gatti,

8   2017 WL 934599, at *15 (N.D. Cal. 2017), aff'd, 742 F. App'x 286 (9th Cir.

9   2018)(dismissal ordered where "Plaintiff's actions evince a persistent belief that it is

10  above any obligation to obey the Court's orders. . .or rules.")[13]

11  ## III.   DISMISSAL IS APPROPRIATE TO ADDRESS PLAINTIFF'S COUNSEL'S DISRESPECT TO THE JUDICIARY.

12

13       As just noted, the need for dismissal in this case is compounded, and

14  exacerbated by Ms. Mkrthchyan's misconduct during the September 2, 2020

15  discovery hearing in this case. Ms. Mkrtchyan wasted no time in attacking the Court

16

17  [13] "[C]ounsel who choose to disregard the orders of the district court place themselves
18  and their clients at risk". Serra-Lugo v. Consortium-Las Marias, 271 F.3d 5, 6 (1st Cir.
    2001). Thus, at this point, Plaintiff's "beef is against [his lawyer] not the court's ruling
19  on the case.... 'Holding the client responsible for the lawyers' deeds ensures that both
20  clients and lawyers take care to comply. If the lawyers' neglect protected the client
    from ill consequences, neglect would become all too common.' " Bakery Mach. &
21  Fabrication, Inc., v. Traditional Baking, Inc., 570 F.3d 845, 848–49 (7th Cir. 2009). "
    '[T]here is certainly nothing novel [or unjust] about holding clients responsible for the
22  conduct of their attorneys, even conduct they did not know about.' " Thorpe v. Ancell,
23  367 F.App'x 914, 923 (10th Cir. 2010); see, Bd. of Trustees of Pipe Fitters' Ret. Fund,
    Local 597 v. Commercial Cooling & Heating, Inc., 2019 WL 2269959, at *16–18
24  (N.D. Ill. 2019)("the proper remedy for an innocent client whose lawyer inexcusably .
25  . . fails in required obligations is a suit against the attorney for malpractice. Keeping a
    suit alive on the theory that a party should not be penalized for the omissions of his
26  chosen attorney – which is Mr. Johnson's belated, unsupported theory – would be
27  visiting the sins of the lawyer on the blameless opponent.")

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1    as soon as she received a ruling which was not to her liking:

2    MS. MKRTCHYAN:  Well, you know, I would object to that [ruling] because I think that that is --

3    THE COURT:  You can take it with --

4    MS. MKRTCHYAN:  -- exactly --

5    THE COURT:  -- Judge Carter by --

6    MS. MKRTCHYAN:  -- [inaudible] --

7    THE COURT:  -- filing a motion for review.

8    MS. MKRTCHYAN:  Well, you know, Your Honor, I -- I will take it up with the Judge Carter because I think that --

9    THE COURT:  Ms. --

10   MS. MKRTCHYAN:  -- **you are bias against plaintiff and you're bias towards me. In fact, from the very beginning of this case that I would like to say that, you know, I don't appreciate impartiality.** Judiciary is a very important fact especially inside of court --

13   THE COURT:  You may . . .

14   MS. MKRTCHYAN:  -- [inaudible] --

15   THE COURT:  -- you may put that in a --

16   MS. MKRTCHYAN:  -- [inaudible] --

17   THE COURT:  -- **Ms. Mkrtchyan, please stop talking.**

18   MS. MKRTCHYAN:  [inaudible] --

19   THE COURT:  The fact -- you -- you may put that in your --

20   MS. MKRTCHYAN:  -- [inaudible] --

21   THE COURT:  -- filing to Judge --

22   MS. MKRTCHYAN:  -- you're going to interrupt me? If you're going to interrupt me, Your Honor, then this proceeding is totally out of place.

24   THE COURT:  Okay.

25   MS. MKRTCHYAN:  Now you can make --

26   THE COURT:  Ms. --

27

28

**42**

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1    MS. MKRTCHYAN:  -- your ruling --

2    THE COURT:  -- Mkrtchyan --

3    MS. MKRTCHYAN:  -- I don't want to be --

4    THE COURT:  -- Ms. Mkrtchyan --

5    MS. MKRTCHYAN:  -- part of this when I'm being interrupted.
As an attorney, I have the right to speak and represent my client.

6
7    And if you're not going to let me speak, then I would like to be
just -- get -- get off this, uh, hearing because it's not appreciated that
you're interrupting me as an attorney of record. So, please, you know,
8    as a judge, you are obligated to hear from each party, regardless of
whether you agree with me or not.

9
THE COURT:  Okay.

10
MS. MKRTCHYAN:  And if I'm not going -- if I'm going to be
11   interrupted and I have no right to speak, maybe I will just, uh, ask you
to make your rulings in writing. I have made my record in writing, so
12   perhaps I should not be part of this since you're biased towards me
personally. . . .

13
MS. MKRTCHYAN:  Because I don't want to be part of the
14   hearing where I'm being interrupted and disrespected, so perhaps, um,
you **know I can just, uh -- you know, be excused and the court can
15   make its rulings.**

16   THE COURT:  **No.**

17   MS. MKRTCHYAN:  I have nothing yet -- **I have nothing else
to add**[14] to what I have written and I just do not appreciate, uh, the fact
18   that I'm being disrespected and, um, mistreated entirely, um,
inappropriately by the court.

19
So, I just, um -- **I'm going to ask to be excused and you can
20   continue with your hearing without me**, uh, because this is
disrespectful toward me. I feel like this is not only **bias towards
21   plaintiff but also to me personally**, despairingly, constantly
interrupting me.

22
You know, I -- just because we have judge, um, it does not mean
23   that the judge can interrupt counsel. And I am representing a party, a
victim of police brutality, uh, and I just do not appreciate this type of
24   treatment.

25

26

27   _____
[14] If only it were so.

28                                                  **43**
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1
2
So, if the court is inclined to continue interrupting me and not hearing from, I will -- I'm just going to be asking to excuse me so that I can leave, and you can make your rulings. **Do I have the permission** --

3
THE COURT:  [inaudible] --

4
MS. MKRTCHYAN:  -- **to leave this hearing?**

5
6
THE COURT:  **You do not have permission to leave the hearing, Ms. Mkrtchyan.**

7
8
MS. MKRTCHYAN:  Well, I want to be excused. **I don't want to be part of this proceeding** because I don't appreciate the Court, you know, **violating the rules of impartiality** and interrupting me.

9
It's discourteous. It's discourteous. **You are bias towards me as plaintiff's counsel.** You have also disparaged me on the record.

10
11
12
As an attorney of many years, you have disparaged me, called my deposition a train wreck that has been used by the defense skillfully to disparage me, **that's defamation** of, okay? **None of my depositions have been a train wreck. It's just it's in the eye of the beholder.**

13
14
I don't know what is your background, Your Honor, I don't appreciate that, you know, and I understand that that is **bias towards me and towards my client.**

15
16
17
So, right now, I don't feel comfortable continuing this because I feel like, you know, I'm being really, um, **mistreated and disparaged and harassed, uh, as a female attorney**, I don't appreciate that. So, if you can continue without me, that is great. Uh, I appreciate your time taking this.

18
19
**I'm not going to continue with this proceeding** where I'm being disrespected entirely and, um, you know, my client's rights are being violated wrongly.

20
21
So, um, I'm going to excuse myself if **you're not letting me to excuse myself because I don't think that this proceeding is impartial**. Okay. Thank you.

22
AUTOMATED VOICE:  Narine Mkrtchyan has left the conference.

23
(Transcript of Proceedings, 17:3-22:6, Ex. "F")(emphasis added.)

24
25
26
27
 "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence, and submission to their lawful mandates." Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991). Thus, "there is an ***implicit standing order*** that parties, counsel, and courtroom

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1   attendees refrain from direct and egregious insults to judicial authority." <u>United States</u>

2   <u>v. Marshall</u>, 371 F.3d 42, 48 (2d Cir.2004)(emphasis added); <u>see</u>, <u>Mayberry v.</u>

3   <u>Pennsylvania</u>, 400 U.S. 455, 462 (1971)("brazen efforts to denounce, insult, and

4   slander the court and to paralyze [litigation] are at war with the concept of justice

5   under law."); <u>Illinois v. Allen</u>, 397 U.S. 337, 346 (1970) ("It would degrade our

6   country and our judicial system to permit our courts to be bullied, insulted, and

7   humiliated and their orderly progress thwarted and obstructed.")

8       Thus, even *pro per* litigants are required to show respect for the judiciary and

9   to show verbal restraint and decorum at court proceedings. <u>See</u>, <u>e.g.</u>, <u>Gueye v. U.C.</u>

10   <u>Health</u>, 2014 WL 4984173, at *5 (S.D. Ohio 2014)("A *pro se* litigant is not excused

11   from the requirement to show appropriate courtesy and respect to the Court. A *pro se*

12   litigant is not entitled to make unfounded accusations that a court or judicial officer is

13   biased or prejudiced or to insult the judge's competence.")(citations omitted.) "A *pro*

14   *se* litigant is not entitled to abuse the court system and its judicial officers." <u>Gueye v.</u>

15   <u>U.C. Health</u>, 2014 WL 4984173, at *5 (S.D. Ohio 2014)(citations omitted).

16       Lawyers are rightly held to an even higher standard. <u>See</u>, <u>e.g.</u>, <u>Com. of Pa. v.</u>

17   <u>Local Union 542, Int'l Union of Operating Engineers</u>, 552 F.2d 498, 508 (3d Cir.

18   1977)("If [a] non-lawyer['s] defiance of a judge's order [in cited precedent] was

19   inexcusable, how much more so should be the conduct of appellant Freedman, a

20   seasoned trial lawyer."); <u>Sacher v. United States</u>, 343 U.S. 1, 9 (1952) ("During [court

21   proceedings], lawyers must speak ... with relevance and moderation. These are . . .

22   obvious matters . . ..."); <u>see also</u>, <u>Business and Professions Code</u> § 6068(b)(it is the

23   duty of all attorneys to "maintain the respect due to the courts of justice and judicial

24   officers."); <u>Cal. Code Civ. Pro.</u> § 1209(a)(1)(forbidding "[d]isorderly, contemptuous,

25   or insolent behavior toward the judge while holding the court, tending to interrupt the

26   due course of a . . .judicial proceeding.")

27       Courts have broad power to respond to attorneys who make "disrespectful

28

45

1 | remarks to the court . . . ." <u>United States v. Lumumba</u>, 794 F.2d 806, 809 (2d

2 | Cir.1986); <u>see</u>, <u>Davis v. Superior Court of State of Cal.</u>, 846 F.2d 1382 (9th Cir.

3 | 1988)(counsel properly held in contempt for "interrupting the Court as it was trying to

4 | speak and raising [his] voice at the Court to where [he was] shouting at the Court.");

5 | <u>McCaffity v. Hurst-Euless-Bedford Indep. Sch. Dist.</u>, 98 F.3d 1339 (5th Cir.

6 | 1996)("*ad hominem* attacks on district court judges will not be tolerated.") As stated

7 | by the Supreme Court:

> The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches. 'If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls 'the judicial power of the United States' would be a mere mockery.'

<u>Young v. United States ex rel. Vuitton et Fils S.A.</u>, 481 U.S. 787, 796 (1987)(citations

omitted); <u>see</u>, <u>Illinois v. Allen</u>, 397 U.S. 337, 346–47 (1970)("if our courts are to

remain what the Founders intended, the citadels of justice, their proceedings cannot

and must not be infected with . . . scurrilous, abusive language and conduct.").

An attorney's charge of judicial bias is particularly odious and disruptive. <u>See</u>,

<u>e.g.</u>, <u>In re Gustafson</u>, 650 F.2d 1017, 1020 (9th Cir. 1981)(a "charge of judicial bias

inherently obstruct[s] the judicial function by undermining the court's ability to

regulate [litigation]. It [is] plainly contemptuous."); <u>Barnes v. United States</u>, 241 F.2d

252, 254 (9th Cir. 1956)("Any lawyer would know that a charge made to a judge in

open court that the judge had made up his mind before the case started was flagrant

contempt of court."); <u>see also</u>, <u>In re Buckley</u>, 10 Cal.3d 237, 248-49, 255

(1973)(accusations of judicial bias are contemptuous on their face and summarily

punishable); <u>Hume v. Superior Court</u>, 17 Cal.2d 506, 513 (1941)(same); <u>Alexander v.

Sharpe</u>, 245 A.2d 279, 281, 283-84 (Me.1968)(same).

This is particularly so when, as here, an attorney levels an unfounded charge of

"sexism" or "racism" at a federal jurist. <u>See</u>, <u>e.g.</u>, <u>Gueye v. U.C. Health</u>, 2014 WL

46

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR<br>VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST<br>FOR MONETARY SANCTIONS

4984173, at *5 (S.D. Ohio 2014)(ordering dismissal where plaintiff "has insulted the integrity, impartiality, and competence of the Court and its judicial officers. Particularly insulting are his repeated, unfounded accusations that Judge Bowman bears racial animus against him and other minority groups."); <u>Maus v. Ennis</u>, 513 F. App'x 872, 874–75 (11th Cir. 2013)(ordering dismissal following allegations that "Judge Presnell had shown 'prejudice and bigotry' against [plaintiff]" where "no reasonable person could conclude that the court's references . . .were evidence of bias, prejudice, or a lack of impartiality."); <u>see also</u>, <u>United States v. Offutt</u>, 145 F. Supp. 111, 114 (D.D.C 1956), <u>modified,</u> 247 F.2d 88 (D.C. Cir. 1957)("If the man who is counsel meets the man who is judge on the street, in the market place, or on the playing field, they are governed by the same rules of conduct that apply to other men, and they stand on equal footing. When in court, however, the judge, even in spite of human frailties, still is the representative of the sovereign [judicial] power, and counsel must always respect the office whatever his opinion of the incumbent.")

Some courts react to outrages of the sort on offer here by recusing themselves – which only deprives the system of talent, causes delay and likely emboldens further wrongdoing. <u>See</u>, <u>e.g.</u>, <u>Lichtman v. Zelenkofske Axelrod & Co.</u>, No. C.A. 98-6555, 2001 WL 1160007, at *1 (E.D. Pa. 2001)(district judge recuses himself when <u>pro per</u> litigant "continues to make the same *ad hominem* attacks on the court, defense counsel, and witnesses which were found baseless both by this court and the Court of Appeals.") But the vast majority of courts have found that the better course is for the judiciary to vindicate its authority and hold counsel to account for their misconduct. <u>See</u>, <u>e.g.</u>, <u>United States v. Abascal</u>, 509 F.2d 752, 754 (9th Cir.), <u>cert. denied</u>, 422 U.S. 1027 (1975)("The ability of a trial judge to compel obedience . . . is fundamental to the proper functioning of our system of justice.") Thus, federal courts have multiple

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1    options for responding to disrespectful insults, including through contempt citations[15],

2    obstruction of justice findings[16], or – in the civil context - dismissal. See, e.g., Maus v.

3    Ennis, 513 F. App'x 872, 878 (11th Cir. 2013)(default judgment affirmed where party

4
_____

5    [15] "Courts repeatedly have found that offensive words directed at the court may form
     the basis for a contempt charge." United States v. Peoples, 698 F.3d 185, 190 (4th Cir.

6    2012)(citations omitted); see, Shillitani v. United States, 384 U.S. 364, 370

7    (1966)(stating the rule); see also, 18 U.S.C. § 401 (imposing criminal penalties for
     "contempt of [the court's] authority.") Summary contempt power "rests on the need to

8    maintain order and a deliberative atmosphere in the courtroom" (Bloom v. State of Ill.,
     391 U.S. 194, 210 (1968) ) and "the need for immediate penal vindication of the

9    dignity of the court." United States v. Martin, 251 F. App'x 979, 981 (6th Cir. 2007)

10   (quoting Harris v. United States, 382 U.S. 162, 165 (1965)); see, In re Oliver, 333
     U.S. 257, 275 (1948)(direct contempt occurs "in open court, in the presence of the

11   judge, [and] disturbs the court's business, where all of the essential elements of the
     misconduct are under the eye of the court, are actually observed by the court, and

12   where immediate punishment is essential to prevent demoralization of the court's

13   authority before the public.")(internal quotation omitted).

14
     Because direct contempt threatens the institution of the court, it "may be punished

15   summarily without notice and a hearing." United States v. Sanchez Hernandez (In re
     Gates), 600 F.3d 333, 338 (4th Cir. 2010). Indirect contempt occurs outside the

16   presence of the court and therefore is not a threat to the "court's immediate ability to

17   conduct its proceedings. " Int'l Union, United Mine Workers of Am. v. Bagwell, 512
     U.S. 821, 832 (1994). It is adjudicated after notice and an opportunity to be heard. Id.;

18   see, In re Oliphant, 2020 WL 247547, at *3 (W.D.N.C. 2020)

19

20   [16] See, Gordon v. United States, 592 F.2d 1215, 1217 (1st Cir.1979) (". . . there is a

21   point at which mere words are so offensive and so unnecessary that their very
     utterance creates a delay which is an obstruction of justice."); United States v.

22   Thoreen, 653 F.2d 1332, 1340 (9th Cir.1981)(litigant's "vituperative outburst ...

23   constitutes an obstruction because it causes a delay in the time involved in the
     litigant's delivery of his outburst and in the time necessary to get the court proceedings

24   back on track"), United States v. Seale, 461 F.2d 345, 370 (7th Cir.1972) (stating that

25   "at some point disrespect and insult become actual and material obstruction" and that
     "the very delay of the proceedings occasioned by a disrespectful outburst or other

26   misbehavior may be sufficient to constitute a material obstruction").

27                                             **48**

28   _____
     DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
     VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
     FOR MONETARY SANCTIONS

1    "accused the district court of 'ignorance' and 'incompetency' . . ..");  Gueye v. U.C.
2    Health, 2014 WL 4984173, at *6 (S.D. Ohio 2014)("In this case, the Court concludes
3    that dismissal of the complaint with prejudice is the only feasible sanction . . ..There
4    does not seem to be a sanction short of dismissal of the complaint that will deter this
5    Plaintiff from repeating the same abusive, contemptuous, and harassing conduct.");  In
6    re Maurice, 167 B.R. 114, 127 (Bankr. N.D. Ill. 1994), as amended (Mar. 31, 1994),
7    subsequently aff'd sub nom. Matter of Maurice, 69 F.3d 830 (7th Cir. 1995)("the
8    appropriate sanction against the Debtor is dismissal of this case with prejudice . .
9    ..[Debtor's counsel] has made several *ad hominem* attacks on the Court.");  Crawford
10   v. JPMorgan Chase Bank, N.A., 242 Cal. App. 4th 1265, 1271 (2015), as modified on
11   denial of reh'g (Jan. 4, 2016)(dismissal ordered under courts' inherent power where
12   "Crawford . . . was openly contemptuous of the trial court. He made it impossible to
13   continue with the litigation. Far from the trial court abusing its discretion, it would
14   have been an abuse of discretion not to impose a terminating sanction.");  see also,
15   National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 643 (1976)(the
16   most severe "sanctions ... must be available to the district court in appropriate cases,
17   not merely to penalize those whose conduct may be deemed to warrant such a
18   sanction, but to deter those who might be tempted to such conduct in the absence of
19   such a deterrent.")

20          Against this backdrop, Ms. Mkrtchyan's repeated misconduct during the
21   September 2, 2020 hearing facially justifies dismissal. She interrupted the Court,
22   raised her voice, monopolized the floor even when the Court was attempting to speak,
23   and – for good measure – denounced the Court with frivolous charges of "sexism".
24   The Court, on multiple occasions, directed Ms. Mkrtchyan not to terminate her
25   participation in the telephonic hearing. But Ms. Mkrtchyan hung up on the Court
26   anyway – a separate act of defiance that frustrated the Court's ability to manage and
27   supervise this litigation. None of this chaotic misconduct is excusable. All of it

28
                                              49

1   justifies dismissal. As noted above, courts in this Circuit and elsewhere have ordered

2   dismissal under far less compelling circumstances than those presented here. See,

3   e.g.,Valley Engineers Inc. v. Electric Engineering Co., 158 F.3d 1051, 1057 (9th Cir.

4   1998) (a single violation of a discovery order can be justification for dismissing a

5   case); Loop AI Labs Inc. v. Gatti, 2017 WL 934599, at *15 (N.D. Cal. 2017), aff'd,

6   742 F. App'x 286 (9th Cir. 2018)(dismissal ordered where "Plaintiff's actions evince a

7   persistent belief that it is above any obligation to obey the Court's orders. . .or

8   rules."); Lee v. Walters, 172 F.R.D. 421, 436 (D. Or. 1996) ("[Rule] 37(b)(2) . . .

9   authorizes a variety of non-monetary sanctions against the party who fails to obey a

10  court order, such as . . .dismissing the action. . ..")

11  ## IV.    **ALTERNATIVELY, THE COURT SHOULD ORDER A SUPERVISED**

12  **REPEAT OF PLAINTIFF'S DEPOSITION AT PLAINTIFF'S**
    **COUNSEL'S EXPENSE AND ANCILLARY SANCTIONS.**

13

14          Even if the Court permits this matter to proceed -- and it should **_not_** -- the

15  defense is entitled to heavy sanctions. For starters, the defense is entitled to a repeat of

16  Plaintiff's deposition under the supervision of a retired Magistrate Judge (at Plaintiff

17  counsel's expense). Apart from the forgoing repeated breaches of the Court's civility

18  order, the following rule violations illustrate the need for constant judicial supervision

19  of Plaintiff's deposition by a bench officer.

20  ### A.    **Improper Instructions Not to Answer.**

21          Ms. Mkrtchyan improperly instructed Plaintiff not to answer questions

22  throughout the deposition. Fed. R. Civ. P. 30 states that counsel "may instruct a

23  deponent not to answer **_only_** when necessary to preserve a **_privilege_**, to enforce a

24  limitation ordered by the court, or to present a motion under Rule 30(d)(3)."

25  (emphasis added.) Plaintiff counsel's many instructions not to answer questions were

26  not to enforce a court order, and the vast majority were not to preserve a "privilege" as

27  Rule 30 permits. See, IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *2

28  50

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1  (S.D. Cal. 2017) ("Instructing a deponent not to answer a question on any grounds not

2  delineated in Rule 30(c)(2) can be grounds for sanctions under Rule 30(d)(2).")

3       "In general, objections during depositions are noted for the record but the

4  deposition proceeds and testimony is taken subject to any objection." <u>Horowitz v.</u>

5  <u>Chen</u>, 2018 WL 4560697, at *3 (C.D. Cal. 2018)(citations omitted.); <u>see</u>, <u>In re Toys R</u>

6  <u>Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.</u>, 2010

7  WL 4942645, at *9 (C.D. Cal. 2010) ("An attorney may ***not*** instruct a witness not to

8  answer a question on the ground that it has been asked and answered, is vague and

9  ambiguous or is irrelevant")(emphasis added.)

10      The following deposition excerpts are illustrative of the problem defense

11  counsel repeatedly confronted:

12          Q     Okay. Was it important to you to help show the officers that
    you posed no threat to them?

13          THE WITNESS: Do we scale off on a matter of importance at that

14  situation? Because **I have a few more things that were important**, like
    my life. I felt threatened. That was important to me at that moment.

15          Whether these guys were going to shoot me like they do a lot of
    other people, that was important to me.

16          Q     BY MR. HARRELL: Sir, was it -- with regret, I'm going to

17  ask it again.

18          You're answering questions that I haven't asked you.
            A     Okay.

19          Q     My question has another focus.

20          MS. MKRTCHYAN: Vague and -- okay. First of all,
    argumentative.

21          MR. HARRELL: So with regret, we're going to read it back.

22          MS. MKRTCHYAN: Well, objection. Argumentative. You are

23  badgering the witness. If you don't like the answers, seriously, I'm not
    going to let you badger my client if you don't like the answer. **This is**

24  **hilarious.**

25          So if you don't understand the question, you need to ask for
    clarification. Okay? But --

26          (The following record was read:

27          "Q Okay. Was it important to you to help show the officers that

28                                          51

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

you posed no threat to them?")

MS. MKRTCHYAN: Vague and ambiguous. Relevance. Calls
for speculation. **What he is thinking at the time is irrelevant**, and
more importantly, he already answered the question.

So, I'm, you know, **instructing you not to answer.** There was an
answer to that already.

If you're going to continually ask him --

MR. HARRELL: Whoa. Stop. You state legal objections, and then
we move on.

MS. MKRTCHYAN: If you're going to ask -- okay. If you're
going to ask the same question over and over again, I'm going to keep
objecting, and I'm going to **instruct him not to answer.**

(Plaintiff's Depo., 97:1 – 98:18, Ex. "B")(emphasis added.)

First of all, Plaintiff counsel's claim that "[w]hat [Plaintiff] is thinking at the
time is irrelevant" is flatly wrong. "[T]he purpose of a deposition is to find out what
the witness **_thinks_**, saw, heard or did." Mazzeo v. Gibbons, 2010 WL 3020021, at *2
(D. Nev. 2010)(emphasis added). Plaintiff's mindset when he was interacting with the
peace officers he now sues is therefore directly relevant to the issues Mr. Holloway
raises. See, Fed. R. Civ. P. 26.

In any event, an instruction not to answer based on "relevance" is not
permissible. See, IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *3 (S.D.
Cal. 2017)("Mr. Mays also objected on grounds of relevance and instructed Mr. King
not to answer questions regarding a consultant for Plaintiff named Julie Dixon, who
apparently performed project manager services for Plaintiff. Although the relevance of
this line of questioning . . . is unclear, it was improper for Mr. Mays to instruct Mr.
King not to answer on grounds of relevance. . ..The instruction not to answer this line
of questioning was improper and impeded and frustrated the fair examination of the
deponent.")(record citations omitted)

Also, Plaintiff – at his counsel's encouragement – combatively failed to answer
the question he was asked – i.e., "was it important to you to help show the officers

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

that you posed no threat to them?" Instead, and consistent with Ms. Mkrtchyan's own outbursts, Plaintiff evaded the question and made an off-point speech denouncing law enforcement. See, MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at *1 (C.D. Cal. 2014)("the witness appears to have been highly evasive and unwilling to simply answer a question. . .. The end result was essentially a filibuster . . ..."); Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)(counsel for the deponent "was disrespectful and personally attacked [questioning] counsel in a way that is wholly unsuitable for a deposition or any other litigation proceeding. . ..These types of comments would have no place in a courtroom, and they accordingly have no place in a deposition proceeding. . .. To make matters worse, the Court's review of the deposition transcript strongly suggests that [counsel for the deponent's] ***antagonistic behavior emboldened [the witness] to be uncooperative***, rendering the deposition nearly wholly ineffective.")(emphasis added.)

Ms. Mkrtchyan's instruction not to answer based on an "asked and answered" objection is also frivolous. "Not only was the objection . . . unfounded as the question had not been answered . . . but that determination is also one for the Court to make rather than counsel during the deposition." Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018); see, Lund v. Matthews, 2014 WL 517569, at *4-6 (D. Neb. 2014) (awarding sanctions where counsel instructed the witness not to answer on the basis of an "asked and answered" objection). As noted above, "[i]t is inappropriate for counsel to . . . assert groundless objections [or] improperly object. . .." Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011) "Courts have characterized such conduct as 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of meaningful testimony and disrupt the orderly flow of a deposition." Id. The Luangisa Court's opinion could have been written to address the deposition transcript at issue here.

Plaintiff's deposition transcript is replete with additional examples of improper

53

instructions not to answer:

       Q     You were calm and cool the entire time of the incident?

       MS. MKRTCHYAN: Asked and answered.

       THE WITNESS: Yes.

       Q BY MR. HARRELL: You used restrained, respectful words throughout the entire incident; right?

       A     I will say I cussed a couple times.

       ...

       Q     Do you make it your practice to use curse words when you're angry and upset?

       MS. MKRTCHYAN: Argumentative.

       THE WITNESS: I wasn't angry --

       MS. MKRTCHYAN: **Argumentative**

       THE WITNESS: -- or upset. I was frustrated.

MS. MKRTCHYAN: Let me object. Okay? This is going --

       Q BY MR. HARRELL: Do you make it your practice to use curse words when you're angry and upset?

       MS. MKRTCHYAN: Asked and answered. Badgering the witness.

       Are you going to continue doing the same thing over and over again? You asked, and he answered.

       Q BY MR. HARRELL: Do you make it your practice, sir, to use --

       MS. MKRTCHYAN: **Don't answer that.**

       (Discussion off the record.)

       (The following record was read:

       "Q Do you make it your practice, sir, to use --")

       MS. MKRTCHYAN: Okay. Asked and answered. I'm instructing not to answer that question.

       Q BY MR. HARRELL: Do you make it your practice, sir, to use curse words when you're angry and upset?

       MS. MKRTCHYAN: I'm **instructing you not to answer**.

       MR. HARRELL: Mark it.

(Plaintiff Depo., 114:8 – 115:21, Ex. "B")(emphasis added.)

     Ms. Mkrtchyan's instruction not to answer based on an "asked and answered" objection is frivolous. See, Lund v. Matthews, 2014 WL 517569, at *4-6 (D. Neb.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

2014) (awarding sanctions where counsel instructed the witness not to answer on the basis of an "asked and answered" objection). And this is particularly so since defense counsel was attempting to obtain a ***usable answer*** that did not include Plaintiff counsel's interruption ***in the middle of her client's answer***.

Plaintiff – emboldened by his counsel's antagonism -- also did not answer the question, which asked about his "practice" as regards his use of profanity. Instead, Plaintiff answered a question no one had asked him – i.e., how he was feeling at the time of the incident. See, Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)(counsel for the deponent "was disrespectful and personally attacked [questioning] counsel in a way that is wholly unsuitable for a deposition or any other litigation proceeding. . ..To make matters worse, the Court's review of the deposition transcript strongly suggests that [counsel for the deponent's] ***antagonistic behavior emboldened [the witness] to be uncooperative***, rendering the deposition nearly wholly ineffective.")(emphasis added.)[17]

At times, Ms. Mkrtchyan even ordered her own client to remain silent so she could start testifying for him:

> Q. Do you believe that officers were outside of your tent for no reason?
>
> MS. MKRTCHYAN: **He would not know**. Calls for speculation. Vague and ambiguous. And asked and answered.  So I'm **instructing you not to answer** the same question.
>
> THE WITNESS: Okay.
>
> MR. HARRELL: Mark it.

---

[17] As Ms. Mkrtchyan became more combative and obstructive, so did Plaintiff:
> Q        BY MR. HARRELL: Okay. So when the officer indicated that he had officer safety concerns and that's why he wanted to --
> A        Yeah.
> Q        -- pat you down, you understood that the officer wanted to do a pat-down search to see if you had any weapons on you; right?
> A        **I understand he wanted to violate my civil rights.**
> Q        I understand, sir. That's kind of more something for your lawyer to say in front of a jury. My question has another focus.
> (Plaintiff Depo., 90:4-15, Ex. "B")(emphasis added.)

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1  (Plaintiff Depo., 135:4-12, Ex. "B")(emphasis added.)

2      Plaintiff seeks "emotional distress" damages in this case. The defense is

3  therefore entitled to find out **_why_** Plaintiff is upset, including **_what_** about the incident

4  supposedly upsets him. See, e.g., <u>Kelley v. Schlumberger Technology Corp.</u>, 849 F.2d

5  41, 44 (1st Cir.1988) (jury instructions correctly stated that plaintiff can only recover

6  for emotional distress if "a reasonable person in the plaintiff's position would have

7  been seriously distressed" under the circumstances); <u>Pichowicz v. Hoyt</u>, 2000 WL

8  1480445, at *3 (D.N.H. 2000)(limiting damages where court finds "a reasonable,

9  normally constituted person would not suffer compensable severe emotional distress

10  under the circumstances of this case.")

11      The threshold defense inquiry in cases of this type is **_what Plaintiff believes_**

12  happened during the subject incident, which is something **_only he_** can answer. Rather

13  than allow defense counsel to gather this relevant information, Ms. Mkrtchyan

14  reformulated defense counsel's question, answered the reformulated question for her

15  client and instructed him not to answer based on "relevance" and "asked and

16  answered" objections.

17      None of this is acceptable. First of all, "answering" for a client is wrong. <u>See</u>,

18  <u>Claypole v. Cty. of Monterey</u>, 2016 WL 145557, at *3 (N.D. Cal. 2016)(sanctions

19  ordered in response to "extremely long speaking objections, coaching witnesses,

20  cutting off witnesses and **_even answering for them_**.")(emphasis added.)

21      Re-phrasing deposition questions in a manner to Ms. Mkrtchyan's liking is also

22  wrong. <u>See</u>, <u>Horowitz v. Chen</u>, 2018 WL 4560697, at *4 (C.D. Cal. 2018)

23  ("Additionally, [Chen's counsel] frequently made speaking objections to coach Chen

24  and **_re-phrase Mannion's questions_** to elicit more favorable responses. . .. [Chen's

25  counsel] used his speaking objections to coach Chen on what issues to

26  address.")(emphasis added.); <u>BNSF Ry. Co. v. San Joaquin Valley Ry. Co.</u>, 2009 WL

27  3872043, at *4 (E.D. Cal. 2009) ("counsel for the witness being deposed is prohibited

56

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1   from acting as an intermediary [by] interpreting questions. . ..") Indeed, even "

2   'cluing' the witness to ask the questions to be rephrased" is wrong. <u>MAG Aerospace</u>

3   <u>Indus., Inc. v. B/E Aerospace, Inc.</u>, 2014 WL 12754932, at *1 (C.D. Cal.

4   2014)("Counsel stepped up the attempt to disrupt any worthwhile examination by . .

5   .'cluing' the witness to ask the questions to be rephrased. . ..")

6          And the instructions not to answer was, once again, frivolous. <u>See</u>, <u>In re Toys R</u>

7   <u>Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.</u>, 2010

8   WL 4942645, at *9 (C.D. Cal. 2010) ("An attorney may not instruct a witness not to

9   answer a question on the ground that it has been asked and answered, is vague and

10  ambiguous or is irrelevant").

11          Q       Okay. For what period of time did you work with Apex
12  Company doing copy repair?
          A  That would have been through 2016. That overlapped with
13  self-employed. I was doing both.
          Q       Okay. When did your work with Apex start?
14          A       2015.
15          ...
           MS. MKRTCHYAN: Just I don't understand, Counsel, why are
16  you going that back in time? What is your – I mean, the guy doesn't
17  remember. Would you remember?
          Maybe yes. Maybe not. What is the relevance of him telling you
18  his employment that going far back ahead -- back?
          MR. HARRELL: Okay. Thank you for all that.
19          Q       Sir, for what period of time --
20          MS. MKRTCHYAN: Well, are you going to answer? **Because I**
21  **can instruct him not to answer. If something I believe is irrelevant to**
**your case**, to your defenses, I can ask -- you know, going back that far, I
22  just don't believe that's relevant.
          You know, what is relevant is maybe five years before the
23  incident employment history or one year before the incident. But you're
24  going 2012 and before then, and **he doesn't even remember.**
          MR. HARRELL: Ma'am --
25          MS. MKRTCHYAN: So **do you have an offer of proof**?
26          MR. HARRELL: Ma'am, **maybe the time to meet and confer is**
27
28
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

**at another time and place.** Why don't you let me ask my questions. You make your objections. If you feel the need to instruct your client not to answer on a relevance objection based on his employment history, then I suppose you will do that.

      MS. MKRTCHYAN: Uh-huh.

      MR. HARRELL: And then we have our remedy.

      MS. MKRTCHYAN: Okay.

      MR. HARRELL: So let me get my questions out there. Let's state objections. **Let's conduct ourselves like we're in court as best as we can.**

      MS. MKRTCHYAN: Uh-huh.

      Q    BY MR. HARRELL: And my next question, sir, is, sir, for what period of time were you employed by Apex?

      MS. MKRTCHYAN: So here is the issue. **I'm going to instruct you not to answer anything that is beyond 2012**. Okay?

      THE WITNESS: All right.

(Plaintiff Depo., 37:7 – 39:25, Ex. "B")(emphasis added.)

Basic background information, such as Plaintiff's employment history, is relevant and discoverable. See, Hunt v. Walmart Store, Inc., 2019 WL 1057199, at *1 (E.D.Mich. 2019)("Many of Defendant's discovery requests are clearly relevant, including basic biographical information such as name, address, ***occupation***, etc. . ..")(emphasis added.); Call v. Shaw Jewelers, 1999 U.S. Dist. LEXIS 636 (E.D. Va. 1999) (noting that "[q]uestions as to an individual's...employment history...are basic identifying questions"; Court orders the material disclosed); DeNardo v. ABC, Inc., 51 P.3d 919, 924 (Alas. 2002) ("[Defendant] is correct that information regarding [plaintiff's] prior . . . employers might have been helpful in determining which jurisdictions to search for his criminal and litigation history"; Case dismissed for plaintiff's failure to provide same); Grant v. Target Corp., 281 F.R.D. 299, 311 (S.D.Ohio 2012)(the defense asked plaintiff "to state the name and address of all employers by whom he has been employed before, during, and since his employment with Target ended, the positions in which he was employed, the dates of employment,

58

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1   the identity of individuals to whom he reported in each job, the salary and/or

2   compensation provided in such position, the benefits provided by such employer,

3   whether he participated in such benefit programs, whether he was counseled or

4   disciplined, and if his employment ended, the reason why. . . .. Mr. Grant is hereby

5   required to answer all of the[se] questions . . ..")

6         Consuming valuable deposition time with a shrill demand that defense counsel

7   "meet and confer" with Ms. Mkrtchyan on a non-controversial topic is also improper.

8   And Plaintiff counsel's instruction not to answer was, once again, frivolous. See, IPS

9   Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *2 (S.D. Cal. 2017)("Counsel

10  for DPT attempted to question Mr. King regarding vehicle sensors. Rather than simply

11  interposing an objection, attorney Mays **_demanded an explanation_** of the relevance of

12  the line of questioning from counsel for DPT. When counsel for DPT **_properly_**

13  **_refused to engage_** with Mr. Mays on the issue, Mr. Mays instructed his client not to

14  answer solely on the basis of relevance.")(emphasis added.); In re Toys R Us-

15  Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig., 2010 WL

16  4942645, at *9 (C.D. Cal. 2010) ("An attorney may not instruct a witness not to

17  answer a question on the ground that it . . .is irrelevant").

18        **B.    Alternative Stressors / Location of Witnesses**

19        Plaintiff seeks "emotional distress" damages in this case. Given Plaintiff's

20  "emotional distress" claims, he "is placing his mental condition at issue in this case,

21  and [the defense] is entitled to explore **_any evidence_** . . .which may be relevant to such

22  a claim." Walker v. Northwest Airlines Corp., 2002 WL 32539635, at *4

23  (D.Minn.2002)(emphasis added).

24        Courts have made this point over and over again – a plaintiff, like Mr.

25  Holloway, who seeks compensation for their "emotional distress" opens the door to

26  discovery of potential alternative causes for their "distressed" condition. See, e.g., Doe

27  v. City of Chula Vista, 196 F.R.D. 562, 569 (S.D. Cal. 1999) ("[plaintiff] elected to

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

seek monetary relief from the defendants to compensate her for 'emotional pain, suffering, loss of self esteem, and mental anguish'; consequently, [plaintiff] is relying on her emotional state to make her case ... But to insure a fair trial, particularly on the element of causation, the court concludes that defendants should have access to evidence that [plaintiff's] emotional state was caused by something else. Defendants must be free to test the truth of [plaintiff's] contention that she is emotionally upset because of the defendants' conduct. Once [plaintiff] has elected to seek such damages, she cannot fairly prevent discovery into evidence relating to the element of her claim."); Fox v. Gates Corp., 179 F.R.D. 303, 306 (D. Colo. 1998) (defendant is entitled to discovery whenever "the information. . . is relevant to whether the emotional distress which plaintiff claims to have suffered as a result of defendant's conduct can be attributed in whole, or in part, to some other stressor in her life."); see also, Vinson v. Superior Court, 43 Cal. 3d 833, 839-840 (1987)("In the case at bar, plaintiff haled defendants into court and accused them of causing her various mental and emotional ailments. Defendants deny her charges. As a result, the existence and extent of her mental injuries is indubitably in dispute. In addition, by asserting a causal link between her mental distress and defendants' conduct, plaintiff implicitly claims it was not caused by [another] mental condition, thereby raising the question of alternative sources for the distress. We thus conclude that her mental state is in controversy.")

Given Plaintiff's demand for "emotional distress" damages, Plaintiff's evident estrangement from his family is a legitimate area for discovery. Even so, Ms. Mkrtchyan wrongly blocked any inquiry into this relevant subject matter:

    Q    And Kailin Holloway is a child that you had with Karlie Holloway?
    A    Yes, it is.
    Q    Okay. Kailin Holloway lives where now?
    A    I do not know.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1          Q     Does she live in the state of California?

2          A     I do not know.

3          Q     When is the last time you had any contact with Kailin
Holloway?

4          MS. MKRTCHYAN: Objection. Relevance. Privacy. **You're
instructed not to answer.**

5          MR. HARRELL: Mark it.

6   . . .

7          Q Are you in contact with your father at the present time?

8          A     No, I am not.

9          Q     Is there a reason why?

       MS. MKRTCHYAN: Objection. Relevance. Privacy. You are
instructed not to answer questions that are private and nobody should have
a right to learn. Thank you.

10          MR. HARRELL: Mark it.

11         ...

12          Q     Are you in contact with your brother, Joseph Holloway?

       MS. MKRTCHYAN: Objection. Relevance. Privacy. You're
instructed not to answer.

13

14          MR. HARRELL: Mark it.

15          Q Are you in contact with your sister, Misty Henderson?

       MS. MKRTCHYAN: Same objection.  You are instructed not to
answer it based on privacy.

16

17          MR. HARRELL: Mark it.

18   (Plaintiff Depo., 45:17 – 51:4, Ex. "B")(emphasis added.)

19        One would suppose that Plaintiff's evident estrangement from his family

20   qualifies as an "alternative stressor" for damages purposes. Defendants are at least

21   entitled to explore the point in discovery in preparing their defense. See, e.g., Walker

22   v. Northwest Airlines Corp., 2002 WL 32539635, at *4 (D. Minn. 2002) (". . .where a

23   plaintiff puts his emotional condition into issue in the litigation, ***he effectively waives***

24   ***his right to privacy*** . . .. Here, Plaintiff has placed his medical condition at issue by

25   claiming emotional distress damages.")(emphasis added and citations omitted.);

26   Mathie v. Fries, 935 F. Supp. 1284, 1304 (E.D.N.Y. 1996) ("In the determination of

27   the monetary damages to be awarded to the plaintiff [under Section 1983] for the

28
61

1   considerable emotional distress sustained as a result of the sexual abuse, the Court

2   must be careful not to compensate the plaintiff for the non-related distress."), aff'd,

3   121 F.3d 808 (2d Cir. 1997); York v. AT&T, 95 F.3d 948, 957-958 (10th Cir. 1996)

4   ("Because York chose to raise a claim of emotional distress, it was entirely

5   appropriate for the court to allow the defendants to introduce evidence of alternate or

6   multiple causes of such distress. The jury must be permitted to consider such relevant

7   evidence of causation where damages are claimed for emotional distress. Moreover, it

8   would be inequitable to allow the plaintiff to introduce selected evidence on the matter

9   but to disallow the defendants to present evidence supporting their theories of

10  causation.")

11  ## C.    Monetary Sanctions And Ancillary Relief

12          By habit and temperament, Defendants' counsel is generally reluctant to seek

13  sanctions against their litigation opponents and colleagues in the bar – particularly on

14  close or fairly debatable issues. But this case is different. And sanctions are

15  unfortunately required here – for multiple reasons. See, Rywkin v. New York Blood

16  Ctr., 1998 WL 633810, at *1 (S.D.N.Y. 1998)(deponent's counsel "(1) repeatedly

17  directed plaintiff not to answer questions on inappropriate grounds, (2) made frivolous

18  privilege objections and then foreclosed questioning by opposing counsel, (3) made

19  speaking objections that suggested to the witness the answer she should give, (4)

20  made ad hominem attacks on opposing counsel, and (5) insinuated, without support,

21  that opposing counsel's conduct was racially motivated. This conduct ***clearly is***

22  ***sanctionable***.")(emphasis added.); Claypole v. Cty. of Monterey, 2016 WL 145557, at

23  *3 (N.D. Cal. 2016)(sanctions ordered in response to "extremely long speaking

24  objections, coaching witnesses, cutting off witnesses and even answering for them.");

25  Funk v. Town of Paradise, 2011 WL 2580357, at *2 (E.D. Cal. 2011)(sanctioning

26  counsel for "appalling" behavior where counsel "repeatedly interrupted the

27  proceedings, interjected editorial comments, and coached or suggested information to

28
                                            62
─────────────────────────────────────────────
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1    the witnesses")[18]

2         These sanctions should include monetary compensation for Orange County's

3    costs incurred at Plaintiff's first attempted deposition. (See, Heathcote Decl., ¶ 9). In

4    this regard, Fed. R. Civ. P. 30(d)(2) provides: "The court may impose an appropriate

5    sanction — including the reasonable expenses and attorney's fees incurred by any

6    party — on a person who impedes, delays, or frustrates the fair examination of the

7    deponent." See, Horowitz v. Chen, 2018 WL 4560697, at *5 (C.D. Cal. 2018)("The

8    Court finds that monetary sanctions in the form of attorney's fees and costs are

9    warranted. [Defense / deponent's counsel's] behavior through coaching, breaks, and

10   frequent unprofessional comments wasted a large portion of Chen's deposition time

11   and forced Plaintiffs to seek the Court's intervention. A monetary sanction is

12   warranted to make Plaintiffs whole.")

13        The Court's sanctions order should also include:

14        1.    A renewed deposition and the costs associated with Plaintiff's renewed

15              deposition. See, Hernandez v. Lynch, 2019 WL 6998774, at *4 (C.D.

16              Cal. 2019)("the Court finds that the Special Master was correct to

17              conclude that Plaintiffs' counsels' conduct was improper and impeded

18              Defendants from conducting a fair deposition and pursuing relevant lines

19              of inquiry. In light of this, it was proper to order new depositions of the

20              Named Plaintiffs."); IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL

21              3457141, at *6 (S.D. Cal. 2017)("Plaintiff must reimburse DPT for

22              reasonable travel, attorney's fees, court reporting and any facility costs

23              for [a] ***renewed*** deposition.")(emphasis added.)

24        2.    The cost associated with a special master to supervise Plaintiff's renewed

25

---

26   [18] "Rule 30(d)(2) sanctions do not require a finding of bad faith." IPS Grp., Inc. v.
     Duncan Sols., Inc., 2017 WL 3457141, at *2 (S.D. Cal. 2017); see, Robinson v. The
27   Chefs' Warehouse, 2017 WL 1064981 *2 (N.D. Cal. 2017)(same).

28
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

1   deposition (at Plaintiff's expense). See, Hernandez v. Lynch, 2019 WL

2   6998774, at *2 (C.D. Cal. 2019)("Federal Rule of Civil Procedure Rule

3   53(a) permits the appointment of a special master to address pretrial

4   matters . . ..")

5   3.   An order limiting Ms. Mkrtchyan's verbal statements at Plaintiff's

6   deposition to matters permitted by Rule 30. See, IPS Grp., Inc. v. Duncan

7   Sols., Inc., 2017 WL 3457141, at *6 (S.D. Cal. 2017)(ordering a renewed

8   deposition where "[o]bjections to questions are limited to the following:

9   'Objection as to form.' Witnesses may not be instructed not to answer

10   any questions unless necessary to enforce a privilege. . ..."); MAG

11   Aerospace Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at

12   *1–2 (C.D. Cal. 2014)(limiting errant counsel's non-privilege based

13   speaking objections at renewed deposition and finding that such

14   "objections will be preserved and shall not be waived even though they

15   are not asserted. Specifically, counsel shall not assert any objection that a

16   question is vague, lacks foundation, calls for hearsay, etc."); see also,

17   Mewborn v. Abbott Labs., 2019 WL 8060095, at *7 (C.D. Cal.

18   2019)("Plaintiff's counsel is encouraged to limit the number of

19   evidentiary objections and must state each objection concisely . . .

20   without further explanation or other extraneous statements."); id.

21   ("Neither counsel shall . . . admonish the other; or make any remarks or

22   comments about the other's behavior, . . facial expressions, conduct,

23   knowledge of the law . . .and so forth."); Luangisa v. Interface

24   Operations, 2011 WL 6029880, at *7 (D.Nev. 2011)("[i]t is inappropriate

25   for counsel to engage in extensive and unnecessary colloquy, assert

26   groundless objections, improperly object, or utilize any opportunity to

27   interrupt and argue with opposing counsel during a deposition.")

28

64

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
FOR MONETARY SANCTIONS

4.     An order that "[n]either shall any counsel interrupt or speak over any other counsel or the deponent." <u>Mewborn v. Abbott Labs.</u>, 2019 WL 8060095, at *7 (C.D. Cal. 2019).[19]

## V.     <u>CONCLUSION</u>

The defense is before the Court through no fault or conduct of its own seeking an end to the abusive language, shouted insults and menacing behavior which have plagued this case from its inception. It is now blindingly obvious that Ms. Mkrtchyan's approach to litigation represents a rogue affront to the dignity of the judiciary and the Court's unquestionable right to require civility in these proceedings. Put mildly, Ms. Mkrtchyan has no one to blame but herself for the fact that dismissal has now become the only realistic answer in this thoroughly poisoned case. <u>See</u>, <u>People v. Fagan</u>, 483 N.Y.S.2d 489 (1984)(noting that "while the correct resolution of civil disputes is indeed an important goal of our legal system, it may fairly be said that society's ***primary interest*** in the resolution of civil disputes is that they be settled in a ***peaceful, orderly***, and impartial manner.")(emphasis added.)

/ / /

/ / /

/ / /

/ / /

/ / /

_____

[19] Defendants request such orders with clear-eyed knowledge that they would be of no real use given Ms. Mkrthchyan's announced mindset – another strong reason for dismissal here:

> MR. HARRELL: Ma'am, are you saying it doesn't matter to you what the judge says?
> MS. MKRTCHYAN: . . . **I don't care what one specific judge says or does not do.** . ..

(Plaintiff Depo., 276: 20 - 25, Ex. "B")(emphasis added.)

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS

1     For this reason, and for all the forgoing reasons, Defendants' Motion should be

2  granted as prayed.

3                                            Respectfully submitted,
   DATED:  November 4, 2020                  **LYNBERG & WATKINS**
4                                            A Professional Corporation

5

6

7  By: _____
       **S. FRANK HARRELL**
8      **TAMARA HEATHCOTE**
       Attorneys for Defendants
9      County of Orange, Deputy Chad Renegar,
       Deputy Joel Gonzalez, Deputy Kevin
10     Pahel, Deputy Brandon Billinger, Deputy
       Mark Borba, Deputy Jameson Gotts and
11     Deputy Justin Gunderson

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                              **66**
   DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR
   VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST
                     FOR MONETARY SANCTIONS

# DECLARATION OF TAMARA M. HEATHCOTE

I, Tamara M. Heathcote, do declare and state as follows:

1.      I am an attorney at law duly authorized to practice before this Court and I am a partner at Lynberg & Watkins, attorneys of record for all Defendants herein. I have personal knowledge of the following facts and, if called as a witness, I could and would testify competently thereto.

2.      Attached hereto as Exhibit "A" is a true and correct copy of Magistrate Judge Douglas McCormick's Order of July 23, 2020.

3.      Attached hereto as Exhibit "B" is a true and correct copy of the pertinent portions of Plaintiff's deposition testimony including his errata sheet and signed certification.

4.      Attached hereto as Exhibit "C" is a true and correct copy of the meet and confer sent by my defense counsel colleague, S. Frank Harrell, to Plaintiff's counsel, Narine Mkrtchyan.

5.      Attached hereto as Exhibit "D" is a true and correct copy of Ms. Mkrtchyan's email in response to Mr. Harrell's meet and confer letter.

6.      Attached hereto as Exhibit "E" is a true and correct copy of the Declaration of Brian Fuerbach filed in support of Defendants' Motion for Summary Adjudication.

7.      Attached hereto as Exhibit "F" is a true and correct copy of the transcript for the Informal Discovery Conference hearing of September 2, 2020.

8.      Attached hereto as Exhibit "G" is a true and correct copy of Magistrate Judge Douglas F. McCormick's Order of September 2, 2020.

9.       My client seeks reimbursement of its fees incurred in connection with this matter for a total of $26,670.82 set forth as follows:

    a. My colleague, S. Frank Harrell's time at the deposition of Plaintiff,

       Jeremy Holloway, totaling 8.8 hours at $180/hour (the partner rate for the

67

1   County of Orange is $180/hour) for $1,584.00

2   b.   The court reporter invoice from Carroll Sells Court Reporting Service for

3       the deposition of Jeremy Holloway for a total of $5,426.19.  A true and

4       correct copy of this invoice is attached hereto as Exhibit "H".

5   c.   The videographer invoice from Witness Legal Video, Inc. for the

6       deposition of Jeremy Holloway for a total of $1,660.63.  A true and

7       correct copy of this invoice is attached hereto as Exhibit "I".

8   d.   My colleague, S. Frank Harrell, spent over forty (40) hours preparing my

9       client's meet and confer letter regarding this motion for a total of

10      $7,200.00.

11  e.   My colleague, S. Frank Harrell spent over forty (40) hours in preparing

12      this Motion for a total of $7,200.00

13  f.   It is anticipated that an additional twenty (20) hours will be spent in

14      reviewing Plaintiff's opposition to this motion, preparing a reply and

15      attending the hearing of this matter for a total of $3,600.00.

16      I declare under the penalty of perjury under the laws of the United States of

17  America that the foregoing is true and correct, and that this Declaration was executed

18  on November 4, 2020 in the City of Orange, County of Orange, State of California.

19

20      Tamara M. Heathcote, Esq.

21      Tamara M. Heathcote, Esq.

22

23  4821-3806-8433, v. 2

24

25

26

27

28

**68**

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR VIOLATION OF COURT ORDER, OR FOR ALTERNATIVE RELIEF; REQUEST FOR MONETARY SANCTIONS**

EXHIBIT A

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | SA CV 19-01514-DOC (DFMx) | | Date: | July 23, 2020 |
|----------|---------------------------|---|-------|---------------|
| Title | Jeremy Holloway v. County of Orange et al. | | | |

| Present: The Honorable | Douglas F. McCormick, United States Magistrate Judge | |
|------------------------|------------------------------------------------------|---|
| Nancy Boehme | Not Present | |
| Deputy Clerk | Court Reporter | |
| Attorney(s) for Plaintiff(s): | Attorney(s) for Defendant(s): | |
| Not Present | Not Present | |

| Proceedings: | **(IN CHAMBERS) Order Granting Plaintiff's Ex Parte Application to Order Resumption of Defendant Renegar's Deposition (Dkt. 69)** |
|--------------|--------------------------------------------------------------------------------------------------------------------------------|

> A deposition is a judicial proceeding that should be conducted with the solemnity and decorum befitting its importance. Lawyers participating in depositions should comport themselves in a professional and dignified manner. When lawyers behave otherwise, it reflects poorly on the entire judicial process.

<u>MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.</u>, No. 13-06089, 2014 WL 12754932, at *1 (C.D. Cal. Aug. 28, 2014).

\* \* \* \* \*

This is a police excessive-force case. Earlier this month, on July 7, Plaintiff's counsel took the deposition of one of the primary deputy-defendants, Chad Renegar. Unfortunately, the deposition did not live up to the standards set forth in the paragraph above. It ended prematurely when Renegar and his counsel unilaterally terminated the deposition.

The following day, Plaintiff's counsel filed an <u>ex parte</u> application to compel the resumption of Renegar's deposition. <u>See</u> Dkt. 69 ("Application"). Plaintiff's counsel sought an order compelling the resumption of Renegar's deposition on a mutually agreeable date and an award of $5,000 in sanctions. <u>See</u> Dkt. 69-2. Defendants filed an opposition. <u>See</u> Dkt. 70.

I held a telephonic conference with counsel on July 9, 2020. During the call, I learned that Plaintiff's counsel had videotaped the deposition. As the parties did not agree on who was at fault for the deposition going awry, I asked Plaintiff's counsel to submit a copy of the video recording.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Plaintiff's counsel also later provided me with a transcript. I have read the entire transcript and reviewed substantial portions of the video. Based on that review, I now rule as follows:

The Federal Rules allow a party or a deponent to move to terminate a deposition. <u>See</u> Fed. R. Civ. P. 30(d)(3)(A).[1] The rules provide that a deposition may be terminated or limited if "it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." <u>Id.</u>

In deciding whether to terminate a deposition, courts have focused on the "manner in which the interrogation is conducted." <u>In re Stratosphere Corp. Sec. Litig.</u>, 182 F.R.D. 614, 619 (D. Nev. 1998). Courts have also observed that depositions should be halted or limited "sparingly." <u>E.g.</u>, <u>Smith v. Logansport Cmty. Sch. Corp.</u>, 139 F.R.D. 637, 640 (N.D. Ind. 1991). This pre-disposition against terminating depositions makes sense; not only do courts want depositions to be completed, but they also do not want to be burdened with mid-deposition motions to terminate every time counsel have a dispute.

Here, although I have, as detailed below, considerable concerns about the manner in which Renegar was questioned by Plaintiff's counsel, those concerns do not overcome my reluctance to see a key witness's deposition terminated before completion. For that reason, the Application to resume Renegar's deposition is GRANTED. Renegar's deposition shall resume on a date, time, and location that is mutually agreeable to counsel and that is before the discovery cut-off date. The remaining portion of Renegar's deposition shall be limited to 90 minutes.[2]

But that's not the only relief Plaintiff's Application seeks. Plaintiff's counsel also seeks $5,000 in sanctions to cover her attorney's fees and court reporter's costs. Rule 37(a)(5) applies to an award of expenses for an unsuccessful motion to terminate. <u>See</u> Fed. R. Civ. P. 30(d)(3)(C). Under Rule 37(a)(5)(A), a payment of expenses is not warranted if the losing party's position is "substantially justified."

Plaintiff's request for sanctions is DENIED. Although I do not agree that Renegar's deposition should be terminated, his deposition was, to put it mildly, a train wreck. And

---

[1] Although the matter is before me on Plaintiff's Application to resume the deposition rather than Defendants' motion to terminate Renegar's deposition, I view the procedural posture as meaningless. It was Plaintiff who caused the procedural posture by filing an <u>ex parte</u> application. And it is clear that Rule 30(d)(3)(A) is the correct standard for deciding Plaintiff's Application.

[2] The record shows that the July 7 deposition began at 9:10 and was terminated at 4:15, and that off-the-record breaks totaling 1 hour and 35 minutes were taken. <u>See</u> Tr. at 5, 32, 114, 133, 192, 249, 284.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

responsibility for that result lies predominantly with Plaintiff's counsel. I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom.[3]

It is clear from the transcript and the video that Plaintiff's counsel repeatedly fell short of this standard. Most courts would not permit a lawyer to comment on a witness's answers to her questions. Plaintiff's counsel did this, repeatedly. See, e.g., Tr. at 166 ("A. I do not recall. Q. You don't recall a lot of things."); 270 ("Q. Do you remember ever telling him why this guy is bleeding to his face? A. I do not recall what I told him. Q. Because you didn't care; right? The guy is injured. You don't give a shit."). Similarly, most courts would not permit a lawyer to editorialize about how a jury would view Plaintiff's testimony. Plaintiff did this, also repeatedly. See, e.g., Tr. at 167 ("And if you are a defendant in this case, do you think the jury will believe that you remember anything? Do you think? I can't wait until we get to trial."). Most courts would also put a stop to arguing between counsel. This happened repeatedly, usually instigated by remarks from Plaintiff's counsel. See, e.g., Tr. at 95 ("Do you understand what 'misstating the evidence' means?").

As the deposition continued into the afternoon, Plaintiff's counsel grew increasingly bellicose with Renegar's responses. Rather than questioning him, she lectured him about his answers. See, e.g., Tr. at 204 ("You come back again and you come back again and now you are, in fact, engaging in use of force and at gun point telling him to 'Get down on the ground.' So you need to justify your actions. You need to justify your actions."). When Defendants' counsel objected to these tirades, she turned on her. See, e.g., Tr. at 208 ("It's a joke. This civil litigation is entirely a joke. You know. Complete joke. But wait until we get to trial and you will see."). By her own admission on the record, she raised her voice, and the Court's review of the video recording shows that she raised her voice several times. See, e.g., Tr. at 267 ("I will raise my voice as long as I want.").

As noted above, I also watched substantial parts of the video recording of the deposition. If anything, the video recording is worse than the cold transcript. For the most part, Renegar and his counsel are largely subdued. Plaintiff's counsel is anything but. Not only does she raise her voice, but it appears to me that she slaps the conference room table at least twice. Her tone of voice ranges from exasperated to indignant. She appears to lose her temper several times. I am confident that none of these antics would have been permitted to persist in any courtroom in the federal courthouse in Orange County.

---

[3] The Advisory Committee notes to Rule 30 make that expectation explicit: "[i]n general, counsel should not engage in conduct during a deposition that would not be allowed in the presence of a judicial officer."

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Finally, after Defendants' counsel accused Plaintiff's counsel of wasting time, Plaintiff's counsel erupted "Excuse me. Excuse me. I'm tired of you. . . . If you are here to testify to the truth, the whole truth, but the truth, why can't you admit a simple fact from your own fricking fucking report." Tr. at 282. This inappropriate and profane outburst caused Defendant's counsel and her client to leave the deposition. See Tr. at 282-84.

In sum, although I am ordering Renegar's deposition resumed, I cannot find that Defendants' counsel's decision to leave the deposition was without substantial justification. But I also do not want to leave the impression that Defendants' counsel's behavior was beyond reproach. Her repeated objections of "misstates testimony" and "the document speaks for itself" were not well-taken, even if they were not overly disruptive and do not appear to be a consistent effort to coach the witness. And threats to terminate a deposition are not generally helpful, and Defendants' counsel begins making such threats within the first hour. Finally, although she largely remained professional in the face of Plaintiff's counsel's behavior, she made several inappropriate remarks in the latter stages of the proceeding. See Tr. at 207 ("I thought the whole case was [a joke], but I tried not to say anything like that."); 277 ("You think that's funny."); 281 ("You're wasting time. Tick tock."). Like Plaintiff's counsel's outbursts, those remarks would not have been tolerated in the courtroom.

* * * * *

"No one expects the deposition of a key witness in a hotly contested case to be a non-stop exchange of pleasantries. However, it must not be allowed to become an excuse for counsel to engage in acts of rhetorical road rage against a deponent and opposing counsel." Freeman v. Schointuck, 192 F.R.D. 187, 189 (D. Md. 2000). Depositions have continued in this case since Renegar's deposition was terminated. I trust that my remarks on July 9 and this subsequent ruling will cause those depositions to be conducted without the rancor that was exhibited on July 7.

EXHIBIT B

# In The Matter Of:

*Jeremy Holloway vs*
*County of Orange*

---

*Jeremy Holloway*
*August 14, 2020*

---

*Carroll Sells Court Reporting Service*
*4132 Katella Avenue*
*Suite 101*
*Los Alamitos, CA  90720*
*562.799.9100*

Original File 081420JH.txt

**Min-U-Script® with Word Index**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

JEREMY HOLLOWAY,                      )
                                      )
                    Plaintiff,        )
                                      )
vs.                                   )  No. 8:19-cv 01514
                                      )      DOC-DFM
COUNTY OF ORANGE; DEPUTY CHAD         )
RENEGAR, individually and as a        )
peace officer; DEPUTY JOEL            )
GONZALEZ, individually and as a       )
peace officer; DEPUTY KEVIN           )
PAHEL, individually and as a          )
peace officer; DEPUTY BRANDON         )
BILLINGER, individually and as        )
a peace officer; DEPUTY MARK          )
BORBA, individually and as a          )
peace officer; DEPUTY JAMESON         )
GOTTS, individually and as a          )
peace officer; DEPUTY JUSTIN          )
GUNDERSON, individually and as        )
a peace officer, et al.,              )
                                      )
                    Defendants.       )
                                      )

DEPOSITION OF JEREMY HOLLOWAY

FRIDAY, AUGUST 14, 2020

ORANGE, CALIFORNIA

REPORTED BY:

VICKY De BOER, C.S.R.
Certificate Number 6055

Jeremy Holloway - August 14, 2020

1   your background.  I try to take careful notes.  So does
2   my colleague.
3           So I listen to you, and then I try to repeat
4   it back to you to make sure that I've got it.  And when
09:36 5   you tell me "yes," "correct," "true," words to that
6   effect, I know that I've got it.  I know my report is
7   accurate, and then I can go back and I can do my job
8   with the client.
9           Do you understand?
09:36 10   A    Yes, sir.
11   Q    Okay.  And no doubt during the course of the
12   day I will be asking you questions of a personal
13   nature.  I already have.  What medication are you on,
14   what doctors are you seeing, where have you lived.
09:36 15           You understand, again, that my job today is to
16   gather information to find out a little bit about you
17   and then go back to my client and report on what you've
18   said?  Do you understand that?
19   A    If I feel the question is personal, do I have
09:37 20   to answer?
21   Q    Well, sir, that's my next question.  If I try
22   to gather information about you, about what your
23   experience in life has been, what your issues are in
24   this case, do you hold that against me?
09:37 25   A    No.  I don't have anything to hide.  I'm

**Jeremy Holloway - August 14, 2020**

```
 1   just -- if there is something really personal, which I
 2   don't -- I don't see.  I'm just wondering if I --
 3        MS. MKRTCHYAN:  I will explain to you.  If -- let
 4   me -- you know, unless I object and instruct you not to
 5   answer, you have to answer.
 6        THE WITNESS:  Okay.
 7        MS. MKRTCHYAN:  However, if I don't object and you
 8   still feel uncomfortable -- okay? -- you can advise
 9   that, and then we can think fact by fact.
10        THE WITNESS:  Okay.
11        MS. MKRTCHYAN:  Okay?  So it's just basically you
12   have to listen to my objections, and if there is
13   something inappropriate happening, I will instruct you
14   not to answer.  Otherwise, you can say, you know, "May
15   I not answer that question?"  But, you know, we already
16   discussed this.  So --
17        THE WITNESS:  Yes.  Okay.
18        MR. HARRELL:  Sure.
19        THE WITNESS:  I'm comfortable.
20        Q    BY MR. HARRELL:  Sure.  Sure, sir.  I have a
21   list of things that I go through, not just with you,
22   but with everybody that comes into this room -- okay --
23   on the other side of the lawsuit that I'm trying to
24   find out who they are --
25        A    Okay.
```

09:37  (line 5)
09:38  (line 10)
09:38  (line 15)
09:38  (line 20)
09:38  (line 25)

**Jeremy Holloway - August 14, 2020**

1   Q   -- so I can go back and I can tell my client
2   this is who they are, this is what they say, this is
3   the road they've traveled, this is what their
4   grievances are.  It's just gathering information is all
09:38  5   that we're doing here today.
6              Do you understand?
7   A   Yes, I do.
8   Q   And if ever at any time, if I ask a question
9   and you just don't feel good about it, please, speak
09:39 10  up.  We'll see if there's a workaround.  We'll see if
11  there's something that we can do.
12             Okay?  Do you understand?
13  A   That sounds good.
14  Q   Okay.  All right.
09:39 15             So we've talked about your addresses.  We've
16  brought it back about ten years.  Let's talk about
17  employment a little bit.
18             Are you employed at the present time?
19  A   Not currently as of the past two weeks.
09:39 20  Q   Okay.  So at the present time you are not
21  employed?
22  A   Correct.
23  Q   Okay.  And you say that that has been the case
24  for about two weeks?
09:39 25  A   Two weeks of nothing -- I --

Jeremy Holloway - August 14, 2020

```
 1        Q    Whoa.  Whoa.  Whoa.  Stop.  Let me do my job.
 2   Okay?  You answered my question.  It's good.
 3        MS. MKRTCHYAN:  But you interrupted him.  He was
 4   trying to answer.  But anyway, objection.  Interrupted
 5   the client.
 6        Q    BY MR. HARRELL:  My next question is, sir, so
 7   starting at about the beginning of August 2020, you
 8   have not been employed; true?
 9        A    Yes.
10        Q    Okay.  Prior to that time, were you employed
11   prior to the beginning of August 2020?
12        A    I was self-employed.
13        Q    Okay.  And what was the nature of your
14   self-employment?
15        A    This is copy repair and other electronics and
16   networking issues.
17        Q    Okay.  Were you incorporated?  Did the
18   business have any type of name?
19        A    No.
20        Q    Okay.  You were an independent contractor that
21   just went to various places and helped them out with
22   their office equipment?
23        A    Yes.
24        Q    Okay.  And how long were you self-employed
25   with office copy machine repair and related work?
```

Jeremy Holloway - August 14, 2020

```
 1              When did your marriage to Karlie Holloway
 2    start?  Your best estimate, please.
 3       A    Best estimate, 2003.
 4       Q    When did your marriage to Karlie Holloway end?
 5    Your best estimate, please.
 6       A    2007.
 7       Q    Okay.  And do you have any children?
 8       A    Yes, I do.
 9       Q    How many children?
10       A    One.
11       Q    The name of your child is?
12       A    Kailin Holloway.
13       Q    Spelling?
14       A    K-A-I-L-I-N.
15       Q    And Kailin Holloway's date of birth is what?
16       A    12/13/06.
17       Q    And Kailin Holloway is a child that you had
18    with Karlie Holloway?
19       A    Yes, it is.
20       Q    Okay.  Kailin Holloway lives where now?
21       A    I do not know.
22       Q    Does she live in the state of California?
23       A    I do not know.
24       Q    When is the last time you had any contact with
25    Kailin Holloway?
```

**Jeremy Holloway - August 14, 2020**

```
       1          MS. MKRTCHYAN:  Objection.  Relevance.  Privacy.

       2             You're instructed not to answer.

       3          MR. HARRELL:  Mark it.

       4          Q    How about Karlie Holloway?  Where does she

09:58  5   live at the present time?

       6          A    I do not know.

       7          Q    Okay.  Do you have any type of partner at the

       8   present time?

       9          A    I do not.

09:58  10         Q    Okay.  When is the last time that you were in

       11  a social relationship with someone who you considered

       12  to be a partner?

       13         MS. MKRTCHYAN:  Objection.  Relevance.  Privacy.

       14         THE WITNESS:  That would have been when I divorced

09:59  15  my wife.  That would have been 2007.

       16         Q    BY MR. HARRELL:  Okay.  Have you ever had a

       17  girlfriend since 2007?

       18         A    I have not.

       19         Q    Okay.  Let me ask you this:  Did -- where were

09:59  20  you born?

       21         A    Nashville, Tennessee.

       22         Q    Okay.  Did you complete high school?

       23         A    Yes, I did.

       24         Q    Where?

09:59  25         A    I went to five different high schools.
```

**Jeremy Holloway - August 14, 2020**

```
      1        Q      Where is the high school that you graduated
      2   from?
      3        A      Orange.
      4        Q      Orange, what?
09:59 5        A      California.
      6        Q      Which high school in the city of Orange?
      7        A      Richland.
      8        Q      Is that a public school or a private school?
      9        A      That is a public school.
09:59 10       Q      Richland High School in Orange, California?
     11        A      Yes.
     12        Q      And when did you complete high school?
     13        A      '94.  1994.
     14        Q      Do you have any education after high school?
10:00 15       A      Yes, I do.
     16        Q      Where?
     17        A      I went to the Art Institute after I completed
     18   my military service.
     19        Q      The Art Institute?
10:00 20       A      Of California.
     21        Q      Did you obtain any type of certificate or
     22   degree from the Art Institute of California?
     23        A      No, I did not finish.
     24        Q      When was your course of study at the Art
10:00 25   Institute of California?
```

**Jeremy Holloway - August 14, 2020**

```
 1         A     Approximately 2002.

 2         Q     Now, are they online?  Do they have a campus?

 3         A     That is a campus on the border of Costa Mesa

 4   and Santa Ana on Flower Avenue.

 5         Q     When did you move to Orange County?

 6         A     I've lived in Orange County since

 7   approximately 1980.

 8         Q     Okay.  So you moved here when you were about

 9   how old?

10         A     About four or five.  Don't remember.

11         Q     Okay.  What were the names of the four or five

12   high schools that you attended?

13         A     I went to Saddleback High School, Santa Ana;

14   Alisal High School, A-L-I-S-A-L; North High School;

15   Orange High School; Richland High School.

16         Q     Okay.  Why, in your mind, did you attend four

17   or five high schools?

18         MS. MKRTCHYAN:  Objection.  Relevance.

19              Do you feel comfortable discussing that?

20         THE WITNESS:  Yes.  It's just moving.

21         MS. MKRTCHYAN:  Okay.

22         THE WITNESS:  I had moved to Salinas to live with

23   my father for two years.  I didn't feel comfortable at

24   Alisal.  I went to North High.  Didn't work out living

25   with my father.  Moved back with my mom to Orange, and
```

**Jeremy Holloway - August 14, 2020**

1   there I ended up at Richland due to just I started the

2   school late at Orange and ended up doing the

3   independent studies.

4        Q    BY MR. HARRELL:   Are your parents still

10:02 5   living?

6        A    Yes.

7        Q    Both of them?

8        A    Yes.

9        Q    What is your father's name?

10:02 10   MS. MKRTCHYAN:   Objection.   Relevance.

11   THE WITNESS:   Joseph Holloway.

12   MS. MKRTCHYAN:   It's pathetic.   I can't believe

13   these people.

14        Q    BY MR. HARRELL:   Where does he live at the

10:03 15   present time?

16        A    I do not know.

17        Q    What is your mother's name?

18        A    Loretta Tafoya.

19        Q    How do you spell the last name?

10:03 20        A    T-A-F-O-Y-A.

21        Q    Where does your mother live at the present

22   time?

23        A    Corona, California.

24        Q    Are you in contact with your mother at the

10:03 25   present time?

**Jeremy Holloway - August 14, 2020**

```
 1       A    Yes.
 2       Q    Are you in contact with your father at the
 3  present time?
 4       A    No, I am not.
10:03  5  Q    Is there a reason why?
 6       MS. MKRTCHYAN:  Objection.  Relevance.  Privacy.
 7            You are instructed not to answer questions
 8  that are private and nobody should have a right to
 9  learn.  Thank you.
10:03 10  MR. HARRELL:  Mark it.
11       Q    Do you have any brothers or sisters?
12       A    Yes, I do.
13       Q    How many?
14       A    One brother, one sister.
10:04 15  Q    What's your brother's name?
16       A    Joseph Holloway.
17       Q    How about your sister?  What's her name?
18       A    Misty Henderson.
19       Q    Are you in contact with your brother, Joseph
10:04 20  Holloway?
21       MS. MKRTCHYAN:  Objection.  Relevance.  Privacy.
22            You're instructed not to answer.
23       MR. HARRELL:  Mark it.
24       Q    Are you in contact with your sister, Misty
10:04 25  Henderson?
```

**Jeremy Holloway - August 14, 2020**

1    questions, you know.

2         MR. HARRELL:  Well, that's what we thought.

3         MS. MKRTCHYAN:  That's so funny.

4         Q    BY MR. HARRELL:  I'm asking about medical

10:08  5    treatment now, not legal advice.  So let's just focus

6    on medical treatment.  And what your lawyer thinks or

7    doesn't think about your medical treatment, I could

8    care less.

9         MS. MKRTCHYAN:  Okay.  Well, you know what?  Excuse

10:09 10   me, Counsel.  If you continue with this type of

11   behavior --

12        Q    BY MR. HARRELL:  What I want to hear about is

13   your medical treatment with your doctors and your

14   billing.  So with respect, let's withdraw and get the

10:09 15   attorney-client privilege out of the way.

16             If we can read the question back.

17             (The following record was read:

18             "Q  The actual medical treatment that

19        you've gotten from doctors and nurses with

20        reference the VA, have you received any bill

21        for being treated, seen, by doctors or nurses

22        from the VA?")

23        MS. MKRTCHYAN:  Your lawyer has received.  Excuse

24   me.  So objection.  It goes into attorney-client

10:09 25   privilege.

**Jeremy Holloway - August 14, 2020**

1          So I'm instructing my client.  This is

2     irrelevant.

3          If these documents were received by your

4     lawyer, then you are instructed not to answer.  But,

10:10  5     you know, if you know whatever billing records were

6     produced to me as part of this discovery, then you may

7     answer.

8          Do you understand the question?

9        THE WITNESS:  Yes.

10:10  10      MS. MKRTCHYAN:  Okay.

11      THE WITNESS:  I have --

12      Q    BY MR. HARRELL:  Sir, have you received a bill

13   from the VA, to your knowledge, for your medical

14   treatment since the incident happened?  Yes, no, or I

10:10  15   don't know?

16      MS. MKRTCHYAN:  Or has your lawyer -- see --

17      MR. HARRELL:  Ma'am, with respect, that's not my

18   question.  So you'll have an opportunity later if

19   you're so inclined to ask whatever you want to ask.

10:10  20   Right now my question has a limited focus that does not

21   involve you, with all due respect.

22      MS. MKRTCHYAN:  Well, excuse me.  If it's

23   attorney-client privilege, then it is involving me.

24      MR. HARRELL:  Ma'am.

10:10  25      MS. MKRTCHYAN:  So -- and you know what?  Your

**Jeremy Holloway - August 14, 2020**

1    attitude -- I really do not appreciate this

2    condescending attitude, unprofessional, sexist attitude

3    that you're coming up across from the very beginning

4    this morning.  I'm not going to tolerate that.

10:11  5        From the very beginning, you've been this

6    hostile, you know, person, you know.  So I'm not going

7    to tolerate that.

8            I'm instructing him not to answer because the

9    answer presupposes attorney-client privilege.  Okay?

10:11  10   He is -- he has -- his attorney has received billing

11   records.  He has not received it.  So, therefore, his

12   answer is irrelevant.  So --

13       MR. HARRELL:  Are you done?

14            One of the reasons, ma'am, why we have a

10:11  15   camera here today is because we need one with you.

16   You've already proven that.  The magistrate judge

17   characterized your conduct as, and I quote, "a train

18   wreck."

19       MS. MKRTCHYAN:  Okay.

10:11  20       MR. HARRELL:  And that's being charitable.

21       MS. MKRTCHYAN:  And excuse me.

22       MR. HARRELL:  We have a camera here today --

23       MS. MKRTCHYAN:  Train wreck.

24       MR. HARRELL:  -- so that you can see --

10:11  25       MS. MKRTCHYAN:  Very good.

**Jeremy Holloway - August 14, 2020**

1    MR. HARRELL:   -- that nobody has raised their voice

2   here today.

3        MS. MKRTCHYAN:  Very good, Counsel.  Very good.

4        MR. HARRELL:  Your comment about me being a

10:12  5   sexist --

6        MS. MKRTCHYAN:  Okay.  I'm taking a break because I

7   don't need this type of attitude.

8        MR. HARRELL:  -- is what we call in the trade a

9   lie --

10        MS. MKRTCHYAN.  Okay.  Until you finish, I'm going

11   to take a break.

12        MR. HARRELL:  -- and you need to get control of

13   yourself.

14        MS. MKRTCHYAN:  Well, thank you.

10:12  15        MR. HARRELL:  You need to pull yourself together --

16        MS. MKRTCHYAN:  Maybe you need to pull yourself

17   together.

18        MR. HARRELL:  -- and it needs to happen now.

19        MS. MKRTCHYAN:  We're going to break until you

10:12  20   bring yourself to normal condition because you are

21   being rude and unprofessional, and you have no right to

22   condescend me like that.  Thank you.

23        Let's go.

24        THE VIDEOGRAPHER:  We are now going off the record.

10:12  25   The time is 10:12 a.m.

**Jeremy Holloway - August 14, 2020**

 1          (Recess.)

 2      THE VIDEOGRAPHER:  We are now back on the record.

 3  The time is 10:29 a.m.

 4      Q    BY MR. HARRELL:  Okay, sir.  Let's see if we

10:29  5  can do a workaround.

 6          To your knowledge, have you received any

 7  medical bills related to the incident that you had with

 8  the Orange County Sheriff's Department?

 9      A    I have received bills, but I have everything

10:29 10  sent to the lawyer.

11      Q    Okay.

12      A    So I don't see bills.

13      Q    Okay.  So your medical bills, if you have

14  them, have been sent to your lawyer and not to you?

10:29 15      A    Correct.

16      Q    You yourself have never seen any medical bills

17  relating to the incident; true?

18      A    Not true.  I have seen bills, but I don't

19  receive them.

10:30 20      Q    You have seen the bills?

21      A    Yes.

22      Q    Do you remember, based on your review of the

23  bills, whether or not you've been charged for any

24  medical care relating to the incident?  Yes, no, or I

10:30 25  don't know?

Jeremy Holloway - August 14, 2020

```
 1        A     I don't know.
 2        Q     Okay.  Now, you indicated that you take
 3   medication at the present time for anxiety?
 4        A     Yes.
 5        Q     Are you anxious at the present time?
 6        A     Not too bad.
 7        Q     Do you believe that you need to be on anxiety
 8   medication at the present time?
 9        A     I don't like going out into public places.  I
10   have headaches a lot, and it's less of a feeling of
11   anxiety and more of a chemical imbalance.
12        Q     That's what your doctors have told you?
13        A     Yes.
14        Q     So your doctors have told you that you have a
15   chemical imbalance at the present time?
16        MS. MKRTCHYAN:  Calls for hearsay.
17        THE WITNESS:  That was a comment made by the doctor
18   as we've been going through my testing.
19        Q     BY MR. HARRELL:  Okay.  And what is the name
20   of the doctor that made that statement to you?
21        A     That would have been the doctor -- the VA
22   doctor.
23        Q     Dr. George?
24        A     No, it wouldn't have been Dr. George.  It
25   would have been a previous one.
```

**Jeremy Holloway - August 14, 2020**

1       Q     Who?

2       A     I don't remember the names that I was seeing

3    in Long Beach.  They were individual doctors, and I

4    really don't remember my psychiatrist's name.

10:31  5       Q     Okay.  So you've been seeing a psychiatrist

6    after the incident?

7       A     Yes, I have.

8       Q     And is it okay if we refer to the facts and

9    circumstances of January 21, 2018 -- is it okay if we

10:32 10   refer to that in shorthand terms as "the incident"?

11      A     I'm fine with that, yes.

12      Q     All right.  Makes the day go by faster.

13            And if you need some help with the chair --

14      A     It keeps loosening up on me.

10:32 15      Q     It's --

16      A     So it's, like, I don't -- just surprised me.

17      MR. BECK:  Do you want to change the seat?

18      MS. MKRTCHYAN:  Do you want me to change --

19      THE WITNESS:  No, it locks.  But I guess it got

10:32 20   loose and -- it got loose, and I was reclining.

21      Q     BY MR. HARRELL:  All right.  Well, they all

22   work the same way.

23      A     Yeah, I know.  I'm fine.  I'm fine.

24      Q     If we switch out chairs, it's not going to

10:32 25   matter.

**Jeremy Holloway - August 14, 2020**

```
  1         A    I understand what's going on with it.

  2         Q    All right.  It's all good.

  3              Did you look at any documents to help prepare

  4    you for your testimony today?

10:32  5    A    No documents.

  6              I take that back.  I did go over some of the

  7    police reports.  I do apologize.  I read over some of

  8    the police reports.

  9         Q    When did that happen?

10:33 10    A    That happened on Tuesday.  That would have

 11    been the 11th.

 12         Q    Okay.  And why did you look at the police

 13    reports?

 14         A    As I was seeing what was going on on my -- on

10:33 15    my case.

 16         Q    Okay.  Were the police reports accurate that

 17    you looked at?

 18         A    Not at all.

 19         Q    Okay.  Well, let's talk about the incident.

10:33 20              The date of the incident that you had with the

 21    sheriff's department was when?

 22         A    Would have been January 20th, I believe.

 23         Q    Of what year?

 24         A    2017.

10:33 25    Q    Okay.  And --
```

**Jeremy Holloway - August 14, 2020**

1      MS. MKRTCHYAN:   2018.

2      Q     BY MR. HARRELL:   -- where did you live on that

3   date?

4      A     Was it 2018?

10:34  5      MR. HARRELL:   Counsel, what do we call that, what

6   you just did?

7      THE WITNESS:   I have a problem with that, and I

8   have because of the December 2017 to January, so I keep

9   messing up.   I've done this already as far as thinking

10:34 10   it's 2018.

11      Q     BY MR. HARRELL:   All right.

12      MS. MKRTCHYAN:   Yeah, seriously.

13      Q     BY MR. HARRELL:   Let's get back with my next

14   question, which is as follows:   What day of the week

10:34 15   did the incident happen on?   Was it a Friday?   Tuesday?

16   Wednesday?   Some other day?

17      A     I want to say a Friday.

18      Q     Okay.

19      A     It was in the morning.   So it could have been

10:34 20   the Saturday, but I know it was, like, on the -- it was

21   on the change of the day time.   So --

22      Q     In the middle of the night?

23      A     Yeah.

24      Q     Yes?

10:34 25      A     Yeah.   Well, morning time.   So it was middle

**Jeremy Holloway - August 14, 2020**

```
 1    of the night for me.  I was woken up from a sleep.  So
 2    I went to bed Friday, and it could have been Saturday,
 3    but to me it was still Friday, if you understand what
 4    I'm saying.
 5         Q    I understand.
 6              Just after midnight the date changes?
 7         A    Yeah.
 8         Q    Yes?
 9         A    Yes.
10         Q    And when you answer my questions, I neglected
11    to mention this at the outset.  This is my bad, but we
12    need to stay away from slang terms like "yeah," "nope,"
13    "uh-huh," "uh-uh."  If you need to tell me yes, that's
14    what we need to hear, a good clear "yes," not a "yeah."
15              Do you understand?
16         A    I understand.
17         Q    It's like no other conversation that you'll
18    ever have, but it's the rules.  I didn't make them.
19         A    No problem.
20         Q    Okay.  So let's talk about the 24 hours
21    running up to the incident, the contact that you had
22    with law enforcement.
23              Where were you at that time?
24         A    I was camping at O'Neill Park.
25         Q    Okay.  And how long had you been camping at
```

**Jeremy Holloway - August 14, 2020**

```
 1   O'Neill Park at the time of the incident?  Days?

 2   Hours?  Years?

 3        A    One night.

 4        Q    Okay.  Was there some type of fee associated

 5   with your campsite?

 6        A    Yes.

 7        Q    And what was the fee?

 8        A    I believe it's around $25, if I remember

 9   correctly.

10        Q    $25 a night?

11        A    Yes.

12        Q    Okay.  So I apologize if I've asked you this.

13             At the time of the incident, how long had you

14   been camping at O'Neill Park for that stay?

15        MS. MKRTCHYAN:  Asked and answered.

16        THE WITNESS:  That stay.  Like I said, I believe I

17   checked in the day before.

18        Q    BY MR. HARRELL:  Okay.  So at the time of the

19   incident, you had been at your campsite at O'Neill Park

20   for about 24 hours?

21        A    Yeah.  I could say that.  Approximate

22   24 hours.

23        Q    Okay.  When you checked into your campsite,

24   were you with anyone else?

25        A    I was not.
```

**Jeremy Holloway - August 14, 2020**

1    Q    Did anyone join you at your campsite before

2  the incident?

3    A    Nobody.

4    Q    Okay.  So in the entire 24-hour period of time

10:37  5  before the incident, before your contact with law

6  enforcement, your testimony is you weren't in the

7  company of a guest?

8    A    Correct.

9    Q    Did you have a girlfriend at the time of the

10:37  10  incident?

11    A    I did not.

12    Q    Okay.  Now, can you recall anything that you

13  said or did in the 24 hours leading up to the incident?

14    MS. MKRTCHYAN:  Vague and ambiguous.

10:37  15    Do you understand the question?

16    THE WITNESS:  I camped.  I cooked.  I ate

17  breakfast, lunch, and dinner.

18    Q    BY MR. HARRELL:  Did you have any

19  conversations with anybody else that was at the

10:38  20  campsite?

21    A    No.

22    Q    Okay.  Did you have a pet with you?  A dog?

23    A    Yes.

24    Q    Oh, okay.  What is your dog's name?

10:38  25    A    My dog's name is Bowser.

Jeremy Holloway - August 14, 2020

```
 1        Q    Is Bowser still with us?
 2        A    Yes, he is.
 3        Q    All right.  He's back in Pennsylvania?
 4        A    He's at the hotel room right now.
10:38 5   Q    Okay.  Where is the hotel you found that will
 6   take a dog?
 7        A    He's a service animal.
 8        Q    Okay.  And what type of service does your dog,
 9   Bowser, give to you?
10:38 10  A    He provides companionship.
11        Q    So explain that.  Is there, like, a note from
12   a doctor or a counselor or someone that allows you to
13   get the dog into the hotel?
14        A    Yes.  I have a note from a VA psychiatrist,
10:39 15  and I'm able to take it on planes, take it into
16   restaurants.
17        Q    Bowser came with you on the plane?
18        A    Yes.
19        Q    Okay.  And how long have you had a note from a
10:39 20  VA psychiatrist that allows you to have a service
21   animal in hotels and on planes?
22        A    For about five years now.
23        Q    Okay.  Starting in about 2015?
24        A    Yeah.  When I -- it would have been when I
10:39 25  purchased --
```

**Jeremy Holloway - August 14, 2020**

```
  1   is the next thing that you said?
  2        MS. MKRTCHYAN:  Asked and answered.  Let me object
  3   first because vague and ambiguous.  Asked and answered.
  4        THE WITNESS:  I said, "It's cold."
10:47  5        Q    BY MR. HARRELL:  Did you say anything else at
  6   this time?
  7        A    I told him, "I've done nothing wrong," which I
  8   repeated.
  9        Q    After you -- did you say anything else at this
10:47 10   time?
 11        A    No.
 12        Q    Okay.  So after you tell Deputy Renegar it's
 13   cold and you've done nothing wrong, what's the next
 14   thing that happens, the very next thing?
10:47 15        A    I believe at that point he explains that
 16   they've got a call on me.
 17             I repeat, "On me?"  You know, I'm making it
 18   clear that he has a call on me personally and not just
 19   a vague call.
10:48 20             And he continues to assure me that it was on
 21   me personally.
 22        Q    And this is all conversation that you're
 23   having with Deputy Renegar; true?
 24        A    Yes.
10:48 25        Q    And at this point you're inside of your tent?
```

**Jeremy Holloway - August 14, 2020**

1        A     Yes.

2        Q     Okay.  After Deputy Renegar tells you, "No.  I

3   want to assure you this call is on you personally" or

4   words to that effect, what's the next thing that

10:48   5   happens, the very next thing?

6        A     He had asked me if I was alone.  I said I was

7   alone.  He asked me if anybody had been there, and I

8   said no.

9        Q     Do you believe that you have a clear memory of

10:49   10   what happened during the incident?

11       A     I have a very clear memory.

12       MS. MKRTCHYAN:  Argumentative.  Excuse me.

13   Argumentative.  Vague and ambiguous.  Clear memory.

14           Do you understand the question?

10:49   15       THE WITNESS:  Yes.

16       MS. MKRTCHYAN:  Okay.

17       Q     BY MR. HARRELL:  Okay.  So Deputy Renegar

18   asked if you are alone, and you assure him, "Yes, I am

19   alone"; right?

10:49   20       A     Yes.

21       Q     And then the next thing that happens is Deputy

22   Renegar asked you with you still inside of your tent,

23   "Has anyone been there?" and you respond, "No, no one

24   else has been here.  It's just me" or words to that

10:50   25   effect; right?

**Jeremy Holloway - August 14, 2020**

1      A     Yes.

2      Q     What's the next thing that happens, the very

3   next thing?

4      A     At this point I exit the tent.

10:50   5      Q     How are you dressed at this time?

6      A     At this point I'm in jeans, a T-shirt, a

7   jacket, and boots.

8      Q     What type of T-shirt are you wearing?

9      A     Just a regular -- a Hanes T-shirt.

10:50  10      Q     White?

11      A     Gray.

12      Q     Gray?  Any writing on it?

13      A     No.

14      Q     Okay.  And when you exited the tent, you did

10:50  15   that because you wanted to cooperate with law

16   enforcement?

17      A     Yes.

18      Q     And you wanted to help any way that you could

19   with whatever this call was about; right?

10:51  20      A     Yes.  I was -- I was offering my help and

21   offering my knowledge.

22      Q     And you knew that you had done nothing wrong;

23   right?

24      A     That is correct.

10:51  25      Q     You were completely innocent of any wrongdoing

**Jeremy Holloway - August 14, 2020**

1    or words to that effect --

2         A     Uh-huh.

3         Q     -- you can understand that; right?

4         MS. MKRTCHYAN:  Objection.  Vague and ambiguous.

11:05  5    Argumentative.

6         THE WITNESS:  I can understand being innocent and

7    wanting somebody to search me?

8         Q     BY MR. HARRELL:  You could understand how an

9    officer that had never met you and had received

11:05  10   information that suggested that you were involved in

11   wrongdoing might want to look out for their safety by

12   doing a pat-down; true?

13        MS. MKRTCHYAN:  Objection.  Argumentative --

14        THE WITNESS:  Well, at this time --

11:05  15       MS. MKRTCHYAN:  Wait.  Let me -- objection.

16   Argumentative.  Vague and ambiguous.

17            Go ahead.

18        THE WITNESS:  I'll say at this time I'm a little

19   bit frustrated with them.  If they were looking for

11:05  20   somebody that was with somebody, they should have left

21   me alone when I told them I was alone.

22            I don't believe as a citizen of America I

23   should have my stuff searched or have myself searched

24   before there's a proven fact that I am in the wrong.  I

11:05  25   had told them over and over, "I have done nothing

**Jeremy Holloway - August 14, 2020**

1    wrong.  I am by myself."

2            At that point he should have left me alone,

3    and that's how I felt at that moment.

4        Q    BY MR. HARRELL:  Okay.  So when the officer

11:06  5    indicated that he had officer safety concerns and

6    that's why he wanted to --

7        A    Yeah.

8        Q    -- pat you down, you understood that the

9    officer wanted to do a pat-down search to see if you

11:06  10    had any weapons on you; right?

11        A    I understand he wanted to violate my civil

12    rights.

13        Q    I understand, sir.  That's kind of more

14    something for your lawyer to say in front of a jury.

11:06  15    My question has another focus.

16            Here, we're going to read it back for you.

17        MS. MKRTCHYAN:  Well, objection.  Argumentative.

18    Vague and ambiguous.  Badgering the witness.  Asked and

19    answered.  And your condescension is on the record,

11:06  20    too.  So if you continue like this, we'll take as many

21    breaks as possible.  So just behave yourself as a

22    normal human being.

23        MR. HARRELL:  Well, ma'am, one of the great things

24    about our country is I don't have to respond to any of

11:07  25    that.

**Jeremy Holloway - August 14, 2020**

1        MS. MKRTCHYAN:  Of course, you will not have to.

2        MR. HARRELL:  I'm not going to.

3        MS. MKRTCHYAN:  Of course, not to, because you just

4    have, you know, absolutely no respect for any other

11:07  5    attorney.  The level of arrogance that I see is just

6    horrendous.  So anyway --

7        MR. HARRELL:  Right, ma'am.  We're not going to

8    have a train wreck today.  The magistrate judge has

9    already got his eye on you and for good reason.

11:07  10       MS. MKRTCHYAN:  Very good.  You are defaming my

11   name.  So continue with that type of attitude.  Train

12   wreck.  Okay.

13       MR. HARRELL:  Ma'am, what's happened to you in this

14   case --

15       MS. MKRTCHYAN:  I'm not going to talk to you.

16       MR. HARRELL:  -- is what you've brought on

17   yourself.

18       MS. MKRTCHYAN:  Okay.  Thank you very much.  This

19   case is not about me.  Continue with your questioning,

11:07  20   Counsel.  This case is about my client.  But I'm not

21   going to let you sit there, condescend me, and then

22   badger my client.  Thank you.  Continue.

23       MR. HARRELL:  If we can get a readback.

24          (The following record was read:

11:08  25          "Q  Okay.  So when the officer indicated

**Jeremy Holloway - August 14, 2020**

1      that he had officer safety concerns and that's

2      why he wanted to --

3          "A  Yeah.

4          "Q  -- pat you down, you understood that the

5      officer wanted to do a pat-down search to see if

6      you had any weapons on you; right?")

7      MS. MKRTCHYAN:  And that was answered.  There was

8  an answer.  Please read the answer for the record.

9      Q    BY MR. HARRELL:  Sir?

11:08 10   A    I was waiting for the answer.

11     MS. MKRTCHYAN:  Excuse me.  Yeah.  There was an

12  answer.  So I'm not going to --

13     Q    BY MR. HARRELL:  Sir, your answer is that you

14  understood he was there to violate your civil rights or

11:08 15  words to that effect.

16          First of all, you're not a lawyer, and you

17  don't know what that term means.

18     A    I do.

19     Q    Okay.  That's good to know.

11:09 20   MS. MKRTCHYAN:  Let him finish.  Okay?  And let me

21  be the one to object.

22     Q    BY MR. HARRELL:  We need an answer to the

23  question that's been posed.  Okay?

24     MS. MKRTCHYAN:  It's been asked.  It's been asked

11:09 25  and answered.

Jeremy Holloway - August 14, 2020

1       So I instruct him not to answer a second time.

2  Thank you.  It's been asked the way he understands your

3  question.

4       MR. HARRELL:  Ma'am, please.  Please.

11:09  5       MS. MKRTCHYAN:  If you have another question, you

6  can continue.  He answered the question.  What else do

7  you want?  Are you going to be dissatisfied, Counsel,

8  all day long?  And you're going to badger the witness?

9       No way I'm going to let that happen.  He's

11:09 10  already a victim of police brutality, and he's not

11  going to be a victim of your nonsense questioning.

12  Okay?  There you go.

13       So he answered the question.  If you have

14  another question, he will answer.  That's how he

11:09 15  answers.  If you don't like that answer, then I'm

16  sorry.  That's your problem, not his.

17       MR. HARRELL:  Are you done, ma'am?

18       MS. MKRTCHYAN:  I'm done insofar as it relates to

19  your question and you are asking him to re-answer the

11:10 20  question.  It's inappropriate.  So, Counsel, move on.

21       I've already instructed him not to re-answer

22  that question, and you're arguing, admonishing my

23  client.  That's the way he understands his question.

24  You asked him a question.  Patting you down, and he

11:10 25  answered he is violating my civil rights.  What else do

**Jeremy Holloway - August 14, 2020**

1    you want to know, Counsel?  I don't understand.  What

2    else do you want to know?

3            If you have another question, move on.

4        Q    BY MR. HARRELL:  Sir, you've already told us

11:10  5    that you wanted to work with the officers when you came

6    out of your tent; true?

7        A    Yes.

8        Q    And one of the things that you wanted to work

9    with the officers on was letting them have a sense of

11:10  10    personal safety when they were dealing with you; right?

11        MS. MKRTCHYAN:  Vague and ambiguous.

12        THE WITNESS:  That's not my concern.  My concern

13    was them laughing at me and laughing when they said

14    "officer safety" and mocking me.  That was my concern.

11:11  15        Q    BY MR. HARRELL:  Okay, sir.  I'm asking what

16    you thought.

17        A    That's what I thought.  These guys are mocking

18    me.  At this point I'm very frustrated.  I've told them

19    everything they needed to know about the situation.

11:11  20        Q    Okay.  So when you came out of the tent, did

21    you want to cooperate with law enforcement or not?

22        A    Hundred percent.

23        Q    Hundred percent you wanted --

24        A    I wanted to help the officers.  Answer any

11:11  25    questions they were asking.

**Jeremy Holloway - August 14, 2020**

1        Q    You wanted to help them.  And you did not know

2    why they were there or what they had heard.  You just

3    knew you had done nothing wrong.

4             Right?

11:11  5      A    Correct.

6        Q    So you had nothing to hide --

7        A    Correct.

8        Q    -- right?

9             Whatever it was that brought officers to your

11:11 10    tent, you wanted to help them to understand that you

11    had done nothing wrong; right?

12       A    Correct.

13       Q    And so you do understand that just from living

14    life, law enforcement can be a dangerous job; right?

11:12 15      MS. MKRTCHYAN:  Vague and ambiguous.

16    Argumentative.  Relevance.

17       THE WITNESS:  Depending on your -- I mean, a lot of

18    them work in an office.

19       Q    BY MR. HARRELL:  It can be a dangerous job

11:12 20    when you work in law enforcement; true?

21       A    True.

22       Q    You understood that law enforcement is called

23    to the scene of problems --

24       MS. MKRTCHYAN:  Vague and ambiguous.

11:12 25      Q    BY MR. HARRELL:  -- and they are asked to try

**Carroll Sells Court Reporting Service**
**(562) 799-9100**
95

**Jeremy Holloway - August 14, 2020**

1    and resolve the problems; right?

2        MS. MKRTCHYAN:  Vague and ambiguous.

3        THE WITNESS:  I have been in an officer situation,

4    and I know how to handle a situation in that sense.

11:12  5    And it's not to violate someone's civil rights, nor is

6    it to take someone's papers without a cause, nor is it

7    to mock that person by laughing when they said "officer

8    safety," knowing they weren't being serious.  That is

9    it.

11:12  10       Q    BY MR. HARRELL:  So, sir, you understood that

11   officers, due to the nature of their job, can have

12   legitimate officer safety concerns; true?

13       A    I understand these officers had no concern for

14   safety.

11:13  15       Q    Okay.  Was it important to you to help show

16   the officers that you posed no threat to them?

17       MS. MKRTCHYAN:  Vague and ambiguous.

18   Argumentative.  Asked and answered.

19       THE WITNESS:  Was it important to me to show the

11:13  20   officers?

21       Q    BY MR. HARRELL:  Sir, we can read it back for

22   you if you want.

23       A    Yes.  Please read it back.

24       Q    Sure.

11:13  25           (The following record was read:

**Jeremy Holloway - August 14, 2020**

1            "Q   Okay.   Was it important to you to help

2        show the officers that you posed no threat to

3        them?")

4        THE WITNESS:   Do we scale off on a matter of

11:14  5   importance at that situation?   Because I have a few

6   more things that were important, like my life.   I felt

7   threatened.   That was important to me at that moment.

8   Whether these guys were going to shoot me like they do

9   a lot of other people, that was important to me.

11:14 10       Q    BY MR. HARRELL:   Sir, was it -- with regret,

11   I'm going to ask it again.

12            You're answering questions that I haven't

13   asked you.

14       A    Okay.

11:14 15       Q    My question has another focus.

16       MS. MKRTCHYAN:   Vague and -- okay.   First of all,

17   argumentative.

18       MR. HARRELL:   So with regret, we're going to read

19   it back.

11:14 20       MS. MKRTCHYAN:   Well, objection.   Argumentative.

21   You are badgering the witness.   If you don't like the

22   answers, seriously, I'm not going to let you badger my

23   client if you don't like the answer.   This is

24   hilarious.

11:14 25            So if you don't understand the question, you

1   need to ask for clarification.  Okay?  But --

2           (The following record was read:

3           "Q  Okay.  Was it important to you to help

4       show the officers that you posed no threat to

11:15  5       them?")

6       MS. MKRTCHYAN:  Vague and ambiguous.  Relevance.

7   Calls for speculation.  What he is thinking at the time

8   is irrelevant, and more importantly, he already

9   answered the question.

11:15 10           So, I'm, you know, instructing you not to

11   answer.  There was an answer to that already.

12           If you're going to continually ask him --

13       MR. HARRELL:  Whoa.  Stop.  You state legal

14   objections, and then we move on.

11:15 15       MS. MKRTCHYAN:  If you're going to ask -- okay.  If

16   you're going to ask the same question over and over

17   again, I'm going to keep objecting, and I'm going to

18   instruct him not to answer.

19           So please move on to your next question.

11:15 20   Thank you.

21       MR. HARRELL:  Have you instructed your client not

22   to answer the pending question?

23       MS. MKRTCHYAN:  Yes, because there was an answer

24   already.  Rephrase your question.

11:15 25       MR. HARRELL:  Let's show respect to the court

**Jeremy Holloway - August 14, 2020**

 1  reporter.  Only one of us can speak at a time.

 2      MS. MKRTCHYAN:  Yes.

 3      Q    BY MR. HARRELL:  Sir, when the officer said,

 4  "I'd like to do a pat-down search on you," you

11:16 5  understood that that was so that the officers could

 6  help assure themselves that you didn't have a weapon

 7  that could hurt them; true?

 8      A    No, because I had already told them I had no

 9  weapons.

11:16 10     Q    Right.  And in your mind, the officer had to

 11  take your word for it; right?

 12     A    Yes.  Because in America --

 13     MS. MKRTCHYAN:  Objection.  Wait a minute.

 14  Objection.  Argumentative.

11:16 15         Answer yes or no.  Let him continue with his

 16  line of questioning.

 17     Q    BY MR. HARRELL:  Please finish your answer,

 18  sir, before your lawyer jumped in the middle of the

 19  proceedings.

11:16 20     A    Yes.  My answer was yes.

 21     Q    Well, let's get the question out there.

 22         (The following record was read:

 23         "Q   Right.  And in your mind, the officer

 24     had to take your word for it; right?")

11:17 25     MS. MKRTCHYAN:  This is the type of questions,

**Carroll Sells Court Reporting Service**
**(562) 799-9100**                                    99

**Jeremy Holloway - August 14, 2020**

1       Counsel --

2           MR. HARRELL:  Okay.  That's a speaking objection.

3       That's not allowed, and I think you know that.

4           MS. MKRTCHYAN:  Vague and ambiguous.

11:17   5       Argumentative.

6               And again, I'm not going to allow you to ask

7       this type of argumentative questions where the answer

8       is not going to lead anywhere for us.  It's going to be

9       not -- you know, it's not relevant.

11:17  10               So I'm going to instruct him.  He already

11      answered.  He has already answered.

12               Any time you are re-asking the same question,

13      I'm going to tell him not to answer the same question.

14      So move on and try to ask questions that are

11:17  15      appropriate.

16           MR. HARRELL:  Ma'am.  Ma'am.

17           MS. MKRTCHYAN:  Thank you.

18           MR. HARRELL:  Ma'am, the magistrate judge would

19      like us to state legal objections, if you have some.

11:17  20      What you're doing, I believe, is called speaking

21      objections.  Those, in my experience, can get you in

22      trouble.

23               And so just state your legal objection.  Your

24      narrative explanation, your thoughts, all that is

11:18  25      something that might be best for you to keep to

**Jeremy Holloway - August 14, 2020**

```
 1    yourself.
 2         Q    Sir, when the officer asked to pat you down,
 3    you believed that that was wrong; right?
 4         A    Yes.
11:18  5         Q    And you believed it was wrong because you had
 6    done nothing wrong; right?
 7         A    Yes.
 8         Q    And you had told the officer you had done
 9    nothing wrong; right?
11:18 10         A    Yes.
11         Q    And so you did not agree with the officer's
12    request to pat you down; true?
13         A    I never said no, but I never said yes.  I just
14    kept asking, "Why are they here?"  And that's what I
11:19 15    just kept repeating.  And I was getting frustrated with
16    them because they would not answer me.
17         Q    Okay.
18         MS. MKRTCHYAN:  Why are you interrupting?
19         Q    BY MR. HARRELL:  So when the officer says --
11:19 20         MS. MKRTCHYAN:  Excuse me.  Let him finish --
21         Q    BY MR. HARRELL:  -- says, "I would like to
22    do" --
23         MS. MKRTCHYAN:  Excuse me.  Hello?
24         Q    BY MR. HARRELL:  -- "a pat-down search" --
11:19 25    "I'd like to do a pat-down search."
```

**Jeremy Holloway - August 14, 2020**

1      MS. MKRTCHYAN:  This is not going to work.  If
2  you're going to continue interrupting my client, this
3  is not going to work.  He was answering your question.
4  Do not interrupt my client.
11:19  5      Did you finish your answer?
6      THE WITNESS:  As far as what he's answering, I
7  think.
8      MS. MKRTCHYAN:  Okay.  When you feel like he's
9  interrupting you, let me know because I'm not going to
11:19  10  allow that.
11      MR. HARRELL:  Okay.
12      MS. MKRTCHYAN:  So do not interrupt the person when
13  he's talking.
14      MR. HARRELL:  Okay.  That's not a legal objection,
11:19  15  but we're going to move on.
16      Q    Sir, when the officer said, "I would like to
17  pat you down for officer safety reasons" or words to
18  that effect, you didn't agree to that and you didn't
19  disagree with that; true?
11:20  20      A    Correct.
21      Q    Instead of responding to the officer's
22  question, you posed a question of your own; right?
23      A    Correct.
24      Q    And your question is, "What is this all about?
11:20  25  Why are you here?" words to that effect; right?

**Jeremy Holloway - August 14, 2020**

```
 1        A     Yes.

 2        Q     And as you stated, you were becoming

 3    frustrated with the officers because you were

 4    repeatedly asking the same question, "What have I done?

 5    What have I done wrong?" and you were not getting an

 6    answer; right?

 7        A     Correct.  And they were already searching my

 8    stuff without consent.

 9        Q     Okay.  So while you were having your

10    conversation with Deputy Renegar, you say that while

11    that was going on, other officers were searching your

12    personal property?

13        A     Yes.

14        Q     Okay.  So what did Deputy Renegar say, if

15    anything, when you repeatedly stated "I haven't done

16    anything wrong?  What is this all about?" words to that

17    effect?  What did he say, if anything?

18        A     He said, "We got a call out here."

19              And I asked him, "Specifically on me?"

20              He said, "Yes."

21              I repeated myself.  "Specifically on me?  My

22    person?  Jeremy Holloway?"

23              And he said, "Well, possibly."  And then he

24    went back at least ten times and said, "No, it was on

25    you.  It was on you."  Like, he was telling me for sure
```

11:20 (line 5)
11:20 (line 10)
11:21 (line 15)
11:21 (line 20)
11:21 (line 25)

**Jeremy Holloway - August 14, 2020**

1    A    No.  When he lied to me, I did.

2    Q    Right.  At this point, when Deputy Renegar

3    said he was there reference calls of misconduct

4    involving you, you sized him up as being a liar; right?

11:30    5    A    As they were searching through my stuff toward

6    the end of that call and I caught him in his lies, yes.

7    Q    And at that point you got angry?

8    A    No.  I was righteous indignation.  I was very

9    upset.  I might have cursed once or twice, but my words

11:31   10    were "ridiculous," "unfair," and "I've done nothing

11    wrong."

12         I was not in any way uncooperative.  I sat

13    down.  I was very upset they were digging through my

14    stuff without permission.  I was very upset they were

11:31   15    laughing at me, pretending officer safety while they

16    said it sarcastically.  And when I caught Officer

17    Renegar in his lies.

18    Q    Okay.  So, now, when -- so when Deputy Renegar

19    says, "We have received calls that you've been involved

11:31   20    in misconduct" or words to that effect, you knew that

21    that couldn't be true --

22    A    Correct.

23    Q    -- right?

24    MS. MKRTCHYAN:  Asked and answered.

11:32   25    Q    BY MR. HARRELL:  And you also knew that

**Jeremy Holloway - August 14, 2020**

```
 1   officers were searching your property at that time;
 2   right?
 3        A    Yes.
 4        Q    And this made you angry; right?
11:32 5      A    It made me very frustrated.
 6        Q    Did it make you angry?
 7        A    No.
 8        Q    You were calm and cool the entire time of the
 9   incident?
11:32 10       MS. MKRTCHYAN:   Asked and answered.
11        THE WITNESS:   Yes.
12        Q    BY MR. HARRELL:   You used restrained,
13   respectful words throughout the entire incident; right?
14        A    I will say I cussed a couple times.
11:32 15       Q    And was that calm and respectful words?
16        A    You know what?   It was not out of control.   I
17   was in very control -- I was very controlled, and I was
18   treating them with far more respect than they were
19   treating me.
11:32 20       Q    Do you make it your practice to use curse
21   words when you're angry and upset?
22        MS. MKRTCHYAN:   Argumentative.
23        THE WITNESS:   I wasn't angry --
24        MS. MKRTCHYAN:   Argumentative
11:33 25       THE WITNESS:   -- or upset.   I was frustrated.
```

**Jeremy Holloway - August 14, 2020**

1          MS. MKRTCHYAN:  Let me object.  Okay?  This is

2     going --

3          Q    BY MR. HARRELL:  Do you make it your practice

4     to use curse words when you're angry and upset?

11:33  5          MS. MKRTCHYAN:  Asked and answered.  Badgering the

6     witness.

7               Are you going to continue doing the same thing

8     over and over again?  You asked, and he answered.

9          Q    BY MR. HARRELL:  Do you make it your practice,

11:33 10     sir, to use --

11          MS. MKRTCHYAN:  Don't answer that.

12               (Discussion off the record.)

13               (The following record was read:

14               "Q  Do you make it your practice, sir,

11:33 15          to use --")

16          MS. MKRTCHYAN:  Okay.  Asked and answered.  I'm

17     instructing not to answer that question.

18          Q    BY MR. HARRELL:  Do you make it your practice,

19     sir, to use curse words when you're angry and upset?

11:33 20          MS. MKRTCHYAN:  I'm instructing you not to answer.

21          MR. HARRELL:  Mark it.

22          MS. MKRTCHYAN:  He answered it.

23          Q    BY MR. HARRELL:  So when Deputy Renegar says,

24     "We've received multiple calls on you being involved in

11:34 25     misconduct" or words to that effect, what is the very

**Jeremy Holloway - August 14, 2020**

1    next thing that you say or do?

2         MS. MKRTCHYAN:  Asked and answered.  Vague and

3    ambiguous.  The very next thing, say, and do.

4              Do you understand the question?

11:34  5         THE WITNESS:  He's asking me when he told me the

6    call was on me.

7         MR. HARRELL:  Counsel, you're really not helping,

8    and I'm trying not to bother the magistrate judge.

9         MS. MKRTCHYAN:  There's not your problem.

11:34 10         MR. HARRELL:  I have heard reports on you that have

11   been very unsettling, and now I see why.  It's like

12   nothing else I've done in quite a while.

13         MS. MKRTCHYAN:  By the way, right now you have no

14   right to talk to me like that.  Okay?  Right now I can

11:35 15   say --

16         MR. HARRELL:  Then pull yourself together.

17         MS. MKRTCHYAN:  Excuse me.  I have a right to

18   object.  Who the hell do you think you are?  I have a

19   right to object.

11:35 20         MR. HARRELL:  Make legal objections.

21         MS. MKRTCHYAN:  I am making the objections the way

22   I understand.  If you have a problem with my

23   objections, you can take it up later.  Okay?  There you

24   go.

11:35 25         MR. HARRELL:  Ma'am, you've got to pull yourself

Jeremy Holloway - August 14, 2020

1    together.

2        MS. MKRTCHYAN:   Okay.   You have yet to see me

3    too -- I mean seriously, this is the sexist,

4    condescending attitude, Counsel, and you are really

11:35  5    behaving just like this with any female attorney that

6    is younger than you?   I'm sorry.   If no one told you

7    outright that that's sexist attitude, I will.   I'm not

8    afraid.

9            And I will tell you that your behavior from

11:35  10    this morning and even before then, your letters,

11    your -- you know, your harassing letters towards me

12    have been infused with condescending attitude.

13            Who do you think you are?   Who do you think

14    you are?   I know who I am, but you need to know your

11:35  15    place.   Okay?   I am a female young attorney, and you

16    have no right to do this to me or my client.

17            You're badgering the witness.   Let's go over

18    the questions.   You have to ask only appropriate

19    questions, and you are not.

11:36  20            And I will object as long as it takes, or I

21    will just stop this deposition as your co-counsel did.

22    So --

23        MR. HARRELL:   Are you all done?   Any more?

24        MS. MKRTCHYAN:   Continue with your questioning, or

11:36  25    we will take a break.

**Jeremy Holloway - August 14, 2020**

```
 1        MR. HARRELL:  All right.  Have we got a pending

 2   question?

 3             (The following record was read:

 4             "Q  So when Deputy Renegar says, 'We've

 5        received multiple calls on you being involved

 6        in misconduct' or words to that effect, what

 7        is the very next thing that you say or do?")

 8        MS. MKRTCHYAN:  Same objection.  Vague and

 9   ambiguous.

11:37 10        THE WITNESS:  I tell him, "So you've had calls on

11   me directly?"

12        Q    BY MR. HARRELL:  Stop.  Just one step at a

13   time.  This is how we want to do it.

14        MS. MKRTCHYAN:  Interrupting the witness.

11:37 15   Objection.

16        Q    BY MR. HARRELL:  After you say to Renegar, "So

17   you've had calls on me directly?" what's the very next

18   thing that happens, whether it's something somebody

19   says or they do?

11:37 20        A    We go -- we do that back and forth a couple

21   times, the -- and I'm making sure.  I want him to say

22   out loud to me --

23        Q    Okay.  I understand.

24        MS. MKRTCHYAN:  Why are you interrupting him?

11:37 25        MR. HARRELL:  Because we're going to get through
```

**Jeremy Holloway - August 14, 2020**

1    MS. MKRTCHYAN:  Right.

2    THE WITNESS:  -- where we're at.  So I'm not

3  sure --

4    MS. MKRTCHYAN:  Vague and ambiguous as to time,

11:41  5  then.

6    THE WITNESS:  Yes.

7    MR. HARRELL:  Okay.  You're cutting your client

8  off.  Okay?

9    MS. MKRTCHYAN:  Of course I can cut off my client.

11:41 10    MR. HARRELL:  He is making a point that will maybe

11  help us ask a better question, but you jump in with

12  speaking objections that are no help to anyone.

13    Q    So, sir, what is it that you think that you

14  need?

11:41 15    MS. MKRTCHYAN:  Ask for clarification.

16    THE WITNESS:  Yes.  I just want clarification

17  because we did do this exchange the whole time about

18  it's me.  You know, I'm going through this, but also at

19  the same time I'm talking to him about the officers

11:42 20  going through my stuff.

21         And so that's what I'm trying to see, if I've

22  already spoke about turning around and asking why are

23  they going through my stuff.

24    Q    BY MR. HARRELL:  Okay.  I can tell you what my

11:42 25  notes say.  Okay?  It's -- up until this point, it's

**Jeremy Holloway - August 14, 2020**

1    been you and Renegar --

2         A    Okay.

3         Q    -- in conversation only.

4         MS. MKRTCHYAN:  Misstates the testimony.

11:42  5    Q    BY MR. HARRELL:  So --

6         MS. MKRTCHYAN:  Misstates the testimony.

7         MR. BECK:  That is a misstatement of the testimony.

8         MS. MKRTCHYAN:  Yeah, you know.  Seriously.  Wait a

9    minute.

11:42 10        MR. HARRELL:  Conversation, not observations.  He's

11   told us about observations, but not conversations.

12        MS. MKRTCHYAN:  No, he did.

13        MR. BECK:  No.  He addressed those other officers

14   that he's testified to.

11:42 15        MS. MKRTCHYAN:  You're just badgering the witness

16   this entire time.  It's just -- and confusing the

17   witness.

18             If your goal is to just --

19        MR. HARRELL:  Okay.  No.  No.  No.  Let's not talk

11:42 20   about goals.  Let's be as quiet as we can.

21        MS. MKRTCHYAN:  No.  Your goal -- what is your goal

22   today?  I don't understand.

23        MR. HARRELL:  My goal is to get through these

24   questions.

11:43 25             (Discussion off the record.)

**Jeremy Holloway - August 14, 2020**

1      MS. MKRTCHYAN:  Off the record.

2      MR. HARRELL:  No, not off the record.  Not with

3 you.  Not ever.

4      MS. MKRTCHYAN:  Very good.  Then on the record.

11:43  5         I am not going to let you badger my client.

6 Because if your goal is to just get a transcript that

7 it's incomprehensible with your vague and ambiguous

8 questions and argumentative questions, then I don't

9 know what you're going to establish, Counsel.

11:43 10         What are you trying to establish here?

11      MR. HARRELL:  Ma'am --

12      MS. MKRTCHYAN:  Are you trying to get what happened

13 to him, or you're trying to get a transcript that is,

14 like, complete nonsense?  Because your questions do not

11:43 15 make sense.  He's already confused.  I'm confused.

16 Everybody is confused where you're going with this.

17         So, you know, I need to take a break

18 because --

19      THE WITNESS:  I need to use the rest room.

11:43 20      MS. MKRTCHYAN:  Yeah, you know.  So at this point.

21      MR. HARRELL:  Okay.  We'll have a break.

22      MS. MKRTCHYAN:  Five minutes.

23      THE VIDEOGRAPHER:  We're going off the record.  The

24 time is 11:44 a.m.

11:51 25         (Recess.)

**Jeremy Holloway - August 14, 2020**

1      THE VIDEOGRAPHER:  We are now back on the record.

2   The time is 12:03 p.m.

3      MR. HARRELL:  Okay.  The group has decided to take

4   a lunch break.  So we're going to break for -- until,

12:03  5   like, about 12:30, 12:45, and we'll see everybody back

6   then.

7      MR. BECK:  All right.  Let's do it.

8      THE VIDEOGRAPHER:  We are now off the record.  The

9   time is now 12:03 p.m.

12:03  10          (Lunch recess to be from 12:03 p.m.

11      to 12:45 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Jeremy Holloway - August 14, 2020**

1        MR. HARRELL:  I have --

2        MS. MKRTCHYAN:  Excuse me.  Excuse me.  You know,

3    are you going to just treat me like, you know, someone

4    who has no right to speak?  Okay?  What is this?

01:04 5        MR. HARRELL:  The court reporter, ma'am, has

6    already asked you very courteously to refrain from

7    speaking when we're reading back a question.  So let's

8    get the question read back, and then if you feel the

9    need to say something, then say it.

01:04 10            But let's show courtesy to the court reporter

11   as much as we can.  Agreed?

12            That's what we like.  It looks like agreement.

13            So we're going to read it back.

14            (The following record was read:

15            "Q  And, sir, you understand -- as you're

16        dealing with your anger and you're upset when you

17        think about the incident, you understand that

18        law enforcement has responsibility to respond

19        to complaints of criminal conduct; right?")

01:05 20       MS. MKRTCHYAN:  Asked and answered.

21       THE WITNESS:  I can't answer that question.

22       Q    BY MR. HARRELL:  Why?

23       A    Because you're telling me how I'm feeling, and

24   so I can't answer that because that's not how I'm

01:05 25  feeling.

**Jeremy Holloway - August 14, 2020**

1        Q     Well, sir, you've already told us that you do

2   sometimes experience anger and upset when you think

3   about the incident; true?

4        MS. MKRTCHYAN:   Misstates the testimony.   Misstates

01:05   5   the testimony.

6        THE WITNESS:   Yes, I did say -- I did say that.

7             (Ms. Heathcote entered the deposition

8        proceedings.)

9        Q     BY MR. HARRELL:   Right.   So now we move on.

01:05  10   We try.   I'm trying to figure out why you're angry and

11   upset when you think about the incident from time to

12   time.

13             Do you understand?

14        A     Is that the question?   Why I'm upset?

01:05  15        Q     Sir, please respond to the question that I

16   just asked you.

17        A     Why am I upset?

18        Q     No.   That's not what I asked you, sir.

19        MS. MKRTCHYAN:   Badgering the witness.

01:05  20        Q     BY MR. HARRELL:   Please listen.   I know you're

21   trying.   I know you're new to the process.   I'll guide

22   you through it.   I'll try.   Just step by step by step.

23        MS. MKRTCHYAN:   You're badgering the witness.

24        Q     BY MR. HARRELL:   Do you understand that now

01:06  25   I'm trying to find out why you say that you're angry

**Jeremy Holloway - August 14, 2020**

```
 1    and upset from time to time when you think about the
 2    incident?  Do you understand?
 3        MS. MKRTCHYAN:  Objection.  Asked and answered.
 4    Badgering the witness.  Argumentative.
 5        Q    BY MR. HARRELL:  Sir?
 6        MS. MKRTCHYAN:  Do you understand his question?
 7        THE WITNESS:  I believe he's asking me why I'm
 8    angry about the incident.
 9        MS. MKRTCHYAN:  Right.
10        Q    BY MR. HARRELL:  No, sir.  That's a question
11    that I haven't asked you.
12        MS. MKRTCHYAN:  Well, then, make more clear
13    questions rather than argue with the deponent, you
14    know.
15        Q    BY MR. HARRELL:  Sir --
16        MS. MKRTCHYAN:  Nonsense of all type of
17    proportions.
18        Q    BY MR. HARRELL:  You do understand that law
19    enforcement has a responsibility to respond to
20    complaints of criminal conduct.  That's part of their
21    job.
22             You understand that; right?
23        A    As much as I can, being a civilian.
24        Q    And you understand, sir, that there was a
25    complaint of criminal conduct at the campground before
```

01:06 (line 5)
01:06 (line 10)
01:06 (line 15)
01:06 (line 20)
01:07 (line 25)

**Jeremy Holloway - August 14, 2020**

1    law enforcement appeared at your tent; true?

2        MS. MKRTCHYAN:  Vague and ambiguous.

3        THE WITNESS:  I understand that now.

4        MS. MKRTCHYAN:  Vague and ambiguous as to time.

01:07  5        Q    BY MR. HARRELL:  Do you hold it against law

6    enforcement for responding to the complaint of criminal

7    conduct at the campground, or do you think they just

8    should have ignored it?

9        MS. MKRTCHYAN:  How do you object to this type of

01:07 10   nonsense?

11       THE WITNESS:  This is --

12       MS. MKRTCHYAN:  Argumentative.  Objection.  Vague

13   and ambiguous.

14       THE WITNESS:  Yeah, I can't answer that question.

01:07 15       MS. MKRTCHYAN:  Wait a minute.  Let me finish my

16   objection.

17           Argumentative.  Vague and ambiguous.

18   Irrelevant.

19       Q    BY MR. HARRELL:  We're going to read it back

01:07 20   for you, sir.

21           And, ma'am, you're free to have a running

22   objection if that's what you would like to have.

23       MS. MKRTCHYAN:  No.  I have an objection to your

24   line of questioning because you are asking the

01:07 25   argumentative questions.  Badgering the witness.  That

**Jeremy Holloway - August 14, 2020**

1    is not likely to lead to admissible evidence.  Okay?

2              And if you are going to interrupt this and I

3    am going to call the magistrate and find out why is

4    this question that right now you're posing three times

01:08  5    is important.

6              The law enforcement has a job to do.  No.  Law

7    enforcement has a job to do, but your clients did not

8    have a right to beat the hell out of my client.

9         MR. HARRELL:  No.  No.

01:08  10         MS. MKRTCHYAN:  And if you, as an attorney, have no

11    sense of understanding and common sense as to what

12    happened, this is a victim of police brutality, and you

13    keep badgering him?  You think that your clients have

14    not committed a crime here?  So go after them, not my

01:08  15    client.

16              And he's not going to tolerate this type of

17    nonsense from a defense counsel who doesn't even bother

18    to wear his mask when we have a coronavirus.  Okay?

19    Seriously.

20         MR. HARRELL:  Ma'am, you're --

21         MS. MKRTCHYAN:  It just bothers me that you have no

22    sense of common sense and compassion.  Someone is

23    sitting in front of you who was beat up by your moron

24    clients.  Okay?  Your clients, your criminal clients

01:08  25    who are wearing a badge and are using that badge to

**Jeremy Holloway - August 14, 2020**

1    commit crimes, including falsifying reports.

2           And you are going to sit here and tell this

3    guy, who was a victim of police brutality, that he does

4    not understand the job of the law enforcement?  Yes, he

01:09  5    understands, but the job of law enforcement is not to

6    go and beat the hell out of people.

7           And you, as an attorney, your job is not just

8    to do your job, defend these kind of criminals, but to

9    do it with some degree of compassion.  Okay?  If you do

01:09  10   not have compassion, maybe you should not be an

11   attorney at all.

12          That's why this country is in this deep shit

13   that we are.  Okay?  People like you and people like

14   your clients.  That's all I've got to say.

01:09  15          The bottom line is that you know what?  I'm

16   going to take as many breaks as I want, and I may stop

17   this deposition because you're continuing to badger

18   this guy, who is a victim.  He's a victim that your

19   clients have ruined the life of, and you're telling him

01:10  20   what is the job of law enforcement?

21       MR. HARRELL:  Where are you going, ma'am?

22       MS. MKRTCHYAN:  I am taking a break because you

23   need to take five minutes to understand what it means

24   to be, you know -- to have common sense and compassion,

01:10  25   you know.

**Jeremy Holloway - August 14, 2020**

1    MR. HARRELL:  Okay.  Well, you take your break.

2    Try to pull yourself together.

3    MS. MKRTCHYAN:  No, but because you do not have a

4    clear understanding of what is the United States

01:10    5    Constitution and what this country's flag is all about.

6    Someone is sitting in front of you who has served you,

7    your country, and you're badgering him with nonsense,

8    stupid questions.

9    MR. HARRELL:  Okay.  We're off the record while

01:10   10    plaintiff's counsel tries to pull herself together.

11    THE VIDEOGRAPHER:  We're now going off the record.

12    The time is 1:10 p.m.

13    (Recess.)

14    THE VIDEOGRAPHER:  We are now back on the record.

01:23   15    The time is 1:23 p.m.

16    Q    BY MR. HARRELL:  Sir, do you hold it against

17    law enforcement that they responded to the complaint of

18    criminal conduct at the campground, or do you think

19    they should have just ignored that?

01:23   20    MS. MKRTCHYAN:  Objection.  Vague and ambiguous.

21    Argumentative.

22    THE WITNESS:  I don't hold any kind of grudge on

23    any kind of cop completing any kind of call that

24    dispatch gives to them.

01:24   25    Q    BY MR. HARRELL:  Okay.  So as you sit here

**Jeremy Holloway - August 14, 2020**

1    now, you understand why law enforcement was at the

2    campground; true?

3         A    At my campsite or the campground?

4         MS. MKRTCHYAN:  Vague and ambiguous.

01:24    5    Q    BY MR. HARRELL:  The campground.

6         A    I understand why they were at the campground.

7         Q    Okay.  You do believe that law enforcement had

8    no reason to focus on you the first time they went to

9    the campground on the date of the incident; true?

01:24    10    MS. MKRTCHYAN:  Vague and ambiguous.  Vague and

11    ambiguous.  Argumentative.

12         Q    BY MR. HARRELL:  True?

13         MS. MKRTCHYAN:  Do you understand the question?

14         THE WITNESS:  Yes, there's no evidence for them to

01:24    15    have any interactions with me.

16         Q    BY MR. HARRELL:  Okay.  Now, you are also

17    angry and upset about a search that was done of your

18    property?

19         A    Yes.  They searched my property without

01:24    20    consent, and they did it in a manner that was just

21    rude.  They just dumped my stuff, moved stuff around,

22    never asked any kind of permission.  At this point they

23    don't even know my name.

24         Q    So, sir, at the time of the incident, and

01:25    25    focusing on the first time law enforcement responded to

**Jeremy Holloway - August 14, 2020**

1        MS. MKRTCHYAN:  Objection.  Vague and ambiguous as

2   to "very next thing."

3        THE WITNESS:  Again, to my best of ability without

4   watching the video, I complained to the neighbors who

01:33   5   were fighting.

6        Q    BY MR. HARRELL:  There were -- okay.

7        A    Why they didn't tell the cops that it was them

8   when they were there harassing me.  I also had told the

9   officers that it was the people next door they were

01:33  10   looking for.

11        Q    This is during the first contact?

12        A    First incident, yes.  They didn't -- they

13   never bothered to go talk to them.

14        Q    Okay.  So at some point during the first

01:33  15   contact that you had with law enforcement on the date

16   of the incident, you told Deputy Renegar that the

17   people that they were looking for, the people that were

18   actually doing the fighting, was some other campers at

19   the campsite; true?

01:34  20        A    There's -- no.  There's a whole new campsite

21   next to mine.  There's campsite, campsite, campsite all

22   the way down.  So they were in the next campsite over.

23        Q    Okay.  Were they in a tent?  Were they in a

24   motor home?

01:34  25        A    There's two tents and two cars on their site.

**Jeremy Holloway - August 14, 2020**

```
       1        Q    Okay.  Let's just focus on these folks that
       2   are fighting.
       3        A    Two tents, two cars.
       4        Q    And they're right next door to you?
01:34  5        A    Right next to my campsite, across from the guy
       6   that called.
       7        Q    Okay.  Let me see if I have it.
       8        A    Okay.
       9        Q    The first time law enforcement responds to
01:34 10   your tent, during that interaction, at some point you
      11   tell Deputy Renegar that the people that they're
      12   looking for, the people that are actually fighting, are
      13   located at another campsite next to you?
      14        A    Yes.
01:35 15        Q    And you identify these people as being the man
      16   and the woman that were quarreling?
      17        A    Yes.
      18   MS. MKRTCHYAN:   Misstates the testimony.
      19        Q    BY MR. HARRELL:  And do you happen to know
01:35 20   what their name is?
      21        A    Never met them.
      22        Q    Do you happen to know what their name is?
      23        A    I never --
      24   MS. MKRTCHYAN:  Asked and answered.
01:35 25   THE WITNESS:  Yeah, I have no idea who they are.
```

```
 1    They're just in a campsite next to me.
 2         Q    BY MR. HARRELL:  Well, a lot has happened
 3    between then and now.
 4              I'm asking now, based on what you know now, do
 5    you know who their name is?
 6         A    I still don't know who they are, yes.
 7         Q    Okay.  But it was a man and a woman?
 8         A    Yes.
 9         Q    And how did you become aware that they were
10    fighting?
11         A    Because you could hear him hitting her and her
12    saying, "See what he's doing to me?  See what he's
13    doing to me?"
14         Q    And when did this happen in relation to law
15    enforcement showing up outside your tent?
16         A    To be honest, it happened sometime during the
17    night.  It kind of woke me up.  I just went back to
18    sleep.  So I couldn't tell you what time.
19         Q    All right.  So at some point during the
20    evening that preceded the incident in the run-up to the
21    incident, you were woken up from your sleep in your
22    tent by the sounds of a man and a woman who appeared to
23    be in a quarrel?
24         A    Correct.
25         Q    And what did you hear?
```

01:35 (line 5)
01:35 (line 10)
01:36 (line 15)
01:36 (line 20)
01:36 (line 25)

**Jeremy Holloway - August 14, 2020**

1      MS. MKRTCHYAN:  Asked and answered.

2      THE WITNESS:  Yeah.  I just said that you could

3  hear, like, wrestling and her just, "Look at what he's

4  doing.  Look what he's doing."

01:37  5      Q    BY MR. HARRELL:  Did you hear anything else at

6  that time?

7      A    Like I said, it just sounded like a scuffle.

8      Q    Sounded like what?

9      A    A scuffle.

01:37  10     Q    Did you go outside your tent to investigate?

11     A    No.

12     Q    So what did Deputy Renegar say when you said

13  to him, "The people that you're looking for are in the

14  adjacent campsite in this tent right next to me?"  What

01:37  15  did he say, if anything?

16     A    Same thing he's been saying the whole night.

17     Q    What?

18     A    Nothing.

19     Q    Just silence?

01:37  20     A    Silence.  Continue to harass me.

21     Q    Okay.  And that made you angry?

22     A    I was ready for them to leave, yeah.

23     Q    One more time?

24     A    I was ready for them to leave my site.

01:38  25     Q    Okay.  When you identified the man and the

**Jeremy Holloway - August 14, 2020**

1    woman, at least their tent that you had heard sounds of

2    a fight coming from, Deputy Renegar, as near as you

3    could tell, just completely ignored you?

4        A    Correct.

01:38  5        Q    He didn't take any steps to investigate that?

6        A    No.  He heard me.  He heard what I said.  He

7    looked at me.  He acknowledged, but not with words.

8        Q    He didn't walk over to the campsite and have

9    any interaction with those campers that you identified

01:38  10   as the people involved in the fight; true?

11       A    He never did nothing.

12       Q    Okay.  Just continued to harass you?

13       A    Just continued to harass me and then left my

14   site, left the campground.

01:38  15       Q    Okay.  So when you returned to your campsite,

16   what's the next thing that happened, the very next

17   thing?

18       A    We're talking past me confronting the

19   neighbors?  Because I told you that.

01:39  20       Q    Yeah.  I'm sorry.  Sometimes I can't read my

21   own writing.

22       A    Okay.

23       Q    All right.  So you get back to your --

24       A    So I get back to my tent.  I confront the

01:39  25   neighbors on why they didn't speak up when they heard

**Jeremy Holloway - August 14, 2020**

1    me getting harassed and, you know, all my stuff getting

2    thrown around, and then nobody responds.

3         Standing in front of my tent, and I see -- it

4    had to have been about five police SUVs coming with the

01:39    5    lights on.

6    Q    Okay.  Thanks for giving me time to jot things

7    down.

8         So when you got back to your campsite, you had

9    some questions that included why didn't these neighbors

01:40   10   speak up and identify themselves as the people that had

11   been involved in the quarrel; true?

12   MS. MKRTCHYAN:   Objection.  Vague and ambiguous.

13   Misstates the testimony.

14   THE WITNESS:  I asked them, yeah, straight up.  I

01:40   15   asked them why.

16   Q    BY MR. HARRELL:  Now, when you asked them why,

17   were they inside of your tent --

18   A    They were inside of their tent.

19   Q    Okay.  Could you tell whether or not they were

01:40   20   awake or asleep?  Were you ever able to make any type

21   of determination there?

22   A    Soon the whole campsite was awake.  That

23   campground after the noise that the sheriffs were

24   making.  So I'm sure everybody was awake.

01:40   25   Q    Okay.  So as a result of law enforcement's

Jeremy Holloway - August 14, 2020

1    first appearance at your campsite, the conclusion that

2    you drew was everybody in the adjacent campsites was

3    now awake because of that noise; true?

4        A    Correct.

01:41    5        Q    Okay.  And you made that assumption about your

6    neighbors who you believe to have been involved in the

7    fight?

8        A    Yes.

9        Q    And so you went -- appeared outside of their

01:41   10    tent, and you say what?

11        A    No.  I was in my own -- in front of my own

12    tent.  I didn't go anywhere near their campsite.  I

13    didn't go to no one's campsite, ever.

14        Q    All right.  So you wanted to confront the

01:41   15    neighbors that had been involved in the fight that you

16    were being blamed for; right?

17        A    Confront?  No.  Just saying, "Hey, why didn't

18    you guys go out?"  I was letting them know, "Hey, why

19    wouldn't you guys do anything?  Nobody said nothing and

01:41   20    I was" --

21        Q    That's what I was going to ask you.

22             So you're at your tent.

23             The neighbors that were involved in the fight

24    are how far away from you?

01:42   25        A    A good 20 feet, 30 feet.

Carroll Sells Court Reporting Service
(562) 799-9100

159

**Jeremy Holloway - August 14, 2020**

1    THE WITNESS:  Just, yeah, like I complained to

2    their kicking.  I told them to stop.  This is all

3    during while they're punching me.  I'm just growling.

4         Again, I'm barely conscious, fearing for my

02:41  5    life, being hit in the head.  I'm not saying much to

6    anybody.  I'm just trying to survive at this point.

7         Q    BY MR. HARRELL:  Okay.  Now, you've told us

8    that you were kneed in the head on multiple occasions

9    when you were down on the ground; true?

02:41  10         A    Yes.

11         Q    Were you ever punched in the head when you

12    were down on the ground or kicked in the head?

13         MS. MKRTCHYAN:  Asked and answered.

14         THE WITNESS:  From what I -- yeah, from what I

02:41  15    know, it's kneed.  From what I remember, being kneed.

16         Q    BY MR. HARRELL:  Okay.  So after this minute

17    of being down on the ground, restrained and being

18    subjected to force in the manner that you've told us

19    about, what's the next thing that happens, the very

02:41  20    next thing?

21         A    Then they tase me.

22         Q    Okay.  Who tases you?

23         A    I don't know.  I was on my stomach.

24         Q    Okay.  So how did you get on your stomach?

02:42  25         A    I'm guessing Renegar let go of my neck, then

**Jeremy Holloway - August 14, 2020**

1    someone grabbed my arm and pulled me to my stomach.

2         Q    Okay.  Well, we don't want you to guess.

3         A    I just remember my arms being pulled and me

4    ending up on my stomach.

02:42  5         Q    Okay.

6         A    So if I'm like this, they grab one arm, and

7    then I ended up on my stomach.

8         MS. MKRTCHYAN:  For the record, let me describe

9    what the witness did.  Basically --

02:42 10         MR. HARRELL:  Maybe that's my job.

11         MS. MKRTCHYAN:  Okay.  Do it.

12         MR. HARRELL:  It's all good.

13         Q    So, sir, we heard the word "guess," and we

14    don't want to hear that.

02:42 15         MS. MKRTCHYAN:  Well, I want the record to

16    reflect --

17         Q    BY MR. HARRELL:  If we hear the word "guess,"

18    that causes problems.

19              Okay?

02:42 20         A    Okay.

21         Q    So let me ask you --

22         MS. MKRTCHYAN:  Are you going to let me to make the

23    record clear, Counsel?

24         MR. HARRELL:  Well, if I can just get my question

02:42 25    out, and then we'll see what happens next.

**Jeremy Holloway - August 14, 2020**

1    MS. MKRTCHYAN:  Well, he made a demonstration, and
2    I wanted to make a record.
3        MR. HARRELL:  Right.  But he also told us --
4        MS. MKRTCHYAN:  It's your deposition.  Fine.
02:43  5    MR. BECK:  Narine, you got this thing on videotape.
6        MS. MKRTCHYAN:  I understand.  But what if that
7    video gets destroyed?  How am I going to know if that
8    video is not going to get destroyed?  A lot of things
9    have happened.  911 call does not exist right now.  So
02:43 10   anyway, that's fine.
11       MR. HARRELL:  All right.  Well, I'll let
12   plaintiff's counsel sort out their conversation later.
13   I'd like to ask a question, and my question is as
14   follows:
02:43 15   Q    Sir, can you tell us without guessing how you
16   got from lying on top of Renegar to being facedown on
17   the ground?  Can you tell us that without guessing?
18   A    I can't tell you exactly how they did it using
19   maybe some kind of sheriff move, but I know from --
20   Q    Right.
21   A    -- I got moved to the ground.  I don't know
22   how they did it.
23   Q    All right.  Fine.
24   A    Okay.
02:43 25   Q    Fine.  That's all that we need.

**Jeremy Holloway - August 14, 2020**

```
         1   fight back like Spiderman to save myself.
         2       Q    BY MR. HARRELL:  Okay, sir.  Well, you don't
         3   have a Spiderman suit, do you?
         4       A    No.  Don't have a time machine neither.
03:28    5       Q    Okay.  But going back, looking at the
         6   incident, the way that it happened, is there anything
         7   that you did that you would change --
         8       MS. MKRTCHYAN:  Vague and ambiguous.
         9       Q    BY MR. HARRELL:  -- or would you conduct
03:28   10   yourself the exact same way that you did and not change
        11   a thing?
        12       A    I would have called 911 --
        13       Q    Okay.
        14       A    -- on the officers that were beating me.
03:28   15       Q    Okay.  Is there anything else that you would
        16   change?
        17       A    No.
        18       Q    All right.  You believe that you conducted
        19   yourself during the incident with respect?
03:28   20       A    Yes.
        21       Q    You believe that you were doing nothing that
        22   warranted law enforcement being on scene?
        23       A    Correct.
        24       Q    You believe that you were doing nothing that
03:29   25   warranted being punched in the face?
```

**Jeremy Holloway - August 14, 2020**

```
         1        A     Correct.

         2        Q     To the contrary, you were doing exactly as law

         3   enforcement asked --

         4        MS. MKRTCHYAN:  Objection.

03:29    5        Q     BY MR. HARRELL:  -- in an effort to help them

         6   not to have any officer safety concerns; true?

         7        MS. MKRTCHYAN:  Objection.  Vague and ambiguous.

         8   Argumentative.

         9             Do you understand that question as it is posed

03:29   10   to you?

        11        THE WITNESS:  Well, he's asking the question as if

        12   officers asked the questions, which nobody answered --

        13   asked me a question.

        14        Q     BY MR. HARRELL:  Okay.  The two of you are

03:29   15   having a conversation that I'm vague and ambiguous on.

        16   I don't know what you guys are saying.

        17        MS. MKRTCHYAN:  Oh.

        18        Q     BY MR. HARRELL:  So we're just going to read

        19   the question back.  How about respond to my question,

03:29   20   and then I'll do as I've done any number of times

        21   today.  I will move on after I get an answer to the

        22   question.

        23        MS. MKRTCHYAN:  Well, your question is vague and

        24   ambiguous.  If you don't want a paraphrase, I will

03:29   25   instruct him not to answer because it's not a proper --
```

**Jeremy Holloway - August 14, 2020**

1    it's not a fair question, and you know it.

2         MR. HARRELL:   Okay.   Let's everybody be as quiet as

3    we can and let the court reporter read.

4         MS. MKRTCHYAN:   Well, you know, there's going to be

03:30   5    an instruction not to answer unless you paraphrase that

6    type of vague and ambiguous question that is assuming

7    facts not in evidence.

8         MR. HARRELL:   It sounds like to me that you're

9    losing the quiet game.   So let's everybody be --

03:30   10        MS. MKRTCHYAN:   Excuse me.

11        MR. HARRELL:   -- as quiet --

12        MS. MKRTCHYAN:   Excuse me.

13        MR. HARRELL:   Let's everybody be as quiet as they

14   can.

03:30   15        MS. MKRTCHYAN:   Excuse me.   You are not my

16   grandfather, as much as you wish you were.

17        MR. HARRELL:   Actually --

18        MR. BECK:   Enough.   That's enough.   That's enough.

19        MS. MKRTCHYAN:   That's the most sexist attitude I

03:30   20   can get from a man saying be quiet.   Okay.

21        MR. BECK:   This is not moving this deposition

22   forward and --

23        MS. MKRTCHYAN:   No, but that's the most dumbest

24   question I've ever heard.

03:30   25        MR. BECK:   Enough.

**Jeremy Holloway - August 14, 2020**

1    MS. MKRTCHYAN:  Anyway -- and you are the second
2   grandfather.
3        MR. BECK:  Enough.
4        MR. HARRELL:  Okay.  Let's everybody take a deep
03:30  5   breath and --
6        MS. MKRTCHYAN:  I've instructed him not to answer.
7   So that question you need to paraphrase, Counsel.
8            Okay?  Can you paraphrase?  Can you make an
9   effort to paraphrase a question that is inappropriate
03:31 10   and argumentative?  I'm sure you can.  You have that
11   articulation abilities.
12        MR. HARRELL:  One of the reasons why I've been
13   asking for a readback is because of all the colloquy,
14   I've lost the question.
03:31 15        MS. MKRTCHYAN:  Okay.  Go ahead.  I just can't
16   believe it.
17            Please, Court Reporter, Ms. Court Reporter, we
18   appreciate your patience today.
19            (The following record was read:
20            "Q  To the contrary, you were doing
21        exactly as law enforcement asked in an effort
22        to help them not to have any officer safety
23        concerns; true?")
24        MS. MKRTCHYAN:  How can someone ask this type of
03:32 25   a -- answer this type of a question?  Vague and

**Jeremy Holloway - August 14, 2020**

```
 1    of your negative experiences during the incident; true?

 2         A    Hundred percent of why I left California.

 3         Q    One more time?

 4         A    It's a hundred percent why I left California.

 5         Q    Okay.  Well, sir, there are some other

 6    reasons; right?

 7         MS. MKRTCHYAN:  Argumentative.  Vague and

 8    ambiguous.  Calls for speculation.

 9         THE WITNESS:  No.

10         Q    BY MR. HARRELL:  Sir, do you know what a

11    warrant is?

12         A    Yes, I do.

13         Q    What is a warrant, as you understand it?

14         A    It's when you're in trouble by the law and

15    they're asking for you to come and take care of what

16    you need to take care of.

17         Q    It's an order by a judge for officers to

18    arrest you and bring you to the judge; right?

19         A    Yes.

20         MS. MKRTCHYAN:  Calls for a legal conclusion.

21         Q    BY MR. HARRELL:  Are there any warrants out

22    for your arrest now in the state of California, to your

23    knowledge?

24         A    No.

25         Q    Not even one?
```

**Jeremy Holloway - August 14, 2020**

1        A      No.

2        Q      Okay.  Is part of the reason why you left the

3    state of California to try to get away from warrants

4    that are out for your arrest?

04:08  5        A      No.

6        Q      Okay.  Now, sir, you are aware that we have

7    requested your social media postings, including from

8    Facebook; true?

9        A      Yes, I am aware.

04:08  10       Q      Are you prepared to turn those over to us?

11       MS. MKRTCHYAN:  No.  Objection.  First of all,

12   attorney-client privilege.  Attorney work product.

13           So he's instructed not to answer that question

14   because that's not his purview.

04:08  15       Q      BY MR. HARRELL:  Sir, do you have any problem,

16   you personally, turning over your Facebook postings to

17   us?

18       MS. MKRTCHYAN:  Objection.  You are instructed not

19   to answer.  You're instructed not to answer.

04:09  20       Q      BY MR. HARRELL:  Sir, you have become aware

21   that we are asking for your Facebook postings; true?

22       MS. MKRTCHYAN:  Asked and answered.  Move on.

23   Instructing not to answer.  This is attorney-client

24   privilege.  He would not be able to answer that

04:09  25   question really without disclosing attorney-client

**Jeremy Holloway - August 14, 2020**

1    privileged communications.  Therefore, move on,

2    Counsel.

3         Q    BY MR. HARRELL:  Sir, you did take some action

4    after you learned that we were seeking your Facebook

04:09   5    postings; true?

6         MS. MKRTCHYAN:  Instruct you not to answer any of

7    that.

8              That's, again, attorney-client privilege, and

9    he will not be able to answer that question without --

04:09   10    without discussing and -- without sharing attorney-

11    client privileged communications.

12              Therefore, you're instructed not to answer.

13         Q    BY MR. HARRELL:  Sir, after you learned that

14    we were seeking your Facebook postings, you switched

04:10   15    your account to private; right?

16         MS. MKRTCHYAN:  Again, objection.

17              You're instructed not to answer.

18              And, Counsel, are you going to continue going

19    into attorney-client privileged communications?

04:10   20         Q    BY MR. HARRELL:  Sir, after you learned that

21    we were after -- are you instructing him not to answer?

22         MS. MKRTCHYAN:  Yes.  Yes.  And I'm asking you to

23    move on with this line of questioning because it goes

24    into attorney-client privileged communications.  What I

04:10   25    instructed my client, what he did or did not do, it's

**Jeremy Holloway - August 14, 2020**

1    none of your business frankly, and that is

2    attorney-client privilege.

3         So if you continue with this line of

4    questioning, I'm going to stop this deposition.

04:10    5    Q    BY MR. HARRELL:   Sir, after you learned that

6    we wanted to see your Facebook postings, you did more

7    than switch it to private; you closed and deleted your

8    entire account; true?

9    MS. MKRTCHYAN:   Objection.   Objection.   You know

04:10   10   what?   We are going to stop this because you are going

11   into areas where it's attorney-client privilege.   It's

12   none of your business what he did and did not do at

13   what instructions.

14   MR. HARRELL:   It is.   When he destroys evidence, it

04:11   15   is.

16   MS. MKRTCHYAN:   Oh, really?   Oh, really?   What

17   evidence?   You giving me some -- here, this is your

18   evidence.

19         Do you want me to show you what evidence

04:11   20   you've given me?   I'm going to show it to you.   Here.

21   Here.   It's nonsense.

22   MR. BECK:   Hey, don't.

23   MS. MKRTCHYAN:   No.   That's nonsense.   I want them

24   to see that someone, a victim of police brutality, is

04:11   25   going to become part of your police reform.   This is

**Jeremy Holloway - August 14, 2020**

```
 1   your evidence.  Okay?

 2           If you have any decent question for my client,

 3   you can go ahead.  But this is -- I'm doing this for

 4   the record, and I will do this for you to satisfy your

 5   nonsense questionnaire, you know.

 6           Go ahead.  That is your evidence, which is

 7   junk.  Okay?  Junk.

 8           And if you continue badgering my client,

 9   again, as a victim of police brutality, this is 4:11.

10   I will stop this deposition, and we'll go, and we will

11   not resume it without permission of a magistrate.

12   Okay?

13           I have a right to tell my client what to do

14   and what not to do.  It's none of your business.  Okay?

15   If you have a legitimate question about your junk

16   evidence, go ahead and ask it.  That's the only

17   question, you know, you are permitted to ask.

18       MR. HARRELL:  Are you saying that you told your

19   client to destroy evidence that we were asking for?

20       MS. MKRTCHYAN:  It's attorney-client privilege,

21   Counsel.  Okay?  Attorney-client privilege.

22           When you come and disclose to me what you told

23   your clients in lying at their depositions to cover up

24   their criminal activities to avoid criminal prosecution

25   by U.S. Attorney's office, which I will ensure will
```

**Jeremy Holloway - August 14, 2020**

1    happen at some point, then we'll disclose my

2    communications with my client.

3           But at this point your Facebook nonsense, this

4    stuff, this Facebook nonsense that you have been

04:12   5    showing me as your supplemental disclosure, this is all

6    you've got?  For this case against my client?  Then

7    you're really in good shape.

8           So -- but I'm instructing you not to answer

9    any questions that relates to attorney-client

04:13  10    privileged communications, and we will move on from the

11    subject.  Otherwise, I'm going to stop this deposition.

12        MR. HARRELL:  Let me just make my record, and if

13    you'd like to make an instruction not to answer, you're

14    free to do that.  But let me just get my record out

04:13  15    there.

16        Q    Sir --

17        MS. MKRTCHYAN:  You're not going to ask him any

18    other questions about this.

19        MR. HARRELL:  Let me just make my record.

04:13  20        MS. MKRTCHYAN:  You're not.  You make your record

21    without dealing with my client.  Okay?  I already told

22    you that's attorney-client communications.

23        MR. HARRELL:  If I may make my record and you make

24    your objections, and we'll see where we go.

04:13  25        MS. MKRTCHYAN:  I already made my objections.

**Jeremy Holloway - August 14, 2020**

1    You're not allowed to ask another question of this to

2    my client.

3        Q     BY MR. HARRELL:   Sir, after you learned that

4    we were seeking --

04:13  5        MS. MKRTCHYAN:   We're getting up.   No.   Let's get

6    up.   Because you know what?   You're continuing to ask

7    the same question going into attorney-client privileged

8    communications.   Thank you.

9             So if you're not going to move onto another

04:14 10    topic that does not infringe upon my client's right to

11    privilege, I will stay here.

12             Do you have another question?

13        MR. HARRELL:   I was trying to get my question out,

14    and somebody interrupted.

04:14 15        MS. MKRTCHYAN:   Well, because you are asking the

16    same exact question.   I already know what question

17    you're asking, because you are already assuming

18    something of my client.   So I'm not going to let that

19    happen.   Okay?

04:14 20             So we're going to take a break.   Let's take a

21    break, and you think about what is attorney-client

22    privilege, and then we'll go forward.

23        THE VIDEOGRAPHER:   We are now going off the record.

24    The time is 4:14 p.m.

04:14 25             (Recess.)

**Jeremy Holloway - August 14, 2020**

1        THE VIDEOGRAPHER:   We are now back on the record.

2   The time is 4:24 p.m.

3        Q     BY MR. HARRELL:   Sir, you have now deleted

4   your Facebook account; true?

04:24   5        MS. MKRTCHYAN:   Objection.   Vague and ambiguous.

6   Calls for speculation.

7        If you can answer that question -- do you feel

8   comfortable answering that question?   Do you understand

9   that question?

04:24   10       THE WITNESS:   Yes, I do.

11       MS. MKRTCHYAN:   Okay.

12       THE WITNESS:   Yes, I did recently delete my

13   Facebook account.

14       Q     BY MR. HARRELL:   And you did that for a

04:24   15   reason; true?

16       A     It was making me upset.

17       Q     Sir, you deleted your Facebook account because

18   you didn't want us to have access to it; true?

19       MS. MKRTCHYAN:   Objection.

04:24   20       THE WITNESS:   Nothing to hide on Facebook.

21       MS. MKRTCHYAN:   It's argumentative.   Wait a minute.

22   Objection.   It's argumentative.

23       Q     BY MR. HARRELL:   Sir?

24       MS. MKRTCHYAN:   You are instructed not to answer to

04:24   25   a question like that.

**Jeremy Holloway - August 14, 2020**

1        THE WITNESS:  Okay.

2        Q    BY MR. HARRELL:  Sir, is there someone that

3    told you to delete your Facebook account?

4        MS. MKRTCHYAN:  Objection.  Argumentative.

04:25 5    Objection.

6            If -- Counsel, if you're going to continue

7    with this line of questioning, we are not going to

8    continue with this deposition.  Okay?  Because you're

9    not entitled to know those -- that line of questioning.

04:25 10   Okay?

11           So what is the relevance, first of all?  Make

12   an offer of proof as to what is the relevance of

13   someone's Facebook account to this case, number one.

14   What is the relevance of that?

04:25 15           Number two, you know, you're badgering my

16   client.

17           Number three, you're asking him questions that

18   necessarily go into attorney-client privileged

19   communications and discussions.

04:25 20           Therefore, I'm instructing him not to answer.

21   Thank you.

22       Q    BY MR. HARRELL:  Sir, part of the reason why

23   you deleted your Facebook account is because you

24   realized that it harmed your lawsuit; true?

04:26 25       MS. MKRTCHYAN:  Objection.  Same instruction.

**Jeremy Holloway - August 14, 2020**

1          Counsel, we are going to walk out.  If you're

2    going to continue with this, we're going to walk out.

3       MR. HARRELL:  Is there an instruction?

4       MS. MKRTCHYAN:  Yes.  Because you are badgering my

04:26  5    client.

6          Do you have any evidence that Facebook account

7    in any way has harmed or might harm my client?  Do you

8    have any evidence?  Unless you have good-faith belief

9    that trash that you've produced as your supplemental

04:26  10   disclosures has anything to do with this lawsuit, you

11   know, you can ask my client those questions.

12          But him, it's his business to have a Facebook

13   account or not have a Facebook account.  Therefore, you

14   are not entitled to that information.

04:26  15          Therefore, if you continue with this

16   badgering, we will walk out of this deposition.

17          Do you have any other questions?

18       MR. HARRELL:  Is there an instruction?

19       MS. MKRTCHYAN:  Yes.

04:26  20          Do you have any other questions?

21       MR. HARRELL:  What's the instruction?

22       MS. MKRTCHYAN:  Instruction not to answer this line

23   of questioning.

24       MR. HARRELL:  Mark it.

04:27  25       MS. MKRTCHYAN:  Because you're -- yes.

**Jeremy Holloway - August 14, 2020**

1    reporter to get the words down.  I was putting my hand
2    up as a signal to you.  Object all that you want, all
3    that you think will --
4         MS. MKRTCHYAN:  Your hand gesture --
04:34  5    MR. HARRELL:  -- serve your client's interest, but
6    just wait until I have my words out.
7         MS. MKRTCHYAN:  Oh, really?  You're finished, and I
8    was objecting, and you're not happy with my objections.
9    You know, you have --
04:35 10    MR. HARRELL:  Ma'am, please stop.  I want to ask a
11   question.
12        MS. MKRTCHYAN:  You asked a question and I'm
13   objecting.  I objected.
14            So can you clarify your question?
04:35 15    MR. HARRELL:  Can we get a readback on the pending
16   question?
17        MS. MKRTCHYAN:  This is going to be funny.  Instead
18   of going into more legitimate areas of inquiry --
19        MR. HARRELL:  Please stop talking.  We're trying to
04:35 20   get a readback.
21        MS. MKRTCHYAN:  -- you're making this deposition
22   into some --
23        MR. HARRELL:  You've got to stop talking.  Stop,
24   please.
04:35 25    MS. MKRTCHYAN:  -- circus.  That's what this is.

**Jeremy Holloway - August 14, 2020**

 1  Facebook posts.  If that's all you have, you're in very
 2  good trouble.
 3      MR. HARRELL:  Ma'am, I'm going to go to the
 4  magistrate judge, and I'm going to ask him to bring
04:35 5  your client back.
 6      MS. MKRTCHYAN:  I will.  I will go to the
 7  magistrate to stop this, and I will walk away.  Okay?
 8  And my client is not going to come back for another
 9  deposition.
04:35 10      MR. HARRELL:  Maybe the judge will have the final
 11  word on that, ma'am.
 12      MS. MKRTCHYAN:  Well, you know what?  I'm sorry.  A
 13  lot of the things right now are still up in the air in
 14  this country.  So whether you have a judge saying
04:35 15  something or the president saying something, it really
 16  doesn't matter anymore.  Okay?
 17      MR. HARRELL:  It doesn't matter to you what the
 18  judge says?
 19      MS. MKRTCHYAN:  Right now what I care is my client
04:36 20  being badgered by you and your condescending behavior
 21  toward me.
 22      MR. HARRELL:  Ma'am, are you saying it doesn't
 23  matter to you what the judge says?
 24      MS. MKRTCHYAN:  At this point all I care is what
04:36 25  the books say.  I don't care what one specific judge

**Jeremy Holloway - August 14, 2020**

1 ==says or does not do.  Nobody is above the law.==

2      MR. HARRELL:  Okay.  Then we're not going to be

3 able to accomplish much in this lawsuit if you don't

4 respect the judge.

04:36  5      MS. MKRTCHYAN:  Don't put words in my mouth.  What

6 I care, I respect the law.  But you do not think -- do

7 you think that anyone is above the law?  Your

8 clients --

9      MR. HARRELL:  Ma'am, all that I'm asking --

04:36 10      MS. MKRTCHYAN:  Anyway, I'm not going to go into

11 this philosophical exchange.

12      MR. HARRELL:  -- is for you to stop talking --

13      MS. MKRTCHYAN:  No.

14      MR. HARRELL:  -- so that we can get a readback on

04:36 15 the question.

16      MS. MKRTCHYAN:  We are going to end the deposition

17 in half an hour if you do not finish this.  Okay?

18      MR. HARRELL:  Ma'am --

19      MS. MKRTCHYAN:  We are going to finish.  I'm giving

04:36 20 you half an hour.  This is right now -- no, not even.

21 This is 4:36.  You have until 5:00 to finish this

22 deposition or I'm walking out, period, because you're

23 wasting my time.  First, you go with nonsense, you

24 know, questionnaire.

04:36 25      MR. HARRELL:  Ma'am, we can't even get a readback

Jeremy Holloway - August 14, 2020

```
 1   on the question because you won't stop talking.
 2       MS. MKRTCHYAN:  Well, because you are out of
 3   control.  Your hand gesture and now you're putting
 4   words in my mouth that I don't believe a judge?
 5   Seriously?  I'm telling you --
 6       MR. HARRELL:  Ma'am, please stop talking so we can
 7   get a readback to the question.
 8       MS. MKRTCHYAN:  Then, you know, move on.  Move on
 9   with your questioning and move on with legitimate areas
10   of inquiry, Counsel.
11       MR. HARRELL:  Ma'am, please stop talking so we can
12   get a readback of the question.  Thank you.
13           (The following record was read:
14           "Q  Sir, we start broadly, and then we
15       narrow it down.
16               "Have you made postings on your
17       Facebook account that express negative views
18       about law enforcement?  Yes, no, or I don't
19       know?")
20   Q    BY MR. HARRELL:  Ever.
21       MS. MKRTCHYAN:  Vague and ambiguous as to time.
22   Argumentative.
23   Q    BY MR. HARRELL:  Ever.
24       MS. MKRTCHYAN:  If you recall, without looking at
25   posts specifically.  Can you answer that question
```

04:37 (lines 5, 10, 20, 25)

**Jeremy Holloway - August 14, 2020**

1      Q    This is from your waist up to your neck.

2           Did you suffer any observable physical

3   injuries?

4      A    Yes.

05:27  5      Q    Okay.  What?

6      A    I had bruising all up and down my ribs and

7   back.

8      Q    Did you take photographs of those?

9      A    Yes, I did.

05:27 10      Q    How many photographs did you take of the

11  bruising to your ribs and your back?

12      MS. MKRTCHYAN:  Calls for speculation.

13           If you recall how many.

14      THE WITNESS:  I took pictures of every -- all the

05:28 15  area.  I mean, eight of them are pretty good.  I took

16  50.

17      Q    BY MR. HARRELL:  All right.  That's a lot of

18  information.

19      A    Correct.

05:28 20      Q    You took 50 photographs total of the physical

21  injuries to your body; true?

22      A    Yes.

23      Q    How many photographs did you take of the

24  bruising up and down your ribs and your back?

05:28 25      MS. MKRTCHYAN:  If you recall.

**Jeremy Holloway - August 14, 2020**

1      THE WITNESS:  I took 50 photographs.

2      Q    BY MR. HARRELL:  Right, sir.  And we've got

3   that, and that's been typed.  I promise you.  My

4   question has another focus now.

05:28  5          How many -- and with regret, I repeat my

6   question.

7          How many injuries did -- strike that.

8          How many photographs of the bruising that

9   you've talked about to your ribs and back -- how many

05:28 10   photographs of that were taken?

11      MS. MKRTCHYAN:  Do you remember?  If you recall.

12      THE WITNESS:  Taken 50 photographs.

13      MS. MKRTCHYAN:  Altogether?

14      THE WITNESS:  Of everything.

05:28 15      MS. MKRTCHYAN:  Right.  But he's asking

16   specifically of this area, if you remember.

17      THE WITNESS:  I have -- I mean --

18      MS. MKRTCHYAN:  If you remember.

19      THE WITNESS:  No.  I mean, that's why I'm saying 50

05:29 20   is a good number.

21      Q    BY MR. HARRELL:  Right, sir, but we're trying

22   to focus now on just photographs of your ribs and your

23   back.

24      A    Well, that's what I'm saying.  I have of

05:29 25   everyone -- the amount of pictures doesn't matter.

**Jeremy Holloway - August 14, 2020**

1    It's the amount of pictures -- like, I have a picture

2    of this side.  I have a picture of this side.  I have a

3    picture up here, here.

4        MS. MKRTCHYAN:  He's asking, if you remember, how

05:29  5    many of each side.  But if you don't remember, you can

6    say "I don't remember."

7        THE WITNESS:  I don't remember the exact number.

8        MS. MKRTCHYAN:  Exactly.

9        MR. BECK:  The record should also reflect that as

05:29  10   he answered that question, he mentioned putting his

11   hands on the right thorax side and the left thorax side

12   and on the right pectoral and the left pectoral side to

13   demonstrate what the pictures were of.

14       MS. MKRTCHYAN:  And those pictures, the record will

05:29  15   be accurate, were produced as part of the discovery to

16   the defense.  So the photos speak for themselves.

17           If you doubt that the photos were taken --

18       MR. HARRELL:  I would now like to ask another

19   question.

05:30  20       MS. MKRTCHYAN:  Excuse me.  Excuse me.  This is

21   ridiculous.  Are you going to let me make my record?

22       MR. HARRELL:  I thought you were finished.

23       MS. MKRTCHYAN:  No, I was not.  Have some decency.

24   Have some respect, man, you know.  What is this?

05:30  25           Do you do with with every female attorney or

Jeremy Holloway - August 14, 2020

```
 1    every attorney?  I did not make my record.
 2            I said that this record, photos have been
 3    produced.  If you have any doubt about, you know, what
 4    those photos represent, you can look at them yourself
 5    and ask my client to look at them and verify.
 6            Now I'm done.
 7        MR. HARRELL:  Then we move on.
 8        MS. MKRTCHYAN:  Jesus Christ.
 9        Q    BY MR. HARRELL:  Sir, did you receive any
10    injuries to your genitals as a result of the incident?
11        A    No.
12        Q    Did you receive any injuries to either one of
13    your legs?
14        MS. MKRTCHYAN:  Visible?  Are we talking -- vague
15    and ambiguous.  Visible, observable injuries or
16    internal injuries?
17        Q    BY MR. HARRELL:  Sir, did you receive any
18    visible, observable injuries to your legs?
19        A    No.
20        Q    Did you receive any visible, observable
21    injuries to your feet?
22        A    No.
23        Q    Did you receive any visible, observable
24    injuries to your buttocks?
25        A    Yes.
```

05:30 at lines 5, 10, 15, 20 and 05:31 at line 25.

pg 7 LINE 22, I REALLY DONT KNOW EXCACT NUMBER
I CANT ANSWER THOSE QUESTIONS FROM MEMORY

pg 37-38, HAVING A HARD TIME WITH WORK
HISTORY. CANT ANSWER FROM MEMORY

pg 40   APEX  TIMELINE IS PROBABLY INCORRECT

pg 43-44 I DONT KNOW MARRIAGE DATES & DEFENSE
WOULD NOT ACCEPT "IDONT KNOW"

pg 69 LINE 18,  I SAID 18TH IS HAS
PRINTED 8

pg 82   I TOLD DEFENSE "IDONT KNOW" WHICH
HE THEN FORCED A GUESS. ABOUT RENEGARS
AGE.

pg 103  23-25, "HE SAID AT LEAST 10 CALLS
WERE PLACED ON ME PERSONALLY"

pg 136 LINE 7, HARRASSING

pg 233 17, NOT SURE WHAT I WAS ANSWERING

pg 245 3, "HOSPITAL" NOT "HOTEL"

pg 290-91 291, HARRASSING ME, INSINUATING IM A CRIMINAL

pg 297 7-10, I ANSWERD, HE SAID THATS NOT WHAT
HE ASKED BUT IT WAS

p 327  12, NOT SURE WHAT I SAID BUT
       IT DOESNT MAKE SENSE.

ERRATA SHEET
CHANGES IN TESTIMONY

Jeremy Holloway vs County of Orange
Jeremy Holloway
August 14, 2020

| PAGE | LINE | FROM | TO |
|------|------|------|-----|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

_____                    8-14-2020
SIGNATURE OF WITNESS                              DATE

1         I declare under penalty of perjury under the

2   laws of the State of California that the foregoing is

3   true and correct, and that this declaration was

4   executed on the _____14_____ day of _AUGUST_____,

5   20_20___, at ___ORANGE_____, California.

6

7   _____

8            WITNESS SIGNATURE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ERRATA SHEET
CHANGES IN TESTIMONY

Jeremy Holloway vs County of Orange
Jeremy Holloway
August 14, 2020

PAGE        LINE        FROM                                              TO

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

_____    _____    _____        _____

                                                                     9-1-2020
_____                          _____
       SIGNATURE OF WITNESS                                     DATE

ERRATA SHEET
CHANGES IN TESTIMONY

Jeremy Holloway vs County of Orange
Jeremy Holloway
August 14, 2020

| PAGE | LINE | FROM | TO |
|------|------|------|-----|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

_____          9-1-2020
SIGNATURE OF WITNESS                   DATE

```
 1                  C E R T I F I C A T E

 2

 3          I, VICKY De BOER, CSR No. 6055, RPR, certify

 4   that the foregoing proceedings were taken before me at

 5   the time and place herein set forth; at which time

 6   JEREMY HOLLOWAY was duly sworn; and that the transcript

 7   is a true record of the testimony so given.

 8          Witness review, correction, and signature was

 9   ( ) by code.                (X) requested.

10   ( ) waived.                ( ) not requested.

11   (X) not handled by the deposition officer due to party

12       stipulation.

13          The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificate null and void.

16          I further certify that I am not financially

17   interested in the action, and I am not a relative or

18   employee of any attorney of the parties, nor of any of

19   the parties.

20          Dated this 17th day of August, 2020.

21

22

23                      Vicky DeBoer

24

25                      VICKY De BOER, CSR
```

EXHIBIT C

# LYNBERG & WATKINS

WWW.LYNBERG.COM

**LOS ANGELES**

1150 S. Olive Street
Eighteenth Floor
Los Angeles, CA 90015
Tel  213-624-8700
Fax  213-892-2763

**ORANGE COUNTY**

1100 Town & Country Road
Suite #1450
Orange, CA 92868
Tel  714-937-1010
Fax  714 937-1003

**SAN DIEGO**

8880 Rio San Diego Drive
Suite #1045
San Diego, CA 92108
Tel  619-814-2169
Fax  619-356-4968

**CENTRAL COAST**

731 South Lincoln Street
Suite C
Santa Maria, CA 93458
Tel  805-623-5863
Fax  805-314-2661

REPLY TO: **ORANGE COUNTY**

*September 7, 2020*

***VIA EMAIL***

Narine Mkrtchyan, Esq.
MKRTCHYAN LAW
655 N. Central Ave, Suite 1700
Glendale, CA 91203

> Re:   ***Jeremy Holloway v. County of Orange, et al.***
> Dates of Alleged Loss:   January 21, 2018
> Our File No.:   1793-0267
> United States District Court, Central District of California
> Case No.: 8:19-cv-01514-DOC-DFM

Dear Counsel:

Through this correspondence, we are extending an offer to meet and confer pursuant to <u>C.D. Cal. L.R.</u> 37-1 regarding your conduct during Plaintiff Jeremy Holloway's recent deposition. As you are aware, "the purpose of a deposition is to find out what the witness thinks, saw, heard or did." <u>Mazzeo v. Gibbons</u>, 2010 WL 3020021, at *2 (D. Nev. 2010). A questioning attorney (in this case us) can only discharge their responsibilities to their client if the attorney representing the witness (in this case you) follows the basic rules governing federal deposition practice – rules which have already been emphasized by our Magistrate Judge in this case. (Order, Dkt. No. 73, p. 3, n. 3)("all counsel should comport themselves in the deposition the same as if they were in the courtroom.  The Advisory Committee notes to Rule 30 make that expectation explicit: '[i]n general, counsel should not engage in conduct during a deposition that would not be allowed in the presence of a judicial officer.' ").

Unfortunately, during Plaintiff's deposition, you repeatedly violated the Court's order by "engag[ing] in conduct . . .that would not be allowed in the presence of a judicial officer' ". (Order, Dkt. No. 73, p. 3, n. 3). Your conduct during Plaintiff's deposition consequently made our efforts "to find out what [Mr. Holloway] thinks, saw, heard or did" impossible. <u>Mazzeo v. Gibbons</u>, 2010 WL 3020021, at *2 (D. Nev. 2010).

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

     Given your conduct, the appropriate result now is dismissal of Plaintiff's case. <u>See</u>, <u>Ferdik v. Bonzelet</u>, 963 F.2d 1258, 1260-61 (9th Cir. 1992) ("[P]ursuant to [Rule] 41(b), the district court may dismiss an action for failure to comply with ***any order*** of the court.")(emphasis added); <u>Loop AI Labs Inc. v. Gatti</u>, 2017 WL 934599, at *15 (N.D. Cal. 2017), <u>aff'd</u>, 742 F. App'x 286 (9th Cir. 2018)(dismissal ordered where "Plaintiff's actions evince a persistent belief that it is above any obligation to obey the Court's orders. . .or rules.")

     Even if the Court permits this action to survive (and it should not), the defense is entitled to a renewed deposition of Plaintiff, supervised by a special master, in which you will be required to follow the basic rules already enunciated by our Magistrate Judge. <u>See</u>, <u>e.g.</u>, <u>Hernandez v. Lynch</u>, 2019 WL 6998774, at *2 (C.D. Cal. 2019)("<u>Federal Rule of Civil Procedure</u> Rule 53(a) permits the appointment of a special master to address pretrial matters . . .."); <u>id.</u> at *4 ("the Court finds that the Special Master was correct to conclude that Plaintiffs' counsels' conduct was improper and impeded Defendants from conducting a fair deposition and pursuing relevant lines of inquiry. In light of this, it was ***proper to order new depositions*** of the Named Plaintiffs.")(emphasis added.)

     The needed re-do of Plaintiff's deposition should be funded by you – as it is your misconduct which necessitates judicial supervision. <u>See</u>, <u>e.g.</u>, <u>IPS Grp., Inc. v. Duncan Sols., Inc.</u>, 2017 WL 3457141, at *6 (S.D. Cal. 2017)(counsel for the deponent "must reimburse [the noticing party] for reasonable travel, attorney's fees, court reporting and any facility costs for this renewed deposition.") We now detail our position in the following subsections.

## I.    VIOLATION OF THE COURT'S CIVILITY ORDER

     Put most charitably, your conduct during Plaintiff's deposition fell far below the standards of professionalism and civility which are required of counsel in federal court proceedings. The repeated outbursts and antics I witnessed during Plaintiff's deposition are frankly unlike anything I have ever seen. And your latest deposition outbursts are part of a troubling and persistent pattern of misconduct in this case. Our Magistrate Judge has already found as much. (Order, Dkt. No. 73, p. 2)(the Renegar "deposition was, to put it mildly, a train wreck. And responsibility for that result lies predominantly with Plaintiff's counsel.")

     As you will recall, the Magistrate Judge noted your tone during the Renegar deposition was "increasingly bellicose" as the day went on. (Order, Dkt. No. 73, p. 3). You spoke in a "raised. . .voice several times", made personal attacks on others and erupted in profane outbursts when you were displeased with witness testimony. (<u>Id.</u>) As the Court rightly noted:

     If anything, the video recording is worse than the cold transcript. For the most part, Renegar and his counsel are largely subdued. Plaintiff's counsel is anything

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

> but. Not only does she raise her voice, but it appears to me that she slaps the
> conference room table at least twice. Her tone of voice ranges from exasperated
> to indignant. She appears to lose her temper several times. I am confident that
> none of these antics would have been permitted to persist in any courtroom in
> the federal courthouse in Orange County.

(Id.)

The Court's findings and admonitions in this case come with good reason.
"Offensive and abusive language by attorneys in the guise of zealous advocacy is
plainly improper, unprofessional, and unacceptable. . .." Laddcap Value Partners, LP v.
Lowenstein Sandler P.C., 859 N.Y.S.2d 895 (2007); see, id.("An attorney who
demonstrates a lack of civility, good manners and common courtesy taint the image of
the legal profession and, consequently, the legal system, which was created and
designed to resolve differences and disputes in a civil manner."); People v. Fagan, 483
N.Y.S.2d 489 (1984)(noting that "while the correct resolution of civil disputes is indeed
an important goal of our legal system, it may fairly be said that society's primary interest
in the resolution of civil disputes is that they be settled in a peaceful, orderly, and
impartial manner.")

All courts agree with these common sense principles. See, e.g., Freeman v.
Schointuck, 192 F.R.D. 187, 189 (D. Md. 2000)("No one expects the deposition of a key
witness in a hotly contested case to be a non-stop exchange of pleasantries. However,
it must not be allowed to become an excuse for counsel to engage in acts of rhetorical
road rage against a deponent and opposing counsel."); MAG Aerospace Indus., Inc. v.
B/E Aerospace, Inc., 2014 WL 12754932, at *1 (C.D. Cal. 2014)("A deposition is a
judicial proceeding that should be conducted with the solemnity and decorum befitting
its importance. Lawyers participating in depositions should comport themselves in a
professional and dignified manner. When lawyers behave otherwise, it reflects poorly on
the entire judicial process.")

One would assume that the Court's prior civility order would have led you to
reflect on your past conduct in this case – and to move forward in a new spirit of
professionalism. The Court's order plainly called for you to do just that. (Order, pp. 2
and 4)(going forward, "I expect, as I told counsel during the July 9 telephone
conference, that all counsel should comport themselves in the deposition the same as if
they were in the courtroom. . ..I trust that my remarks on July 9 and this subsequent
ruling will cause [future] depositions to be conducted without the rancor that was
exhibited on July 7 [at the Renegar deposition].")

But you have plainly chosen another course of conduct. None of the Court's
warnings and admonitions have moved you to alter your deposition conduct. Instead, if
anything, your conduct during Plaintiff's deposition reached ***a startling series of new
lows***.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

Plaintiff's deposition transcript is peppered with your cringeworthy verbal outbursts, many of which featured personal attacks on me and my clients. It all started with strange, antagonistic murmuring:

**Page 49**

4 Q BY MR. HARRELL: Are your parents still
5 living?
6 A Yes.
7 Q Both of them?
8 A Yes.
9 Q What is your father's name?
10 MS. MKRTCHYAN: Objection. Relevance.
11 THE WITNESS: Joseph Holloway.
12 MS. MKRTCHYAN: **It's pathetic. I can't believe**
13 **these people.**

(Transcript, 49:4-13)(emphasis added.)

Given the Court's prior admonitions, I probably should have adjourned the deposition proceedings when your caustic murmuring first started. I should have sought appointment of a special master then and there. But, in my defense, I have frankly never had any problem getting along with people. I thought my interaction with you would be no different, and that I would consequently be able to do my job in a peaceful, professional environment.

But I was mistaken.

Rather than work with me as a fellow member of the federal bar, you quickly chose to unleash the same type of raised voice outbursts and snarling personal attacks that led the Court to issue its previous written civility admonishment.

The name-calling began with your announcement that I am not a "normal human being" – at least in your view:

**Page 90**

4 Q BY MR. HARRELL: Okay. So when the officer
5 indicated that he had officer safety concerns and
6 that's why he wanted to --
7 A Yeah.
8 Q -- pat you down, you understood that the
9 officer wanted to do a pat-down search to see if you
10 had any weapons on you; right?

**4**

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

11 A I understand he wanted to violate my civil
12 rights.
13 Q I understand, sir. That's kind of more
14 something for your lawyer to say in front of a jury.
15 My question has another focus.
16 Here, we're going to read it back for you.
17 MS. MKRTCHYAN: Well, objection. Argumentative.
18 Vague and ambiguous. Badgering the witness. Asked and
19 answered. And your **condescension** is on the record,
20 too. So if you continue like this, we'll take as many
21 breaks as possible. So just behave yourself as a
22 **normal human being**.
23 MR. HARRELL: Well, ma'am, one of the great things
24 about our country is I don't have to respond to any of
25 that.

**Page 91**

1 MS. MKRTCHYAN: Of course, you will not have to.
2 MR. HARRELL: I'm not going to.
3 MS. MKRTCHYAN: Of course, not to, because you just
4 have, you know, absolutely **no respect** for any other
5 attorney. The level of **arrogance** that I see is just
6 **horrendous**. So anyway --
7 MR. HARRELL: Right, ma'am. **We're not going to**
8 **have a train wreck today.** The magistrate judge has
9 already got his eye on you and for good reason.
10 MS. MKRTCHYAN: Very good. You are defaming my
11 name. So continue with that type of attitude. Train
12 wreck. Okay.

(Transcript, 90:4 – 91:12)(emphasis added.)


        I was not the only victim of your many outbursts. At another point, you lashed out
when your client rightly declined to agree with your attempted "coaching" of his
deposition answers:

**Page 138**

21 MS. MKRTCHYAN: . . .Your goal -- what is your goal
22 today? I don't understand.
23 MR. HARRELL: My goal is to get through these
24 questions.

**5**

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

**Page 138**

1 Q Well, sir, you've already told us that you do
2 sometimes experience anger and upset when you think
3 about the incident; true?
4 MS. MKRTCHYAN: **Misstates the testimony. Misstates**
5 **the testimony.**
6 THE WITNESS: **Yes, I did say -- I did say that. . ..**

**Page 140**

15 Q BY MR. HARRELL: Sir --
16 MS. MKRTCHYAN: **Nonsense of all type of**
17 **proportions.**

(Transcript, 138:21 – 140:17)(emphasis added.)

And then you erupted at me when I legitimately attempted to follow up on the
reasons, if any, for Plaintiff's "emotional distress" claims arising out of the subject arrest
incident. Your outburst also featured more rank "coaching" of your client:

**Page 140**

18 Q BY MR. HARRELL: You do understand that law
19 enforcement has a responsibility to respond to
20 complaints of criminal conduct. That's part of their
21 job.
22 You understand that; right?
23 A As much as I can, being a civilian.
24 Q And you understand, sir, that there was a
25 complaint of criminal conduct at the campground before

**Page 141**
1 law enforcement appeared at your tent; true?
2 MS. MKRTCHYAN: Vague and ambiguous.
3 THE WITNESS: I understand that now.
4 MS. MKRTCHYAN: Vague and ambiguous as to time.
5 Q BY MR. HARRELL: Do you hold it against law
6 enforcement for responding to the complaint of criminal
7 conduct at the campground, or do you think they just
8 should have ignored it?
9 MS. MKRTCHYAN: How do you object to this type of
10 **nonsense**?

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

11 THE WITNESS: This is --
12 MS. MKRTCHYAN: Argumentative. Objection. Vague
13 and ambiguous.
14 THE WITNESS: Yeah, I can't answer that question.
15 MS. MKRTCHYAN: Wait a minute. Let me finish my
16 objection.
17 Argumentative. Vague and ambiguous.
18 Irrelevant.
19 Q BY MR. HARRELL: We're going to read it back
20 for you, sir.
21 And, ma'am, you're free to have a running
22 objection if that's what you would like to have.
23 MS. MKRTCHYAN: No. I have an objection to your
24 line of questioning because you are asking the
25 argumentative questions. Badgering the witness. That

**Page 142**

1 is not likely to lead to admissible evidence. Okay?
2 And if you are going to interrupt this and I
3 am going to call the magistrate and find out why is
4 this question that right now you're posing three times
5 is important.
6 The law enforcement has a job to do. No. Law
7 enforcement has a job to do, but **your clients** did not
8 have a right to **beat the hell out of my client.**
9 MR. HARRELL: No. No.
10 MS. MKRTCHYAN: And if you, as an attorney, have no
11 sense of understanding and **common sense** as to what
12 happened, this is a victim of **police brutality**, and you
13 keep badgering him? You think that your clients have
14 not committed **a crime here**? So go after them, not my
15 client.
16 And he's not going to tolerate this type of
17 **nonsense** from a defense counsel who doesn't even bother
18 to wear his mask when we have a coronavirus. Okay?
19 Seriously.
20 MR. HARRELL: Ma'am, you're --
21 MS. MKRTCHYAN: It just bothers me that **you have no**
22 **sense of common sense and compassion.** Someone is
23 sitting in front of you who was beat up by your **moron**
24 clients. Okay? Your clients, **your criminal clients**
25 who are wearing a badge and are using that badge to

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

**Page 143**

1 **commit crimes, including falsifying reports.**
2 And you are going to sit here and tell this
3 guy, who was a victim of police brutality, that he does
4 not understand the job of the law enforcement? Yes, he
5 understands, but the job of law enforcement is not to
6 go and **beat the hell out of people**.
7 And you, as an attorney, your job is not just
8 to do your job, defend these kind of criminals, but to
9 do it with some **degree of compassion**. Okay? If you do
10 not have compassion, **maybe you should not be an**
11 **attorney at all.**
12 That's why this country is in **this deep shit**
13 that we are. Okay? **People like you and people like**
14 **your clients.** That's all I've got to say.[1]
15 The bottom line is that you know what? I'm
16 going to take as many breaks as I want, and I may stop
17 this deposition because you're continuing to badger
18 this guy, who is a victim. He's a victim that your
19 clients have ruined the life of, and you're telling him
20 what is the job of law enforcement?
21 MR. HARRELL: Where are you going, ma'am?
22 MS. MKRTCHYAN: I am taking a break because you
23 need to take five minutes to understand what it means
24 to be, you know -- to have **common sense and compassion**,
25 you know.

**Page 144**

1 MR. HARRELL: Okay. Well, you take your break.
2 Try to pull yourself together.
3 MS. MKRTCHYAN: No, but because you do not have a
4 clear understanding of what is the United States
5 Constitution and what this country's flag is all about.
6 Someone is sitting in front of you who has served you,
7 your country, and you're badgering him with **nonsense,**
8 **stupid questions.**
9 MR. HARRELL: Okay. We're off the record while
10 plaintiff's counsel tries to pull herself together.
11 THE VIDEOGRAPHER: We're now going off the record.

---

[1] If only it were so.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


12 The time is 1:10 p.m.
13 (Recess.)

(Transcript, 140:18 – 144:13)(emphasis added.)

Our put-upon court reporter repeatedly asked you to cease your commentary so as to permit read-backs when they were needed to frame questions. But you showed the court reporter no professional courtesy or respect either:

**Page 241**

18 Q BY MR. HARRELL: So we're just going to read
19 the question back. How about respond to my question,
20 and then I'll do as I've done any number of times
21 today. I will move on after I get an answer to the
22 question.
23 MS. MKRTCHYAN: Well, your question is vague and
24 ambiguous. If you don't want a paraphrase, I will
25 instruct him not to answer because it's not a proper --

**Page 242**

1 it's not a fair question, and you know it.
2 MR. HARRELL: Okay. Let's everybody be as quiet as
3 we can and let the court reporter read.
4 MS. MKRTCHYAN: Well, you know, there's going to be
5 an instruction not to answer unless you paraphrase that
6 type of vague and ambiguous question that is assuming
7 facts not in evidence.
8 MR. HARRELL: It sounds like to me that you're
9 losing the quiet game. So let's everybody be --
10 MS. MKRTCHYAN: Excuse me.
11 MR. HARRELL: -- as quiet --
12 MS. MKRTCHYAN: Excuse me.
13 MR. HARRELL: Let's everybody be as quiet as they
14 can.
15 MS. MKRTCHYAN: Excuse me. You are not my
16 grandfather, as much as you wish you were.

(Transcript, 241:18 – 242:16)(emphasis added.)


At this point, ***your co-counsel***, Mr. Beck, plainly sympathized with the court reporter's legitimate request for silence during read-backs, and he felt the need to

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

admonish you to ***be quiet as well***. But Mr. Beck fared no better with you than I did. You interrupted Mr. Beck and quarreled with him too:

18 MR. BECK: Enough. That's enough. That's enough.
19 MS. MKRTCHYAN: That's the most **sexist attitude** I
20 can get from a man saying be quiet. Okay.
21 MR. BECK: This is not moving this deposition
22 forward and --
23 MS. MKRTCHYAN: **No**, but that's the most **dumbest**
24 question [sic] I've ever heard.
25 MR. BECK: **Enough.**

(Transcript, 241:18 – 242:25)(emphasis added.)

As you are aware, nothing I said or did during Plaintiff's deposition had anything to do with your gender. Even so, you repeatedly (and unfairly) attacked me as being a "sexist" bigot for no good reason:

**Page 116**

16 MR. HARRELL: . . .[P]ull yourself together.
17 MS. MKRTCHYAN: Excuse me. I have a right to
18 object. Who the hell do you think you are? I have a
19 right to object.
20 MR. HARRELL: Make legal objections.
21 MS. MKRTCHYAN: I am making the objections the way
22 I understand. If you have a problem with my
23 objections, you can take it up later. Okay? There you
24 go.
25 MR. HARRELL: Ma'am, you've got to pull yourself

**Page 117**

1 together.
2 MS. MKRTCHYAN: Okay. You have yet to see me
3 too -- I mean seriously, this is the **sexist**,
4 condescending attitude, Counsel, and you are really
5 behaving just like this with any female attorney that
6 is younger than you? I'm sorry. If no one told you
7 outright that that's **sexist** attitude, I will. I'm not

10

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

8 afraid.
9 And I will tell you that your behavior from
10 this morning and even before then, your letters,
11 your -- you know, your harassing letters towards me
12 have been infused with condescending attitude.
13 Who do you think you are? Who do you think
14 you are? I know who I am, but you need to know your
15 place. Okay? I am a female young attorney, and you
16 have no right to do this to me or my client.
17 You're badgering the witness. Let's go over
18 the questions. You have to ask only appropriate
19 questions, and you are not.


(Transcript, 116:16 – 117:19)(emphasis added.)


"Sexist" seemed to be your go-to response any time I tried to get answers to the legitimate question I posed (rather than re-draft my question in the manner you wrongfully demanded):

**Page 56**

12 Q BY MR. HARRELL: Sir, have you received a bill
13 from the VA, to your knowledge, for your medical
14 treatment since the incident happened? Yes, no, or I
15 don't know?
16 MS. MKRTCHYAN: **Or has your lawyer** -- see --
17 MR. HARRELL: Ma'am, **with respect, that's not my**
18 **question**. So you'll have an opportunity later if
19 you're so inclined to ask whatever you want to ask.
20 Right now my question has a limited focus that does not
21 involve you, with all due respect.
22 MS. MKRTCHYAN: Well, excuse me. If it's
23 attorney-client privilege, then it is involving me.
24 MR. HARRELL: Ma'am.
25 MS. MKRTCHYAN: So -- and you know what? Your

**Page 57**

1 attitude -- I really do not appreciate this
2 condescending attitude, unprofessional, **sexist** attitude
3 that you're coming up across from the very beginning
4 this morning. I'm not going to tolerate that.
5 From the very beginning, you've been this
6 hostile, you know, person, you know. So I'm not going

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

7 to tolerate that.
8 I'm instructing him not to answer because the
9 **answer presupposes attorney-client privilege**. Okay?
10 He is -- he has -- his attorney has received billing
11 records. He has not received it. So, therefore, his
12 answer is irrelevant. So --
13 MR. HARRELL: Are you done?
14 One of the reasons, ma'am, why we have a
15 camera here today is because we need one with you.
16 You've already proven that. The magistrate judge
17 characterized your conduct as, and I quote, "a train
18 wreck."
19 MS. MKRTCHYAN: Okay.
20 MR. HARRELL: And that's being charitable.
21 MS. MKRTCHYAN: And excuse me.
22 MR. HARRELL: We have a camera here today --
23 MS. MKRTCHYAN: Train wreck.
24 MR. HARRELL: -- so that you can see --
25 MS. MKRTCHYAN: Very good.

**Page 58**

1 MR. HARRELL: -- that **nobody has raised their voice**
2 here today.
3 MS. MKRTCHYAN: Very good, Counsel. Very good.
4 MR. HARRELL: Your comment about me being a
5 **sexist** --
6 MS. MKRTCHYAN: Okay. I'm taking a break because I
7 don't need this type of attitude.
8 MR. HARRELL: -- is what we call in the trade a
9 lie --
10 MS. MKRTCHYAN. Okay. Until you finish, I'm going
11 to take a break.
12 MR. HARRELL: -- and you need to get control of
13 yourself.
14 MS. MKRTCHYAN: Well, thank you.
15 MR. HARRELL: You need to pull yourself together --
16 MS. MKRTCHYAN: Maybe you need to pull yourself
17 together.
18 MR. HARRELL: -- and it needs to happen now.
19 MS. MKRTCHYAN: We're going to break until you
20 bring yourself to normal condition because you are
21 being rude and unprofessional, and you have no right to
22 condescend me like that. Thank you.
23 Let's go.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

(Transcript, 56:12 – 58:23)(emphasis added.)

    In short, I did not use "sexist" language to anyone during Plaintiff's deposition. To the contrary, I tried to show courtesy and respect to everyone in the deposition room – just as the Magistrate Judge has directed.

    For example, I repeatedly extended every courtesy to your client, Mr. Holloway. First of all, I explained why I was asking the personal background questions that defense attorneys (like me) ask of almost all plaintiffs (like Mr. Holloway). I did that to help address your client's visible discomfort with this portion of the proceedings. I also did that as a matter of common courtesy and respect:

**Page 29**

20 Q BY MR. HARRELL: Sure. Sure, sir. I have a
21 list of things that I go through, not just with you,
22 but with everybody that comes into this room -- okay --
23 on the other side of the lawsuit that I'm trying to
24 find out who they are --
25 A Okay.

**Page 30**

1 Q -- so I can go back and I can tell my client
2 this is who they are, this is what they say, this is
3 the road they've traveled, this is what their
4 grievances are. It's just gathering information is all
5 that we're doing here today.
6 Do you understand?
7 A **Yes, I do.**
8 Q And if ever at any time, if I ask a question
9 and you just don't feel good about it, **please, speak**
10 **up. We'll see if there's a workaround.** We'll see if
11 there's something that we can do.
12 Okay? Do you understand?
13 A **That sounds good.**

(Transcript, 29:20 – 30:13)(emphasis added.)

    When there was a brief pause in deposition questioning, I explained the reason for my momentary silence. Again, I did that to help address your client's comfort with the proceedings. I also did that as a matter of common courtesy and respect

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

(notwithstanding your "coaching" interruptions):

**Page 158**

6 Q Okay. **Thanks for giving me time to jot things**
7 **down.**
8 So when you got back to your campsite, you had
9 some questions that included why didn't these neighbors
10 speak up and identify themselves as the people that had
11 been involved in the quarrel; true?
12 MS. MKRTCHYAN: Objection. Vague and ambiguous.
13 **Misstates the testimony.**
14 THE WITNESS: I asked them, **yeah**, straight up. I
15 asked them why.

(Transcript, 158:6-15)(emphasis added.)

        When your client seemed confused by my request for an audible answer to my
questions, I again explained the need for my request. Here too, I explained matters to
help address your client's comfort level. I also did that as a matter of common courtesy
and respect:

**Page 161**

9 Q. . .So when you address your neighbors from the
10 vantage point of you standing at your tent, you make a
11 statement to the effect of "Why didn't you come out and
12 stop this? Instead, you let me take the blame"; right?
13 A Uh-huh.
14 Q Yes?
15 A That's what I said. Yes.
16 Q Okay. I can see you.
17 A I got it. I got it. Nobody saw. Got it.
18 Q **You have to have actual words.**
19 A I didn't know what this was. I didn't know
20 what you were doing.
21 Q It's, like, **I need some words.**
22 A **I got you.**

(Transcript, 161:9-22)(emphasis added.)

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

Again, I generally have no problem getting along with people of all types, including your client. The transcript shows as much – over and over again. Against this backdrop, your inflammatory, unprovoked personal attacks on my character, including your smear claim that I am some type of "rude", "sexist" bigot, are baseless and sanctionable.

Again, they are belied by the cold deposition transcript and by the video record of the proceedings. Your character attacks on me are yet another violation of the Magistrate Judge's standing order in this case requiring civility, verbal self-control and professionalism. See, e.g., Rywkin v. New York Blood Ctr., 1998 WL 633810, at *1 (S.D.N.Y. 1998)(counsel representing the deponent "made *ad hominem* attacks on opposing counsel . . ..This conduct clearly is sanctionable."); id. (counsel representing the deponent "insinuated, without support, that opposing counsel's conduct was racially motivated. This conduct clearly is sanctionable."); Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)(counsel for the deponent "was disrespectful and personally attacked [questioning] counsel in a way that is wholly unsuitable for a deposition or any other litigation proceeding. . ..These types of comments would have no place in a courtroom, and they accordingly have no place in a deposition proceeding."); (Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..)

Events at Plaintiff's deposition reached a crescendo of sorts when I attempted to focus on your client's "false arrest" claim. As you are aware, my law enforcement clients contend that they had good cause to suspect Plaintiff of physically abusing a female companion at the time they first confronted him.

Indeed, eyewitness "911" reports by other campers advised officers that Mr. Holloway had physically attacked a female in his campsite tent. For example, Plaintiff's neighbor at the campground, one Brian Fuerbach, testified to his disturbing observations of Mr. Holloway's misconduct as follows:

**Page 15**

23      Q.      Okay. So if we are going to establish for
24      purposes of this deposition, your[] [campsite number] was 63 and
25      **plaintiff's was 65. . ..**

**Page 16**

3       A.      Yes. . ..

(Transcript, 15:23 – 16:3)(emphasis added.)[2]

_____

[2] Plaintiff's campsite number was "65":

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

**Page 87**

1       Q.       Okay. All right. So -- but even though
2       that mid-afternoon you arrived, you saw the two
3       tents, you did not see or have any contact with
4       the -- with the plaintiff Jeremy?
5       A.        No, because he wasn't -- wasn't there as
6       far --
7       Q.       He wasn't there. And you did not see any
8       female there either?
9       A.        No.
10      Q.       Okay. So the whole time you were there
11      this afternoon until 2:00 a.m., nothing, aside from
12      that dog barking inside of the tent, brought the
13      attention of that campsite to you until 2:00 a.m.
14      or 3:00 a.m. when you called 911?
15      A.        It was about around 2:00 a.m.
16      Q.       Right. So -- but what I'm saying is that
17      nothing else happened about this campsite until
18      you -- you heard this altercation?
19      A.        It appeared to be unoccupied as far as
20      anybody there.
21      Q.       Okay. And you obviously could not tell
22      when the occupant came back and the truck -- when
23      the truck came back and parked?
24      A.        2:00 a.m.
25      Q.       Oh, you saw the truck actually come in at

**Page 88**

1       2:00?
2       A.        We heard the door slam and the -- it woke
3       us up, and my wife thought something hit our
4       camper, so I looked out, and there was two door
5       slams, it was like boom, boom, and then we

_____

17 Q You had a campsite number there; right?
18 A Yes.
19 Q What was your campsite number?
20 A 65.

(Transcript, 160:17-20)

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

6       realized, oh, it's the neighbor's back, and then we
7       heard talking, a woman talking.

(Transcript, 87:1 – 88:7)

**Page 16**

21      Q.      Okay. So now when -- at night you know
22      that you called 911. I wanted to have you tell me
23      little bit in your own words what did you hear that
24      night, you know, that prompted you to call 911.
25      A**.      I heard a bunch of expletives, yelling, and**

**Page 17**

1       **then I heard fist blows being landed on somebody,**
2       **which I believe was a woman because she said she**
3       **was. . ..**
20      Q.      Okay. Sure. So you were sleeping, but the
21      sounds of the noise and disturbance was loud enough
22      to awaken you, is that what you're telling me?
23      A.      Yes.
24      Q.      Okay. And then you're telling me
25      expletives, et cetera, but when you peaked out of

**Page 18**
1       the window, could you see the people who were
2       actually yelling and doing this, you know, involved
3       in the disturbance?
4       A.      **No. We could just see the tent moving, and**
5       **a woman saying, "No, no, no" --**
6       Q.      Uh-huh.
7       A.      **-- "Please stop. I'm just a girl."**
8       Q.      So you could -- okay.
9       A.       Yelled out, "Stop."
10      Q.      Okay. But you could -- you're telling me
11      you could hear and you could see --
12      A.       Oh, yeah.
13      Q.      -- from your [RV] window that this is the tent
14      where the disturbance was occurring?
15      A.      Yes.
16      Q.      Okay. So when you called 911, it was still
17      dark outside; right? How was the lighting at the
18      campground? Can you describe to me?

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

19        A.        It was dark.
20        Q.        This was around what time do you recall?
21        Was it 3:00 o'clock in the morning? 4:00 o'clock
22        in the morning?
23        A.        It was 3:00 o'clock approximately.


**Page 19**

1         Q.        But could you see actually the people
2         outside of the tent or were they inside of the
3         tent?
4         A.        They were inside.
5         Q.        Did you open your [RV] window to hear or, you
6         know, see better?
7         A.        Yes.
8         Q.        And so you peaked out, you peaked out of
9         the window. What could you tell me when you did
10        that? What else could you hear when you did that?
11        A.        The -- **the blows** that -- **the fist blows**
12        being landed on somebody you could clearly hear
13        that. . ..

**Page 23**
11        Q.        Okay. And when you were watching this,
12        obviously, since you called 911, you were hoping
13        that they would find the female victim; right?
14        A.        Yes.
15        Q.        Did you see [law enforcement] actually locate the female
16        victim from that campsite, of the plaintiff's
17        campsite, No. 65 next to yours?
18        A.        No**.**
19        Q.        Did you ever -- prior to sheriffs coming,
20        did you ever see a woman leave that campsite?
21        A.        No. We only heard, and then we heard the
22        tent unzip and somebody running away through the
23        gravel.

(Transcript, 16:21 – 23:23)(emphasis added.)[3]

---

[3] It is ironic, to say the least, that you have evidently been too busy calling me a "sexist"
to develop any coherent response to Mr. Fuerbach's compelling testimony that Plaintiff
brought the subject arrest incident on himself by beating a woman.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


For his part, Plaintiff disputes Mr. Fuerbach's incriminating testimony.[4] He has not only denied any female companion was with him at the campsite, he has denied having a girlfriend of any type since 2007 (when his spouse evidently divorced him):

---

[4] **Page 64**

20 Q Okay. So let's talk about the 24 hours
21 running up to the incident, the contact that you had
22 with law enforcement.
23 Where were you at that time?
24 A I was camping at O'Neill Park.
25 Q Okay. And how long had you been camping at

**Page 65**
13 At the time of the incident, how long had you
14 been camping at O'Neill Park for that stay?
15 MS. MKRTCHYAN: Asked and answered.
16 THE WITNESS: That stay. Like I said, I believe I
17 checked in the day before.
18 Q BY MR. HARRELL: Okay. So at the time of the
19 incident, you had been at your campsite at O'Neill Park
20 for about 24 hours?
21 A Yeah. I could say that. Approximate
22 24 hours.
23 Q Okay. When you checked into your campsite,
24 were you with anyone else?
25 A I was not.

**Page 66**

1 Q Did anyone join you at your campsite before
2 the incident?
3 A Nobody.
4 Q Okay. So in the entire 24-hour period of time
5 before the incident, before your contact with law
6 enforcement, your testimony is you weren't in the
7 company of a guest?
8 A Correct.
9 Q Did you have a girlfriend at the time of the
10 incident?
11 A I did not.

(Transcript, 45:17 – 51:4)

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

**Page 46**

10 Q Okay. When is the last time that you were in
11 a social relationship with someone who you considered
12 to be a partner?
13 MS. MKRTCHYAN: Objection. Relevance. Privacy.
14 THE WITNESS: That would have been when I divorced
15 my wife. That would have been 2007.
16 Q BY MR. HARRELL: Okay. Have you ever had a
17 girlfriend since 2007?
18 A I have not.

(Transcript, 46:10-18)

Accordingly, in order to test Plaintiff's assertions, the defense has served a Fed.
R. Civ. P. 34 request for Mr. Holloway's social media posts, which might disclose his
contacts with the woman Mr. Fuerbach observed Plaintiff abuse on the night of the
incident.

*__Following__* dispatch of Defendant's request, however, Plaintiff appears to have
*__deleted__* his Facebook posts, as well as his entire Facebook account. The defense
rightly seeks to question Plaintiff regarding his handling of his Facebook account
*__following Defendant's request for access to it.__* The following transcript contains the
relevant deposition inquiry:

**Page 258**

6 Q Okay. Now, sir, you are aware that we have
7 requested your social media postings, including from
8 Facebook; true?
9 A **Yes, I am aware.**
10 Q Are you prepared to turn those over to us?
11 MS. MKRTCHYAN: No. Objection. First of all,
12 attorney-client privilege. Attorney work product.
13 So he's instructed not to answer that question
14 because that's not his purview.
15 Q BY MR. HARRELL: Sir, do you have any problem,
16 you personally, turning over your Facebook postings to
17 us?
18 MS. MKRTCHYAN: Objection. You are instructed not
19 to answer. You're instructed not to answer.
20 Q BY MR. HARRELL: Sir, you have become aware

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

21 that we are asking for your Facebook postings; true?
22 MS. MKRTCHYAN: Asked and answered. Move on.
23 Instructing not to answer. This is attorney-client
24 privilege. He would not be able to answer that
25 question really without disclosing attorney-client

**Page 259**
1 privileged communications. Therefore, move on,
2 Counsel.
3 Q BY MR. HARRELL: Sir, you did take some action
4 after you learned that we were seeking your Facebook
5 postings; true?
6 MS. MKRTCHYAN: Instruct you not to answer any of
7 that.
8 That's, again, attorney-client privilege, and
9 he will not be able to answer that question without --
10 without discussing and -- without sharing attorney-
11 client privileged communications.
12 Therefore, you're instructed not to answer.
13 Q BY MR. HARRELL: Sir, after you learned that
14 we were seeking your Facebook postings, you switched
15 your account to private; right?
16 MS. MKRTCHYAN: Again, objection.
17 You're instructed not to answer.
18 And, Counsel, are you going to continue going
19 into attorney-client privileged communications?
20 Q BY MR. HARRELL: Sir, after you learned that
21 we were after -- are you instructing him not to answer?
22 MS. MKRTCHYAN: Yes. Yes. And I'm asking you to
23 move on with this line of questioning because it goes
24 into attorney-client privileged communications. What I
25 instructed my client, what he did or did not do, it's

**Page 260**
1 none of your business frankly, and that is
2 attorney-client privilege.
3 So if you continue with this line of
4 questioning, I'm going to stop this deposition.
5 Q BY MR. HARRELL: Sir, after you learned that
6 we wanted to see your Facebook postings, you did more
7 than switch it to private; you closed and deleted your
8 entire account; true?
9 MS. MKRTCHYAN: Objection. Objection. You know
10 what? We are going to stop this because you are going

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

11 into areas where it's attorney-client privilege. It's
12 none of your business what he did and did not do at
13 what instructions.
14 MR. HARRELL: It is. When he destroys evidence, it
15 is.
16 MS. MKRTCHYAN: Oh, really? Oh, really? What
17 evidence? You giving me some -- here, this is your
18 evidence.
19 Do you want me to show you what evidence
20 you've given me? I'm going to show it to you. Here.
21 Here. It's nonsense.

**[ At this point, as depicted on video, Plaintiff's counsel continues shouting and throws
voluminous papers across the deposition table in the direction of defense counsel and
deposition staff ]**

(Transcript, 258:6 - 260:21)

As you stood and began menacingly throwing papers about, ***your own co-
counsel***, Mr. Beck, was also plainly alarmed by your enraged tirade. He attempted to
stop your misconduct. But he too was unsuccessful:

**Page 260**

22 MR. BECK: **Hey, don't.**
23 MS. MKRTCHYAN: No. That's nonsense. I want them
24 to see that someone, a victim of police brutality, is
25 going to become part of your police reform. This is

**Page 261**

1  your evidence. Okay?
2 If you have any decent question for my client,
3 you can go ahead. But this is -- I'm doing this for
4 the record, and I will do this for you to satisfy your
5 nonsense questionnaire, you know.
6 Go ahead. That is your evidence, which is
7 junk. Okay? Junk.
8 And if you continue badgering my client,
9 again, as a victim of police brutality, this is
10 I will stop this deposition, and we'll go, and we will
11 not resume it without permission of a magistrate.
12 Okay?
13 **I have a right to tell my client what to do**
14 and what not to do. It's none of your business. Okay?

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

15 If you have a legitimate question about your junk
16 evidence, go ahead and ask it. That's the only
17 question, you know, you are permitted to ask.
18 MR. HARRELL: **Are you saying that you told your**
19 **client to destroy evidence that we were asking for?**
20 MS. MKRTCHYAN: **It's attorney-client privilege,**
21 Counsel. Okay? Attorney-client privilege.
22 When you come and disclose to me what you told
23 your clients in lying at their depositions to cover up
24 their criminal activities to avoid criminal prosecution
25 by U.S. Attorney's office, which I will ensure will

**Page 262**
1 happen at some point, then we'll disclose my
2 communications with my client.
3 But at this point your **Facebook nonsense**, this
4 stuff, this **Facebook nonsense** that you have been
5 showing me as your supplemental disclosure, this is all
6 you've got? For this case against my client? Then
7 you're really in good shape.
8 So -- but I'm instructing you not to answer
9 any questions that relates to attorney-client
10 privileged communications, and we will move on from the
11 subject. Otherwise, I'm going to stop this deposition.
12 MR. HARRELL: Let me just make my record, and if
13 you'd like to make an instruction not to answer, you're
14 free to do that. But let me just get my record out
15 there.
16 Q Sir --
17 MS. MKRTCHYAN: You're not going to ask him any
18 other questions about this.
19 MR. HARRELL: **Let me just make my record.**
20 MS. MKRTCHYAN: You're not. You make your record
21 without dealing with my client. Okay? I already told
22 you that's attorney-client communications.
23 MR. HARRELL: **If I may make my record and you make**
24 **your objections, and we'll see where we go.**
25 MS. MKRTCHYAN: I already made my objections.

Page 263
1 You're not allowed to ask another question of this to
2 my client.
3 Q BY MR. HARRELL: Sir, after you learned that
4 we were seeking --
5 MS. MKRTCHYAN: We're getting up. No. Let's get

23

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

6 up. Because you know what? You're continuing to ask
7 the same question going into attorney-client privileged
8 communications. Thank you.
9 So if you're not going to move onto another
10 topic that does not infringe upon my client's right to
11 privilege, I will stay here.
12 Do you have another question?
13 MR. HARRELL**: I was trying to get my question out,**
14 **and somebody interrupted.**
15 MS. MKRTCHYAN: Well, because you are asking the
16 same exact question. I already know what question
17 you're asking, because you are already assuming
18 something of my client. So I'm not going to let that
19 happen. Okay?
20 So we're going to take a break. Let's take a
21 break, and you think about what is attorney-client
22 privilege, and then we'll go forward.
23 THE VIDEOGRAPHER: We are now going off the record.
24 The time is 4:14 p.m.
25 (Recess.)


Page 264
1 THE VIDEOGRAPHER: We are now back on the record.
2 The time is 4:24 p.m.
3 Q BY MR. HARRELL: Sir, you have now deleted
4 your Facebook account; true?
5 MS. MKRTCHYAN: Objection. Vague and ambiguous.
6 Calls for speculation.
7 If you can answer that question -- do you feel
8 comfortable answering that question? Do you understand
9 that question?
10 THE WITNESS: Yes, I do.
11 MS. MKRTCHYAN: Okay.
12 THE WITNESS: Yes, I did recently delete my
13 Facebook account.
14 Q BY MR. HARRELL: And you did that for a
15 reason; true?
16 A It was making me upset.
17 Q Sir, you deleted your Facebook account because
18 you didn't want us to have access to it; true?
19 MS. MKRTCHYAN: Objection.
20 THE WITNESS: Nothing to hide on Facebook.
21 MS. MKRTCHYAN: It's argumentative. Wait a minute.
22 Objection. It's argumentative.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


23 Q BY MR. HARRELL: Sir?
24 MS. MKRTCHYAN: **You are instructed not to answer to**
25 **a question like that.**

(Transcript, 260:22 – 264:25)


All of the forgoing inquiry – relating to ***destruction of requested evidence*** -- is
facially relevant to my clients' developing ***spoliation claim*** in this lawsuit. As noted by
our Magistrate Judge (in another case), a spoliation remedy requires factual support –
which is just what I was attempting to elicit during Plaintiff's deposition:


Spoliation is the destruction or significant alteration of evidence, or the
failure to preserve property for another's use as evidence, in pending or
reasonably foreseeable litigation. Reinsdorf v. Skechers U.S.A., Inc., 296 F.R.D.
604, 625 (C.D. Cal. 2013). The bare fact that evidence has been altered or
destroyed 'does not necessarily mean that the party has engaged in sanction-
worthy spoliation.' Ashton v. Knight Transp., Inc., 772 F. Supp. 2d 772, 799-800
(N.D. Tex. 2011). Courts typically apply the following test to determine whether to
impose sanctions for spoliation, requiring the party seeking sanctions to
establish: (1) that the party having control over the evidence had an obligation to
preserve it at the time it was destroyed; (2) that the records were destroyed with
***a 'culpable state of mind'*** and (3) that the evidence was 'relevant' to the party's
claim or defense such that a reasonable trier of fact could find that it would
support that claim or defense. Reinsdorf, 296 F.R.D. at 626; see also Zubulake v.
UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). . ..[¶] ***The party
seeking spoliation sanctions has the burden of establishing the elements
of a spoliation claim.*** Reinsdorf, 296 F.R.D. at 626.

Star Envirotech, Inc. v. Redline Detection, LLC, 2015 WL 9093561, at *5 (C.D. Cal.
2015)(McCormick, M.J.)(emphasis added.)


In its prior civility order, the Court rightly took a dim view of your decision to slam
your hand down on the deposition table. (Order, Dkt. No. 73, p. 3)(admonishing you for
"slap[ping] the conference room table at least twice."). Your outburst during the forgoing
spoliation inquiry – which featured ***throwing documents*** in my direction (and in the
direction of court reporting / video staff) – represents an even more serious refusal to
listen to (or care about) the Court's orders requiring civility and professionalism in this
case. (See, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the
July 9 telephone conference, that all counsel should comport themselves in the
deposition the same as if they were in the courtroom. . ..)

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

If there were any doubt on the issue, you made your contempt for the Court's previous civility orders explicit during another one of your window-rattling deposition outbursts:

**Page 275**

7   MS. MKRTCHYAN: . . .I will walk away. Okay?
8   And my client is not going to come back for another
9   deposition.
10 MR. HARRELL: Maybe the judge will have the final
11 word on that, ma'am.
12 MS. MKRTCHYAN: Well, you know what? I'm sorry. A
13 lot of the things right now are still up in the air in
14 this country. **So whether you have a judge saying**
15 **something** or the president saying something, **it really**
16 **doesn't matter anymore. Okay?**
17 MR. HARRELL: It doesn't matter to you what the
18 judge says?
19 MS. MKRTCHYAN: Right now what I care is my client
20 being badgered by you and your condescending behavior
21 toward me.
22 MR. HARRELL: Ma'am, are you saying it doesn't
23 matter to you what the judge says?
24 MS. MKRTCHYAN: A
13 lot of the things right now are still up in the air in
14 this country. **So whether you have a judge saying**
15 **something** or the president saying something, **it really**
16 **doesn't matter anymore. Okay?**
At this point all I care is what
25 the books say. **I don't care what one specific judge**

**Page 276**

1 **says or does not do.** Nobody is above the law.

(Transcript, 275:7 – 276:25)

From your conduct alone, even the most naïve observer would conclude that the Court's prior directive requiring professionalism and civility means nothing to you. But you made your contempt for the Court's civility orders ***explicit*** during the forgoing outburst. (Transcript, 275:7 – 276:25)("A lot of the things right now are still up in the air in this country. **So whether you have a judge saying something** or the president

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


saying something, **it really doesn't matter anymore.** Okay?. . ..**_I don't care what one specific judge says . . .._")**(emphasis added.)[5]


To state the obvious, indifference to court orders rightly has consequences for attorneys who take an oath to uphold respect for the law. These consequences can include a contempt citation. See, e.g., Business and Professions Code § 6068(b)(it is the duty of an attorney to "maintain the respect due to the courts of justice and judicial officers."); Chula v. Superior Court In & For Orange Cty., 109 Cal. App. 2d 24, 39 (1952)("counsel, however zealous in his client's behalf, has, as an officer of the court, a paramount obligation to the due and orderly administration of justice, and **_at all times_** should maintain a respectful attitude toward the court. A disavowal of intentional disrespect or wrongful intent is no defense to a contempt order.")(emphasis added.); People v. Chong, 76 Cal. App. 4th 232, 245 (1999)(upholding contempt finding against attorney who "challenged the court's authority.")

The consequences for your "I don't care" view of the Court's standing civility order also include dismissal of Plaintiff's case. Given the Court's prior warnings, and its extant civility order which you have chosen to **_repeatedly violate_**, the Court can (and should) order dismissal. See, Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir.

---

[5] All this illustrates your evidently fervent wish to drag this country into a darker age without learned judges, court orders or fixed law. It is worth remembering that the rule of law is part of our society's response to the Jacobins — the most radical and ruthless of the political groups formed in the wake of the French Revolution, who (in association with Robespierre) instituted the 1793–4 "Reign of Terror". During the Terror, judges, attorneys and citation to law itself were all banished in favor of *ad hoc* "street justice". Left unchecked, Robespierre and the Terror he unleashed featured roving mobs of Jacobins performing almost instant executions of random groups of unfortunates.

Jacobinism later, of course, also took hold in revolutionary Russia and China — all with disastrous results. As all three cases demonstrate, once reliance on judicially expressed rules of conduct is abandoned, no one is safe from the resulting downward spiral into chaos. Centuries of judicial opinions have taken note. See, e.g., College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 690 (1999)(denouncing a "proposition that . . .might well have dropped from the lips of Robespierre, but surely not from those of Madison, Jefferson, or Hamilton. . .."); People ex rel. Thorne v. Hays, 4 Cal. 127, 133–34 (1854)(noting "the days of the [early French] Republic, when Robespierre. . .[brought] bloody scenes of tumult and revolution. . ..") For this reason, among others, our society requires respect for trained judges and the considered orders they issue; Jacobin - like pronouncements pulled out of nowhere will not do.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

1992) ("[P]ursuant to [Rule] 41(b), the district court may dismiss an action for failure to comply with ***any order*** of the court.")(emphasis added); Loop AI Labs Inc. v. Gatti, 2017 WL 934599, at *15 (N.D. Cal. 2017), aff'd, 742 F. App'x 286 (9th Cir. 2018)(dismissal ordered where "Plaintiff's actions evince a persistent belief that it is above any obligation to obey the Court's orders. . .or rules."); Lee v. Walters, 172 F.R.D. 421, 436 (D. Or. 1996) ("[Rule] 37(b)(2) . . . authorizes a variety of non-monetary sanctions against the party who fails to obey a court order, such as designating facts as proven, prohibiting certain matters from being introduced into evidence, striking pleadings, dismissing the action, or even entering a judgment by default.") Dismissal is particularly appropriate where, as here, "the Court has issued unambiguous warnings that a refusal to correct course and abide by the local rules, standing orders, court orders, and Federal Rules would result in sanctions." Loop AI Labs Inc. v. Gatti, 2017 WL 934599, at *12 (N.D. Cal. 2017), aff'd, 742 F. App'x 286 (9th Cir. 2018); (see, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..")

Even if the Court permits this matter to proceed (and it should ***not***), the defense is entitled to some safeguards to help ensure that what happened at Plaintiff's deposition is not repeated again. For starters, we need a re-do of Plaintiff's deposition under the supervision of a retired Magistrate Judge (at your expense). Apart from the forgoing repeated breaches of the Court's civility order, the following rule violations illustrate the need for your constant supervision by a bench officer.

## II.    SPEAKING OVER OTHERS

For starters, the defense is entitled to have a deposition transcript which they can actually use at trial. Your constant interruptions during the deposition make Plaintiff's deposition transcript essentially unusable. Part of the problem is your interruptions while questions were being asked or answers were being given. There is no practical way to edit your videoed interruptions out of the middle of someone else's attempt to ask (or answer) questions.

The following deposition excerpts (featuring your interruptions of both me and your client) are illustrative:

**Page 95**

22 Q You understood that law enforcement is called
23 to the scene of problems --
24 MS. MKRTCHYAN: **Vague and ambiguous.**
25 Q BY MR. HARRELL: -- and they are asked to try

**Page 96**
1 and resolve the problems; right?
2 MS. MKRTCHYAN: Vague and ambiguous.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


(Transcript, 95:22 – 96:2)(emphasis added)


**Page 263**


3 Q BY MR. HARRELL: Sir, after you learned that
4 we were seeking --
5 MS. MKRTCHYAN: **We're getting up. No.** Let's get
6 up. Because you know what? You're continuing to ask
7 the same question going into attorney-client privileged
8 communications. Thank you.
9 So if you're not going to move onto another
10 topic that does not infringe upon my client's right to
11 privilege, I will stay here.
12 Do you have another question?
13 MR. HARRELL: **I was trying to get my question out,**
14 **and somebody interrupted.**
15 MS. MKRTCHYAN: Well, because you are asking the
16 same exact question. I already know what question
17 you're asking, because you are already assuming
18 something of my client. So I'm not going to let that
19 happen. Okay?

(Transcript, 263:3 - 19)(emphasis added)


**Page 114**


8 Q You were calm and cool the entire time of the
9 incident?
10 MS. MKRTCHYAN: Asked and answered.
11 THE WITNESS: Yes.
12 Q BY MR. HARRELL: You used restrained,
13 respectful words throughout the entire incident; right?
14 A I will say I cussed a couple times. . ..

20 Q Do you make it your practice to use curse
21 words when you're angry and upset?
22 MS. MKRTCHYAN: Argumentative.
23 THE WITNESS: I wasn't angry --
24 MS. MKRTCHYAN: **Argumentative**
25 THE WITNESS: -- or upset. I was frustrated.

(Transcript, 114:8 - 25)(emphasis added)


    I thereafter tried to get a usable deposition answer from your client (without your
interruption). But you wrongful blocked my efforts:

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

**Page 115**

1 MS. MKRTCHYAN: Let me object. Okay? This is
2 going --
3 Q BY MR. HARRELL: Do you make it your practice
4 to use curse words when you're angry and upset?
5 MS. MKRTCHYAN: Asked and answered. Badgering the
6 witness.
7 Are you going to continue doing the same thing
8 over and over again? You asked, and he answered.
9 Q BY MR. HARRELL: Do you make it your practice,
10 sir, to use --
11 MS. MKRTCHYAN: **Don't answer that.**
12 (Discussion off the record.)
13 (The following record was read:
14 "Q Do you make it your practice, sir,
15 to use --")
16 MS. MKRTCHYAN: Okay. Asked and answered. I'm
17 **instructing not to answer** that question.
18 Q BY MR. HARRELL: Do you make it your practice,
19 sir, to use curse words when you're angry and upset?
20 MS. MKRTCHYAN: **I'm instructing you not to answer**.
21 MR. HARRELL: Mark it.

(Transcript, 115:1 - 21)(emphasis added.)

**Page 194**

17 Q BY MR. HARRELL: If we hear the word "guess,"
18 that causes problems.
19 Okay?
20 A Okay.
21 Q So let me ask you --
22 MS. MKRTCHYAN: Are you going to let me to make the
23 record clear, Counsel?
24 MR. HARRELL: Well, **if I can just get my question**
25 **out**, and then we'll see what happens next.

(Transcript, 194:17 - 25)(emphasis added.)

     In federal cases, "[i]t is inappropriate for counsel to . . . *__interrupt__* . . .opposing counsel during a deposition. . ..Courts have characterized such conduct as 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of meaningful testimony and disrupt the orderly flow of a deposition." <u>Luangisa v. Interface Operations,</u>

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

2011 WL 6029880, at *7 (D.Nev. 2011)(emphasis added.) It is also improper for you to
interrupt your own client's answer. See, Claypole v. Cty. of Monterey, 2016 WL 145557,
at *3 (N.D. Cal. 2016)(sanctions ordered in response to "extremely long speaking
objections, coaching witnesses, [and] ***cutting off witnesses*** . . ..")(emphasis added.);
see, Claredon Nat'l Ins. Co. v. Foley & Bezek, LLP, 2001 WL 1223486, at * 1 n.2 (C.D.
Cal. 2001)(constant interference during a deposition is a " 'blatant and egregious'
discovery violation[ ].") As the forgoing excerpts illustrate, you violated this rule
repeatedly at Plaintiff's deposition. (See, Order, pp. 2 and 4)(going forward, "I expect, as
I told counsel during the July 9 telephone conference, that all counsel should comport
themselves in the deposition the same as if they were in the courtroom. . ..")

## III.    IMPROPER INSTRUCTIONS NOT TO ANSWER

You also improperly instructed Plaintiff not to answer questions throughout the
deposition. As you are aware, Fed. R. Civ. P. 30 states that counsel "may instruct a
deponent not to answer ***only*** when necessary to preserve a ***privilege***, to enforce a
limitation ordered by the court, or to present a motion under Rule 30(d)(3)." (emphasis
added.) Your many instructions not to answer questions were not to enforce a court
order, and the vast majority were not to preserve a "privilege" as Rule 30 permits. See,
IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *2 (S.D. Cal. 2017)
("Instructing a deponent not to answer a question on any grounds not delineated in Rule
30(c)(2) can be grounds for sanctions under Rule 30(d)(2).")

"In general, objections during depositions are noted for the record but the
deposition proceeds and testimony is taken subject to any objection." Horowitz v. Chen,
2018 WL 4560697, at *3 (C.D. Cal. 2018)(citations omitted.); see, In re Toys R Us-
Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig., 2010 WL
4942645, at *9 (C.D. Cal. 2010) ("An attorney may ***not*** instruct a witness not to answer
a question on the ground that it has been asked and answered, is vague and
ambiguous or is irrelevant")(emphasis added.)

The following deposition excerpts are illustrative of the problem I repeatedly
confronted:

**Page 97**

1 Q Okay. Was it important to you to help
2 show the officers that you posed no threat to
3 them?
4 THE WITNESS: Do we scale off on a matter of
5 importance at that situation? Because **I have a few
6 more things that were important**, like my life. I felt

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

7 threatened. That was important to me at that moment.
8 Whether these guys were going to shoot me like they do
9 a lot of other people, that was important to me.
10 Q BY MR. HARRELL: Sir, was it -- with regret,
11 I'm going to ask it again.
12 You're answering questions that I haven't
13 asked you.
14 A Okay.
15 Q My question has another focus.
16 MS. MKRTCHYAN: Vague and -- okay. First of all,
17 argumentative.
18 MR. HARRELL: So with regret, we're going to read
19 it back.
20 MS. MKRTCHYAN: Well, objection. Argumentative.
21 You are badgering the witness. If you don't like the
22 answers, seriously, I'm not going to let you badger my
23 client if you don't like the answer. **This is**
24 **hilarious.**
25 So if you don't understand the question, you

**Page 98**
1 need to ask for clarification. Okay? But --
2 (The following record was read:
3 "Q Okay. Was it important to you to help
4 show the officers that you posed no threat to
5 them?")
6 MS. MKRTCHYAN: Vague and ambiguous. Relevance.
7 Calls for speculation. **What he is thinking at the time**
8 **is irrelevant**, and more importantly, he already
9 answered the question.
10 So, I'm, you know, **instructing you not to**
11 **answer.** There was an answer to that already.
12 If you're going to continually ask him --
13 MR. HARRELL: Whoa. Stop. You state legal
14 objections, and then we move on.
15 MS. MKRTCHYAN: If you're going to ask -- okay. If
16 you're going to ask the same question over and over
17 again, I'm going to keep objecting, and I'm going to
18 **instruct him not to answer.**

(Transcript, 97:1 – 98:18)(emphasis added.)

First of all, your claim that "[w]hat [Plaintiff] is thinking at the time is irrelevant" is flatly wrong. "[T]he purpose of a deposition is to find out what the witness _**thinks**_, saw, heard or did." Mazzeo v. Gibbons, 2010 WL 3020021, at *2 (D. Nev. 2010)(emphasis

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

added). Plaintiff's mindset when he was interacting with the peace officers he now sues is therefore directly relevant to the issues Mr. Holloway raises. See, Fed. R. Civ. P. 26.

In any event, an instruction not to answer based on "relevance" is not permissible. See, IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *3 (S.D. Cal. 2017)("Mr. Mays also objected on grounds of relevance and instructed Mr. King not to answer questions regarding a consultant for Plaintiff named Julie Dixon, who apparently performed project manager services for Plaintiff. Although the relevance of this line of questioning . . . is unclear, it was improper for Mr. Mays to instruct Mr. King not to answer on grounds of relevance. . ..The instruction not to answer this line of questioning was improper and impeded and frustrated the fair examination of the deponent.")(record citations omitted)

Also, Plaintiff – at your encouragement – combatively failed to answer the question he was asked – i.e., "was it important to you to help show the officers that you posed no threat to them?" Instead, and consistent with your own outbursts, Plaintiff evaded the question and made an off-point speech denouncing law enforcement. See, MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at *1 (C.D. Cal. 2014)("the witness appears to have been highly evasive and unwilling to simply answer a question. . .. The end result was essentially a filibuster . . .."); Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)(counsel for the deponent "was disrespectful and personally attacked [questioning] counsel in a way that is wholly unsuitable for a deposition or any other litigation proceeding. . ..These types of comments would have no place in a courtroom, and they accordingly have no place in a deposition proceeding. . .. To make matters worse, the Court's review of the deposition transcript strongly suggests that [counsel for the deponent's] ***antagonistic behavior emboldened [the witness] to be uncooperative***, rendering the deposition nearly wholly ineffective.")(emphasis added.)

Your instruction not to answer based on an "asked and answered" objection is frivolous. "Not only was the objection . . . unfounded as the question had not been answered . . . but that determination is also one for the Court to make rather than counsel during the deposition." Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018); see, Lund v. Matthews, 2014 WL 517569, at *4-6 (D. Neb. 2014) (awarding sanctions where counsel instructed the witness not to answer on the basis of an "asked and answered" objection). As noted above, "[i]t is inappropriate for counsel to . . . assert groundless objections [or] improperly object. . .." Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011) "Courts have characterized such conduct as 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of meaningful testimony and disrupt the orderly flow of a deposition." Id. The Luangisa Court's opinion could have been written to address the deposition transcript at issue here.

Plaintiff's deposition transcript is replete with additional examples of improper instructions not to answer:

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

**Page 114**

8 Q You were calm and cool the entire time of the
9 incident?
10 MS. MKRTCHYAN: Asked and answered.
11 THE WITNESS: Yes.
12 Q BY MR. HARRELL: You used restrained,
13 respectful words throughout the entire incident; right?
14 A I will say I cussed a couple times. . ..

20 Q Do you make it your practice to use curse
21 words when you're angry and upset?
22 MS. MKRTCHYAN: Argumentative.
23 THE WITNESS: I wasn't angry --
24 MS. MKRTCHYAN: **Argumentative**
25 THE WITNESS: -- or upset. I was frustrated.

**Page 115**

1 MS. MKRTCHYAN: Let me object. Okay? This is
2 going --
3 Q BY MR. HARRELL: Do you make it your practice
4 to use curse words when you're angry and upset?
5 MS. MKRTCHYAN: Asked and answered. Badgering the
6 witness.
7 Are you going to continue doing the same thing
8 over and over again? You asked, and he answered.
9 Q BY MR. HARRELL: Do you make it your practice,
10 sir, to use --
11 MS. MKRTCHYAN: **Don't answer that.**
12 (Discussion off the record.)
13 (The following record was read:
14 "Q Do you make it your practice, sir,
15 to use --")
16 MS. MKRTCHYAN: Okay. Asked and answered. I'm
17 instructing not to answer that question.
18 Q BY MR. HARRELL: Do you make it your practice,
19 sir, to use curse words when you're angry and upset?
20 MS. MKRTCHYAN: I'm **instructing you not to answer**.
21 MR. HARRELL: Mark it.

(Transcript, 114:8 – 115:21)(emphasis added.)

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

Your instruction not to answer based on an "asked and answered" objection is
frivolous. <u>See</u>, <u>Lund v. Matthews</u>, 2014 WL 517569, at *4-6 (D. Neb. 2014) (awarding
sanctions where counsel instructed the witness not to answer on the basis of an "asked
and answered" objection). And this is particularly so since I was attempting to obtain a
***usable answer*** that did not include your interruption ***in the middle of your client's
answer***.

Plaintiff – emboldened by your antagonism -- also did not answer the question,
which asked about his "practice" as regards his use of profanity. Instead, Plaintiff
answered a question no one had asked him – <u>i.e.</u>, how he was feeling at the time of the
incident. <u>See</u>, <u>Horowitz v. Chen</u>, 2018 WL 4560697, at *4 (C.D. Cal. 2018)(counsel for
the deponent "was disrespectful and personally attacked [questioning] counsel in a way
that is wholly unsuitable for a deposition or any other litigation proceeding. . ..To make
matters worse, the Court's review of the deposition transcript strongly suggests that
[counsel for the deponent's] ***antagonistic behavior emboldened [the witness] to be
uncooperative***, rendering the deposition nearly wholly ineffective.")(emphasis added.)[6]

At times, you even ordered your client to remain silent so you could start testifying
for him:

**Page 135**

4 Q. Do you believe that officers were
5 outside of your tent for no reason?
6 MS. MKRTCHYAN: **He would not know**. Calls for
7 speculation. Vague and ambiguous. And asked and
8 answered.
9 So I'm **instructing you not to answer** the same
10 question.

---

[6] As you became more combative and obstructive, so did Plaintiff:

4 Q BY MR. HARRELL: Okay. So when the officer
5 indicated that he had officer safety concerns and
6 that's why he wanted to --
7 A Yeah.
8 Q -- pat you down, you understood that the
9 officer wanted to do a pat-down search to see if you
10 had any weapons on you; right?
11 A **I understand he wanted to violate my civil**
12 **rights.**
13 Q I understand, sir. That's kind of more
14 something for your lawyer to say in front of a jury.
15 My question has another focus.

(Transcript, 90:4-15)(emphasis added.)

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


11 THE WITNESS: Okay.
12 MR. HARRELL: Mark it.

(Transcript, 135:4-12)(emphasis added.)


Plaintiff seeks "emotional distress" damages in this case. The defense is therefore entitled to find out ***why*** Plaintiff is upset, including ***what*** about the incident supposedly upsets him. See, e.g., Kelley v. Schlumberger Technology Corp., 849 F.2d 41, 44 (1st Cir.1988) (jury instructions correctly stated that plaintiff can only recover for emotional distress if "a reasonable person in the plaintiff's position would have been seriously distressed" under the circumstances); Pichowicz v. Hoyt, 2000 WL 1480445, at *3 (D.N.H. 2000)(limiting damages where court finds "a reasonable, normally constituted person would not suffer compensable severe emotional distress under the circumstances of this case.")

The threshold defense inquiry in cases of this type is ***what Plaintiff believes*** happened during the subject incident, which is something ***only he*** can answer. Rather than allow me to gather this relevant information, you reformulated my question, answered the reformulated question for your client and instructed him not to answer based on "relevance" and "asked and answered" objections.

None of this is acceptable. First of all, "answering" for your client is wrong. See, Claypole v. Cty. of Monterey, 2016 WL 145557, at *3 (N.D. Cal. 2016)(sanctions ordered in response to "extremely long speaking objections, coaching witnesses, cutting off witnesses and ***even answering for them***.")(emphasis added.)

Re-phrasing my deposition questions in a manner to your liking is also wrong. See, Horowitz v. Chen, 2018 WL 4560697, at *4 (C.D. Cal. 2018)("Additionally, [Chen's counsel] frequently made speaking objections to coach Chen and ***re-phrase Mannion's questions*** to elicit more favorable responses. . .. [Chen's counsel] used his speaking objections to coach Chen on what issues to address.")(emphasis added.); BNSF Ry. Co. v. San Joaquin Valley Ry. Co., 2009 WL 3872043, at *4 (E.D. Cal. 2009) ("counsel for the witness being deposed is prohibited from acting as an intermediary [by] interpreting questions. . ..") Indeed, even " 'cluing' the witness to ask the questions to be rephrased" is wrong. MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at *1 (C.D. Cal. 2014)("Counsel stepped up the attempt to disrupt any worthwhile examination by . . .'cluing' the witness to ask the questions to be rephrased. . ..")

And your instruction not to answer was, once again, frivolous. See, In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig., 2010 WL 4942645, at *9 (C.D. Cal. 2010) ("An attorney may not instruct a witness not to answer a question on the ground that it has been asked and answered, is vague and ambiguous or is irrelevant").

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

**Page 37**

7 Q Okay. For what period of time did you work
8 with Apex Company doing copy repair?
9 A That would have been through 2016. That
10 overlapped with self-employed. I was doing both.
11 Q Okay. When did your work with Apex start?
12 A 2015. . ..

**Page 38**

12 MS. MKRTCHYAN: Just I don't understand, Counsel,
13 why are you going that back in time? What is your -- I
14 mean, the guy doesn't remember. Would you remember?
15 Maybe yes. Maybe not. What is the relevance of him
16 telling you his employment that going far back ahead --
17 back?
18 MR. HARRELL: Okay. Thank you for all that.
19 Q Sir, for what period of time --
20 MS. MKRTCHYAN: Well, are you going to answer?
21 **Because I can instruct him not to answer. If something**
22 **I believe is irrelevant to your case**, to your defenses,
23 I can ask -- you know, going back that far, I just
24 don't believe that's relevant.
25 You know, what is relevant is maybe five years

**Page 39**

1 before the incident employment history or one year
2 before the incident. But you're going 2012 and before
3 then, and **he doesn't even remember.**
4 MR. HARRELL: Ma'am --
5 MS. MKRTCHYAN: So **do you have an offer of proof**?
6 MR. HARRELL: Ma'am, **maybe the time to meet and**
7 **confer is at another time and place.** Why don't you let
8 me ask my questions. You make your objections. If you
9 feel the need to instruct your client not to answer on
10 a relevance objection based on his employment history,
11 then I suppose you will do that.
12 MS. MKRTCHYAN: Uh-huh.
13 MR. HARRELL: And then we have our remedy.
14 MS. MKRTCHYAN: Okay.
15 MR. HARRELL: So let me get my questions out there.
16 Let's state objections. **Let's conduct ourselves like**
17 **we're in court as best as we can.**

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

18 MS. MKRTCHYAN: Uh-huh.
19 Q BY MR. HARRELL: And my next question, sir,
20 is, sir, for what period of time were you employed by
21 Apex?
22 MS. MKRTCHYAN: So here is the issue. **I'm going to**
23 **instruct you not to answer anything that is beyond**
24 **2012**. Okay?
25 THE WITNESS: All right.

(Transcript, 37:7 – 39:25)(emphasis added.)

Basic background information, such as Plaintiff's employment history, is relevant and discoverable. See, Hunt v. Walmart Store, Inc., 2019 WL 1057199, at *1 (E.D.Mich. 2019) ("Many of Defendant's discovery requests are clearly relevant, including basic biographical information such as name, address, ***occupation***, etc. . . ..")(emphasis added.); Call v. Shaw Jewelers, 1999 U.S. Dist. LEXIS 636 (E. D. Va. 1999) (noting that "[q]uestions as to an individual's...employment history...are basic identifying questions"; Court orders the material disclosed); DeNardo v. ABC, Inc., 51 P.3d 919, 924 (Alas. 2002) ("[Defendant] is correct that information regarding [plaintiff's] prior . . . employers might have been helpful in determining which jurisdictions to search for his criminal and litigation history"; Case dismissed for plaintiff's failure to provide same); Grant v. Target Corp., 281 F.R.D. 299, 311 (S.D.Ohio 2012)(the defense asked plaintiff "to state the name and address of all employers by whom he has been employed before, during, and since his employment with Target ended, the positions in which he was employed, the dates of employment, the identity of individuals to whom he reported in each job, the salary and/or compensation provided in such position, the benefits provided by such employer, whether he participated in such benefit programs, whether he was counseled or disciplined, and if his employment ended, the reason why. . . .. Mr. Grant is hereby required to answer all of the[se] questions . . ..")

Further, consuming valuable deposition time with a shrill demand that I "meet and confer" with you on a non-controversial topic is improper. And your instruction not to answer was, once again, frivolous. See, IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *2 (S.D. Cal. 2017)("Counsel for DPT attempted to question Mr. King regarding vehicle sensors. Rather than simply interposing an objection, attorney Mays ***demanded an explanation*** of the relevance of the line of questioning from counsel for DPT. When counsel for DPT ***properly refused to engage*** with Mr. Mays on the issue, Mr. Mays instructed his client not to answer solely on the basis of relevance.")(emphasis added.); In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig., 2010 WL 4942645, at *9 (C.D. Cal. 2010) ("An attorney may not instruct a witness not to answer a question on the ground that it . . .is irrelevant").

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

## IV.  CONSTANT DISRUPTIVE COMMENTS

Plaintiff's deposition is replete with off-putting interjections that often amounted to needless attempted quarrels over nothing:

**Page 75**

9 Q Do you believe that you have a clear memory of
10 what happened during the incident?
11 A I have a very clear memory.
12 MS. MKRTCHYAN: Argumentative. Excuse me.
13 Argumentative. **Vague and ambiguous.** Clear memory.
14 **Do you understand the question?**
15 THE WITNESS: **Yes.**
16 MS. MKRTCHYAN: Okay.

(Transcript, 75:9-16)(emphasis added.)

**Page 101**

11 Q And so you did not agree with the officer's
12 request to pat you down; true?
13 A I never said no, but I never said yes. I just
14 kept asking, "Why are they here?" And that's what I
15 just kept repeating. And I was getting frustrated with
16 them because they would not answer me.
17 Q Okay.
18 MS. MKRTCHYAN: **Why are you interrupting?**
19 Q BY MR. HARRELL: So when the officer says --
20 MS. MKRTCHYAN: Excuse me. Let him finish --
21 Q BY MR. HARRELL: -- says, "I would like to
22 do" --
23 MS. MKRTCHYAN: Excuse me. Hello?
24 Q BY MR. HARRELL: -- "a pat-down search" --
25 "I'd like to do a pat-down search."

**Page 102**

1 MS. MKRTCHYAN: This is not going to work. **If**
2 **you're going to continue interrupting my client, this**
3 **is not going to work.** He was answering your question.
4 **Do not interrupt my client.**
5 **Did you finish your answer?**
6 THE WITNESS: **As far as what he's answering, I**

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

7 **think.**

(Transcript, 101:11-102:7)(emphasis added.)

**Page 139**

1 Q Well, sir, you've already told us that you do
2 sometimes experience anger and upset when you think
3 about the incident; true?
4 MS. MKRTCHYAN: **Misstates the testimony. Misstates**
5 **the testimony.**
6 THE WITNESS: **Yes, I did say -- I did say that.**

(Transcript, 139:1-6)(emphasis added.)

**Page 154**

9  Q The first time law enforcement responds to
10 your tent, during that interaction, at some point you
11 tell Deputy Renegar that the people that they're
12 looking for, the people that are actually fighting, are
13 located at another campsite next to you?
14 A Yes.
15 Q And you identify these people as being the man
16 and the woman that were quarreling?
17 A **Yes.**
18 MS. MKRTCHYAN: **Misstates the testimony.**

(Transcript, 154:9-18)(emphasis added.)

**Page 158**

6  Q . . .
8 So when you got back to your campsite, you had
9 some questions that included why didn't these neighbors
10 speak up and identify themselves as the people that had
11 been involved in the quarrel; true?
12 MS. MKRTCHYAN: Objection. Vague and ambiguous.
13 **Misstates the testimony.**
14 THE WITNESS: I asked them, **yeah**, straight up. I
15 asked them why.

(Transcript, 158:6-15)(emphasis added.)

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


**Page 194**


17 Q BY MR. HARRELL: If we hear the word "guess,"
18 that causes problems.
19 Okay?
20 A Okay.
21 Q So let me ask you --
22 MS. MKRTCHYAN: Are you going to let me to make the
23 record clear, Counsel?
24 MR. HARRELL: Well, **if I can just get my question**
25 **out, and then we'll see what happens next.**


**Page 195**


1 MS. MKRTCHYAN: Well, he made a demonstration, and
2 I wanted to make a record.
3 MR. HARRELL: Right. But he also told us --
4 MS. MKRTCHYAN: It's your deposition. Fine.
5 MR. BECK [Plaintiff's co-counsel]: Narine, **you got this thing on videotape.**
6 MS. MKRTCHYAN: I understand. But what if that
7 **video gets destroyed**? How am I going to know if that
8 video is not **going to get destroyed**? . . ..[7]

(Transcript, 194:17 – 195:8)(emphasis added.)


        In federal cases, "[i]t is inappropriate for counsel to engage in extensive and
***unnecessary colloquy*** . . .or utilize any opportunity ***to interrupt and argue*** with
opposing counsel during a deposition." Luangisa v. Interface Operations, 2011 WL
6029880, at *7 (D.Nev. 2011). This is particularly so where, as here, there is nothing
legitimate to argue about. Id. ("Courts have characterized such conduct as 'Rambo
litigation tactics' designed to interfere with or prevent the elicitation of meaningful
testimony and disrupt the orderly flow of a deposition.") Here too, your failure to abide
by basic deposition principles wrongfully interfered with my ability to conduct a
meaningful deposition. (See, Order, pp. 2 and 4)(going forward, "I expect, as I told

---

[7] Given Plaintiff's apparent destruction of his Facebook account to frustrate its
production in discovery, the irony of this outburst is also one of the defining
characteristics of Plaintiff's litigation team: loudly accuse others of wrongdoing that you
yourself are guilty of. Freud called this tactic "projection." The rest of us call it hypocrisy.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

counsel during the July 9 telephone conference, that all counsel should comport
themselves in the deposition the same as if they were in the courtroom. . ..")


## V.    ALTERNATIVE STRESSORS / LOCATION OF WITNESSES

Plaintiff seeks "emotional distress" damages in this case. Given Plaintiff's
"emotional distress" claims, he "is placing his mental condition at issue in this case, and
[the defense] is entitled to explore ***any evidence*** . . .which may be relevant to such a
claim." Walker v. Northwest Airlines Corp., 2002 WL 32539635, at *4
(D.Minn.2002)(emphasis added).

Courts have made this point over and over again – a plaintiff, like Mr.
Holloway, who seeks compensation for their "emotional distress" opens the door to
discovery of potential alternative causes for their "distressed" condition. See, e.g., Doe
v. City of Chula Vista, 196 F.R.D. 562, 569 (S.D. Cal. 1999) ("[plaintiff] elected to seek
monetary relief from the defendants to compensate her for 'emotional pain, suffering,
loss of self esteem, and mental anguish'; consequently, [plaintiff] is relying on her
emotional state to make her case ... But to insure a fair trial, particularly on the element
of causation, the court concludes that defendants should have access to evidence that
[plaintiff's] emotional state was caused by something else. Defendants must be free to
test the truth of [plaintiff's] contention that she is emotionally upset because of the
defendants' conduct. Once [plaintiff] has elected to seek such damages, she cannot
fairly prevent discovery into evidence relating to the element of her claim."); Fox v.
Gates Corp., 179 F.R.D. 303, 306 (D. Colo. 1998) (defendant is entitled to discovery
whenever "the information. . . is relevant to whether the emotional distress which
plaintiff claims to have suffered as a result of defendant's conduct can be attributed in
whole, or in part, to some other stressor in her life."); see also, Vinson v. Superior Court,
43 Cal. 3d 833, 839-840 (1987)("In the case at bar, plaintiff haled defendants into court
and accused them of causing her various mental and emotional ailments. Defendants
deny her charges. As a result, the existence and extent of her mental injuries is
indubitably in dispute. In addition, by asserting a causal link between her mental
distress and defendants' conduct, plaintiff implicitly claims it was not caused by
[another] mental condition, thereby raising the question of alternative sources for the
distress. We thus conclude that her mental state is in controversy.")

Given Plaintiff's demand for "emotional distress" damages, Plaintiff's evident
estrangement from his family is a legitimate area for discovery. Even so, you wrongly
blocked any inquiry into this relevant subject matter:

**Page 45**

17 Q And Kailin Holloway is a child that you had
18 with Karlie Holloway?
19 A Yes, it is.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


20 Q Okay. Kailin Holloway lives where now?
21 A I do not know.
22 Q Does she live in the state of California?
23 A I do not know.
24 Q When is the last time you had any contact with
25 Kailin Holloway?


**Page 46**

1 MS. MKRTCHYAN: Objection. Relevance. Privacy.
2 **You're instructed not to answer.**
3 MR. HARRELL: Mark it.


**Page 50**

2 Q Are you in contact with your father at the
3 present time?
4 A No, I am not.
5 Q Is there a reason why?
6 MS. MKRTCHYAN: Objection. Relevance. Privacy.
7 You are instructed not to answer questions
8 that are private and nobody should have a right to
9 learn. Thank you.
10 MR. HARRELL: Mark it. . ..


19 Q Are you in contact with your brother, Joseph
20 Holloway?
21 MS. MKRTCHYAN: Objection. Relevance. Privacy.
22 You're instructed not to answer.
23 MR. HARRELL: Mark it.
24 Q Are you in contact with your sister, Misty
25 Henderson?


**Page 51**

1 MS. MKRTCHYAN: Same objection.
2 You are instructed not to answer it based on
3 privacy.
4 MR. HARRELL: Mark it.


(Transcript, 45:17 – 51:4)(emphasis added.)


One would suppose that Plaintiff's evident estrangement from his family qualifies
as an "alternative stressor" for damages purposes. Defendants are at least entitled to
explore the point in discovery in preparing their defense. See, e.g., Walker v. Northwest
Airlines Corp., 2002 WL 32539635, at *4 (D. Minn. 2002) (". . .where a plaintiff puts his

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

emotional condition into issue in the litigation, ***he effectively waives his right to
privacy*** . . .. Here, Plaintiff has placed his medical condition at issue by claiming
emotional distress damages.")(emphasis added and citations omitted.); <u>Mathie v. Fries</u>,
935 F. Supp. 1284, 1304 (E.D.N.Y. 1996) ("In the determination of the monetary
damages to be awarded to the plaintiff [under Section 1983] for the considerable
emotional distress sustained as a result of the sexual abuse, the Court must be careful
not to compensate the plaintiff for the non-related distress."), <u>aff'd</u>, 121 F.3d 808 (2d Cir.
1997); <u>York v. AT&T</u>, 95 F.3d 948, 957-958 (10th Cir. 1996) ("Because York chose to
raise a claim of emotional distress, it was entirely appropriate for the court to allow the
defendants to introduce evidence of alternate or multiple causes of such distress. The
jury must be permitted to consider such relevant evidence of causation where damages
are claimed for emotional distress. Moreover, it would be inequitable to allow the plaintiff
to introduce selected evidence on the matter but to disallow the defendants to present
evidence supporting their theories of causation.")

## VI.    COACHING

You often told Plaintiff how to testify through suggestive comments and leading
"objections":

**Page 62**

19 Q Okay. Well, let's talk about the incident.
20 The date of the incident that you had with the
21 sheriff's department was when?
22 A Would have been January 20th, I believe.
23 Q Of what year?
24 A 2017.
25 Q Okay. And –

**Page 63**

1 MS. MKRTCHYAN: **2018.**
2 Q BY MR. HARRELL: -- where did you live on that
3 date?
4 A **Was it 2018?**
5 MR. HARRELL: **Counsel, what do we call that, what**
6 **you just did?**

(Transcript, 62:19-63:6)(emphasis added.)

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


As you are aware, what you "just did" is called "coaching". It is not permissible in a deposition. <u>See</u>, <u>Mazzeo v. Gibbons</u>, 2010 WL 3020021, at *2 (D. Nev. 2010)(noting the "clearly established legal rules" for conduct during a deposition, including the requirement "that lawyers are not supposed to coach or change the witness's own words . . .."); (<u>See</u>, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom. . ..") But coaching was a regular go-to response to my questions.


Examples of your misconduct are not in short supply:


**Page 141**


5 Q BY MR. HARRELL: Do you hold it against law
6 enforcement for responding to the complaint of criminal
7 conduct at the campground, or do you think they just
8 should have ignored it?
9 MS. MKRTCHYAN: How do you object to this type of
10 **nonsense**?
11 THE WITNESS: This is --
12 MS. MKRTCHYAN: Argumentative. Objection. **Vague**
13 **and ambiguous.**
14 THE WITNESS: **Yeah, I can't answer that question.**

(Transcript, 141:5-14)(emphasis added.)


Coaching of this type is wrong. <u>See</u>, <u>Mazzeo v. Gibbons</u>, 2010 WL 3020021, at *2 (D. Nev. 2010)(noting the "clearly established legal rules" for conduct during a deposition, including "mak[ing] speaking, coaching, suggestive objections which violate Rule 30(c)(2)."); <u>Luangisa v. Interface Operations</u>, 2011 WL 6029880, at *7 (D.Nev. 2011)("Deposition testimony should be that of the deponent, not a version edited or glossed by the deponent's lawyer through coaching or speaking objections.") "Courts have characterized such conduct as 'Rambo litigation tactics' designed to interfere with or prevent the elicitation of meaningful testimony and disrupt the orderly flow of a deposition." <u>Luangisa,</u> 2011 WL 6029880, at *7.


Your coaching included undisguised requests for Plaintiff to "not remember" when you felt it best for your case:


**Page 317**

8  Q. . .How many photographs of the bruising that

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

9 you've talked about to your ribs and back -- how many
10 photographs of that were taken?
11 MS. MKRTCHYAN: **Do you remember**? If you recall.
12 THE WITNESS: Taken 50 photographs.
13 MS. MKRTCHYAN: Altogether?
14 THE WITNESS: Of everything.
15 MS. MKRTCHYAN: Right. But he's asking
16 specifically of this area, **if you remember.**
17 THE WITNESS: I have -- I mean --
18 MS. MKRTCHYAN: **If you remember**. . ..

**Page 318**

4 MS. MKRTCHYAN: He's asking, **if you remember**, how
5 many of each side. But if you don't remember, **you can**
6 **say "I don't remember."**
7 THE WITNESS: **I don't remember** the exact number.
8 MS. MKRTCHYAN: **Exactly.**

(Transcript, 317:8-318:8)(emphasis added.)

Needless to say, coaching of this type is wrong. <u>See, Mazzeo v. Gibbons</u>, 2010 WL 3020021, at *2 (D. Nev. 2010)(noting the "clearly established legal rules" for conduct during a deposition, including the recognition "that speaking objections such as 'if you remember,' 'if you know,' 'don't guess,' 'you've answered the question,' and 'do you understand the question' are designed to coach the witness and are improper."); <u>Cotton v. City of Eureka</u>, 2010 WL 2889498, at *1-3 (N.D. Cal. 2010) (noting that an attorney had violated Rule 30(c)(2) when she "interposed improper coaching objections and improper speaking objections")

Your coaching even crossed the line to ___*outright testimony*___ on behalf of your client:

**Page 56**

12 Q BY MR. HARRELL: Sir, have you received a bill
13 from the VA, to your knowledge, for your medical
14 treatment since the incident happened? Yes, no, or I
15 don't know?
16 MS. MKRTCHYAN: **Or has your lawyer** -- see --
17 MR. HARRELL: Ma'am, with respect, that's not my
18 question. So you'll have an opportunity later if
19 you're so inclined to ask whatever you want to ask.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

20 Right now my question has a limited focus that does not
21 involve you, with all due respect.
22 MS. MKRTCHYAN: Well, excuse me. If it's
23 attorney-client privilege, then it is involving me.
24 MR. HARRELL: Ma'am.
25 MS. MKRTCHYAN: So -- and you know what? Your

**Page 57**

1 attitude -- I really do not appreciate this
2 condescending attitude, unprofessional, sexist attitude
3 that you're coming up across from the very beginning
4 this morning. I'm not going to tolerate that.
5 From the very beginning, you've been this
6 hostile, you know, person, you know. So I'm not going
7 to tolerate that.
8 I'm instructing him not to answer because the
9 answer presupposes attorney-client privilege. Okay?
10 **He is -- he has -- his attorney has received billing**
11 **records.** He has not received it. So, therefore, his
12 answer is irrelevant. So –

(Transcript, 56:12-57:12)(emphasis added.)

Your decision to "answer" deposition questions which were directed to your client
is wrong. <u>See</u>, <u>Claypole v. Cty. of Monterey</u>, 2016 WL 145557, at *3 (N.D. Cal.
2016)(sanctions ordered in response to "extremely long speaking objections, coaching
witnesses, cutting off witnesses and ***even answering for them***.")(emphasis added.);
<u>Luangisa v. Interface Operations,</u> 2011 WL 6029880, at *7 (D.Nev. 2011) ("Deposition
testimony should be that of the deponent, not a version edited or glossed by the
deponent's lawyer through coaching or ***speaking objections***.")(emphasis added.);
(<u>See</u>, Order, pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9
telephone conference, that all counsel should comport themselves in the deposition the
same as if they were in the courtroom. . ..")

Re-phrasing my questions into something you felt best served your case is also
improper. <u>See</u>, <u>Horowitz v. Chen</u>, 2018 WL 4560697, at *4 (C.D. Cal.
2018)("Additionally, [Chen's counsel] frequently made speaking objections to coach
Chen and ***re-phrase Mannion's questions*** to elicit more favorable responses. . ..
[Cen's counsel] used his speaking objections to coach Chen on what issues to
address."); <u>BNSF Ry. Co. v. San Joaquin Valley Ry. Co.</u>, 2009 WL 3872043, at *4 (E.D.
Cal. 2009) ("[C]ounsel for the witness being deposed is prohibited from acting as an
intermediary [by] ***interpreting questions***. . ..")(emphasis added.); (<u>See</u>, Order, pp. 2
and 4)(going forward, "I expect, as I told counsel during the July 9 telephone

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

conference, that all counsel should comport themselves in the deposition the same as if
they were in the courtroom. . ..")

## VII.   SANCTIONS

We could go on and on -- and on some more. There is certainly much more that
can be said about your misconduct. But the nature of the many problems with your
conduct during Plaintiff's deposition should have been clear pages ago. Plaintiff's
deposition was yet another "train wreck" performance on your part. Your misconduct
repeatedly violated the Court's civility order as well as basic, long-settled rules
governing how federal depositions are supposed to proceed.

As noted above, the appropriate remedial result now is dismissal of Plaintiff's
case. See, Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992) ("[P]ursuant to
[Rule] 41(b), the district court may dismiss an action for failure to comply with ***any order***
of the court.")(emphasis added); Loop AI Labs Inc. v. Gatti, 2017 WL 934599, at *15
(N.D. Cal. 2017), aff'd, 742 F. App'x 286 (9th Cir. 2018)(dismissal ordered where
"Plaintiff's actions evince a persistent belief that it is above any obligation to obey the
Court's orders. . .or rules.")[8]

The need for dismissal here is only heightened and exacerbated by your
conduct during our last discovery hearing with Magistrate Judge McCormick just last
week. As the transcript we ordered will reflect, you saw fit to show a complete lack of
civility to our Magistrate Judge which featured insults and verbal outrages of a type I
have never witnessed in a court proceeding. Your raised voice tirade was *non compos
mentis* – to an astonishing degree.[9] Before you abruptly hung up on the judge, it

---

[8] At this point, Plaintiff's "beef is against [his lawyer] not the court's ruling on the case....
'Holding the client responsible for the lawyers' deeds ensures that both clients and
lawyers take care to comply. If the lawyers' neglect protected the client from ill
consequences, neglect would become all too common.' " Bakery Mach. & Fabrication,
Inc., v. Traditional Baking, Inc., 570 F.3d 845, 848–49 (7th Cir. 2009). " '[T]here is
certainly nothing novel [or unjust] about holding clients responsible for the conduct of
their attorneys, even conduct they did not know about.' " Thorpe v. Ancell, 367 F.App'x
914, 923 (10th Cir. 2010); see also, Bd. of Trustees of Pipe Fitters' Ret. Fund, Local
597 v. Commercial Cooling & Heating, Inc., 2019 WL 2269959, at *16–18 (N.D. Ill.
2019)("the proper remedy for an innocent client whose lawyer inexcusably misses
deadlines and/or otherwise fails in required obligations is a suit against the attorney for
malpractice. Keeping a suit alive on the theory that a party should not be penalized for
the omissions of his chosen attorney – which is Mr. Johnson's belated, unsupported
theory – would be visiting the sins of the lawyer on the blameless opponent.")

[9] "Train wreck" – the descriptor used by the Court in its prior order – frankly does not do
your most recent misconduct justice. Neither does "car crash" or "dumpster fire". In a
case already punctuated by meltdowns, you went full Nagasaki at our last hearing.

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

became plain – once again -- that you have no respect for our judge, his orders or our
judicial system. In such an unhinged environment, my clients have no hope of obtaining
a "just, speedy, and inexpensive determination" of this action. Fed. R. Civ. P. 1.

Even if Plaintiff's case somehow survives, sanctions are plainly required here –
for multiple reasons. See, Rywkin v. New York Blood Ctr., 1998 WL 633810, at *1
(S.D.N.Y. 1998)(deponent's counsel "(1) repeatedly directed plaintiff not to answer
questions on inappropriate grounds, (2) made frivolous privilege objections and then
foreclosed questioning by opposing counsel, (3) made speaking objections that
suggested to the witness the answer she should give, (4) made *ad hominem* attacks on
opposing counsel, and (5) insinuated, without support, that opposing counsel's conduct
was racially motivated. This conduct ***clearly is sanctionable***.")(emphasis added.); see,
Claypole v. Cty. of Monterey, 2016 WL 145557, at *3 (N.D. Cal. 2016)(sanctions
ordered in response to "extremely long speaking objections, coaching witnesses, cutting
off witnesses and even answering for them."); Funk v. Town of Paradise, 2011 WL
2580357, at *2 (E.D. Cal. 2011) (sanctioning counsel for "appalling" behavior where
counsel "repeatedly interrupted the proceedings, interjected editorial comments, and
coached or suggested information to the witnesses")[10]

These sanctions should include monetary compensation for the County's costs
incurred at Plaintiff's first attempted deposition. Fed. R. Civ. P. 30(d)(2) provides: "The
court may impose an appropriate sanction — including the reasonable expenses and
attorney's fees incurred by any party — on a person who impedes, delays, or frustrates
the fair examination of the deponent." See, Horowitz v. Chen, 2018 WL 4560697, at *5
(C.D. Cal. 2018)("The Court finds that monetary sanctions in the form of attorney's fees
and costs are warranted. [Defense / deponent's counsel's] behavior through coaching,
breaks, and frequent unprofessional comments wasted a large portion of Chen's
deposition time and forced Plaintiffs to seek the Court's intervention. A monetary
sanction is warranted to make Plaintiffs whole.")

The Court's sanctions order should also include:

1. The costs associated with Plaintiff's renewed deposition. See, Hernandez v.
   Lynch, 2019 WL 6998774, at *4 (C.D. Cal. 2019)("the Court finds that the
   Special Master was correct to conclude that Plaintiffs' counsels' conduct was
   improper and impeded Defendants from conducting a fair deposition and
   pursuing relevant lines of inquiry. In light of this, it was proper to order new
   depositions of the Named Plaintiffs."); IPS Grp., Inc. v. Duncan Sols., Inc.,
   2017 WL 3457141, at *6 (S.D. Cal. 2017)("Plaintiff must reimburse DPT for

---

[10] "Rule 30(d)(2) sanctions do not require a finding of bad faith." IPS Grp., Inc. v.
Duncan Sols., Inc., 2017 WL 3457141, at *2 (S.D. Cal. 2017); see, Robinson v. The
Chefs' Warehouse, 2017 WL 1064981 *2 (N.D. Cal. 2017)(same).

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020

reasonable travel, attorney's fees, court reporting and any facility costs for this **_renewed_** deposition.")(emphasis added.)

2. If the Magistrate Judge is otherwise engaged, appointment of a special master to supervise Plaintiff's renewed deposition (at Plaintiff's expense). See, Hernandez v. Lynch, 2019 WL 6998774, at *2 (C.D. Cal. 2019)("Federal Rule of Civil Procedure Rule 53(a) permits the appointment of a special master to address pretrial matters . . ..")

3. An order limiting Plaintiff's counsel's verbal statements at Plaintiff's deposition to matters permitted by Rule 30. See, IPS Grp., Inc. v. Duncan Sols., Inc., 2017 WL 3457141, at *6 (S.D. Cal. 2017)(ordering a renewed deposition where "[o]bjections to questions are limited to the following: 'Objection as to form.' Witnesses may not be instructed not to answer any questions unless necessary to enforce a privilege. . ..."); MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 2014 WL 12754932, at *1–2 (C.D. Cal. 2014)(limiting errant counsel's non-privilege based speaking objections at renewed deposition and finding that such "objections will be preserved and shall not be waived even though they are not asserted. Specifically, counsel shall not assert any objection that a question is vague, lacks foundation, calls for hearsay, etc."); see also, Mewborn v. Abbott Labs., 2019 WL 8060095, at *7 (C.D. Cal. 2019)("Plaintiff's counsel is encouraged to limit the number of evidentiary objections and must state each objection concisely . . . without further explanation or other extraneous statements."); id. ("Neither counsel shall . . . admonish the other; or make any remarks or comments about the other's behavior, . . facial expressions, conduct, knowledge of the law . . .and so forth."); Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D.Nev. 2011)("[i]t is inappropriate for counsel to engage in extensive and unnecessary colloquy, assert groundless objections, improperly object, or utilize any opportunity to interrupt and argue with opposing counsel during a deposition.")

4. An order that "[n]either shall any counsel interrupt or speak over any other counsel or the deponent." Mewborn v. Abbott Labs., 2019 WL 8060095, at *7 (C.D. Cal. 2019)

/ / /

/ / /

/ / /

/ / /

Re: Meet and Confer re Plaintiff's deposition
November 3, 2020


       The defense has been excused from the meet-and-confer requirement, and the Informal Discovery Conference requirement as regards your conduct at Plaintiff's deposition. <u>See</u>, <u>C.D. Cal. L.R.</u> 37-1. Even so, we send this correspondence to show all concerned, including you, just how hard we are trying to avoid what is about to happen.

       Please provide your ***<u>agreement to dismiss</u>*** this tainted action by close of business tomorrow. And please make sure that your dismissal acknowledgment is ***<u>in writing.</u>***


*Sincerely,*


**S. FRANK HARRELL**

SFH/ dm

cc:    Tamara Heathcote, Esq.

# EXHIBIT D



**From:** Narine Mkrtchyan <narine57@gmail.com>
**Sent:** Friday, September 11, 2020 10:48 AM
**To:** Shelton Harrell <sharrell@lynberg.com>
**Subject:** Re: Holloway to do - Meet and confer re Pltff Depo. 9.3.20 - SFH

> CAUTION: This email originated from outside of Lynberg & Watkins. Do not click any links or open any attachments unless you recognize the sender, verified the email address and know the content is safe.

Counsel:

Plaintiff was deposed adequately on all relevant issues. Unless you cooperate in discovery and produce all outstanding items of discovery Plaintiff has been seeking since inception of this case, you will not get any reciprocity from Plaintiff. I would have produced my client on Zoom whatever issues you believed you did not cover at the deposition, just to move the case along, had I seen some effort to comply on your part. Let us see what you can accomplish by making this litigation more contentious and asking for sanctions from a magistrate who is advocating for the County. The final arbiter in all human endeavors is God and I will put my client's case into the hands of God, not judge(s) presiding over this case.

You will only hope to settle this case for your clients favorably before I go to trial and expose all the dirt and corruption of the Department and your clients, have no doubt about that. Therefore, please be on notice Plaintiff is not inclined to engage in mediation with you and will move to change the venue to Los Angeles County.

Thank you.

**Narine Mkrtchyan**
Attorney at Law
MKRTCHYAN LAW
1010 North Central Ave, Suite 204
Glendale, CA 91202
Tel:     (818) 388-7022
Web:   www.narinelaw.com

This is a communication between an attorney's office & client, & is protected by the attorney client privilege &/or is the result of
research performed at the request of an attorney & is protected by the attorney work product privilege. Sending an e-mail to an
attorney will not establish an attorney/client relationship. Such a relationship is not typically established until an attorney knows that
so doing will not create a conflict of interest and mutual agreement is reached on the terms of representation.

The information contained in this email is intended only for the use of the individual or entity named above. If the reader of this
message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is
strictly prohibited. This e-mail and any attachments are covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections
2510-2521, are confidential, privileged and not to be read or disclosed to anyone other than the intended recipient. If you are not the
intended recipient or an agent responsible to deliver it to the intended recipient, disclosure, dissemination, copying or other use of the
contents of this e-mail is prohibited.

On Mon, Sep 7, 2020 at 9:02 PM Shelton Harrell <sharrell@lynberg.com> wrote:

> Counsel-
>
> Please find the attached correspondence which requires your immediate attention.
>
> Sincerely,
>
> **S. Frank Harrell | LYNBERG & WATKINS**
>
> 1100 Town & Country Road, Suite 1450, Orange, CA 92868
> (714) 937-1010 | Fax: (714) 937-1003
>
> sharrell@lynberg.com / www.lynberg.com
>
> ***********************************************************
>
> The information transmitted is intended only for the person(s) or entity to which it is addressed and may contain confidential and/or legally privileged
> material.  Delivery of this message to any person other than the intended recipient(s) is not intended in any way to waive privilege or confidentiality.  Any review,

retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by entities other than the intended recipient is prohibited.  If you receive this in error, please contact the sender and delete the material from any computer.

EXHIBIT E

S. Frank Harrell – SBN 133437
sharrell@lynberg.com
Tamara M. Heathcote – SBN 193312
theathcote@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants COUNTY OF ORANGE,
DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ,
DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER,
DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and
DEPUTY JUSTIN GUNDERSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.<br><br>Defendants. | CASE NO. 8:19-cv-01514-DOC-DFM<br><br>*Assigned for All Purposes to:*<br>*Hon. David O. Carter, Courtroom 9D*<br><br>*Assigned for Discovery Purposes to:*<br>*Hon. Douglas F. McCormick, Courtroom 6B*<br><br>**DECLARATION OF BRIAN FUERBACH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>**Date:   December 14, 2020**<br>**Time:  8:30 a.m.**<br>**Dept.:  9D**<br><br>*Trial Date: January 19, 2021*<br>*Second Amended Complaint filed: December 10, 2019* |

**1**

**DECLARATION OF BRIAN FUERBACH IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# DECLARATION OF BRIAN FUERBACH

I, Brian Fuerbach, do state and declare as follows:

1.      I have been employed in the plastics industry since 1989 and has an engineering manager since 2008 and have lived in the County of Orange for fifty-three (53) years.

2.      I have personal knowledge of the facts stated herein, except those stated upon information and belief, and as to those matters, I believe them to be true.  If called upon to testify to the matters herein, I could and would competently do so.

3.      On January 20, 2028, my wife and I went camping for one night at O'Neill Park in our Recreational Vehicle ("R.V."). We arrived during the afternoon of January 20. 2018.

4.      On the side of my R.V. is a large window that is approximately two feet by five feet and below that window is dinette/bed.

5.      My wife and I were camping at campsite 63.

6.      At approximately 2:00 a.m. on January 21, 2018, I was awakened by a sound coming from campsite 65 which was located directly next door to us.  I now understand that campsite 65 was occupied by Jeremy Holloway as I have been deposed by Jeremy Holloway's counsel in the matter of Jeremy Holloway v. County of Orange, et al., Case No. 8:19-cv-01514-DOC-DFM.

7.      The loud noise at 2:00 a.m. sounded like something had hit my R.V.  The sound was like "boom, boom".  I looked out of the large window above the bed and discovered that it was the sound of the two doors closing on the white truck that was now at campsite 65.  I also heard a male and female talking inside one of the two tents at campsite 65.  At that point I went back to sleep.

8.      At approximately 3:00 a.m. I was awakened again to the sound of yelling and a bunch of expletives.  I also heard fist blows being landed on somebody.  I opened the window above the bed to look out at campsite 65 and saw the tent moving and a woman yelling "No, no, no.  Please stop.  I'm just a girl."  I could also hear the

2

**DECLARATION OF BRIAN FUERBACH IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

1   noise of someone rubbing the inside the tent fabric with what I thought was their arm

2   and then the sound of further fist blows being landed on somebody as the tent moved.

3   I heard my wife yell out the window toward campsite 65, "Stop hitting her".

4        9.      At this point I was concerned for the woman's safety and called 9-1-1.  I

5   reported I had heard a male and female yelling, fists being landed on somebody, and a

6   woman yelling to stop hitting her, that she's just a girl.

7        10.     While still listening for the peace officers to arrive, I heard the sound of a

8   tent unzip and the sound of footsteps running across gravel.

9        11.     When the sheriff deputies arrived I looked out the large window above

10  my bed and could hear the deputies ask Jeremy Holloway to step out of his tent.  Mr.

11  Holloway was combative and did not want to come out of the tent.  Mr. Holloway was

12  yelling and cursing at the deputies.  Eventually I saw him come out of the tent.  I saw

13  the deputies and Mr. Holloway speaking but could not hear the precise words.  After a

14  total of five to ten minutes, the deputies left.

15       12.     After the deputies left, it was quiet for approximately ten minutes.  After

16  this time, Jeremy Holloway started going up and down the road yelling at the various

17  campsites for the person who called the police to come out.  When Mr. Holloway got

18  in front of our RV, he stopped and was yelling "I know it was you, mother f*cker.

19  Come out."   Due to Mr. Holloway's actions I felt threatened and was afraid of what

20  he may do.

21       13.     After a while, Mr. Holloway went away from my RV.

22       14.     After a short period of time the deputies came back to Jeremy

23  Holloway's campsite.  Mr. Holloway was extremely combative with the deputies.

24  The deputies asked Mr. Holloway to show his hands.  Mr. Holloway refused to

25  cooperate.  They asked him to put his hands on his head but he would not comply.  In

26  my opinion, Mr. Holloway was acting in a threatening manner toward the deputies

27  because he was yelling at them, being verbally abusive and not cooperating.

28       15.     After Jeremy Holloway was on the ground, I could see that Mr. Holloway

3

**DECLARATION OF BRIAN FUERBACH IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

1  appeared to be fighting to get away.  Mr. Holloway's tent, however, obstructed my
2  view of what occurred next.
3      16.   I am thankful that law enforcement returned to the campground the
4  second time as we needed law enforcement protection from Jeremy Holloway.
5      I declare under penalty of perjury under the law of the United States of America
6  that the foregoing is true and correct.
7      Executed this 23rd day of October, 2020, in Ontario, California.
8
9
10      **BRIAN FUERBACH, Declarant**
11
12
13
14  4818-9937-1471, v. 1
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**4**

**DECLARATION OF BRIAN FUERBACH IN SUPPORT OF DEFENDANTS'**

EXHIBIT F

1

2

3

4

5

6

7

8                    TRANSCRIPT OF AUDIO-RECORDED

9                       TELEPHONIC HEARING

10

11                      SEPTEMBER 2, 2020

12

13        IN THE CASE OF HOLLOWAY V. COUNTY OF ORANGE, ET AL.

14

15

16

17

18

19

20

21

22

23

24

25

1        CLERK:  Now on case SACV-19-1514, Jeremy Holloway

2    versus County of Orange et al. Counsel, your

3    appearances, please.

4        MS. MKRTCHYAN:  Yes, Narine Mkrtchyan on behalf

5    of plaintiff, Holloway.

6        MR. HARRELL:  Good afternoon, Your Honor, Shel

7    Harrell and Tamara Heathcote for the defendant. And we

8    also have a representative from the Orange County DA's

9    office in attendance pursuant to the request of the

10   court.

11       MR. CLAUSTRO:  And, uh, my name is, uh, Israel

12   Claustro, C-l-a-u-s-t-r-o, and I'm from the Orange

13   County District Attorney's office.

14       THE COURT:  All right. Thank you, Ms. Mkrtchyan;

15   thank you, Mr. Harrell and Ms. Heathcote and thank you

16   District Attorney. This is Judge McCormick.

17       Um, so we have -- I got three things on ag- -- on

18   the agenda today. And -- and a courtesy to Mr.

19   Claustro because he doesn't have anything to do with

20   Items 2 and 3, let's start with the DA's office, uh,

21   documents.

22       As I recall, we discussed some months ago with

23   one of your counterparts or colleagues in the District

24   Attorney's office, um, Mr. Claustro the fact that

25   there were some, uh, internal case notes related to

1    the declination of Mr. Holloway's case.

2         Um -- or I guess the pre- -- presentation of Mr.

3    Holloway's case. Um, what's the status of that at this

4    point, the case?

5         MR. CLAUSTRO:  Um, there -- the investigation has

6    -- has con- -- is actually completed, Judge. So, uh,

7    to keep --

8         THE COURT:  All right.

9         MR. CLAUSTRO:  -- this short --

10        THE COURT:  I [inaudible] -- defend Mr.

11   Holloway's case and I misspoke --

12        MR. CLAUSTRO:  Yeah.

13        THE COURT:  -- and I meant Renegar's case.

14        MR. CLAUSTRO:  Yes. I -- I -- I believe that

15   that's how I understood it, Judge. Um, so, the -- the

16   con- -- the investigation has concluded. Um -- uh, the

17   investigation portion of it included -- and not to get

18   too far afield, the investigation in- -- included a

19   number of, uh, interviews by Sheriff's Department and

20   other officials, as well as our office.

21        We also, uh, prior to making any decision on

22   filing or not filing, uh, we also required the use of

23   multiple experts that we, um, had to, uh -- uh, retain

24   and, um, and actually consult to determine whether or

25   not, you know, any filing was or was not appropriate.

1    So, that part of the -- that portion of the

2    investigation is concluded.

3         The last thing that -- that's, uh, that's waiting

4    to be done is -- whether or not we're going to file

5    any charges at all. Um, so that is kind of in abeyance

6    right now. And, um -- uh, that's the only thing left.

7    So, I anticipate that we should have a decision within

8    the next 30 or 45 days on that.

9         THE COURT:  All right. With the body of documents

10   that I -- I reviewed, as I recall --

11        MR. CLAUSTRO:  Yes.

12        THE COURT:  -- were -- were -- were, um, some

13   internal reports at the, uh -- from the Sheriff's

14   Department relating to some initial, um, documents

15   that were collected and some statements that were

16   made. Um, I -- I -- [inaudible] I think I've promised

17   -- or not promised, because I think I've told Ms.

18   Mkrtchyan on other occasions, it is going to be

19   disappointing to her, uh, I think, but that doesn't

20   mean -- the fact that that's disappointing doesn't

21   mean she's not entitled to it --

22        MR. CLAUSTRO:  Sure.

23        THE COURT:  -- um, I'm -- I'm -- I'm ordered --

24   I'm inclined to order the production of what I -- what

25   I reviewed several months ago and -- and -- and if and

4

1   when the Court -- the -- the case is declined or not

2   declined or whatever it is you decide to do with it,

3   so be it. Um, because I do have a very, very tight

4   deadlines [sic] here and I have discov- -- a district

5   judge who's going to hold the parties to those

6   deadlines. And we've -- we've -- we've taken about as

7   long as we can with this.

8        MR. CLAUSTRO:  Sure. And, uh, I'll tell you our -

9   - our position on that is, um -- um, just -- just the

10  Court is aware even before I even state what our

11  position is on that is, that, um, in addition to the

12  document that you have, Judge, um, I don't believe

13  that the last, uh, portion of the investigation of

14  those documents is included in what the court has or

15  has reviewed in camera --

16       THE COURT:  Probably not.

17       MR. CLAUSTRO:  -- so, um, that may or may not

18  make a difference, but I -- I -- I tend to agree with

19  you that there's, you know, I don't know that -- that

20  -- that -- I mean I'm not trying this case but I don't

21  know that anything there is going to be relevant, but

22  if it is, um, there -- there may be supplemental, uh,

23  documents that may or may not be dis- -- disclosed to

24  defen- -- to plaintiff's counsel, uh, at some point.

25       But, um, as far as our position on it, I -- I

5

```
 1   mean I think, um, I'll let -- I'll let County counsel,

 2   uh -- uh, chime in on that --

 3        THE COURT:  Right.

 4        MR. CLAUSTRO:  -- but as far as I'm concerned,

 5   uh, we -- we don't -- I mean we don't have a -- a

 6   horse in that race.

 7        Nevertheless, um, the documents themselves, um,

 8   as far as I -- I can tell, they, uh, are part of that,

 9   uh, internal criminal investigation and, uh, to be

10   candid with the court as I just stated, um, in

11   addition to those documents the court has, we have

12   additional investigative as well as expert documents

13   that, um, you know, pursuant to -- to -- to any order

14   that the court issues we probably would, uh, require

15   to supplement the court's packet with what we have.

16        THE COURT:  All right. Well, let -- let me hear

17   from Mr. Harrell and Ms. Heathcote and then -- and

18   then -- and then I think -- I think we need to push

19   ahead.

20        MR. HARRELL:  Your Honor, thank you. Um, my -- my

21   interest here, um, is standing up for my client with

22   regard to what we're speaking about now that is the

23   Orange County DA's office.

24        Um, I -- I want them to be able to do their job

25   in an atmosphere where they think, uh, justice can be
```

6

1    -- be done and the level of secrecy or publicity that

2    surrounds the documents they generate, um, I have no

3    problem with anything being turned over just so long

4    as, uh, the Orange County DA's office feels that

5    turning this material over is not going to compromise

6    their efforts to come to a just decision with regard

7    to filing or not filing against Deputy Renegar.

8         THE COURT:  All right. Um, re- -- re- -- my --

9    refresh my recollection, Mr. Harrell or Ms. Heathcote.

10   Were the documents that were submitted to me in camera

11   submitted to me by -- by -- by you or by the District

12   Attorney's office?

13        MS. HEATHCOTE:  They were given to us by the

14   District Attorney's office in a sealed envelope and

15   that's what we then provided to the court. So, we do

16   not have a copy of what was in there nor do we know

17   what's in there.

18        THE COURT:  Okay.

19        MR. HARRELL:  Yeah.

20        THE COURT:  All right. Um, Mr. Claustro, do you

21   have a record, I -- I -- I -- I don't want to put my -

22   - I'm not a producing party. I don't want to be --

23        MR. CLAUSTRO:  Sure.

24        THE COURT:  -- myself in the position of

25   producing documents. Uh --

```
 1          MR. CLAUSTRO:  Sure.

 2          THE COURT:  -- would -- would you be able to

 3    produce to Ms. Mkrtchyan a copy of what was submitted

 4    to the Court?

 5          MR. CLAUSTRO:  Uh, yes, Your Honor. We -- we can

 6    do that. Um --

 7          THE COURT:  Okay.

 8          MR. CLAUSTRO:  -- however, uh, in the interest

 9    of, um -- of preserving the integrity of our case,

10    investigation, until we make that decision, would the

11    court be inclined to -- to issue that order with --

12    with the protective order so that --

13          THE COURT:  You could --

14          MR. CLAUSTRO:  -- the documents are not --

15          THE COURT:  -- you can, uh -- you can produce

16    them subject to the parties' protective order in this

17    case.

18          In fact, I'll order the documents produced be

19    deemed, um -- order -- order the document -- what are

20    the various confidentiality designations the parties

21    have, Mr. Harrell, Ms. Heathcote, Ms. Mkrtchyan? What

22    -- what -- what -- what categories do you have?

23          MR. HARRELL:  Uh --

24          MS. MKRTCHYAN:  Well, we have --

25          MR. HARRELL:  -- Your Honor, I apologize. We --
```

8

```
1   we don't have the -- the protective order in front of

2   us now. If it's not broad enough, if it doesn't do the

3   job, um, [inaudible] --

4        THE COURT:  Well, let -- let me ask Ms. Mkrtchyan

5   because she started to answer. Ms. Mkrtchyan, what --

6   what categories --

7        MS. MKRTCHYAN:  Yes.

8        THE COURT:  -- of -- are -- are in the protective

9   order?

10       MS. MKRTCHYAN:  Yes, Your Honor. We have, you

11  know, all categories covered:  Official information

12  privilege, um, attorney work product, anything that is

13  related to any privileges that are recognized --

14       THE COURT:  My -- my --

15       MS. MKRTCHYAN:  -- by [inaudible] --

16       THE COURT:  -- my question is --

17       MS. MKRTCHYAN:  -- [inaudible] --

18       THE COURT:  -- is there confidential, highly

19  confidential, attorneys' eyes only or is there just --

20  just one -- just confidential?

21       MR. HARRELL:  One broad category --

22       MS. MKRTCHYAN:  [inaudible] --

23       MR. HARRELL:  -- Your --

24       MS. MKRTCHYAN:  And --

25       MR. HARRELL:  -- Honor.
```

9

```
 1          MS. MKRTCHYAN:  -- it is --

 2          THE COURT:  Okay.

 3          MS. MKRTCHYAN:  -- attorneys' eyes only and I

 4     think that, um, my understanding would be that the

 5     protective order we have right now would cover that.

 6          But I wanted to make sure, Your Honor, that I get

 7     all supplemental additional records that have been,

 8     um, investigated and have been, uh, compiled by the

 9     DA's office after the court's received this [sic]

10     records because I think that they're entitled to the

11     complete -- complete, um, investigative file under the

12     -- the protective order.

13          THE COURT:  Okay. I'm going to order the -- the

14     District Attorney's office to produce what they

15     previously submitted to court to Ms. Mkrtchyan within

16     seven days. Under the terms of the parties' protective

17     order, uh, those documents will be produced

18     [inaudible] -- those documents will be treated as

19     attorneys' eyes only.

20          Um, Ms. Mkrtchyan, if after receipt of those

21     documents you wish to address with me the remainder of

22     the District Attorney's office file, you can do that

23     in a subsequent proceeding.

24          MS. MKRTCHYAN:  Well, Your Honor, we don't have

25     much time left. We haven't even gotten --
```

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1        THE COURT:  Ms. Mkrtchyan --

2        MS. MKRTCHYAN:  -- [inaudible] --

3        THE COURT:  -- I'm not arguing with you. I just

4    ruled. Thank you.

5        [whispering in background, inaudible]

6        THE COURT:  Um, Mr. Claustro, uh, you understand

7    your marching orders?

8        MR. CLAUSTRO:  I do, Your Honor. Uh, the only

9    issue left for me is, um -- um, does the -- does the

10   court -- is the court requiring us to turn over those

11   documents, um -- uh, only to Ms. Mkrtchyan?

12       THE COURT:  Well, yeah. You can also -- you can -

13   - you should provide a copy to -- to -- to -- to, um,

14   Mr. Renegar -- to Deputy Renegar's counsel.

15       MR. CLAUSTRO:  Okay.

16       THE COURT:  Yeah.

17       MR. CLAUSTRO:  Okay.

18       MR. HARRELL:  And I'll just state for the record,

19   I have no plans to look at any of that until the DA

20   has reached a determination on what they're going to

21   do.

22       MR. CLAUSTRO:  Great.

23       THE COURT:  Okay. Uh, Mr. Claustro, thank you so

24   much for -- for -- for being with us today. It's been

25   very helpful, um, and -- and I appreciate your

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    office's participation in this matter.

2         MR. CLAUSTRO:  Thank -- thank you, Your Honor.

3         THE COURT:  Thank you. All right. Um, counsel,

4    let's turn then to the 24 written --

5         [AUTOMATED VOICE]:  Israel Claustro has left the

6    conference.

7         THE COURT:  -- let's turn then to the 24 written

8    interrogatories that I reviewed. Um, I've reviewed,

9    um, like I said 24 written interrogatories. I have

10   reviewed the moving papers filed by, um, Deputy

11   Renegar and the County. Um, I have reviewed Ms.

12   Mkrtchyan's opposition.

13        Um, as I think I've already indicated in a -- at

14   least one written order in this court, in -- in this

15   case, this case has been, uh -- uh, afflicted by

16   problems with discovery, uh, really since the outset

17   and, um, candidly, Ms. Mkrtchyan, I -- I -- I find

18   that you're responsible for most of those problems and

19   nevertheless, there are some written interrogatories

20   here that are problematic in my view and your

21   objections to them are, uh, well taken and your --

22   your ability to re- -- your -- the -- the motion as to

23   those, uh, is not well taken. So, I'm in a bit of fix.

24        Um, I want to go through these one by one. I'm

25   happy to do that. Uh, and -- and -- and -- and make

12

1    sure you've told me what you need to tell me.

2        Um, I think my initial thought was it will be

3    helpful for me to rule on these, um, before we talked

4    about the written R- -- the RFP requests that are the

5    subject of the next potential motion, but you may feel

6    differently about that.

7        Um, so, my thought is we start with Number 1,

8    County Number 1 and go from there. Um, I would deny

9    the motion as to County Number 1, I find that the

10   response is adequate.

11       Mr. Harrell, Ms. Tec- -- Ms. Heathcote do you

12   want to be heard on that? Anything you have to say

13   that -- in addition to what's in your motion papers?

14       MR. HARRELL:  Your Honor, nothing to add apart

15   from what we've briefed.

16       THE COURT:  Okay. Motion is denied as to

17   Interrogatory Number 1.

18       Uh, as to Interrogatory Number 2, um, same

19   ruling, I've denied the motion of Interrogatory Number

20   2. Mr. Mkr- -- uh, Mr. Heathcote -- or Ms. Heathcote

21   or Mr. Harrell, anything to add?

22       MR. HARRELL:  Uh, Your Honor, um, the, um -- the

23   -- the point that we have a concern on here, is that

24   the plaintiff's counsel seems to be saying, um, I

25   don't need to give you this information because you

13

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    can go talk to the plaintiff at a deposition and we

2    have tried to do that and I'd like to address that a

3    little bit, but before I do that, I want to find out

4    if, um, that is the reason why that the court is

5    inclined not to grant the motion with regard to these

6    interrogatories asking for the basic facts of

7    plaintiff's case.

8        THE COURT:  I found that the description in that

9    -- in Interrogatory Number 1 was sufficient. Um, for

10   Interrogatory Number 2, uh, I think the -- again, the

11   description here is sufficient. Uh, he -- he's unable

12   to identify which deputy inflicted which of the

13   injuries and he says so.

14       Um, we could turn then to Interrogatory Number 3,

15   uh, I mean I think that -- that, uh, I would order a

16   supplemental response to Interrogatory Number 3 and he

17   -- he needs to describe -- provide descriptions of

18   what he recalls about the deputies who he recalls

19   assaulted him.

20       Um, you know, there are some deputies I think who

21   are in the category of -- of assailant. There are some

22   deputies who are in the categories of failure to

23   intervene.

24       We need to know because the jury may care about

25   that and, uh, so I think that is -- that's, you know,

1    I -- I've looked at these responses carefully and --

2    and -- and tried to be thoughtful about what I think

3    is necessary, so I think a supplemental response to

4    Number 3 is warranted.

5        I don't know if that responds to your question,

6    Mr. Harrell, or not.

7        MR. HARRELL:  Um -- um, yes. I -- I -- I think of

8    three, I think that Number 3 is, uh, the most

9    important. Um, and with that, I will -- I will, um,

10   ask the court to please continue with rulings.

11       THE COURT:  Ms. Mkrtchyan, you want to be heard

12   on Number 3 since I'm asking for a supplemental

13   response?

14       MS. MKRTCHYAN:  Yes. Because it doesn't really,

15   um, look like to me that, uh, parties are

16   understanding the responses by plaintiff.

17       Um, the plaintiff says I could not see the people

18   that attacked me and I cannot give physical

19   descriptions, etcetera, of -- of the people who

20   attacked me. He pro- -- was deposed on the subject --

21       THE COURT:  Ms. -- Ms. Mkrtchyan, can --

22       MS. MKRTCHYAN:  -- [inaudible] --

23       THE COURT:  -- I interrupt you for a moment?

24       MS. MKRTCHYAN:  Yes.

25       THE COURT:  Where in the response does he say he

15

 1    did not -- did not see and cannot identify?

 2         MS. MKRTCHYAN:  Well, the -- the -- the response

 3    itself is saying that, you know, and I --

 4         THE COURT:  I'm reading --

 5         MS. MKRTCHYAN:  -- I think that --

 6         THE COURT:  -- I'm on page -- I'm on Document 79,

 7    page 13, um, which is I think your -- your -- your

 8    document, um, lines 8 through 18.

 9         MS. MKRTCHYAN:  Well, yes, I understand what

10    you're saying but what I'm saying is, that after the

11    interrogatory, you know, he was deposed. I mean what -

12    - what about the fact that he was deposed?

13         I mean, I really do not -- he already responded

14    to the same questions posed to him at his deposition

15    and he did not provide any more information, so right

16    now there's no further information to be provided

17    aside from what he said at his deposition.

18         He could not -- he cannot provide height and

19    weight of these people, physical descriptions,

20    etcetera, so I mean is the court going to say that the

21    fact that plaintiff was deposed subsequently --

22    subsequent to these interrogatories is irrelevant to

23    this discovery proceeding?

24         THE COURT:  Yes. You're ordered to produce a --

25         MS. MKRTCHYAN:  Okay.

```
1        THE COURT:  -- supplemental response to
2    Interrogatory Number 13 [sic] within 14 days.
3        MS. MKRTCHYAN:  Well, you know, I would object to
4    that because I think that that is --
5        THE COURT:  You can take it with --
6        MS. MKRTCHYAN:  -- exactly --
7        THE COURT:  -- Judge Carter by --
8        MS. MKRTCHYAN:  -- [inaudible] --
9        THE COURT:  -- filing a motion for review.
10        MS. MKRTCHYAN:  Well, you know, Your Honor, I --
11    I will take it up with the Judge Carter because I
12    think that --
13        THE COURT:  Ms. --
14        MS. MKRTCHYAN:  -- you are bias against plaintiff
15    and you're bias towards me. In fact, from the very
16    beginning of this case that I would like to say that,
17    you know, I don't appreciate impartiality. Judiciary
18    is a very important fact especially inside of court --
19        THE COURT:  You may -- you may -- you may --
20        MS. MKRTCHYAN:  -- [inaudible] --
21        THE COURT:  -- you may put that in a --
22        MS. MKRTCHYAN:  -- [inaudible] --
23        THE COURT:  -- Ms. Mkrtchyan, please stop
24    talking.
25        MS. MKRTCHYAN:  [inaudible] --
```

17

```
 1          THE COURT:  The fact -- you -- you may put that
 2     in your --
 3          MS. MKRTCHYAN:  -- [inaudible] --
 4          THE COURT:  -- filing to Judge --
 5          MS. MKRTCHYAN:  -- you're going to interrupt me?
 6     If you're going to interrupt me, Your Honor, then this
 7     proceeding is totally out of place.
 8          THE COURT:  Okay.
 9          MS. MKRTCHYAN:  Now you can make --
10          THE COURT:  Ms. --
11          MS. MKRTCHYAN:  -- your ruling --
12          THE COURT:  -- Mkrtchyan --
13          MS. MKRTCHYAN:  -- I don't want to be --
14          THE COURT:  -- Ms. Mkrtchyan --
15          MS. MKRTCHYAN:  -- part of this when I'm being
16     interrupted. As an attorney, I have the right to speak
17     and represent my client.
18          And if you're not going to let me speak, then I
19     would like to be just -- get -- get off this, uh,
20     hearing because it's not appreciated that you're
21     interrupting me as an attorney of record. So, please,
22     you know, as a judge, you are obligated to hear from
23     each party, regardless of whether you agree with me or
24     not.
25          THE COURT:  Okay.
```

18

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

```
1        MS. MKRTCHYAN:  And if I'm not going -- if I'm
2    going to be interrupted and I have no right to speak,
3    maybe I will just, uh, ask you to make your rulings in
4    writing. I have made my record in writing, so perhaps
5    I should not be part of this since you're biased
6    towards me personally.
7        THE COURT:  That's what I'll do then. Court will
8    issue a written ruling --
9        MS. MKRTCHYAN:  [inaudible] --
10       THE COURT:  -- um, and I'll have a written ruling
11   for you on each of the interrogatory responses.
12       MS. MKRTCHYAN:  Thank you --
13       THE COURT:  Um --
14       MS. MKRTCHYAN:  -- very much.
15       THE COURT:  -- we'll do that. I don't have any
16   problem with that. Um --
17       MS. MKRTCHYAN:  Thank you.
18       THE COURT:  -- Interrogatory Number 4 --
19       MS. MKRTCHYAN:  Well, then I'm going to be
20   excused from this hearing?
21       THE COURT:  Yeah.
22       MS. MKRTCHYAN:  Because I don't want to be part
23   of the hearing where I'm being interrupted and
24   disrespected, so perhaps, um, you know I can just, uh
25   -- you know, be excused and the court can make its
```

19

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    rulings.

2         THE COURT:  No.

3         MS. MKRTCHYAN:  I have nothing yet -- I have

4    nothing else to add to what I have written and I just

5    do not appreciate, uh, the fact that I'm being

6    disrespected and, um, mistreated entirely, um,

7    inappropriately by the court.

8         So, I just, um -- I'm going to ask to be excused

9    and you can continue with your hearing without me, uh,

10   because this is disrespectful toward me. I feel like

11   this is not only bias towards plaintiff but also to me

12   personally, despairingly, constantly interrupting me.

13        You know, I -- just because we have judge, um, it

14   does not mean that the judge can interrupt counsel.

15   And I am representing a party, a victim of police

16   brutality, uh, and I just do not appreciate this type

17   of treatment.

18        So, if the court is inclined to continue

19   interrupting me and not hearing from, I will -- I'm

20   just going to be asking to excuse me so that I can

21   leave, and you can make your rulings. Do I have the

22   permission --

23        THE COURT:  [inaudible] --

24        MS. MKRTCHYAN:  -- to leave this hearing?

25        THE COURT:  You do not have permission to leave

20

1   the hearing, Ms. Mkrtchyan.

2       MS. MKRTCHYAN:  Well, I want to be excused. I

3   don't want to be part of this proceeding because I

4   don't appreciate the court, you know, violating the

5   rules of impartiality and interrupting me.

6       It's discourteous. It's discourteous. You are

7   bias towards me as plaintiff's counsel. You have also

8   disparaged me on the record.

9       As an attorney of many years, you have disparaged

10  me, called my deposition a train wreck that has been

11  used by the defense skillfully to disparage me, that's

12  defamation of, okay? None of my depositions have been

13  a train wreck. It's just it's in the eye of the

14  beholder.

15      I don't know what is your background, Your Honor,

16  I don't appreciate that, you know, and I understand

17  that that is bias towards me and towards my client.

18      So, right now, I don't feel comfortable

19  continuing this because I feel like, you know, I'm

20  being really, um, mistreated and disparaged and

21  harassed, uh, as a female attorney, I don't appreciate

22  that. So, if you can continue without me, that is

23  great. Uh, I appreciate your time taking this.

24      I'm not going to continue with this proceeding

25  where I'm being disrespected entirely and, um, you

1    know, my client's rights are being violated wrongly.

2        So, um, I'm going to excuse myself if you're not

3    letting me to excuse myself because I don't think that

4    this proceeding is impartial. Okay. Thank you.

5        AUTOMATED VOICE:  Narine Mkrtchyan has left the

6    conference.

7        THE COURT:  All right. The record will show that

8    Ms. Mkrtchyan has left the conference.

9        Uh, Mr. Harrell, would you like to, uh, be heard

10   on the, uh, interrogatories which I intend to deny the

11   County or Deputy Renegar's, uh, motion on?

12       MR. HARRELL:  Uh, Your Honor, I -- I believe

13   we've adequately addressed it in the papers. Uh, we

14   made our best pitch and the court did not find it

15   persuasive and we accept that. And, uh --

16       THE COURT:  Well, I -- I don't -- I -- I -- I

17   have others that I would -- would have discussed with

18   you, uh, and -- and I -- I would -- I don't want to,

19   um, forestall or foreshorten your opportunity to be

20   heard on those because Mkrtchyan chose not to

21   participating in this hearing.

22       MR. HARRELL:  I understand. Um, the denials are

23   with regard to 1 and 2 and the court is granting the

24   motion as to Number 3 and that's what my notes show

25   how far we made it before, um -- uh, plaintiff's

1    counsel left the hearing.

2         THE COURT:  Yes. Um, I -- so I -- I can go

3    through and -- and tell you which of the additional

4    ones I would have been inclined to deny. Uh --

5         MR. HARRELL:  Yes.

6         THE COURT:  -- and -- and -- and you can have an

7    opportunity to be heard on those. Uh, I don't --

8    again, I don't want to foreshorten your opportunity to

9    be heard on a motion you brought because plaintiff's

10   counsel's declined to participate.

11        MR. HARRELL:  I understand if there're any

12   denials, um -- uh, I would be happy to address that if

13   I think I have something worthwhile to offer on the

14   balance of the motion that we brought.

15        THE COURT:  Okay. Well, let me -- let me give you

16   the numbers real quick and you can look through them

17   and then --

18        MR. HARRELL:  Sure.

19        THE COURT:  -- you can -- you can ask whether you

20   want -- you wish to be heard. I would have denied or

21   would be inclined to deny, uh, the motion as to County

22   Interrogatory Number 5, County Interrogatory Number 9,

23   County Interrogatory Number 12, County Interrogatories

24   17 and 18, County Interrogatory Number 20 and County

25   Interrogatory Number 25.

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    Um, I was probably going to discuss with the

2    parties Renegar Inter- -- Renegar Interrogatory Number

3    2 but since Ms. -- Ms. Mkrtchyan is -- is, uh, no

4    longer participating, I will probably have to forge

5    ahead a- -- alone on that.

6         MR. HARRELL:  Um, understood, Your Honor. If you

7    can give me a moment, I --

8         THE COURT:  Take as much time as you need.

9         MR. HARRELL:  Right, Your Honor. Uh,

10   Interrogatory Number 5, uh, plaintiff appears to refer

11   us to Interrogatories 1 and 2 and we've been

12   unsuccessful on our motion there, so, I'll just submit

13   on Number 5.

14        On Number 9, I'll -- on Number 9, Your Honor, it

15   -- it seems to be that, um, plaintiff is referring us

16   to the Rule 26 disclosures and I apologize, I did not

17   include this in my brief.

18        Plain- -- plaintiff has made Rule 26 disclosures

19   in the case but as the court is aware, um, and my

20   understanding of the law is Rule 26 tells the parties,

21   both sides, that they need to share, um, with their

22   opponent any material, any documentary material that

23   they want to get into evidence at trial.

24        And here's what our concern is:  Plaintiff --

25   yes, plaintiff has given us some Rule 26 disclosures

1    of health care records, but it's only what she wants

2    to get into trial -- plaintiff counsel wants to get

3    into trial.

4         Interrogatory Number 9 is designed so that we get

5    names and addresses of health care providers so we can

6    issue a subpoena and we can find out, is there

7    anything there that helps our case that plaintiff's

8    counsel is not attaching to her Rule 26 disclosures.

9    So, that's the reason for Interrogatory Number 9. Uh -

10   -

11        THE COURT:  Can -- and -- and can you do that to

12   the -- to the health care providers that are

13   identified in Document 79-3?

14        I mean there's a -- a number of -- of, um, health

15   care providers that are identified there as well as,

16   um, document -- documents that are identified by Bates

17   number.

18        Um, I -- I don't see the doc- -- I don't see the

19   -- I can't see the documents, of course, because I

20   don't have them, I'm not provided with them but I -- I

21   do see the health care providers.

22        Now, you know, I suppose it would be better if we

23   had a -- a -- a supplemental response that said, the

24   health care providers identified in supplemental

25   disclosures are every health care provider and -- and

25

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1  maybe that -- maybe I should modify my ruling to make

2  that clear.

3      MR. HARRELL:  Well, Your Honor, we -- we just

4  want -- don't want to miss anything. We know that

5  there are some health care identifier- -- health care

6  providers that are identified in plaintiff's Rule 26

7  disclosures, but it sure would be helpful to have a

8  response under penalty of perjury where plaintiff just

9  gives a list.

10     Um, under Rule 26, yeah, we -- we do have

11  information where we can try to guess and -- and --

12  and hope that we've got a complete list but

13  Interrogatory Number 9 is designed for plaintiffs to

14  give us a full candid and complete list.

15     Doesn't seem like it would be that much work on

16  their part. We just want to make sure that we have

17  under oath plaintiff's statement of where's he gone

18  for treatment.

19     THE COURT:  All right. Uh, residential history.

20     MR. HARRELL:  Is this, uh --

21     THE COURT:  Number 12.

22     MR. HARRELL:  -- Number 12? Uh, Your -- Your

23  Honor, I routinely get this information, um -- uh,

24  it's -- so that we can find out a little bit about

25  plaintiff's background, um, where he has been, um, so

1      that, um, we know where to be looking frankly, for

2      information involving arrest history.

3          Um, this is a law enforcement case and -- and,

4      uh, my understanding of the law is that the -- because

5      plaintiff is suing law enforcement, there's some

6      unique characteristics, uh, with regard to his

7      criminal history that -- that might make it admissible

8      at a trial of the case.

9          Um, I -- I don't think that I've ever gone to

10     court on, uh, an interrogatory like Number 12 for the

11     residential history because people just give it to us.

12     I don't understand what, um, what the, uh, great

13     privacy is, and we have cited any number of opinions

14     where courts have ordered the residential history to

15     be turned over. Um --

16         THE COURT:  Okay. Let --

17         MR. HARRELL:  -- and --

18         THE COURT:  -- let --

19         MR. HARRELL:  -- yeah, I --

20         THE COURT:  -- let's look at --

21         MR. HARRELL:  -- don't have anything else to add.

22     Sorry.

23         THE COURT:  -- let's look ahead to 17 and 18. Um,

24     I do think -- my -- my -- my -- I think if I had

25     reviewed these before the deposition, I would have

27

1    said these are better covered deposition. I know you

2    took a deposition, um --

3         MR. HARRELL:  Your Honor, I did and, um, here's -

4    - here's what the problem was.

5         Um, [inaudible] the case, um, plaintiff filed a

6    bare bones complaint that did not tell my client with

7    any factual detail, um, what they supposedly has --

8    had done wrong or why they were being hauled into

9    federal court.

10        And plaintiff's counsel's come back there was,

11   well, just do some written discovery, do some

12   interrogatories.

13        Well, we did some interrogatories and, um, the

14   response is, well, go take their deposition. A -- a

15   deposition is the best place for this to happen.

16        Uh, Your Honor, I will tell the court, um, and

17   plaintiff counsel if she were here, that we tried to

18   take plaintiff's, uh, deposition on August, uh, 14th

19   and I have made the request previously to the court

20   that we need a special master, or a retired magistrate

21   judge or someone, um, to help supervise, um, because I

22   have never participated in anything like what I

23   participated in on August 14th. I have no problem

24   getting along with anyone, um, it's -- it's how I try

25   to live life and, uh --

28

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

```
 1         THE COURT:  Well, look, if you have motion to

 2   bring with respect to the deposition, I -- I mean, you

 3   need to bring it. I -- I don't know that I can have

 4   you telling me that the deposition is a reason that --

 5   that -- that -- we --

 6         MR. HARRELL:  Right, right. I understand. I

 7   understand but -- but, um, the -- the court seems to

 8   be inquiring, um, of -- of why don't we just go take

 9   the deposition of the plaintiff and -- and see if we

10   can't get an answer to Interrogatory Number 17.

11         And, Your Honor, it started out with murmuring by

12   plaintiff's counsel.

13         The court has already patiently asked plaintiff's

14   counsel to conduct herself as though she were in court

15   and it started with murmuring in the middle of my

16   questions.

17         Um, and then there was talking over others which

18   included me, her own client, the court reporter.

19         Um, and I -- I know that the court has the

20   partic- -- has been a trial attorney and one of the

21   things that -- that I try to -- to do is, I try to do

22   use the video deposition, um, to prepare for trial. I

23   am routinely told like all attorneys are, edit out any

24   colloquy, edit out any objections.

25         Because plaintiff's counsel talked over and
```

29

1    through my questions and people's answers, I don't

2    have a deposition transcript that I can use at trial.

3         And so I am asking the court, um, to order an

4    answer to Number 17. It might be the only way that I

5    can inform my client what plaintiff's contentions are

6    as to who said what to -- to who. A deposition hasn't

7    worked.

8         Interrogatory Number 17 would get me a big part

9    of the information that I need in order to adequately

10   -- to prepare for trial and certainly to advise my

11   client what this case is about.

12        So, um, but that information I would submit on it

13   unless the court has any questions, but I do ask that

14   plaintiff be ordered to give an answer to Number 17.

15        THE COURT:  Okay. Same thing for 18, I presume.

16        MR. HARRELL:  Uh, for Number 18, as well, Your

17   Honor.

18        THE COURT:  Um, all right. I found the response

19   to 20 to be adequate. Uh, I don't know if you want to

20   be heard on that. And, let's see, 25.

21        MR. HARRELL:  Your Honor, I'll submit on Number

22   20. And I'll submit on Number 25.

23        THE COURT:  Okay. Um, all right and I'll do my

24   best with Interrogatory Number 2 in terms of arrests.

25        Um, the third -- the topic for today was -- was

1     going to be your motion on all the RFPs. I'm going to

2     go ahead and authorize you to file that motion. Uh,

3     and I'm going to authorize you to file it without

4     compliance of Local Rule 37.

5          You may file it, uh, under Local Rule 7 and you

6     may dispense with the requirements of Local Rule 37

7     for the joint stipulation.

8          MR. HARRELL:  Uh, Your Honor, um, with regret I

9     also inform the court that, um, I know that we're

10    going to need a motion with regard to the deposition

11    of August 14th and I have ordered an expedited

12    transcript. May we have leave the court to file that

13    motion as well?

14         THE COURT:  You may. You may have an -- and --

15    and you have leave of court to file that without

16    compliance with Local Rule 37 and you may do that

17    under Local Rule 7.

18         MR. HARRELL:  Understood, Your Honor.

19         THE COURT:  And so this is not a regular law

20    motion then.

21         MR. HARRELL:  Understood, Your Honor.

22         THE COURT:  Okay. Um, anything additional from

23    defense today?

24         MR. HARRELL:  Uh, nothing further, Your Honor.

25    Thank you for your time.

```
1          THE COURT:  All right. Thank you.

2          MS. HEATHCOTE:  Thank you.

3          THE CLERK:  This court is done in recess.

4          AUTOMATED VOICE:  A participant --

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NOBLE TRANSCRIPTION SERVICES – 714.335.1645

1

2

3          I, Chris Naaden, a transcriber, hereby declare

4    under penalty of perjury that to the best of my

5    ability the above 32 pages contain a full, true and

6    correct transcription of the tape-recording that I

7    received regarding the event listed on the caption on

8    page 1.

9

10         I further declare that I have no interest in the

11   event of the action.

12

13         September 24, 2020

14         Chris Naaden

15

16                             X_____

17

18

19   (Holloway v. County of Orange, telephonic hearing, 9-

20   2-20)

21

22

23

24

25

EXHIBIT G

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | SA CV 19-01514-DOC (DFMx) | | Date: | September 9, 2020 |
|---|---|---|---|---|
| Title | Jeremy Holloway v. County of Orange et al. | | | |

| Present: The Honorable | Douglas F. McCormick, United States Magistrate Judge |
|---|---|
| Nancy Boehme | Not Present |
| Deputy Clerk | Court Reporter |
| Attorney(s) for Plaintiff(s): | Attorney(s) for Defendant(s): |
| Not Present | Not Present |

| Proceedings: | **(IN CHAMBERS)** Order re Motions to Compel (Dkts. 75, 76) |
|---|---|

   Defendant County of Orange ("the County") moves to compel Plaintiff Jeremy Holloway ("Plaintiff" or "Holloway") to provide supplemental responses to the County's First Set of Interrogatories, Nos. 1-5, 8-15, 17-20, and 22-25. See Dkt. 75 ("County Motion"). Defendant Deputy Chad Renegar ("Renegar") also moves to compel Plaintiff to provide supplemental responses to Renegar's First Set of Interrogatories, Nos. 2-4. See Dkt. 76 ("Renegar Motion"). Plaintiff opposed both motions and seeks discovery sanctions. See Dkt. 79 ("Opposition"). The Court held a telephonic hearing with the parties and made some oral rulings.[1] Shortly into the hearing, however, Plaintiff's counsel asked for written rulings and the Court indicated that it would issue a written order. This order supersedes any rulings made orally during the hearing.

## I.    COUNTY MOTION

**No. 1**: Describe whatever injuries YOU allegedly received during YOUR arrest with as much factual detail as YOU can recall.

**No. 2**: IDENTIFY who inflicted each of the physical injuries identified in YOUR response to Interrogatory No. 1.

DENIED. Plaintiff's responses are adequate.

---

[1] The Court and the parties also discussed the report identified on the County's privilege log as Item No. 3. The District Attorney's office is ORDERED to produce to Plaintiff what was previously submitted to the Court for in camera review. The report shall be designated "attorneys' eyes only" under the terms of the existing protective order.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

**No. 3**: Provide a complete name and physical description, including height, weight, age, hair color, race, and other distinguishing characteristics YOU can recall, for each individual who YOU contend physical injured YOU during the INCIDENT(S) of which YOU complain.

GRANTED. The current response is deficient. Plaintiff should describe what he recalls about the deputies that allegedly assaulted him. If he is unable to recall specific details, he should say so. Plaintiff is ORDERED to provide a supplemental response to County Interrogatory No. 3 within fourteen (14) days.

**No. 4**: Describe all of YOUR conduct in the twenty-four-hour period which preceded each of YOUR alleged injuries with as much factual detail as YOU can recall.

GRANTED. Plaintiff's response is inadequate, and his conduct before the incident is relevant and discoverable. Plaintiff is ORDERED to provide a supplemental response to County Interrogatory No. 4 within fourteen (14) days.

**No. 5**: Describe how YOUR alleged injuries occurred with as much factual detail as YOU can recall.

DENIED. Plaintiff's response is adequate.

**No. 8**: Describe all of YOUR conduct in the twenty-four (24) hour period which followed each of YOUR alleged injuries with as much factual detail as YOU can recall.

GRANTED. Plaintiff's response is inadequate, and his conduct following the incident is relevant to his claim for emotional distress damages. Plaintiff is ORDERED to provide a supplemental response to County Interrogatory No. 8 within fourteen (14) days.

**No. 9**: IDENTIFY every health care provider who has treated and of YOUR alleged injuries by providing their full name, address and telephone number.

DENIED. This information is available in Plaintiff's Rule 26 disclosures.

**No. 10**: IDENTIFY every health care provider who treated YOU in the five (5) years which preceded the INCIDENT by providing their full name, address, and telephone number.

GRANTED. Plaintiff has placed his medical condition at issue by alleging that he suffered physical injuries and emotional distress. See, e.g., SAC ¶ 13. Defendants are entitled to explore

Case 8:19-cv-01514-DOC-DFM  Document 146  Filed 04/09/20  Page 287 of 294  Page ID
#:3309
Case 8:19-cv-01514-DOC-DFM  Document 86  Filed 09/09/20  Page 3 of 6  Page ID #:1633

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

any evidence, including Plaintiff's medical records, which may be relevant to such a claim.
Plaintiff is ORDERED to provide a supplemental response to County Interrogatory No. 10 within
fourteen (14) days.

> **No. 11**: Describe YOUR employment history during the past ten (10) years,
> including YOUR employers (including addresses and telephone numbers), YOUR
> positions at each place of employment, and YOUR salaries at each place of
> employment.

GRANTED. Plaintiff's basic background information is relevant and discoverable,
particularly in light of Plaintiff's lost wages claim. Plaintiff is ORDERED to provide a
supplemental response to County Interrogatory No. 11 within fourteen (14) days.

> **No. 12**: Describe YOUR residential history during the past ten (10) years by stating
> YOUR address in reverse chronological order, including jail facilities.

DENIED. Any minimal relevance of Plaintiff's residential history is not proportional to the
needs of this case.

> **No. 13**: If YOU are seeking medical expense damages in this matter, state the
> amount of YOUR claim and explain how YOU calculated this figure.

> **No. 14**: If YOU are seeking lost wages damages in this matter, state the amount of
> YOUR claim and explain how YOU calculated this figure.

> **No. 15**: If YOU are seeking emotional distress damages in this mater, state the
> amount of YOUR claim and explain how YOU calculated this figure.

GRANTED. Although some of these categories of damages may be difficult to quantify,
Plaintiff must still state how much he will be asking for in each category. If the category of
damages is something that can be calculated, such as lost wages, he does have to provide that
calculation. In fact, this type of information is also the subject of the mandatory disclosures
described in Fed. R. Civ. P. 26(a)(1). Plaintiff's response that he will supplement at some
unknown later time is inadequate, particularly as discovery is now near completion. Plaintiff is
ORDERED to provide supplemental responses to County Interrogatory Nos. 13-15 within
fourteen (14) days.

> **No. 17**: If YOU had any oral conversation with any law enforcement employee
> during the INCIDENT of which YOU complain, state the words spoken by each
> party.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

**No. 18**: If YOU had any oral conversation with any law enforcement employee during the MAY INTERACTION of which YOU complain, state the words spoken by each party.

DENIED. The information sought is more readily obtained through deposition testimony.

**No. 19**: If YOU contend that Defendant Deputy Chad Renegar used "excessive force" during the INCIDENT, state all fact which support YOUR contention.

**No. 20**: If YOU contend that any law enforcement employee used "excessive force" during the MAY INTERACTINO, state all facts which support YOUR contention.

DENIED. Plaintiff's responses are adequate.

**No. 22**: List any damages not already specified in YOUR interrogatory responses that YOU attribute, in whole or in part, to the INCIDENT, including the nature of the damages, the amount, how that amount was calculated, and the date such loss was incurred.

**No. 23**: List any damages not already specified in YOUR interrogatory responses that YOU attribute, in whole or in part, to the MAY INTERACTION, including the nature of the damages, the amount, how that amount was calculated, and the date such loss was incurred.

GRANTED, for the same reasons as Nos. 17-18. Plaintiff is ORDERED to provide supplemental responses to County Interrogatory Nos. 22-23 within fourteen (14) days.

**No. 24**: IDENTIFY each and every witness to any of the events surrounding this lawsuit, including witnesses to liability and damages/injuries, identifying each such witness by the name, address and telephone number.

GRANTED. Background information of witnesses is relevant and discoverable. Plaintiff is ORDERED to provide supplemental responses to County Interrogatory No. 24 within fourteen (14) days.

**No. 25**: For each witness listed in response to Interrogatory No. 24, summarize to the best of YOUR knowledge the witness' involvement in and knowledge of the events surrounding the lawsuit.

DENIED. Plaintiff's response is adequate.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

## II.   RENEGAR MOTION

**No. 2**: State every offense for which YOU have been arrested during the past ten (10) years, the date of arrest, arresting agency, case number of disposition of charges.

**No. 3**: List each occasion, if any, when YOU have been convicted of a crime and state the name under which YOU were convicted, the offense(s) for which YOU were convicted, the city, state, and county where YOU were convicted, the date of the conviction and the court and case number relative thereto.

GRANTED. While Plaintiff's criminal history is not relevant to his substantive claims, he seeks emotional distress damages because of Defendants' actions. See SAC ¶ 13 ("Plaintiff sustained great physical and mental pain and shock to his nervous system, fear, anxiety, torment, degradation and emotional distress."). It is reasonable to expect that the amount of emotional distress suffered by someone who encounters law enforcement is shaped, at least to some extent, by his or her prior dealings with law enforcement. Additionally, because Plaintiff has put emotional distress damages at issue, Defendants are entitled to offer evidence of alternative sources of distress. See Lewis v. District of Columbia, 793 F.2d 361, 363 (D.C. Cir. 1986). Plaintiff is ORDERED to provide supplemental responses to Renegar Interrogatory Nos. 2 and 3 within fourteen (14) days.

**No. 4**: IDENTIFY each educational institution that YOU have attended, the address, the year attended, the field of study, any degrees obtained, and any disciplinary action taken against YOU by any such institution.

GRANTED in part. Plaintiff's basic educational history is relevant and discoverable. However, Defendant has not shown a need for information concerning disciplinary action. Plaintiff is ORDERED to provide supplemental responses to Renegar Interrogatory No. 4 within fourteen (14) days, except for disciplinary action.

## III.   SANCTIONS

Both sides ask for sanctions. Defendants ask for sanctions for their fees in connection with their motions. Plaintiff asks for sanctions under Federal Rule of Civil Procedure 37(b)(2) based on Defendants' "willful discovery non-compliance." Opposition at 44-46. In light of the fact that Defendants' motions were granted in part and denied in part, both requests are DENIED. The Court exercises its discretion to have each side bear its own attorney's fees associated with these motions. See Fed. R. Civ. P. 37(a)(5)(C).

## IV.   WAIVER OF LOCAL RULE 37

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Plaintiff's counsel disconnected from the hearing before it was over without the Court's permission. After she left, Defendants' counsel raised the possibility of filing two additional discovery motions, a motion to compel further responses to document requests and a motion related to Plaintiff's deposition. The Court hereby WAIVES the requirements of Local Rule 37 as to those motions. Defendants have leave of court to file those motions in accordance with Local Rule 7.

cc: Chambers of Hon. David O. Carter

EXHIBIT H

# INVOICE

## Carroll Sells Court Reporting Service

*4132 Katella Avenue, Suite 101*
*Los Alamitos, CA  90720*
*(562) 799-9100*
*Tax ID# 84-1752107*

S. FRANK HARRELL, ESQUIRE
LYNBERG & WATKINS
1100 TOWN & COUNTRY ROAD
SUITE 1450
ORANGE, CA  92868

August 17, 2020

**Invoice#** 15353

**Balance:**  $5,426.19

**Re:** JEREMY HOLLOWAY V. ORANGE / JEREMY HOLLOWAY
CASE NO. 8:19-cv-01514-DOC-DFM
*on 08/14/20  Billed 08/17/20*
*by* VICKY De BOER, CSR #6055

| Charge Description | Amount |
|---|---|
| Videotaped Deposition of Jeremy Holloway | 2,760.55 |
| Original and one certified copy | |
| 2 Day Expedite - 90% | 2,484.49 |
| After 5:00 p.m. | 118.75 |
| Exhibits | 2.40 |
| Shipping/Handling/Processing | 60.00 |

Original transcript sent this date to
Narine Mkrtchyan, Atty. at Law.

P l e a s e   R e m i t  - - >  Please tear off stub and return with payment. Total Due: $5,426.19

*We accept Visa, MasterCard & American Express*
*10% interest will be applied after 30 days*

Carroll Sells Court Reporting Service
4132 Katella Avenue, Suite 101
Los Alamitos, CA  90720

Invoice# 15353

Balance$    5,426.19

EXHIBIT I

**Witness Legal Video, Inc.**

840 Apollo St Suite 100
El Segundo, CA 90245
info@witnesslegalvideo.com
(310) 683-8139

# INVOICE

| | |
|---|---|
| INVOICE NO. | 201784 |
| DATE | 08/14/2020 |
| JOB NO. | 20-212 |
| WITNESS | Jeremy Holloway |
| CASE NAME | Holloway vs County of Orange |

**INVOICE FOR**
S. Frank Harrell
Lynberg & Watkins
1100 Town & Country Rd. Ste.1450
Orange, CA  92868
sharrell@lynberg.com

**PAYABLE TO**
Witness Legal Video, Inc

**TAX ID #**
84-4460378

| DESCRIPTION | | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Videographer Hours:WLV(cc) 2-Hr Min | Scheduled Start Time: 9:00am<br>Lunch: 30min<br>End Bill Time: 6:36pm | 1 | 325.00 | 325.00 |
| Additional Hours:WLV(cc) | Hours worked (11:00am-5:00pm) | 6 | 95.00 | 570.00 |
| Overtime Hours:WLV(cc) | Hours worked after 5pm | 1.75 | 142.50 | 249.38 |
| Media Format:Video Sync/Depoview | Per media hour | 6.75 | 75.00 | 506.25 |
| Shipping | | 1 | 10.00 | 10.00 |

SUBTOTAL $1,660.63

**Notes:**