1

**MKRTCHYAN LAW**

2

Narine Mkrtchyan, Esq. (SBN 243269)
1010 N. Central Ave, Suite 204

3

Glendale, CA 91202
Telephone No. (818) 388-7022

4

Web:  www.narinelaw.com

5

Email: narine57@gmail.com

6

Attorney for Plaintiff Jeremy Holloway

7

8

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

9

10

JEREMY HOLLOWAY,

Case No. 8:19-cv-01514-DOC-DFM

11

Plaintiff,

**PLAINTIFF'S OPPOSITION TO**

12

vs.

**DEFENDANTS' MOTION TO
DISMISS FOR VIOLATION OF**

13

COUNTY OF ORANGE, DEPUTY

**COURT ORDER; DECLARATION
OF COUNSEL; EXHIBITS A-F**

14

CHAD RENEGAR, individually and as
a peace officer, DEPUTY JOEL

GONZALEZ, individually and as a

**HONORABLE DOUGLAS F.
MCCORMICK**

15

peace officer, DEPUTY KEVIN
PAHEL, individually and as a peace

16

officer, DEPUTY BRANDON
BILLINGER, individually and as a

**DCO: November 15, 2020
Trial: January 19, 2021**

17

peace officer, DEPUTY MARK
BORBA, individually and as a peace

18

officer, DEPUTY JAMESON GOTTS

**Date: December 8, 2020**

individually and as a peace officer,

**Time: 10:00 am**

19

DEPUTY JUSTIN GUNDERSON,

**Ctrm: 6B**

individually and as a peace officer, and

20

DOES 1-10.

21

Defendants.

22

23

24

PLEASE TAKE NOTICE THAT on December 8, 2020, at the hour of 10:00

25

a.m. or as soon thereafter as Counsel may be heard in Courtroom "6B" of the

26

27

28

above referenced Court located at Ronald Reagan Federal Building and United States Courthouse, 411 W. Fourth St., Santa Ana, CA 92701, Plaintiff will and does hereby oppose the Defendants' motion to dismiss as set forth in the appended motion.

Said motion is based on this Opposition, the records, papers and files in this case, as well as such oral and documentary evidence as may be produced at the hearing on the Motion.

Plaintiff is hereby expressly responding to the Defendants' motion to compel, **Document No. 111**, Filed on November 4, 2020, despite their attempt to amend that motion thereafter, without court orders permitting amendments and without proper notice under Rule 7-9. Plaintiff is expressly requesting to disregard any amendment to the motion that were not made with leave of Court and in violation of the Local Rules.

DATED: November 17, 2020          **MKRTCHYAN LAW**

By: _____/s/Narine Mkrtchyan_____
**NARINE MKRTCHYAN**
Attorney for Plaintiff
Jeremy Holloway

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **Introduction**

In the early morning hours of January 21, 2018, 41-year old Plaintiff Jeremy Holloway, an honorably discharged then homeless veteran of the United States Marine Corps, was lawfully camping with a permit at the O'Neill Regional Park in Trabuco Canyon, Orange County and sleeping peacefully in a tent with his dog. At around 4 am in the morning Defendants Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Billinger and Borba awoke him, ordered him to get out of his tent, claimed he was the suspect in a domestic violence dispute, patted him down and searched his tents and campsite with all belongings without consent by tossing and turning everything. The deputies left confirming the incident 'unfounded' as to Jeremy. Both reporting parties to the incident have testified at their depositions that they never actually saw Jeremy with a female at any point in time before or during the incident that night, but were basing their statements entirely on what they heard from inside their tent/RV.

Upset Jeremy then walked to the ranger station to make a complaint about the incident. Prevented from making a complaint by the locked doors at the Ranger station and the fact there were still police SUVs parked at the station, he walked back to his campsite and attempted to speak with the neighbors asking them to clear him with the deputies and accept responsibility for the disturbance caused by them. As he was preparing to get back to sleep, he saw about 7-10 sheriff's deputies, including Chad Renegar, Joel Gonzalez, Kevin Pahel, Brandon Billinger, Mark Borba, Jameson Gotts, and Justin Gunderson circling his campsite with guns drawn, ordering him to show his hands and get down on the ground. Jeremy put his hands out to his sides, but asked, 'Why? What have I done?' inquiring why he needed to get down on the ground. Another officer believed to be Gonzalez yelled,

'Tase him!' At this time, Jeremy felt that his life would be in danger if he got to the ground. Immediately, he was punched to the left side of his face by an officer he believed to be Deputy Renegar. The punch knocked him out, and when he came to his senses, he was already on the ground with multiple deputies, one deputy choking him, another striking him with full force in the head with a knee multiple times until he started bleeding profusely. He was kicked and punched in multiple areas of his body, while his arms and legs were being held by multiple deputies. He was unable to breathe due to the chokehold and was hoping to survive. After this unjustified and cruel beating, the deputies turned him to his stomach and tasered him approximately 4 times, striking his buttocks area. Jeremy was left with bruised ribs and legs, head injury, severely bleeding and swollen face, lost vision, severe back pain, periodic loss of consciousness, and severe emotional distress. Jeremy was treated by the paramedics for visible injuries at scene and was hospitalized to the Mission Viejo hospital. After that Deputies Renegar, Gonzalez, and Pahel took him to the County Jail in Santa Ana where he was booked on false felony charges for Cal. Penal Code Sec. 69 and 243(b). In an implicit admission of the allegations' false nature, the Orange County District Attorney declined to file charges in the interests of justice. On May 24 when Jeremy ventured to camp again at the same location, a number of unknown OCSD deputies detained and searched him by harassing and instilling more fear for his life and safety, prompting him to pack his belongings and move to Pennsylvania.  Due to the incident, Jeremy has been continuously receiving treatment from the Department of Veteran's Affairs in Long Beach and Pittsburgh for injuries including vision loss, headaches, backache, tooth loss and emotional distress. The extent of his injuries has been substantial and he is still undergoing treatment and will continue in the future. Collecting those records has been a burdensome task in light of the fact that the VA is a government run agency and is slow in responding. Despite the big burden of

gaining access Plaintiff has supplied all current medical records to defense. Since Plaintiff is ongoing continuous treatment, he will supplement his medical records up through trial under Rule 26(a). However, all treating providers have been identified in Plaintiff's Supplemental Disclosures.

## Statement of the discovery status

This is the third motion to compel filed by Defendants, noticed outside the current Discovery Cut-Off of November 15, 2020. It is improperly titled as 'Motion to Dismiss for Violation of Court Order' when there has been no specific order that Plaintiff or his counsel have failed to comply in the case.  The motion really pertains to Plaintiff's deposition that took place **in-person** on August 14, 2020 at the Orange County Office of the defense counsel despite the coronavirus restrictions. Plaintiff who currently resides in Pennsylvania travelled specially to Orange County, California for this deposition, despite the financial hardship and the health risks associated with ongoing travel restrictions. The deposition lasted **6 hours, 34 minutes** interspersed with breaks, from **9:08 am to 6:36 pm**, and was voluntarily ceased by defense counsel after Plaintiff answered all the questions posed by defense several times, with limited exceptions, summarized below. **Declaration of Plaintiff Jeremy Holloway, Declaration of Counsel Narine Mkrtchyan, Plaintiff's Deposition Transcript as Exhibit A**.

At this deposition, Plaintiff was subjected to prolonged harassment and badgering by male defense counsel in his 60s, Mr. Frank Harrell, whose primary goal was not to find out facts about the underlying incident, or the extent and scope of Plaintiff's injuries, but to harass, disparage, intimidate, accuse and belittle him and his female counsel. Defense counsel was not wearing a face mask as was the agreement between parties and demanded that Plaintiff also does not wear a mask. Plaintiff's counsel in good faith instructed Plaintiff not to answer certain questions

based on privileges and phrasing of the questions and the number of times they were asked, and was provoked to object to personally disparaging and sexist commentary and body language of defense counsel. **Declaration of Counsel**. However, Plaintiff endured and cooperated at the deposition and answered all questions as reflected more fully in the complete transcript of the deposition attached to this motion as **Exhibit A**. All substantive areas of inquiry related to this litigation have been covered at his deposition. **Exhibit A, Declaration of Plaintiff, Jeremy Holloway.**

Almost two  months after the deposition, and without in good faith fulfilling the letter and spirit of the Local Rule 7-3 requiring a personal conference of counsel, and in further flagrant efforts to harass and intimidate Plaintiff  and his counsel, the defense has filed the instant motion, *third in line*, not only seeking another session of Plaintiff's in-person deposition, but also improperly asking for sanctions for his counsel's conduct, by taking out excerpts from the deposition out of context, misrepresenting the nature of this litigation, the factual background of the case, the Plaintiff's counsel's general behavior with defense counsel in this litigation. Since September after their first letter to meet and confer on the subject, Plaintiff's counsel has been in continuous communications with defense counsel, Ms. Tamara Heathcote, and she never once requested to personally meet and confer on this subject either on the telephone or at the multiple depositions conducted since then. **Declaration of Counsel, Email Communications, Exhibit B**.  In fact, the communications were overall friendly and the counsel cooperated on most of the issues, including scheduling of some additional depositions and extension of discovery deadlines. Therefore, it came as a big surprise when defense counsel turned around and without raising the issues personally at any point in time, filed a motion for sanctions infused with such offensive and pejorative language against Plaintiff's counsel displaying bias and prejudice, demanding

sanctions for upward nearing $30,000. **Declaration of Counsel, Email Communications Exhibit B**. The whole point of the federal Local Rule 7-3 requiring personal conference of the counsel prior to filing of the motions is to resolve issues between parties without interference of Court. This type of underhanded behavior and personal attacks erodes confidence in the communications between parties and amounts to a ***war in attrition***, not substantive litigation. Defense counsel here is really interested in punishing Plaintiff for filing this suit by making it prohibitively costly and intimidating his counsel from zealously advocating for her client.

　　More significantly, the defense have not identified what specific issues of substance they have not been able to cover at the all-day deposition that they were entitled to under FRCP 30. The defense has reached their 7-hour 1 day limit and now are not entitled to another session after waiting for two months. The entire motion is grounded on improper *ad hominem* attacks on Plaintiff's counsel, without regard to defense counsel's and their clients' conduct at their depositions, that were objected to by Plaintiff previously in the **Ex Parte Application to Compel Depositions**, on File with Court, filed in July, that came about, when defense counsel unilaterally stopped and walked out of the deposition of the key defendant in the action, Chad Renegar, before it was finished and further cancelled a number of depositions, on various excuses. Plaintiff and his counsel had to absorb costs of these cancellations, resumptions and rescheduling. No sanctions were imposed on defense by Court as a result of their actions. See **Declaration of Counsel, Exhibit C**. Since July Plaintiff has conducted approximately 15 depositions and the defense counsel did not move for sanctions or complain about the Plaintiff counsel's conduct until it came to Plaintiff's deposition and only two months after it was taken, pointing to lack of prejudice and lack of urgency of the issues raised in their motion, and improper motives described above.

The fact that the Magistrate has permitted the Defendants to lodge their multiple motions to compel without fulfilling requirements of the Local Rule 37 pertaining to all discovery matters, has prejudiced Plaintiff because the defense has abused this allowance by filing largely frivolous motions on the brink of the DCO, designed not to obtain legitimate relief for discovery, but to harass, intimidate and overwhelm Plaintiff and his counsel. The defendants have further failed to respond to Plaintiff's legitimate discovery demands pending since August. See **Plaintiff's Second Ex Parte Application to Compel Discovery**. **On File With Court**.

This motion should be stricken because it is an abuse of the process, was brought without adequate meet and confer efforts in good faith, is noticed outside the current Discovery Cut-Off of November 15. Plaintiff is asking for sanctions and attorney's fees for the time spent in defending this motion replete with personal attacks, unfair adjectives lodged against Plaintiff's counsel and willful misrepresentations about the general background of this litigation and underlying facts of the incident.

## I.    DEFENDANTS ARE NOT ENTITLED TO ANOTHER SESSION OF PLAINTIFF'S DEPOSITION BECAUSE THEY HAVE EXHAUSTED ALL RELEVANT INQUIRY TO THIS LITIGATION AT THE ALL DAY DEPOSITION OF PLAINTIFF

### a.  Points and Authorities

Rule 26(b)(1) permits discovery in civil actions of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Generally, the purpose of discovery is to remove surprise from trial preparation so the parties can obtain evidence necessary to

evaluate and resolve their dispute." *Oakes v. Halvorsen Marine Ltd.,* 179 F.R.D. 281, 283 (C.D.Cal.1998). Yet all discovery, and federal litigation generally, is subject to Rule 1, which directs that the rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. To that end, the Federal Rules of Civil Procedure limit the duration of depositions to "1 day of 7 hours." Fed. R. Civ. P. 30(d)(1).

Rule 30 provides that counsel may make objections to deposition questions and "may instruct a deponent not to answer [a question] only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Fed. R. Civ. P. 30(c)(2). Thus, attorneys representing a deponent or party may, of course, object to questions asked a witness, provided the objections are not disruptive of the proceedings. *Id.* Indeed, a party waives certain objections, such as to the form of questions or answers or to other errors that might be obviated, removed, or cured if promptly presented, by failing to make the objection at the deposition. Fed. R. Civ. P. 32(d)(3)(B); 8 Wright, Miller & Marcus, *Federal Practice and Procedure:* Civil 2d § 2113 (1994). However, "[u]nder the plain language of Fed. R. Civ. P. 30(d)(1), counsel may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation  directed by the court, or to suspend a deposition in order to present a motion [for a protective order]." *Resolution Trust Corp. v. Dabney,* 73 F.3d 262, 266 (10th Cir. 1995); *Redwood v. Dobson,* 476 F.3d 462, 468 (7th Cir. 2007).

Rule 30(d)(3) provides that a party or deponent, "[a]t any time during a deposition… may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party" whereby "the court may order that the deposition be terminated or may limit its scope and manner as provided in Rule 26(c)." Fed.

R. Civ. P. 30(d)(3). "The motion may be filed in the court where the action is pending or the deposition is being taken. If the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order." *Id*.

Court <u>granted</u> the plaintiff's motion for a protective order under Rule 30(d) where defendant's deposition questions were improper, irrelevant, utterly distasteful, and disrespectful, where the tone of the deposition was hostile and confrontational from the beginning, and where the intent of the questioning was to accuse the plaintiff of lying despite knowledge to the contrary. *United States ex rel. Baltazar v. Warden*, 302 F.R.D. 256, 258 (N.D. Ill. 2014).

Court <u>denied</u> motion to compel further deposition of non-party where deponent was asked to look through 700 pages of documents to find a statement which counsel asking the question conceded did not exist (in order to elicit the answer that it did not exist). *Mir v. Kirchmeyer*, Civil No. 12cv2340-GPC (DHB), at *3 (S.D. Cal. Oct. 19, 2016). The court found that "it would be unduly burdensome, annoying and harassing" to require deponent to respond, especially as "Plaintiff has equal access to the information he seeks," being "in possession of the transcripts, and the documents speak for themselves." *Id*.

However, "upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense. . . ." *Austin During v. City University of New York*, No. 05 Civ. 6992(RCC)RLE, 2006 WL 618764, at *1 (quoting Fed. R. Civ. P. 26(c))." "Even if the discovery sought by Defendant was found to be relevant, [the] Court must still weigh Defendant's right to obtain that discovery against the burden imposed on Plaintiff. *Mirkin v. Winston Res., LLC*, No. 07 Civ. 02734, 2008 WL 4861840, at *1 (S.D.N.Y. Nov. 10, 2008) (citing *During*, 2006 WL 2192843, at *4

(citing Fed. R. Civ. P. 26(b)(2), 26(c)). "Because '[t]he trial court is in the best position to weigh fairly the competing needs and interest of parties affected by discovery,' Rule 26 confers broad discretion to weigh discovery matters." *During*, 2006 WL 2192843, at *4 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984)). Moreover, the court may issue an order "to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense . . . ." Fed. R. Civ. P. 26(c). *Warnke v. CVS Corp.*, 265 F.R.D. 64, 66 & 69 (E.D.N.Y. 2010).

> Sometime ago, this court recognized the potential for such abuse in *Mannino v. Superior Court*, (1983) 142 Cal.App.3d 776 [191 Cal.Rptr. 163], when it noted "We are also aware the discovery process is subject to frequent abuse and, like a cancerous growth, can destroy a meritorious cause or defense ...." (Id. at p. 778.)  Our observations of the day-to-day practice of law lead us to conclude this cancer is spreading and judges must become more aggressive in curbing these abuses.  Courts must insist discovery devices be used as tools to facilitate litigation rather than as weapons to wage litigation.  These tools should be well calibrated; the lancet is to be preferred over the sledge hammer."

> In *Greyhound Corp v. Superior Court* (1961) 56 Cal.2d 335, 15 Cal.Rptr. 90, 364 P.2d 266, the seminal case in California civil discovery, the court gave examples of improper 'fishing' WHICH CLEARLY APPLY HERE: 'The method of "fishing" may be, in a particular case, entirely improper (i.e., insufficient identification of the requested information to acquaint the other party with the nature of information desired, attempt to place the burden and cost of supplying information equally available to both solely upon the adversary, placing more burden upon the adversary than the value of the information

warrants, etc.).  **Such improper methods of "fishing" may be (and should be) controlled by the trial court under the powers granted to it by the statute.'** (*Id*. at pp. 384-385.)  The concerns for avoiding undue burdens on the 'adversary' in the litigation expressed in *Greyhound* apply with even more weight to a nonparty.

**Had the *Greyhound* court been able to anticipate the tremendous burdens promiscuous discovery has placed on litigants and nonparties alike, it might well have taken a stronger stand against such 'fishing.'** *Greyhound's* optimism in noting the then new discovery system would be 'simple, convenient, and inexpensive,' would 'expedite litigation,' and 'expedite and facilitate both preparation and trial,' has certainly proven to have been considerably off the mark.  (56 Cal.2d at p. 376.)

*Calcor Space Facility, Inc. v. Superior Court* (1997) 53 Cal.App.4th 216, at 221, 224-25.


Questions of evidentiary privilege arising in the course of the adjudication of federal rights, such as here, are governed by the principles of federal common law. *United States v. Zolin,* 491 U.S. 554, 562 (1989); Fed. R. Evid. 501. "Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged." *Fisher v. United States,* 425 U.S. 391, 403 (1976); *Clarke v. American Commerce Nat'l Bank,* 974 F.2d 127, 129 (9th Cir.1992). "The attorney-client privilege may be divided into eight essential elements: '(1 ) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the

client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.'" *In re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th Cir.1992) (citation omitted); *United States v. Martin,* 278 F.3d 988, 999 (9th Cir. 2002). A corporation may claim the attorney-client privilege. *Commodity Futures Trading Comm'n. v. Weintraub,* 471 U.S. 343, 348 (1985); *Upjohn Co. v. United States,* 449 U.S. 383, 390 (1981).

The Court held that deponent did not need to respond to questions which invaded attorney-client privilege in *Quiksilver, Inc. v. Kymsta Corp.*, 247 F.R.D. 579 (C.D. Cal. 2007).

Court <u>denied</u> motion to compel further deposition of plaintiffs where defendants contended that "the further questioning of [plaintiffs] was made necessary due to the improper actions of their counsel." *Mendez v. R+L Carriers, Inc.*, Case No.: CV 11-02478-CW (JSC) (N.D. Cal. Apr. 30, 2012). The Court reasoned:

1. Plaintiff #1's deposition lasted five hours and forty-six minutes, throughout which counsel asserted approximately 265 objections and six instructions not to respond.

2. Plaintiff #2's deposition totaled five hours and fifty-one minutes, and counsel objected some 293 times and gave twelve instructions not to answer.

3. The court concluded that "**although Plaintiff's objections were excessive… Defendants are not entitled to further depositions… as [they] have not identified the subjects on which they need to depose these Plaintiffs.**"

   ▪ "Defendants voluntarily ended [plaintiff's] deposition, noting that counsel had no further questions."

- ▪ "Significantly, a majority of the questions that Plaintiffs'
    counsel improperly instructed [plaintiff] not to answer were
    ultimately addressed by the witness."
- ▪ "If any questions remain that Defendants feel were not
    answered by the witness, Defendants may seek responses to
    those queries by propounding interrogatories consistent with
    Federal Rule of Civil Procedure 33."

*Mendez v. R+L Carriers, Inc., Case No.: CV 11-02478-CW.*

Court denied compelling further deposition testimony on a line of
questioning which defendant was improperly instructed to answer where "Plaintiffs
were not harmed by this erroneous instruction, because the question was
answered." *Robinson v. Chefs' Warehouse*, No. 3:15-cv-05421-RS (KAW), at *5
(N.D. Cal. Oct. 10, 2017). In this same case, the Court upheld as proper an
instruction not to answer on privacy grounds, where the non-party deponent had
"verified his former employment, and testified that he was terminated for
misplacing drug testing records. He is not a party to this case, nor is he even a
putative class member, so additional information would be subject to protection
under California law." *Id*. at *4. The Court noted that, generally "[t]he privacy
right protects personnel information, including an employee's confidential human
resources file and records relating to discipline or demotions, but not the facts of
employment itself." Another instruction not to answer in this case but which did
not result in harm to plaintiffs, although improper, resulted in the Court having
deponent confirm and provide a phone number to Plaintiffs, in lieu of requiring
witness undergo further deposition. *Id*. at *5.

In a case where most of defendant's motions to compel answers after a
deposition were granted, one of them was denied as arguably privileged where the
question sought "information pertaining to litigation strategy or legal advice."

*Vasquez v. Leprino Foods Co.*, No. 1:17-cv-00796-AWI-BAM, at *12 (E.D. Cal. Apr. 30, 2019):

> ■ Q. Ms. Hefke, did you decide that a third amended Complaint should be filed in this case?
>
> ■ MR. DOWNEY:· Objection.· Do not answer that question. Calls for a legal opinion and a legal conclusion. Attorneys decide on behalf of their clients whether or not a third amended Complaint should be filed, unless a plaintiff is representing themselves pro se, which is not the case here."

Where Fifth Amendment privileges are implicated in a deposition, a Court noted that it could be a basis not to answer if "invoked on a question-by-question basis." *Highlander Holdings v. Fellner*, Case No.: 3:18-cv-1506-AHG, at *21 (S.D. Cal. June 29, 2020).

Even though privacy is not one of the enumerated grounds for an instruction not to answer under Fed. R. Civ. P. 30(c)(2), courts "will also consider state law as to the right of privacy to the extent it is not inconsistent with federal law. *See Soto*, 162 F.R.D. at 618 (determining that California state constitutional right to privacy is consistent with federal right to privacy)." *McClure v. Prisoner Transp. Servs. of Am.*, No. 1:18-cv-00176-DAD-SKO, at *4 (E.D. Cal. Mar. 12, 2020). There, the Court did not compel a response to a question about deponent's past financial information as irrelevant, noting however that relevance is not a proper basis for an instruction not to answer, rather making this ruling under a privacy basis. *Id.* at *7. "[S]tate law is nevertheless relevant, especially in mixed claims where one of the elements of the federal claim is that a state actor was acting under color of state law when the federal right was violated—a category which includes every 42 U.S.C. § 1983 action." *Id.* at *4. "'Federal courts ordinarily recognize a constitutionally-based right of privacy that can be raised in response to discovery

requests.' *Soto*, 162 F.R.D. at 616 (citing *Breed v. United States Dist. Ct. for Northern District*, 542 F.2d 1114, 1116 (9th Cir. 1976))". *Id*. at *5. "'Unlike a privilege, the right of privacy is not an absolute bar to discovery and courts must balance the need for the information against the claimed privacy right.' *Gamino v. Yosemite Community College District*, et al., Case No. 1:18-cv-00391-SAB, 2020 WL 977933, at *2 (E.D. Cal. Feb. 28, 2020*)". *Id*.

In *Obregon v. Superior Court*, (1998) 67 Cal. App. 4th 424, 433-44, citing <u>*Calcor*</u> and other cases, the court intimated that sending out "grossly overbroad discovery," then writing one meet and confer letter before moving to compel, may suffice to deny the motion to compel.

"Petitioner's objections are grounded upon the constitutional right to privacy contained within article I, section 1 of the California Constitution.  Therefore, real parties' argument relating to the scope of discovery and the ability to undertake a fishing expedition misses the mark.  **While the filing of the lawsuit by petitioner may be something like issuing a fishing license for discovery, as with a fishing license, the rules of discovery do not allow unrestricted access to all species of information.**  Discovery of constitutionally protected information is on a par with discovery of privileged information and is more narrowly proscribed than traditional discovery. (*Britt v. Superior Court*, *supra*, 20 Cal. 3d at pp. 852-853.)

'When the right to discovery conflicts with a privileged right, the court is required to carefully balance the right of privacy with the need for discovery. (Citations.)' (*Harris v. Superior Court* (1992) 3 Cal.App.4th 661, 665, 4 Cal.Rptr.2d 564.)  Discovery may be compelled only upon a showing of a compelling public interest.  (*Id*. at p. 664.)  In those

situations where it is argued that a party waives protection by filing a lawsuit, the court must construe the concept of 'waiver' narrowly and a compelling public interest is demonstrated only where the material sought is *directly relevant* to the litigation.  (*Britt v. Superior Court*, *supra*, 20 Cal.3d at pp. 858-859.)  The party seeking the constitutionally protected information has the burden of establishing that the information sought is directly relevant to the claims.  (*Harris v. Superior Court*, *supra*, 3 Cal.App.4th at p. 665.)"  (*Tylo, supra*, 55 Cal.App.4th at 1387, italicized emphasis in original, bold emphasis added.)

"'The attorney-client privilege is absolute and disclosure may not be ordered, without regard to relevance, necessity or any particular circumstances peculiar to the case.' 'Although exercise of the privilege may occasionally result in the suppression of relevant evidence, the Legislature of this state has determined that these concerns are outweighed by the importance of preserving confidentiality in the attorney-client relationship.  The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence.'"  (*2,022 Ranch v. Superior Court*, (2003) 113 Cal.App.4th 1377, 1388.)

"A discovery order compelling answers that violate the attorney client privilege constitutes an abuse of discretion." (*Venture Law Group v. Superior Court*, (2004) 118 Cal.App.4th 96, 102.)

"Confidential personnel files at a person's place of employment are within a zone of privacy."  (Weil & Brown, *California Practice Guide—Civil Procedure Before Trial* (Rutter 2007) p. 8C-91 ¶ 8:308; *see additionally Board of Trustees v. Superior Court* (1981) 119 Cal.App.3d 516; *and see Harding Lawson Associates v. Superior Court* (1992) 10 Cal.App.4th 7.)   As well, in requesting testimony or material pertaining to other patients, the deposition request violates the confidentiality of non-party third person patients and their families in violation of Civil Code § 56 *et seq.* and Cal. Const. Art. I § 1.

Courts narrowly and strictly construe waiver of privilege. *Transamerica Title Ins. Co. v. Superior Ct.*, 188 Cal. App. 3d 1047, 1052 (1987) ("The scope of either a statutory or implied waiver is narrowly defined and the information required to be disclosed must fit strictly within the confines of the waiver."). Privilege is waived only "if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone." Evid. Code § 912(a) (emphasis added). When applying this strict construction to investigations, courts hold that disclosing (1) the existence of an investigation and/or (2) the conclusions reached as a result of that investigation will not result in a waiver of all underlying communications and work product involved in reaching those conclusions. See, e.g., *Kaiser,* 66 Cal. App. 4th at 1227 ("Where a defendant has produced its files and disclosed the substance of its internal investigation conducted by nonlawyer employees, and only seeks to protect specified discrete communications which those employees had with their attorneys," such communications are privileged) (emphasis added); *In re Dayco Corp. Deriv. Sec. Litig.*, 99 F.R.D. 616, 619 (S.D. Ohio 1983) (issuance of "two-page press release . . . which summarized the establishment of a [special committee], the retention of [a] law firm, and the 'findings' and 'conclusions' of the [special committee] and counsel

in the report" did not waive privilege). "the identity and capacity of all individuals who authored, sent, or received each allegedly privileged document, the document's date, a brief description of the document and its contents or subject matter sufficient to determine whether the privilege applies, and the precise privilege or protection asserted." *Catalina Island Yacht Club v. Superior Ct.,* 242 Cal. App. 4th 1116, 1130 (2015). Once it meets that burden, it is "presumed" that the challenged documents are privileged, and PLC "has the burden of proof to establish that the communication[s] [were] not confidential, or that an exception exists." *Uber Techs., Inc. v. Google LLC*, 27 Cal. App. 5th 953, 967 (2018), as modified (Oct. 25, 2018) (internal quotation marks omitted). Rather than prove how each document is not privileged, PLC raises broad, all-encompassing arguments that barely touch on the actual documents.

While there is sometimes a basis for admitting prior arrests to mitigate damages from a groundless false arrest, courts have come to recognize the loss of liberty and incarceration stemming from a bona fide arrest is completely different from the same losses based on malicious and false accusations as is the case here. *Smith v. Baltimore City Police Dep't*, 2016 U.S. App. LEXIS 19394 *16;  See also *Nelson v. City of Chicago*, 810 F.3d 1061, 1069 (7th Cir. 2016). Therefore, Plaintiff's counsel properly could instruct Plaintiff not to respond to questions related to remote arrests at the deposition.

*Morgan v. State*, 818 So. 2d 1163, 1173-74 (Miss. 2002):
"¶ 26. Even if it was an attempt to show bias, the first objection could have been correctly sustained on the basis of badgering the witness or being argumentative. Otto had already stated that his plea to manslaughter had nothing to do with this case. Similarly, Flood was badgering the witness

when he asked/stated the following: "So when the deal gets good enough, you'll say whatever —," and the Court again sustained the State's objection. Regardless, Otto denied for a second time that there was a deal. Flood then pursued another line of questioning. In sum, the record does not indicate that Flood was prevented from asking questions about the bias, if that is the "essence" of his proffer. He clearly was allowed to do so, and Otto twice denied that the manslaughter plea was the result of a deal. As in Craft , even if it was true that Otto had received some favorable treatment, he was not going to reveal it. We find the judge did not abuse his discretion or commit reversible error in sustaining the objections." *Id*.

Court denied sanctions under Fed. R. Civ. P. 37(b)(2) and found it unnecessary to warn plaintiff that further misconduct would result in a dismissal of its lawsuit where plaintiff had "produced, or agreed to produce, several of its witnesses for depositions." *Matrix Motor Co. Inc. v. Toyota Motor Sales, US, Inc.*, No. SACV-03-601-CJC-(JTLX), at *7 (C.D. Cal. May 8, 2003). The court noted that, while plaintiff had failed to satisfy the discovery deadline, "courts generally impose this drastic sanction in only 'extreme circumstances' where the disobedient party flagrantly and repeatedly disregards a court's discovery order. *Cf. In Re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996) (affirming dismissal sanction where noncompliant party totally failed to respond to all discovery). Indeed, courts will usually impose a dismissal sanction only when all other less drastic sanctions have failed to make the disobedient party comply with the court's discovery orders. See, e.g., *FDIC v. Conner*, 20 F.3d 1376, 1380 (5th Cir. 1994) (describing dismissal sanction as 'draconian remedy,' as 'remedy of last resort,' and as 'lethal weapon')." *Id*. at 7.

According to a 2018 study by the American Bar Association's Commission on Women in the Profession and the Minority Corporate Counsel Association, "female lawyers, and especially women of color, are more likely than their male counterparts to be interrupted, to be mistaken for non-lawyers, to do more office housework, and to have less access to prime job assignments." Kim Elsesser, *Female Lawyers Face Widespread Gender Bias, According To New Study*, Forbes (Oct. 1, 2018), https://www.forbes.com/sites/kimelsesser/2018/10/01/female-lawyers-face-widespread-gender-bias-according-to-new-study/?sh=27b0eed04b55. Significantly as it relates to work such as representation at depositions, "[a]lthough assertiveness and self-promotion are often needed to succeed in the legal field, women often feel that they must walk a tightrope. If they are too assertive, then they are criticized for not behaving in a ladylike fashion. If they are not assertive enough, then they are often seen as lacking the confidence needed to succeed." *Id*.

### b.  Argument

The defense motion starts off with a scathing indictment and accusatory pleading against Plaintiff's counsel and her alleged obstructive conduct at the deposition and demanding sanctions against her and Plaintiff for ***53 pages***, by willfully ignoring the defense counsel's conduct in this litigation at both Plaintiff's deposition and their client's depositions. See **Plaintiff's previous Ex Parte Application to Compel Deposition of Renegar. Declaration of Counsel.** Furthermore, it also willfully misrepresents Plaintiff's counsel's conduct at other depositions in an effort to defame her as attorney. **Declaration of Counsel. Exhibit D,  a sample Deposition of Defendant Gotts.**

Then the defense counsel improperly characterizes the Plaintiff's counsel's legitimate objections to the Magistrate's perceived attitude towards Plaintiff's counsel and his rulings at discovery hearings, most notably of September 2, 2020.

Plaintiff's counsel had the right to object to the proceedings conducted, treatment of Plaintiff's counsel at these proceedings, and rulings by the Magistrate. Further, Plaintiff also fairly exercised his rights to move for further review of the Magistrate's previous discovery orders based on a number of legal grounds. See **Court Docket No. 55, 82, 96**. Plaintiff cannot be retaliated against for exercising his federal rights and his counsel's representation of his rights cannot be legally construed by defense as 'Disrespect to Judiciary.' Therefore, requesting sanctions for alleged 'disrespect to judiciary' is without merit, when it is entirely based on Plaintiff's proper exercise of legal rights and remedies to object and seek review of legally erroneous rulings.

After exhausting their lengthy barrage of purely personal accusations against Plaintiff's counsel, only **at p. 62** of their motion, the defense moves to the relatively 'substantive' portion of their grievances as to what issues they were unable to cover at the deposition. Here, going to the actual merits of these issues awkwardly raised by defense by taking out excerpts out of context, review of the entire transcript proves, while there were several instructions not to answer during the course of the all-day deposition of Plaintiff based on privileges or form of the questions, all issues of relevance have been answered by Plaintiff either at another juncture of this deposition, or in other discovery responses by Plaintiff as illustrated in detail below. Plaintiff was subjected to harassment and improperly hostile interrogation by defense counsel, which is apparent only from review of the entire transcript, not excerpts taken out of context by defense. See **Plaintiff's Deposition Transcript, Exhibit A**. His counsel was personally attacked by defense at various junctures during the deposition with his sexist attitude, provoking defensive responses by Plaintiff's counsel.

**Plaintiff's Deposition Summary:**

1.  Defense counsel began by refusing to wear a mask and demanded Plaintiff remove his mask despite the Covid-19. The agreement between counsel was to conduct in-person depositions but the Defendants were wearing masks at all depositions, so was their counsel who was objecting at all time for Plaintiff's counsel removing her mask at any point in time. **Declaration of Counsel**, (**Exhibit A**, Holloway Dep.  12:2-13:19). The general order by the Central District and most of the judges has been for remotely held hearings and Zoom depositions due to coronavirus and inherent health risks.

2.  Plaintiff was asked multiple questions regarding his residential history and answered them all. (**Exhibit A**, Holloway Dep. 22:18-27:13).

3.  Taken aback, Plaintiff asks if he has to respond to personal questions.

> A.  If I feel the question is personal, do I have to answer? (Holloway Dep. 28:19-20).
> A.  No. I don't have anything to hide. I'm just -- if there is something really personal, which I don't -- I don't see. I'm just wondering if I -- (**Exhibit A**, Holloway Dep. 28:25-29:2).

4.  While questioning and re-questioning witness about his employment history, defense counsel interrupted the witness by telling him 'Let me do my job!'

> Q.  Are you employed at the present time?
> A.  Not currently as of the past two weeks.
> Q.  Okay. So at the present time you are not employed?
> A.  Correct.
> Q.  Okay. And you say that that has been the case for about two weeks?
> A.  Two weeks of nothing -- I --
> Q.  **Whoa. Whoa. Whoa. Stop. Let me do my job. Okay?** (**Exhibit A**, Holloway Dep. 30:18-31:2).

5.  Defense counsel went on to question witness about his employment history extensively, asking questions that had already been asked and answered in

1

2

an apparent effort to belittle and embarrass him. (**Exhibit A**, Holloway Dep.
32-40).

3

4

5

6

> Q.    My next question is, sir, so starting at about the beginning of
>        August 2020, you have not been employed; true?
> A.    Yes. (Holloway Dep. 31:6-9).
> Q.    So the only thing that I'm square on is from August 2020 -- the
>        first week of August 2020 until now, I understand that you're
>        not employed. (**Exhibit A**, Holloway Dep. 32:23-25).

7

8

9

10

11

12

13

14

6.   **First instruction not to answer** based on remoteness of employment

history, privacy and not reasonably likely to lead to admissible evidence.

(**Exhibit A**, Holloway Dep. 40-42). Counsel was inquiring about

employment history going back to before 2012, when Plaintiff indicated he

had hard time recalling that far back without assistance of documents. In

good faith, Plaintiff's counsel made the instruction. This same Interrogatory

for employment history limited to 10 years was propounded and answered

by Plaintiff in Interrogatory No. 11 per the Court's Order of 09/09/2020,

Document No. 86, p. 3. **Declaration of Counsel. Exhibit E.**

15

16

7.   Marriage history, relationships, asked the same question multiple times, how

long he had been married, when witness could not recall exact dates.

17

18

19

20

21

22

23

24

> Q.    All right. And your marriage to Karlie Holloway started when
>        and ended when?
> A.    This one is a tough one. It's been 12 years from now. So I'm
>        going to guess 20 –
> Q.    We don't want you to guess.
> A.    Well, that is what I'd be doing. (**Exhibit A**, Holloway Dep.
>        43:4-9).
> Q.    For what period of time were you married to Karlie Holloway?
>        (**Exhibit A** Holloway Dep. 43:22-23).
> Q.    Your marriage with Karlie Holloway started approximately
>        when? (**Exhibit A** Holloway Dep. 44:3-4).
> A.    I don't know.
> Q.    You have no idea?

A.   I have no idea.

Q.   It could have been in 1968? It could have been three weeks ago? You just have no idea? (**Exhibit A** Holloway Dep. 44:9-13).

Q.   When did your marriage to Karlie Holloway start? (**Exhibit A** Holloway Dep. 45:1-2).

8.  **Instructed not to answer**, when was the last time had contact with daughter, instruction based on privacy. ( **Exhibit A** Holloway Dep. 45:24-46:2).

9.  Educational history. (**Exhibit A** Holloway Dep. 46-48).

10. Intrusive questionnaire about parents, <u>instructed not to answer</u> on privacy about whether he still had contacts with father and brother, sister. (**Exhibit A** Holloway Dep. 49-51). Relationships with family have nothing to do with emotional distress damages claimed as a result of police brutality and injuries sustained. This is a factual inquiry. In this case, Plaintiff not only sustained emotional distress, but serious and significant physical injuries, including back/neck strain, vision loss, headaches and neurological disabilities. One can imagine, in a case where Plaintiff is only seeking pain and suffering, but not substantial physical injuries, alternative stressors might play a bigger role to attack the claim for emotional distress.

11. Military service. (**Exhibit A** Holloway Dep. 51-52).

12. Medical benefits with VA, was asked if he had received any bill for treatment at the VA. Objection was on grounds of attorney-client privilege, because the collection of medical bills was through counsel, not directly by Plaintiff. Then defense made an improper comment directed at Plaintiff's counsel, whether Plaintiff received medical treatment through his lawyer, interrupted Plaintiff's counsel. (**Exhibit A** Holloway Dep. 54:10-55). All

medical billing in possession of Plaintiff has been produced to the defense in Plaintiff's Supplemental Disclosures. **Exhibit F.**

13. **Instructed not to answer** to further questions about medical bills based on attorney-client privilege. Plaintiff's counsel legitimately objected to the attitude by defense counsel since the collection of the bills was done through counsel and Plaintiff was unable to respond to questions related to bills without disclosing attorney-client communications. (**Exhibit A** Holloway Dep. 56:22-57:12). See **Exhibit F, Plaintiff's Supplemental Disclosures**.

14. Then the defense counsel provoked Plaintiff's counsel with his pejorative attacks and comments, improperly quoting from the Magistrate's earlier quote from a ruling that an earlier deposition was a 'train wreck.' He unfairly accused Plaintiff's counsel of losing control by displaying paternalistic and sexist attitude towards Plaintiff's counsel.

> MR. HARRELL: **Are you done? One of the reasons, ma'am, why we have a camera here today is because we need one with you. You've already proven that. The magistrate judge characterized your conduct as, and I quote, "a train wreck."**
> MS . MKRTCHYAN: Okay.
> MR. HARRELL: **And that's being charitable.**
> (**Exhibit A** Holloway Dep. 57:13-20).

15. Drugs and medical diagnoses based on doctor hearsay statements.

> Q.  Do you believe that you need to be on anxiety medication at the present time?
> A.  I don't like going out into public places. I have headaches a lot, and it's less of a feeling of anxiety and more of a chemical imbalance.
> Q.  That's what your doctors have told you?
> A.  Yes.
> Q.  So your doctors have told you that you have a chemical imbalance at the present time? (**Exhibit A** Holloway Dep. 60:7-15).

16. Incident: Admonished Plaintiff for using slang while himself using slang in the admonishment.

> Q.    And when you answer my questions, I neglected to mention this at the outset. This is my bad, but we need to stay away from slang terms like "yeah," "nope," "uh-huh," "uh-uh." If you need to tell me yes, that's what we need to hear, a good clear "yes," not a "yeah." Do you understand? (**Exhibit A** Holloway Dep. 64:10-15).

17. Answered questions related to activity 24 hours before incident. (**Exhibit A** Holloway Dep. 64-66).

18. Intrusive questionnaire about his pet and why he had him as a companion dog, unrelated to incident. (**Exhibit A** Holloway Dep. 67-68).

19. Contact with law enforcement in Incident with constant interruptions and vague question, asking the same question again and again 'What is the very next thing that happened?':

> Q.    Okay. So -- so, the very first thing that you hear that causes you to wake up is an announcement by the sheriff's department and a request that you get out of your tent right? (**Exhibit A** Holloway Dep. 71:15-18).
>
> Q.    All right. So when you heard the announcement that the sheriff's department was on scene, they wanted you to get out of your tent, what's the next thing that happened, the very next thing? (**Exhibit A** Holloway Dep. 71:25-72:3).
>
> Q.    Okay. After Deputy Renegar says that he wants to talk to you, what's the next thing that happens, the very next thing? (Holloway Dep. 73:5-7).
>
> Q.    After Deputy Renegar says for the second time, "We want to talk to you," what's the next thing that happened, the very next thing? (Holloway Dep. 73:11-13).
>
> Q.    After Deputy Renegar says for the second time, "We want to talk to you" or words to that effect, what is the next thing that you said? (Holloway Dep. 73:24-74:1). **Exhibit A**

20. Improper comments.

      Q.    **Okay. What you just told me seemed like a mixture of things that you were thinking and things that you were saying. So let me just get my question out there**. (**Exhibit A** Holloway Dep. 73:20-23).

      Q.    Do you believe that you have a clear memory of what happened during the incident? (Holloway Dep. 75:9-10).

      Q.    Can you think of any reason why they had some type of grudge against you? (Holloway Dep. 77:12-13).

      Q.    Okay. But it's not, like, in your mind, when you saw the officers, you had had some long-running feud with more -- with one or more of them; true? (Holloway Dep. 77:18-21).

21. Defense counsel interrupted witness to ask the same question he was in the middle of answering.

      Q.    Did you have any conversation with any other deputies during the incident?

      A.    In the first incident, when they were going through my stuff, I asked them why they were going through –

      Q.    I understand. Did you have any conversation? (**Exhibit A** Holloway Dep. 84:23-85:3).

22. Argumentative questionnaire.

      Q.    Right. So when the officer says that he wants to pat you down to address his officer safety concerns or words to that effect --

      A.    Uh-huh.

      Q.    -- you can understand that; right?

      A.    I can understand being innocent and wanting somebody to search me?

      Q.    You could understand how an officer that had never met you and had received information that suggested that you were involved in wrongdoing might want to look out for their safety by doing a pat-down; true? (**Exhibit A** Holloway Dep. 88:24-89:12).

23. Defense counsel disparaging Plaintiff for asserting his civil rights.

      A.    I understand he wanted to violate my civil rights.

> Q.   **I understand, sir. That's kind of more something for your lawyer to say in front of a jury**. (**Exhibit A** Holloway Dep. 90:13-14).

24. Plaintiff's counsel makes appropriate objection to counsel disparaging Plaintiff with argumentative questioning and insulting Plaintiff's counsel.

> Mr. Harrell: Well, ma'am, one of the great things about our country is I don't have to respond to any of that. (**Exhibit A** Holloway Dep. 90:23-24).
>
> Mr. Harrell: **Right, ma'am. We're not going to have a train wreck today. The magistrate judge has already got his eye on you and for good reason**." (Holloway Dep. 91:7-9).

25. Defense counsel demands an answer to a question that was answered already by badgering Plaintiff and his counsel.

> Q.   Sir, your answer is that you understood he was there to violate your civil rights or words to that effect. First of all, you're not a lawyer, and you don't know what that term means.
> A.   I do.
> Q.   Okay. That's good to know. (Holloway Dep. 92:13-19).
> Q.   We need an answer to the question that's been posed, okay? (**Exhibit A** Holloway Dep. 92:22-23).

26. Badgering the witness asking repeatedly the same questions after he already answers (**Exhibit A** Holloway Dep. 94-97): "With regret I am going to ask again. You are answering questions I have not asked you." (Holloway Dep. 97:10-12).  Plaintiff's counsel instructs not to answer because the question was already answered at 97:4-9. (Holloway Dep. 98:10-11).

27. More badgering of witness with argumentative questioning about what the witness thought the officers were thinking when they asked to search and pat him down. (**Exhibit A** Holloway Dep. 99-100).

28. Interrupts Plaintiff and Plaintiff's counsel objects. (**Exhibit A** Holloway Dep. 101-102, 104-107).

Q.    Okay. And at that point you just knew that whatever these
      people were saying that you had done or hadn't done was just a
      lie; right?
A.    Correct.
Q.    Because you had been sleeping the whole time; right?
A.    Well, I've -- the way Renegar was talking, I caught him in
      several lies, so --
Q.    Okay. Whoa. Whoa. (**Exhibit A** Holloway Dep. 104:10-18).

29. Plaintiff says, "I feel like I am answering the same questions over and
    over." (**Exhibit A** Holloway Dep. 107:10-11).

30. Defense counsel again admonishing  Plaintiff's counsel with paternalistic
    attitude. (**Exhibit A** Holloway Dep. 107-110).

Mr. Harrell:  So what we're going to do is we're going to read the
              question back. Okay? Just try to respond to my question.
              Okay? Later you lawyer might have some questions that
              bring up the things that you want to talk about, but for
              right now I need answers to my questions. Okay?
Ms. Mkrtchyan: And then don't interrupt him.
Mr. Harrell:  So we're going to read the question back now. Okay?
              (Holloway Dep. 107:17-25).

Mr. Harrell:  Ma'am, I tried to get this deposition taken in front of the
              magistrate –
Ms. Mkrtchyan: Oh, really? That would have been great.
Mr. Harrell:  -- **because I wanted him to see you, experience you,
              and live you.** (Holloway Dep. 108:5-10).

Mr. Harrell:  **Ma'am, you aren't even making legal objections. It's
              just useless words**. (Holloway Dep. 108:22-23).

Mr. Harrell:  **Sir, please respond to my question. Really.** I'm really
              about a quarter inch away from just going to the
              magistrate, doing this in chambers, and getting through
              this. I do this all day long with all kind of people --
              (Holloway Dep. 109:21-25).

31. Continues badgering the witness (**Exhibit A** Holloway Dep. 111-112).

Q.      You knew that no one had called about you?
Ms. Mkrtchyan: Calls for speculation.
Q.      True?
Ms. Mkrtchyan: Don't speculate.
Q.      True?
Ms. Mkrtchyan: Objection.
A.      True. I knew I did nothing wrong.
Q.      True?
A.      Yes.
Q.      Right, sir. And did you do anything wrong?
A.      I did nothing wrong.
Q.      Well, then, let's not say that again unless I ask you about it.
(Holloway Dep. 111:16-112:5).

32. Continues with same questions that have been answered, argumentative and
    badgering witness. Plaintiff is instructed not to answer to the same question
    that was answered in the same minute. Attacks Plaintiff's counsel. (**Exhibit
    A** Holloway Dep. 113-117).

Q.      And this made you angry; right?
A.      It made me very frustrated.
Q.      Did it make you angry?
A.      No. (Holloway Dep. 114:4-7).
Q.      Do you make it your practice to use curse words when you're
        angry and upset? (Holloway Dep. 114:20-21).
A.      I wasn't angry -- or upset. I was frustrated. (Holloway Dep.
        114:23, 25).
Q.      **Do you make it your practice to use curse words when
        you're angry and upset**?
Ms. Mkrtchyan: Asked and answered. Badgering the witness. Are you
        going to continue doing the same thing over and over again?
        You asked, and he answered.
Q.      Do you make it your practice, sir, to use –
Ms. Mkrtchyan: Don't answer that. (Holloway Dep. 115:3-11).

Mr. Harrell: I have heard reports on you that have been very
        unsettling, and now I see why. It's like nothing else I've done
        in quite a while. (Holloway Dep. 116:10-12).

Mr. Harrell: **Ma'am, you've got to pull yourself together**.
(Holloway Dep. 116:25-117:1).

33. Continues asking the same question and interrupts the witness. (**Exhibit A**
Holloway Dep. 118-119).

A.   I tell him, "So you've had calls on me directly?"
Q.   Stop. Just one step at a time. This is how we want to do it.
(Holloway Dep. 118:10-13).

34. Badgers the witness.

Q.   I understand, sir. Right now my focus is on what people are
saying and doing, not what you –
A.   Yeah. No. He's saying lies.
Q.   -- not what you know or you don't know.
A.   Okay.
Q.   Okay? Just what people say and do.
A.   Okay.
Q.   Okay? (**Exhibit A** Holloway Dep. 120:4-11).

35. Asks the same questions and confuses witness by not responding to requests
for clarification regarding timeline. (**Exhibit A** Holloway Dep. 121:20-
123:23).

36. Tells Plaintiff's counsel to be quiet, as if she is a child.

Ms. Mkrtchyan: You're just badgering the witness this entire time. It's
just -- and confusing the witness. If your goal is to just --
Mr. Harrell: **Okay. No. No. No. Let's not talk about goals. Let's be
as quiet as we can**. (**Exhibit A** Holloway Dep. 124:15-20).

<u>After the lunch break</u>:

37. Interrupts the witness when witness is describing the incident, re-asks the
same questions that were asked and answered prior to lunch by ending,
'what was the very next thing that happened?' (**Exhibit A** Holloway Dep.
129-131, 133). Badgering the witness, by asking the same question over and

Case 8:19-cv-01514-DOC-DFM   Document 120   Filed 11/17/20   Page 33 of 42   Page ID
#:3383

over again and after getting an answer he does not like (Holloway Dep. 133-134).

38. Makes improper comment about what the Plaintiff would know about 'criminal conduct'; Badgering the witness with repeated same line of questioning and argumentative remarks to Plaintiff with same questions over and over again (**Exhibit A** Holloway Dep. 137-40), and provokes Plaintiff's counsel to frustrating colloquy; (Holloway Dep. 141-44).

> Ms. Mkrtchyan: "Criminal conduct," vague and ambiguous. Do you understand "criminal conduct?"
> The Witness: Yeah. It's very large --
> Mr. Harrell: Oh, I think he does. (Holloway Dep. 136:4-7).

39. Argumentative question about Plaintiff's memory being hazy on a point. (**Exhibit A** Holloway Dep. 148:13-18).

40. Asks the same questions three times and admits he can't read his own handwriting. (**Exhibit A** Holloway Dep. 154-57).

41. Questions about the actual interaction with deputies goes relatively smoothly because counsel was not interrupting Plaintiff as much, although asks the same questions twice. (**Exhibit A** Holloway Dep. 158-180).

42. Defense counsel does not allow Plaintiff's counsel to put on the record what Plaintiff was describing with hand gestures. (**Exhibit A** Holloway Dep. 194-195).

43. Badgering the witness for time. (Holloway Dep. 205-06).

44. Interrupting and admonishing witness. (**Exhibit A** Holloway Dep. 208-11).

> Q.    Okay What's your best estimate of the time between the third jolt and fourth jolt?
> A.    Again, I'd be guessing. So I couldn't say. Just know there was wrestling --
> Q.    Okay. Then just stop talking. (Holloway Dep. 208:3-5).

Q.      Okay. Are officers saying anything to you --
A.      No. They've --
Q.      Are officers saying anything to you --
A.      No.
Ms. Mkrtchyan: He's answering the question. Why are you
interrupting him?
Q.      Are officers saying anything to you during the fourth jolt?
A.      No. (Holloway Dep. 208:14-22).

45. Asks the same questions over and over again as to when Plaintiff's dog was

released from the tent, with defense counsel grinning. (**Exhibit A** Holloway

Dep. 216-21).

46. Argumentative questioning if witness told the truth to medical staff.

(Holloway Dep. 236:25-237:11).

47. 239-240 badgering the witness with argumentative and vague questioning

Q.      As you reflect back on it, is there anything that you would
        change if you had to do it all over again?
Ms. Mkrtchyan: Vague and ambiguous.
Q.      Or would you do it all exactly the same way? (Holloway Dep.
        239:1-6).

Q.      If you had to do it all over again, sir, would you change
        anything about how you conducted yourself during the incident,
        or would you do it all exactly the same way -- (Holloway Dep.
        239:14-17).
Q.      Okay. But going back, looking at the incident, the way that it
        happened, is there anything that you did that you would change --
Ms. Mkrtchyan: Vague and ambiguous.
Q.      Or would you conduct yourself the exact same way that you did
        and not change a thing? (Holloway Dep. 240:5-11).

48. Offensive words to Plaintiff's counsel. (**Exhibit A** Holloway Dep. 241-44).

Mr. Harrell: Okay. Let's everybody be as quiet as we can and let the
court reporter read.

Ms. Mkrtchyan: Well, you know, there's going to be an instruction not to answer unless you paraphrase that type of vague and ambiguous question that is assuming facts not in evidence.

Mr. Harrell: **It sounds like to me that you're losing the quiet game. So let's everybody be** –

Ms. Mkrtchyan: Excuse me.

Mr. Harrell: -- as quiet –

Ms. Mkrtchyan: Excuse me.

Mr. Harrell: **Let's everybody be as quiet as they can**. (Holloway Dep. 242:2-14).

49. Asks the same question again (**Exhibit A** Holloway Dep. 246:8-25), asks the same question twice (Holloway Dep. 247-48).

50. Badgers the witness with argumentative question. (Holloway Dep. 251:25-252:6).

51. **Instruction not to answer based on privacy**. (**Exhibit A** Holloway Dep. 255:1-7).

52. Badgering the witness with the same question. (Holloway Dep. 256-57).

53. Asks questions of witness that is protected attorney client privilege and attorney work product related to social media posting and whether he is going to produce it. Makes improper accusations against counsel and Plaintiff not based in evidence. ( **Exhibit A** Holloway Dep. 258-63).

54. Plaintiff answers questions related to social media accounts. (Holloway Dep. 264).

55. **Instruction not to answer** to argumentative questions and based on attorney-client privilege (**Exhibit A** Holloway Dep. 265:20).

56. Plaintiff continues answering questions related to social media account and being badgered. (Holloway Dep. 268-78).

57. Plaintiff is asked the same questions related to his arrests that were answered before, answers questions related to his arrests, continues re-

asking the same questions about arrests despite limiting instruction by

counsel. (**Exhibit A** Holloway Dep. 279-94).

> Q.      Okay. What was the first time that you were arrested, sir? When
>         was that? (Holloway Dep. 281:3-4).
> Ms. Mkrtchyan: So you're instructed not to answer to any of the
>         arrests that are beyond ten years.
> Q.      With regret, sir, I ask again. When is the first time that you
>         were arrested? (Holloway Dep. 281:16-20).
>
> Q.      -- what is the third time that you were arrested, sir?
> A.      I don't know.
> Q.      No idea?
> A.      No. (Holloway Dep. 288:25-289:4).
>
> Q.      Okay. I'm now asking another question. You've made your
>         instruction. Now it's quiet time. Let me get a question out, and
>         then you do what you do.
> Ms. Mkrtchyan: Continue with normal line of questioning.
> Q.      What is the third arrest for, sir? What was the charge –
> A.      I think I just told you I don't remember.
> Q.      Okay. Did you plead guilty with –
> A.      I just told you I don't remember.
> Q.      Was there some type of sentence imposed?
> A.      I just told you I don't remember. (Holloway Dep. 290:3-15).

58. Badgers the witness re-asking the same argumentative questions. (**Exhibit
    A** Holloway Dep. 294-96).

59. Keeps asking the same argumentative questions of Plaintiff. (Holloway
    Dep. 296-99).

60. Keeps asking the same argumentative questions of Plaintiff. (Holloway
    Dep. 300-02).

61. More argumentative questionnaire related to emotional distress, Plaintiff
    answers them all. (Holloway Dep. 303-07).

62. More questions that were asked before. (Holloway Dep. 307-10).

63. Plaintiff is asked questions about his physical injuries and answers them all.
(Holloway Dep. 311-23).

64. Plaintiff is asked questions about loss of wages and answers them all,
presses Plaintiff to provide guesses related to amount of loss of wages he
had not calculated. (Holloway Dep. 324-25).

65. More badgering of witness with argumentative questions and asking the
same question three times (**Exhibit A** Holloway Dep. 326-32).

> Q.    Well, when officers ask you to get down on the ground, did it
> ever occur to you to cooperate with the officers and get down
> on the ground? (Holloway Dep. 326:20-22).

> Q.    Sir, when law enforcement asks you to get down on the ground,
> did it ever occur to you that they wanted you to do that for
> everyone's safety? (Holloway Dep. 328:2-5).

> Q.    Sir, did it ever occur to you that law enforcement, in fact, had a
> reason for asking you to get on the ground; it was for
> everyone's safety, based on their training? (Holloway Dep.
> 328:20-23).

> Q.    Did that ever occur to you, sir? (Holloway Dep. 329:3-4).

> Q.    Sir, as you reflect back on it, has it ever occurred to you that if
> you had gotten down on the ground, that that would have
> lowered the officer's safety concerns? (Holloway Dep. 329:11-
> 14).

> Q.    Has that ever occurred to you? (Holloway Dep. 329:16-17).

66. Argumentative question to Plaintiff about his objective to win money out of
the lawsuit.

> Q.    **So, sir, one of the thing you'd like to achieve by filing this
> lawsuit is you'd like to win money, right**? (Holloway Dep.
> 333:7-9).

67. Argumentative badgering the witness, asks the same questions previously answered again. (Holloway Dep. 336-40).

Based on this transcript, while there were some questions instructed not to be answered, Plaintiff responded to some of the same issues in other parts of the deposition. For example, the limitations about his arrest and employment history were legitimately based on witness' apparent failure to recollect and privacy grounds. He had also responded to the same questions in Interrogatories. **Exhibit E. Declaration of Counsel.** Familiar relationships with family members were also properly instructed not to be answered based on privacy. His relationships with family would not have any relevance to his emotional distress damages in this case. Plaintiff's damages do not revolve entirely on intangible emotional distress damages, but significant documented and tangible physical injuries. Therefore, the defense would not gain anything by fishing into Plaintiff's private life, when he has sustained serious physical injuries and further pain and suffering as a result of the brutal beating by police, the Defendants in this case. More importantly, even if relevant, privacy rights in this instance outweigh any relevance arguments. By filing a suit, Plaintiff has not opened his entire life with personal relationships to such unbridled scrutiny.

As to the issues related to whether Plaintiff was going to produce his social media accounts, that line of inquiry was entirely attorney work-product and based on attorney-client privilege communications. Plaintiff would not be in a position to state whether legally the defense are entitled to his social media accounts or not or whether Plaintiff would be able to produce them. That calls for legal conclusion as well. Therefore, he was properly instructed not to answer. Plaintiff also was badgered with several questions about whether he deleted his Facebook page

because of this lawsuit, when he responded that the reason he closed his account
had nothing to do with this lawsuit as he had nothing to hide, but because he felt
upset with Facebook. See **Plaintiff's Opposition to Defendants' Motion to
Compel, Court Docket. No. 108, p. 36-46.**

Throughout the deposition, the defense counsel was arguing and accusing
Plaintiff of all manner of things, necessitating proper instructions and objections by
his counsel. When Plaintiff was asked the same question multiple times and he had
already provided an answer, he was legitimately instructed not to answer the same
question again and again because the question was only designed to oppress, harass
and badger him. There is no rule of Evidence that permits the counsel to ask the
same question multiple times demanding a suitable answer for questioning counsel.
Plaintiff was interrupted at multiple junctures when he was furnishing with an
answer, because the defense counsel was not interested in learning his answer, and
was only interested in arguing with Plaintiff. Plaintiff's counsel could have stopped
the deposition and moved for a protective order. But in the interests of moving the
case along and the fact that Plaintiff was in town for a limited time, Plaintiff
endured this all day ordeal. What matters is Plaintiff did respond to all areas of
inquiry and provided answers to all relevant questions, with proper limitations and
instructions identified above. The defense efforts to characterize this all-day
deposition as a failure is simply a gross overstatement because all relevant areas of
inquiry have been covered. There is nothing of substance that defense has fallen
short of covering at this deposition and their lengthy motion fails to identify it by
diverting the attention from the actual issues to the contentious colloquy between
counsel that was provoked by the defense counsel's attitude throughout the
deposition.

**II.**   **DEFENDANTS SHOULD BE SANCTIONED FOR ABUSE OF PROCESS, MISREPRESENTATIONS TO THE COURT AND FEET-DRAGGING AND REFUSAL TO PRODUCE RELEVANT DISCOVERY DESPITE THE EARLIER AGREEMENT BETWEEN PARTIES AND THE COURT'S ORDERS ON PLAINTIFF'S DISCOVERY**

Fed. R. Civ. P. 37(b)(2) authorizes the Court to impose sanctions for non-compliance of Court Order. Discovery rules are to be construed liberally in favor of the party seeking discovery. *Marshall v. Electric Hose & Rubber Co.*, 68 F.R.D. 287 (D. Del. 1975). This rule establishes flexible means by which court may enforce compliance with discovery procedures through broad choice of remedies and procedures. *B.F. Goodrich Tire Co. v. Lyster*, 328 F.2d 411 (5th Cir. 1964). It should be construed to secure the just, speedy, and inexpensive determination of actions. *Babcock & Wilcox Co. v. North Carolina Pulp Co.*, 25 F. Supp. 596 (D. Del. 1938).

Recovery of costs and fees and order striking certain pleadings, or entering dismissal or default, may be requested under either subd. (b) of this rule enumerating sanctions which court may impose for party's failure to provide discovery or subd. (d) of this rule authorizing court to impose sanctions and incorporating by reference such enumerated sanctions. *J.M. Cleminshaw Co. v. City of Norwich*, 93 F.R.D. 338 (D. Conn. 1981).

Sanctions for failure to comply with discovery orders must be applied diligently both to penalize those whose conduct may be deemed to warrant such sanctions and to deter those who might be tempted to such conduct in absence of such deterrent. *Roadway Exp., Inc. v. Piper*, 447 U.S. 752 (1980); *See also*, *T.E.*

*Quinn Truck Lines, Ltd. v. Boyd, Weir & Sewell, Inc.*, 91 F.R.D. 176 (W.D.N.Y. 1981).

Plaintiff's first set of discovery requests was served on the County on September 13, 2019 seeking among other things very basic discovery, including all audio/video, radio transmissions, witness names, all reports related to the incident in the case. Since then the Defendants produced Initial Disclosures, and agreed to produce these basic discovery records subject of Plaintiff's requests without a motion. Plaintiff did not include some of these discovery requests in the motion to compel in reliance on this promise. Therefore, by the time of Defendants depositions in July-August, the County had purportedly produced all 911 calls, all PVS (patrol vehicle recordings), radio transmissions, witness names to the incident. However, as it has become apparent from the depositions, key evidence has been withheld or not produced with no explanation, including the 911 calls for reporting party, the unredacted taser records for the Defendants and the complete and unaltered copy of all the PVS recordings. Some of these items were produced only after months of delay and after Plaintiff filed an ex parte application to compel. **On File With Court**.

Since the August 18, 2020 IDC where the Magistrate indicated to the defense they should produce these records, Plaintiff has been chasing after the defense counsel for indefinite meet and confers and answers to no avail. Because Plaintiff has had to defend Defendants' endless motions replete with misrepresentations of facts and evidence in the case, Plaintiff has little time to concentrate his limited resources on obtaining his own discovery.

Disappointedly, the defense counsel are engaged in active misrepresentation in their declarations and pleading papers, trying to smear Plaintiff, a veteran who honorably served our country and does not deserve personal attacks in response to filing this action to recover for injuries sustained as a result of brutal actions by

these Defendants. This is so when it is the Defendant Renegar should be scrutinized for his activities as a peace officer that resulted in a year-long criminal investigation. It is also against public policy to keep his criminal investigation files under a Protective Order as it is in this case. The public has the right to know whether the law enforcement charged with public safety operates with integrity and how the Department or prosecuting agencies investigate or discipline any improper behavior by these officers.

Plaintiff is seeking sanctions for this willful discovery non-compliance after multiple meet and confers have been exhausted and issues have been raised at an informal discovery conference.

Plaintiff is also seeking sanctions for his attorney time and costs in defending endless discovery motions lodged by defense that are imposing an undue burden on him in litigating this case. Plaintiff should not be punished and chilled for bringing suit to vindicate his Constitutional rights.

DATED: November 17, 2020          **MKRTCHYAN LAW**

By: _____/s/Narine Mkrtchyan_____
**NARINE MKRTCHYAN**
Attorney for Plaintiff
Jeremy Holloway