**MKRTCHYAN LAW**
Narine Mkrtchyan, Esq. (SBN 243269)
1010 N. Central Ave, Suite 204
Glendale, CA 91202
Telephone No. (818) 388-7022
Web: www.narinelaw.com
Email: narine57@gmail.com

Attorney for Plaintiff Jeremy Holloway

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEREMY HOLLOWAY,<br>Plaintiff,<br>vs.<br>COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.<br>Defendants. | Case No. 8:19-cv-01514-DOC-DFM<br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL**<br>**HONORABLE DAVID O. CARTER**<br>**Date: December 14, 2020**<br>**Time: 8:30 am**<br>**Ctrm: 9D** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

PLAINTIFF hereby opposes the Defendants County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson Motion for Summary Judgment under Rule 56.

Said motion was made without the defendants' compliance with the Local Rule 7-3 on conference of counsel prior to filing motions.

Said motion is based on this Opposition, the records, papers and files in this case, as well as such oral and documentary evidence as may be produced at the hearing on the Motion.

DATED: November 30, 2020 **MKRTCHYAN LAW**

By: ___________/s/Narine Mkrtchyan__________
**NARINE MKRTCHYAN**
Attorney for Plaintiff
Jeremy Holloway

## TABLE OF CONTENTS

**INTRODUCTION** .......... 1

**I. QUALIFIED IMMUNITY DOES NOT SHIELD OFFICERS FOR LEGALLY WRONGFUL CONDUCT WHEN THEIR VERSION OF EVENTS IS MATERIALLY CONTRADICTED** .......... 10

A. First Encounter With Jeremy .......... 13

B. Second Encounter with Jeremy .......... 15

**II. THE INVESTIGATORY DETENTION OF JEREMY TURNED INTO A DE FACTO ARREST WITHOUT PROBABLE CAUSE WHEN DEFENDANTS ARRIVED THE SECOND TIME AND CIRCLED HIM WITH GUNS DRAWN** .......... 15

**III. THE ILLEGAL DETENTION WAS ESCALATED INTO UNJUSTIFIED USE OF FORCE BY DEPUTIES AGAINST JEREMY AND BILLINGER AND GUNDERSON ARE LIABLE EVEN IF THEY DENY PHYSICAL CONTACT WITH JEREMY** .......... 25

**IV. DEPUTIES FALSELY ARRESTED JEREMY WITHOUT PROBABLE CAUSE IN VIOLATION OF THE FOURTH AMENDMENT** .......... 28

**V. QUALIFIED IMMUNITY DOES NOT SHIELD DEFENDANTS BECAUSE THEY WERE ON NOTICE OF THE CLEARLY ESTABLISHED LAW** .......... 33

**CONCLUSION** .......... 37

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abdullah v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) -------------------------28

*Allen v. City of Portland* 73 F.3d 232 (9th Cir. 1995) ---------------------------------32

*Anderson v. Creighton*, 483 U.S. 635 (1987) ------------------------------------------10

*Arvin v. Santa Clara Valley Transp. Agency*, 261 f.3d 912 (9th Cir. 2001) --- 13, 16

*Arvin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) -20

*Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1997) ----------------------------------34

*Beck of Ohio* (1964) 379 U.S. 89--------------------------------------------------- 29, 31

*Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009)--------------------------------- 2

*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998) -----------------------------------------34

*Brosseau* v. *Haugen*, 543 U. S. 194 (2004) -------------------------------------------11

*Butz v. Economou*, 438 U.S. 478 (1978) ----------------------------------------- 11, 24

*Cameron v. Fogarty*, 649 F.Supp. 3 (E.D.N.Y. 1985)--------------------------------29

*Carnell v. Grimm* 74 F.3d 977 (9th Cir. 1996) -----------------------------------------35

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ---------------------------------------- 2

*Chalkboard, Inc. v. Brandt*, 902 F.2d 1375 (9th Cir. 1989) --------------------------34

*City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500 (2019)--------------------------10

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000)-------------------------------27

*Del La Cruz v. Kauai County*, (2002) 123 S.Ct. 608, 154 L.Ed. 2d 531 ------------35

*Dellums v. Powell*, 566 F.2d 167 (D.C.Cir 1977) ------------------------------------29

*Dellums v. Powell*, 566 F.2d 167 (D.C.Cir. 1977) -----------------------------------32

*Dubner v. City and County of San Francisco*, 266 F.3d 959 (2001)------------ 28, 32

*Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1990) ----------------------------35

*Elder v. Holloway*, 510 U.S. 510 (1994) ----------------------------------------------11

*Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528 (9th Cir. 2010)-----------12

*Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993)-------------------------------36

*Florida v. J. L.*, 529 U.S. 266, 120 S. Ct. 1375 L. Ed. 2d 254 (2000)---------------19
*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003)-------------------------------------- 3
*Gagnon v. Ball*, 696 F.2d 17 (2d Cir. 1982) -------------------------------------------28
*Gerstein v. Pugh* 420 U.S. 103 (1975)----------------------------------------------29
*Gilker v. Baker*, 576 F.2d 245 (9th Cir. 1978)----------------------------------- 28, 31
*Goka v. Bobbitt*, 862 F.2d 646 (7th Cir. 1988) ------------------------------------ 1, 2
*Graham v. Connor*, 490 U.S. 386 (1989) ---------------------------------------------36
*Green v. City and County of San Francisco*, 751 F.3d 1039 ----------------17, 24, 26
*Greenstreet v. County of San Bernardino*, 41 F.3d 1306 (9th Cir. 1994)------------35
*Gulliford v. Pierce County*, 136 F.3d 1345 (9th Cir. 1998)----------------------------35
*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)--------------------------------------------11
*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997) ------------------------------------35
*Hart v. Parks* 450 F.3d 1059 (9th Cir. 2006) ------------------------------------------29
*Henry v. United States*, 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168 (1959) -------32
*Hope v. Pelzer*, 536 U.S. 730 (2002) ------------------------------------------------13
*Houston v. Hill*, 482 U.S. 451, 107 S.Ct. 2502 L.Ed.2d 398 (1987)------------ 22, 35
*Hunter v. Bryant* 502 U.S. 224 (1991)----------------------------------------------29
*Hurtado v. California* 110 U.S. 516, 28 L.Ed. 232, 4 S.Ct. 111 (1984)------------34
*Indep. Towers of Wash. v. Washington*, 350 F.3d 925 (9th Cir. 2003)---------------- 2
*Jessop v. City of Fresno*, 936 F.3d 937 (9th Cir. 2019) ------------------------------13
*Lanigan v. Village of East Hazel Crest*, 110 F.3d 467 (7th Cir. 1997)--------------28
*Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011------------------------------------23
*Mackinney v. Nielsen*, 69 F.3d 1002 (9th Cir. 1995) ---------------------------------21
*Mahaffey v. Ramos*, 588 F.3d 1142 (7th Cir. 2009)----------------------------------- 2
*Malley v. Briggs* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) -----------36
*Martin v. Duffie*, 463 F.2d 464 (10th Cir.1972) --------------------------------------28
*Martin v. Duffie*, 463 F.2d 467 (10th Cir. 1972) --------------------------------------32
*Maryland v. Macon* (1985) 472 U.S. 463 ---------------------------------------------29

*McKenzie v. Lamb*, 738 F.2d 1005 (9th Cir. 1984) ---------------------------------- 32
*Mendecino Environmental Center v. Mendecino County*, 192 F.3d 1283 (9th Cir. 1999) ------------------------------------------------------------------------------- 35
*Michigan v. Summers*, 452 U.S. 692, 101 S. Ct. 2587 L. Ed. 2d 340 (1981) ------- 31
*Morales v. Fry*, 873 F.3d 817 (9th Cir. 2017) ---------------------------------------- 12
*Nagle v. Marron*, 663 F.3d 100 (2d Cir. 2011) --------------------------------------- 11
*Navarette v. California*, 572 U.S. 393 (2014) ---------------------------------------- 18
*Navarette v. California*, 572 U.S. 393, 401 ------------------------------------------ 19
*Nehad v. Browder*, D.C. No. 3:15-cv-01386-WQH-NLS (9th Cir. 2019) --------- 12
*Nicacio v. United States I.N.S.*,797 F.2d 700 (9th Cir.1985) ------------------------ 18
*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) ------------------------------------ 27
*Patzig v. O'Neill* 577 F.2d 841 (3d Cir. 1978)------------------------------------------ 29
*Patzig v. O'Neill*, 577 F.2d 841 (3d Cir. 1978) --------------------------------------- 32
*Pearson v. Callahan*, 555 U.S. 223 (2009) ------------------------------------------- 10
*People v. Lopez* (1996) 48 Cal.App.4th Supp 1 --------------------------------------- 22
*Phillips v. Community Insurance Group*, 678 F.3d 513 (7th Cir. 2012) ------------ 37
*Reichle v. Howards*, 566 U.S. 658 (2012)------------------------------------------- 10
*Robins v. Meecham*, 60 F.3d 1436 (9th Cir. 1995)------------------------------------ 27
*Robinson v. Solano County*, 218 F.3d 1030, 1037 (9th Cir. 2000)-------------- 12, 17
*Rosenbaum v. City & County of San Francisco*, 2005 U.S. Dist. LEXIS 963 1153 ----------------------------------------------------------------------------------- 30
S. B. v. Cnty. of San Diego, 864 F.3d 1010 (9th Cir. 2017)-------------------------- 12
*Sacramento v. Lewis*, 523 U.S. 833, 140 L.Ed.2d 1043, 118 S.Ct. 1708 ----------- 34
*Struk v. Bush*, 2011 U.S. Dist. LEXIS 133638 ---------------------------------------- 33
*Taylor v. Riojas*, No. 19-1261 (Nov. 2, 2020) ----------------------------------------- 12
*Timas v. Klaser*, 23 Fed.Appx. 574 (7th Cir. 2001)------------------------------------ 36
*Tolan v. Cotton*, 572 U.S. 650 (2014) ----------------------------------------------- 11
*Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011)---------------------- 11, 12

U.S. v. Lopez-Soto, 205 F.3d 1101 (9th Cir. 2000)----------------------------------17
*United States v. Colin*, 314 F.3d 439 (9th Cir. Cal. 2002) ----------------------------18
*United States v. Cortez*, 449 U.S. 411 (1981)----------------------------------------18
*United States v. Del Vizo*, 918 F.2d 821 (9th Cir. 1990) ------------------------------24
*United States v. Delgadillo-Velasquez*, 856 F.2d 1292 (9th Cir. 1988) -------------24
*United States v. Hernandez-Alvarado*, 891 F.2d 1414 (9th Cir. 1989)--------------18
*United States v. Koon*, 34 F.3d 1416 (9th Cir. 1994) ---------------------------------27
*United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007)---------------------------------32
*United States v. Rojas-Millan*, 234 F.3d 464 (9th Cir. 2000)------------------------18
*United States v. Smith*, 790 F.2d 789 (9th Cir. 1986)----------------------------------31
*Ward v. San Diego County*, 791 F.2d 1329 (9th Cir. 1986) --------------------------34
*Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996) -------------------------------24
*Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003) ---------------------- 10, 11

## FEDERAL STATUTES

42 U.S.C. § 1986 ------------------------------------------------------------------28

## CALIFORNIA STATUTES

Cal Penal Code Section 118.1 -----------------------------------------------------7, 36
Cal. PC 243(b) ---------------------------------------------------------------------- 7, 8
Cal. PC 69 ---------------------------------------------------------------------------- 7, 8
California Evidence Code § 664----------------------------------------------------31
California Penal Code section 182 ------------------------------------------------36
Penal Code section 146 ---------------------------------------------------------------36
Penal Code Section § 415 -------------------------------------------------------------30
Penal Code section 415 ---------------------------------------------------------- 29, 33

## CALIFORNIA CASES

*Abbott v. Cooper*, (1933) 218 Cal.425-----------------------------------------------28

*Bryan v. MacPherson* 608 F.3d 614 (Cal. 2010) ---------------------------------------21
*Cervantez v. J.C. Penny Co.* 24 Cal.3d 579 (1979) ------------------------------------29
*In re Brown* (1973) 9 Cal.3d 612, 108 Cal.Rptr. 465 P.2d 1017 ---------------- 30, 33
*In re Justin B.* (1999) 69 Cal.App.4th 879 ---------------------------------------------29
*In re Manuel G.*, 16 Cal. 4th 805, 941 P.2d 880 (1997) ------------------------------23
*People v. Boissard* (1992) 5 Cal.App.4th 972 -----------------------------------------29
*People v. Cressey*, 2 Cal.3d 836 (1970) -----------------------------------------------21
*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217, 275 Cal.Rptr. 729 P.2d 1159 - 22, 23
*People v. Gorrostieta* (1993) 19 Cal.App.4th 71---------------------------------------29
*People v. Harris* (1975) 15 Cal.3d 384 ------------------------------------------------29
*People v. Limon* (1993) 17 Cal.App.4th 524 -------------------------------------------29
*People v. Price* (1991) 1 Cal.4th 324 -------------------------------------------------29
*People v. Quiroga* 16 Cal.App.4th 961 (1993) ----------------------------------------21
*People v. Simons* (1996) 42 Cal.App.4th 1100, 50 Cal.Rptr.2d 351)----------------22
*People v. Souza* (1994) 9 Cal.4th 224 -------------------------------------------------29
*People v. Superior Court (Commons)* 135 Cal.App.3d 812, 185 Cal.Rptr. 492 (Cal.App.,1982)--------------------------------------------------------------------30
*People v. Wetzel*, 11 Cal.3d 104 (1974) -----------------------------------------------21

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The Defendants through their counsel of record have filed a grossly inaccurate and misleading statement of facts in support of their MSJ, with knowledge of incompleteness and falsity of their statements, and in gross disregard of their duties as officers of court, in efforts to smear Plaintiff in every possible way in the eyes of the Court. Because the Defendants have no substantive defenses to their actions, their counsel have centered this litigation not around the merits of the case, but on a coordinated effort to smear and harass Plaintiff and his counsel. More than 10 depositions have been conducted showing a material dispute of facts, but the defense motion is entirely silent about these depositions and relies entirely on concocted declarations contradicting the sworn deposition testimony of witnesses, the reporting parties who called 911 on the day of the incident, and Defendants themselves. Therefore, defendants' motion amounts to sanctionable misconduct because it purposefully withholds evidence known to them and necessarily defeats their officers' arguments.

> A movant may not "identify *only* those portions of the record [supporting its] position on summary judgment, although there exists evidence to the contrary of which defendants are aware." *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988). A motion that ignores known, material and disputed facts is improper, and must fail:
> When a party has obtained knowledge through the course of Discovery, or otherwise, that a material factual dispute exists and yet proceeds to file a summary judgment motion, in hopes that the opposing party will fail or be unable to meet its burden in responding to the motion, he defeats [the] purpose [of summary judgment]; and,

more importantly, violates the rules of procedure which govern the conduct of trial, specifically Rule 11. *Goka*, 862 F.2d at 650.

Furthermore, the cursory statements in Defendants' Motion for Summary Judgment that Plaintiff has not produced any evidence supporting various listed claims is not sufficient to meet the burden of "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, at 325 (1986). Courts need not "manufacture arguments for a [party]." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009); see also *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003) ("However much we may importune lawyers to be brief and to get to the point, we have never suggested that they skip the substance of their argument in order to do so. . . . We require contentions to be accompanied by reasons."); *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

**STATEMENT OF FACTS**

In the early morning hours around 4:23 am of January 21, 2018, 41-year old Plaintiff Jeremy Holloway, an honorably discharged then homeless veteran, Sergeant of the Amphibian Battalion in the United States Marine Corps, was lawfully camping at the O'Neill Regional Park in Trabuco Canyon, Orange County and sleeping peacefully in a tent with his dog. (**Plaintiff's Separate Statement of Disputed Material Facts, [Plaintiff's SS]#1** ).[1] Defendants Chad Renegar, Joel

[1] "[a]t the summary judgment stage, [the Court does] not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the

Gonzalez, Kevin Pahel, Brendon Billinger and Mark Borba awoke him, representing themselves as the 'Sheriff's Department', and insisted he come out of his tent to speak with them. (Plaintiff's SS# 2) Half-awake and upset with this intrusion, Jeremy inquired from inside his tent, 'Why? Why do you need to talk to me? It is cold outside.' It was a cold winter night at the camp. (Plaintiff's SS# 3) Defendant Renegar insisted by raising his voice, demanding he come out of his tent, still not explaining why they needed to talk to him. (Plaintiff's SS# 4) As Jeremy put on a jacket and came out, he saw 5 deputies surrounding his campsite and his tent. (Plaintiff's SS# 5) Getting more and more frustrated and fearful with this unjustified intrusion, he inquired further, as to why they awakened him and are harassing him. (Plaintiff's SS# 6) Renegar rudely continued, demanding without cause to pat him down for weapons, still not explaining why they were there. (Plaintiff's SS# 7 ) Renegar asked him if there was anyone else in his tent with him then or earlier, to which Jeremy replied no and that he was alone the whole evening and night. (Plaintiff's SS# 8) Jeremy was then patted down for claimed 'officer safety', asked if he had any weapons anywhere on his campsite. He truthfully said, he had a pocket knife and camping knives (that were secured in his tents in backpacks), but protesting why they were harassing him. (Plaintiff's SS# 10) Renegar then misrepresented that Jeremy was a subject of an unidentified call from other campers. (Plaintiff's SS# 11) Jeremy got even more frustrated and inquired further, as to who and why would have called on him, when he was alone camping and minding his own business alone that weekend. (Plaintiff's SS# 12) Renegar's tone was getting increasingly accusatory as he told him, 'I take it you have been through this before!' (Plaintiff's SS# 13) Jeremy who kept asking what

---

admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

he had done, was ordered to sit on a log surrounded by five deputies, who then tossed and turned things in his tents and all belongings in backpacks, searching them for no justification. (Plaintiff's SS# 14) Jeremy kept protesting and asking why they were doing this, harassing him in the middle of the night but cooperated and provided all information they asked for and for his identification. (Plaintiff's SS# 15) He was never given a proper explanation as to what was going on and what he was being accused of. (Plaintiff's SS# 16) The deputies did not find a trace of a female or anyone else anywhere in his campsite, or his belongings, except his only companion, his dog. (Plaintiff's SS# 17) Then they justified their intrusion by claiming, 'If we get a call, we need to investigate.' (Plaintiff's SS# 18) They again falsely claimed they got multiple calls on his campsite, when the calls were not about a specific campsite or Jeremy and the deputies were still investigating the uncertain source of the disturbance by going into different campsites before they came to Jeremy's that night. (Plaintiff's SS# 19) Jeremy then told them that they should instead be going to the campsite next to him, No. 66, where he heard a fight earlier that night between a man and a female. (Plaintiff's SS# 20) The Defendants apologetically left his campsite. (Plaintiff's SS# 21) Renegar, the primary unit handling this call, did not go to Camp No. 66, that was only about 20 feet away from Jeremy's camp to speak with their occupants and left the campground by registering the incident as 'Unfounded' for Jeremy. (Plaintiff's SS# 22 ) Jeremy was not arrested or cited for anything at this time. (Plaintiff's SS# 23)

Upset and agitated Jeremy then walked to the Ranger Station to file a complaint and use the restroom. (Plaintiff's SS# 24) As he walked to the Ranger Station, the lights were on, but the doors locked. (Plaintiff's SS# 25) He could see Sheriff's SUVs still parked near the Ranger station. (Plaintiff's SS# 26) Intimidated he walked back to his campsite, and attempted to get the attention of

his neighbors at camp 66 to tell the sheriffs they were the cause of the disturbance. (Plaintiff's SS# 27) As the neighbors ignored him, he got ready to get back to sleep, took off his shoes and was near his tent, when he saw multiple Sheriffs SUVs coming back on the roadway with lights and sirens on. (Plaintiff's SS# 28) Thinking to himself, they must have found the person they were looking for, he got taken aback when he saw multiple deputies, around 6 or 7 of them swarming towards him with guns pointed at him. (Plaintiff's SS# 29) As Defendants Renegar, Gonzalez, Pahel first approached and circled his campsite at gunpoint, they told him to get away from the tent, get in the middle of the campsite, arms out to the side and feet together. (Plaintiff's SS# 30) He complied by moving towards the center of his campsite, by extending his arms out to the sides. (Plaintiff's SS# 31) He showed his hands, by extending them like a cross from his shoulders with palms open and kept asking, 'Why? What did I do? You were just here!' (Plaintiff's SS# 31) Then they yelled at him multiple times, 'Get down on the ground! Or you will be tased!' He also heard another officer yell 'Tase him!' (Plaintiff's SS# 32) In fear for his life, he stood there in disbelief and fear that if he went down to the ground, he would be shot. (Plaintiff's SS# 33)

As he stood with his arms out as directed, Defendant Renegar rushed towards him, punched him to the left side of his face. (Plaintiff's SS# 34) Jeremy had lost his peripheral vision to the left side, and did not see the blow coming. (Plaintiff's SS# 35) The punch was so strong that Jeremy blacked out momentarily. (Plaintiff's SS# 36) When he came back to himself, he was being forced down to the ground by Renegar who held Jeremy in a chokehold.(Plaintiff's SS# 37) As he was growling from inability to breathe, and was attempting to free his neck from the hold, he could see another officer kneeing him in the head and kicking him multiple times in the head and temple area until he started bleeding profusely. (Plaintiff's SS# 38). Additional Defendants were holding him forcefully to the

ground by bodyweight and restraining his arms and legs. (Plaintiff's SS# 39) He kept screaming from pain, that he could not breathe, and that he was bleeding. (Plaintiff's SS# 40) Defendants delivered multiple punches to his ribs and stomach areas, and kicked him in the head multiple times. (Plaintiff's SS# 41) To top that, he was turned to his stomach and maliciously tasered at least 4 times. (Plaintiff's SS# 42) Jeremy is a 5.5 feet tall 175 lbs man, was taken to the ground by Defendant Renegar who then enlisted Gonzalez, Pahel, Borba and Gotts to engage in this unjustified use of force against him. (Plaintiff's SS# 43) He believes, there were more than five engaged in the use of force, because initially he saw around 6 or 7 officers (Plaintiff's SS# 44) The detail call log and the PVS recordings prove that at least by the time he was tasered there were 7 officers at scene, including Defendants Gunderson and Billinger. (Plaintiff's SS# 45) At some point in time he also saw an unidentified uniformed female witness who was standing behind and watching this incident unravel. (Plaintiff's SS# 44)

When the brutal beating ceased, blood was oozing from Jeremy's face and head and he was in pain (Plaintiff's SS# 46) He could hear himself telling them, 'You kicked and kneed in my head. That is why I am bleeding. I did not do anything wrong! You guys got the wrong person!' (Plaintiff's SS# 47) He was then seated on the log, with multiple deputies, including Defendants Renegar, Gonzalez, Pahel, Borba, Billinger, Gunderson, Gotts surrounding him but not attending to his bleeding wounds. (Plaintiff's SS# 48)

More deputies kept arriving to the scene, including Sergeant Stewart Rawlings who then actively engaged in a cover-up of his subordinates' actions by a shallow and biased use of force investigation at scene. (Plaintiff's SS# 49) Deputies then began their active cover-up of their actions, by creating a false story line. (Plaintiff's SS# 50) With knowledge they had no evidence against Jeremy for domestic dispute that originated the calls to the campground, Renegar falsely

arrested him for felony resisting police, Cal. PC 69 and battery on a peace officer, Cal. PC 243(b) claiming himself, Gonzalez and Pahel as the victims of the non-existent crimes. (Plaintiff's SS# 51) Renegar then provided a false version of what happened to his supervisor Rawlings and in the police report that Jeremy was the one who placed a head restraint on him by attempting to grab his ballistic vest, when Jeremy neither had the opportunity nor ability to do it compressed to the ground by Defendants Renegar, Gonzalez, Pahel, Borba and Gotts. (Plaintiff's SS# 52) None of the deputies involved in the use of force could corroborate that assertion by Renegar either in their reports or at their depositions. But all of them attempted to justify their own actions by falsely claiming Jeremy was actively resisting them, kicking at them on the ground, refusing to give up his arms and was trying to get up. (Plaintiff's SS# 53) In line with this code of silence, they failed to account for the prohibited headstrikes that caused visible injuries and bleeding to Jeremy, denied they had smeared themselves with Jeremy's blood and claimed not to recall what other officers did during the use of force. (Plaintiff's SS# 54)

In line with these false stories, Defendants Renegar, Gonzalez, Pahel, Borba and Gotts then wrote false police reports and a false probable cause declaration in violation of Cal Penal Code Section 118.1. (Plaintiff's SS# 55) This was not new to Renegar, who was recently caught for falsifying official reports and was subject of a criminal investigation. (Plaintiff's SS# 56)

Defendants Renegar, Gonzalez, Pahel, Borba, Gotts, Gunderson, Billinger falsely claimed that the reporting parties identified Jeremy's campsite as the source of trouble, that Jeremy had multiple knives strewn around his campsite, justifying the brutal attack and beating for 'officer safety.' (Plaintiff's SS# 57) When Renegar arrived to the campground and spoke with the reporting party Joshua Gomez at 67, Gomez told Renegar not that Jeremy was the source, but that the

noise was coming from the general direction of Jeremy's campsite 65. Gomez indicated he heard the noise coming from across his campsite, which was Campsite 66, not Campsite 65 where Jeremy was. (Plaintiff's SS#58) This was the same direction that Jeremy gave to Renegar at the initial contact, but Renegar failed to follow up and speak with Campsite 66. (Plaintiff's SS# 58) The reality is that the campers had never seen Jeremy with a female on his campsite, and never provided a description of the male, and had made 911 calls from what they could hear from inside their tents at nighttime. (Plaintiff's SS# 59) There were multiple campsites tightly situated next to one another within 20 feet and the deputies simply failed to find the actual source of the disturbance. (Plaintiff's SS# 60) No knives were strewn around his campsite within his arms reach, but were in his backpack, later removed by deputies and placed on the picnic table at the time they booked this into evidence. (Plaintiff's SS# 61)

After a five minute accusatory interview with Sergeant Rawlings at the scene, when Jeremy was accused of not getting down to the ground with alacrity in response to the deputies' demands, Jeremy was treated by the paramedics at scene who arrived to treat his bleeding wounds and was transported to the Mission Hospital for further medical treatment. (Plaintiff's SS# 62) There he was treated for a number of injuries, including head contusion, rib contusion, and eye laceration. (Plaintiff's SS# 63)

Thereafter, Jeremy was jailed in the County jail in Santa Ana, and booked for false allegations of felony Cal PC 69 Resisting peace officer and Cal PC 243 (b) Battery on peace officer. (Plaintiff's SS# 64) The District Attorney's Office did not prosecute him for these charges but only after Jeremy paid for bail and lawyer to defend himself in criminal court. (Plaintiff's SS# 65).

Jeremy continued his treatment at the Veteran's Hospital for his ongoing injuries. (Plaintiff's SS# 66) He has sustained a number of neurological and

orthopedic injuries, including vision loss, continued headaches, blackouts, spinal/back and neck pain. (Plaintiff's SS# 67) This has affected his ability to work and maintain a stable work history as a copy machine/technical repairman. (Plaintiff's SS# 68).

After another incident in May of 2018 where he was again harassed by the Sheriff's deputies at the same campground, Jeremy vowed to never return to the O'Neill Regional Park. A long-time resident of the Orange County, he felt unsafe, left for Pittsburgh, Pennsylvania, where he continued treatment for his injuries at the VA's. (Plaintiff's SS# 69).

Jeremy filed a citizen complaint with the Department and it went to the same Sergeant who had approved of the use of force by these Defendants, Sergeant Stewart Rawlings. (**Plaintiff's Disputed Statement of Facts/Monell [Plaintiff's DSM# 1], Plaintiff's SS# 70**) The Sergeant did nothing to investigate the citizen complaint, did not interview Jeremy, did not review his medical injuries, did not do any separate interviews of the Deputies for the incident in violation of the established procedures, misrepresented his interview with reporting party Gomez, claiming Gomez told him he identified Jeremy as the one involved in the domestic dispute when that never happened and could not have happened because Gomez said that he had not seen the couple fighting. (Plaintiff's SS# 71, Plaintiff's DSM # 1) The Departmental heads then approved the citizen complaint without any further review or discipline of the involved officers thereby ratifying their conduct. (Plaintiff's SS# 72, Plaintiff's DSM# 1) Defendant Renegar with an affluent history of use of force was not disciplined for his conduct culminating in deprivation of Plaintiff's rights. (Plaintiff's SS# 73, Plaintiff's DSM# 1) His activities though brought him under a spotlight of the OC District Attorney's Office prompting a criminal investigation into his professional dishonesty for fabricating reports (Plaintiff's SS# 73, Plaintiff's DSM# 1).

## I. QUALIFIED IMMUNITY DOES NOT SHIELD OFFICERS FOR LEGALLY WRONGFUL CONDUCT WHEN THEIR VERSION OF EVENTS IS MATERIALLY CONTRADICTED

To determine whether officers are entitled to qualified immunity, a court conducts a two-step inquiry. "The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003)(citations omitted)."Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To be a clearly established constitutional right, a right must be sufficiently clear "that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012)(citation and internal quotation marks omitted). "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 20. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). Consequently, at summary judgment, an officer may be denied qualified immunity in a § 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at

issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). In making this determination, the Court still must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650 (2014). The issue of qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514 (1994). But, "[w]here disputed facts exist, [a court] determines if the denial of qualified immunity was proper by assuming that the version of events offered by the non-moving party is correct." *Wilkins*, 350 F.3d at 951. The objective inquiry allows room for error by guaranteeing officials immunity for reasonable mistakes as to the legality of their actions but not for unreasonable mistakes, which should be prevented by an official's knowledge of the law governing his conduct. *Nagle v. Marron*, 663 F.3d 100, 114–15 (2d Cir. 2011). "The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative. In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 813-14 (1982) (citing *Butz v. Economou*, 438 U.S. 478, 506 (1978). *Brosseau* v. *Haugen*, 543 U. S. 194, 198 (2004) (*per curiam*) ("[T]he focus" of qualified immunity "is on whether the officer had fair notice that her conduct was unlawful").

In cases where excessive force is alleged, and there is a material factual dispute, the courts defer the issue to jury determination instead of a finding as a matter of law:

> Here, the disputed facts go to the very heart of the question of whether the officers' conduct was reasonable. A reasonable jury considering all the facts could determine that the officers' conduct

> was reasonable, and that they are entitled to qualified immunity. On the other hand, a reasonable jury could determine that the conduct was unreasonable, and find for Robinson. Under these circumstances, it is inappropriate to decide the case as a matter of law. *Robinson v. Solano County*, 218 F.3d 1030, 1037 (9th Cir. 2000), citing to *Katz*, 194 F.3d at 968-969.

When there are two conflicting stories about what happened on the street, Justice Ginsburg observed, a trial is necessary. *Saucier v. Katz*, 533 U.S. 194, at 216 (2001), 121 S. Ct. at 2164 (Ginsburg, J. concurring). "[W]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017) (citing commentary to Ninth Circuit Model Civil Jury Instruction 9.34 (2017)); *see also Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010). In determining whether an officer is entitled to qualified immunity under the clearly-established prong, we "assume []he correctly perceived all of the relevant facts and ask whether an officer could have reasonably believed at the time that the force actually used was lawful under the circumstances." *Torres*, 648 F.3d at 1127 (internal quotation marks omitted). This analysis must be made "in light of the specific context of the case, not as a broad general proposition." *S. B. v. Cnty. of San Diego*, 864 F.3d 1010 at 1015 (9th Cir. 2017). There need not be a prior case "directly on point," so long as there is precedent" plac[ing] the statutory or constitutional question beyond debate." *Id. Nehad v. Browder*, D.C. No. 3:15-cv-01386-WQH-NLS (9th Cir. 2019) The U.S. Supreme Court has recently clarified in *Taylor v. Riojas*, No. 19-1261 (Nov. 2, 2020)the standard is not whether a case on all fours exists, but rather whether "'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific

conduct in question.'" Slip Op. at 2 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). See also *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019)

In this case, there is a material dispute as to the operative facts the officers are relying in support of their arguments and as discussed more below, there is decisional law that applies to the specific conduct in question that placed these officers on notice that they were violating the Plaintiff's clearly established right to be free from unreasonable seizure and arrest. But the Defendants are self-servingly conflating the constitutional analysis for their two encounters with Jeremy, which is improper, and undermines the ability of the Court to assess the issues at hand in context of the full factual and legal backdrop. Furthermore, while the Defendants are moving to dismiss Plaintiff's Excessive Force Claim under First Cause of Action only as to Defendants Billinger and Gunderson, without the full facts about the excessiveness of the force against Jeremy by the Defendants, he cannot counter this argument. Therefore, Plaintiff's opposition constitutionally breaks down the two encounters, and provides a factual context for the excessive force claim in response to the Defendants' Motion.

### A. First Encounter With Jeremy

When Defendants Renegar, Gonzalez, Pahel, Borba and Billinger arrived to the campground in response to the first dispatch call that originated at 3:40 am about a domestic dispute, they should have been in their proper functional investigative mode to determine the source of the disturbance. See *Arvin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) In line with that, Renegar went and knocked on a few campsites and was in that investigative process, when he came upon Jeremy's campsite at 4:23 am. (Plaintiff's SS#11). In glaring contradiction to the Defendants' factual assertion in the motion, (**Def.**

**Motion, Doc. 105 p. 11, lines 17-25, p. 13, lines 7-9**), the reporting parties Fuerbach and Gomez were not sure that the source of the disturbance was indeed coming from Jeremy's camp, had never seen Jeremy with a female and were giving a direction of where they heard noise. (**Plaintiff's Disputed Statement of Facts [Plaintiff's DS# 2, 4], Plaintiff's SS# 11, 57-59**) Otherwise, Renegar would not have gone to speak with other campers before he came to Jeremy's at 4:23. (Plaintiff's SS# 11) No one among those campers pointed to Jeremy or his campsite and Renegar was still in his investigative mode when he came to Jeremy's tent. (Plaintiff's SS# 11, Plaintiff's DS# 2, 4) It is conceded by Plaintiff in this Opposition that because there was a domestic dispute call, Renegar had a reason to contact and speak with Jeremy, and detain him briefly pending further investigation, although he could have handled it differently without unnecessary antagonism towards Jeremy. Since Jeremy was also on probation with search and seizure conditions, the deputies also could search his campsite for a trace of a female. The search went beyond the claimed protective sweep for female as alleged by deputies, because they tossed and turned all of Jeremy's belongings in his tents, by looking through his backpacks, which was unreasonable and amounted to harassment. (Plaintiff's SS# 14) However, due to the search and seizure conditions as part of his probation, Jeremy cannot claim a Fourth Amendment violation for unlawful detention and search for the first encounter with the deputies. Plaintiff concedes as part of this Opposition, he has no illegal search claim for those reasons. But that does not apply to illegality of the second encounter for illegal detention, false arrest and excessive force against all Defendants, including Billinger and Gunderson. Because the Defendants conflate the two encounters in their motion, (**Def. Motion, p. 10, lines 15-17**), their argument that Jeremy does not have a false arrest, or illegal detention claim in the Plaintiff's First Cause of Action is without merit. (**See Plaintiff's Second**

**Amended Complaint, Document 28**) The Court should not fall into this trap and should analyze the two encounters separately.

### B. Second Encounter with Jeremy

Jeremy is asserting that all of the named Defendants Renegar, Gonzalez, Pahel, Borba, Billinger, Gotts, Gunderson have violated his Fourth Amendment rights when after their first encounter when they determined the domestic call was 'unfounded' as to him, they came back within half an hour, detained him again and attacked him, without lawful cause and reasonable suspicion and subjected him to brutal force and further arrested him without probable cause, falsely on bogus criminal charges. The fact that he was on probation did not give a *carte blanche* to continue harassing him and escalating the initial detention into a full-blown arrest with no probable cause.

## II. THE INVESTIGATORY DETENTION OF JEREMY TURNED INTO A DE FACTO ARREST WITHOUT PROBABLE CAUSE WHEN DEFENDANTS ARRIVED THE SECOND TIME AND CIRCLED HIM WITH GUNS DRAWN

When the second call came in at 4:55-4:58 am, within half an hour of the Defendants' first encounter with Jeremy, it was to the effect that a man was walking around looking for subject who called the police, then it was updated to a man yelling and a little girl screaming, making it a priority call. (Plaintiff's DS# 10-12**)** Similar to the first call, the reporting party did not identify or provide a description of the male as Jeremy, or give the campsite he was from, or where the little girl was screaming. (Plaintiff's SS# 57-59)

Renegar, Gonzalez, Pahel, Borba, Billinger who had just been there, had learned Jeremy had not been involved in that incident involving a domestic dispute and was alone. (Plaintiff's SS# 21-22) When they came back on this priority call and zoned in on Jeremy's campsite again, they had no reasonable suspicion that he was engaged in any reported criminal activity, let alone the screaming child. (Plaintiff's SS# 57-59; Plaintiff's DS# 13-14) He was alone again, visibly standing on his campsite, with no female or little girl with him. (Plaintiff's SS# 28-30, Plaintiff's DS# 12-14) Detaining him the second time without reasonable suspicion he was engaged in anything criminal, was in violation of the Fourth Amendment. Even if any of reporting parties had indicated there was a man walking looking for the subject who called the police, the deputies had a duty to investigate and not go entirely by the statements of the reporting parties the second time especially because they had not located the true source of the disturbance earlier. See *Arvin v. Santa Clara Valley* , 261 F.3d 912, 925 (9th Cir. 2001) (on duty of officers to investigate). When Jeremy went and tried to complain to his neighbors about their actions asking them to accept responsibility and tell the sheriffs' they caused the disturbance, that cannot be perceived as a crime under any penal code section. (Plaintiff's SS# 27) Therefore, the deputies had a duty to investigate where was the little girl screaming that made the call a priority. At best, it gave them only a reason to detain him briefly again pending further investigation. But Renegar was operating on a subjective hunch that Jeremy somehow had been engaged in the claimed domestic dispute with the female/child due to their arrival the first time because he did not like Jeremy's 'attitude' and verbal protests for detaining and searching him. (Plaintiff's SS# 1-22, Plaintiff's DS# 13-14) The call was updated to a priority not because of the man walking around, but because there was an allegation of a little girl screaming in connection with a male yelling, which deputies knew did not entail Jeremy. (Plaintiff's DS# 10-12)

When they saw Jeremy standing on his own campsite near his tent with shoes off and alone, getting ready to get back to sleep, they did not see or hear him yelling at anyone. He was not a threat to anyone especially to the multiple uniformed deputies that arrived. He complied with their commands and showed his hands and stood there in the middle of his campsite. (Plaintiff's SS# 28-31) There was no female or child next to him. (Plaintiff's SS# 28-31, Plaintiff's DS #12-14) Circling him with guns drawn, ordering him to get down on the ground without any investigation, without talking with the reporting parties, was an illegal detention with excessive force, based on the facts known to them at this time. (Plaintiff's SS# 29-30, #59, Plaintiff's DS #10-14) The mere fact they drew guns at him at this juncture, without facts he was committing a crime, or had committed a crime, was excessive under the Fourth Amendment. In fact, at this point, the investigatory detention turned into a *de facto* arrest requiring not merely a reasonable suspicion, but probable cause of criminal activity. See *Robinson v. Solano County*, supra, 218 F.3d 1030, 1035 ("But drawing and pointing a gun are serious steps that are not warranted under all circumstances, and officers can be held liable under § 1983 for pointing a gun at a suspect where the circumstances do not warrant such a use of force"); *Green v. City and County of San Francisco*, 751 F.3d 1039, (methods and law enforcement coercive tactics used in investigatory detention may raise an investigatory stop to a *de facto* arrest).

Reasonable suspicion, as this court recently affirmed, "is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *U.S. v. Lopez-Soto*, 205 F.3d 1101, at 1105 (9th Cir. 2000)(citations and internal quotation marks omitted). Further, although "[a]n officer is entitled to rely on his training and experience in drawing inferences from

the facts he observes, ... those inferences must also be grounded in objective facts and be capable of rational explanation." *Id.* (citations and internal quotation marks omitted). *United States v. Rojas-Millan*, 234 F.3d 464, 468–69 (9th Cir. 2000). "The facts are to be interpreted in the light of a trained officer's experience. *United States v. Cortez*, 449 U.S. 411, 418 (1981). They must, however, *be more than the mere subjective impressions* of a particular officer. Permissible deductions or rational inferences must be grounded in objective facts and be capable of rational explanation; "while an officer may evaluate the facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop." *Nicacio v. United States I.N.S.*,797 F.2d 700, 705 (9th Cir.1985)."(italics added). *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989); *see also United States v. Colin*, 314 F.3d 439, 442 (9th Cir. Cal. 2002).

> The 'reasonable suspicion' necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama* v. *White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)" The standard takes into account "the totality of the circumstances—the whole picture." *Cortez, supra*, at 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). Although a mere "'hunch'" does not create reasonable suspicion, *Terry, supra*, at 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause, *United States* v. *Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).
>
> *Navarette v. California*, 572 U.S. 393, 397 (2014)

In *Navarette*, the Court was charged with deciding under what circumstances the anonymous tip by a 911 caller can justify an investigatory stop by police. In reviewing the previous cases of *Alabama* v. *White, supra*, 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)" and *Florida v. J. L.*, 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000), the court concluded in this particular case, the 911 call bore sufficient indicia of reliability because the tipster claimed eyewitness knowledge by reporting she had been run off by a specific car giving the license plate and the mark of the car, and had reported the incident soon after she observed it happening, making her call sufficiently contemporaneous to the reported incident. Even when a tip is reliable, it can justify an investigatory stop only if it creates a 'reasonable suspicion' that a crime is afoot. *Navarette v. California*, 572 U.S. 393, 401 (citations omitted) An anonymous tip about someone carrying a gun that is not confirmed by the officer's own observations is not reliable for purposes of making a valid Fourth Amendment investigatory stop and frisk:

> The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J. L.
>
> *Florida v. J. L.*, 529 U.S. 266, 271 (2000)

Renegar's facts amount to no more than subjective (mis)impressions (assuming arguendo he actually held those beliefs at the time). When he and his deputies arrived the second time with guns drawn and circled Jeremy, Renegar had no reasonable suspicion that Jeremy had been the man who had been yelling in connection with a little girl screaming, that caused the call to become a priority

one. (Plaintiff's SS# 59, Plaintiff's DS #10-14) The caller had not given any description of the male and the little girl, which campsite the male was from. In fact, the caller indicated the male was going through things in a RV in camp 61. (Plaintiff's DS# 11) Renegar had learned from his previous encounter Jeremy was from campsite 65. (Plaintiff's DS #11, Plaintiff's SS# 11) He was acting entirely on his subjective hunch that Jeremy was somehow implicit despite the fact they had just minutes before searched his campsite without a trace of a female. (Plaintiff's DS# 13, Plaintiff's SS# 57) He cannot offer any reasonable articulable facts that the male the caller described was in fact Jeremy and that Jeremy was engaged in anything criminal let alone a domestic dispute. Further, even if the reporting parties had again pointed in the direction of Jeremy's campsite, which is disputed, he and other deputies had a duty to investigate this tip further. In stark contradiction to the Defendants' factual assertion, (**Def. Motion, p. 14, Footnote 4**,) the reporting party Joshua Gomez testified, Renegar did not speak to him the second time when he arrived prior to Renegar's detention of Holloway at gunpoint. (Plaintiff's DS# 13, Plaintiff's SS# 59) "In establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was the victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Arvin v. Santa Clara Valley Transp. Agency*, 261 f.3d 912, 925 (9th Cir. 2001).

Renegar's facts fall short of reasonable suspicion for the second encounter. Gomez testimony that officers did not speak to him at the second time they arrived to the campground makes it clear, Renegar failed to investigate and was operating under a false assumption that Jeremy was somehow implicit in this second call due to their prior visit (Plaintiff's SS# 57-59, Plaintiff's DS# 13) In the absence of any particularized suspicion that Jeremy was in any way shape or form, connected to

the second call for disturbance, with a little girl screaming, there was no cause to detain him.

Further, even if the officers could articulate reasonable suspicion to detain Jeremy again based on their first encounter, they escalated this detention, and instead of further investigating the disturbance and who was the female crying, they threatened Jeremy, with guns drawn, by yelling at him 'Get away from your tent! Get in the middle of the campsite, arms out to the side and feet together!' Jeremy complied by extending his arms out to his sides, visibly holding his palms out, but inquired, 'Why?! What did I do? What is going on? You were just here!' (Plaintiff's SS# 28-34) Then he was ordered by multiple officers still with guns drawn, 'Get down on the ground!' 'If you do not get down, you will be tased!' threatening to taser him. Jeremy saw a Hispanic officer holding a taser, and verbally protested, 'Why?! I have done nothing wrong' (Plaintiff's SS# 28-34)

It has been established, that momentary hesitation and alacrity to comply with officers' commands is not in violation of the relevant penal code sections. See *People v. Wetzel*, 11 Cal.3d 104, 110 (1974)(no 148PC offense committed by refusing to open door to officers in alleged hot pursuit of a suspect). "[I]n *People v. Cressey*, 2 Cal.3d 836 (1970), the California Supreme Court stated that the refusal to open a door upon a *proper* police request, was not a violation of § 148. And in *Cressey*, the defendant never did capitulate." *Mackinney v. Nielsen*, 69 F.3d 1002, 1006 (9th Cir. 1995); *Bryan v. MacPherson* 608 F.3d 614, 626 (Cal. 2010) ("Even if Bryan failed to comply with the command to remain in his vehicle, such noncompliance does not constitute 'active resistance' supporting a substantial use of force."); *People v. Quiroga* 16 Cal.App.4th 961, 966 (1993) ("it surely cannot be supposed that Penal Code section 148 criminalizes a person's failure to respond with alacrity to police orders"). Although section 148 proscribes resisting, delaying, or obstructing a police officer, " 'the First Amendment protects a

significant amount of verbal criticism and challenge directed at police officers.' " *Id*. at (quoting *Houston v. Hill,* 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston* 482 U.S. at 462-63, 107 S.Ct. 2502. See also *People v. Lopez* (1996) 48 Cal.App.4th Supp 1, 6. "'Speech is generally protected by the First Amendment, even if it intended to interfere with the performance of an officer's duties provided no physical interference results.'" *Id*., quoting *Long v. Valentino*, (1989) 216 Cal.App.3d 1287, 1296(italics in original).

The deputies are attempting to justify their use of force and arrest of Jeremy entirely on the false premise that Jeremy refused to get down on the ground in response to their commands and was resisting them. (Plaintiff's SS# 51) First, their commands were not lawful, because a citizen does not have to comply with unlawful commands. There was no reasonable suspicion that at this time Jeremy was engaged in anything criminal to justify the deputies ordering him to get down on the ground.

The longstanding rule in California and other jurisdictions is that a defendant cannot be convicted of an offense against a peace officer " 'engaged in ... *the performance of* ... [his or her] *duties*' " unless the officer was acting lawfully at the time the offense against the officer was committed. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217, 275 Cal.Rptr. 729, 800 P.2d 1159, original italics; see also *People v. Simons* (1996) 42 Cal.App.4th 1100, 1109, 50 Cal.Rptr.2d 351). "The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in 'duties,' for purposes of an offense defined in such terms, if the officer's conduct is unlawful.... [¶] ... [T]he lawfulness of the victim's conduct forms part of the corpus delicti of the offense." (*People v.*

*Gonzalez, supra*, 51 Cal.3d at p. 1217, 275 Cal.Rptr. 729, 800 P.2d 1159); *In re Manuel G*., 16 Cal. 4th 805, 815, 941 P.2d 880, 885 (1997).

> "First, it is said that failure to obey the command of a police officer constitutes a traditional form of breach of the peace. Obviously, however, one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution. The command of the officers in this case was doubly a violation of petitioners' constitutional rights." *Wright v. Georgia* (1963) 373 U.S. 284, 291-292 [10 L.Ed.2d 349, 454-355, 83 S.Ct. 1240].(police order given to black basketball players causing no disruption in a public park to leave on the ground that 3rd parties might be disturbed by their use of the park).

Second, Jeremy was entitled to an explanation as to why he was being detained again, within the half hour period, after the same deputies searched him and his campsite with negative results. His verbal protestation and delay in getting down to the ground in the absence of physical interference with deputies, did not amount to a criminal activity of resisting police giving deputies' probable cause to arrest him.

Third, an investigatory detention that is prolonged beyond the initial investigative purpose, turns into a *de facto* arrest, requiring probable cause, which was non-existent in this case. In determining whether a detention is prolonged, the Court stated, "we determine whether '[i]n attempting to confirm or dispel his suspicions of illegal activity, [the officer] used ... threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics.'" *Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011)(citing *U.S. v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996)). "Reaching this conclusion does not require us to engage in 'unrealistic second-guessing' of the officers at the scene. Officer Estrada

himself evidenced an understanding that his behavior was unreasonable, when he said, 'I don't care about complaints.'" *Id.* The "show of force and detention techniques used in this context are indistinguishable from police conduct in an arrest." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988); *See also United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir. 1990).

In *Green v. City and County of San Francisco*, 751 F.3d 1039, 1044 (9th Cir. 2014), in finding detention a de facto arrest and force unreasonable the Court reasoned, "Furthermore, the officers lacked specific information that Green was a proper suspect, and there was no indication that Green posed a threat to the officers necessitating the tactics employed. There were as many as six officers on the scene, in comparison to Green, who was alone and visibly unthreatening." "Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the *Fourth Amendment*." *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996); *see also United States v. Del Vizo,* 918 F.2d 821, 825 (9th Cir. 1990).

Because Defendants immediately escalated the initial detention of Jeremy into a forceful physical attack with no justification, the detention at this point turned into a *de facto* arrest. Constitutionally this is critical and Defendants muddle this line in their motion, because detention requires only reasonable suspicion of criminal activity, while arrest requires probable cause. See *Green v. City and County of San Francisco*, 751 F.3d 1039 at 1044, supra. There was no need to use force on Jeremy and deputies could have investigated the call without resorting to use of force against Jeremy. They could have inquired, whether Jeremy heard a little girl screaming and what direction it came from. They could have gone to the next Campsite 66 as Jeremy had initially directed them to find out whether that

was a girl or female there in distress. They never did and the source of the domestic dispute was never identified. (Plaintiff's SS# 20-22, 58-60).

Thus, even if arguendo there was reason to detain Jeremy the second time for an initial investigation of the 911 call, the manner and the degree of force applied impermissibly extended the scope of the detention making it a full-blown arrest without probable cause.

## III. THE ILLEGAL DETENTION WAS ESCALATED INTO UNJUSTIFIED USE OF FORCE BY DEPUTIES AGAINST JEREMY AND BILLINGER AND GUNDERSON ARE LIABLE EVEN IF THEY DENY PHYSICAL CONTACT WITH JEREMY

When the Deputies escalated their initial detention by attacking Jeremy and getting physical with him, when Renegar rushed and punched him taking him down to the ground, with Deputies uncritically following him, they violated his Fourth Amendment rights by unreasonable and brutal force in effecting an arrest for non-existing crime. (Plaintiff's SS# 34-43) Therefore, the named Defendants, Renegar, Gonzalez, Pahel, Borba, Billinger, Gotts and Gunderson who according to the dispatch calls, were at scene of the incident, are liable to Plaintiff for unlawful detention and excessive force for the second encounter on different theories of liability explored more below. (Plaintiff's SS# 43-45)

> The question therefore becomes whether this degree of intrusion was justified by the governmental interests at stake. To assess the gravity of the government interests, we have typically considered "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Chew, 27 F.3d at 1440*. Where these

interests do not support a need for force, "*any* force used is constitutionally unreasonable." *Lolli v. County of Orange, 351 F.3d 410, 417 (9th Cir. 2003)* *Green v. City and County of San Francisco*, 751 F.3d 1039.

Renegar made the arrest of Holloway and claimed himself with Gonzalez and Pahel as victims of the false felony crimes for California Penal Codes on Resisting Police and Battery on Peace Officer. (Plaintiff's SS# 51) Gonzalez and Pahel wrote their reports corroborating Renegar's false story line by confirming they were victims of false crimes. (Plaintiff's SS# 53, 55, 57) Gotts and Borba, also wrote police reports and materially corroborated the reports by Renegar, Gonzalez and Pahel about Jeremy's actions justifying the use of force and arrest. (Plaintiff's SS# 53-55, 57) Therefore, they are all liable to Plaintiff for Excessive Force and False Arrest as a result of this second encounter. They all admitted to the use of force against Jeremy, although greatly minimized the extent and justification for it. (Plaintiff's SS# 43, 53-55, 57) None of their reports accounted for the head strikes that caused bleeding to Jeremy on scene. (Plaintiff's SS# 54). They could not have because there was no valid reason to strike or kick Jeremy in the head with such malice, knowing this is lethal force requiring particular justification they did not have. Perhaps to cover-up these headstrikes, Renegar made up the false line about Jeremy placing him in a headlock, something that none of the other deputies could corroborate (Plaintiff's SS# 52-53). These reports and their statements to the Sergeant at scene are the best examples of the code of silence in action.

Billinger and Gunderson did not author police reports and are denying they had any physical contact with Jeremy. (Plaintiff's DS# 15-16) However, there is uncontroverted evidence they were at scene right around the time when admittedly the other deputies were engaged in use of force against Holloway but did nothing to stop them. (Plaintiff's SS# 45; Plaintiff's DS#15-16) Gunderson who arrived to

the scene with Gotts, saw how the deputies maliciously attacked and brutalized Holloway but with ability and opportunity to stop did not intervene. The same holds for Billinger, whose account of how he was there but did not see the use of force lacks credibility, because he could not account for his activities at scene at the same time Jeremy was being detained and attacked. (Plaintiff's SS# 48, 53-54, Plaintiff's DS#15-16) Both of these officers, are liable to Jeremy on 'failure to intervene' theory alone, in adherence to the same code of silence.

In *United States v. Koon*, the Ninth Circuit clearly stated that police officers have a duty to intercede when they observe a violation of a constitutional right:

> Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen. [citations removed]. [T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows. Thus, an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights.

*United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994); *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000)(recognizing police officers' duty to intercede where they have the opportunity to stop a violation of rights); *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995)(holding that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" when another official acts unconstitutionally); *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on behalf of a

citizen whose constitutional rights are being violated in his presence by other officers.”).

While the case law imposing bystander liability primarily concerns brutality claims, the same principle applies to the prevention of an illegal or unlawful arrest and conspiracies to deprive civil rights as here. 42 U.S.C. § 1986; *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982). This legal principle has been applied to common law false arrest and imprisonment by the California Supreme Court. *Abbott v. Cooper*, (1933) 218 Cal.425. “[A] ‘realistic opportunity’ to intervene may exist whenever an officer could have ‘called for backup, called for help, or at least cautioned the excessive force defendant to stop.’ ” *Abdullah v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005)(quoting *Yang*, 37 F.3d at 285). The Seventh Circuit has stated, “whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.” *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997).

## IV. DEPUTIES FALSELY ARRESTED JEREMY WITHOUT PROBABLE CAUSE IN VIOLATION OF THE FOURTH AMENDMENT

Similarly, the Plaintiff’s false arrest claim against all Defendants stands because based on the facts presented by him, there was no probable cause to arrest him and the arrest was made with unreasonable force thereby invalidating it.
At summary judgment, the burden of establishing probable cause rests with the arresting officer, not the arrested plaintiff. *Dubner v. City and County of San Francisco*, 266 F.3d 959, 965 (2001); *Gilker v. Baker*, 576 F.2d 245 (9th Cir. 1978); *Martin v. Duffie*, 463 F.2d 464, 468-469 (10th Cir.1972); *Dellums v.*

*Powell*, 566 F.2d 167, 175-176 (D.C.Cir 1977), *Patzig v. O'Neill* 577 F.2d 841, 849 n.9 (3d Cir. 1978); *Cervantez v. J.C. Penny Co.* 24 Cal.3d 579, 592 (1979); *Cameron v. Fogarty*, 649F.Supp. 3,5 (E.D.N.Y. 1985). Defendants' motion fails to meet this burden, legally or factually.

Probable cause to arrest exists when the facts and circumstances known to the arresting officer at the time of the arrest justify a prudent person in believing that the suspect committed or was committing an offense. *Hart v. Parks* 450 F.3d 1059, 1065 -1066 (9th Cir. 2006)*; Hunter v. Bryant* 502 U.S. 224, 228 (1991); *Gerstein v. Pugh* 420 U.S. 103, 111 (1975); *People v. Souza* (1994) 9 Cal.4th 224, 230. To differentiate probable cause from the reasonable suspicion necessary from a temporary detention, courts often say that probable cause requires a 'strong' or 'honest and strong' suspicion that the person arrested is guilty of a crime. *People v. Price* (1991) 1 Cal.4th 324, 410; *People v. Harris* (1975) 15 Cal.3d 384, 389; *In re Justin B.* (1999) 69 Cal.App.4th 879, 887; *People v. Gorrostieta* (1993) 19 Cal.App.4th 71. An officer's subjective beliefs as to the significance of facts known to him or her at the time of arrest is immaterial in determining probable cause to arrest. *People v. Limon* (1993) 17 Cal.App.4th 524, 539; *People v. Boissard* (1992) 5 Cal.App.4th 972, 980. The subjective belief and intent of the officer are also irrelevant, as is subjective good faith. *Beck of Ohio* (1964) 379 U.S. 89, 97; See *Maryland v. Macon* (1985) 472 U.S. 463, 470 (whether Fourth Amendment violation occurred turns on objective assessment of officer's actions and not on officer's state of mind at time actions were taken).

Taking all the facts in the light most favorable to the plaintiff, the inescapable conclusion has to be drawn there was no reasonable cause for violations of Penal Code section 415(2) or any other law as those code sections are interpreted by the California courts. Renegar's subjective assumption at the time he and other deputies arrived to the campground the second time, that Jeremy was

involved in any kind of domestic disturbance, is irrelevant for his determination whether Jeremy was engaged in any crime justifying an arrest. Viewing objectively at the totality of the circumstances, there was no probable cause to arrest Jeremy for disturbance.

Penal Code Section § 415 is entitled: Disturbing the peace. Subsection (2) states the offense is committed when "Any person who *maliciously* and *willfully* disturbs another person by loud and *unreasonable* noise."(emphasis added). Furthermore, 415(2) has received a narrow judicial construction which holds the statute can  be violated only if the loudness presents an imminent danger of violence or when the noise is designed to disrupt lawful endeavors.

> We are satisfied that loud shouting and cheering constitute the loud 'noise' prohibited by section 415 only in two situations: 1) where there is a clear and present danger of imminent violence and 2) where the purported communication is used as a guise to disrupt lawful endeavors.
>
> *People v. Superior Court (Commons)* 135 Cal.App.3d 812, 817, 185 Cal.Rptr. 492, 495 (Cal.App.,1982), *In re Brown* (1973) 9 Cal.3d 612, 621, 108 Cal.Rptr. 465, 510 P.2d 1017

"§415 is a specific intent crime." *Rosenbaum v. City & County of San Francisco*, 2005 U.S. Dist. LEXIS 963 1153. Based on the facts presented here, the Deputies only had cause to investigate further the second time they arrived. Furthermore, there was no cognizable victim at the time of the arrest. The deputies never found any female or little girl when they arrived. (Plaintiff's SS# 51, Plaintiff's DS# 14) A  reporting party's telephone call does not amount to probable cause to arrest anyone. It merely provided the basis to investigate. While a citizen informant's report of a crime is considered reliable, the phone call that brought

Renegar and deputies to the campground the second time, did not give a description of the male who was disturbing the peace, and there was indication of a little girl screaming in conjunction. (Plaintiff's DS #10-12) Thus when Defendants arrived to the campground, and saw Jeremy on his campsite standing alone, they could not connect him to the call aside from Renegar's hunch from his earlier encounter with Jeremy that Jeremy was somehow involved. (Plaintiff's DS#10-14; Plaintiff's SS# 57-60) Instead of probing further to find out where was the little girl screaming, they drew guns and attacked Jeremy (Plaintiff's SS# 29-43).

A warrantless arrest is presumed illegal (California Evidence Code § 664). The burden of providing justification is upon the defense. *Gilker v. Baker*, 576 F.2d 245 (9th Cir. 1978). Defendants must competently establish each of the facts that constitute probable cause for the arrest they made of the plaintiff. *Ibid, p.* 246 ("Once a warrantless arrest is established, the burden of going forward with the evidence passes to the defendant.").

Under the Fourth Amendment, a warrantless arrest requires probable cause. See *Michigan v. Summers*, 452 U.S. 692, 700, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964). Alternatively, this court has defined probable cause as follows: when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or even strong reason to

suspect are not enough." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984)(citing *Henry v. United States*, 361 U.S. 98, 101, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959)). *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

See also, *Martin v. Duffie*, 463 F.2d 467 (10th Cir. 1972)(plaintiff who has been arrested without a warrant 'need only present a prima facie case of illegal arrest in order to sustain his burden"); *Patzig v. O'Neill*, 577 F.2d 841, 849 n.9 (3d Cir. 1978); *Dellums v. Powell*, 566 F.2d 167, 175-76 (D.C.Cir. 1977). If the defendant is unable to or refuses to come forward with any evidence that the arresting officers had probable cause and the plaintiff's own testimony does not establish it, the court should presume the arrest was unlawful." *Dubner v. City and County of San Francisco* (2001) 266 F.3d 959, 965. Where the arrest is alleged to be based on probable cause, that concept is tested at the moment of the seizure. In order to satisfy the requirements of the Fourth Amendment, an arrest must be supported by probable cause to believe that the arrestee has committed a crime. *Henry v. United States*, 361 U.S. 98, 102, 4 L. Ed. 2d 134, 80 S. Ct. 168 (1959). Probable cause must be determined at the time the arrest is made. *Allen v. City of Portland* 73 F.3d 232, 236 (9th Cir. 1995).

Moreover, when the crime defines the suspect's state of mind as 415(2) requires both malice and willfulness to disturb, Deputy Renegar was required to have these facts to support probable cause without speculating.

> Probable cause must be present based on the "facts and circumstances known to the officers at the *moment* of the arrest." *Newman*, 265 F. Supp. 2d at 1106 (emphasis in original) (citing *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1296 (9th Cir. 1998)). "While conclusive evidence of guilt is not necessary to establish probable cause, mere suspicion, common rumor, or even strong reason to

suspect are not enough." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009) (internal marks and citations omitted). In addition, in cases such as this where "specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." *Lopez*, 482 F.3d at 1073(citation omitted); *People v. Hunter*, 147 Cal. App. 2d 472, 305 P.2d 608, 609 (1957) ("[t]he crime of grand theft is complete when a man takes property not his own with the intent to take it"). *Struk v. Bush*, 2011 U.S. Dist. LEXIS 133638 *12.

Accordingly, Renegar's and his corroborating deputies' seizure and arrest of the Plaintiff can only have been supported by probable cause if, and only if, these essential constituent elements of subdivision were satisfied and he lacked them both.

## V. QUALIFIED IMMUNITY DOES NOT SHIELD DEFENDANTS BECAUSE THEY WERE ON NOTICE OF THE CLEARLY ESTABLISHED LAW

With respect to qualified immunity, none of the Defendants would be entitled to the defense because it has been established since at least 1972 that 415(2) cannot be violated unless there is a clear and present danger of imminent violence and where the noise is used as a guise to disrupt lawful endeavors. *In re Brown, supra*. *People v. Superior Court (Commons), supra*. Renegar does not claim that either of these conditions ever existed. All these defendants are held to have known in January 2018 that they cannot lawfully seize and book the plaintiff for a violation of 415(2) under the circumstances presented to them. Ninth Circuit

authority "places the responsibility for keeping abreast of constitutional developments in criminal law squarely on the shoulders of law enforcement officials." *Ward v. San Diego County*, 791 F.2d 1329, 1332 (9th Cir. 1986). "We assume that officials are aware of available decisional law." *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1382 (9th Cir. 1989). Gomez testified that Renegar did not speak to him the second time he arrived to confirm what he saw and heard and whether Jeremy was the one causing the disturbance. (Plaintiff's SS# 59, Plaintiff's DS# 13, 14) The other reporting party Fuerbach also testified that the police did not speak to him until after the use of force and arrest of Holloway. (Plaintiff's SS# 59, Plaintiff's DS# 2)

This dispute of material facts undermines the Defendants' claim to qualified immunity. Police officers may not use their powers for the purposes of oppression. *Hurtado v. California* 110 U.S. 516, 527, 28 L.Ed. 232, 4 S.Ct. 111 (1984). See also *Sacramento v. Lewis*, 523 U.S. 833, 140 L.Ed.2d 1043, 118 S.Ct. 1708 holding that the due process clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression, quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126, 117 L.Ed.2d 261, 112 S.Ct. 1061 (1992). When the plaintiff asserts as in this case he was arrested not just in the absence of probable cause but essentially because he delayed going down to the ground by verbally protesting the officers' actions and for his earlier attitude when they detained him the first time, liability is established under section 1983 for the deprivation of the plaintiff's rights. At the same time, qualified immunity protection is out of reach. "There can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment. *See, id.; Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998); see also *Barrett v. Harrington*, 130 F.3d 246, 264, (6th Cir. 1997)("[T]he First Amendment right criticize public

officials is well established and supported by ample case law. Furthermore, it is well established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of §1983.") *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)("[G]overnment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely, anyone who takes an oath of office knows - or should know -that much.")"; *Gulliford v. Pierce County*, 136 F.3d 1345, 1350 (9th Cir. 1998). "Criticism of the police, profane or otherwise, is not a crime. *Hill*, 482 U.S. at 462-63, 107 S.Ct. 2502.

Plaintiff's opposing evidence proves each of the co-defendants joined together to violate the plaintiff's constitutionally protected rights. (Plaintiff's SS# 53-57) Accepted as true for the purposes of this motion, that willful conduct bars the qualified immunity defense. *Carnell v. Grimm* 74 F.3d 977, 978-979 (9th Cir. 1996)(qualified immunity unavailable where material facts are disputed); *Mendecino Environmental Center v. Mendecino County*, 192 F.3d 1283, 1295 (9th Cir. 1999); *Del La Cruz v. Kauai County*, (2002) 123 S.Ct. 608, 154 L.Ed. 2d 531. See also, *Greenstreet v. County of San Bernardino*, 41 F.3d 1306, 1310 (9th Cir. 1994)(qualified immunity denied to deputy based on warrant issued by judge which was induced by deputy's misrepresentations of probable cause). An officer who manufactures probable cause for an arrest and conspires with other officers to suppress the truth of the events is *never* entitled to qualified immunity. *Harris v. Roderick*, 126 F.3d 1189, 1205 (9th Cir. 1997). It has long been the law that anyone, *especially* police officers, who provide false and misleading evidence against a person they know not to be guilty of the accusations, commit crimes.

California Penal Code section 182, subdivision (2)[1] criminalizes such conduct. Subdivision (1) criminalizes conspiracies to commit *any* crime. Penal Code section 146 criminalizes any unlawful arrest or detention of a person against his will under color of law. Penal Code section 118.1 criminalizes knowing and intentional falsehoods in police reports. Prohibitions against these forms of behavior by peace officers have long been clearly established. Hence, evidence that defendants conducted themselves in intentional violation of these criminal prohibitions categorically requires the denial of qualified immunity. Qualified immunity is unavailable to "those who knowingly violate the law." *Malley v. Briggs* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Surely, based on the facts presented by Jeremy, there was no probable cause to arrest him either for resisting police or battery on peace officer. He was maliciously attacked, taken down and beaten only for verbal challenge and his justifiable lack of alacrity to get down to the ground when facing multiple deputies at gun point. (Plaintiff's SS# 29-43) *See Timas v. Klaser*, 23 Fed.Appx. 574, 580 (7th Cir. 2001)(quoting *McDonald v. Haskins*, 966 F.2d 292, 292–93 (7th Cir. 1992))("The excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger [s]he posed – to the community or to the arresting officers – if left unattended."); *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993)("Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of … force."); *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("The reasonableness inquiry in an excessive force case is an objective one:

---

[1] "Falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime."

'the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" . . . An officer's good intentions will not make an objectively unreasonable use of force constitutional.); *Phillips v. Community Insurance Group*, 678 F.3d 513, 527 (7th Cir. 2012)("Even when officers' goals are eminently reasonable, there are definite limits to the force officers may use to prod arrestees into obeying commands. A rule that pins reasonableness on whether officers used the force necessary to secure compliance would be a rule that *requires* officers to beat non-resisting arrestees into submission.").

## CONCLUSION

Thus, all named Defendants are liable to Plaintiff for illegal detention, excessive force and false arrest as part of the second encounter and Defendants' motion should be denied.

DATED: November 30, 2020 **MKRTCHYAN LAW**

By: __________/s/Narine Mkrtchyan__________
**NARINE MKRTCHYAN**
Attorney for Plaintiff
Jeremy Holloway