# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JEREMY HOLLOWAY, )
)
Plaintiff, )
)
vs. ) Case No. 8:19-cv-
) 01514-DOC-DFM
COUNTY OF ORANGE, DEPUTY )
CHAD RENEGAR, individually )
and as a peace officer, )
DEPUTY JOEL GONZALEZ, )
individually and as a peace )
officer, DEPUTY KEVIN PAHEL, )
individually and as a peace )
officer, DEPUTY BRANDON )
BILLINGER, individually and )
as a peace officer, DEPUTY )
MARK BORBA, individually and )
as a peace officer, DEPUTY )
JAMESON GOTTS, individually )
and as a peace officer, )
DEPUTY JUSTIN GUNDERSON, )
individually and as a peace )
officer, and DOES 7-10, )
)
Defendants. )
_____________________________)

VIDEOTAPED REMOTE DEPOSITION OF

JOSHUA GOMEZ

Honolulu, Hawaii

Friday, August 7, 2020

Reported by: Deidre Young
CSR No. 11461
LitiCourt Job No.: 202914

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS, individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 7-10,<br><br>Defendants. | Case No. 8:19-cv-01514-DOC-DFM |

VIDEOTAPED REMOTE DEPOSITION OF JOSHUA GOMEZ, taken on behalf of the plaintiff on Friday, August 7, 2020, beginning at 9:59 a.m., and ending at 1:34 p.m. at 275 North Vineyard Boulevard, Apartment 207, Honolulu, Hawaii, before Deidre Young, RPR, CSR No. 11461.

all -- that's why I don't like zoom.
(Recorded call was played.)
THE WITNESS: So there was -- we can hear that, but that was like in the middle of the call.
BY MS. MKRTCHYAN: 11:46:47
Q Okay. Let me play again. Let me play again. If you can hear this better, let me know, okay?
A Okay.
(Recorded call was played.)
BY MS. MKRTCHYAN: 11:46:52
Q Could you hear that?
A Yes, I could hear that one.
Q Okay. And what was being said by you about this?
A So, now you're very dim. 11:47:33
MS. HEATHCOTE: Yeah, we can't hear you now, Narine.
MS. MKRTCHYAN: Okay. Okay. Because my microphone, okay. That's why I hate this zoom experience. Thank you. Okay. All right. So I put 11:47:49 microphone to the speaker and then now to me.
BY MS. MKRTCHYAN:
Q So basically I'm just trying to establish what you could hear yourself say to the dispatch.
A Okay. Yeah. So yes, I heard it that time, I 11:48:02

think.
Q Okay. And what could you tell us that you heard yourself saying to the dispatch?
A That the individual was involved in a domestic dispute; wasn't arrested and is now going -- trying to find who called the police. 11:48:17
Q Okay. So basically you are telling the dispatch that you believed that the person, the first call for -- for service that you made earlier was related to this second one? 11:48:34
A Yeah. So yes, I'm connecting the two.
Q Right. You connected the two, but do you agree with me as we spoke earlier, earlier you testified that it's possible these two are not connected? 11:48:48
A Yes, it's possible.
Q It's possible that the person who was involved in this domestic disturbance with the female and the little girl screaming later on is a totally separate from this man walking up and down yelling and screaming, correct? 11:49:02
A Yes.
Q Okay. All right. But we agree that this is your second call to the dispatch?
A Yes. That is my second call. 11:49:14

Q All right. Let's continue hearing this. And I'm going to put my microphone again towards the speaker.

(Recorded call was played.)

BY MS. MKRTCHYAN: 11:50:46

Q Okay. So in this segment, we heard, you know, generally you're trying to clarify the location of the area, because the dispatch was not hearing you very well because you were whispering. And then you confirmed with her -- she asked you, Isn't this where 11:51:01 we came again, we came before? You confirmed with her, yes, you were dispatched before. And then basically she's trying to find out the location. She's asking you why are you whispering and what was your explanation to that? 11:51:16

A It's because he was walking up and down the campsite.

Q Okay. So -- and that's consistent with your testimony today that the reason you were whispering is because you didn't want to be audible to him; you 11:51:28 didn't want him since he was talking in general about who called the police on me, you know, et cetera, et cetera, you didn't want to be audible to him or --

A Yeah.

Q Okay. All right. So let's continue playing 11:51:43

know who he has with him or not.
Q Right.
A Right? So I'm reporting whatever I hear to the dispatcher, because it's necessary, right? Because I'm not just going to hear a little girl scream and then just go, Oh, well I don't know where that came from. 12:19:15
Q Of course. But we've agreed -- we've established that you were assuming, again, because you did not -- you never saw this man with a female; you never saw a little girl next to him; you are assuming that this man who had just walked down and was making threats, as you said verbal threats, was the same guy who was involved with a girl, correct? 12:19:28
A No, I'd say that that was, like, a separate situation. I wouldn't say that I was, like, Oh, this is the same person that was beating on his girlfriend, because obviously the sheriffs came and left him there, right, because he was alone. So -- or at least that's what I assuming, right? 12:19:47 12:20:03
Q Right. Right. So --
A I guess so, yeah.
Q I guess, so you were assuming?
A Yes.
Q Okay. All right let's continue. 12:20:11

(Recorded call was played.)
BY MS. MKRTCHYAN:
Q In this segment we can hear the sirens behind, right, in the back --
A Yeah. 12:21:28
Q You're confirming your campsite, et cetera, okay?
(Recorded call was played.)
BY MS. MKRTCHYAN:
Q So as you're hearing this, are you still inside your tent or did you get out of your tent at this point? 12:22:15
A No. I'm still inside my tent. I said it in the call too.
Q Okay. So let me know when you get out of the tent, as you're talking to the dispatch, okay? Because that's what you testified earlier that you and your girlfriend got out to watch what was happening. So I just want to know at what point in time you got out of your tent, okay? 12:22:25 12:22:42
A Okay. I'll do my best to recall.
Q Sure. Of course. Understandable, thank you.
(Recorded call was played.)
THE WITNESS: So that's where I started coming out because they asked, where did he go? Where is he? 12:24:08

And I said, He's over that way.
BY MS. MKRTCHYAN:
Q So this is actually -- you actually remembered coming out and talking with the sheriffs again?
A Yeah, so I -- yeah, I totally forgot about this part. 12:24:19
Q Okay. That's fine --
A Because I had gotten dressed -- oh, sorry.
Q Go ahead.
A I had gotten dressed and when I -- I think, like, right in between, you can kind of hear somebody say, Come out, Come out, or something like that. And so I open the thing. And I said, like -- and then he starts asking me, Where did he go? Where did he go, that way? And I said, Oh, he's over that way. Like, I heard it coming from over there, right? 12:24:29 12:24:46
Q Okay. And did you stay outside after this or did you go inside again?
A I stayed outside. I don't know if I stepped all the way out. I think I was, like, halfway in, halfway out. 12:24:58
Q Did your girlfriend come out with you at this time?
A I don't remember. No.
Q And when you came out, you gave the direction 12:25:09

of the RV towards -- for the sheriffs?
A Towards the direction -- yeah, towards the campsites that way.
Q Okay. And how many sheriffs do you remember there? 12:25:21
A I think there was two that had come up and asked.
Q Okay.
A And then I saw them running towards that way.
Q But we agree that on this dispatch, you never say the number of the campsite; you just give them the direction where you believe the man walked, right? 12:25:34
A That's correct.
Q Okay. Let's continue playing this and let's see what else is there. 12:25:47
(Recorded call was played.)
BY MS. MKRTCHYAN:
Q So again, what -- you know, what can you tell me happened in the segment?
A Yeah, so that's when they were asking me -- they were asking me, like, where it was coming from, right? And I do remember seeing them coming. And then I asked my girlfriend -- because she was also standing next to me. I asked her, I said, Did he run? Because I didn't see him, right, or she didn't see him either. 12:26:14 12:26:31

STATE OF CALIFORNIA )
) ss:
COUNTY OF LOS ANGELES )

I, DEIDRE YOUNG, do hereby certify:

That I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of certificate number 11461, which is in full force and effect and that I am authorized to administer oaths and affirmations;

That the foregoing deposition testimony of the herein named witness was taken before me at the time and place herein set forth;

That prior to being examined, the witness named in the foregoing deposition, was duly sworn or affirmed by me, to testify the truth, the whole truth, and nothing but the truth;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;

That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

That prior to the completion of the foregoing deposition, review of the transcript was requested.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 24th day of August, 2020.

Deidre P. Young

DEIDRE YOUNG, CSR No. 11461