S. Frank Harrell – SBN 133437
sharrell@lynberg.com
Tamara M. Heathcote – SBN 193312
theathcote@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ, DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER, DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and DEPUTY JUSTIN GUNDERSON

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

JEREMY HOLLOWAY,

Plaintiff,

vs.

COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.

Defendants.

CASE NO. 8:19-cv-01514-DOC-DFM

*Assigned to:*
*Hon. David O. Carter, Courtroom 9D*

**DEFENDANTS' OBJECTIONS IN RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

Objections to ECF Docket No. 125-2

Date: December 14, 2020
Time: 8:30 a.m.
Dept.: 9D

*Trial Date: January 19, 2021*
*Second Amended Complaint filed: December 10, 2019*

**TO THE HONORABLE COURT AND ALL PARTIES:**

**PLEASE TAKE NOTICE** Defendants hereby submit the following objections in response to Plaintiff Jeremy Holloway's Separate Statement of Disputed Material Facts in Opposition to Defendants' Motion for Summary Judgment or Adjudication[1] (ECF Docket No. 125-2.):

| **<u>PLAINTIFF'S STATEMENT OF GENUINE ISSUES OF FACT & EVIDENCE</u>** | **<u>REPLY</u>** |
|---|---|
| 1. In the early morning hours around 4:23 am of January 21, 2018, 41-year old Plaintiff Jeremy Holloway, an honorably discharged then homeless veteran, Sergeant of the Amphibian Battalion in the United States Marine Corps, was lawfully camping at the O'Neill Regional Park in Trabuco Canyon, Orange County and sleeping peacefully in a tent with his dog.<br><br>Holloway Deposition, pp. 51, 64-66 (Exhibit 4); Holloway Declaration ¶ 2-4 | Mr. Holloway's background is undisputed for purposes of this Motion, but also immaterial. Remainder is disputed on the basis of evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, concurrently filed Defendants' Objections to Evidence Offered in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("**Defts' Objections to** |

[1] Plaintiff opted to file separate documents responding to Defendants' Separate Statement and setting forth Plaintiff's Statement of Uncontroverted Facts, rather than the combined one called for by the Court's Standing Order.
Plaintiff also violates the Court's Order Re Motions for Summary Judgment in his presentation of this "fact." <u>See</u>, Court's Scheduling Order 5:5-6 ("Each cell should contain a narrowly focused statement of fact, and address a single subject in as concise a manner as possible."); and 6:3-6 ("These additional facts shall continue in sequentially numbered paragraphs (i.e., if the moving party's last allegedly undisputed fact was set forth as ¶ 30, then the first allegedly undisputed fact specified by the opposing party shall be set forth as ¶ 31.").

| | |
|---|---|
| (Exhibit 9). | **Pltf Evidence**") No. 1. |
| 2. Defendants Chad Renegar, Joel Gonzalez, Kevin Pahel, Brendon Billinger and Mark Borba awoke him, representing themselves as the 'Sheriff's Department', and insisted he come out of his tent to speak with them.<br><br>Holloway Deposition, pp. 71, 77 (Exhibit 4)(testimony that five officers were present during the first encounter); Holloway Declaration ¶6 (Exhibit 9); Rawlings Deposition, pp. 170; 236-38 (Exhibit 10)(testimony that Borba was present during the first encounter); Borba Deposition, pp. 67-71, 82-84 (Exhibit 11)(Borba's testimony that Borba, Billinger, and Renegar made contact with Jeremy during the first encounter); Renegar Deposition, pp. 75-78 (Exhibit 2)(Renegar testifies to approaching | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 2. |

| | |
|---|---|
| Jeremy's campsite with Pahel and Gonzalez); Pahel Deposition, pp. 62-70 (Exhibit 12) (Pahel, Gonzalez, and Renegar make contact with Jeremy at his campsite for the first time); Gonzalez Deposition, pp. 35-44 (Exhibit 13); PVS Recording, Borba 4:23; PVS Recording, Renegar 4:23-4:32 (Exhibit 7).<br>Call Detail Info Report shows Renegar, Gonzalez, Pahel, Borba and Billinger arrive to the campground in response to the 911 call for disturbance. (Call Detail Info Report, pp. 5-6) (Exhibit 8). | |
| 3. Half-awake and upset with this intrusion, Jeremy inquired from inside his tent, 'Why? Why do you need to talk to me? It is cold outside.'<br><br>Holloway Deposition, pp. 72-74 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 3. |
| 4. Renegar insisted by raising his voice, demanding he come out of his tent, still not explaining why they needed to talk to him. | Disputed on the basis of immateriality and evidentiary objections. |

| | |
|---|---|
| Holloway Deposition, pp. 71-74 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | **Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 4. |
| 5. As Jeremy put on a jacket and came out, he saw 5 deputies surrounding his campsite and his tent.<br><br>Holloway Deposition, pp. 75-76 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 5. |
| 6. Getting more and more frustrated and fearful with this unjustified intrusion, he inquired further, as to why they awakened him and are harassing him.<br><br>Holloway Deposition, pp. 89-90, 94, 103-105 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 6. |
| 7. Renegar rudely continued, demanding to pat him down for weapons, still not | Disputed on the basis of immateriality and evidentiary |

| | |
|---|---|
| explaining why they were there.<br><br>Holloway Deposition, pp. 77-78, 86-90 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 7. |
| 8. Renegar asked him if there was anyone else in his tent with him then or earlier, to which Jeremy replied no and that he was alone the whole evening and night.<br><br>Holloway Deposition, p. 75 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 8. |
| 9. Jeremy was then patted down for claimed 'officer safety', asked if he had any weapons anywhere on his campsite.<br><br>Holloway Deposition, pp. 87, 90, 129 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 9. |
| 10. He truthfully said he had a pocket knife, which turned out to be a lighter and | Undisputed that Holloway stated he had knives. Remainder is disputed |

| | |
|---|---|
| camping knives (that were in backpacks in the tent, not strewn around as deputies later claimed), but protesting why they were harassing him.<br><br>Holloway Deposition, pp. 127-128 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 10. |
| 11. Renegar then falsely claimed Jeremy was a subject of an unidentified call from other campers.<br><br>Holloway Deposition, pp. 74-75, 104-05 (Exhibit 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32; Renegar PVS Recording 4:07-4:23 (Exhibit 7)(Renegar was investigating the call for disturbance and did not know if it was coming from Jeremy's campsite because he had checked on different campsites to determine the source of the disturbance. None of the campers could conclusively identify which campsite the noise was coming from and gave a direction); Fuerbach Deposition, pp. 17-20 | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 11. |

| | |
|---|---|
| (Exhibit 1)(Fuerbach did not actually see the male and female who were making the noise. Fuerbach only saw the tent moving and perceived as if people were moving in the tent. He did not come out of his tent to see who was involved. He could not see which campsite it was coming from and only provided general information and potential location about what he and his wife heard to the dispatch); Gomez Deposition, pp. 28-34, 38-40 (Exhibit 3)(Gomez did not advise Deputy Renegar that he heard sounds specifically coming from Jeremy's campsite 65. Rather, Gomez testified that he could not see anything or anyone, but that he showed the police officers where he believed the sounds were coming from by pointing to a general south-southeast direction with multiple campsites). | |
| 12. Jeremy got even more frustrated and inquired further, as to who could have called on him, when he was alone camping and minding his own business that whole weekend. | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence |

| | |
|---|---|
| Holloway Deposition, pp. 74-75 (Exhibit 4); Holloway Declaration ¶ 6-7 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | No. 12. |
| 13. Renegar's tone was getting increasingly accusatory as he told him, 'I take it you have been through this before!'<br><br>Renegar PVS Recording 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 13. |
| 14. Jeremy kept asking what he had done, was ordered to sit on a log surrounded by five deputies, who then tossed and turned things in his tents and all belongings in backpacks, searching them for no justification.<br><br>Holloway Deposition, pp. 78, 86, 343-44 (Exhibit 4); Holloway Declaration ¶ 6-8 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 14. |

| | |
|---|---|
| 15. Jeremy kept protesting and asking why they were doing this, harassing him in the middle of the night but cooperated and provided all information they asked for, his identification.<br><br>Holloway Deposition, pp. 94, 113, 145-46 (Exhibit 4); Holloway Declaration ¶ 6-8 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 15. |
| 16. He still did not get a proper explanation as to what was going on and what he was being accused of.<br><br>Holloway Deposition, p. 78 (Exhibit 4); Holloway Declaration ¶ 6-8 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 16. |
| 17. The deputies did not find a trace of a female or anyone else anywhere in his campsite, or his belongings, except his only companion, his dog.<br><br>Renegar Deposition, pp. 108, 114-15, 121-23 (Exhibit 2); PVS Recording, Renegar | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 17. |

| | |
|---|---|
| 4:23-4:32 (Exhibit 7). | |
| 18. Then they justified their intrusion by claiming, 'If we get a call, we need to investigate.'<br><br>PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Undisputed but immaterial.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 18. |
| 19. They again falsely claimed they got multiple calls on his campsite, when the calls were not about a specific campsite or Jeremy and the deputies were still investigating the source of the disturbance by going into different campsites before they came to Jeremy's that night.<br><br>PVS Recording, Renegar 4:07-4:23; PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 19. |
| 20. Jeremy then told them that they should instead be going to the campsite next to him, No. 66, where he heard a fight earlier that night, a man and a female arguing.<br><br>Holloway Deposition, pp. 153-57 (Exhibit | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 20. |

| | |
|---|---|
| 4); Holloway Declaration ¶ 6 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | |
| 21. The deputies apologetically wished him a good night and left his campsite.<br><br>Holloway Deposition, p. 131 (Exhibit 4); Holloway Declaration ¶ 9 (Exhibit 9); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Undisputed that deputies left Holloway's campsite. Remainder is disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 21. |
| 22. Renegar, the primary unit handling this call, did not go to Camp No. 66, that was only about 20 feet away from Jeremy's camp to speak with their occupants and left the campground by registering the incident as 'Unfounded' for Jeremy.<br><br>Holloway Deposition, pp. 153-157 (Exhibit 4); Holloway Declaration ¶ 8 (Exhibit 9); Renegar Deposition, pp. 108, 114-15, 121-129 (Exhibit 2); PVS Recording, Renegar 4:23-4:32 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 22. |

| | |
|---|---|
| 23. Jeremy was not arrested or cited for anything at this time.<br><br>Renegar Deposition, pp. 108, 111, 114 (Exhibit 2); PVS recording of the incident, Renegar 4:23-4:32 (Exhibit 7). | Undisputed, but also immaterial for purposes of this Motion.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 23. |
| 24. Upset and agitated Jeremy then walked to the Ranger Station to file a complaint and use the restroom.<br><br>Holloway Deposition, pp. 149, 151 (Exhibit 4); Holloway Declaration ¶ 9 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 24. |
| 25. As he walked to the Ranger Station, the lights were on, but the doors locked.<br><br>Holloway Deposition, pp. 149, 151 (Exhibit 4); Holloway Declaration ¶ 9 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 25. |
| 26. He could see Sheriff's SUVs parked near the Ranger station.<br><br>Holloway Deposition, p. 149 (Exhibit 4); | Disputed on the basis of immateriality and evidentiary objections. |

| | |
|---|---|
| Holloway Declaration ¶ 9 (Exhibit 9). | **Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 26. |
| 27. Intimidated, he walked back to his campsite, and attempted to get the attention of his neighbors at Camp 66, by telling them to tell the sheriff's they were the cause of the disturbance.<br><br>Holloway Deposition, pp. 151-54, 157-59 (Exhibit 4); Holloway Declaration ¶ 10 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 27. |
| 28. As the neighbors ignored him, he got ready to get back to sleep, took off his shoes and was near his tent, when he saw the multiple Sheriff's SUVs coming back on the driveway with lights and sirens on.<br><br>Holloway Deposition, pp. 161-64 (Exhibit 4); Holloway Declaration ¶ 10 (Exhibit 9); PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:14; Pahel 4:57-5:14 (Exhibit 7). | Undisputed that officers re-responded with lights and sirens. Remainder is disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 28. |
| 29. Thinking to himself, they must have found the person they were looking for, he got taken aback when he saw multiple | Undisputed that officers re-responded to Holloway's campsite. Remainder is Disputed on the basis |

| | |
|---|---|
| deputies, at least 7 of them swarming towards him with guns drawn.<br><br>Holloway Deposition, pp. 158, 163-68 (Exhibit 4); Holloway Declaration ¶ 11-12 (Exhibit 9); PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:14; Pahel 4:57-5:14 (Exhibit 7). | of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 29. |
| 30. As Defendants Renegar, Gonzalez, Pahel first approached and circled his campsite at gunpoint, they told him to get away from the tent, get in the middle of the campsite, arms out to the side and feet together.<br><br>Holloway Deposition, p. 168-70 (Exhibit 4); Holloway Declaration ¶ 12(Exhibit 9); Gonzalez Deposition, p. 85 (Exhibit 13); PVS Recording Renegar 4:58-5:08; Pahel 5:02-5:07 (Exhibit 7). | Undisputed that officers issued commands to Holloway. Remainder is disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 30. |
| 31. He complied by moving towards the center of his campsite, by extending his arms out to the sides. He showed his hands, by extending them like a cross from his shoulders with palms open and kept asking, | Disputed on the basis of immateriality and evidentiary objections. |

| | |
|---|---|
| 'Why? What did I do? You were just here!'<br><br>Holloway Deposition, pp. 170-71 (Exhibit 4); Holloway Declaration ¶ 12 (Exhibit 9); PVS Recording Renegar 4:58-5:08 (Exhibit 7). | **Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 31. |
| 32. Then they yelled at him multiple times, 'Get down on the ground! Or you will be tased!' He also heard another officer yell 'Tase him!'<br><br>Holloway Deposition, pp. 167-172 (Exhibit 4); Holloway Declaration ¶ 12-13 (Exhibit 9); Renegar Deposition, pp. 362-63 (Exhibit 2); Gonzalez Deposition, p. 85 (Exhibit 13); PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:09; Pahel 5:02-5:06 (Exhibit 7). | Undisputed that officers issued commands to Holloway. Remainder is disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 32. |
| 33. In fear for his life, he stood there in disbelief and in fear that if he went down to the ground, he would be shot. | Undisputed as to Holloway's non-compliance with officer safety commands. Remainder is Disputed on the basis of immateriality and evidentiary objections. |

| | |
|---|---|
| Holloway Deposition, p. 171 (Exhibit 4); Holloway Declaration ¶12-13 (Exhibit 9); PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:09; Pahel 5:02-5:06 (Exhibit 7). | **Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 33. |
| 34. As he stood with his arms out as directed, Defendant Renegar rushed towards him, punched him to the left side of his face.<br><br>Holloway Deposition, pp. 172-73, 177 (Exhibit 4); Holloway Declaration ¶ 13 (Exhibit 9); PVS Recording Renegar 4:58-5:08 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 34. |
| 35. Jeremy had lost his peripheral vision to the left side, and could not have seen it coming.<br><br>Holloway Deposition, p. 176 (Exhibit 4); Holloway Declaration ¶ 13 (Exhibit 9). | Mr. Holloway's peripheral vision is not disputed for purposes of this Motion, but is immaterial. The remainder is disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 35. |

| | |
|---|---|
| 36. The punch was so strong that Jeremy blacked out momentarily.<br><br>Holloway Deposition, p. 178 (Exhibit 4); Holloway Declaration ¶ 13 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 36. |
| 37. When he came back to himself, he was being forced down to the ground by Renegar who held Jeremy in a chokehold.<br><br>Holloway Deposition, pp. 178-179 (Exhibit 4); Holloway Declaration ¶ 13-15 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 37. |
| 38. As he was growling from inability to breathe, and was attempting to free his neck from the hold, he could see another officer kneeing him in the head and kicking him multiple times in the head and temple area until he started bleeding profusely.<br><br>Holloway Deposition, pp. 180-84 (Exhibit 4); Holloway Declaration ¶ 14-15 (Exhibit 9); Gotts Deposition, p. 117 (Exhibit 14)(Gotts witnessed Jeremy bleeding from | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 38 |

| | |
|---|---|
| his face). | |
| 39. Additional Defendants were holding him forcefully to the ground by bodyweight and restraining his arms and legs.<br><br>Holloway Deposition, pp. 184-86 (Exhibit 4); Holloway Declaration ¶ 14-15 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 39. |
| 40. He kept screaming from pain, that he could not breathe, and that he was bleeding.<br><br>Holloway Deposition, pp. 180-82 (Exhibit 4); Holloway Declaration ¶ 14-15 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 40. |
| 41. Defendants delivered multiple punches to his ribs and stomach areas, and kicked him in the head multiple times.<br><br>Holloway Deposition, pp. 190-93 (Exhibit 4); Holloway Declaration ¶ 14-16 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 41. |
| 42. To top that, he was turned to his stomach and tasered at least 4 times without | Disputed on the basis of immateriality and evidentiary |

| | |
|---|---|
| warning.<br><br>Holloway Deposition, pp. 193-94, 196-208 (Exhibit 4); Holloway Declaration ¶ 14-16 (Exhibit 9). | objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 42. |
| 43. Jeremy is a 5.5 feet tall 175 lbs man, was taken to the ground by Defendant Renegar who then enlisted Gonzalez, Pahel, Borba, Gotts admittedly engaging in this unjustified use of force against him.<br><br>Holloway Deposition, pp. 172-73, 176-86, 190, 196, 199-208 (Exhibit 4); Holloway Declaration ¶ 12-16 (Exhibit 9).<br><br>Renegar Deposition (Exhibit 2), pp. 313-23 (Renegar punched Jeremy in the ribcage), 323 (Renegar held down Jeremy's feet), 337-40 (Renegar tased Jeremy for the first time), 341-43 (Renegar tased Jeremy for the second time), 352-53 (Gonzalez joined in taking down Jeremy), 357-59 (Renegar's police report identifies Pahel and Gonzalez as among the officers using force); Gonzalez Deposition (Exhibit 13), pp. 123-156 | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 43. |

| | |
|---|---|
| (Gonzalez's account from when Jeremy is taken down to the ground to when Jeremy is handcuffed), 123-131 (Gonzalez and Renegar use force to take down Jeremy to the ground), 137-144 (Gonzalez witnessing Renegar throwing punches at Jeremy's rib cage), 151-52 (Gonzalez hears the taser warnings and the taser sound).<br><br>Borba Deposition (Exhibit 11) , pp. 138-41 (Borba identifies Renegar and Gonzalez placing their weight on Holloway's back before the first taser deployment), 140-160 (Borba grabbed Holloway's left arm and placed his right knee on Holloway's upper back before and after the first taser deployment), 169-170 (Borba witnessing Holloway bleeding from the top of his head), 204-206 (discussion of video footage of Holloway bleeding from the face), 277-282 (Gotts used force on Holloway along with Renegar, Gonzalez, and Borba before Holloway was placed in handcuffs), 282-285 (Pahel's police report indicating that before Holloway was placed in handcuffs, | |

| | |
|---|---|
| Borba pulled out his firearm, assisted Renegar and Gonzalez in taking down Holloway to the ground, attempted to control Holloway's hands, and placed his knee on Jeremy's upper back).<br><br>Gotts Deposition (Exhibit 14), pp. 85-89 (Gotts identifies the officers involved in the use of force as Renegar, Gonzalez, Pahel, Borba, and himself), 89-96, 99-102 (Gotts testified that he used his body weight by pinning down Jeremy's upper back with his knee and tried to control Jeremy's left arm, that he witnessed Renegar on Jeremy's legs, that he witnessed Gonzalez and Pahel controlling Jeremy's arms, that he witnessed Borba using body weight on Jeremy's mid to upper torso and trying to control Jeremy's right arm), 97-98 (Gotts testified that he is 6 feet and he observed Jeremy being 5 foot eight inches, shorter than him, and of medium build); 102-03 (Gotts believes that Borba is taller and heavier than he), 105-107 (Gotts heard the taser deployed before using force on Jeremy). | |

| | |
|---|---|
| Pahel Deposition (Exhibit 12), pp. 139-161 (Pahel's account from when he participated in the use of force to when Jeremy is handcuffed), 139-40, 231-33 (Pahel testifying that he used force on Jeremy, including kneeling on his back).<br><br>Gunderson Deposition (Exhibit 6), pp. 39-41 (Gunderson testifying that multiple deputies, Gotts, Borba, Renegar, Gonzalez and Pahel were positioned and involved with Jeremy).<br><br>PVS Recording Renegar 4:58-5:08; Gotts 4:58-5:09; Pahel 5:02-5:06 (Exhibit 7). | |
| 44. He believes, there were more than 5 officers engaged in the use of force, because initially he saw 6 or 7 officers swarming around him. At some point he also saw an unidentified uniformed female who was standing back and watching.<br><br>Holloway Deposition (Exhibit 4), pp. 167-68 (Jeremy testifies seeing 6 or 7 officers, and all have their guns drawn); 341-42 (Jeremy testifies to a uniformed female | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 44. |

| | |
|---|---|
| witness); Holloway Declaration ¶ 12 (Exhibit 9); Plaintiff's Disputed Statement of Facts, #15-16 (Billinger's testimony that he was not at the scene during the use of force contradicts Jeremy's testimony and is inconsistent with the call history and video footage); Gunderson Deposition (Exhibit 6), pp. 24 (Gunderson testified that he witnessed the use of force incident), 37 (Gunderson saw Jeremy laying facedown with multiple deputies on top of him), 40-41 (Gunderson witnessed Gotts and Borba place their knees on Jeremy's back), 44-45 (Gunderson saw Jeremy bleeding as he was being lifted from the ground), 51 (although Gunderson did not see Jeremy being tased, he knew that Jeremy had been tased); Call Detail Info Report shows in addition to Renegar, Gonzalez, Pahel, Borba and Gotts, who admittedly were involved in the use of force, Billinger and Gunderson arrived at around the same time when Jeremy was on the ground by the other deputies, pp. 2, 7 (Exhibit 8). | |
| 45. The detail call log and the PVS recordings prove that at least by the time he | Disputed on the basis of immateriality and evidentiary |

| | |
|---|---|
| was tasered there were 7 officers at the scene, Defendants Renegar, Gonzalez who arrived with Pahel, Borba, Billinger, Gotts who arrived with Gunderson.<br><br>Holloway Deposition (Exhibit 4), pp. 167-68; Holloway Declaration ¶ 12 (Exhibit 9); PVS recordings Renegar 5:01-5:08; Gotts 5:03-5:09; Pahel 5:02-5:07; Billinger 5:02-5:08; Borba 05:03-05:07 (Exhibit 7); Call Detail Info Report, pp. 2, 7 (Exhibit 8). | objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 45. |
| 46. When the brutal beating ceased, blood was oozing from Jeremy's face and head.<br><br>Holloway Deposition (Exhibit 4), pp. 200, 211-13; Holloway Declaration ¶ 12-16 (Exhibit 9); Borba Deposition (Exhibit 11), pp. 170-71 (Borba witnessed blood flowing from Jeremy's forehead while still on the ground); Gotts Deposition (Exhibit 14), p. 182. | Disputed on the basis of evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 46. |
| 47. He could hear himself telling them, 'You kicked and kneed in my head. That is why I am bleeding. I did not do anything | Disputed on the basis of immateriality and evidentiary objections. |

| | |
|---|---|
| wrong! You guys got the wrong person!' Nobody was listening to him.<br><br>Holloway Deposition (Exhibit 4), pp. 181, 200, 214-15; Holloway Declaration ¶ 12-16 (Exhibit 9); PVS Recordings (Exhibit 7) Pahel 5:07-5:22; Gotts 5:05-5:10; Renegar 5:08-5:23 | **Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 47. |
| 48. He was then seated on the log, with multiple deputies, including Defendants Renegar, Gonzalez, Pahel, Borba, Billinger, Gunderson, Gotts surrounding him but not attending to his bleeding wounds.<br><br>Holloway Deposition (Exhibit 4), pp. 211-16; Holloway Declaration ¶ 18 (Exhibit 9); Gunderson Deposition (Exhibit 6), pp. 106-112 (Gunderson identifying himself and Borba at the scene and testifying that none of the officers did anything to stop Jeremy from bleeding), 178-203 (identifying seven officers, including Gunderson, Billinger, Gotts, Renegar, Gonzalez, Borba, and Pahel); Renegar Deposition (Exhibit 2), pp. 61-62, 254, 261; PVS Recordings (Exhibit 7) Pahel 5:07-5:22; Gotts 5:05-5:10; | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 48. |

| | |
|---|---|
| Renegar 5:08-5:23; Rawlings 5:17; 5:27-5:49; Gotts Deposition (Exhibit 14), pp. 104, 181-85, 233, 284-86. | |
| 49. More deputies kept arriving to the scene, including Sergeant Stewart Rawlings, who then actively engaged in a cover-up of his subordinates' actions by a shallow and biased use of force investigation at scene.<br><br>Plaintiff's Disputed Statement of Facts In Opposition to Defendant County of Orange's Motion for Summary Judgment/*Monell* ("Disputed Statement of Facts/*Monell*), pp. 8-19; Holloway Declaration ¶ 16-19 (Exhibit 9); Roger Clark Declaration, (Exhibit 18) pp. 30-36. PVS Recordings (Exhibit 7) Pahel 5:07-5:22; Gotts 5:05-5:10; Renegar 5:08-5:23; Rawlings 5:17; 5:27-5:52. | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 49. |
| 50. Deputies then began their active cover-up of their actions, by creating a false story line.<br><br>PVS Recordings (Exhibit 7) Renegar 5:11- | Disputed on the basis of evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. |

| | |
|---|---|
| 5:40; Renegar 5:40-5:55; Borba 5:07-5:34; Gotts 5:09-5:14. | 50. |
| 51. With knowledge they had no evidence against Jeremy for domestic dispute that originated the calls to the campground, Renegar falsely arrested him for felony resisting police, Cal. PC 69 and battery on a peace officer, 243(b) claiming himself, Gonzalez and Pahel as victims of the non-existent crimes.<br><br>Renegar Deposition (Exhibit 2), pp. 65-66, 108, 114; 273-276; Police Reports (Exhibit 15); Holloway Declaration ¶ 16-19, 21 (Exhibit 9); Roger Clark Declaration, (Exhibit 18) pp. 30-36 | Undisputed that Holloway was placed under arrest. Remainder is disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 51. |
| 52. Renegar then provided a false version of what happened to his supervisor Rawlings and in the police report that Jeremy was the one who placed a head restraint on him by attempting to grab his ballistic vest, when Jeremy neither had the opportunity nor ability to do it while compressed to the ground by Defendants | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 52. |

| | |
|---|---|
| Renegar, Gonzalez, Pahel, Borba and Gotts.<br><br>Holloway Deposition (Exhibit 4), pp. 351-53; Holloway Declaration ¶ 16 (Exhibit 9); Roger Clark Declaration (Exhibit 18); PVS Recordings (Exhibit 7), Renegar 5:19-5:22; 5:34-5:37 (Renegar and Borba, Pahel telling Rawlings how the incident happened); Renegar Deposition (Exhibit 2), pp. 218, 229-232, 273 (Renegar testifies how Jeremy placed his arm around his head and attempted to grab his ballistic vest), 314-16, 321-26, 328-343, 349-359 (Renegar testifies about the headlock, makes inconsistent statements about whether Jeremy attempted or actually grabbed his ballistic vest, and that Jeremy was only tased twice); Rawlings Deposition (Exhibit 10), pp. 328-335; Gunderson Deposition (Exhibit 6), pp. 50, 66-68 (testifying that he neither saw Jeremy grab any officer's vest nor place any officer in a headlock), 77-80 (Gunderson testifying that he did not see Jeremy rotate to his stomach and contradicting Renegar's police report that Jeremey rotated his body towards Renegar on the ground and attempted to | |

| | |
|---|---|
| grab Renegar's ballistic vest and wrap his arm around Renegar's head); Gonzalez Deposition (Exhibit 13), pp. 162, 249-50 (testifying that he did not see Jeremy place Renegar in a headlock). | |
| 53. None of the deputies involved in the use of force could corroborate that assertion by Renegar either in their reports or at their depositions. But all of them attempted to justify their own actions by falsely claiming Jeremy was actively resisting them, kicking at them on the ground, refusing to give up his arms and trying to get up.<br><br>Holloway Declaration ¶ 16 (Exhibit 9); Gonzalez Deposition (Exhibit 13), pp. 162-63 (Gonzalez testifying that he did not see Jeremy place Renegar in a headlock), 102, 109, 125-38, 140-41 (Gonzalez testifying that Jeremy was neither complying nor listening to commands and resisting), 300-01 (Gonzalez testifying that he did not see Jeremy choke or restrain Renegar).<br><br>Pahel Police Report (Exhibit 15)(Pahel did not mention Jeremy placing Renegar in a | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No.53. |

| | |
|---|---|
| headlock in his police report).<br>Pahel Deposition (Exhibit 12), pp. 139-41 (Pahel testifying that Holloway had both arms tucked under his waist area), 224-230 (testifying that Jeremy resisted and would not comply and stay on the ground).<br><br>Borba Deposition (Exhibit 11), pp. 191 (testifying that Jeremy never assaulted or used violence on an officer and never made any threats to an officer at any time and during the officers' use of force on Jeremy), 147-154 (testifying that Jeremy was physically resisting).<br><br>Gotts Deposition (Exhibit 14), pp. 98 (testifying that Jeremy was actively resisting when he arrived at the use of force scene), 249 (testifying that he did not see Jeremy place a chokehold on Renegar although admits it is what Renegar says happened).<br><br>Billinger Deposition (Exhibit 5), pp. 196-97, 311 (Billinger did not witness Jeremy allegedly placing Renegar in a chokehold). | |

| | |
|---|---|
| Gunderson Deposition (Exhibit 6), p. 67 (Gunderson testifying that he did not see Jeremy placing Renegar in a chokehold), 71-73 (Gunderson testifying as to seeing Jeremy trying to get up off the ground and tucking his arms). | |
| 54. In line with this code of silence, they failed to account for the prohibited head strikes that caused visible injuries and bleeding to Jeremy, denied they had smeared themselves with Jeremy's blood and claimed not to recall what other officers did during the use of force.<br><br>Holloway Declaration ¶ 14-15 (Exhibit 9); Roger Clark Declaration, (Exhibit 18) pp. 30-36<br>PVS Recordings (Exhibit 7) Renegar 5:11-5:40; Renegar 5:40-5:55; Borba 5:07-5:34; Gotts 5:09-5:14.<br><br>Renegar Deposition (Exhibit 2), pp. 156-57 (Renegar not remember Borba's actions during the use of force), 158 (Renegar not recalling Gotts' supplemental report where Gotts admits to using force), 165-68 | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 54. |

| | |
|---|---|
| (testifying that he cannot speak to what the other deputies did or did not do and not remembering whether any deputy commanded Jeremy to face away and put his hands behind his back), 219-221, 227 (Renegar stating that he cannot speak about Gonzalez's actions despite Renegar writing a police report that indicates Gonzalez's actions and testifying that he cannot recall the other deputies' actions as he performed an attempted armbar takedown on Jeremy), 240 (Renegar testifying that he is not sure how many officers were on top of Jeremy while Jeremy lay on the ground and stating that he cannot speak for the actions of the other officers because Jeremy purportedly placed him in a headlock), 242-44 (Renegar testifying that he does not know of anyone who put their knee on Jeremy while Jeremy lay on the ground), 246-48 (discussing how Renegar omitted from his police report Jeremy's head injuries), 253 (Renegar testifying that he did not see Jeremy's head impact the ground and that he does not know why Jeremy's head was bleeding), 253-58 (Renegar denying having any knowledge on why Jeremy was bleeding, | |

| | |
|---|---|
| denying kicking Jeremy in the head, and denying seeing anyone or any object hit Jeremy in the head), 264-69 (Renegar unable to explain how Jeremy received a black eye and testifying that he neither punched Jeremy in the face nor witnessed other deputies punch Jeremy), 346-47 (Renegar cannot explain Jeremy's right eye injury, Jeremy kicked in the head), 343-44 (Renegar cannot recall the other deputies' actions when the taser was removed from Jeremey's calf).<br><br>Gonzalez Deposition (Exhibit 13), pp. 144-46 (Gonzalez not remember details about Renegar punching Jeremy in the ribcage), 150-53 (Gonzalez testifying that he did not witness the taser deployment), 155-162 (denying knowledge of the deputy's identity, who placed his knee on Jeremy's back and denying knowledge of when the deputy removed the knee from Jeremy's back), 157-58 (Gonzalez not recalling which deputies raised Jeremy from his stomach to his feet and not knowing why Jeremy's face was bleeding), 159-61 (testifying as to not having knowledge | |

| | |
|---|---|
| about Borba and Gott's participation in the use of force), 214-15 (denying having any knowledge of how Jeremy injured his head and face), 294-95 (Gonzalez not recalling whether Borba or Gotts assisted him in grabbing Jeremy's right hand), 296 (testifying as to not knowing Renegar's body position), 298-99 (not knowing which deputy worked with Pahel in using force).<br><br>Billinger Deposition (Exhibit 5), p. 288 (testifying as to not having seen any use of force on Jeremy).<br><br>Gunderson Deposition (Exhibit 6), pp. 41 (Gunderson unable to recall Renegar's physical position in relation to Jeremy and not remembering Renegar using the taser on Jeremy), 42 (Gunderson not recalling the physical position of Gonzalez and Pahel in relation to Jeremy during the use of force), 123-25 (Gunderson testifying that the head is a sensitive area, that using impact weapons can be considered deadly force, and that a kick to the head can be deadly), 104 (Jeremy saying, "You guys kicked me in the head, that's why" and | |

| | |
|---|---|
| Gunderson denying seeing anyone kick Jeremy in the head), 150-54 (Gunderson testifying as to not seeing Billinger or Baek at all), 243-47 (Gunderson unable to explain the blood stains on Gotts' pants).<br><br>Gotts Deposition (Exhibit 14), pp. 87-88 (Gotts testifying that he and Gunderson arrived at the scene together, but he did not see Gunderson's actions during the use of force), 88-94 (Gotts unable to recall Jeremy's position on the ground and the actions of Renegar, Gonzalez, Pahel, and Borba during the use of force), 105-07 (Gotts testifying that he heard the Taser sound, but that he did not include the Taser use in his police report), 181-82 (Gotts denying having knowledge on who lifted Jeremy from the ground despite testifying as to having assisted in lifting Jeremy and escorting him to a log), 182-185 (Gotts testifying that he saw Jeremy's face bleeding, but showing no concern or knowledge of how Jeremy was injured), 186-88 (Gotts testifying that the scratches on his hands were not caused by the use of force despite testifying earlier that he | |

| | |
|---|---|
| received scratches from the use of force), 233-34 (Gotts unable to explain Jeremy's bleeding face and bleeding head), 256 (Gotts denies discussing with Borba about the blood on Borba's hands), 256-283 (Gotts unable to explain why he said that he has blood all over himself and providing inconsistent statements as to where the blood came from).<br><br>Borba Deposition (Exhibit 11), pp. 141-45 (Borba testifying that he does not recall what physical positions the other deputies are in while using force on Holloway on the ground, but remembering other details), 149-53 (Borba testifying as to not recalling Renegar and Gonzalez's actions during the use of force despite their close proximity to Borba, and to not recalling the identify of other deputies involved in the use of force), 159-61 (Borba not recalling who placed handcuffs of Jeremy, whether he handcuffed Jeremy, or whether he offered his hand cuffs to another deputy), 161-62 (Borba unable to recall the actions of Gonzalez, Renegar, Pahel, or Gotts after Jeremy is handcuffed and after Borba used | |

| | |
|---|---|
| his radio), 165-66 (Borba unable to recall multiple questions about what happened to Jeremy after being handcuffed and unable to recall Renegar's actions immediately after using the Taser on Jeremy), 171 (Borba unable to recall whether Jeremy complained about his pain or injury), 190-91 (Borba testifying as to having no knowledge about the blows to the head Jeremy endured and Jeremy's forehead injury), 200-01 (Borba explaining that he was looking at his palms because he had numerous cuts to his hands from a separate incident and that he was concerned about Jeremy's blood contaminating him).<br><br>Pahel Deposition (Exhibit 12), pp. 153 (Pahel claiming not to see Gonzalez during the use of force), 171-73 (Pahel testifying that he heard Jeremy complaining about getting kicked in the head and that he did not see the kick), 141 (Pahel testifying as to not knowing what physical positions the other officers were in while they used force on Holloway on the ground), 145-149 (Pahel testifying hearing an officer say, "Taser, Taser, Taser," yet not knowing who | |

| | |
|---|---|
| used the Taser on Holloway despite only two other deputies using force on Holloway at this time), 148 (Pahel testifying that he cannot speak for the other officers about what commands they gave Holloway as the officers used force on him on the ground), 152-53, 156-57 (Pahel providing conflicting testimony that he did not see how Gonzalez participated in the use of force despite providing details earlier and later in the testimony about Gonzalez's actions), 157 (Pahel testifying that he does not know whether Renegar or Gonzalez applied force on Holloway's legs, but later identifying Gonzalez as the deputy applying force between Holloway's waist and armpit area), 161, 203-204 (Pahel testifying to knowing at least one other deputy that assisted in handcuffing Jeremy, but to not knowing the deputy's identity and to not being asked by Rawlings to identify the deputy after the use of force).<br><br>Billinger Deposition (Exhibit 5), p. 288 (testifying as to not having seen any use of force on Jeremy). | |

| | |
|---|---|
| 55. In line with these false stories, Defendants Renegar, Gonzalez, Pahel, Borba and Gotts then wrote false police reports and a false probable cause declaration in violation of Cal Penal Code Section 118.1.<br><br>Police Reports/Probable Cause Declaration (Exhibit 15); Holloway Declaration ¶ 16, 21 (Exhibit 9). Roger Clark Declaration, (Exhibit 18) pp. 30-36<br><br>Renegar Deposition (Exhibit 2), pp. 65-66, 271, 274-82 (Jeremy was arrested and charged with a felony for allegedly violating Penal Code §§ 69 and 243. Renegar, in his police report, included Gonzalez, Pahel and himself as the victims during the use of force, even though Renegar testified as to not knowing what happened to Gonzalez and Pahel during the use of force and Renegar could not explain how Gonzalez and Pahel are victims), 65-68 (Renegar wrote a probable cause declaration that did not include the knives and other weapons Renegar included in his police report as among the reasons he | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 55. |

| | |
|---|---|
| pointed a gun at Jeremy and detained him), 70-75, 160-61 (Renegar's police report indicated that "Multiple knives scattered throughout the campsite within close range to Jeremy" in contradiction with photos showing no knives and weapons scattered around the campsite), 224-25, 232, 319-20, 355-58 (Renegar wrote in his police report that Jeremy wrapped his arms around the back of Renegar's head, which is not corroborated by any of the other deputies' account of the use of force incident, *see* Fact #52-53 above), 243-49, 256-63 (testimony about how Renegar's police report does not include Jeremy's head injury and indicates only an "apparent minor injury" even though Jeremy's head was bleeding profusely), 229-33, 348-55 (Renegar wrote in his report that "Jeremy rotated his body towards me on the ground and attempted to grab ahold of my ballistic vest" and offered conflicting testimony on how Jeremy was able to grab his vest), 319-20, 355-58 (Renegar's testimony that Jeremy placed him in a headlock is not corroborated by the other deputies' reports), 348-49, 351-55 (Renegar offered | |

| | |
|---|---|
| conflicting testimony on how Jeremy grabbed his vest), 359-65 (inconsistencies between Renegar's probable cause declaration and Renegar's testimony); 256-63 (testimony about how Renegar's police report does not include Jeremy's head injury and indicates only an "apparent minor injury" even though Jeremy's head was bleeding profusely).<br><br>Gotts Deposition (Exhibit 14), pp. 105-116 (Gotts did not mention the taser in his police report despite knowing that it was deployed before he participated in the use of force, and omitted Gonzalez, Pahel, and Borba from his report despite testifying as to his knowledge of their presence and participation in the use of force), 128-142 (Gotts provides inconsistent testimony as to whether he saw the taser deployed), 142-53 (discussions about the code of silence and how Gotts' police report omitted the use of force by the other deputies and the use of the taser), 168-81 (showing inconsistencies between Gotts' police report and testimony and Renegar's police report), 192, 233-36, 244-51 (none of the police reports | |

| | |
|---|---|
| mentioned a head strike and Jeremy's bleeding head injury).<br><br>Borba Deposition (Exhibit 11), pp. 167-68 (Borba testifies that there may have been a fourth officer engaged in use of force but could not identify whom), 272-76 (Borba omitted the contact use of the taser on Jeremy's buttock area), 277-81 (showing inconsistencies between Borba's testimony and Gotts' police report as to using force on Jeremy's left arm), 282-88 (Gotts never mentioned Pahel in his report despite Pahel's involvement in the use of force incident).<br><br>Gonzalez Deposition (Exhibit 13), pp. 284 (Gonzalez wrote in his report, "Jeremy was walking around O'Neill Park campground harassing campers" in contradiction with Renegar's and witness testimony, *see* Plaintiff's Disputed Statement of Facts #10-14).<br>Police Reports (Exhibit 15)(Gonzalez wrote in his report that when he pointed his taser and ordered Jeremy, 'Get on the ground or you will be tased,' Jeremy replied, 'Do it.' | |

| | |
|---|---|
| He corroborated Renegar in his claim that Jeremy attempted to grab Renegar's ballistic vest and confirmed Jeremy was resisting while on the ground, necessitating his and other deputies' involvement to succumb him);<br>Gonzalez Deposition (Exhibit 13), p. 116-118, 126-128, 281-301.<br><br>Pahel Deposition (Exhibit 12), pp. 218-223 (Pahel wrote in his police report that "[t]here were multiple large-bladed knives on the ground within a reach of [Jeremy]. Jeremy had both of his hands in his pockets and appeared to be agitated"), 223-24 (Pahel wrote in his police report that "Renegar attempted to take Jeremy to the ground using an arm bar takedown on Jeremy's left arm. As Jeremy was going towards the ground, he began to stand back up."), 227 (Pahel wrote in his police report, "Renegar fell to the ground with Jeremy and was struggling to keep Jeremy from getting back to his feet"), 229 (Pahel wrote in his police report that he "took Jeremy to the ground with the assistance of Renegar and Gonzalez in contradiction with his | |

| | |
|---|---|
| earlier testimony that Jeremy fell to the ground with Renegar and Gonzalez's testimony that only he and Renegar took Jeremy to the ground, *see* Pahel Deposition, p. 227, Gonzalez Deposition, pp. 123-131), 231 (Pahel writing in his police report, "I took Jeremy to the ground with the assistance of Renegar and Gonzalez. Once on the ground, I attempted to gain control of Jeremy's hands, but he was tucking them underneath his body near his front waistband"), 233-35 (Pahel wrote "Jeremy continued to struggle the entire time. I finally gained control of Jeremy's hands and placed them into handcuffs"). | |
| 56. Fabrication of reports is not new to Renegar, who has been subject of a criminal investigation most recently for falsifying official papers.<br><br>Rawlings Deposition (Exhibit 10), pp. 41-43; Renegar Deposition (Exhibit 2), pp. 31-34; *See* Court Docket for in-camera records related to Renegar criminal investigation. Doc. 41, 47, 49. | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 56. |

| | |
|---|---|
| 57. Renegar, Gonzalez, Pahel, Borba, Gotts, Gunderson, Billinger falsely claimed that the reporting parties identified Jeremy's campsite as the source of trouble, that Jeremy had multiple knives strewn around his campsite, necessitating the brutal attack and beating for 'officer safety.'<br><br>Police Reports (Exhibit 15); Holloway Declaration ¶ 6-9, 17 (Exhibit 9).<br><u>The Officer's False Claims That Jeremy's Campsite Was the Source of Trouble – First Interaction With Jeremy</u><br><br>Renegar Decl., ¶ 8 (Renegar declaring that he made contact with Jeremy at campsite 65 and found Jeremy's denials of domestic violence unconvincing in light of the multiple third party reports that implicated Mr. Holloway)(*see* Defendants' Exhibits).<br><br>Renegar Deposition (Exhibit 2), pp. 108, 114 (Renegar testifying that the allegations of a domestic disturbance incident were unfounded and that there was no female with Holloway, 108 (Holloway was not | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 57. |

| | |
|---|---|
| cited for any violations when the officers left Holloway's campsite for the first time), 111 (the officers determined that Holloway did not commit any crimes before the officers left after the first interaction with Holloway), 51-53 (Renegar testifying that Fuerbach told him that the domestic disturbance was coming from Holloway's campsite 65,) 110 (Renegar later testified that he does not recall whether Fuerbach told him the specific campsite number or only the direction where the alleged domestic disturbance was coming from).<br><br>Fuerbach Deposition (Exhibit 1), pp. 19-20 (Fuerbach only saw the tent moving and perceived as if people were moving in the tent. He did not come out of his tent to see who was involved. He could not see which campsite it was coming from and only provided general information and potential location about what he and his wife heard to the dispatch).<br><br>Renegar Decl., ¶ 6 and 7 (Renegar declaring that witness Joshua Gomez | |

| | |
|---|---|
| advised him that he heard the sounds of fighting and arguing coming from Holloway's campsite (65))(*see* Defendants' Exhibits).<br><br>Gomez Deposition (Exhibit 3), pp. 28-34, 38-40 (Gomez testifying that he did not advise Deputy Renegar that he heard sounds specifically coming from Holloway's campsite 65. Rather, Gomez testified that he could not see anything or anyone, but that he showed the police officers where he believed the sounds were coming from by pointing to a general south-southeast direction with multiple campsites), 33-34 (Gonzalez testified that a person pointed the deputies towards Jeremy's campsite 65).<br><br>Borba Deposition (Exhibit 11), pp. 64-67 (Borba testifying that they spoke with subject at campsite 63 prior to contacting Jeremy the first time, who was adamant the disturbance had been at Campsite 65).<br><br>Billinger Deposition (Exhibit 5), pp. 22-23, 27, 29-30 (Billinger testifying that he | |

| | |
|---|---|
| learned over broadcast the source of the reported domestic violence was Jeremy's campsite 65), 41-42 (Billinger testifying that he was "looking for campsite 65 or any of the numbers associated to that location.")<br><br>Gunderson Deposition (Exhibit 6), pp. 35-36 (Gunderson testifying that he did not know the nature of the first call, but the second call concerned the same subject, who was "trying to find the person who called the police on him from the previous call").<br><br>Gotts Deposition (Exhibit 14), pp. 119-120 (Gotts connecting the subject of the first dispatch call to the second dispatch call), 121 (Gotts connecting the little girl screaming to Jeremy's campsite).<br><br><u>The Officer's False Claims That Jeremy's Campsite Was the Source of Trouble – Second Interaction With Jeremy</u><br><br>Renegar Decl., ¶ 10 (Renegar declared that a reporting party advised that a male subject | |

| | |
|---|---|
| was walking from campsite to campsite looking for the individual(s) who had called the police)(*see* Defendants' Exhibits).<br><br>Renegar Deposition (Exhibit 2), pp. 148 (Renegar testified that he *assumed* that the male subject was Holloway based on the first contact), 148-152 (Renegar testifying that he could not explain why his assumptions were valid given that the officers had not found a trace of a female at Holloway's campsite within half an hour during their first contact with Holloway).<br><br>Gonzalez Deposition (Exhibit 13), pp. 68-69, 75-76, 82-84 (Gonzalez testifying on the second call they came looking for Jeremy again, even though he did not see Renegar make contact with Reporting Party).<br><br>Pahel Deposition (Exhibit 12), pp. 107-109 (Pahel testifying about the second call regarding how he was following Renegar's direction to focus on Campsite 65 even though he could not tell whether Renegar made contact with the Reporting | |

| | |
|---|---|
| Party).<br><br>Gunderson Deposition (Exhibit 6), pp. 35 (Gunderson testifying that an officer broadcasted over the radio that the same person was the subject of the first and second dispatch call), 35-37 (Gunderson testifying as to his belief that Borba knew where the disturbance was occurring and which campsite to go to on the second dispatch call based on the first dispatch call, and that Gunderson and Gotts followed Borba to Jeremy's campsite 65), 54 (Gunderson agreeing that Jeremy was being detained for causing a domestic disturbance and other reasons), 176-77 (Gunderson testifying that the first dispatch call brought the officers to Jeremy's campsite 65 during the second dispatch call).<br><br>Gotts Deposition (Exhibit 14), pp. 119-23 (Gotts testifying that the second dispatch call was the "second response for a subject who was creating a disturbance at the campground, looking for, I believe, a person who had called the police on him | |

| | |
|---|---|
| earlier.”).<br><br>Billinger Deposition (Exhibit 5), pp. 109-110 (Billinger testifying that he heard over radio broadcast that a child was screaming, but he did not make any effort to investigate the identity of the child or the reporting party or witnesses), 219 (Billinger testifying that Pahel was unsuccessful in finding the child reported to be screaming).<br><br><u>The Multiple Knives Around the Campsite As Pretense For the Brutal Attack and Beating</u><br><br>Renegar Deposition (Exhibit 2), pp. 67-68, 159 (Renegar testifying that the knives scattered around the campsite was among the reasons for detaining Jeremy at gunpoint).<br><br>Gonzalez Deposition (Exhibit 13), pp. 90-91 (testifying that he took his firearm out because of the knives, ax, and machete, among other reasons), 68-72 (testifying about a broadcast communicating to all | |

| | |
|---|---|
| units that Jeremy's campsite had knives), 281-82 (discussing Gonzalez's report, which mentions several knives, hammers, machetes, and an ax at Jeremy's campsite).<br><br>Borba Deposition (Exhibit 11), pp. 71-73 (testifying that he noticed officer safety issues and signaled to the other officers that there were multiple weapons within very close proximity to Jeremy spread throughout the campsite), 282-83 (discussing Pahel's police report which indicated that multiple large-bladed knives on the ground were within reach and Gonzalez testifying that he saw the knives).<br><br>Pahel Deposition (Exhibit 12), pp. 191-192; 218-219 (discussing the knives strewn around the campsite); 236-240 (discussing what he wrote in his report regarding reporting party Gomez' statements).<br><br>Gunderson Deposition (Exhibit 6), pp. 33-37 (Gunderson testifying that he heard over the radio that Jeremy had multiple weapons at his campsite, including possibly a gun). | |

| | |
|---|---|
| 58. When Renegar arrived to the campground the first time and spoke with the reporting party Joshua Gomez at 67, Gomez did not tell Renegar that Jeremy was the source, but that the noise was coming from the general direction of Jeremy's campsite 65. Gomez indicated he heard the noise coming from across his campsite, which was Campsite 66, not Campsite 65 where Jeremy was. This was the same direction that Jeremy gave to Renegar at the initial contact, but Renegar failed to follow-up and investigate Campsite 66.<br><br>Holloway Declaration ¶ 5-6 (Exhibit 9); Google Map Overview (Exhibit 16); Gomez Deposition (Exhibit 3), pp. 28-34, 38-40, (Gomez did not advise Deputy Renegar that he heard sounds specifically coming from Holloway's campsite 65. Rather, Gomez testified that he could not see anything or anyone, but that he showed the police officers where he believed the sounds were coming from by pointing to a general south-southeast direction with | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 58. |

| | |
|---|---|
| multiple campsites.)<br><br>Holloway Deposition (Exhibit 4), pp. 153-57 (Deputy Renegar failed to investigate further after he contacted Holloway the first time. Holloway had informed the officers that it was the people next to his campsite at Campsite 66 who were fighting, yet Deputy Renegar did not follow up on this information.) Renegar Deposition (Exhibit 2), pp. 123-128 (The officers also did not ask further questions from the informant and did not investigate the other campsites in close proximity to Holloway's.) | |
| 59. The reality is that the campers had never seen Jeremy with a female on his campsite, and never provided a description of the male, and had made 911 calls from what they could hear from inside their tents at nighttime. Prior to circling Holloway with guns drawn, Renegar and deputies did not speak with the reporting parties the second time they arrived to confirm where the noise was coming this time.<br><br>Fuerbach Deposition (Exhibit 1), pp. 17-22; | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 59. |

| | |
|---|---|
| 40-41; Gomez Deposition (Exhibit 3), pp. 28-34, 38-40, 60, 54-56; Renegar Deposition (Exhibit 2), p. 110; Google Map Overview of the Campground (Exhibit 16); PVS Recording Renegar 4:15-4:17; 5:25-5:30; 5:34-5:36; 5:44-5:49; Pahel 5:30-5:34 (Exhibit 7). | |
| 60. There were multiple campsites tightly situated next to one another within 20 feet, and the deputies simply failed to find the actual source of the disturbance.<br><br>Holloway Deposition (Exhibit 4), pp. 153-157 Google Map Overview (Exhibit 16); PVS Recording (Exhibit 7) Renegar 4:15-4:17; 5:25-5:30; 5:34-5:36; 5:44-5:49; Pahel 5:30-5:34 (Exhibit 7). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 60. |
| 61. No knives were strewn around Jeremy's campsite within his arms reach, but were in his backpack in the tent, later removed by deputies and placed on the picnic table at the time they booked this into evidence.<br><br>Holloway Deposition (Exhibit 4), pp. 345- | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 61. |

| | |
|---|---|
| 347, 348-351; 354; Holloway Declaration ¶ 6, 17 (Exhibit 9); PVS Recording (Exhibit 7) Renegar 5:14, Pahel 5:14 (deputies removing knives from inside the tent and arranging them on the picnic table). | |
| 62. After a five minute accusatory interview with Sergeant Rawlings, when Jeremy was accused of not getting down to the ground with alacrity in response to the deputies' demands, Jeremy was treated by the paramedics at scene who arrived to treat his bleeding wounds, and was transported to the Mission Hospital for further medical treatment.<br><br>Rawlings Deposition (Exhibit 10), pp. 50-51; Holloway Deposition (Exhibit 4), pp. 233-35, 236-37; Holloway Declaration ¶ 18-20 (Exhibit 9); PVS Recording (Exhibit 7) Rawlings 5:27-5:34. | Undisputed that Holloway was treated by paramedics. Remainder is disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 62. |
| 63. Jeremy was treated for a number of injuries at the Mission Hospital, including head contusion, rib contusion, and eye laceration. | Undisputed that Holloway was treated at Mission Hospital. Remainder is disputed on the basis of immateriality and evidentiary objections. |

| | |
|---|---|
| Holloway Deposition (Exhibit 4), pp. 237, 244-45, 313-323; Holloway Declaration ¶ 20 (Exhibit 9); PVS Recording (Exhibit 7) Rawlings 5:27-5:34. | **Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 63. |
| 64. Thereafter, Jeremy was jailed in the Santa Ana jail, and booked on false allegations of felony Cal PC 69 Resisting peace officer and Cal PC 243 (b) Battery on peace officer.<br><br>Holloway Deposition (Exhibit 4), pp. 245-46; Holloway Declaration ¶ 21 (Exhibit 9); Renegar Deposition (Exhibit 2), p. 65; Rawlings Deposition (Exhibit 10), pp. 56-57. | Undisputed that Holloway was jailed in the Santa Ana Jail.<br>Undisputed that Holloway was booked for California Penal Code 69 "Resisting Arrest" and California Penal Code 243(b) "Battery on a Peace Officer."<br>Remainder is Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 64. |
| 65. The District Attorney's Office did not prosecute him for these charges but only after Jeremy paid for bail and lawyer to | Undisputed that the Orange County District Attorney elected to not prosecute Holloway. Remainder is |

| | |
|---|---|
| defend himself in criminal court.<br><br>Holloway Deposition (Exhibit 4), pp. 248-49; Holloway Declaration ¶ 21 (Exhibit 9). | disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 65. |
| 66. Jeremy continued his treatment at the Veteran's Hospital for his ongoing injuries.<br><br>Holloway Deposition (Exhibit 4), pp. 52, 307; Holloway Declaration ¶ 26 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 66. |
| 67. He has sustained a number of neurological and orthopedic injuries, including vision loss, continued headaches, blackouts, spinal/back and neck pain.<br><br>Holloway Deposition (Exhibit 4), pp. 307-310, 313-324; Holloway Declaration ¶ 26 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** <u>See</u>, Defts' Objections to Pltf Evidence No. 67. |
| 68. His injuries including emotional distress he suffered as a result have affected his | Disputed on the basis of immateriality and evidentiary |

| | |
|---|---|
| ability to work and maintain a stable work history as a copy machine/technical repairman.<br><br>Holloway Deposition (Exhibit 4), pp. 35-38, 40-41, 310-311; 312-313, 324-26; Holloway Declaration ¶ 26 (Exhibit 9). | objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 68. |
| 69. After another incident in May of 2018 where he was harassed by the Sheriff's deputies at the same campground, Jeremy vowed to never return to the O'Neill Regional Park. As a long-term resident of the Orange County, he felt unsafe, left for Pittsburgh, Pennsylvania where he continued treatment for his injuries at the VA's.<br><br>Holloway Deposition (Exhibit 4), pp. 26-27, 33, 255-57, 307-313; Holloway Declaration ¶ 25 (Exhibit 9). | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 69. |
| 70. Jeremy filed a citizen complaint with the Department and it went to the same Sergeant who had approved of the use of force by these Defendants, Sergeant | Undisputed that Holloway filed a complaint. Remainder is disputed on the basis of immateriality and evidentiary objections. |

| | |
|---|---|
| Stewart Rawlings.<br><br>Rawlings Deposition (Exhibit 10), pp. 25-29, 72-77, 138; Holloway Declaration ¶ 24 (Exhibit 9). | **Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 70. |
| 71. Sergeant Stewart Rawlings who had arrived at scene of the incident, and had approved of the use of force by covering up for his employees, did nothing to investigate the citizen complaint, did not interview Jeremy, did not review his medical injuries, did not do any separate interviews of the Deputies for the incident in violation of the established procedures, misrepresented his interview with reporting party Gomez, claiming Gomez told him he identified Jeremy as the one involved in the domestic dispute when that never happened and could not have happened because Gomez said that he had not seen the couple fighting.<br><br>Plaintiff's Disputed Statement of Facts /*Monell*, pp. 3-19; Holloway Declaration ¶ 24 (Exhibit 9); Roger Clark Declaration, (Exhibit 18) pp. 30-36; Gomez Deposition | Undisputed that Sergeant Stewart Rawlings arrived on the scene. Remainder is Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 71. |

| | |
|---|---|
| (Exhibit 3), pp. 28-34, 38-40, 54-56, 60, 126-128. | |
| 72. The Departmental heads then approved the citizen complaint without any further review or discipline of the involved officers thereby ratifying their conduct.<br><br>Rawlings Deposition (Exhibit 10), pp. 70-78; Plaintiff's Disputed Statement of Facts/*Monell*, pp 3-19. | Disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 72. |
| 73. Deputy Renegar with a long history of use of force was not disciplined for his conduct culminating in deprivation of Jeremy's rights. His activities though brought him under a spotlight of the OC District Attorney's Office prompting a criminal investigation into his professional dishonesty for fabricating reports.<br><br>Renegar Deposition (Exhibit 2), p. 31; Rawlings Deposition (Exhibit 10), pp. 41-43; RFA Responses by Renegar (Exhibit 17). *See* Court Docket for in-camera records related to Renegar criminal | Undisputed that Deputy Renegar was not disciplined for his use of force on Holloway. Remainder is disputed on the basis of immateriality and evidentiary objections.<br><br>**Evidentiary Objection(s).** See, Defts' Objections to Pltf Evidence No. 73. |

| | |
|---|---|
| investigation. Doc. 41, 47, 49 | |

DATED: December 7, 2020

Respectfully submitted,

**LYNBERG & WATKINS**

By: */s/ Tamara M. Heathcote*

**S. FRANK HARRELL**
**TAMARA HEATHCOTE**
Attorneys for Defendants
County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts and Deputy Justin Gunderson