S. Frank Harrell – SBN 133437
sharrell@lynberg.com
Tamara M. Heathcote – SBN 193312
theathcote@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants COUNTY OF ORANGE,
DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ,
DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER,
DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and
DEPUTY JUSTIN GUNDERSON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE, DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY BRANDON BILLINGER, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, DEPUTY JUSTIN GUNDERSON, individually and as a peace officer, and DOES 1-10.<br><br>Defendants. | CASE NO. 8:19-cv-01514-DOC-DFM<br><br>*Assigned for All Purposes to:*<br>*Hon. David O. Carter, Courtroom 9D*<br><br>**DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F. MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO DISMISS FOR VIOLATION OF COURT ORDERS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF TAMARA M. HEATHCOTE; EXHIBITS**<br><br>*Trial Date: May 25, 2021*<br>*Second Amended Complaint filed: December 10, 2019* |

**1**

1   **TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF**
2   **RECORD:**
3       On January 11, 2021, Magistrate Judge Douglas McCormick's Order re:
4   Defendants' Motion for Sanctions (hereinafter "Order") was filed. (See, Dkt. 144, Ex.
5   "A"). This Order addresses Defendants' Motion to Dismiss for Violation of Court
6   Order, Or for Alternative Relief. (See, Dkt. 116). In the Order, the Magistrate Judge
7   recommended "to the District Judge that Defendants' motion for dismissal be
8   DENIED." (Dkt. 144, p. 2).
9       Magistrate Judge McCormick further ruled that "[o]bjections to this order are
10  governed by 28 U.S.C. § 636. The recommendation that Defendants' motion for
11  involuntary dismissal be denied is dipositive and objections shall be reviewed de novo
12  by the district judge. See id, § 636(b)(1)(C). . . . Objections to this order shall be filed
13  within fourteen (14) days of the date of this order." (Dkt. 144, p. 31).
14      This objection to the Order addresses one narrow aspect of Magistrate Judge
15  McCormick's recommendation – i.e., the recommendation that Defendants' motion
16  for involuntary dismissal be denied. (Dkt. 144, p. 2). Defendants' objection is based
17  on this Notice, Defendants' underlying Motion (Dkt. 116), the attached Memorandum
18  of Points and Authorities, the Declaration of Tamara M. Heathcote and the Exhibits
19  thereto.
20  DATED:                                    Respectfully submitted,
                                              **LYNBERG & WATKINS**
21
22                          By: _____
23                                            **S. FRANK HARRELL**
                                              **TAMARA HEATHCOTE**
24                                            Attorneys for Defendants
                                              County of Orange, Deputy Chad Renegar,
25                                            Deputy Joel Gonzalez, Deputy Kevin
                                              Pahel, Deputy Brandon Billinger, Deputy
26                                            Mark Borba, Deputy Jameson Gotts and
                                              Deputy Justin Gunderson
27
28
                                         **2**

# **TABLE OF CONTENTS**

I.      BACKGROUND AND PROCEDURAL HISTORY ........................................ 1

II.     STANDARD OF REVIEW ...................................................................... 6

III.    THE COURT SHOULD ORDER TERMINATING SANCTIONS BASED ON THE UNDISPUTED FACTS OF THIS CASE ....................................................................................... 6

IV.     CONCLUSION ............................................................................... 12

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F. MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO DISMISS FOR VIOLATION OF COURT ORDER

# <u>TABLE OF AUTHORITIES</u>

**Pages**

<u>Cases</u>

<u>Garden City Boxing Club, Inc. v. Izarraraz,</u>
  2008 WL 5351681 (D. Nev. 2008) .......................................................................9

<u>Henderson v. Duncan,</u>
  779 F.2d 1421 (9th Cir. 1986) ............................................................................8

<u>Illinois v. Allen,</u>
  397 U.S. 337 (1970)..................................................................................10, 11

<u>In re Barrera,</u>
  2016 WL 3004429 (Bankr. C.D. Cal. 2016) .....................................................11

<u>In re Exxon Valdez,</u>
  102 F.3d 429 (9th Cir. 1996) ............................................................................12

<u>In re Phenylpropanolamine Prod. Liab. Litig.,</u>
  460 F.3d 1217 (9th Cir. 2006) ............................................................................8

<u>Malone v. U.S. Postal Serv.,</u>
  833 F.2d 128 (9th Cir. 1987) ..........................................................................8, 9

<u>Valley Engineers Inc. v. Electric Engineering Co.,</u>
  158 F.3d 1051 (9th Cir.1998) .............................................................................7

<u>Wachovia Bank, N.A. v. Chaparral Contracting, Inc.,</u>
  2010 WL 2667204 (D. Nev. 2010) ......................................................................8

<u>Woods v. Los Angeles Cty. Sheriff's Dep't,</u>
  2009 WL 5090932 (C.D. Cal. 2009) .................................................................8, 9

<u>Young v. United States ex rel. Vuitton et Fils S.A.,</u>
  481 U.S. 787 (1987).........................................................................................10

<u>Statutes</u>

28 <u>U.S.C.</u> § 636...............................................................................................2, 6

**1**

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F. MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO DISMISS FOR VIOLATION OF COURT ORDER

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   BACKGROUND AND PROCEDURAL HISTORY

On January 21, 2018, the Orange County Sheriff's Department received middle - of – the - night "911" calls regarding a man attacking a woman at a County - owned campground. (See, e.g., Fuerbach Declaration, ¶¶ 6-11, Ex. "B").  Law enforcement responded to the scene and encountered one Jeremy Holloway – who had just been released on probation following his latest conviction on felony charges.

Holloway unconvincingly denied the campers' allegations against him. But as Holloway's female victim had fled the scene, no arrest was made.

Holloway thereafter pressed his luck by threatening the campground witnesses against him as soon as officers departed the scene. When deputies returned in response to frightened campers' latest "911" calls, Holloway was subdued and arrested. After warrants subsequently issued for Holloway's arrest, he responded by: (1) filing this pestiferous litigation, and (2) by fleeing California for the East Coast.

Plaintiff's operative Complaint is frankly difficult to read or understand. In an effort to unearth and verify whatever facts and evidence Holloway contends support his many claims, the Orange County Defendants have attempted to conduct discovery in this case. Unfortunately, Plaintiff's counsel, Narine Mkrtchyan, has fought what should be non-controversial discovery requests at every opportunity – often in quite strident terms.

After its review of one pertinent transcript, the Magistrate Judge rightly directed all counsel in this litigation, including Ms. Mkrtchyan, to conduct themselves at all future depositions as though they were in a courtroom. (Order, Dkt. No. 73, p. 3, n. 3, Ex. "C")(going forward, "all counsel should comport themselves in the deposition the same as if they were in the courtroom.  The Advisory Committee notes to Rule 30 make that expectation explicit: '[i]n general, counsel should not engage in conduct during a deposition that would not be allowed in the presence of a judicial officer.'");

**1**

1  (id., pp. 2 and 4)(going forward, "I expect, as I told counsel during the July 9

2  telephone conference, that all counsel should comport themselves in the deposition the

3  same as if they were in the courtroom. . ..I trust that my remarks on July 9 and this

4  subsequent ruling will cause [future] depositions to be conducted without the rancor

5  that was exhibited on July 7 [at a previous deposition].")

6        The Court's oral ruling and its written civility order should have frankly been

7  the end of the matter, however, Ms. Mkrtchyan has continued to act as though that

8  order was never entered.  Defendants filed their Motion for Dismissal to address not

9  only misconduct that was directed at Defendants and defense counsel but also

10 misconduct directed toward the Magistrate Judge, including the following (i)

11 Plaintiff's counsel Narine Mkrtchyan's repeated violation of the Magistrate Judge's

12 verbal and written good conduct orders, requiring all counsel to conduct themselves at

13 Plaintiff's deposition as though they were in a courtroom,   (ii) Ms. Mkrtchyan's

14 violation of the Court's directive to not hang up the phone during the parties'

15 September 2, 2020 telephonic discovery hearing, (iii) Ms. Mkrtchyan's September 2,

16 2020 unfounded accusation of "bias" and "sexism" against the Court (before she hung

17 up), and (iv) her previously videotaped instances of deposition misconduct occurring

18 on July 7, 2020 (the only party defendant deposition taken by Plaintiff) and again on

19 August 14, 2020 (during Plaintiff's deposition).

20       Ms. Mkrtchyan has even extended her hostility to her interactions with

21 Magistrate Judge McCormick. As the transcript of proceedings on September 2, 2020

22 reflects:

23            MS. MKRTCHYAN:  Well, you know, I would object to that
            [ruling] because I think that that is --
24
            THE COURT:  You can take it with --
25
            MS. MKRTCHYAN:  -- exactly --
26
            THE COURT:  -- Judge Carter by --
27
            MS. MKRTCHYAN:  -- [inaudible] --
28
                                    2

1    THE COURT:  -- filing a motion for review.

2    MS. MKRTCHYAN:  Well, you know, Your Honor, I -- I will take it up with the Judge Carter because I think that --

3

4    THE COURT:  Ms. --

5    MS. MKRTCHYAN:  -- **you are bias against plaintiff and you're bias towards me. In fact, from the very beginning of this case that I would like to say that, you know, I don't appreciate impartiality.** Judiciary is a very important fact especially inside of court --

6

7    THE COURT:  You may . . .

8    MS. MKRTCHYAN:  -- [inaudible] --

9    THE COURT:  -- you may put that in a --

10   MS. MKRTCHYAN:  -- [inaudible] --

11   THE COURT:  -- **Ms. Mkrtchyan, please stop talking.**

12   MS. MKRTCHYAN:  [inaudible] --

13   THE COURT:  The fact -- you -- you may put that in your --

14   MS. MKRTCHYAN:  -- [inaudible] --

15   THE COURT:  -- filing to Judge --

16   MS. MKRTCHYAN:  -- you're going to interrupt me? If you're going to interrupt me, Your Honor, then this proceeding is totally out of place.

17

18   THE COURT:  Okay.

19   MS. MKRTCHYAN:  Now you can make --

20   THE COURT:  Ms. --

21   MS. MKRTCHYAN:  -- your ruling --

22   THE COURT:  -- Mkrtchyan --

23   MS. MKRTCHYAN:  -- I don't want to be --

24   THE COURT:  -- Ms. Mkrtchyan --

25   MS. MKRTCHYAN:  -- part of this when I'm being interrupted. As an attorney, I have the right to speak and represent my client.

26

27   And if you're not going to let me speak, then I would like to be just -- get -- get off this, uh, hearing because it's not appreciated that

28

---

3

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F. MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO DISMISS FOR VIOLATION OF COURT ORDER

1    you're interrupting me as an attorney of record. So, please, you know, as a judge, you are obligated to hear from each party, regardless of whether you agree with me or not.

3    THE COURT:  Okay.

4    MS. MKRTCHYAN:  And if I'm not going -- if I'm going to be interrupted and I have no right to speak, maybe I will just, uh, ask you to make your rulings in writing. I have made my record in writing, so perhaps I should not be part of this since you're biased towards me personally. . ..

7    MS. MKRTCHYAN:  Because I don't want to be part of the hearing where I'm being interrupted and disrespected, so perhaps, um, you **know I can just, uh -- you know, be excused and the court can make its rulings.**

9    THE COURT:  **No.**

11   MS. MKRTCHYAN:  I have nothing yet -- **I have nothing else to add**[1] to what I have written and I just do not appreciate, uh, the fact that I'm being disrespected and, um, mistreated entirely, um, inappropriately by the court.

13   So, I just, um -- **I'm going to ask to be excused and you can continue with your hearing without me**, uh, because this is disrespectful toward me. I feel like this is not only **bias towards plaintiff** but also to me **personally**, despairingly, constantly interrupting me.

16   You know, I -- just because we have judge, um, it does not mean that the judge can interrupt counsel. And I am representing a party, a victim of police brutality, uh, and I just do not appreciate this type of treatment.

18   So, if the court is inclined to continue interrupting me and not hearing from, I will -- I'm just going to be asking to excuse me so that I can leave, and you can make your rulings. **Do I have the permission** --

20   THE COURT:  [inaudible] --

21   MS. MKRTCHYAN:  -- **to leave this hearing?**

22   THE COURT:  **You do not have permission to leave the hearing, Ms. Mkrtchyan.**

24   MS. MKRTCHYAN:  Well, I want to be excused. **I don't want to be part of this proceeding** because I don't appreciate the Court, you know, **violating the rules of impartiality** and interrupting me.

---

[1] If only it were so.

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F. MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO DISMISS FOR VIOLATION OF COURT ORDER

It's discourteous. It's discourteous. **You are bias towards me as plaintiff's counsel.** You have also disparaged me on the record.

As an attorney of many years, you have disparaged me, called my deposition a train wreck that has been used by the defense skillfully to disparage me, **that's defamation** of, okay? **None of my depositions have been a train wreck. It's just it's in the eye of the beholder.**

I don't know what is your background, Your Honor, I don't appreciate that, you know, and I understand that that is **bias towards me and towards my client.**

So, right now, I don't feel comfortable continuing this because I feel like, you know, I'm being really, um, **mistreated and disparaged and harassed, uh, as a female attorney**, I don't appreciate that. So, if you can continue without me, that is great. Uh, I appreciate your time taking this.

**I'm not going to continue with this proceeding** where I'm being disrespected entirely and, um, you know, my client's rights are being violated wrongly.

So, um, I'm going to excuse myself if **you're not letting me to excuse myself because I don't think that this proceeding is impartial**. Okay. Thank you.

AUTOMATED VOICE:  Narine Mkrtchyan has left the conference.

(Transcript of Proceedings, 17:3-22:6, Ex. "D")(emphasis added.)

Plaintiff Jeremy Holloway himself has also exacerbated the forgoing outrages with litigation misconduct of his own. Specifically, the January 20, 2021 order issued by Magistrate Judge Douglas McCormick (Dkt. 147) has found Holloway responsible for spoliation of key evidence.  (See, Dkt 147, p. 3, Ex. E)(Plaintiff Jeremy Holloway "had an obligation to preserve his Facebook account, [but he] deleted the account with a culpable state of mind" even though it was "relevant to Defendants' claims."); see, Payne v. Exxon Corp., 121 F.3d503,505–06, 508 (9th Cir.1997) ("district court may properly consider all of a party's discovery misconduct in weighing a motion to dismiss, including conduct which has been the subject of earlier sanctions").

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F. MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO DISMISS FOR VIOLATION OF COURT ORDER

In short, both Holloway and his counsel have proven themselves to be openly
hostile to the Magistrate Judge's civility orders as well basic notions of evidence
preservation. The only remaining issue now is what should be done about it.

## II.   STANDARD OF REVIEW

The Order states that "[o]bjections to this order are governed by 28 U.S.C. §
636.  The recommendation that Defendants' motion for involuntary dismissal be
denied is dipositive and objections shall be reviewed de novo by the district judge.
See id, § 636(b)(1)(C). . .." (Dkt. 144, p. 31).[2]

Pursuant to 28 U.S.C. § 636(b)(1)(C), the district court judge "shall make a de
novo determination of those portions of the report or specified proposed findings or
recommendations to which objection is made. A judge of the court may accept, reject,
or modify, in whole or in part, the findings or recommendations made by the
magistrate judge. The judge may also receive further evidence or recommit the matter
to the magistrate judge with instructions."

## III.   THE COURT SHOULD ORDER TERMINATING SANCTIONS BASED
ON THE UNDISPUTED FACTS OF THIS CASE

The Magistrate Judge's lengthy and detailed order has rightly made findings of
fact regarding Ms. Mkrtchyan's violation of his civility orders that are beyond dispute.
Indeed, the civility order violations in issue are captured on deposition videotape and
in reporter's transcripts. As this evidence reveals, and as noted in the Magistrate
Judge's order, the issue here is not a momentary slip of the tongue. The issue here is
Ms. Mkrtchyan's decision to engage in a lengthy rampage of unfounded insults,

---

[2] Pursuant to 28 U.S.C. § 636(b)(1)(C), the district court judge "shall make a de novo
determination of those portions of the report or specified proposed findings or
recommendations to which objection is made. A judge of the court may accept, reject,
or modify, in whole or in part, the findings or recommendations made by the
magistrate judge. The judge may also receive further evidence or recommit the matter
to the magistrate judge with instructions."

**6**

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F.
MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO
DISMISS FOR VIOLATION OF COURT ORDER

1 | thrown objects and cringeworthy invective hurled at defense counsel over a period
2 | that has extended ***over many months***.

3 |     In declining to order dismissal, the Magistrate Judge seemed to focus on his
4 | lack of prior "warnings" to Ms. Mkrtchyan that violation of his civility orders could
5 | lead to dismissal. (Order, _____). The defense submits that, under the
6 | circumstances of this case, no such "warnings" were required. A short survey of the
7 | relevant law makes Defendants' point.

8 |             [The Ninth Circuit has] come up with a five-part 'test' to
9 |             determine whether a dismissal sanction is just: (1) the
10 |            public's interest in expeditious resolution of litigation; (2)
11 |            the court's need to manage its dockets; (3) the risk of
12 |            prejudice to the [party seeking sanctions]; (4) the public
13 |            policy favoring disposition of cases on their merits; and (5)
14 |            the availability of less drastic sanctions. We have said that
15 |            where a court order is violated, factors 1 and 2 support
16 |            sanctions and 4 cuts against case-dispositive sanctions, so 3
17 |            and 5, prejudice and availability of less drastic sanctions, are
18 |            decisive.

19 | Valley Engineers Inc. v. Electric Engineering Co., 158 F.3d 1051, 1057 (9th
20 | Cir.1998)(citations omitted.)

21 |     "Factor five involves the consideration of three subparts: whether the court
22 | explicitly discussed alternative sanctions, whether it tried them, and ***whether it***
23 | ***warned*** the recalcitrant party about the ***possibility of dismissal***." Valley Engineers Inc.
24 | v. Elec. Eng'g Co., 158 F.3d 1051, 1056 (9th Cir. 1998)(emphasis added.) "[D]espite
25 | all this elaboration of factors, we have said that it is ***not always necessary*** for the court
26 | to impose less serious sanctions first, ***or to give any explicit warning***." Id. (emphasis
27 | added and citations omitted); see, id. at 1056-57 (text of Federal Rules of Civil

28 |

**7**

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F.
MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO
DISMISS FOR VIOLATION OF COURT ORDER

1  Procedure themselves put "all lawyers and their clients" on notice that "dismissal is a

2  possible sanction for failure to obey discovery orders"). Stated otherwise, the five

3  dismissal factors are "not a series of conditions precedent before the judge can do

4  anything," but a "way for a district judge to think about what to do." In re

5  Phenylpropanolamine Prod. Liab. Litig., 460 F.3d 1217, 1226 (9th Cir. 2006)(citations

6  omitted).

7       Many cases in this Circuit make the point – a prior "warning" is **_not_** required to

8  support dismissal for violation of a federal court order. See, e.g., Malone v. U.S.

9  Postal Serv., 833 F.2d 128, 133 (9th Cir. 1987)(dismissal affirmed "[a]lthough in the

10 instant case the district court did not explicitly warn Malone that dismissal would

11 follow violation of the pretrial order. . .. A plaintiff can hardly be surprised by a harsh

12 sanction in response to willful violation of a pretrial order. Rules 16(f) and 41(b)

13 explicitly state that dismissal may be ordered for violation of a court order.");

14 Henderson v. Duncan, 779 F.2d 1421, 1424 (9th Cir. 1986) ("The district court need

15 not exhaust every sanction short of dismissal before finally dismissing a case . . ..");

16 Wachovia Bank, N.A. v. Chaparral Contracting, Inc., 2010 WL 2667204, at *3 (D.

17 Nev. 2010), report and recommendation adopted, 2010 WL 2667203 (D. Nev.

18 2010)(dismissal ordered where "[t]he Court finds that Defendant's failure to comply

19 with Order (# 34) was willful. The Court further finds that imposition of less drastic

20 sanctions are not likely to obtain Defendant Plise's compliance with the Court's orders.

21 Nor is it necessary or appropriate under the circumstances to first warn Defendant

22 Plise of the potential for the imposition of severe sanctions before imposing them.");

23 Woods v. Los Angeles Cty. Sheriff's Dep't,  2009 WL 5090932, at *4 (C.D. Cal.

24 2009)(dismissal ordered despite no prior dismissal warning: "[I]n light of Plaintiff's

25 prior refusals to comply with the court's orders, the court is convinced that lesser

26 sanctions would have no effect. . ..Given the consistent and purposeful nature of

27 Plaintiff's refusal to comply with discovery rules in this case, only a dismissal sanction

28

**8**

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F.
MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO
DISMISS FOR VIOLATION OF COURT ORDER

1   seems just."); <u>Garden City Boxing Club, Inc. v. Izarraraz</u>, 2008 WL 5351681, at *4

2   (D. Nev. 2008)(ordering defendant's answer stricken despite the fact that "[t]he Court.

3   . .has not had occasion to . . .warn him that severe sanctions may be imposed for his

4   failure to provide discovery or comply with court orders.")

5           These principles are directly relevant here. This is not a case where "warnings"

6   can realistically be expected to have any meaningful impact. The Court can surmise as

7   much from the undisputed record of Plaintiff's counsel's cavalier trampling of the

8   Magistrate Judge's civility order – a record that includes a startlingly lengthy

9   catalogue of unfounded insults, thrown objects and wild invective hurled at defense

10  counsel over a period of many months. And if there were any possible doubt on the

11  issue, Plaintiff's counsel has removed it by bluntly announcing that she has no respect

12  for the Court or the orders it issues. (Dkt. 116, Plaintiff Depo., 275:7 – 276:25, Ex.

13  "B")("A lot of the things right now are still up in the air in this country. **So whether**

14  **you have a judge saying something** . . . **it really doesn't matter anymore.** Okay?. .

15  .._**I don't care what one specific judge says** . . .._**")**(emphasis added.)

16          Put simply, no practicing attorney needs (or deserves) a "warning" that

17  engaging in the multiple instances of contemptuous conduct at issue here may lead to

18  dismissal. <u>See</u>, <u>e.g.</u>, <u>Malone v. U.S. Postal Serv.</u>, 833 F.2d 128, 133 (9th Cir.

19  1987)(dismissal affirmed "[a]lthough in the instant case the district court did not

20  explicitly warn Malone that dismissal would follow violation of the pretrial order. . ..

21  A plaintiff can hardly be surprised by a harsh sanction in response to willful violation

22  of a pretrial order. Rules 16(f) and 41(b) explicitly state that dismissal may be ordered

23  for violation of a court order."); <u>Woods v. Los Angeles Cty. Sheriff's Dep't</u>,  2009 WL

24  5090932, at *4 (C.D. Cal. 2009)(dismissal ordered despite no prior dismissal warning:

25  "[I]n light of Plaintiff's prior refusals to comply with the court's orders, the court is

26  convinced that lesser sanctions would have no effect. . ..Given the consistent and

27  purposeful nature of Plaintiff's refusal to comply with discovery rules in this case,

28

9

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F.
MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO
DISMISS FOR VIOLATION OF COURT ORDER

1  only a dismissal sanction seems just.") As stated by the Supreme Court:

2             The ability to punish disobedience to judicial orders is

3             regarded as essential to ensuring that the Judiciary has a

4             means to vindicate its own authority without complete

5             dependence on other Branches. 'If a party can make himself

6             a judge of the validity of orders which have been issued, and

7             by his own act of disobedience set them aside, then are the

8             courts impotent, and what the Constitution now fittingly

9             calls 'the judicial power of the United States' would be a

10            mere mockery.'

11 Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 796 (1987)(citations

12 omitted); see, Illinois v. Allen, 397 U.S. 337, 346–47 (1970)("if our courts are to

13 remain what the Founders intended, the citadels of justice, their proceedings cannot

14 and must not be infected with . . . scurrilous, abusive language and conduct.") These

15 principles – combined with Ms. Mkrtchyan's many contemptuous outburst – warrant

16 dismissal here.

17        This is particularly so given that Ms. Mkrtchyan has openly voiced her view

18 that Court orders – whether in the form of "warnings" or otherwise – mean nothing to

19 her. (Dkt. 116, Plaintiff Depo., 275:7 – 276:25, Ex. "B")("A lot of the things right

20 now are still up in the air in this country. **So whether you have a judge saying**

21 **something** . . . **it really doesn't matter anymore. Okay?. . .***I don't care what one*

22 *specific judge says* . . ..**")(emphasis added.) She underscored the point at a September

23 2, 2020 hearing where she excoriated the Magistrate Judge in terms which should be

24 startling even to those with hardened sensibilities. (See, Transcript of Proceedings,

25 17:3-22:6, Ex. "D")(emphasis added.)

26        As the transcript of the event reveals, Ms. Mkrtchyan repeatedly denounced the

27 Magistrate Judge as being "biased" (four times), lacking "impartiality" (three times)

28

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F.
MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO
DISMISS FOR VIOLATION OF COURT ORDER

and "mistreat[ing] and disparage[ing] and harass[ing]" her because she is "a female attorney". (Id.) She repeatedly violated the Court's order to "please stop talking" and the Court's directive that she not hang up on the Court. (Id.) Given this contemptuous mindset, no one can have any confidence that "warnings" will have any affect on Ms. Mkrtchyan or that the defense has any chance of entering into the type of partnership on which the litigation process depends.[3]

This Court is rightly acknowledged as an opinion leader and a thought leader by both the bench and the bar. Stated otherwise, what this Court says matters. And judicial leadership is sorely needed to address the erosion of professional civility that (as the record here illustrates) has reached chronic proportions in this District. See, e.g., Jason D. Russell, "Closing Argument: Litigation, Civility, and How Nice Guys Can Finish First," Los Angeles Lawyer, April 2016 at page 20 (op-ed article by a local litigation partner observing that "the Central District and the Los Angeles Superior Court have codified guidelines admonishing attorneys to be civil because 'there has been a discernible erosion of civility and professionalism in our courts' " and "[l]itigators in California can attest to the truth of that assertion.")(citation omitted)[4]. Todd G. Friedland, Building A More Inclusive and Stronger OCBA, Orange County Law., February 2016, at 14 (discusses creation of the Orange County Bar Association 2016 Civility Task Force due to the erosion of civility in the practice of law "to

---

[3] Even now, after all that has been said and done, Ms. Mkrtchyan continues with open contempt of the Magistrate Judge and his orders. As noted in the Magistrate Judge's Order:

> Additionally, counsel has not displayed any remorse about her conduct during Plaintiff's deposition.  To the contrary, Plaintiff's counsel insisted at least twice during the hearing on this motion that she had not done anything wrong.

(Dkt. 144, p. 29).

[4] See, In re Barrera, 2016 WL 3004429, at *2 (Bankr. C.D. Cal. 2016)(citing same)

**11**

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F. MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO DISMISS FOR VIOLATION OF COURT ORDER

1   formulate civility guidelines and [] for members to then explore ways to implement

2   the guidelines"); Richard G. Johnson, <u>Integrating Legal Ethics & Professional</u>

3   <u>Responsibility with Federal Rule of Civil Procedure 11</u>, 37 Loy. L.A. L. Rev. 819,

4   923 (2004); <u>Section of Legal Educ. & Admissions to the Bar, A.B.A., Report of the</u>

5   <u>Professionalism Committee: Teaching and Learning Professionalism</u> §1(B) (1996)

6   (discussing the decline in professionalism and describing the prevalent themes among

7   various commentators on the problem); <u>The Professionalism Crisis</u>, Prof. Law.,

8   Spring 2001, at 1, 6 ("Civility ... embodies the notion that there is a type of social

9   behavior that is acceptable within the legal profession and a type that is not .... Most of

10  us would agree that over the years, there has been a decided decrease in civility, and

11  an increase in some forms of unethical behavior" . . . "Every member of the bench,

12  from the chief justice to the magistrates, has a personal responsibility to contribute to

13  the efforts to improve lawyer conduct and enhance professionalism. Because of their

14  visibility within the legal community and in the larger community, judges are

15  uniquely positioned to affect the level of professionalism in their respective

16  jurisdictions ....")

17       There is need for a turnaround in the lack of professional civility in this District.

18  And it should rightly begin with an opinion from this Court finding that attorney

19  misconduct of the type in evidence in this case will not be tolerated by the judiciary.

20  <u>See</u>, <u>e.g.</u>, <u>In re Exxon Valdez</u>, 102 F.3d 429, 433 (9th Cir. 1996)(affirming dismissal

21  where trial "the court properly considered the importance of sanctions as a deterrent in

22  litigation . . ..."). Given the magnitude of the civility problem before the Court, the

23  resolution of this matter may be one of the most enduring and important opinions this

24  Court ever issues.

25  **IV.    CONCLUSION**

26       For the reasons set forth above, and in Defendants' Motion (Dkt. 116) and

27  Reply (Dkt 122), Defendants respectfully request that this Court review the Motion to

28

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F.
MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO
DISMISS FOR VIOLATION OF COURT ORDER

1   Dismiss de novo and grant Defendant's Motion to Dismiss based on Plaintiff's and his

2   counsel's continued misconduct throughout this litigation.

3   DATED:  January 25, 2021          Respectfully submitted,
**LYNBERG & WATKINS**

By:      _____
**S. FRANK HARRELL**
**TAMARA HEATHCOTE**
Attorneys for Defendants
County of Orange, Deputy Chad Renegar,
Deputy Joel Gonzalez, Deputy Kevin
Pahel, Deputy Brandon Billinger, Deputy
Mark Borba, Deputy Jameson Gotts and
Deputy Justin Gunderson

**13**

DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE DOUGLAS F.
MCCORMICK'S RECOMMENDATION AS TO DEFENDANTS' MOTION TO
DISMISS FOR VIOLATION OF COURT ORDER

## <u>DECLARATION OF TAMARA M. HEATHCOTE</u>

I, Tamara M. Heathcote, do declare and state as follows:

1.      I am an attorney at law duly authorized to practice before this Court and I am a partner at Lynberg & Watkins, attorneys of record for all Defendants herein.

2.      I have personal knowledge of the following facts and, if called as a witness, I could and would testify competently thereto.

3.      Attached hereto as Exhibit "A" is a true and correct copy of Magistrate Judge Douglas McCormick's Oder re Defendants' Motion for Sanctions, Dkt. 144.

4.      Attached hereto as Exhibit "B" is a true and correct copy of the Declaration of Brian Fuerbach.

5.      Attached hereto as Exhibit "C" is a true and correct copy of the Magistrate Judge Douglas McCormick's July 23, 2020 order.

6.      Attached hereto as Exhibit "D" is a true and correct copy of the transcript of the hearing of September 2, 2020.

7.      Attached hereto as Exhibit "E" is a true and correct copy of the Magistrate Judge Douglas McCormick's January 20, 2021 Order re Plaintiff's Facebook Account, Dkt. 147.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed on January 25, 2021 in the City of Orange, County of Orange, State of California.

_____
Tamara M. Heathcote, Esq.

4833-4074-8249, v. 1

**14**

EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF ORANGE et al.,<br><br>Defendants. | No. SA CV 19-01514-DOC (DFMx)<br><br>Order re: Defendants' Motion for Sanctions (Dkt. 116) |

## I. INTRODUCTION

Defendants County of Orange, Deputy Chad Renegar, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Brandon Billinger, Deputy Mark Borba, Deputy Jameson Gotts, and Deputy Justin Gunderson (collectively, "Defendants") move for an order dismissing this action for violations of this Court's orders. See Dkt. 116 ("Motion") at 2-3.[1] Defendants also seek an award of monetary sanctions against Plaintiff and Plaintiff's counsel Narine Mkrtchyan for costs incurred in taking Plaintiff's deposition as well as fees and expenses incurred in bringing this motion. See id. at 3. As an alternative to dismissal, Defendants seek orders: (1) compelling Plaintiff to appear for a renewed deposition; (2) appointing a special master under Fed. R. Civ. P. 53(a)

---

[1] Except for citations to the record, page citations are to the CM/ECF pagination.

to supervise the renewed deposition at Plaintiff's expense; (3) limiting the verbal statements of Plaintiff's counsel during the renewed deposition to matters permitted by Rule 30; and (4) limiting counsel from interrupting or speaking over any other counsel or the deponent. See id. at 3-4.

Plaintiff opposed Defendants' motion. See Dkt. 120 ("Opp'n"). Defendants filed a reply. See Dkt. 122 ("Reply"). After providing the parties with a written tentative ruling, the Court held a hearing on December 8, 2020, at which it heard oral argument from both sides and then took the matter under submission. See Dkt. 132.

Based on its review of the record, the parties' papers, and the arguments of counsel at the hearing, the Court now RECOMMENDS and ORDERS as follows:

1.    The Court RECOMMENDS to the District Judge that Defendants' motion for dismissal be DENIED.

2.    The Court ORDERS Plaintiff to appear at a renewed deposition of up to seven (7) hours within sixty (60) days of this order. During the renewed deposition, the defending attorney may:

     a.    In response to a question, state any or all of the following, if legally appropriate: "Object to form," "I instruct you not to answer," or "Don't include privileged information in your answer."

     b.    Request a break when appropriate, which the examining attorney shall agree to if no question is pending.

     c.    When it appears that seven hours of record time has passed, ask the videographer, "has this deposition lasted seven hours of record time?" Upon receiving confirmation that the deposition has lasted seven hours, state "This deposition is over. We are leaving."

        d.    State, if warranted, "I move to terminate [or limit] this deposition under Rule 30(d)(3)," and at his or her option, "I demand that this deposition be suspended for the time necessary to obtain an order."

        e.    The defending attorney may say essentially nothing else during the deposition. The word "essentially" allows for only brief statements concerning the logistics of the deposition, such as "Can you please hand me a copy of the exhibit?" or "My real-time monitor stopped working" or the like.

        f.    These paragraphs apply to the defending attorney in his or her capacity as a defending attorney. When he or she does a redirect exam, the roles are reversed, and these paragraphs apply to the attorney who was previously the examining attorney.

    3.    The Court ORDERS Plaintiff's counsel to pay Defendants' counsel the costs of the court reporter and videographer for Plaintiff's August 14, 2020 deposition in the amount of $7,086.82 within thirty (30) days of the date of this order. Defendants shall bear the costs for the renewed deposition ordered above.

    4.    The Court ORDERS that Plaintiff and Plaintiff's counsel, jointly and severally, shall pay at least a portion of Defendants' reasonable expenses and attorney's fees for bringing this motion under Rule 30(d)(2) and Rule 37(a)(5)(A). No later than seven (7) calendar days from the date of the issuance of this Order, Defendants shall file declaration(s) supporting sanctions in the amount of the reasonable expenses related to the motion. Plaintiff and Plaintiff's counsel may, separately or jointly, file opposition(s), no later than seven (7) calendar days from the date Defendants file their declaration(s). Defendants may file a reply or replies, no later than seven (7) calendar days from the filing of the opposition(s).

## II.  BACKGROUND

### A.  Deputy Renegar's Deposition and the Court's Subsequent Ruling

This is a police excessive-force case. Plaintiff alleges that the Orange County Sheriff's Department deputies named as individual defendants violated his constitutional rights during an incident that occurred in the early morning hours of January 21, 2018, at O'Neill Regional Park. One of those individual defendants, Deputy Chad Renegar, was deposed on July 7, 2020.

Defendants' counsel terminated Deputy Renegar's deposition early, unilaterally leaving after approximately 5 ½ hours of on-the-record testimony. This prompted Plaintiff to file an ex parte application for an order compelling resumption of Deputy Renegar's deposition. See Dkt. 69. Plaintiff's counsel also sought an award of $5,000 in sanctions. See id. Defendants filed an opposition. See Dkt. 70.

After reviewing the parties' submissions, the Court held a telephone conference on July 9, 2020. During this telephonic hearing the Court began the discussion by stating its general expectation that counsel should comport themselves in a deposition the same as if they were in the courtroom. The Court learned that the deposition had been video-recorded by Plaintiff's counsel. See Dkt. 73 at 1. The Court accordingly directed Plaintiff's counsel to submit a copy of the video recording, which she did. Plaintiff's counsel also later supplied a transcript. The Court reviewed the entire transcript and substantial portions of the video recording. See id. at 2.

Based on the Court's review of the transcript and video recording, it was apparent that Deputy Renegar's deposition was not conducted in a way that was consistent with the Court's expectations. Nevertheless, the Court did not want to see the deposition of a key witness like Deputy Renegar terminated early. Accordingly, the Court issued a written order granting Plaintiff's ex

4

parte application and ordering Deputy Renegar's deposition resumed for the remaining 90 minutes. See id.

But the Court denied Plaintiff's request for sanctions, writing: "Although I do not agree that Renegar's deposition should be terminated, his deposition was, to put it mildly, a train wreck. And responsibility for that result lies predominantly with Plaintiff's counsel." Id. The Court then detailed what it did not like about what Plaintiff's counsel did, identifying eight examples of inappropriate remarks with citations to the transcript. See id. at 3-4. The Court also stated its concerns about what it saw on the video recording, noting that Plaintiff's counsel raised her voice, slapped the conference room table, appeared to lose her temper several times, and used a tone of voice that ranged from "exasperated to indignant." Id. at 3. Based on these concerns, the Court concluded that it could not find that Deputy Renegar's counsel's decision to leave the deposition early was without substantial justification. See id. at 4.[2]

The Court concluded its written order by acknowledging that depositions in a hotly contested case (like this one) should not be expected to be a "non-stop exchange of pleasantries" but must not be allowed to become an excuse for counsel to "engage in acts of rhetorical road rage." Id. (quoting Freeman v. Schointuck, 192 F.R.D. 187, 189 (D. Md. 2000)). The Court then stated that "I trust that my remarks on July 9 and this subsequent ruling will cause [future] depositions to be conducted without the rancor that was exhibited on July 7." Id.

---

[2] Although Deputy Renegar's counsel "largely remained professional" despite the behavior of Plaintiff's counsel, the Court noted that several of her objections were misplaced and that she made several inappropriate remarks toward the end of the deposition. Id. at 4.

5

**B.** <u>Plaintiff's Deposition and the Instant Motion</u>

Plaintiff's deposition was taken on August 14, 2020, less than a month after the Court's written ruling about Deputy Renegar's deposition. <u>See</u> Motion, Exh. B at 1.[3] The deposition was taken by Defendants' lead trial counsel, who was not the same attorney who defended Deputy Renegar's deposition. <u>See</u> Depo at 2. Defendants' counsel questioned Plaintiff for over 6 hours.

On September 2, 2020, the Court held a telephonic hearing on two motions to compel filed by Defendants. <u>See</u> Dkt. 84. Plaintiff's counsel disconnected from the hearing without the Court's permission. <u>See</u> Dkt. 86 at 6. After Plaintiff's counsel left the hearing, Defendants' counsel raised the possibility of filing the instant motion related to Plaintiff's deposition. <u>See</u> <u>id.</u> The Court had previously ordered the parties to present any potential discovery disputes to the Court using its informal telephone conference procedure. <u>See</u> Dkt. 35. Defendants' counsel requested leave of court to file that motion without proceeding with an additional telephone conference; the Court granted the request and gave Defendants permission to file the instant motion without complying with Local Rule 37. <u>See</u> Dkt. 86 at 6.

Defendants filed their motion on November 9, 2020. Relying on Rule 37(b)(2), Rule 41(b), and the Court's inherent power, Defendants' motion seeks a recommendation that the case be dismissed for Plaintiff's counsel's violation of the Court's oral comments and written order related to Deputy Renegar's deposition. <u>See</u> Motion at 18-55. Separately, Defendants argue that a recommendation of dismissal is warranted based on Plaintiff's counsel's

---

[3] Defendants submitted portions of Plaintiff's deposition transcript in support of their motion. Plaintiff submitted the entire transcript. <u>See</u> Opp'n, Exs. A1, A2 (hereinafter "Depo").

conduct during the September 2 hearing. <u>See</u> <u>id.</u> at 55-64. As an alternative to dismissal, Defendants request that the Court order a "repeat" of Plaintiff's deposition at Plaintiff's counsel's expense. <u>See</u> <u>id.</u> at 64-79. Additionally, Defendants request the appointment of a special master and an order from this Court limiting Plaintiff's counsel's statements at the "repeat" deposition to matters permitted by Rule 30. <u>See</u> <u>id.</u>

## III.    DISCUSSION

### A.    <u>Improper Instructions Not to Answer</u>

The Court begins with counsel's instructions to Plaintiff not to answer Defendants' questions. The Court's review of Plaintiff's deposition reveals roughly two dozen instances where Plaintiff's counsel instructed her client not to answer a question based on relevance, privacy, argumentative, badgering, or asked and answered objections:

- Questions about his work history before 2012 – relevance (Depo at 39-42)

- Questions about his minor daughter – relevance and privacy (Depo at 46)

- Questions about his parents and siblings – relevance and privacy (Depo at 50-51)

- Questions about his understanding of deputy's request during the incident – asked and answered (Depo at 93)

- Question about what was important to him during the incident – asked and answered (Depo at 98)

- Question about his language during the incident – asked and answered (Depo at 115)

- Question about his belief during the incident – speculation, vague and ambiguous, asked and answered (Depo at 135)

7

- Question about prior time spent in jail – relevance (Depo at 252)

- Questions about name of older brother – privacy (Depo at 255)

- Question about why he deleted his Facebook account – argumentative (Depo at 264)

- Question about whether someone told him to delete his Facebook account – relevance, badgering, privilege (Depo at 265)

- Question about when he opened his Facebook account – privacy (Depo at 269)

- Question about prior experiences with law enforcement – asked and answered, argumentative (Depo at 279)

- Question about prior arrests – privacy, badgering, asked and answered (Depo at 280)

- Question about identity of victim involved in domestic violence arrest – relevance (Depo at 284)

- Question about charge on which Plaintiff was arrested – basis not specified (Depo at 289)

- Question about sentence – asked and answered (Depo at 291)

- Questions about why law enforcement came to Plaintiff's campsite – asked and answered (Depo at 301, 302)

- Question about outcome of Plaintiff's DUI arrest – relevance (Depo at 305)

- Question about deputy's request that Plaintiff get on the ground – badgering, asked and answered, argumentative, relevance (Depo at 329)

- Question about whether he said, "I'm going to file a lawsuit," during the incident – argumentative (Depo at 331)

- Question about what he'd like to achieve through lawsuit – argumentative, irrelevant (Depo at 333)

- Questions about whether plaintiff thinks he deserves money in this case – argumentative, badgering (Depo at 335)

- Question about whether he was told to get on the ground before he was punched in the face – asked and answered (Depo at 340)

The Court starts with "asked and answered," an objection that served as the basis for several of counsel's instructions not to answer. Plaintiff's counsel explained her objections on the record during the deposition: "Any time you are re-asking the same question, I'm going to tell him not to answer the same question." Depo at 100. This statement is legally misplaced. As another district court in California recent noted, "[i]n the context of a deposition, 'asked and answered' objections are utterly pointless and serve no purpose." La Jolla Spa MD, Inc. v. Avidas Pharmaceuticals, LLC, No. 17-1124, 2019 WL 4141237, at *19 (S.D. Cal. Aug. 20, 2019). Another district court in California has elaborated:

There is nothing wrong with asking a question multiple times during a deposition. Sometimes the witness didn't answer it, or answered only part of it, or the answer is implausible, or the answer builds in caveats that a slight rephrasing of the question might expose, or asking essentially the same question from

different angles or in slightly different ways yields different answers. Unless repeated questioning crosses the line into harassment, it can be an effective technique of cross-examination. Objecting "asked and answered" is a way of coaching the witness because it is not actually objectionable to ask a question multiple times. Saying "asked and answered" can be a way of telling the witness not to change his testimony from what he said before. Also, as every lawyer knows, when the defending attorney objects "asked and answered," often the question really wasn't answered, so the objection becomes a suggestion to the witness to continue refusing to answer the question, which is what happened here.

Zeleny v. Newsom, No. 17-7357, 2020 WL 6585793, at *4 (N.D. Cal. Nov. 10, 2020).[4]

Nor do counsel's instructions based on relevance or harassment (like argumentative or badgering) fare any better. The Federal Rules distinguish between evidentiary objections (like relevance) and objections necessary to preserve a privilege or enforce a court-ordered limitation. Relying on this distinction, the Rules permit counsel to instruct a witness not to answer "only when necessary to preserve a privilege, to enforce a limitation ordered by the

---

[4] Moreover, contrary to her statement on the record, Plaintiff's counsel knows better. Plaintiff's counsel correctly identified that "asked and answered" was not a basis for an instruction not to answer during Deputy Gotts's deposition on July 23, 2020, responding to such an instruction as follows: "No. He – you cannot instruct him not to answer. . . . You're not going to go down this path. Unless you have a privilege, you cannot instruct him not to answer my questions." Gotts Depo (Opp'n, Exh. D) at 108-09 (emphasis added). As noted above, that is a correct statement of the law. And in this instance Defendants' counsel relented and Deputy Gotts answered Plaintiff's counsel's questions.

court, or to present a motion under Rule 30(d)(3)." Fed. R. Civ. P. 30(c)(2).[5]
For all other objections, the testimony should be taken subject to the objection.
See Natural-Immunogenics Corp. v. Newport Trial Grp., No. 15-2034, 2017
WL 10562691, at *4 (C.D. Cal. Aug. 7, 2017); see also Jackson v. Cnty. of San
Bernardino, No. 13-01650, 2016 WL 7495816, at *3 (C.D. Cal. Apr. 21, 2016)
("A relevance objection is an insufficient basis for instructing a witness not to
answer."); In re Toys R Us-Delaware, Inc. Fair & Accurate Credit
Transactions Act (FACTA) Litig., No. 08-1980, 2010 WL 4942645, at *9 n.12
(C.D. Cal. July 29, 2010) ("An attorney may not instruct a witness not to
answer a question on the ground that it has been asked and answered, is vague
and ambiguous or is irrelevant.").

      To be sure, Rule 30 does allow a deponent to end the examination where
deposing counsel acts "in bad faith" or "unreasonably annoys, embarrasses, or
oppresses the deponent or party." Fed. R. Civ. P. 30(c)(2). But the Rules do
not permit counsel to refuse to answer questions on this basis. See Natural-
Immunogenics Corp., 2017 WL 10562691 at *4. Put simply, "[a] deponent
may not unilaterally refuse to answer questions at a deposition and then
require a deposing party to obtain a court order directing the deponent to
answer." Luangisa v. Interface Operations, No. 11-00951, 2011 WL 6029880,
at *12 (D. Nev. Dec. 5, 2011).

      In sum, Plaintiff's counsel should have instructed her client to answer
Defendants' questions subject to objections. Instead, as evidenced by the
transcript, counsel repeatedly objected in a manner that resulted in incomplete
answers or no answer at all. This was improper and impeded the fair

---

[5] Plaintiff's counsel understands the limitations of Rule 30(c)(2), having
cited it verbatim in the Opposition. See Opp'n at 9.

examination of Plaintiff. For this reason alone, Plaintiff's deposition must be repeated.

**B.   Other Deposition Misconduct**

   **1.   Lengthy Speaking Objections and Arguments**

A tell-tale sign of a deposition that has gone off the rails is page upon page of transcript that reflects counsels' squabbling rather than questions and answers. The transcript of Plaintiff's deposition contains several of these events. The Court has selected three episodes for discussion, although there were many more to choose from.

The first extended episode arises at about the one-hour mark of the deposition when Defendants' counsel attempts to ask about Plaintiff's medical bills:

> MR. HARRELL: Sir, have you received a bill from the VA, to your knowledge, for your medical treatment since the incident happened? Yes, no, or I don't know?
>
> MS. MKRTCHYAN: Or has your lawyer -- see –
>
> MR. HARRELL: Ma'am, with respect, that's not my question. So you'll have an opportunity later if you're so inclined to ask whatever you want to ask. Right now my question has a limited focus that does not involve you, with all due respect.
>
> MS. MKRTCHYAN: Well, excuse me. If it's attorney-client privilege, then it is involving me.
>
> MR. HARRELL: Ma'am.
>
> MS. MKTRCHYAN: So -- and you know what? Your attitude -- I really do not appreciate this condescending attitude, unprofessional, sexist attitude that you're coming up across from the very beginning this morning.  I'm not going to tolerate that.

From the very beginning, you've been this hostile, you know, person, you know. So I'm not going to tolerate that.

I'm instructing him not to answer because the answer presupposes attorney-client privilege.  Okay? He is -- he has -- his attorney has received billing records. He has not received it. So, therefore, his answer is irrelevant.  So –

MR. HARRELL: Are you done?

One of the reasons, ma'am, why we have a camera here today is because we need one with you. You've already proven that. The magistrate judge characterized your conduct as, and I quote, "a train wreck."

MS. MKRTCHYAN: Okay.

MR. HARRELL: And that's being charitable.

MS. MKRTCHYAN: And excuse me.

MR. HARRELL: We have a camera here today –

MS. MKRTCHYAN: Train wreck.

MR. HARRELL:  --  so that you can see --

MS. MKRTCHYAN: Very good.

MR. HARRELL: -- that nobody has raised their voice here today.

MS. MKRTCHYAN: Very good, Counsel. Very good.

MR. HARRELL: Your comment about me being a sexist --

MS. MKRTCHYAN: Okay. I'm taking a break because I don't need this type of attitude.

MR. HARRELL: is what we call in the trade a lie.

13

MS. MKRTCHYAN: Okay. Until you finish, I'm going to take a break.

MR. HARRELL: -- and you need to get control of yourself.

MS. MKRTCHYAN: Well, thank you.

MR. HARRELL: You need to pull yourself together.

MS. MKRTCHYAN: Maybe you need to pull yourself together.

MR. HARRELL: -- and it needs to happen now.

MS. MKRTCHYAN: We're going to break until you bring yourself to normal condition because you are being rude and unprofessional, and you have no right to condescend me like that. Thank you.

Let's go.

THE VIDEOGRAPHER: We are now going off the record.

Depo at 56-58. Here, a question about whether a bill was received from the VA prompts an inappropriate speaking objection from counsel, from which follows an extended diatribe by Plaintiff's counsel. This outburst prompts Defendants' counsel to remind Plaintiff's counsel of this Court's prior ruling, and after some additional colloquy, a break is taken.

A second episode occurs about an hour later when Defendants' counsel asks Plaintiff about his demeanor during the incident:

MR. HARRELL: You were calm and cool the entire time of the incident?

MS. MKRTCHYAN: Asked and answered.

THE WITNESS: Yes.

14

MR. HARRELL: You used restrained, respectful words throughout the entire incident; right?

THE WITNESS: I will say I cussed a couple times.

MR. HARRELL: And was that calm and respectful words?

THE WITNESS: You know what? It was not out of control. I was in very control -- I was very controlled , and I was treating them with far more respect than they were treating me.

MR. HARRELL: Do you make it your practice to use curse words when you're angry and upset?

MS. MKRTCHYAN: Argumentative.

THE WITNESS: I wasn't angry --

MS. MKRTCHYAN: Argumentative.

THE WITNESS: -- or upset. I was frustrated.

MS. MKRTCHYAN: Let me object. Okay? This is going--

MR. HARRELL: Do you make it your practice to use curse words when you're angry and upset?

MS. MKRTCHYAN: Asked and answered. Badgering the witness.

Are you going to continue doing the same thing over and over again? You asked, and he answered.

MR. HARRELL: Do you make it your practice, sir, to use --

MS. MKRTCHYAN: Don't answer that.

(Discussion off the record.)

15

(The following record was read: "Q Do you make it your practice, sir, to use --")

MS. MKRTCHYAN: Okay. Asked and answered. I'm instructing not to answer that question.

MR. HARRELL: Do you make it your practice, sir, to use curse words when you're angry and upset?

MS. MKRTCHYAN: I'm instructing you not to answer.

MR. HARRELL: Mark it.

MS. MKRTCHYAN: He answered it.

MR. HARRELL: So when Deputy Renegar says, "We've received multiple calls on you being involved in misconduct" or words to that effect, what is the very next thing that you say or do?

MS. MKRTCHYAN: Asked and answered. Vague and ambiguous. The very next thing, say, and do.

Do you understand the question?

THE WITNESS: He's asking me when he told me the call was on me.

MR. HARRELL: Counsel, you're really not helping, and I'm trying not to bother the magistrate judge.

MS. MKRTCHYAN: There's not your problem.

MR. HARRELL: I have heard reports on you that have been very unsettling, and now I see why. It's like nothing else I've done in quite a while.

MS. MKRTCHYAN: By the way, right now you have no right to talk to me like that. Okay? Right now I can say--

MR. HARRELL: Then pull yourself together.

16

MS. MKRTCHYAN: Excuse me. I have a right to object. Who the hell do you think you are? I have a right to object.

MR. HARRELL: Make legal objections.

MS. MKRTCHYAN: I am making the objections the way I understand. If you have a problem with my objections, you can take it up later. Okay? There you go.

MR. HARRELL: Ma'am, you've got to pull yourself together.

MS. MKRTCHYAN: Okay. You have yet to see me too -- I mean seriously, this is the sexist, condescending attitude, Counsel, and you are really behaving just like this with any female attorney that is younger than you? I'm sorry. If no one told you outright that that's sexist attitude, I will. I'm not afraid.

And I will tell you that your behavior from this morning and even before then, your letters, your -- you know, your harassing letters towards me have been infused with condescending attitude. Who do you think you are?

Who do you think you are? I know who I am, but you need to know your place. Okay? I am a female young attorney, and you have no right to do this to me or my client.

You're badgering the witness. Let's go over the questions. You have to ask only appropriate questions, and you are not.

And I will object as long as it takes, or I will just stop this deposition as your co-counsel did. So --

MR. HARRELL: Are you all done? Any more?

MS. MKRTCHYAN: Continue with your questioning, or we will take a break.

Depo at 116-19. Here, after an improper instruction not to answer, counsel makes another speaking objection, which prompts Defendants' counsel to make another reference to the Court's prior ruling by mentioning "the magistrate judge." As it did before, the reference to the Court's prior ruling does not end the colloquy, and it continues as Plaintiff's counsel makes a lengthy speech about counsel's questioning.

From there, the deposition continues, and shortly thereafter, a third episode occurs:

> MR. HARRELL: You do understand that law enforcement has a responsibility to respond to complaints of criminal conduct. That's part of their job. You understand that; right?
>
> THE WITNESS: As much as I can, being a civilian.
>
> MR. HARRELL: And you understand, sir, that there was a complaint of criminal conduct at the campground before law enforcement appeared at your tent; true?
>
> MS. MKRTCHYAN: Vague and ambiguous.
>
> THE WITNESS: I understand that now.
>
> MS. MKRTCHYAN: Vague and ambiguous as to time.
>
> MR. HARRELL: Do you hold it against law enforcement for responding to the complaint of criminal conduct at the campground, or do you think they just should have ignored it?
>
> MS. MKRTCHYAN: How do you object to this type of nonsense?
>
> THE WITNESS: This is --
>
> MS. MKRTCHYAN: Argumentative. Objection. Vague and ambiguous.

18

THE WITNESS: Yeah, I can't answer that question.

MS. MKRTCHYAN: Wait a minute. Let me finish my objection. Argumentative. Vague and ambiguous. Irrelevant.

MR. HARRELL: We're going to read it back for you, sir. And, ma'am, you're free to have a running objection if that's what you would like to have.

MS. MKRTCHYAN: No. I have an objection to your line of questioning because you are asking the argumentative questions. Badgering the witness. That is not likely to lead to admissible evidence. Okay?

And if you are going to interrupt this and I am going to call the magistrate and find out why is this question that right now you're posing three times is important.

The law enforcement has a job to do. No. Law enforcement has a job to do, but your clients did not have a right to beat the hell out of my client.

MR. HARRELL: No. No.

MS. MKRTCHYAN: And if you, as an attorney, have no sense of understanding and common sense as to what happened, this is a victim of police brutality, and you keep badgering him?  You think that your clients have not committed a crime here? So go after them, not my client.

And he's not going to tolerate this type of nonsense from a defense counsel who doesn't even bother to wear his mask when we have a coronavirus. Okay? Seriously.

MR. HARRELL: Ma'am, you're --

MS. MKRTCHYAN: It just bothers me that you have no sense of common sense and compassion. Someone is sitting in front of you who was beat up by your moron clients. Okay? Your clients, your

criminal clients who are wearing a badge and are using that badge to commit crimes, including falsifying reports.

And you are going to sit here and tell this guy, who was a victim of police brutality, that he does not understand the job of the law enforcement? Yes, he understands, but the job of law enforcement is not to go and beat the hell out of people.

And you, as an attorney, your job is not just to do your job, defend these kind of criminals, but to do it with some degree of compassion. Okay? If you do not have compassion, maybe you should not be an attorney at all.

That's why this country is in this deep shit that we are. Okay? People like you and people like your clients. That's all I've got to say.

The bottom line is that you know what? I'm going to take as many breaks as I want, and I may stop this deposition because you're continuing to badger this guy, who is a victim. He's a victim that your clients have ruined the life of, and you're telling him what is the job of law enforcement?

MR. HARRELL: Where are you going, ma'am?

MS. MKRTCHYAN:  I am taking a break because you need to take five minutes to understand what it means to be, you know -- to have common sense and compassion, you know.

MR. HARRELL: Okay. Well, you take your break. Try to pull yourself together.

MS. MKRTCHYAN: No, but because you do not have a clear understanding of what is the United States Constitution and what this country's flag is all about. Someone is sitting in front of you who has served you, your country, and you're badgering him with nonsense, stupid questions.

MR. HARRELL: Okay. We're off the record while plaintiff's counsel tries to pull herself together.

20

THE VIDEOGRAPHER: We're now going off the record. The time is 1:10 p.m.

Depo at 140-44.

These lengthy episodes reflect a proceeding that has been derailed by counsel's obstructionist behavior. It is beyond any reasonable dispute that counsel's behavior was inappropriate. Another district court has written the following about the "limited role" contemplated by Rule 30 for attorneys defending a deposition:

They may make a "nonargumentative and nonsuggestive" objection to a question. Fed. R. Civ. P. 30(c)(2). They may "instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Id. They may "move to terminate or limit" the deposition "on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. Proc. 30(d)(3)(A). And in connection with so moving, the defending attorney may demand the suspension of the deposition. Id.

By convention, there are a few more things defending attorneys may do that are not expressly mentioned in Rule 30. They can do redirect following the completion of the examining attorney's questioning. They can ask to take a break every hour or so, and provided that no question is pending, that request should be agreed to. They can suggest a lunch break around noon. They can ask the videographer how much time has gone by on the record. And then when the seven hours are up, they can declare the deposition over, take their witness and leave.

And that's it. They are not allowed to make long, argumentative objections, or reframe the question for the witness, or make speeches about the irrelevance of the examining attorney's questions, or get into arguments with the other side. None of that is allowed.

21

<u>Hardin v. Mendocino Coast Dist. Hosp.</u>, No. 17-05554, 2019 WL 1855989, at *7 (N.D. Cal. 2019).

Suffice to say, Plaintiff's counsel did not stick to what is allowed. As illustrated above, large portions of the deposition veered from questions and answers to lengthy speaking objections and arguments between counsel. For this, Defendants' counsel is not without blame. Although for the most part he tried to continue questioning the witness in the face of Plaintiff's counsel's behavior, he did at times respond to her misconduct with unnecessary and unhelpful responses. Notably, he should not have suggested more than once that Plaintiff's counsel "pull herself together." Such a comment was unnecessary at the least and provoked rather than deescalated Plaintiff's counsel's misconduct.

But as with Deputy Renegar's deposition, the vast majority of responsibility for these extended episodes of bickering falls on Plaintiff's counsel. Over the course of a two-hour period, Plaintiff's counsel called Defendants' counsel "sexist," "rude," "unprofessional," "condescending," and lacking "common sense and compassion." She also rebuffed his reasonable deposition questions as "nonsense" and "stupid," and referred to his clients as "morons." Near the end, Plaintiff's counsel's launched into lengthy diatribes about the injustice done to her client, effectively preventing Defendants from deposing the witness. As noted by the Court in <u>Hardin</u>, this type of behavior "substantively interferes with the whole point of a deposition" and "makes the discovery process valueless because it prevents the other side from building its case." <u>Id.</u>

### 2. Improper Comments about Questions

Plaintiff's counsel's misconduct was not limited to these episodes and the improper instructions not to answer. The transcript and the video reveals a

"low hum" of obstructive and harassing behavior by Plaintiff's counsel that persisted throughout the deposition. In the Court's ruling about Deputy Renegar's deposition, it identified several of her improper comments on the record about the witness's answers to her questions. See Dkt. 73 at 3-4. Here, in Plaintiff's deposition, with counsel's role as the attorney defending the deposition, those comments took the form of improper comments on the record about counsel's questioning.

The deposition transcript is littered with them. To cite just a few, counsel described a question as "pathetic." Depo at 49. She called another question "the [] dumbest question[] I have ever heard," id. at 54, an accusation she repeats later in the deposition, see id. at 242. At one point she called the questioning "hilarious." Id. at 97. At another she told counsel his questions "do not make sense." Id. at 125.

One of counsel's favorite words is "nonsense," and she used it repeatedly to describe her adversary's questioning. Counsel called the questioning "nonsense of all type of proportions." Id. at 140. She asked after another question, "How do you object to this type of nonsense?" Id. at 141. Later in the deposition she interrupted a question to say that counsel was "full of nonsense." Id. at 288.

She tells him that his question is "making a nightmare." Id. at 219. Counsel wonders how someone can "ask" or "answer this type of question." Id. at 243. At another point, when Defendants' counsel asks for a readback of a question, counsel comments, "You are never happy. I wonder if anyone has ever made you happy ever. Jesus." Id. at 247. When Defendants' counsel suggests that an objection is an improper speaking objection, she responds, "I'm making my objections. If you don't understand my objections, open the legal foundation evidence book." Id. at 281. Counsel repeatedly told Defendants' counsel that "you're just not learning your lesson" as she makes

23

improper instructions not to answer. Id. at 298. Counsel characterized the questioning as "a joke," id. at 302, in a repeat of something said in Deputy Renegar's deposition and cited by the Court as an inappropriate comment, see Dkt. 73 at 3 (identifying as improper counsel's comment "It's a joke. This civil litigation is entirely a joke").

As the Court has repeatedly stated, a deposition should be conducted as if it were a courtroom proceeding. These comments would have no place in a courtroom. The Court expressly counseled Plaintiff's counsel about these kinds of comments in connection with Deputy Renegar's deposition, making that very point, telling counsel that "none of these antics would have been permitted to persist in any courtroom in the federal courthouse in Orange County." Dkt. 73 at 3.

It is not just that the Court's earlier comments went unheeded. These kinds of comments denigrate the proceedings. They turn what is supposed to be an orderly, professionally conducted search for the truth into a forum for childish name calling. More critically, they signal to the witness that it is okay to argue with examining counsel and make flippant, inappropriate remarks, which was the case here. See, e.g., Depo at 272 (when asked what he meant by "Facebook is bathroom activity," Plaintiff's responding, "You read a book when you take a shit. Same thing.").

### 3. Disruptive Behavior and Comments about the Court

Plaintiff's misconduct reached a zenith during questions about Plaintiff's Facebook account.[6] After some back and forth over attorney-client privilege objections, Plaintiff's counsel, whom the Court had previously chided for slamming her fists down on the table, stood up and threw documents across

---

[6] Defendants believe that Plaintiff deleted his Facebook posts or entire account following their request for access to it.

the deposition table in the direction of Defendants' counsel and deposition
staff. <u>See</u> Depo at 260. Nothing – absolutely nothing – would justify this type
of outburst. Were it to occur in a courtroom, the Court cannot imagine any
possible outcome other than a finding of contempt. It is no less contemptuous
because it occurred during a deposition.

After a short recess, Defendants' counsel attempted to continue his line
of questioning. In response, Plaintiff's counsel repeatedly threatened to leave
and became so argumentative that the court reporter was unable to read back
counsel's questions, prompting Defendants' counsel to suggest the Court's
assistance. This did not deter Plaintiff's counsel:

> MR. HARRELL: Ma'am, I'm going to go to the magistrate judge,
> and I'm going to ask him to bring your client back.
>
> MS. MKRTCHYAN: I will. I will go to the magistrate judge to
> stop this, and I will walk away. Okay? And my client is not going
> to come back for another deposition.
>
> MR. HARRELL: Maybe the judge will have the final word on
> that, ma'am.
>
> MS. MKRTCHYAN: Well, you know what? I'm sorry. A lot of
> the things right now are still up in the air in this country. So
> whether you have a judge saying something or the president saying
> something, it really doesn't matter anymore. Okay?
>
> MR. HARRELL: It doesn't matter to you what the judge says?
>
> MS. MKRTCHYAN: Right now what I care is my client being
> badgered by you and your condescending behavior toward me.
>
> MR. HARRELL: Ma'am, are you saying it doesn't matter to you
> what the judge says?

> MS. MKRTCHYAN: At this point all I care is what the books
> say. I don't care what one specific judge says or does not do.
> Nobody is above the law.

Depo at 276-77. These comments are especially troublesome when considered alongside Plaintiff's counsel prior decision to defy the Court and disconnect from a telephonic hearing. See Dkt. 86 at 6.

Plaintiff's counsel responds that she was simply acting in self-defense, and that she was provoked and harassed by Defendants' counsel. See Opp'n at 22. In support, she cites sixty-seven examples of Defendants' counsel's harassing and hostile deposition conduct. See id. at 23-38. The Court has reviewed all of them. The vast majority showcase typical deposition behavior and questions that Plaintiff's counsel should have countered with short objections, not outrage. A few examples, such as telling Plaintiff's counsel she was losing "the quiet game," were unnecessary and provoking; going forward, Defendants' counsel should refrain from making these sorts of comments. But having reviewed the entire transcript, these minor transgressions by Defendants' counsel did not justify, in any fashion, the misconduct of Plaintiff's counsel. Plaintiff's provocation claims are meritless.

## C. Notwithstanding Counsel's Misconduct, Terminating Sanctions Are Not Warranted

District courts have inherent power to impose sanctions for "conduct which abuses the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991); see also Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006) ("There are two sources of authority under which a district court can sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37."). District courts have inherent power to impose sanctions, including default or dismissal, when a party has "willfully

26

deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." Fjelstad v. Am. Honda Motor Co., Inc., 762 F.2d 1334, 1338 (9th Cir. 1985); see also TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 916 (9th Cir. 1987) ("Courts have inherent equitable powers to dismiss actions or enter default judgments[.]").

Terminating sanctions are a severe remedy, and should be imposed only in extreme circumstances, "where the violation is 'due to willfulness, bad faith, or fault of the party.'" In re Exxon Valdez, 102 F.3d 429, 432 (9th Cir. 1996) (quotation omitted); see also Anheuser-Busch, Inc. v. Nat. Beverage Distribs., 69 F.3d 337, 348 (9th Cir. 1995) (terminating sanctions are warranted where "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings"). "The most critical criterion for the imposition of a dismissal sanction is that the misconduct penalized must relate to matters in controversy in such a way as to interfere with the rightful decision of the case. This rule is rooted in general due process concerns. There must be a nexus between the party's actionable conduct and the merits of his case." Tripati v. Corizon Inc., 713 F. App'x 710, 711 (9th Cir. 2018) (quoting Halaco Eng'g Co. v. Costle, 843 F.2d 376, 381 (9th Cir. 1988)).

Additionally, before imposing the "harsh sanction" of dismissal, the court must consider the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." Leon, 464 F.3d at 958 (citation omitted). Because the first two factors generally weigh in favor of sanctions and the fourth factor weighs against sanctions, "the key factors are prejudice and availability of lesser sanctions." Stars' Desert Inn Hotel & Country Club, Inc. v. Hwang, 105 F.3d 521, 524 (9th Cir. 1997).

27

Here, the Court finds that prejudice and the availability of lesser sanctions cut strongly against dismissal. Although Plaintiff's deposition was marred by counsel's conduct and her improper instructions not to answer, those incidents did not afflict the entire deposition and there were significant portions of Plaintiff's testimony that were taken without incident or interference. Moreover, a reopened deposition would cure any prejudice suffered by Defendants. The Court accordingly cannot conclude at this point that counsel's conduct during the deposition has impaired the ability of Defendants to go to trial or interfered with a rightful decision in the case. See U.S. for the Use and Benefit of Wiltec Guam, Inc. v. Kahaluu Constr. Co., 857 F.2d 600, 603 (9th Cir. 1988) (rejecting terminating sanctions where defendant's discovery violations, including delaying depositions, "certainly caused serious inconvenience for [plaintiff]" but "did not prejudice the outcome of [plaintiff's action"); Joshua Ventures Int'l Inc. v. Morse, No. 05-01018, 2007 WL 923631, at *3 (D. Nev. Mar. 23, 2007) (finding no prejudice where defendant failed to show for deposition because he agreed to appear a week later).

As to less drastic sanctions, the Court has considered (1) whether they are available, and if so, why they would be inadequate; (2) whether they were employed before; and (3) whether the party subject to dismissal was warned of the possibility of dismissal. Although the Court has previously cautioned Plaintiff's counsel about her deposition behavior, it has not previously imposed sanctions. And the Court has not warned Plaintiff of the possibility of dismissal—which it now does, explicitly.

Citing National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 643 (1976), Defendants argue that any sanction short of dismissal will only embolden Plaintiff's counsel. See Motion at 63; Reply at 15-16. In NHL, plaintiffs continuously disregarded their discovery obligations, even in the face

28

of warnings that their failures could result in dismissal. <u>See</u> 427 U.S. at 640-41. We have not reached that point in this case, yet. Nevertheless, Plaintiff and his counsel are expressly warned that failure to comply with this order or any future order may result in a recommendation of dismissal.

## D.    The Renewed Deposition and Additional Sanctions

### 1.    A Renewed Deposition and Monetary Sanctions Are Warranted

Sanctions, including costs and attorneys' fees, may be awarded for conduct that the court finds "impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). The court may order depositions to be resumed or taken again and that the cost be borne by the party whose counsel's conduct necessitated retaking the deposition. <u>See</u> <u>Obrien v. Amtrak</u>, 163 F.R.D. 232, 236 (E.D. Pa. 1995); Fed. R. Civ. P. 30(d)(3)(C) ("Rule 37(a)(5) applies to the award of expenses.").

Here, for the reasons stated above, the Court finds that Plaintiff's counsel impeded and frustrated the fair examination of Plaintiff during his August 14, 2020 deposition. Defendants are entitled to a deposition that is not marred by improper instructions to answer and misconduct of Plaintiff's counsel. Additionally, counsel has not displayed any remorse about her conduct during Plaintiff's deposition. To the contrary, Plaintiff's counsel insisted at least twice during the hearing on this motion that she had not done anything wrong. Plaintiff's counsel is entitled to her point of view, but she is not entitled to continue disobeying the Court's clear orders or engaging in what the Court has repeatedly identified as inappropriate, unprofessional misconduct.

Accordingly, the Court will require that: (1) Plaintiff's counsel pay to Defendants' counsel the costs of the court reporter and videographer for the August 14 deposition and (2) Plaintiff's deposition be taken again within sixty (60) days of this order. This renewed deposition will be governed by an order

29

that implements the requirements of Rule 30, the details of which are set forth at the beginning and end of this order.

During the hearing, Plaintiff's counsel suggested that she would be unable to pay these or other monetary sanctions and may have to terminate her representation if sanctions are imposed. These arguments were not part of the Opposition and there is no evidence in the record regarding Plaintiff's counsel's financial condition. In any event, it is Plaintiff's counsel's repeated misconduct that necessitated the Court's intervention. Lesser sanctions, given the history of this case, would not suffice.

## 2. A Special Master Is Not Warranted

Defendants also seek an order appointing a special master to oversee the renewed deposition. Rule 53 of the Federal Rules of Civil Procedure limits the scope of appointment of special masters to a narrow set of circumstances. See Fed. R. Civ. P. 53(a)(1). The only one relevant here is appointment to "address pretrial . . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). "A pretrial master should be appointed only when the need is clear." Fed. R. Civ. P. 53(a)(1) advisory committee's note to 2003 amendment.

To be sure, the Court has already admonished Plaintiff's counsel both orally and in writing about deposition conduct. It had little effect. However, the Court hopes that this detailed order, and the threat of additional sanctions that will issue if the order is violated, will suffice to permit a new deposition to be completed without a special master. In ordering a renewed deposition the Court is mindful of Plaintiff's representation that attending a deposition would create considerable expense for him personally due to his relocation to Pennsylvania. Regrettably, his counsel's conduct and improper instructions not to answer at his initial deposition make a renewed deposition necessary.

### 3.     Attorneys' Fees for Bringing This Motion

Pursuant to Fed. R. Civ. P. 37(a)(5)(A), if a court grants a motion to compel discovery it must, after giving an opportunity to be heard, require the non-moving party to "pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Id. Because the Court grants Defendants' Motion, Defendants are instructed to file declarations supporting sanctions in the amount of the reasonable expenses related to the motion. Plaintiff and Plaintiff's counsel will have the opportunity to oppose the filings.

## IV.     RECOMMENDATION AND ORDER

Objections to this order are governed by 28 U.S.C. § 636. The recommendation that Defendants' motion for involuntary dismissal be denied is dispositive and objections shall be reviewed de novo by the district judge. See id. § 636(b)(1)(C). The remaining rulings are non-dispositive and may be set aside by the district judge only when they are "clearly erroneous or contrary to law." Id. § 636(b)(1)(A). Objections to this order shall be filed within fourteen (14) days of the date of this order.

IT IS HEREBY ORDERED AS FOLLOWS:

1.     The Court RECOMMENDS to the District Judge that Defendants' motion for dismissal be DENIED.

2.     The Court ORDERS Plaintiff to appear at a renewed deposition of up to seven (7) hours within sixty (60) days of this order. During the renewed deposition, the defending attorney may:

a.     In response to a question, state any or all of the following, if legally appropriate: "Object to form," "I instruct you not to answer," or "Don't include privileged information in your answer."

b.     Request a break when appropriate, which the examining attorney shall agree to if no question is pending.

     c.     When it appears that seven hours of record time has passed, ask the videographer, "has this deposition lasted seven hours of record time?" Upon receiving confirmation that the deposition has lasted seven hours, state "This deposition is over. We are leaving."

     d.     State, if warranted, "I move to terminate [or limit] this deposition under Rule 30(d)(3)," and at his or her option, "I demand that this deposition be suspended for the time necessary to obtain an order."

     e.     The defending attorney may say essentially nothing else during the deposition. The word "essentially" allows for only brief statements concerning the logistics of the deposition, such as "Can you please hand me a copy of the exhibit?" or "My real time monitor stopped working" or the like.

     f.     These paragraphs apply to the defending attorney in his or her capacity as a defending attorney. When he or she does a redirect exam, the roles are reversed, and these paragraphs apply to the attorney who was previously the examining attorney.

     **g.     Vioations of this paragraph by Plaintiff's counsel during a renewed deposition may result in a recommendation of dismissal or other sanctions.**

     3.     The Court ORDERS Plaintiff's counsel to pay Defendants' counsel the costs of the court reporter and videographer for Plaintiff's August 14, 2020 deposition in the amount of $7,086.82 within thirty (30) days of the date of this order. Defendants shall bear the costs for the renewed deposition ordered above.

     4.     The Court ORDERS that Plaintiff and Plaintiff's counsel, jointly and severally, shall pay at least a portion of Defendants' reasonable expenses and attorney's fees for bringing this motion under Rule 30(d)(2) and Rule 37(a)(5)(A). No later than seven (7) calendar days from the date of the issuance of this Order, Defendants shall file declaration(s) supporting sanctions in the

amount of the reasonable expenses related to the motion; Plaintiff and Plaintiff's counsel may, separately or jointly, file opposition(s), no later than seven (7) calendar days from the date Defendants file their declaration(s); and Defendants may file a reply or replies, no later than seven (7) calendar days from the filing of the opposition(s).

Date: January 11, 2021

DOUGLAS F. McCORMICK
United States Magistrate Judge

EXHIBIT B

1   S. Frank Harrell – SBN 133437
2   sharrell@lynberg.com
    Tamara M. Heathcote – SBN 193312
3   theathcote@lynberg.com
4   **LYNBERG & WATKINS**
    A Professional Corporation
5   1100 W. Town & Country Road, Suite 1450
6   Orange, California 92868
    (714) 937-1010 Telephone
7   (714) 937-1003 Facsimile
8   Attorneys for Defendants COUNTY OF ORANGE,
9   DEPUTY CHAD RENEGAR, DEPUTY JOEL GONZALEZ,
    DEPUTY KEVIN PAHEL, DEPUTY BRANDON BILLINGER,
10  DEPUTY MARK BORBA, DEPUTY JAMESON GOTTS and
    DEPUTY JUSTIN GUNDERSON

11

12                  **UNITED STATES DISTRICT COURT**

13                  **CENTRAL DISTRICT OF CALIFORNIA**

14  JEREMY HOLLOWAY,                    CASE NO. 8:19-cv-01514-DOC-DFM

15      Plaintiff,                      *Assigned for All Purposes to:*
                                        *Hon. David O. Carter, Courtroom 9D*
16      vs.
                                        *Assigned for Discovery Purposes to:*
17  COUNTY OF ORANGE,                   *Hon. Douglas F. McCormick, Courtroom*
    DEPUTY CHAD RENEGAR,                *6B*
18  individually and as a peace officer,
    DEPUTY JOEL GONZALEZ,               **DECLARATION OF BRIAN**
19  individually and as a peace officer, **FUERBACH IN SUPPORT OF**
    DEPUTY KEVIN PAHEL, individually    **DEFENDANTS' MOTION FOR**
20  and as a peace officer, DEPUTY      **SUMMARY JUDGMENT, OR IN THE**
    BRANDON BILLINGER, individually     **ALTERNATIVE, SUMMARY**
21  and as a peace officer, DEPUTY      **ADJUDICATION**
    MARK BORBA, individually and as a
22  peace officer, DEPUTY JAMESON       **Date:   December 14, 2020**
    GOTTS individually and as a peace   **Time:  8:30 a.m.**
23  officer, DEPUTY JUSTIN              **Dept.: 9D**
    GUNDERSON, individually and as a
24  peace officer, and DOES 1-10.       *Trial Date: January 19, 2021*
                                        *Second Amended Complaint filed:*
25                                      *December 10, 2019*
        Defendants.
26

27

28

                                    **1**

    **DECLARATION OF BRIAN FUERBACH IN SUPPORT OF DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT**

## DECLARATION OF BRIAN FUERBACH

I, Brian Fuerbach, do state and declare as follows:

1.     I have been employed in the plastics industry since 1989 and has an engineering manager since 2008 and have lived in the County of Orange for fifty-three (53) years.

2.     I have personal knowledge of the facts stated herein, except those stated upon information and belief, and as to those matters, I believe them to be true.  If called upon to testify to the matters herein, I could and would competently do so.

3.     On January 20, 2028, my wife and I went camping for one night at O'Neill Park in our Recreational Vehicle ("R.V."). We arrived during the afternoon of January 20. 2018.

4.     On the side of my R.V. is a large window that is approximately two feet by five feet and below that window is dinette/bed.

5.     My wife and I were camping at campsite 63.

6.     At approximately 2:00 a.m. on January 21, 2018, I was awakened by a sound coming from campsite 65 which was located directly next door to us.  I now understand that campsite 65 was occupied by Jeremy Holloway as I have been deposed by Jeremy Holloway's counsel in the matter of <u>Jeremy Holloway v. County of Orange, et al.</u>, Case No. 8:19-cv-01514-DOC-DFM.

7.     The loud noise at 2:00 a.m. sounded like something had hit my R.V.  The sound was like "boom, boom".  I looked out of the large window above the bed and discovered that it was the sound of the two doors closing on the white truck that was now at campsite 65.  I also heard a male and female talking inside one of the two tents at campsite 65.  At that point I went back to sleep.

8.     At approximately 3:00 a.m. I was awakened again to the sound of yelling and a bunch of expletives.  I also heard fist blows being landed on somebody.  I opened the window above the bed to look out at campsite 65 and saw the tent moving and a woman yelling "No, no, no.  Please stop.  I'm just a girl."  I could also hear the

2

## DECLARATION OF BRIAN FUERBACH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

noise of someone rubbing the inside the tent fabric with what I thought was their arm and then the sound of further fist blows being landed on somebody as the tent moved. I heard my wife yell out the window toward campsite 65, "Stop hitting her".

9.     At this point I was concerned for the woman's safety and called 9-1-1. I reported I had heard a male and female yelling, fists being landed on somebody, and a woman yelling to stop hitting her, that she's just a girl.

10.     While still listening for the peace officers to arrive, I heard the sound of a tent unzip and the sound of footsteps running across gravel.

11.     When the sheriff deputies arrived I looked out the large window above my bed and could hear the deputies ask Jeremy Holloway to step out of his tent. Mr. Holloway was combative and did not want to come out of the tent. Mr. Holloway was yelling and cursing at the deputies. Eventually I saw him come out of the tent. I saw the deputies and Mr. Holloway speaking but could not hear the precise words. After a total of five to ten minutes, the deputies left.

12.     After the deputies left, it was quiet for approximately ten minutes. After this time, Jeremy Holloway started going up and down the road yelling at the various campsites for the person who called the police to come out. When Mr. Holloway got in front of our RV, he stopped and was yelling "I know it was you, mother f*cker. Come out." Due to Mr. Holloway's actions I felt threatened and was afraid of what he may do.

13.     After a while, Mr. Holloway went away from my RV.

14.     After a short period of time the deputies came back to Jeremy Holloway's campsite. Mr. Holloway was extremely combative with the deputies. The deputies asked Mr. Holloway to show his hands. Mr. Holloway refused to cooperate. They asked him to put his hands on his head but he would not comply. In my opinion, Mr. Holloway was acting in a threatening manner toward the deputies because he was yelling at them, being verbally abusive and not cooperating.

15.     After Jeremy Holloway was on the ground, I could see that Mr. Holloway

3

1  appeared to be fighting to get away.  Mr. Holloway's tent, however, obstructed my

2  view of what occurred next.

3      16.   I am thankful that law enforcement returned to the campground the

4  second time as we needed law enforcement protection from Jeremy Holloway.

5      I declare under penalty of perjury under the law of the United States of America

6  that the foregoing is true and correct.

7      Executed this 23rd day of October, 2020, in Ontario, California.

8

9

10      **BRIAN FUERBACH, Declarant**

11

12

13

14  4818-9937-1471, v. 1

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF BRIAN FUERBACH IN SUPPORT OF DEFENDANTS'**

EXHIBIT C

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | SA CV 19-01514-DOC (DFMx) | | Date: | July 23, 2020 |
|---|---|---|---|---|
| Title | Jeremy Holloway v. County of Orange et al. | | | |

| Present: The Honorable | Douglas F. McCormick, United States Magistrate Judge | |
|---|---|---|
| Nancy Boehme | | Not Present |
| Deputy Clerk | | Court Reporter |
| Attorney(s) for Plaintiff(s): | | Attorney(s) for Defendant(s): |
| Not Present | | Not Present |

| Proceedings: | **(IN CHAMBERS) Order Granting Plaintiff's Ex Parte Application to Order Resumption of Defendant Renegar's Deposition (Dkt. 69)** |
|---|---|

> A deposition is a judicial proceeding that should be conducted with the solemnity and decorum befitting its importance. Lawyers participating in depositions should comport themselves in a professional and dignified manner. When lawyers behave otherwise, it reflects poorly on the entire judicial process.

MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., No. 13-06089, 2014 WL 12754932, at *1 (C.D. Cal. Aug. 28, 2014).

\* \* \* \* \*

This is a police excessive-force case. Earlier this month, on July 7, Plaintiff's counsel took the deposition of one of the primary deputy-defendants, Chad Renegar. Unfortunately, the deposition did not live up to the standards set forth in the paragraph above. It ended prematurely when Renegar and his counsel unilaterally terminated the deposition.

The following day, Plaintiff's counsel filed an ex parte application to compel the resumption of Renegar's deposition. See Dkt. 69 ("Application"). Plaintiff's counsel sought an order compelling the resumption of Renegar's deposition on a mutually agreeable date and an award of $5,000 in sanctions. See Dkt. 69-2. Defendants filed an opposition. See Dkt. 70.

I held a telephonic conference with counsel on July 9, 2020. During the call, I learned that Plaintiff's counsel had videotaped the deposition. As the parties did not agree on who was at fault for the deposition going awry, I asked Plaintiff's counsel to submit a copy of the video recording.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Plaintiff's counsel also later provided me with a transcript. I have read the entire transcript and reviewed substantial portions of the video. Based on that review, I now rule as follows:

The Federal Rules allow a party or a deponent to move to terminate a deposition. <u>See</u> Fed. R. Civ. P. 30(d)(3)(A).[1] The rules provide that a deposition may be terminated or limited if "it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." <u>Id.</u>

In deciding whether to terminate a deposition, courts have focused on the "manner in which the interrogation is conducted." <u>In re Stratosphere Corp. Sec. Litig.</u>, 182 F.R.D. 614, 619 (D. Nev. 1998). Courts have also observed that depositions should be halted or limited "sparingly." <u>E.g.</u>, <u>Smith v. Logansport Cmty. Sch. Corp.</u>, 139 F.R.D. 637, 640 (N.D. Ind. 1991). This pre-disposition against terminating depositions makes sense; not only do courts want depositions to be completed, but they also do not want to be burdened with mid-deposition motions to terminate every time counsel have a dispute.

Here, although I have, as detailed below, considerable concerns about the manner in which Renegar was questioned by Plaintiff's counsel, those concerns do not overcome my reluctance to see a key witness's deposition terminated before completion. For that reason, the Application to resume Renegar's deposition is GRANTED. Renegar's deposition shall resume on a date, time, and location that is mutually agreeable to counsel and that is before the discovery cut-off date. The remaining portion of Renegar's deposition shall be limited to 90 minutes.[2]

But that's not the only relief Plaintiff's Application seeks. Plaintiff's counsel also seeks $5,000 in sanctions to cover her attorney's fees and court reporter's costs. Rule 37(a)(5) applies to an award of expenses for an unsuccessful motion to terminate. <u>See</u> Fed. R. Civ. P. 30(d)(3)(C). Under Rule 37(a)(5)(A), a payment of expenses is not warranted if the losing party's position is "substantially justified."

Plaintiff's request for sanctions is DENIED. Although I do not agree that Renegar's deposition should be terminated, his deposition was, to put it mildly, a train wreck. And

---

[1] Although the matter is before me on Plaintiff's Application to resume the deposition rather than Defendants' motion to terminate Renegar's deposition, I view the procedural posture as meaningless. It was Plaintiff who caused the procedural posture by filing an <u>ex parte</u> application. And it is clear that Rule 30(d)(3)(A) is the correct standard for deciding Plaintiff's Application.

[2] The record shows that the July 7 deposition began at 9:10 and was terminated at 4:15, and that off-the-record breaks totaling 1 hour and 35 minutes were taken. <u>See</u> Tr. at 5, 32, 114, 133, 192, 249, 284.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

responsibility for that result lies predominantly with Plaintiff's counsel. I expect, as I told counsel during the July 9 telephone conference, that all counsel should comport themselves in the deposition the same as if they were in the courtroom.[3]

It is clear from the transcript and the video that Plaintiff's counsel repeatedly fell short of this standard. Most courts would not permit a lawyer to comment on a witness's answers to her questions. Plaintiff's counsel did this, repeatedly. See, e.g., Tr. at 166 ("A. I do not recall. Q. You don't recall a lot of things."); 270 ("Q. Do you remember ever telling him why this guy is bleeding to his face? A. I do not recall what I told him. Q. Because you didn't care; right? The guy is injured. You don't give a shit."). Similarly, most courts would not permit a lawyer to editorialize about how a jury would view Plaintiff's testimony. Plaintiff did this, also repeatedly. See, e.g., Tr. at 167 ("And if you are a defendant in this case, do you think the jury will believe that you remember anything? Do you think? I can't wait until we get to trial."). Most courts would also put a stop to arguing between counsel. This happened repeatedly, usually instigated by remarks from Plaintiff's counsel. See, e.g., Tr. at 95 ("Do you understand what 'misstating the evidence' means?").

As the deposition continued into the afternoon, Plaintiff's counsel grew increasingly bellicose with Renegar's responses. Rather than questioning him, she lectured him about his answers. See, e.g., Tr. at 204 ("You come back again and you come back again and now you are, in fact, engaging in use of force and at gun point telling him to 'Get down on the ground.' So you need to justify your actions. You need to justify your actions."). When Defendants' counsel objected to these tirades, she turned on her. See, e.g., Tr. at 208 ("It's a joke. This civil litigation is entirely a joke. You know. Complete joke. But wait until we get to trial and you will see."). By her own admission on the record, she raised her voice, and the Court's review of the video recording shows that she raised her voice several times. See, e.g., Tr. at 267 ("I will raise my voice as long as I want.").

As noted above, I also watched substantial parts of the video recording of the deposition. If anything, the video recording is worse than the cold transcript. For the most part, Renegar and his counsel are largely subdued. Plaintiff's counsel is anything but. Not only does she raise her voice, but it appears to me that she slaps the conference room table at least twice. Her tone of voice ranges from exasperated to indignant. She appears to lose her temper several times. I am confident that none of these antics would have been permitted to persist in any courtroom in the federal courthouse in Orange County.

---

[3] The Advisory Committee notes to Rule 30 make that expectation explicit: "[i]n general, counsel should not engage in conduct during a deposition that would not be allowed in the presence of a judicial officer."

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

     Finally, after Defendants' counsel accused Plaintiff's counsel of wasting time, Plaintiff's counsel erupted "Excuse me. Excuse me. I'm tired of you. . . . If you are here to testify to the truth, the whole truth, but the truth, why can't you admit a simple fact from your own fricking fucking report." Tr. at 282. This inappropriate and profane outburst caused Defendant's counsel and her client to leave the deposition. See Tr. at 282-84.

     In sum, although I am ordering Renegar's deposition resumed, I cannot find that Defendants' counsel's decision to leave the deposition was without substantial justification. But I also do not want to leave the impression that Defendants' counsel's behavior was beyond reproach. Her repeated objections of "misstates testimony" and "the document speaks for itself" were not well-taken, even if they were not overly disruptive and do not appear to be a consistent effort to coach the witness. And threats to terminate a deposition are not generally helpful, and Defendants' counsel begins making such threats within the first hour. Finally, although she largely remained professional in the face of Plaintiff's counsel's behavior, she made several inappropriate remarks in the latter stages of the proceeding. See Tr. at 207 ("I thought the whole case was [a joke], but I tried not to say anything like that."); 277 ("You think that's funny."); 281 ("You're wasting time. Tick tock."). Like Plaintiff's counsel's outbursts, those remarks would not have been tolerated in the courtroom.

* * * * *

     "No one expects the deposition of a key witness in a hotly contested case to be a non-stop exchange of pleasantries. However, it must not be allowed to become an excuse for counsel to engage in acts of rhetorical road rage against a deponent and opposing counsel." Freeman v. Schointuck, 192 F.R.D. 187, 189 (D. Md. 2000). Depositions have continued in this case since Renegar's deposition was terminated. I trust that my remarks on July 9 and this subsequent ruling will cause those depositions to be conducted without the rancor that was exhibited on July 7.

EXHIBIT D

1

2

3

4

5

6

7

8                    TRANSCRIPT OF AUDIO-RECORDED

9                       TELEPHONIC HEARING

10

11                      SEPTEMBER 2, 2020

12

13        IN THE CASE OF HOLLOWAY V. COUNTY OF ORANGE, ET AL.

14

15

16

17

18

19

20

21

22

23

24

25

1      CLERK:  Now on case SACV-19-1514, Jeremy Holloway

2  versus County of Orange et al. Counsel, your

3  appearances, please.

4      MS. MKRTCHYAN:  Yes, Narine Mkrtchyan on behalf

5  of plaintiff, Holloway.

6      MR. HARRELL:  Good afternoon, Your Honor, Shel

7  Harrell and Tamara Heathcote for the defendant. And we

8  also have a representative from the Orange County DA's

9  office in attendance pursuant to the request of the

10  court.

11      MR. CLAUSTRO:  And, uh, my name is, uh, Israel

12  Claustro, C-l-a-u-s-t-r-o, and I'm from the Orange

13  County District Attorney's office.

14      THE COURT:  All right. Thank you, Ms. Mkrtchyan;

15  thank you, Mr. Harrell and Ms. Heathcote and thank you

16  District Attorney. This is Judge McCormick.

17      Um, so we have -- I got three things on ag- -- on

18  the agenda today. And -- and a courtesy to Mr.

19  Claustro because he doesn't have anything to do with

20  Items 2 and 3, let's start with the DA's office, uh,

21  documents.

22      As I recall, we discussed some months ago with

23  one of your counterparts or colleagues in the District

24  Attorney's office, um, Mr. Claustro the fact that

25  there were some, uh, internal case notes related to

2

```
 1    the declination of Mr. Holloway's case.

 2         Um -- or I guess the pre- -- presentation of Mr.

 3    Holloway's case. Um, what's the status of that at this

 4    point, the case?

 5         MR. CLAUSTRO:  Um, there -- the investigation has

 6    -- has con- -- is actually completed, Judge. So, uh,

 7    to keep --

 8         THE COURT:  All right.

 9         MR. CLAUSTRO:  -- this short --

10         THE COURT:  I [inaudible] -- defend Mr.

11    Holloway's case and I misspoke --

12         MR. CLAUSTRO:  Yeah.

13         THE COURT:  -- and I meant Renegar's case.

14         MR. CLAUSTRO:  Yes. I -- I -- I believe that

15    that's how I understood it, Judge. Um, so, the -- the

16    con- -- the investigation has concluded. Um -- uh, the

17    investigation portion of it included -- and not to get

18    too far afield, the investigation in- -- included a

19    number of, uh, interviews by Sheriff's Department and

20    other officials, as well as our office.

21         We also, uh, prior to making any decision on

22    filing or not filing, uh, we also required the use of

23    multiple experts that we, um, had to, uh -- uh, retain

24    and, um, and actually consult to determine whether or

25    not, you know, any filing was or was not appropriate.
```

3

1    So, that part of the -- that portion of the

2    investigation is concluded.

3        The last thing that -- that's, uh, that's waiting

4    to be done is -- whether or not we're going to file

5    any charges at all. Um, so that is kind of in abeyance

6    right now. And, um -- uh, that's the only thing left.

7    So, I anticipate that we should have a decision within

8    the next 30 or 45 days on that.

9        THE COURT:  All right. With the body of documents

10   that I -- I reviewed, as I recall --

11       MR. CLAUSTRO:  Yes.

12       THE COURT:  -- were -- were -- were, um, some

13   internal reports at the, uh -- from the Sheriff's

14   Department relating to some initial, um, documents

15   that were collected and some statements that were

16   made. Um, I -- I -- [inaudible] I think I've promised

17   -- or not promised, because I think I've told Ms.

18   Mkrtchyan on other occasions, it is going to be

19   disappointing to her, uh, I think, but that doesn't

20   mean -- the fact that that's disappointing doesn't

21   mean she's not entitled to it --

22       MR. CLAUSTRO:  Sure.

23       THE COURT:  -- um, I'm -- I'm -- I'm ordered --

24   I'm inclined to order the production of what I -- what

25   I reviewed several months ago and -- and -- and if and

1    when the Court -- the -- the case is declined or not

2    declined or whatever it is you decide to do with it,

3    so be it. Um, because I do have a very, very tight

4    deadlines [sic] here and I have discov- -- a district

5    judge who's going to hold the parties to those

6    deadlines. And we've -- we've -- we've taken about as

7    long as we can with this.

8        MR. CLAUSTRO:  Sure. And, uh, I'll tell you our -

9    - our position on that is, um -- um, just -- just the

10   Court is aware even before I even state what our

11   position is on that is, that, um, in addition to the

12   document that you have, Judge, um, I don't believe

13   that the last, uh, portion of the investigation of

14   those documents is included in what the court has or

15   has reviewed in camera --

16       THE COURT:  Probably not.

17       MR. CLAUSTRO:  -- so, um, that may or may not

18   make a difference, but I -- I -- I tend to agree with

19   you that there's, you know, I don't know that -- that

20   -- that -- I mean I'm not trying this case but I don't

21   know that anything there is going to be relevant, but

22   if it is, um, there -- there may be supplemental, uh,

23   documents that may or may not be dis- -- disclosed to

24   defen- -- to plaintiff's counsel, uh, at some point.

25       But, um, as far as our position on it, I -- I

1    mean I think, um, I'll let -- I'll let County counsel,

2    uh -- uh, chime in on that --

3        THE COURT:  Right.

4        MR. CLAUSTRO:  -- but as far as I'm concerned,

5    uh, we -- we don't -- I mean we don't have a -- a

6    horse in that race.

7        Nevertheless, um, the documents themselves, um,

8    as far as I -- I can tell, they, uh, are part of that,

9    uh, internal criminal investigation and, uh, to be

10    candid with the court as I just stated, um, in

11    addition to those documents the court has, we have

12    additional investigative as well as expert documents

13    that, um, you know, pursuant to -- to -- to any order

14    that the court issues we probably would, uh, require

15    to supplement the court's packet with what we have.

16        THE COURT:  All right. Well, let -- let me hear

17    from Mr. Harrell and Ms. Heathcote and then -- and

18    then -- and then I think -- I think we need to push

19    ahead.

20        MR. HARRELL:  Your Honor, thank you. Um, my -- my

21    interest here, um, is standing up for my client with

22    regard to what we're speaking about now that is the

23    Orange County DA's office.

24        Um, I -- I want them to be able to do their job

25    in an atmosphere where they think, uh, justice can be

1      -- be done and the level of secrecy or publicity that

2      surrounds the documents they generate, um, I have no

3      problem with anything being turned over just so long

4      as, uh, the Orange County DA's office feels that

5      turning this material over is not going to compromise

6      their efforts to come to a just decision with regard

7      to filing or not filing against Deputy Renegar.

8           THE COURT:  All right. Um, re- -- re- -- my --

9      refresh my recollection, Mr. Harrell or Ms. Heathcote.

10     Were the documents that were submitted to me in camera

11     submitted to me by -- by -- by you or by the District

12     Attorney's office?

13          MS. HEATHCOTE:  They were given to us by the

14     District Attorney's office in a sealed envelope and

15     that's what we then provided to the court. So, we do

16     not have a copy of what was in there nor do we know

17     what's in there.

18          THE COURT:  Okay.

19          MR. HARRELL:  Yeah.

20          THE COURT:  All right. Um, Mr. Claustro, do you

21     have a record, I -- I -- I -- I don't want to put my -

22     - I'm not a producing party. I don't want to be --

23          MR. CLAUSTRO:  Sure.

24          THE COURT:  -- myself in the position of

25     producing documents. Uh --

```
 1          MR. CLAUSTRO:  Sure.

 2          THE COURT:  -- would -- would you be able to

 3    produce to Ms. Mkrtchyan a copy of what was submitted

 4    to the Court?

 5          MR. CLAUSTRO:  Uh, yes, Your Honor. We -- we can

 6    do that. Um --

 7          THE COURT:  Okay.

 8          MR. CLAUSTRO:  -- however, uh, in the interest

 9    of, um -- of preserving the integrity of our case,

10    investigation, until we make that decision, would the

11    court be inclined to -- to issue that order with --

12    with the protective order so that --

13          THE COURT:  You could --

14          MR. CLAUSTRO:  -- the documents are not --

15          THE COURT:  -- you can, uh -- you can produce

16    them subject to the parties' protective order in this

17    case.

18          In fact, I'll order the documents produced be

19    deemed, um -- order -- order the document -- what are

20    the various confidentiality designations the parties

21    have, Mr. Harrell, Ms. Heathcote, Ms. Mkrtchyan? What

22    -- what -- what -- what categories do you have?

23          MR. HARRELL:  Uh --

24          MS. MKRTCHYAN:  Well, we have --

25          MR. HARRELL:  -- Your Honor, I apologize. We --
```

1   we don't have the -- the protective order in front of

2   us now. If it's not broad enough, if it doesn't do the

3   job, um, [inaudible] --

4       THE COURT:  Well, let -- let me ask Ms. Mkrtchyan

5   because she started to answer. Ms. Mkrtchyan, what --

6   what categories --

7       MS. MKRTCHYAN:  Yes.

8       THE COURT:  -- of -- are -- are in the protective

9   order?

10       MS. MKRTCHYAN:  Yes, Your Honor. We have, you

11   know, all categories covered:  Official information

12   privilege, um, attorney work product, anything that is

13   related to any privileges that are recognized --

14       THE COURT:  My -- my --

15       MS. MKRTCHYAN:  -- by [inaudible] --

16       THE COURT:  -- my question is --

17       MS. MKRTCHYAN:  -- [inaudible] --

18       THE COURT:  -- is there confidential, highly

19   confidential, attorneys' eyes only or is there just --

20   just one -- just confidential?

21       MR. HARRELL:  One broad category --

22       MS. MKRTCHYAN:  [inaudible] --

23       MR. HARRELL:  -- Your --

24       MS. MKRTCHYAN:  And --

25       MR. HARRELL:  -- Honor.

9

1    MS. MKRTCHYAN:  -- it is --

2    THE COURT:  Okay.

3    MS. MKRTCHYAN:  -- attorneys' eyes only and I

4    think that, um, my understanding would be that the

5    protective order we have right now would cover that.

6    But I wanted to make sure, Your Honor, that I get

7    all supplemental additional records that have been,

8    um, investigated and have been, uh, compiled by the

9    DA's office after the court's received this [sic]

10   records because I think that they're entitled to the

11   complete -- complete, um, investigative file under the

12   -- the protective order.

13   THE COURT:  Okay. I'm going to order the -- the

14   District Attorney's office to produce what they

15   previously submitted to court to Ms. Mkrtchyan within

16   seven days. Under the terms of the parties' protective

17   order, uh, those documents will be produced

18   [inaudible] -- those documents will be treated as

19   attorneys' eyes only.

20   Um, Ms. Mkrtchyan, if after receipt of those

21   documents you wish to address with me the remainder of

22   the District Attorney's office file, you can do that

23   in a subsequent proceeding.

24   MS. MKRTCHYAN:  Well, Your Honor, we don't have

25   much time left. We haven't even gotten --

1        THE COURT:  Ms. Mkrtchyan --

2        MS. MKRTCHYAN:  -- [inaudible] --

3        THE COURT:  -- I'm not arguing with you. I just

4    ruled. Thank you.

5        [whispering in background, inaudible]

6        THE COURT:  Um, Mr. Claustro, uh, you understand

7    your marching orders?

8        MR. CLAUSTRO:  I do, Your Honor. Uh, the only

9    issue left for me is, um -- um, does the -- does the

10   court -- is the court requiring us to turn over those

11   documents, um -- uh, only to Ms. Mkrtchyan?

12       THE COURT:  Well, yeah. You can also -- you can -

13   - you should provide a copy to -- to -- to -- to, um,

14   Mr. Renegar -- to Deputy Renegar's counsel.

15       MR. CLAUSTRO:  Okay.

16       THE COURT:  Yeah.

17       MR. CLAUSTRO:  Okay.

18       MR. HARRELL:  And I'll just state for the record,

19   I have no plans to look at any of that until the DA

20   has reached a determination on what they're going to

21   do.

22       MR. CLAUSTRO:  Great.

23       THE COURT:  Okay. Uh, Mr. Claustro, thank you so

24   much for -- for -- for being with us today. It's been

25   very helpful, um, and -- and I appreciate your

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    office's participation in this matter.

2         MR. CLAUSTRO:  Thank -- thank you, Your Honor.

3         THE COURT:  Thank you. All right. Um, counsel,

4    let's turn then to the 24 written --

5         [AUTOMATED VOICE]:  Israel Claustro has left the

6    conference.

7         THE COURT:  -- let's turn then to the 24 written

8    interrogatories that I reviewed. Um, I've reviewed,

9    um, like I said 24 written interrogatories. I have

10   reviewed the moving papers filed by, um, Deputy

11   Renegar and the County. Um, I have reviewed Ms.

12   Mkrtchyan's opposition.

13        Um, as I think I've already indicated in a -- at

14   least one written order in this court, in -- in this

15   case, this case has been, uh -- uh, afflicted by

16   problems with discovery, uh, really since the outset

17   and, um, candidly, Ms. Mkrtchyan, I -- I -- I find

18   that you're responsible for most of those problems and

19   nevertheless, there are some written interrogatories

20   here that are problematic in my view and your

21   objections to them are, uh, well taken and your --

22   your ability to re- -- your -- the -- the motion as to

23   those, uh, is not well taken. So, I'm in a bit of fix.

24        Um, I want to go through these one by one. I'm

25   happy to do that. Uh, and -- and -- and -- and make

1    sure you've told me what you need to tell me.

2        Um, I think my initial thought was it will be

3    helpful for me to rule on these, um, before we talked

4    about the written R- -- the RFP requests that are the

5    subject of the next potential motion, but you may feel

6    differently about that.

7        Um, so, my thought is we start with Number 1,

8    County Number 1 and go from there. Um, I would deny

9    the motion as to County Number 1, I find that the

10   response is adequate.

11       Mr. Harrell, Ms. Tec- -- Ms. Heathcote do you

12   want to be heard on that? Anything you have to say

13   that -- in addition to what's in your motion papers?

14       MR. HARRELL:  Your Honor, nothing to add apart

15   from what we've briefed.

16       THE COURT:  Okay. Motion is denied as to

17   Interrogatory Number 1.

18       Uh, as to Interrogatory Number 2, um, same

19   ruling, I've denied the motion of Interrogatory Number

20   2. Mr. Mkr- -- uh, Mr. Heathcote -- or Ms. Heathcote

21   or Mr. Harrell, anything to add?

22       MR. HARRELL:  Uh, Your Honor, um, the, um -- the

23   -- the point that we have a concern on here, is that

24   the plaintiff's counsel seems to be saying, um, I

25   don't need to give you this information because you

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    can go talk to the plaintiff at a deposition and we

2    have tried to do that and I'd like to address that a

3    little bit, but before I do that, I want to find out

4    if, um, that is the reason why that the court is

5    inclined not to grant the motion with regard to these

6    interrogatories asking for the basic facts of

7    plaintiff's case.

8         THE COURT:  I found that the description in that

9    -- in Interrogatory Number 1 was sufficient. Um, for

10   Interrogatory Number 2, uh, I think the -- again, the

11   description here is sufficient. Uh, he -- he's unable

12   to identify which deputy inflicted which of the

13   injuries and he says so.

14        Um, we could turn then to Interrogatory Number 3,

15   uh, I mean I think that -- that, uh, I would order a

16   supplemental response to Interrogatory Number 3 and he

17   -- he needs to describe -- provide descriptions of

18   what he recalls about the deputies who he recalls

19   assaulted him.

20        Um, you know, there are some deputies I think who

21   are in the category of -- of assailant. There are some

22   deputies who are in the categories of failure to

23   intervene.

24        We need to know because the jury may care about

25   that and, uh, so I think that is -- that's, you know,

1    I -- I've looked at these responses carefully and --

2    and -- and tried to be thoughtful about what I think

3    is necessary, so I think a supplemental response to

4    Number 3 is warranted.

5         I don't know if that responds to your question,

6    Mr. Harrell, or not.

7         MR. HARRELL:  Um -- um, yes. I -- I -- I think of

8    three, I think that Number 3 is, uh, the most

9    important. Um, and with that, I will -- I will, um,

10   ask the court to please continue with rulings.

11        THE COURT:  Ms. Mkrtchyan, you want to be heard

12   on Number 3 since I'm asking for a supplemental

13   response?

14        MS. MKRTCHYAN:  Yes. Because it doesn't really,

15   um, look like to me that, uh, parties are

16   understanding the responses by plaintiff.

17        Um, the plaintiff says I could not see the people

18   that attacked me and I cannot give physical

19   descriptions, etcetera, of -- of the people who

20   attacked me. He pro- -- was deposed on the subject --

21        THE COURT:  Ms. -- Ms. Mkrtchyan, can --

22        MS. MKRTCHYAN:  -- [inaudible] --

23        THE COURT:  -- I interrupt you for a moment?

24        MS. MKRTCHYAN:  Yes.

25        THE COURT:  Where in the response does he say he

1    did not -- did not see and cannot identify?

2         MS. MKRTCHYAN:  Well, the -- the -- the response

3    itself is saying that, you know, and I --

4         THE COURT:  I'm reading --

5         MS. MKRTCHYAN:  -- I think that --

6         THE COURT:  -- I'm on page -- I'm on Document 79,

7    page 13, um, which is I think your -- your -- your

8    document, um, lines 8 through 18.

9         MS. MKRTCHYAN:  Well, yes, I understand what

10   you're saying but what I'm saying is, that after the

11   interrogatory, you know, he was deposed. I mean what -

12   - what about the fact that he was deposed?

13        I mean, I really do not -- he already responded

14   to the same questions posed to him at his deposition

15   and he did not provide any more information, so right

16   now there's no further information to be provided

17   aside from what he said at his deposition.

18        He could not -- he cannot provide height and

19   weight of these people, physical descriptions,

20   etcetera, so I mean is the court going to say that the

21   fact that plaintiff was deposed subsequently --

22   subsequent to these interrogatories is irrelevant to

23   this discovery proceeding?

24        THE COURT:  Yes. You're ordered to produce a --

25        MS. MKRTCHYAN:  Okay.

16

1          THE COURT:  -- supplemental response to

2     Interrogatory Number 13 [sic] within 14 days.

3          MS. MKRTCHYAN:  Well, you know, I would object to

4     that because I think that that is --

5          THE COURT:  You can take it with --

6          MS. MKRTCHYAN:  -- exactly --

7          THE COURT:  -- Judge Carter by --

8          MS. MKRTCHYAN:  -- [inaudible] --

9          THE COURT:  -- filing a motion for review.

10         MS. MKRTCHYAN:  Well, you know, Your Honor, I --

11    I will take it up with the Judge Carter because I

12    think that --

13         THE COURT:  Ms. --

14         MS. MKRTCHYAN:  -- you are bias against plaintiff

15    and you're bias towards me. In fact, from the very

16    beginning of this case that I would like to say that,

17    you know, I don't appreciate impartiality. Judiciary

18    is a very important fact especially inside of court --

19         THE COURT:  You may -- you may -- you may --

20         MS. MKRTCHYAN:  -- [inaudible] --

21         THE COURT:  -- you may put that in a --

22         MS. MKRTCHYAN:  -- [inaudible] --

23         THE COURT:  -- Ms. Mkrtchyan, please stop

24    talking.

25         MS. MKRTCHYAN:  [inaudible] --

1           THE COURT:  The fact -- you -- you may put that

2      in your --

3           MS. MKRTCHYAN:  -- [inaudible] --

4           THE COURT:  -- filing to Judge --

5           MS. MKRTCHYAN:  -- you're going to interrupt me?

6      If you're going to interrupt me, Your Honor, then this

7      proceeding is totally out of place.

8           THE COURT:  Okay.

9           MS. MKRTCHYAN:  Now you can make --

10          THE COURT:  Ms. --

11          MS. MKRTCHYAN:  -- your ruling --

12          THE COURT:  -- Mkrtchyan --

13          MS. MKRTCHYAN:  -- I don't want to be --

14          THE COURT:  -- Ms. Mkrtchyan --

15          MS. MKRTCHYAN:  -- part of this when I'm being

16     interrupted. As an attorney, I have the right to speak

17     and represent my client.

18          And if you're not going to let me speak, then I

19     would like to be just -- get -- get off this, uh,

20     hearing because it's not appreciated that you're

21     interrupting me as an attorney of record. So, please,

22     you know, as a judge, you are obligated to hear from

23     each party, regardless of whether you agree with me or

24     not.

25          THE COURT:  Okay.

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1          MS. MKRTCHYAN:  And if I'm not going -- if I'm

2     going to be interrupted and I have no right to speak,

3     maybe I will just, uh, ask you to make your rulings in

4     writing. I have made my record in writing, so perhaps

5     I should not be part of this since you're biased

6     towards me personally.

7          THE COURT:  That's what I'll do then. Court will

8     issue a written ruling --

9          MS. MKRTCHYAN:  [inaudible] --

10          THE COURT:  -- um, and I'll have a written ruling

11     for you on each of the interrogatory responses.

12          MS. MKRTCHYAN:  Thank you --

13          THE COURT:  Um --

14          MS. MKRTCHYAN:  -- very much.

15          THE COURT:  -- we'll do that. I don't have any

16     problem with that. Um --

17          MS. MKRTCHYAN:  Thank you.

18          THE COURT:  -- Interrogatory Number 4 --

19          MS. MKRTCHYAN:  Well, then I'm going to be

20     excused from this hearing?

21          THE COURT:  Yeah.

22          MS. MKRTCHYAN:  Because I don't want to be part

23     of the hearing where I'm being interrupted and

24     disrespected, so perhaps, um, you know I can just, uh

25     -- you know, be excused and the court can make its

1    rulings.

2         THE COURT:  No.

3         MS. MKRTCHYAN:  I have nothing yet -- I have

4    nothing else to add to what I have written and I just

5    do not appreciate, uh, the fact that I'm being

6    disrespected and, um, mistreated entirely, um,

7    inappropriately by the court.

8         So, I just, um -- I'm going to ask to be excused

9    and you can continue with your hearing without me, uh,

10   because this is disrespectful toward me. I feel like

11   this is not only bias towards plaintiff but also to me

12   personally, despairingly, constantly interrupting me.

13        You know, I -- just because we have judge, um, it

14   does not mean that the judge can interrupt counsel.

15   And I am representing a party, a victim of police

16   brutality, uh, and I just do not appreciate this type

17   of treatment.

18        So, if the court is inclined to continue

19   interrupting me and not hearing from, I will -- I'm

20   just going to be asking to excuse me so that I can

21   leave, and you can make your rulings. Do I have the

22   permission --

23        THE COURT:  [inaudible] --

24        MS. MKRTCHYAN:  -- to leave this hearing?

25        THE COURT:  You do not have permission to leave

1    the hearing, Ms. Mkrtchyan.

2        MS. MKRTCHYAN:  Well, I want to be excused. I

3    don't want to be part of this proceeding because I

4    don't appreciate the court, you know, violating the

5    rules of impartiality and interrupting me.

6        It's discourteous. It's discourteous. You are

7    bias towards me as plaintiff's counsel. You have also

8    disparaged me on the record.

9        As an attorney of many years, you have disparaged

10   me, called my deposition a train wreck that has been

11   used by the defense skillfully to disparage me, that's

12   defamation of, okay? None of my depositions have been

13   a train wreck. It's just it's in the eye of the

14   beholder.

15       I don't know what is your background, Your Honor,

16   I don't appreciate that, you know, and I understand

17   that that is bias towards me and towards my client.

18       So, right now, I don't feel comfortable

19   continuing this because I feel like, you know, I'm

20   being really, um, mistreated and disparaged and

21   harassed, uh, as a female attorney, I don't appreciate

22   that. So, if you can continue without me, that is

23   great. Uh, I appreciate your time taking this.

24       I'm not going to continue with this proceeding

25   where I'm being disrespected entirely and, um, you

 1    know, my client's rights are being violated wrongly.

 2         So, um, I'm going to excuse myself if you're not

 3    letting me to excuse myself because I don't think that

 4    this proceeding is impartial. Okay. Thank you.

 5         AUTOMATED VOICE:  Narine Mkrtchyan has left the

 6    conference.

 7         THE COURT:  All right. The record will show that

 8    Ms. Mkrtchyan has left the conference.

 9         Uh, Mr. Harrell, would you like to, uh, be heard

10    on the, uh, interrogatories which I intend to deny the

11    County or Deputy Renegar's, uh, motion on?

12         MR. HARRELL:  Uh, Your Honor, I -- I believe

13    we've adequately addressed it in the papers. Uh, we

14    made our best pitch and the court did not find it

15    persuasive and we accept that. And, uh --

16         THE COURT:  Well, I -- I don't -- I -- I -- I

17    have others that I would -- would have discussed with

18    you, uh, and -- and I -- I would -- I don't want to,

19    um, forestall or foreshorten your opportunity to be

20    heard on those because Mkrtchyan chose not to

21    participating in this hearing.

22         MR. HARRELL:  I understand. Um, the denials are

23    with regard to 1 and 2 and the court is granting the

24    motion as to Number 3 and that's what my notes show

25    how far we made it before, um -- uh, plaintiff's

1    counsel left the hearing.

2         THE COURT:  Yes. Um, I -- so I -- I can go

3    through and -- and tell you which of the additional

4    ones I would have been inclined to deny. Uh --

5         MR. HARRELL:  Yes.

6         THE COURT:  -- and -- and -- and you can have an

7    opportunity to be heard on those. Uh, I don't --

8    again, I don't want to foreshorten your opportunity to

9    be heard on a motion you brought because plaintiff's

10   counsel's declined to participate.

11        MR. HARRELL:  I understand if there're any

12   denials, um -- uh, I would be happy to address that if

13   I think I have something worthwhile to offer on the

14   balance of the motion that we brought.

15        THE COURT:  Okay. Well, let me -- let me give you

16   the numbers real quick and you can look through them

17   and then --

18        MR. HARRELL:  Sure.

19        THE COURT:  -- you can -- you can ask whether you

20   want -- you wish to be heard. I would have denied or

21   would be inclined to deny, uh, the motion as to County

22   Interrogatory Number 5, County Interrogatory Number 9,

23   County Interrogatory Number 12, County Interrogatories

24   17 and 18, County Interrogatory Number 20 and County

25   Interrogatory Number 25.

1    Um, I was probably going to discuss with the

2    parties Renegar Inter- -- Renegar Interrogatory Number

3    2 but since Ms. -- Ms. Mkrtchyan is -- is, uh, no

4    longer participating, I will probably have to forge

5    ahead a- -- alone on that.

6        MR. HARRELL:  Um, understood, Your Honor. If you

7    can give me a moment, I --

8        THE COURT:  Take as much time as you need.

9        MR. HARRELL:  Right, Your Honor. Uh,

10   Interrogatory Number 5, uh, plaintiff appears to refer

11   us to Interrogatories 1 and 2 and we've been

12   unsuccessful on our motion there, so, I'll just submit

13   on Number 5.

14       On Number 9, I'll -- on Number 9, Your Honor, it

15   -- it seems to be that, um, plaintiff is referring us

16   to the Rule 26 disclosures and I apologize, I did not

17   include this in my brief.

18       Plain- -- plaintiff has made Rule 26 disclosures

19   in the case but as the court is aware, um, and my

20   understanding of the law is Rule 26 tells the parties,

21   both sides, that they need to share, um, with their

22   opponent any material, any documentary material that

23   they want to get into evidence at trial.

24       And here's what our concern is:  Plaintiff --

25   yes, plaintiff has given us some Rule 26 disclosures

  1         of health care records, but it's only what she wants

  2         to get into trial -- plaintiff counsel wants to get

  3         into trial.

  4                Interrogatory Number 9 is designed so that we get

  5         names and addresses of health care providers so we can

  6         issue a subpoena and we can find out, is there

  7         anything there that helps our case that plaintiff's

  8         counsel is not attaching to her Rule 26 disclosures.

  9         So, that's the reason for Interrogatory Number 9. Uh -

 10         -

 11                THE COURT:  Can -- and -- and can you do that to

 12         the -- to the health care providers that are

 13         identified in Document 79-3?

 14                I mean there's a -- a number of -- of, um, health

 15         care providers that are identified there as well as,

 16         um, document -- documents that are identified by Bates

 17         number.

 18                Um, I -- I don't see the doc- -- I don't see the

 19         -- I can't see the documents, of course, because I

 20         don't have them, I'm not provided with them but I -- I

 21         do see the health care providers.

 22                Now, you know, I suppose it would be better if we

 23         had a -- a -- a supplemental response that said, the

 24         health care providers identified in supplemental

 25         disclosures are every health care provider and -- and

1    maybe that -- maybe I should modify my ruling to make

2    that clear.

3        MR. HARRELL:  Well, Your Honor, we -- we just

4    want -- don't want to miss anything. We know that

5    there are some health care identifier- -- health care

6    providers that are identified in plaintiff's Rule 26

7    disclosures, but it sure would be helpful to have a

8    response under penalty of perjury where plaintiff just

9    gives a list.

10        Um, under Rule 26, yeah, we -- we do have

11   information where we can try to guess and -- and --

12   and hope that we've got a complete list but

13   Interrogatory Number 9 is designed for plaintiffs to

14   give us a full candid and complete list.

15        Doesn't seem like it would be that much work on

16   their part. We just want to make sure that we have

17   under oath plaintiff's statement of where's he gone

18   for treatment.

19        THE COURT:  All right. Uh, residential history.

20        MR. HARRELL:  Is this, uh --

21        THE COURT:  Number 12.

22        MR. HARRELL:  -- Number 12? Uh, Your -- Your

23   Honor, I routinely get this information, um -- uh,

24   it's -- so that we can find out a little bit about

25   plaintiff's background, um, where he has been, um, so

1    that, um, we know where to be looking frankly, for

2    information involving arrest history.

3         Um, this is a law enforcement case and -- and,

4    uh, my understanding of the law is that the -- because

5    plaintiff is suing law enforcement, there's some

6    unique characteristics, uh, with regard to his

7    criminal history that -- that might make it admissible

8    at a trial of the case.

9         Um, I -- I don't think that I've ever gone to

10   court on, uh, an interrogatory like Number 12 for the

11   residential history because people just give it to us.

12   I don't understand what, um, what the, uh, great

13   privacy is, and we have cited any number of opinions

14   where courts have ordered the residential history to

15   be turned over. Um --

16        THE COURT:  Okay. Let --

17        MR. HARRELL:  -- and --

18        THE COURT:  -- let --

19        MR. HARRELL:  -- yeah, I --

20        THE COURT:  -- let's look at --

21        MR. HARRELL:  -- don't have anything else to add.

22   Sorry.

23        THE COURT:  -- let's look ahead to 17 and 18. Um,

24   I do think -- my -- my -- my -- I think if I had

25   reviewed these before the deposition, I would have

1    said these are better covered deposition. I know you

2    took a deposition, um --

3        MR. HARRELL:  Your Honor, I did and, um, here's -

4    - here's what the problem was.

5        Um, [inaudible] the case, um, plaintiff filed a

6    bare bones complaint that did not tell my client with

7    any factual detail, um, what they supposedly has --

8    had done wrong or why they were being hauled into

9    federal court.

10       And plaintiff's counsel's come back there was,

11   well, just do some written discovery, do some

12   interrogatories.

13       Well, we did some interrogatories and, um, the

14   response is, well, go take their deposition. A -- a

15   deposition is the best place for this to happen.

16       Uh, Your Honor, I will tell the court, um, and

17   plaintiff counsel if she were here, that we tried to

18   take plaintiff's, uh, deposition on August, uh, 14th

19   and I have made the request previously to the court

20   that we need a special master, or a retired magistrate

21   judge or someone, um, to help supervise, um, because I

22   have never participated in anything like what I

23   participated in on August 14th. I have no problem

24   getting along with anyone, um, it's -- it's how I try

25   to live life and, uh --

1          THE COURT:  Well, look, if you have motion to

2     bring with respect to the deposition, I -- I mean, you

3     need to bring it. I -- I don't know that I can have

4     you telling me that the deposition is a reason that --

5     that -- that -- we --

6          MR. HARRELL:  Right, right. I understand. I

7     understand but -- but, um, the -- the court seems to

8     be inquiring, um, of -- of why don't we just go take

9     the deposition of the plaintiff and -- and see if we

10    can't get an answer to Interrogatory Number 17.

11         And, Your Honor, it started out with murmuring by

12    plaintiff's counsel.

13         The court has already patiently asked plaintiff's

14    counsel to conduct herself as though she were in court

15    and it started with murmuring in the middle of my

16    questions.

17         Um, and then there was talking over others which

18    included me, her own client, the court reporter.

19         Um, and I -- I know that the court has the

20    partic- -- has been a trial attorney and one of the

21    things that -- that I try to -- to do is, I try to do

22    use the video deposition, um, to prepare for trial. I

23    am routinely told like all attorneys are, edit out any

24    colloquy, edit out any objections.

25         Because plaintiff's counsel talked over and

29

1      through my questions and people's answers, I don't

2      have a deposition transcript that I can use at trial.

3            And so I am asking the court, um, to order an

4      answer to Number 17. It might be the only way that I

5      can inform my client what plaintiff's contentions are

6      as to who said what to -- to who. A deposition hasn't

7      worked.

8            Interrogatory Number 17 would get me a big part

9      of the information that I need in order to adequately

10     -- to prepare for trial and certainly to advise my

11     client what this case is about.

12           So, um, but that information I would submit on it

13     unless the court has any questions, but I do ask that

14     plaintiff be ordered to give an answer to Number 17.

15           THE COURT:  Okay. Same thing for 18, I presume.

16           MR. HARRELL:  Uh, for Number 18, as well, Your

17     Honor.

18           THE COURT:  Um, all right. I found the response

19     to 20 to be adequate. Uh, I don't know if you want to

20     be heard on that. And, let's see, 25.

21           MR. HARRELL:  Your Honor, I'll submit on Number

22     20. And I'll submit on Number 25.

23           THE COURT:  Okay. Um, all right and I'll do my

24     best with Interrogatory Number 2 in terms of arrests.

25           Um, the third -- the topic for today was -- was

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1   going to be your motion on all the RFPs. I'm going to

2   go ahead and authorize you to file that motion. Uh,

3   and I'm going to authorize you to file it without

4   compliance of Local Rule 37.

5       You may file it, uh, under Local Rule 7 and you

6   may dispense with the requirements of Local Rule 37

7   for the joint stipulation.

8       MR. HARRELL:  Uh, Your Honor, um, with regret I

9   also inform the court that, um, I know that we're

10  going to need a motion with regard to the deposition

11  of August 14th and I have ordered an expedited

12  transcript. May we have leave the court to file that

13  motion as well?

14      THE COURT:  You may. You may have an -- and --

15  and you have leave of court to file that without

16  compliance with Local Rule 37 and you may do that

17  under Local Rule 7.

18      MR. HARRELL:  Understood, Your Honor.

19      THE COURT:  And so this is not a regular law

20  motion then.

21      MR. HARRELL:  Understood, Your Honor.

22      THE COURT:  Okay. Um, anything additional from

23  defense today?

24      MR. HARRELL:  Uh, nothing further, Your Honor.

25  Thank you for your time.


31

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1          THE COURT:  All right. Thank you.

2          MS. HEATHCOTE:  Thank you.

3          THE CLERK:  This court is done in recess.

4          AUTOMATED VOICE:  A participant --

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NOBLE TRANSCRIPTION SERVICES – 714.335.1645

1

2

3          I, Chris Naaden, a transcriber, hereby declare

4      under penalty of perjury that to the best of my

5      ability the above 32 pages contain a full, true and

6      correct transcription of the tape-recording that I

7      received regarding the event listed on the caption on

8      page 1.

9

10         I further declare that I have no interest in the

11     event of the action.

12

13         September 24, 2020

14         Chris Naaden

15

16                                   X_____

17

18

19     (Holloway v. County of Orange, telephonic hearing, 9-

20     2-20)

21

22

23

24

25

33

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

EXHIBIT E

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | SA CV 19-01514-DOC (DFMx) | | Date: | January 20, 2021 |
|---|---|---|---|---|
| Title | Jeremy Holloway v. County of Orange et al. | | | |

| Present: The Honorable | Douglas F. McCormick, United States Magistrate Judge |
|---|---|
| Nancy Boehme | Not Present |
| Deputy Clerk | Court Reporter |
| Attorney(s) for Plaintiff(s): | Attorney(s) for Defendant(s): |
| Not Present | Not Present |

| Proceedings: | (IN CHAMBERS) Order re Plaintiff's Facebook Account |
|---|---|

## I.    BACKGROUND

In 2019, Defendants propounded Requests for Production of Documents ("RFPs") on Plaintiff. RFP No. 48 sought Plaintiff's "entire Facebook profile/website/webpage(s)." Dkt. 101, Ex. A at 88-89. On December 3, 2019, Plaintiff objected to RFP No. 48 on various grounds but did not otherwise respond or produce any documents. See id. at 89-90. In July 2020, Plaintiff was served with Defendants' Supplemental Disclosures, which included download pages from Plaintiff's (at the time) public Facebook account. See id., Ex. F at 142-59.

On August 14, 2020, Defendants deposed Plaintiff. During the deposition, Plaintiff indicated that he recently deleted his Facebook account because it was "making him upset." Id., Ex. E at 136. Defendants' attempt to clarify when and why Plaintiff deleted his account was stymied by Plaintiff's counsel's objections. See id. at 57-69.[1]

On October 22, 2020, Defendants filed a motion to compel Plaintiff to, among other things, provide a supplemental response and produce responsive documents to RFP No. 48. See Dkt. 101 at 2-3. Defendants also sought sanctions for spoliation of evidence. See id. at 3. Defendants asserted that Plaintiff admittedly deleted his Facebook account in order to keep several posts critiquing law enforcement from being seen by a jury. See id. at 31-34. During a telephonic hearing, the Court suggested that Defendants' request for Plaintiff's entire Facebook account was facially overbroad but could be narrowly tailored to require some production. See Dkt. 133.

---

[1] Plaintiff's counsel's deposition conduct is extensively documented in the Court's January 11, 2020 Order, which granted Defendants' motion for sanctions. See Dkt. 144.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Because the status of the account was unclear, however, the Court deferred ruling on RFP No. 48. See id.

Plaintiff's counsel later represented that Plaintiff's Facebook account had been permanently deleted, prompting the Court to order Plaintiff to submit a declaration "confirming that his Facebook account has been permanently deleted (not temporarily deactivated) and describing the circumstances under which such deletion occurred, including the approximate date." Dkt. 137. In his declaration, filed on December 29, 2020, Plaintiff stated that he: (1) left Facebook in mid-2020 in response to the George Floyd and Breonna Taylor incidents and resulting protests; (2) does not recall the exact date when he closed his Facebook account; (3) did not believe his personal Facebook account was relevant to this lawsuit; and (4) was unsuccessful in his attempt to retrieve the account because it had been permanently deleted. See Dkt. 143.

## II.    LEGAL STANDARD

For a finding of spoliation, a party must show that "(1) the party with control over the evidence had an obligation to preserve it at the time of destruction; (2) the evidence was destroyed with a 'culpable state of mind'; and (3) the evidence was relevant to the party's claim or defense." In re Hitachi Television Optical Block Cases, 2011 WL 3563781, at *5 (S.D. Cal. Aug. 12, 2011) (quoting Zubulake v. UBS Warburg, LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)). Once spoliation is shown, the guilty party has the burden of demonstrating that no prejudice resulted from the spoliation. See id. at *6. "Prejudice is determined by looking at whether the spoliating party's actions impaired the non-spoliating party's ability to go to trial, threatened to interfere with the rightful decision of the case, or forced the non-spoiling party to rely on incomplete and spotty evidence." Id. (citing Leon v. IDX Systems Corp., 464 F.3d 951, 959 (9th Cir. 2006)).

Spoliation sanctions can "include assessing attorney's fees and costs, giving the jury an adverse inference instruction, precluding evidence, or imposing the harsh, case-dispositive sanctions of dismissal or judgment." Compass Bank v. Morris Cerullo World Evangelism, 104 F.Supp.3d 1040, 1052-53 (S.D. Cal. 2015) (citation omitted). The destruction of evidence does not require bad faith to warrant evidentiary sanctions. See Hitachi, 2011 WL 3563781, at *6. "Sanctions may be imposed on a party that merely had notice that the destroyed evidence was potentially relevant to litigation." Id.

## III.    ANALYSIS

Here, Defendants have presented evidence supporting a finding of spoliation of evidence. With regard to the first element, Plaintiff had control over his Facebook account and had an obligation to preserve it at the time of the filing of the complaint in August 2019, and certainly no later than when Defendants served RFP No. 48. "As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." In re Napster, Inc., 462 F.Supp.2d 1060, 1067 (N.D. Cal. 2006). This preservation

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

obligation runs first to counsel, "who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction." <u>Surowiec v. Capital Title Agency, Inc.</u>, 790 F.Supp.2d 997, 1006 (D. Ariz. 2011).

For the second element, Defendants have presented evidence demonstrating that the account was destroyed with a "culpable state of mind." Plaintiff was served with RFP No. 48 seeking his Facebook account in 2019 but did provide substantive responses or produce any documents. Less than a year later, he <u>permanently deleted</u> the account. <u>See</u> Dkt 101, Ex. E at 136 ("Yes, I did recently delete my Facebook account."). That Plaintiff may have deleted his account over societal issues and not with the intent to destroy evidence is not dispositive; to the contrary, Plaintiff's "conscious disregard" of his discovery obligations is sufficient to show a culpable state of mind. <u>See</u> <u>Apple Inc. v. Samsung Elecs. Co.</u>, 888 F.Supp.2d 976, 998 (N.D. Cal. 2012); <u>see also</u> <u>Reinsdorf v. Sketchers U.S.A., Inc.</u>, 296 F.R.D. 604, 626 (C.D. Cal. 2013) (culpable state of mind may be demonstrated by ordinary negligence). Additionally, it is worth repeating that Defendants' efforts to elicit the circumstances surrounding the deletion were stymied by Plaintiff's counsel's improper objections. <u>See</u> Dkt. 144 at 24-26 (recounting counsel's disruptive behavior during questions about Plaintiff's Facebook account).

The third element is satisfied as Defendants have presented evidence showing that the deleted evidence was relevant to Plaintiff's claims of emotional distress and whether he was biased against law enforcement. Plaintiff responds that the posts collected by Defendants are irrelevant because they were made by Plaintiff after the events at issue in this case. But that does not mean that there are no relevant Facebook posts that pre-date this lawsuit. Indeed, we will never know the answer to that question given that all potentially relevant posts have been permanently deleted by Plaintiff. Given the nature of the litigation and of the evidence that has been deleted, the Court finds that Plaintiff's actions have "forced [Defendants] to rely on incomplete and spotty evidence." <u>Hitachi</u>, 2011 WL 3563781, at *6.

In sum, Plaintiff had an obligation to preserve his Facebook account, he deleted the account with a culpable state of mind, and the account was relevant to Defendants' claims. Accordingly, the Court finds that an adverse inference regarding Plaintiff's deleted Facebook account is appropriate. <u>See</u> <u>Nutrition Distrib. LLC v. PEP Research, LLC</u>, No. 16-2328, 2018 WL 3769162, at *18 (S.D. Cal. Aug. 9, 2018) (finding an adverse inference regarding Defendants' deleted social media posts appropriate); <u>Painter v. Atwood</u>, No. 12-01215, 2014 WL 1089694, at *9 (D. Nev. Mar. 18, 2014) (same, noting that "[a]lthough Plaintiff's counsel may have failed to advise Plaintiff that she needed to save her Facebook posts and of the possible consequences for failing to do so, the deletion of a Facebook comment is an intentional act, not an accident, and the Court cannot infer that Plaintiff deleted Facebook comments . . . for an innocent reason").

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

### IV.    ORDER AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY ORDERED that Defendants' motion for sanctions based on spoliation of evidence is GRANTED.

IT IS FURTHER RECOMMENDED that the District Judge give the following adverse inference instruction:

> Plaintiff has failed to preserve relevant evidence for Defendants' use in this litigation by deleting his Facebook account. This is known as the "spoliation of evidence."

> I instruct you, as a matter of law, that Plaintiff failed to preserve evidence after his duty to preserve arose. You may presume that Defendants have met its burden of providing that following two elements by a preponderance of the evidence: First, that relevant evidence was destroyed after the duty to preserve arose. Evidence is relevant if it would have clarified an issue at trial and otherwise would naturally have been introduced into evidence. Second, the lost evidence was favorable to Defendants.

> Whether this finding is important to you in reaching your verdict in this case is for you to decide. You may choose to find it determinative, somewhat determinative, or not at all determinative in reaching your verdict.

Objections to this order shall be filed within fourteen (14) days of the date of this order.[2]

---

[2] The Court has authority to order the sanctions outlined in this section without a recommendation to the District Judge. See Fed. R. Civ. P. 72(a) (providing that non-dispositive matters are those that are "not dispositive of a claim or defense of a party"); Oracle USA, Inc. v. SAP AG, 264 F.R.D. 541, 545 (N.D. Cal. 2009) (holding that discovery sanctions in general are non-dispositive unless imposition of the sanction would be dispositive of a party's claim or defense). However, because the language of the instruction presents an issue of trial management, the Court believes that the better practice is to present these rulings to the District Judge in the form of a recommendation. The Court expresses no view on whether the District Judge must resolve any objections to these recommendations in advance of trial, or what standard the District Judge should apply in resolving any such objections.