S. Frank Harrell (SBN 133437)
sharrell@lynberg.com
Tamara M. Heathcote (SBN 193312)
theathcote@lynberg.com
Jonathan C. Bond (SBN 280266)
jbond@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendants DEPUTY JOEL GONZALEZ, DEPUTY KEVIN PAHEL DEPUTY MARK BORBA, and DEPUTY JAMESON GOTTS

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE, et al.,<br><br>　　　　　Defendants. | CASE NO. 8:19-cv-01514-DOC-DFM<br><br>*Assigned for All Purposes to:*<br>*Hon. David O. Carter, Courtroom 9D*<br><br>**DEFENDANTS' TRIAL BRIEF** |

1
**DEFENDANTS' TRIAL BRIEF**

**TO THE HONORABLE COURT AND ALL PARTIES:**

Defendants County Of Orange, Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Mark Borba, and Deputy Jameson Gotts ("**Defendants**")[1], hereby submit their Trial Brief pursuant to Central District Local Rule 16-10.

DATED: August 10, 2021

**LYNBERG & WATKINS**
A Professional Corporation

By: */s/ Jonathan C. Bond*
**S. FRANK HARRELL
TAMARA HEATHCOTE
JONATHAN C. BOND**
Attorneys for Defendants Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Mark Borba, and Deputy Jameson Gotts

---

[1] Deputy Chad Renegar is represented by separate counsel, Mr. Michael Wroniak, Esq. and Ms. Christie B. Swiss, Esq. Defendants County of Orange, Brandon Billinger, and Justin Gunderson were dismissed pursuant to the Court's Ruling on Defendants' Motions for Summary Judgment/Adjudication. (See, MSADJ Order, ECF 217.)

# TABLE OF CONTENTS

Contents

I. PRELIMINARY STATEMENT ........................................................................... 1

II. STATEMENT OF FACTS ................................................................................... 2

    A. The Incident – Witness Account and Report of Battery ................................. 2

    B. Deputies Respond to the First 911 Call ........................................................ 3

    C. Deputies Respond to Second 911 Call .......................................................... 4

    D. Holloway's Other Stressors .......................................................................... 6

III. PLAINTIFF'S EXCESSIVE FORCE CLAIM IS WITHOUT MERIT ................ 7

IV. PLAINTIFF'S DAMAGES CLAIMS ARE UNSUPPORTED BY EVIDENCE ... 8

V. CONCLUSION .................................................................................................. 9

# TABLE OF AUTHORITIES

### Cases

Brosseau v. Haugen,
    543 U.S. 597 (2004)..................................................................................8

Edson v. City of Anaheim,
    63 Cal.App.4th 1269 (1998).....................................................................7

Graham v. Connor,
    490 U.S. 386 (1989)..............................................................................7, 8

Johnson v. County of Los Angeles,
    340 F.3d 787 (9th Cir. 2003)....................................................................8

Reed v. Hoy,
    909 F.2d 323 (9th Cir. 1989)....................................................................7

Saman v. Robbins,
    173 F.3d 1150 (9th Cir. 1999)..................................................................8

Scott v. Henrich,
    39 F.3d 912 (9th Cir. 1994)......................................................................7

### Statutes

42 U.S.C. § 1983...........................................................................................7

**1**

**TABLE OF AUTHORITIES - DEFENDANTS' TRIAL BRIEF**

# MEMORANDUM OF POINTS & AUTHORITIES

## I. PRELIMINARY STATEMENT

On January 21, 2018, the Orange County Sheriff's Department received middle - of – the - night "911" call**s** (as in, more than one) from citizens looking to enjoy their family camping trips. The calls decried a similar concern – a woman was being attacked by a man – a concern that is equal parts time sensitive and criminal. The Orange County Sheriff's Department ("**OCSD**") responded to the County-owned campground, then proceeding to the location identified by the callers. Once upon the scene, OCSD encountered Mr. Jeremy Holloway ("**Holloway**" or "**Plaintiff**"). On probation following his recent release from custody for insurance fraud,[2] Holloway emphatically denied his fellow campers' claims reporting the abuse of a female at his campsite, became belligerent with the deputies and initially denied their request to pat him down due to officer safety concerns. As Holloway's female victim had fled the scene, no arrest was made at that time and the OCSD deputies departed.

Once OCSD had departed, Holloway opted next to threaten the concerned, campground witnesses. Unsurprisingly, a new bout of "911" calls were immediately made (unsurprisingly) resulting in the (re) response of OCSD deputies. Deputies raced back to the campground, located Holloway and attempted to gain his compliance in getting down on the ground so they could conduct a search. Instead, Holloway argued with the deputies, fought with the deputies and was eventually subdued and arrested. Holloway responded by: (1) filing this pestiferous litigation, and (2) by fleeing California for the East Coast where Holloway was arrested at the end of 2020 for assaulting his neighbor with a knife, with the trial of same pending in Pennsylvania.

Holloway's litigation advanced a "grab bag" of operative theories, against two-handfuls of individual peace officer Defendants. While there is significant overlap in

---

[2] Holloway also has prior convictions for spousal abuse, as well as for violation of the Court's order to stay away from the spouse he battered.

1

**DEFENDANTS' TRIAL BRIEF**

rationale for the theories' failure, the commonality is the result – Plaintiff's claims can and will fail. Indeed, Plaintiff's claims have all been duly dismissed excepting for his excessive force claim.

## II. STATEMENT OF FACTS

### A. The Incident – Witness Account and Report of Battery

On January 20, 2021, Brian Fuerbach and his wife went camping for one night at O'Neill Park in their Recreational Vehicle ("**RV**"), arriving during the afternoon and parking his RV in campsite 63. Fuerbach's RV had a large (2' x 5') window facing campsite 65. At approximately 2:00 a.m. on January 21, 2018, Fuerbach was awakened by a sound coming from campsite 65, immediately next to his own, where Plaintiff Holloway was camping. The noise disturbance sounded to Fuerbach like something had hit his RV, a "boom, boom". Fuerbach looked out of the large window facing campsite 65, and observed the two doors closing on the white truck that had just arrived at campsite 65. Fuerbach then heard a male and female talking inside ***one of the two tents*** at campsite 65, and then fell back to sleep.

At approximately 3:00 a.m. Fuerbach was awakened again to the sound of yelling and expletives coming from campsite 65, and heard the sound of fist blows being landed on somebody. Fuerbach opened his window to look out and heard a woman yelling "No, no, no. Please stop. I'm just a girl." Fuerbach could also see the tent in campsite 65 move and hear what appeared to be the noise of someone's arm rubbing the inside of the tent fabric, as though a fist was raised, followed by the sound of further fist blows being landed on somebody. Fuerbach's wife then yelled out the window toward campsite 65, "Stop hitting her".

Concerned for the woman's safety, Fuerbach called 9-1-1 and reported he had heard a male and female yelling, fists being landed on somebody, and a woman yelling to "stop hitting her", that "she's just a girl". Afterward, while listening for the deputies to arrive, Fuerbach heard the sound of a tent unzip and the sound of footsteps running across gravel.

### B. Deputies Respond to the First 911 Call

On January 21, 2018, Chad Renegar, Mark Borba, Kevin Pahel and Jameson Gotts were Orange County Deputy Sheriffs assigned to patrol, with the deputies "general duties" being to patrol their assigned area of Orange County and respond to calls for service in protection of the public. At approximately 3:40 a.m., the deputies became aware of a call for service to O'Neill Park. This call at 3:40 a.m. consisted of the reporting party advising that there was a male versus female in a physical altercation that was disturbing the peace occurring to the right of campsite 63. The campgrounds at no lighting at the campsites, making it impossible for the deputies to locate the campsite at issue.

At approximately 4:07 a.m., the deputies heard dispatch state that per the reporting party, domestic violence was occurring in a tent by a white truck to the right of campsite 63. The deputies spoke with multiple parties at campsites who pointed in a certain direction as to where the noise had been coming from. The deputies eventually spoke with one of the reporting parties whom they later learned to be Joshua Gomez and his girlfriend. Gomez indicated he knew where the sound of fighting and arguing was coming from and pointed to campsite 65 which was located across the roadway/path from his.

The deputies then made contact with Mr. Holloway at campsite 65. Holloway was immediately belligerent and using profanity demanded that the deputies leave him alone as he was a former veteran. The deputies persisted and eventually Holloway emerged from his tent. Holloway denied that there was any female in his tent and claimed he had been alone at the campsite all day. When asked if the deputies could pat him down and search his tents, Holloway again became abusive toward the deputies, claiming they were liars, and initially refused the request to be patted down. The deputies found Mr. Holloway's denials of domestic violence unconvincing in light of the **_multiple, corroborating, third party reports_** that implicated Mr. Holloway and they could not come up with any reason for the witnesses reporting Mr. Holloway

3

**DEFENDANTS' TRIAL BRIEF**

1  to lie. The deputies believed they had reasonable suspicion to detain Mr. Holloway
2  for battery/domestic violence based on the third party reports against Mr. Holloway.
3  However, the deputies did not detain Mr. Holloway or charge him with a crime based
4  on their inability to locate the victim.

5          C. **Deputies Respond to Second 911 Call**

6        After the encounter with Mr. Holloway, the deputies went back to their vehicles
7  and drove to the entrance of the park. Deputy Renegar pulled over and ran Mr.
8  Holloway through the system. At that time, Deputy Renegar *discovered that*
9  *Holloway was on probation and subject to search and seizure at any time*. Deputy
10 Renegar then proceeded to also leave the campgrounds. After leaving, all was quiet
11 for approximately ten minutes. After this period of quiet, however, Holloway started
12 going up and down the campground road yelling at the various campsites for the
13 person who called the police to come out and fight him. When Holloway got in front
14 of Fuerbach's RV, Holloway yelled "I know it was you, mother f*cker! Come out!"
15 Unsurprisingly, Holloway's actions were threatening to Fuerbach, who was afraid of
16 what Holloway might do.

17       Within minutes of departing the scene, deputies became aware of another call
18 for service at approximately 4:55 a.m. to O'Neill Park. The reporting party advised
19 that a male subject was walking from campsite to campsite looking for the
20 individual(s) who had called the police. The deputies turned around to return to
21 O'Neill Park.

22       While the deputies were en route to O'Neill Park at approximately 4:58 a.m.
23 they learned from dispatch that the reporting party stated the male subject was by
24 campsite 61 rummaging in a white RV. The reporting party also stated that the male
25 subject was the same individual the deputies had just been talking with. A few
26 seconds later, the deputies learned from dispatch that the reporting party was stating
27 that a little girl was screaming and the call was upgraded to a priority one. The
28 deputies came rushing in their vehicles and exited their vehicles, immediately drawing

1 their guns. Deputies Renegar, Pahel and Gotts located Holloway and began yelling
2 for Holloway to get on the ground. As before, Holloway became belligerent, yelling
3 at the deputies, refusing to get on the ground. Fearing for their safety, Deputy
4 Renegar went around to the side of Holloway and attempted an arm-bar takedown.
5 Holloway, for his part, began to fight with Deputy Renegar, grabbing at his tactical
6 vest and putting him in a headlock. Deputies Pahel and Gotts immediately came to
7 the aid of Deputy Renegar and all three of the deputies attempted to restrain Holloway
8 and handcuff him on the ground. Instead of complying, Holloway continued to curse
9 at and fight the deputies, kicking and trying to get up off the ground. Deputy Renegar
10 told Holloway to stop kicking and when Holloway did not comply, Deputy Renegar
11 deployed his Taser. One of the probes missed Holloway who continued kicking and
12 fighting. Around that time, two other deputies arrived and joined in trying to restrain
13 Holloway. Deputy Renegar then drive stunned Holloway with his Taser and the
14 deputies were then able to immediately handcuff Holloway and get him seated on a
15 log.
16       Deputy Renegar believed he had reasonable suspicion to detain Mr. Holloway
17 and investigate for the occurrence of any crime regarding the screaming girl,
18 threatening other campers and rummaging through an R.V. based on the statements of
19 the persons reporting the incident to dispatch. However, Deputy Renegar confined his
20 charges to what he personally observed Holloway commit during the second
21 encounter with him.
22       In addition to Deputies Renegar, Pahel, Gotts, Borba and Gonzalez, Holloway
23 has sued Deputies Gunderson and Billinger for excessive force. Based on Deputy
24 Renegar's observations during the incident, Deputies Gunderson and Billinger had no
25 physical contact with Mr. Holloway. Based on Rengar's observations, they did not
26 any use force on Mr. Holloway, let alone excessive force. In fact, when one listens to
27 the audio of the dispatch on the vehicles of Deputies Gunderson and Billinger, these
28 two deputies did not even arrive until after it was reported to dispatch that the Taser

had been deployed.

### D.    Holloway's Other Stressors

There were at least two other encounters by Holloway with law enforcement that appear to have played out in much the same manner as in the lawsuit at issue. The first occurred when Holloway and his ex-wife were exchanging their then toddler daughter for visitation with Holloway at the City of Orange Police Department parking lot as ordered by the Court.  Holloway obtained the toddler from his ex-wife but then stood in the doorway of his ex-wife's car and refused to allow her to close her car door and yelling at her.  He then reached behind his ex-wife, grabbed her by the hair and attempted to pull her out of the vehicle.  Holloway also spit on his former mother-in-law who was in the passenger seat.  A police officer inside the building observed the incident and rushed out of the police building to stop Holloway. Holloway denied he had done anything despite the police officer saying he observed it all from the second floor window.  Holloway then tried to use his toddler in a manner to prevent the police officer from trying to take him into custody, refusing to give the toddler back to her mother.  Other officers arrived and the toddler was returned to her mother and Holloway was arrested, and later pled guilty to, domestic violence.  The above recitation is from the information and statements from the police officers contained in the police report.

In late 2020, Holloway posted on his Instagram page that he had been arrested by the police for an attempted stabbing of his across the hall neighbour.  He indicated that it was his neighbour had tried to burn the door of his apartment and that the police found it "easier" to arrest him and claim he had tried to assault the neighbour. Holloway then claimed he spent time in jail, in a "Velcro suit", in a cell by himself, with no access to toilet paper or other personal hygiene products.

When questioned about these two incidents, Holloway claimed it was the police that were liars and that it was he who was actually the victim, just as he is claiming in this within matter.

Finally, Holloway has pending criminal matters in both California and Pennsylvania.

## III. PLAINTIFF'S EXCESSIVE FORCE CLAIM IS WITHOUT MERIT

Plaintiff alleges a Section 1983 "excessive force" claim against a host of Deputies – even though at least two of them used no force at all in the incident of which Holloway complains as "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). This standard makes broad allowance for the dangers inherent in police work. See, id., at 396 ("Not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, violates the [Constitution.") (citations omitted). Thus, all force must be evaluated from the perspective of a "reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

Moreover, officers are not required to "retreat" before using force. Reed v. Hoy, 909 F.2d 323, 331 (9th Cir. 1989). In addition, officers need not attempt the least "intrusive" force options available when confronting suspects. Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994) ("Requiring officers to find and choose the least intrusive [force] alternative would require them to exercise superhuman judgment. In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission."); see, Edson v. City of Anaheim, 63 Cal.App.4th 1269, 1273–1274 (1998) ("We share the view . . . [that] unless a plaintiff can show that *unnecessary* force was used, courts will protect the officer.") (quotation omitted) (emphasis added). Indeed, "[i]t makes sense to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases." Id. at 1275.

Here, the force used by the deputies was in direct response to the resistance and actions of Plaintiff Holloway, and followed a dispatch call advising the deputies of a domestic dispute, and on the "return call" that Holloway had threatened other campers

for their reporting the domestic disturbance.  More to the point, the deputies observed knives and other edged weapons strewn about Holloway's campsite – another factor highly pertinent to the determination of reasonableness of force.  Plaintiff Holloway's active resistance, in a situation that was "tense, uncertain and rapidly evolving." Graham, 490 U.S. at 396-397.  The Supreme Court and Ninth Circuit have consistently dismissed far more substantial "excessive force" claims at the summary judgment stage than that presented by Plaintiff here.  See, e.g., Brosseau v. Haugen, 543 U.S. 597 (2004) (Officer shot suspect "in the back" as he attempted to flee from law enforcement authorities in his vehicle; No actionable Fourth Amendment violation); Johnson v. County of Los Angeles, 340 F.3d 787, 793 (9th Cir. 2003) ("[H]ard pulling and twisting" of a subject who "was not actively resisting arrest at the time Deputy Woodard was pulling him from the car ... was patently reasonable and commensurate with what was needed"); Saman v. Robbins, 173 F.3d 1150, 1156 (9th Cir. 1999) (Single kick to suspect "objectively reasonable as a matter of law").

## IV. PLAINTIFF'S DAMAGES CLAIMS ARE UNSUPPORTED BY EVIDENCE

Plaintiff Holloway has a high school education with some additional education at the Art Institute of California.  Holloway has had apparent difficulty in securing and maintaining employment, as reflected by his discovery responses and deposition testimony establishing same – as well as his felony record.  Plaintiff recently moved to Pennsylvania, but was fired from his employment there due to a verbal altercation with his employer's daughter (who was his supervisor) at a company lunch.  Holloway, of course, claimed that he was once again the victim in this situation was well.  Holloway's sworn interrogatory responses evidence an hourly wage of $20 in 2012-2016, $25 per hour in 2016, and approximately $36,000-$48,000 annually in 2017-2018.  In 2018-2019 Holloway earned salaries of less than $20,000.00.  Since the Covid pandemic, Holloway has had very little employment doing a few minor temporary jobs.  Despite the lessening overall amounts, Holloway "claims" he would

8

**DEFENDANTS' TRIAL BRIEF**

be making $3,000-$4000 per month if not for the incident.

With respect to his physical injuries, Holloway is seeking $48,564.80 in "hard sums" resultant from medical bills, however, the bulk of his treatment appears to be due to two Ischemic strokes he sustained, one before the subject incident, and one after. Holloway claims he is undergoing additional medical care and psychiatric care.

With respect to emotional trauma, Holloway's evasive response was that "my attorney and the jury will be the best at quantifying my emotional trauma." The defense will point to Holloway's social media history to show he is under no trauma related to this incident, and already had an anti-police sentiment prior to the incident herein. Likewise, Holloway's arrest for assault with a deadly weapon against his neighbor in Pennsylvania, his arrears on child support, and prior convictions for insurance fraud will also speak to other, obvious and more likely sources of any emotional trauma Holloway harbors.

With respect to property or similar damages, Holloway claims his destroyed camping equipment was worth $5,000.00, and was "forced" to post bail in the amount of $2,000.00 and $500.00 for criminal defense costs.

In sum, Plaintiff has delusional damage demands which are universally undercut by evidence to the contrary.

## V. CONCLUSION

Plaintiff Holloway is an unsympathetic claimant with a history of violence towards others and animosity towards law enforcement. Indeed, he seems to be arrested nearly every place he has ever lived. But, Holloway will swear up and down that he bears no responsibility for any of these encounters. Likewise, that **_none_** of the other events in his life have created any stress.

/ / /

/ / /

/ / /

/ / /

9

**DEFENDANTS' TRIAL BRIEF**

For all of the foregoing reasons, Defendants seek exoneration from Plaintiffs' improper allegations through a complete defense judgment.

DATED:  August 10, 2021

**LYNBERG & WATKINS**
A Professional Corporation

By: */s/ Jonathan C. Bond*
**S. FRANK HARRELL
TAMARA HEATHCOTE
JONATHAN C. BOND**
Attorneys for Defendants Deputy Joel Gonzalez, Deputy Kevin Pahel, Deputy Mark Borba, and Deputy Jameson Gotts

**DEFENDANTS' TRIAL BRIEF**