**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **JEREMY HOLLOWAY** | **Case No. 8:19-CV-01514-DOC-DFMx** |
| **Plaintiff,** | |
| | |
| **vs.** | **OMNIBUS ORDER ON POST-TRIAL** |
| | **MOTIONS SUBMITTED AFTER THE** |
| **ORANGE COUNTY ET AL.,** | **THIRD TRIAL** |
| **Defendants.** | |

In the third trial in this matter, the jury concluded that all five defendant officers— Deputies Renegar, Gonzalez, Pahel, Gotts, and Borba—used excessive force when apprehending Plaintiff Jeremy Holloway but that Holloway had suffered zero dollars in actual damages. Because Plaintiff did not request a nominal damages jury instruction, Plaintiff walked away with nothing, despite the finding that his constitutional rights were violated.

The jury's split decision prompted the three post-trial motions currently before the Court. First, all five officers moved for judgment as a matter of law that they are protected by qualified immunity. Second, Plaintiff moved for a new trial on the issues of damages. Finally, Plaintiff's counsel moved for attorneys' fees.

For the reasons explained below, the Court grants Plaintiff's Motion for a New Trial. The fourth trial will not be limited to damages, however, and will include a liability phase as well. Moreover, based on the evidence presented at the third trial, Deputies Pahel, Gonzalez, and Borba are entitled to qualified immunity. They are dismissed from the action and will not be defendants in the fourth trial. Finally, Plaintiff's Motion for Attorneys' Fees is denied as moot.

## I.     Background

Because the jury concluded that all five officers used excessive force when apprehending Plaintiff Jeremy Holloway, the Court construes the evidence presented at trial in the light most favorable to him. *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

### A.  First Encounter

Around 3 a.m., Orange County dispatch received a call from Brian Fuerbach, who was camping in his RV. Fuerbach informed the dispatcher that he heard a man and woman yelling, fists being landed, and a woman pleading to stop hitting her, that she is just a girl. The sounds of pleading and punches ceased after Fuerbach heard a tent unzip and someone run across the gravel. Fuerbach reported that the sounds were coming from inside a tent that was pitched near a white truck adjacent to Fuerbach's campsite. Deputy Chad Renegar, along with other officers including Deputy Mark Borba, responded to Fuerbach's call. When they arrived at the

campground, another camper identified Plaintiff Jeremy Holloway's campsite, Campsite 65, as the source of the disturbance. Campsite 65 was both adjacent to Fuerbach's RV and had a white truck parked nearby.

Renegar proceeded to Campsite 65 and politely asked Holloway to exit his tent. After some back and forth, Holloway complied. Outside his tent, Holloway was uncooperative, agitated, and hostile; he also demanded to know why the officers were there. Holloway informed Renegar that he was on probation, and subject to search and seizure at any time. After searching Holloway's campsite, the officers could not locate the girl, but they did find several camping knives. The officers left without placing Holloway under arrest. Throughout the interaction, Holloway was angry that some campers had called 9-1-1, repeatedly asked the officers who had called, and called the campers who called "assholes and morons."

Within fifteen minutes of the officers departing the scene, Orange County dispatch received another call from the campground. The caller reported that Holloway was walking around the campground looking for and threatening the person who called the police, that he was rummaging through a white RV, and that a little girl was screaming. The call was classified as a priority one, meaning that there was a potentially life-threatening emergency.

**B. Second Encounter**

Renegar, followed closely by Deputies Pahel and Gonzalez, was the first officer to respond to the second call. As the three officers approached Holloway, Renegar repeatedly ordered Holloway to show his hands and get on the ground. Holloway showed his hands, but he did not get on the ground and instead asked why the officers had returned. In between shouting orders at Holloway, Renegar repeatedly asked Pahel, who was close behind him, whether he had a taser.

Renegar, Holloway testified, then punched him in the face. Holloway momentarily lost consciousness and fell onto his stomach with his arms pinned beneath him, near his waistband. Deputies Pahel and Gonzalez joined Renegar after the initial punch. They each placed their bodyweight on Holloway's back and tried, unsuccessfully, to free his arms so that they could handcuff him. Renegar, meanwhile, punched Holloway in the side but he too could not secure

Holloway's hands. Renegar then attempted to deploy a taser to Holloway's buttocks, but the taser was ineffective.

Deputies Borba and Gotts arrived on the scene around the time Renegar unsuccessfully deployed the taser. Deputy Borba successfully freed one of Holloway's arms from beneath Holloway's stomach. Gotts, who arrived a few seconds after Borba, kneed Holloway in the head several times.

Renegar then deployed the taser for a second time during the struggle; this time, to one of Holloway's calves. The officers then finally freed Holloway's other arm and handcuffed him. As soon as Holloway was in handcuffs, the officers immediately went to Holloway's tent to look for a little girl, but they were unable to find her. Holloway was arrested for resisting arrest and battery on a police officer.

At trial, Holloway presented evidence of several injuries that he claimed were a result of the altercation, including (1) photos showing bruising and swelling to his face, (2) ongoing back pain, including a spinal injury, and (3) emotional distress.

## C. The Jury's Verdict

This was the third trial in this case. The first trial ended in a hung jury. The Court declared a mistrial in the second trial after Plaintiff violated a pretrial order not to mention the first trial. In the third trial, the jury deliberated for less than one day, and concluded that all five Defendant Officers violated Plaintiff Jeremy Holloway's Fourth Amendment right to be free from excessive force, but that he did not sustain any compensable injuries.

After the third trial in this case, all five officers moved for judgment as a matter of law that they are protected by qualified immunity.[1] Plaintiff also moved for a new trial on the issue of damages[2] and for attorneys' fees.[3] The Court addresses each motion in turn.

---

[1] *See* Borba's Renewed Motion for Judgment as a Matter of Law ("Borba Mot.") (Dkt. 639); Gotts' Renewed Motion for Judgment as a Matter of Law ("Gotts Mot.") (Dkt. 640); Pahel's Renewed Motion for Judgment as a Matter of Law ("Pahel Mot.") (Dkt. 641); Gonzalez's Renewed Motion for Judgment as a Matter of Law ("Gonzalez Mot.") (Dkt. 642); Order Regarding Defendant Renegar's Rule 50(b) Motion ("Renegar Mot.") (Dkt. 675).
[2] Motion to Amend Judgment or New Trial for Damages ("New Trial Mot.") (Dkt. 633).
[3] Motion for Attorneys Fees ("Fees Mot.") (Dkt. 664).

1    **II.    The Officers' Motions for Judgments as a Matter of Law**

2        **A.  Legal Background**

3            **1.    Excessive Force**

4        An officer violates the Fourth Amendment when they use force "greater than is

5    reasonable under the circumstances." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Courts

6    determine whether a use of force is objectively reasonable by "careful[ly] balancing of the

7    nature and quality of the intrusion on the individual's Fourth Amendment interests against the

8    countervailing governmental interest at stake." *Id.* With respect to the Fourth Amendment

9    intrusion side of the balance, courts "evaluat[e] the type and amount of force and amount of

10   force inflicted." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). For the governmental

11   interest side of the ledger, courts must examine all relevant factors, including "the severity of

12   the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

13   others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

14   *Brooks v. Clark Cnty.*, 828 F.3d 910, 920 (9th Cir. 2016). "The 'reasonableness' of a particular

15   use of force must be judged from the perspective of a reasonable officer on the scene, rather

16   than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

17           **2.    Qualified Immunity**

18       "Qualified immunity shields government officials from civil liability unless a plaintiff

19   establishes that: (1) the official violated a constitutional right; and (2) that right was 'clearly

20   established' at the time of the challenged conduct, such that 'every reasonable official' would

21   have understood that what he is doing violates that right." *Morales v. Fry*, 873 F.3d 817, 821

22   (9th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011)). "[T]he two prongs

23   of qualified immunity balance two important, competing interests: the need to hold public

24   officials accountable for irresponsible actions, and the need to shield them from liability when

25   they make reasonable mistakes." *Id.* at 822.

26       Because qualified immunity is a question of law, it is often decided before trial. *See*

27   *Comm. House, Inc. v. City of Boise*, 623 F.3d 945, 968 (9th Cir. 2010); *S.R. Nehad v. Browder*,

28   929 F.3d 1125, 1140 (9th Cir. 2019). A qualified immunity case must proceed to trial, however,

"when there are disputed factual issues that are necessary to a qualified immunity decision." *Nehad*, 929 F.3d at 1140 (quoting *Morales*, 873 F.3d at 821). In this situation, the jury "decide[s] the disputed factual issues," and the judge "decide[s] whether the right was clearly established once the factual issues are resolved." *Morales*, 873 F.3d at 821. When deciding whether the right was clearly established on a Rule 50(b) renewed motion for judgment as a matter of law, "the jury's view of the facts must govern" the court's analysis. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 457 (9th Cir. 2013). That is, the court must "view[] the evidence in the light most favorable to the nonmoving party, and draw[] all reasonable inferences in favor of the nonmoving party." *Tan Lam v. City of Los Banos*, 976 F.3d 986, 997 (9th Cir. 2020).

Here, the jury has already conducted the first prong of the qualified immunity analysis—that all five officers violated Holloway's Fourth Amendment right to be free of excessive force. Post-trial, Defendants do not argue that the jury's excessive verdict is unsupported by substantial evidence. Therefore, the jury's verdict against the officers is sufficient to deny them quality immunity at the first step of the qualified immunity analysis. *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018). Defendants' entitlement to qualified immunity thus turns on whether their conduct violated clearly established right.

A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017). "The function of the inquiry…is to ensure that officials are subject to suit only for actions that they knew or should have known violated the law." *Cates v. Stroud*, 976 F.3d 972, 978 (9th Cir. 2020). Although a case directly on point is not necessary, "'[c]learly established law *usually* means that there is a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Hill v. City of Fountain Valley*, 70 F.4th 507, 517 n.6 (9th Cir. 2023) (emphasis added). Whether law is clearly established is assessed "at the time of the challenged conduct." *Mendoza v. Block*, 27 F.3d 1357, 1360 (9th Cir. 1994).

The Supreme Court has reiterated that "clearly established law should not be defined at a high level of generality." *E.g.*, *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam). The inquiry "must be taken in the light of the specific context of the case, not as a broad general

1   proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam); *see also al-Kiid*, 563

2   U.S. at 742 (framing the question as whether the defendant's "*particular* conduct" violated

3   clearly established law) (emphasis in original). "Such specificity is especially important in the

4   Fourth Amendment context," because "it is sometimes difficult for an officer to determine how"

5   a legal doctrine like excessive force "will apply to the factual situation the officer confronts."

6   *Mullenix*, 577 U.S. at 12 (internal quotations omitted). Put simply, qualified immunity protects

7   "all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580

8   U.S. 73, 78 (2017).

9      **B.  Application**

10        With these legal principles, the Court turns to the five officers' entitlement to qualified

11   immunity.

12          **1.  Renegar**

13        For the reasons explained below, Renegar is not entitled to qualified immunity.

14           **a.  Renegar's punch violated clearly established law.**

15        In *Nelson v. City of Davis*, the Ninth Circuit cited cases dating back to 2001 clearly

16   establishing "that a failure to fully or immediately comply with an officer's orders" does not

17   "justif[y] the use of a non-trivial amount of force." 685 F.3d 867, 881 (9th Cir. 2012); *see also*

18   *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013). The most analogous of the

19   cases cited in *Nelson* is *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (en banc). There,

20   police responded to a domestic violence report and found the plaintiff on the porch, separated

21   from his wife, the alleged victim. *Id.* at 693. The plaintiff complied with the officer's instruction

22   to show his hands but did not follow an order to put his hands on his head and walk toward the

23   officer. *Id.* In response, the officers unleashed considerable force on the plaintiff. *See id.* at 693-

24   94. This force, the Ninth Circuit ruled, was excessive. *Id.* at 704. The court emphasized that,

25   because the plaintiff had removed his hands from his pockets, there was no "reason to believe

26   that he possessed any weapon or posed any immediate threat to the safety of the officers or

27   others." *Id.* at 702. And, although the officers were responding a serious crime, the plaintiff was

28

1    "on the porch alone and separated from his wife," indicating that he no longer posed a threat to

2    her. *Id.*

3         When Renegar punched him, Holloway's "resistance" resembled the resistance in *Smith*.

4    Like the plaintiff in *Smith*, Holloway obeyed Renegar's orders to show his hands.

5    Consequently, Holloway did not pose an immediate safety threat to Renegar, despite Renegar's

6    knowledge that Holloway had knives at his campsite. *See id.* Additionally, Holloway was alone

7    when Renegar returned to the campground. Even if it was reasonable for the officers to believe

8    that Holloway had been assaulting the girl who the campers heard screaming, he was not

9    presently a threat to her. *See id.*

10        Because Holloway did not pose an immediate threat to the officers or the alleged

11   domestic violence victim, Renegar could not use more than a trivial amount of force. *See id.*;

12   *Nelson*, 685 F.3d at 881. There is no Ninth Circuit caselaw establishing that a punch is more

13   than non-trivial force; however, it does not matter that no case directly addresses a particular

14   type of force. "[A]n officer is not entitled to qualified immunity solely on the grounds that the

15   law is not clearly established every time a novel method is used to inflict injury." *Mendoza v.*

16   *Block*, 27 F.3d 1357, 1362 (9th Cir.1994). The Ninth Circuit has ruled that tasers, *Gravelet-*

17   *Blondin*, 728 F.3d at 1095, baton strikes, *Young*, 655 F.3d at 1160, pepper spray, *Headwaters*

18   *Forest Defense v. Cnty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002), and bean bag projectiles,

19   *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001), all constitute non-trivial force. A

20   punch to the face is similar to those types of non-trivial force, both in its capability to impose

21   immediate pain as well as lasting damage, so it too constitutes non-trivial force.

22        In sum, Renegar's decision to punch Holloway—who, at that point, was showing his

23   hands, verbally challenging Renegar, and refusing a demand to get on the ground—violated

24   clearly established law. Consequently, Renegar is not entitled to qualified immunity.

25        **b. Renegar's use of the taser did not violate clearly established law.**

26        Renegar first employed the taser in dart mode[4] when Holloway's hands were pinned

27   ───────────────

28   [4] When a taser is deployed in dart mode, the taser shoots aluminum dart. Upon striking the person, the gun delivers an electrical charge through wires, which "instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." Bryan v. MacPherson, 630 F.3d 805, 824 (9th Cir. 2010). "The tased person also experiences an excruciating pain that radiates throughout the body." *Id.*

beneath his stomach while Gonzales and Pahel were attempting to free them. The taser, however, was ineffective. After Borba and Gotts arrived on the scene and Borba freed one of Holloway's hands, Renegar employed the Taser again, this time in drive stun mode to Holloway's calf. Renegar argues that these two tasings are protected by qualified immunity. The Court agrees, because there is no case law that would put Renegar on notice that the tasings were excessive.

An officer must have more than a "minimal interest in the use of force" before they use a taser. *Bryan*, 630 F.3d at 831. The "most important factor" in determining an officer's interest in applying force is "whether the suspect posed an immediate threat to the safety of the officers or others." *Id.* at 826 (internal quotations omitted).

In all six pre-incident, published cases where the Ninth Circuit has found that use of a taser violated the Fourth Amendment, the suspect posed no safety risk to the officers or others at the time they were tased. For example, in *Jones v. Las Vegas Metro. Police Dept.*, the decedent sprinted away from officers after was stopped for a routine traffic violation. 873 F.3d 1123, 1127 (9th Cir. 2017). The officer fired a taser at the fleeing decedent, which caused his body to "lock up" and he fell to the ground. *Id.* Backup arrived, and those officers controlled the decedent's feet and handcuffed him. *Id.* At this point, the decedent was no longer resisting, but two of the officers continued to tase the decedent for over ninety seconds. *Id.* The court concluded that the original tasing—the one used to stop the decedent from fleeing and to place him under arrest—was reasonable, but "the justification for the use of force waned" once backup arrived. *Id.* at 1130. Because the backup officers had controlled the decedent, he no longer posed a safety threat, making the additional taser shocks unreasonable. *Id.* at 1130-31; *see also Mattos*, 661 F.3d at 449 (concluding that a taser was excessive where the plaintiff posed "no threat to the officers"); *Brooks v. City of Seattle*, 661 F.3d 433, 444 (9th Cir. 2011) (en banc) (deciding that using a taser in drive stun mode on someone who was not "even a potential threat to the officers' or others' safety" was unreasonable) (emphasis in original); *Bryan*, 630 F.3d at 832 (concluding that an officer used excessive force where the officer tased a suspect who was not "an immediate threat"); *Gravelet-Blondin*, 728 F.3d at 1091 (holding that an officer

1  used excessive force where the officer tased a bystander when "there was no reason to believe,

2  based on [the bystander's] behavior, demeanor, and distance from the officers, that he posed an

3  immediate threat to anyone's safety"); *Thomas v. Dillard*, 818 F.3d 864, 890 (9th Cir. 2016)

4  (concluding that an officer used excessive force by tasing a suspect where the officer "had scant

5  reason to believe [the suspect] posed an immediate threat to him or anyone else").

6        Here, by contrast, Holloway was a threat to Renegar and the other officers when Renegar

7  tased him. During both instances where Holloway was tased, at least one of his hands was

8  pinned beneath him near his waistband. The placement of Holloway's hands was dangerous for

9  the officers, because, as Deputy Pahel testified, "hands kill." Conversely, "[i]f you can secure

10  someone's hands," Pahel testified, "the risk of injury to anyone at that point goes down to nearly

11  zero." That Holloway's hands were near his waistband only added to the safety concern. Gotts

12  testified that, based on his training and experience, "subjects often keep weapons in their

13  waistband area," and, based on Renegar's first trip to the campground, he knew that Holloway

14  had knives at the campground. Thus, at the time of both tasings, Holloway was a risk to officer

15  safety. Given the lack of caselaw finding tasing to be excessive where the plaintiff was a risk to

16  officer safety, the tasings did not violate clearly established law.

17        In fact, courts have approved use of tasers in situations like this one. For instance, in

18  *Lindsay v. Kiernan*, the Ninth Circuit held that a taser was justified where a suspect's

19  "increasing hostility, physical resistance, and repeated refusal to leave the gas station could have

20  led a reasonable officer to believe that" the suspect posed an immediate safety threat to the

21  officers and a bystander. 378 Fed. Appx. 606, 609 (9th Cir. 2010).

22        Other circuits are in accord. Many circuits, including the Sixth, Eighth, Tenth, and

23  Eleventh "drawn the line" separating permissible and impermissible use of a taser at "active

24  resistance." *See Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509-10 (6th Cir. 2012)

25  (collecting cases). In those circuits, active resistance includes "refusing to move your hands for

26  the police to handcuff you." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015); *see also*

27  *Hagans*, 695 F.3d at 509 (holding that a suspect's "refus[al] to remove his arms from under his

28  body" was active resistance); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004)

1  (similar). That Renegar's actions would not violate the Fourth Amendment—much less clearly

2  established Fourth Amendment law—in many circuits underscores their reasonableness.

3      Therefore, Renegar's use of the taser is protected by qualified immunity.[5]

4      **2.    Gotts**

5      For Gotts, the qualified immunity question is a close one. Viewing the evidence in the

6  light most favorable to Holloway, Gotts arrived on the scene a few seconds before Borba. At

7  the time he arrived, two officers were trying to free one of Holloway's arms, and Renegar was

8  trying to control Plaintiff's legs. Despite four officers being on top of Plaintiff and Renegar

9  preparing to apply the stun gun to Plaintiff, Gotts, Holloway testified, kneed Holloway in the

10  head several times.

11      The excessive force inquiry begins by analyzing the severity of force at issue. Although

12  blunt force strikes are usually classified as "intermediate force," *see Coles v. Eagle*, 704 F.3d

13  624, 628 (9th Cir. 2012), such strikes may constitute deadly force if delivered to the head,

14  *Garlick v. City of Kern*, 167 F. Supp. 3d 1117, 1146-47 (E.D. Cal. 2016). A reasonable jury

15  could have concluded that Gotts repeatedly kneeing a prone suspect in the head "created a

16  substantial risk of death or serious bodily injury." *See id.* (quoting *Bryan*, 630 F.3d at 825)).

17  Thus, Gotts used lethal force when apprehending Holloway.

18      Because "[d]eadly force is the most severe intrusion on Fourth Amendment interests," it

19  may only be used to advance compelling governmental interests. *See Sabbe v. Washington Cnty.*

20  *Bd. of Comm'rs*, 84 F.4th 807, 821-22 (9th Cir. 2023). A reasonable officer in Gotts' position

21  would know that such a strong justification was lacking. When Gotts kneed Holloway, one of

22  his arms was already in handcuffs. Thus, while Holloway was still a threat to the officers'

23  safety, the threat had waned somewhat, reducing the need for deadly force. Indeed, use of force

24  experts for both Plaintiff and Defendants agreed that, if the incident unfolded as Holloway

25  testified, Gotts' knee would be excessive. Because the Court must take Holloway's version of

26  events as true, *see A.D.*, 712 F.3d at 457, the experts testified that Gotts used excessive force.

27

28  [5] This conclusion does not preclude Plaintiff from presenting evidence of the tasings at the fourth trial. Although Renegar's use of the taser itself does not violate clearly established law, its use is relevant to other issues in the case (*e.g.*, whether Gotts' knees were reasonable).

1  Their agreement strongly suggests that Gotts violated clearly established law. *See Marquez v.*

2  *City of Phoenix*, 693 F.3d 1167, 1171 (9th Cir. 2012) (looking to expert testimony to decide a

3  question of qualified immunity); *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1109-10 (9th Cir.

4  2008 (similar).

5      Another relevant factor in assessing the reasonableness of deadly force is "the availability

6  of alternative methods of capturing or subduing a suspect." *S.R. Nehad*, 929 F.3d at 1138. Gotts

7  and Borba arrived around at the scene around the same time. While Borba went to one of

8  Holloway's arms to help free them from underneath his stomach, Gotts elected to knee Plaintiff

9  in the head. A reasonable jury could have concluded that Gotts should have followed Borba's

10  lead and tried to help free Holloway's hands, instead of kneeing him in the head. Moreover,

11  while Gotts was kneeing Holloway, Renegar was shouting that he was about to redeploy the

12  taser. This impending taser—the use of force that ultimately facilitated Holloway's arrest—

13  reduced the necessity for Gotts to use deadly force to accomplish the same.

14      In conclusion, a reasonable officer in Gotts' position would have known that kneeing a

15  prone suspect who was about to be handcuffed would violate the Fourth Amendment. Therefore,

16  Gotts is not entitled to qualified immunity.

17      **3.     Pahel, Gonzalez, and Borba**

18      Deputies Pahel, Gonzalez, and Borba encountered Holloway while he was prone, with

19  his hands pinned beneath his waistband. They applied their bodyweight to Plaintiff's back and

20  pulled at his arms to try and free them. The three deputies applied their bodyweight for around

21  one minute and ceased once Holloway was handcuffed.

22      The officers are entitled to qualified immunity for their application of bodyweight to

23  Holloway's back. The Ninth Circuit has found that applying bodyweight is excessive only

24  where the officer applies bodyweight after the suspect is handcuffed or otherwise subdued. *See,*

25  *e.g.*, *La Londe v. Cnty. of Riverside*, 204 F.3d 947, 952, 959 (9th Cir. 2000) (finding excessive

26  force where an officer "forcefully put his knee into [the plaintiff's back]" after he had been

27  handcuffed); *Drummond ex. rel Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir.

28  2003) (concluding that applying bodyweight to the plaintiff after he was handcuffed and

pleading for help was excessive). Pahel, Gonzalez, and Borba, by contrast, applied bodyweight to help control Holloway and ceased once he was in handcuffs. Therefore, the three officers' use of bodyweight on Plaintiff's back is protected by qualified immunity.

Plaintiff argues that, even if Pahel, Gonzalez, and Borba did not themselves use excessive force, they may still be liable based on an "integral participant" theory of liability. An officer is an "integral participant" in excessive force, and therefore liable, when they either (1) "knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct" constituted excessive force or (2) "set in motion a series of acts by others which the defendant knows or reasonably should know would cause others to" use excessive force. *See Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022).

As to the first excessive use of force—Renegar's punch— Pahel and Gonzalez were not integral participants. There is no indication that the punch was planned. Rather, Renegar punched Holloway without any apparent warning after Holloway did not obey Renegar's order to get down on the ground. Similarly, Pahel or Gonzalez had no reason to know that responding to the scene of a credible domestic violence tip would lead to an unconstitutional use of fore taking place. In sum, Pahel and Gonzalez in no way contributed to or were involved in Renegar's punch and are therefore not integral participants.[6]

Similar reasoning also demonstrates why Pahel, Gonzalez, and Borba, were not integral participants in the second excessive use of force—Gotts' knees to Holloway's head. Although the three officers holding Holloway down facilitated Gotts kneeing Holloway, there is no indication that they were applying their bodyweight for that purpose. Rather, in unrefuted testimony, the three officers stated that they applied their bodyweight to help subdue and control a potentially armed individual who was uncooperative, not yet in handcuffs, and suspected of a serious crime. Therefore, Pahel, Gonzalez, and Borba were not integral participants in Gotts' excessive use of force.

The motions for qualified immunity brought by Pahel, Gonzalez, and Borba are granted.

---

[6] The same is true for Borba. At the time of the punch, Borba was not on the scene, and there is no indication that he spoke with Renegar before the punch.

-13-

1    **III.    Plaintiff's Motion for a New Trial**

2        Despite its excessive force finding, the jury concluded that Plaintiff suffered zero dollars

3    in actual damages. Plaintiff argues that these two conclusions are inconsistent, warranting a

4    new trial solely on the issues of damages. New Trial Mot. at 2. While the Court agrees that a

5    new trial is necessary, the fourth trial in this matter will not be limited to damages.

6        **A.  A new trial is warranted.**

7        A breach of legal duty verdict does not require that the jury award compensable (as

8    distinct from nominal) damages. *See Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S.

9    474, 483 (1993); *Westcott v. Crinklaw*, 133 F.3d 658, 661 (8th Cir. 1998) (holding that an

10   excessive force finding does not entitle the victim to compensatory damages as a matter of law).

11   "[T]he federal rule is that a failure to award damages does not by itself render a verdict invalid."

12   *Philippine Nat. Oil Co. v. Garrett Corp.*, 724 F.2d 803, 806 (9th Cir. 1984). However, where a

13   jury's failure to award compensatory damages is "contrary to the clear weight of the evidence,"

14   a new trial is warranted. *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510

15   n.15 (9th Cir. 2000); *see also* Fed. R. Civ. P. 59(a)(1). When deciding a new trial motion, the

16   district court has "the duty…to weigh the evidence as [the court] saw it, and to set aside the

17   verdict of the jury, even though supported by substantial evidence, where, in [the court's]

18   conscientious opinion, the verdict is contrary to the" evidence's clear weight. *Molski v. M.J.*

19   *Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Murphy v. City of Long Beach*, 914 F.2d

20   183, 187 (9th Cir. 1990)).

21       In *Atkins v. New York City*, the Second Circuit granted the plaintiff's motion for a new

22   trial after the jury found that the defendants used excessive force but did not award

23   compensatory damages. 143 F.3d 100, 104 (2d Cir. 1998). There, the jury found that the

24   defendant used "excessive force to stop and arrest plaintiff." *Id.* at 103 (internal quotations

25   omitted). Although it was undisputed that the plaintiff "sustained a laceration and multiple

26   abrasions on his forehead and head" because of the altercation, the jury found that he suffered

27   no compensable damages and awarded only nominal damages. *Id.* The plaintiff moved for a new

28   trial, arguing that the jury's damages verdict was against the clear weight of the evidence, and

-14-

1  the district court denied the motion. *Id.* The Second Circuit reversed. It held that "[a] beating

2  severe enough to leave marks is sufficient proof of compensable injury," and "the jury's

3  rejection of [the plaintiff's] undisputed injuries and of the pain and suffering from the beating

4  itself is unsupportable." *Id.* at 104.

5      Here too, Renegar and Gotts delivered a "beating severe enough to leave a mark." *See id.*

6  At trial, Holloway presented photographic evidence that he suffered facial abrasions, swelling,

7  and a black eye. Defendants argue that this photograph overstates Holloway's injury, because a

8  side effect of Plaintiff's blood thinning medication is excessive bleeding. New Trial Opp'n (Dkt.

9  636) at 4, 10. However, this argument only goes to the extent of Holloway's injuries. It does not

10  refute—and in fact confirms—that Holloway suffered facial lacerations, just like the plaintiff in

11  *Atkins*. In any event, the jury was instructed to consider the "pain and suffering" Plaintiff

12  suffered as a result of Defendants' use of excessive force. Jury Instruction No. 16 (Dkt. 619).

13  The jury's finding that a punch to the face and several knees to the head caused Plaintiff no

14  compensable "pain and suffering" is patently unsupportable. *See Atkins*, 143 F.3d at 104.

15      Therefore, Plaintiff's motion for a new trial is granted.

16  **B.  Scope of the New Trial**

17      Next, the Court addresses whether to grant a new trial on all issues or to limit it to

18  damages. While courts may order a new trial solely on the issue of damages, it must reopen the

19  issue of liability "if a new trial on damages alone would work injustice." *Wharf v. Burlington*

20  *N. R. Co.*, 60 F.3d 631, 638 (9th Cir. 1995). This standard is satisfied when the jury returns a

21  "compromise verdict." *See, e.g.*, 11 Charles A. Wright & Arthur R. Miller, Federal Practice and

22  Procedure § 2814 ("A new trial on damages is inappropriate if there is reason to think that the

23  verdict may represent a compromise among jurors."); *Romberg v. Nichols*, 970 F.2d 512, 521

24  (9th Cir. 1992), *vacated on other grounds*, 506 U.S. 1075 (1993); *Bavlsik v. Gen. Motors, LLC*,

25  870 F.3d 800, 808-812 (8th Cir. 2017). "A compromise verdict is one reached when the jury,

26  unable to agree on liability, compromises that disagreement and enters a low award of

27  damages." *Romberg*, 970 F.2d at 521 (quoting *Nat'l R.R. Passenger Corp. v. Koch Indus.*, 701

28  F.2d 108, 110 (10th Cir. 1983)). These types of verdicts warrant a new trial on all issues

because both the jury's liability and damages conclusions reflect pragmatic considerations, instead of its true view of the facts. It would be unfair to treat the jury's compromised liability finding against a defendant as final, while vacating its equally compromised zero-dollar award and giving the plaintiff a second chance to prove damages.

In determining whether a jury reached a compromise verdict, courts look to the "totality of the circumstances," and consider "any indicia of compromise apparent from the record and any factors that may have caused a verdict for damages that would be inadequate if the jury actually found liability." *Yarbrough v. Sturm, Ruger & Co.*, 964 F.2d 376, 379 (5th Cir. 1992). "[S]uspicion should be aroused if the jury" does not award compensatory damages. *Romberg*, 970 F.2d at 521(quoting *Nat'l R.R.*, 701 F.2d at 110). In *Atkins*, the court inferred that the jury compromised, warranting a new trial on all issues, because "(1) the issue of liability was close and vigorously contested and (2) the verdict on damages was inconsistent with the facts adduced at trial." 143 F.3d at 104 (enumeration added).

Both of those elements are present here. First, the liability question was close and contested. The parties presented the jury with starkly different accounts of the incident. Indeed, the liability question in this case was so contested and close that the first trial in this matter ended in a hung jury. Second, the jury's zero-dollar damages verdict was inconsistent with its finding of liability. Holloway presented unrefuted evidence of facial lacerations and eye swelling. The extent and nature of these injuries make it almost certain that they were the result of blunt force—*i.e.*, Renegar punching Holloway and Gotts kneeing him—not the skirmish on the ground where the officers tried to handcuff Holloway.

The jury may have thought that their creative verdict was equitable. It chastened potentially over-zealous police officers, at least one of whom has a prior instance of professional misconduct, while also not financially rewarding a plaintiff who was needlessly hostile to the officers. However, "[p]art of the district court's function" is to "prevent such Solomonic solutions by the jury." *Romberg*, 953 F.2d at 1160 (internal quotations omitted). If the jury truly believed its liability finding, it should have awarded Holloway *some* compensatory damages for

his unrefuted facial injuries, pain, and suffering caused by the officers' excessive use of force.[7] Because the jury did not, a new trial on all issues is required.

**IV.    Plaintiff's Attorneys' Fee Motion**

The "prevailing party" in a §1983 case may recover attorneys' fees and costs. 42 U.S.C. § 1988. Plaintiff's counsel argues that Plaintiff is the "prevailing party" because the jury returned an excessive force verdict. Fees Mot. at 4. However, because the Court granted Plaintiff's motion for a new trial, that verdict "is of no effect." *See* 12 Moore's Federal Practice § 59.19.

Accordingly, Plaintiff's Motion for Attorneys' Fees is denied as moot. Counsel may renew her motion for fees after the fourth trial, if appropriate.

**V.    Disposition**

For the foregoing reasons, the Court rules as follows:

- Defendant Mark Borba's Motion for Judgment as a Matter of Law (dkt. 639) is **GRANTED**.

- Defendant Jameson Gotts's Motion for Judgment as a Matter of Law (dkt. 640) is **DENIED**.

- Defendant Kevin Pahel's Motion for Judgment as a Matter of Law (dkt. 641) is **GRANTED**.

- Defendant Joel Gonzalez's Motion for Judgment as a Matter of Law (dkt. 642) is **GRANTED**.

- Defendant Chad Renegar's Motions for Judgment as a Matter of Law (dkts. 588, 589, 590) and his renewed oral motion (dkt. 675) are **DENIED**.

- Plaintiff's Motion for a New Trial (dkt. 633) is **GRANTED IN PART**. Specifically, the Court orders a new trial on all issues.

---

[7] The jury's failure to award *any* money is not what made its verdict invalid. Plaintiff—in what the Court assumes was a tactical decision—did not ask for a nominal damages instruction. However, even if Plaintiff requested and the jury awarded nominal damages, the verdict still would be flawed. Compensatory damages serve "to compensate for a proven injury or loss." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 871 (9th Cir. 2017). Nominal damages, on the other hand, are symbolic. They "are awarded to vindicate rights, the infringement of which has not caused actual, provable injury." *Id.*; *see also Atkins*, 143 F.3d at 103-04 (ordering a new trial where the jury found excessive force but awarded nominal but not compensatory damages).

1    -    Plaintiff's Motion for Attorneys' Fees (Dkt. 664) is **DENIED AS MOOT**.

2         Further, Defendants' Rule 50(a) Motions (dkts. 592, 593, 594, 595, 599, 600, 601, 602)

3    and Request for Order (dkt. 551) are **DENIED AS MOOT**.

4         The parties are **ORDERED** to appear for a scheduling conference on **April 8, 2024, at**

5    **9:00 a.m.**

6

7

8         DATED: March 18, 2024

9

10                                              DAVID O. CARTER

11                                              UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28