**MKRTCHYAN LAW**
Narine Mkrtchyan, Esq. (SBN 243269)
655 N. Central Ave, Suite 1700
Glendale, CA 91203
Telephone No. (818) 388-7022
Web: www.narinelaw.com
Email: narine57@gmail.com

Attorney for Jeremy Holloway

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEREMY HOLLOWAY,<br><br>Plaintiff,<br><br>vs.<br><br>DEPUTY CHAD RENEGAR, individually and as a peace officer, DEPUTY JOEL GONZALEZ, individually and as a peace officer, DEPUTY KEVIN PAHEL, individually and as a peace officer, DEPUTY MARK BORBA, individually and as a peace officer, DEPUTY JAMESON GOTTS individually and as a peace officer, and DOES 1-10.<br><br>Defendants. | Case No. 8:19-cv-01514-DOC-DFM<br><br>**HONORABLE DAVID O. CARTER**<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS CHAD RENEGAR, JAMESON GOTTS' MOTION FOR DIRECTED VERDICT**<br><br>Hearing: July 14, 2025<br>Time: 8:30 am |

Plaintiff submits this memorandum of points and authorities in opposition to defendants' motions for directed verdict or that qualified immunity applies to bar liability.

Plaintiff requests leave of Court to file an oversized brief under Local Rule 11-6.1 related to the multiple issues raised by defendants in their pleadings and anticipated motions for new trial.

Dated: May 30, 2025 MKRTCHYAN LAW

/s/ Narine Mkrtchyan
Attorney for Plaintiff

## TABLE OF CONTENTS

**INTRODUCTION** 4

**MEMORANDUM OF POINTS AND AUTHORITIES** 11

Standard of Review 11

A. IT IS CLEARLY ESTABLISHED LAW PLAINTIFF DOES NOT HAVE TO IDENTIFY WHICH OFFICER STRUCK WHICH BLOW, ONLY INDIVIDUAL PARTICIPATION IN THE USE OF FORCE 14

ARGUMENT 18

B. COURT HAS TO DEFER TO JURY'S FINDINGS INCLUDING PUNITIVE DAMAGES UNDER EACH PRONG OF QUALIFIED IMMUNITY ANALYSIS 23

ARGUMENT 30

CONCLUSION 41

**Introduction**

This is an egregious case where all the involved officers denied the undeniable, striking Plaintiff Holloway in the head after an assault at the campground where he was compressed to the ground by combined bodyweight of 5 or more officers. This is in the face of independent evidence of Plaintiff's audible screams from PVS that he was getting kneed and struck in the head evident from his head injuries at scene. None of their police reports accounted for any headstrikes either, leaving their Sergeant Rawlings with a mystery to resolve, which he resolved in favor of his deputies, not Plaintiff, by claiming Plaintiff *might* have struck his face on the ground during the takedown. Little did he know that his officers buried themselves in that regard too because none of them ever reported or testified that Plaintiff struck his face on the ground. Someone had to take responsibility for striking Plaintiff in the head and covering up each other! However, throughout years of litigation, defendants took advantage of their denials by demanding Plaintiff to identify who struck him in the head, misleading the Court on the state of the law on the subject.

Two sets of jury to date, 18 people (**10 at third trial, 8 at fourth**), now have unanimously found all involved officers liable, not because Plaintiff identified what each *did* or *did not do*, but because of what they did in a group together! Court may not undo what jurors have decided, without also depriving Plaintiff of his right to jury trial.

Initially, before the first trial Plaintiff had named 7 individual defendants in the Complaint for individual claims of excessive force and conspiracy, Chad Renegar, Joel Gonzalez, Kevin Pahel, Mark Borba, Jameson Gotts, Justin Gunderson, Brendon Billinger. At subsequent trials the Court steadily dismissed defendants for various grounds, through erroneous review of facts and application

of the clearly established law cited by Plaintiff on the integral participation and failure to intercede in all federal circuits.

At his deposition Plaintiff was only able to identify Chad Renegar as the officer who initiated and escalated the use of force. Chad Renegar was also the arresting officer who wrote the main police report admitting to more of the use of force, takedown, punches to the torso, and the taser. Under the pressure of rigorous cross-examination by defense counsel Plaintiff was also able to describe the officer who he saw knee him in the head. **Exhibit A, Plaintiff deposition and trial excerpts**. At all three trials, he identified Gotts as the officer who closely resembled the officer he described at his deposition. **Exhibit A.** However, he was always insistent that he could not see exactly who was striking the blows while he was on the ground first face up and then facedown before he was handcuffed. Thus, Plaintiff's theory of liability revolved ***not on*** Plaintiff's ability to identify the officers, but on their admissions, denials, and the complete picture portrayed with PVS recordings. See **Exhibit D, PVS recordings, filed manually**. The law cited by Plaintiff in numerous pleadings ***does not*** require him to identify the officers who struck which blow, only to identify them as individual participants in the use of force! Plaintiff successfully did so at all trials by focusing on their official police reports, the PVS recordings, their statements to the arriving sergeant Stewart Rawlings, their depositions, and previous trial testimony. Independent evidence of his medical injuries proved the excessiveness of the force. Because if defendants' admissions were taken true, Plaintiff would not have sustained such injuries!

At all three trials, in light of the number of the officers, Plaintiff was questioned extensively by defendants whom he could identify striking him. Thus, under similar pressures, Plaintiff identified Jameson Gotts as the one striking him with his knee, and Mark Borba who stood up on his leg after he was placed in cuffs. However, Plaintiff never testified Gotts was **the only one** striking him with

his knee for a simple reason Gotts arrived in the midst of the use of force after he was already facedown. In fact, based on the PVS recordings of Pahel, Renegar, Gotts tapes, that are <u>not in sync</u>, it became clear that Plaintiff was struck with knees by multiple officers. Plaintiff testified that kneestrikes were multiple.

Thereafter, the Court further dismissed 3 of the defendants on the grounds that Plaintiff did not identify what each was specifically doing at third trial, which was the erroneous application of the state of the law. See **Doc. 679** Moreover, the Court took the officers' version of what happened when dismissing defendants, not Plaintiff's, when the law required the opposite. This is despite the fact, that liability for Joel Gonzalez and Kevin Pahel appeared solid, as they were integral participants of the initial takedown with force on Plaintiff. Kevin Pahel also offered a police report where he wrote that in assisting Gonzalez with Renegar in the takedown, he placed his knee on the back and **<u>head</u>** of Plaintiff. This is exactly the same time when Plaintiff audibly started screaming on his tape, '<u>Aah, bitch, You are kneeing me in the head</u>!' The microphone from PVS captures the sounds better, the closer one gets to the scene, as the officers testified. The first complaint of Plaintiff about getting hit in the head is best heard on Pahel's tape. This is further evidence that Plaintiff was struck with knees not by one officer, but more even though he did not describe or identify Pahel at any point in time who was the trainee of Gonzalez. **Exhibit B Pahel report.** Gotts arrived seconds after the first scream by Plaintiff about getting kneed! Therefore, this is evidence that Pahel was kneeing him before Gotts came and joined. This is not the first time that someone has complained that these deputies have used kneestrikes and punches to the head, as it was apparent from Chad Renegar's prior use of force incident investigated by his Sergeant Lavinia Vega Betzler, who testified at trial. Plaintiff has unearthed more discovery of use of force incidents regarding these deputies, in particular Chad Renegar and Jameson Gotts with similar description of force, that was

excluded from all three trials on the grounds they were ‘jail incidents’. With the exception of Gonzalez, these deputies were brand new on patrol and most of their prior use of force incidents were in jail setting, that did not detract from their usefulness to show modus operandi. See **Pl. MIL #6 to Admit Prior Bad Acts, DOC. 183**.

Because this prior ruling dismissing Pahel, Gonzalez and Borba jeopardized Plaintiff’s ability to get a liability verdict against the remaining defendants Renegar and Gotts, Plaintiff could no longer focus on the individual defendants and their specific actions at fourth trial. Because if Plaintiff focused on identifying who struck which blow, logically the question for jury would arise, why Defendants Chad Renegar and Jameson Gotts were on trial but not Kevin Pahel, Joel Gonzalez, Mark Borba, who were intricately involved in the use of force by their own admission. That would have opened a Pandora’s Box as the Court stated at one of the hearings, excluding any mention whether they were defendants or not in this trial! Hence, there was a risk that Plaintiff would not succeed in getting a liability verdict against the 2 remaining defendants.

As a result of Court’s rulings, Plaintiff’s theory of liability at fourth trial revolved yet again not on his ability to identify the officers specifically striking any of the blows or headstrikes, but on their admissions, denials and their PVS recordings. Moreover, Plaintiff’s direct testimony was interrupted twice by Court after a recess and on the second day when Court questioned Plaintiff about his loss of wages outside the presence of the jury, interrupting the flow of examination. It was a pure mistake on part of Plaintiff and his counsel to fail to specifically identify Gotts striking Plaintiff at fourth trial. Plaintiff has also sustained a stroke with heart surgery in the interim that has affected him cognitively. Plaintiff’s counsel was cognizant of that and attempted to limit his time on direct examination. **Exhibit G**, **Declaration of Counsel**. However, Plaintiff established

liability against Jameson Gotts at fourth trial by his admissions in report and to Rawlings, '**I came in there with a knee!**' and his denial that he had bloodstained his uniform, pantleg area with Plaintiff's blood. He had admitted that he placed his knee with bodyweight on Plaintiff when he arrived right before the taser was applied. See **Exhibit C Gotts report**. A reasonable jury could infer that he did not tell the entire story and he was actually striking him with his knee and that is how his pantleg got bloodstained. He claimed he fell to the ground when he got out of his car, when the ground was not wet. If he was innocent of any wrongdoing, there is no reason for him to deny that he had blood on his uniform. Defense counsel speculated in closing argument he might have bloodied his uniform somehow as he touched the ground in the area of the use of force. Yet, he never testified to that! Denial or failure to explain adequately is consciousness of guilt. Circumstantial evidence is as good as direct evidence. His PVS recording is also clear that after he arrived and joined in the force, Plaintiff continued audibly complaining about getting kicked in the head and bleeding before the taser was applied. Plaintiff's argument was not only there was circumstantial evidence Gotts was kneeing him in the head, but also that his application of the force was excessive in light of the fact at the time Plaintiff was screaming from getting hit in the head and from taser application! Thus, regardless whether Gotts was the only one kneeing him in the head, his force on Plaintiff was excessive at the time he arrived. Placing a bodyweight on Plaintiff when he was screaming from blood and was tasered was clearly excessive, when more officers were already involved in succumbing him to the ground with their knees and combined bodyweight. It was irrelevant what Rawlings, who was not qualified as a use of force expert by any standard, thought or did not think about his deputies' force, that he covered. Nor was it material that Plaintiff did not specifically ask questions of his own expert Roger Clark of Gott's liability. Plaintiff's examination of any expert witness, Clark or Fonzi was limited

in time and Plaintiff could only focus on the most pertinent issues. But defense expert Robert Fonzi agreed that if Holloway's version was taken as true, these officers used excessive force. Holloway's version at deposition and prior trials was always that Gotts was seen striking him in the head. At no point in time, Gotts' personal involvement in the force application was questionable. If there was any question for his involvement, the Court would have granted Rule 50 motion prior to the jury verdict and at previous trials.

As it relates to Chad Renegar, he was the initiator and escalator of the use of force, regardless of his denials. He was the one who approached Plaintiff without any warning, grabbed and took him down to the ground, by his own admission. The fact that Plaintiff's sentence 'Why am I being…!' was interrupted right around the time he grabbed him is the best indication that Plaintiff was punched to his face! His different versions of the claimed headlock by Plaintiff were the biggest falsification, that the jury did not buy! He told different versions in his report, to Rawlings at scene, at his deposition and at trial. Then his justification for multiple applications of the taser was lame, because Plaintiff was not in a position of any advantage to kick or get off the ground from the weight of multiple officers who by their own admissions placed their bodyweight on him trying to grab his arms! His veracity and credibility on the application of the force were the key issues for the jury to decide.

The jury had to determine credibility of witnesses and spoke loud and clear. Credibility is the sole province of the jury, not the Court. The fact that they assessed punitive damages against both officers forcefully proves that Plaintiff proved his claims above and beyond the preponderance of the evidence and the directed verdict would be inappropriate.

The '**law of the case doctrine**' also requires Court to stand by its earlier rulings denying directed verdict to Jameson Gotts and Chad  Renegar, based on the

state of the evidence at various trials. Plaintiff's different theories of liability do not change the law of the case that has developed through the years and multiple trials in this case. [1] He should not be punished for delays in court. The incident happened in 2018 and the fourth trial in 2025. His memory of the incident has become more distant and he sustained another stroke affecting him cognitively and emotionally by the time of the fourth trial. See **Exhibit G, medical records**. Dismissing defendants because plaintiff somehow forgot to mention names of all officers at fourth trial, when their involvement is not questionable based on the state of the evidence, is inconsistent with this legal doctrine.

If the Court wishes to revisit the Order on denying qualified immunity to Gotts on the state of the evidence produced at combined four trials, then Court should also reinstate Gonzalez, Pahel and Borba and reverse its ruling(s) in other regards, as it limited Plaintiff's ability to prove damages for excessive force. Plaintiff was severely limited in producing evidence of emotional distress and physical injuries under the threat of 'opening doors' to his subsequent arrest in Pennsylvania. Plaintiff continued his treatment for PTSD, his back injuries and headaches in Pennsylvania and Montana, yet was unable to introduce any of that.

---

[1] As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. See 1B J. Moore & T. Currier (hereinafter Moore), ¶ 0.404 (1980).8 Law of the case directs a court's discretion, it does not limit the tribunal's power. *Southern R. v. Clift*, 260 U.S. 316, 319, 43 S.Ct. 126, 126, 67 L.Ed. 283 (1922); *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). -- *Arizona v. California*, 460 U.S. 605, 618, 103 S. Ct. 1382, 1391, 75 L. Ed. 2d 318 (1983), decision supplemented, 466 U.S. 144, 104 S. Ct. 1900, 80 L. Ed. 2d 194 (1984).

He was also unable to testify about his recent stroke and heart surgery, and loss of wages as a result of this incident. The number of defendants involved was a critical factor in assessing the excessiveness of the force and ensuing damages. As a result of the cumulative effect of these rulings at fourth trial, Plaintiff was able to get only a modest verdict for damages against two of the defendants, when in reality he was beaten by at least 5 deputies or more and his damages are much higher. Plaintiff underwent insurmountable obstacles in proving his case through multiple retrials ordered by Court, and should not be punished while defendants have been rewarded by procedural loopholes and tactical advantage.

## MEMORANDUM OF POINTS AND AUTHORITIES

## STANDARD OF REVIEW

A district court can grant a Rule 50(a) motion for judgment as a matter of law only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109-10 (9th Cir. 2013); *Jorgensen v. Cassiday*,320 F.3d 906, 917 (9th Cir.2003)(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*,530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "[I]n entertaining a motion for judgment as a matter of law, the court ... may not make credibility determinations or weigh the evidence." *Go Daddy Software, Inc.*,581 F.3d at 961 (alteration in original) (quoting *Reeves*,530 U.S. at 150, 120 S.Ct. 2097). And although taking a motion under submission and ruling on it after the jury returns a verdict is proper practice, *see* Fed.R.Civ.P. 50(b) advisory committee's note, the court "**may not substitute its view of the evidence for that of the jury.**" *Winarto v. Toshiba Am. Elecs. Components, Inc.*,274 F.3d 1276, 1283 (9th Cir.2001) (quoting *Johnson v. Paradise Valley Unified Sch. Dist.*,251 F.3d 1222, 1227 (9th Cir.2001)).

> If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict — "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Munson*, *supra*, at 448.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)

The trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady* v. *Southern R. Co.*, 320 U.S. 476, 479-480 (1943). <u>If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed</u>. *Wilkerson* v. *McCarthy*, 336 U.S. 53, 62 (1949). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986)

> The Court has said that summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor* v. *Arkansas Gas Corp.*, 321 U.S. 620, 624 (1944). And we have noted that the "genuine issue" summary judgment standard is "very close" to the "reasonable jury" directed verdict standard: "The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence,

> while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc*. v. *NLRB*, 461 U.S. 731, 745, n. 11 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986)

Thus, a court may grant a motion for judgment as a matter of law "only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party." *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir.1993) (emphasis added). In ruling on such a motion, the court must bear in mind that the jury is free to believe part and disbelieve part of any witness's testimony. *See, e.g., Fiacco v. City of Rensselaer*, 783 F.2d 319, 325 (2d Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *see also Haywood v. Koehler*, 78 F.3d 101, 105 (2d Cir.1996) (jurors are "free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credit"). *Zellner v. Summerlin*, 494 F.3d 344, 370-71 (2d Cir. 2007)

A renewal for judgment as a matter of law under Rule 50(b) after trial must mirror the pre-verdict Rule 50 (a) motion for grounds stated. Fed.R.Civ.P. 50 advisory committee's note on 1963 amendments (emphasis added). Later, the notes to the 1991 amendments reiterated this requirement. "This provision retains the concept of the former rule that the post-verdict motion is a renewal of an earlier motion made at the close of the evidence. . . . **A post-trial motion for judgment**

**can be granted only on grounds advanced in the pre-verdict motion.**" Fed.R.Civ.P. 50 advisory committee's note on 1991 amendments. The Rule itself, as well as these amendments, explicitly require a previous motion to be made before submission to the jury. *Tortu v. Las Vegas Metro*, 556 F.3d 1075, 1081-82 (9th Cir. 2009); See also *Vazquez v. City of Long Beach*, et al. 2:13-cv-03227-PJW, (Central District of Cal. January 24, 2017).

## A. IT IS CLEARLY ESTABLISHED LAW PLAINTIFF DOES NOT HAVE TO IDENTIFY WHICH OFFICER STRUCK WHICH BLOW, ONLY INDIVIDUAL PARTICIPATION IN THE USE OF FORCE

It is axiomatic that defendants are jointly and severally liable to plaintiff for each injury he sustained, even if he cannot point out which officer made which strike. See also *Flanagan v. Wolf*, 136 A.D.3d 739 (2d Dept. 2016) [where several defendants collectively shot at plaintiff but plaintiff was only struck once, defendants were jointly and severally liable for the resulting injury to plaintiff]; *D'Elia v 58-35 Utopia Parkway Corp*., 43 A.D.3d 976, 978 (2007) [plaintiff is not required to parse out which of the defendants' hits or kicks caused his injuries where defendants collectively engaged in the assault on plaintiff]; *Hamilton v. City of Peekskill Police Dep't*, 2015 U.S. Dist. LEXIS 101903, 8-9 (S.D.N.Y. 2015) [in § 1983 excessive force claim, plaintiff's inability to identify "the particular officer who kicked him, rendering him unconscious" is immaterial where the trier of fact can find that the defendant officers collectively using force against plaintiff]; *Rodriguez v. City of New York*, 112 A.D.3d 905, 906-907 (2nd Dept. 2013) [noting that "all those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer…are equally liable with him"]; *Skorupski v. County of Suffolk*, 652 F. Supp. 690, 694 (E.D.N.Y. 1987) [plaintiff's inability to "specify which of the

officers actually struck him" is not fatal to his § 1983 claim where excessive force was used by or in the immediate presence of all of the defendant police officers]; *Morris v. Pierce*, 2008 U.S. Dist. LEXIS 70911, 14-21 (W.D. La. Sept. 17, 2008) [noting that courts in multiple jurisdictions have uniformly held that a plaintiff's inability to identify which officer caused which particular injury is immaterial, where it is undisputed that the officers collectively engaged in excessive force against the plaintiff] The same holding was reached in *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir. 1986), where the Court stated:

> While Rutherford could not specifically state whether defendants Officers Houpt, McBride or Hood punched or kicked him, he did testify that they were among the five or six officers who were surrounding him while he was being beaten and that he saw each of their faces while he was being beaten. These three officers agreed that they were among the five or six officers who detained, arrested and handcuffed Rutherford, but denied punching or kicking Rutherford. From this evidence, a jury could reasonably infer that the named officers were participants in punching or kicking Rutherford. By declining to give Rutherford the benefit of this inference, the district court improperly took this case from the jury. We express no opinion whether a jury would have made that inference; that decision is one for the trier of fact. Accordingly, we reverse and remand for a trial consistent with this opinion.

*Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448, overruled on other grounds in *Graham v. Connor*, 490 U.S. 386, 398 (1989).

As the Ninth Circuit explained further in *Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003):

> Even though Lolli has not been able to identify precisely which officer delivered which alleged blow or use of force, he has developed and presented sufficient evidence from which a jury could infer that the individual officers who had physical contact with Lolli participated in the alleged beating. Lolli has done more than simply place the officers at the scene of the altercation and assert a group liability theory. . . . Instead, he has properly relied on the deputies' own admissions that they were involved in the altercation and that they exerted some physical force on him to create the necessary inference that the deputies were "integral participants in the alleged unlawful act."

The Tenth Circuit reached a similar conclusion in *Estate of Booker v. Gomez 745 F.3d 405* (10th Cir. 2014). In that case "Mr. Booker died [while being booked into the jail] after officers restrained him in response to his alleged insubordination. Several officers pinned Mr. Booker face down to the ground, one placed him in a chokehold, and another tased him." The defendants argued their actions should be assessed individually. The Tenth Circuit "disagree[d] and conclude[d] that individualized analysis was not necessary at the summary judgment stage." Because the officers "engaged in a group effort, a reasonable jury could find them liable for any underlying finding of excessive force." Put another way, "all Defendants actively participated in a coordinated use of force . . . . If excessive force occurred, all deputies contributed to it" and are liable.

This is consistent with the Sixth Circuit's holding that "a police officer may be responsible for another officer's use of excessive force if the officer . . . actively participated in the use of excessive force." *Bletz v. Gribble*, 641 F.3d 743, 754 (6th Cir. 2011). Likewise, the Seventh Circuit has found it "axiomatic," in an excessive force case, "that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury." *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985).

"Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen. E.g., *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988); Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986); Bruner v. Dunaway, 684 F.2d 422, 425-26 (6th Cir. 1982), cert. denied, 459 U.S. 1171 (1983); Putman v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981); *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972). In these cases, the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows. Thus an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights." *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994). 6. Police officers have an affirmative duty to intercede or intervene to protect those in custody from constitutional abuses by their fellow officers. See, *Koon*, 34 F.3d at 1447, n. 25 ("An officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to deprivation of his Fourth Amendment rights."); *Cunningham v. Gates*, 229 F.3d 1271, 1289-1290 (9th Cir. 2000) (recognizing police officers' duty to intercede where they have the opportunity to stop a violation of rights); *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (holding that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" when another official acts unconstitutionally)*; O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."

**ARGUMENT**

As a starting point, the standard of review at this stage requires Court to take Holloway's version of what happened, not officers. The Court, however, previously entirely took the officers' version of what happened when granting qualified immunity and dismissing 3 of the defendants, after a jury verdict at third trial. [2]**Doc. 679**. The Court also parsed out the specific uses of force based on whether Holloway identified any of the officers' *specific* application of the force and missed the fact that Borba was identified by Holloway as standing up on his leg after he was already in handcuffs. But that kind of analysis does not take into account, that all defendants have denied headstrikes and Holloway only identified Gotts, who arrived seconds after he was screaming 'You are kneeing me in the head!' Thus, integral participation or failure to intercede theory was the only theory of liability because Plaintiff could not identify which officer struck him in the head at various times during force. Plaintiff had described Gotts as one of the officers who was involved kneeing him, but Gotts arrived seconds before the taser was applied and Plaintiff was already facedown. Since someone struck him before Gotts arrived and joined in, he was unable to identify. The Court's ruling in dismissing 3 of the remaining defendants Joel Gonzalez, Kevin Pahel, Mark Borba

---

[2] The Court analyzed the application of the taser on pp. 8-10 completely in light of the officers' version, because Holloway always testified that his arms were not pinned underneath him, and were held by the officers when he was on the ground. He testified that he was neither fighting with his arms, nor kicking at the officers. Therefore, based on Holloway's version the application of the taser on a non-violent non-combative subject was in violation of the clearly established law. Court also did not consider Defendant Gonzalez' version that Holloway was only passively resisting on the ground, and was not combative during the application of the taser. He specifically testified it was not appropriate to use taser on a resistant subject, who was not combative. See **Exhibit E**, excerpts of Gonzalez testimony.

after jury found them liable at third trial, despite the clearly established law in all circuits that Plaintiff does not have to identify the officers' specific application of the force, had severely jeopardized Plaintiff's ability to prove the excessive force claim against the remaining defendants Chad Renegar and Jameson Gotts at fourth trial. Because to a layperson juror the liability of the first 3 participants, Renegar, Gonzalez and Pahel was most clear, as they were the ones who drew their guns, took Plaintiff down to the ground, and inflicted force before officers Gotts, Borba arrived and got involved in the midst of the force. Plaintiff had established successfully to the jury their liability at third trial based on their own admissions and PVS recordings, not because Plaintiff was able to identify what specifically they were doing while he was on the ground. Court had instructed the jury on the integral participation theory and failure to intercede and yet dismissed 3 of the defendants after jury reached a verdict. In fact, Pahel had admitted he had also placed his knee on his back and head, right at the time Plaintiff was screaming '**You are kneeing me in the head**!' But Plaintiff could not identify or describe him as someone striking him and Pahel also denied he struck him in the head, as the rest of the defendants.

Thus at fourth trial Plaintiff had no choice but to strategize how to prove liability against the remaining officers. Instead of focusing who struck which blows, Plaintiff now focused on the PVS recordings, what screams were heard at the time each officer arrived to the scene, their admissions, their statements to Sgt Rawlings and more importantly, their denials. **What they failed to explain was more important than what they admitted.** See California Jury Instruction CACI 205. Thus, Gotts' lame excuse he fell to the ground and stained his uniform before he got involved in the force, his denial he was cleaning his uniform from blood, and his admission to Rawlings twice 'I came in there with a knee' became the best evidence against him, short of admitting he struck Plaintiff with a knee! All

officers similarly minimized their use of force by claiming they only used bodyweight with their knees, yet Plaintiff sustained spinal injuries as a result of their combined bodyweight alone. Thus, Plaintiff highlighted the following excerpts from the PVS recordings of Pahel, Renegar and Gotts in pursuit of his theory to jury, **Exhibit D, PVS recordings** :

**<u>Renegar tape</u> <u>5:02:42-5:04:53</u>**

**RENEGAR: Get on the ground Now!**

**Holloway: 5:03:11 Why am I being… ? 31 seconds taken to the ground**

**Holloway: 5:03:25 'You are kneeing me in the head!'**

**Holloway: 5:03:48 'You kicked me in the fucking head! I am bleeding!'**

**Renegar: 5:03:50 Taser, taser, taser**

**Renegar: 5:03:56 Taser, taser, taser**

**Borba: ONE IN CUFFS**

**5:04:06 THIRD SOUND OF CLICK OF TASER**

**Holloway: 5:04:30 'You kicked me in the head, that is why!'**

**Holloway: 5:04:53, 'It is on my head!'**

**<u>Pahel tape</u>: 5:03:25-5:08:30**

**Holloway: 5:03:26—'Uhh, bitch… You are kneeing me in the head!'**

**Holloway: 5:06:44- is kneeing in the head the protocol. Cause I sure was kneed and kicked in the head! That is why I am bleeding in the head!**

**Holloway: 5:08:14 You kicked me in the fucking head!**

**5:07:00 His head is off the ground to his left side, not right side**

**<u>Gotts tape is a few seconds behind Renegar's and Pahel's: 5:03:40-5:10:24</u>**

**Holloway: 5:03:51 'You kicked me in the fucking head! I am bleeding!'**

**Holloway: 5:04:33 You kicked me in the head! That is why I am bleeding!**
**Holloway: 5:05:00 'It is on my head!**
**Holloway: 5:06:49 Is kneeing in the head the protocol?! Cause I sure was kicked and kneed in the head! That is why I am bleeding! I didn't know that was the protocol!**
**Gotts: 5:09:36 I got blood all over my…**
**5:10:24 you can see Gotts' right pantleg wet**
**Gotts to Rawlings twice: 5:10:53 'I came in there with my knee'**

Therefore, it was not fatal that Plaintiff during his testimony, unlike previous trials, mistakenly failed to specify Gotts as one of the officers he saw strike him in the head. Plaintiff successfully proved he was intricately involved in the use of force but grossly minimized it. If defendants wanted to raise the issue to impeach his credibility, they had the opportunity to do so during cross-examination but failed. Their theory is that Plaintiff had misidentified Gotts as the one striking him in the head, because at the time Plaintiff first screamed 'You are kneeing me in the head!' Gotts had not joined in the use of force yet. If that was their theory, they should have raised the issue on cross-examination and impeach Plaintiff's credibility on this key aspect of their defense. Yet, they failed to raise the issue, despite lengthy cross-examination. Plaintiff was on the stand for a full day and a half. Since defendant Gotts failed to raise this issue on cross-exam or in their defense case-in-chief, he has waived the right to raise this argument at Rule 50 motion for the first time. <u>An objection not raised timely is waived</u>. Nothing prevented him to bring in Plaintiff's prior testimony at deposition and prior testimony and compare PVS recordings as Plaintiff has done in raising their argument, their client was not liable.

Because Plaintiff's theory of liability against Renegar and Gotts slightly differed at this trial, Plaintiff forgot to mention in his direct about his previous ability to identify Gotts as an officer kneeing him. Either way, this failure or mistake cannot be used against him, because he offered a stronger theory of liability against Gotts, his admission of force with denials and PVS recording where Plaintiff continued screaming he was getting hit in the head right at the time Gotts with Borba arrived. It resonated with the jury who found him liable and assessed punitive damages against him individually.

2. **Use of Special Interrogatories to Jury was Denied by Court**

At the close of the evidence, defendants Gotts and Renegar requested the Court to order special interrogatories to jury focusing on the specific application of force by each defendant. It was denied by Court, because it was problematic in many respects, primarily because the clearly-established law does not require Plaintiff to prove what each officer did or did not do. The defendants capitalized on the Court's earlier ruling in dismissing certain aspects of the force on qualified immunity grounds after third trial, but use of interrogatories in that manner threatened to displace Plaintiff's right to jury trial on the excessive force claim. **Doc. 679** Court had already instructed the jury over Plaintiff's objection that the initial application of the taser was not in violation of the policy, but subsequent use of it could be considered. Special interrogatories to jury are misleading and are generally discouraged.[3] Because the jury could find Gotts failed to intercede or

---

[3] In special verdict forms the jury makes factual findings from which the court draws legal conclusions and renders judgment based thereon. [FRCP 49(a); Antrim Pharmaceuticals LLC v. Bio-Pharm, Inc. (7th Cir. 2020) 950 F3d 423, 427, fn. 1; see Winarto v. Toshiba America Electronics Components, Inc. (9th Cir. 2001) 274 F3d 1276, 1282-1284—special verdict

was an integral participant in the beating of Holloway just by getting involved in the use of force without even specifically finding he was the one striking him with his knee. The jury could have also found Renegar liable for his initiation, escalation of force with multiple application of taser regardless whether he specifically punched or did not punch Holloway in the face which was heavily disputed. Jury could buy part of Plaintiff's story and reject other parts, but rely on the uncontroverted evidence of PVS recordings. They are instructed they don't have to accept every piece of testimony from any witness. Court instructed the jury on the failure to intercede and at this point, it is immaterial what theory of liability the jury relied on in finding Gotts or Renegar liable. In any event, if the Court seriously considered dismissing either of the defendants on a directed verdict, the Court should have instructed the jury on their proposed specific application of force. Since the Court has not, it is prejudicial now to displace jury's findings with a directed verdict, unless no reasonable jury could find them liable. It speaks volumes that two sets of jury have found these officers liable.

## B. COURT HAS TO DEFER TO JURY'S FINDINGS INCLUDING PUNITIVE DAMAGES UNDER EACH PRONG OF QUALIFIED IMMUNITY ANALYSIS

Court should take notice that qualified immunity is under a heightened scrutiny in the legal forum under the public outcry for police reform. See, e.g., *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our

---

answered 26 questions] "However, like all fine tools, it must be skillfully employed and its successful use requires … that the questions are framed to avoid the possibility of inconsistent answers." [Guidry v. Kem Mfg. Co., supra, 598 F2d at 406

qualified immunity jurisprudence.") It was a reason for much debate in the proposed new civil rights legislation George Floyd Justice in Policing Act of 2021 by Congress, where legislators argued to abolish it altogether and restricted its applicability to promote police accountability, in a resounding criticism of the doctrine. This judicially created doctrine has no historic support in the original language of the 1983 statute, nor in its legislative history. See Alexander Reinert, 111 Calif. L. Rev. 201, (February 2023) *Qualified Immunity's Flawed Foundation*.

"The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (citations omitted)."Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The higher Court has recently clarified in *Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020) the standard is not whether a case on all fours exists, but rather whether "'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" Slip Op. at 2 "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 20. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). *See also Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). See also *Ashcroft v. al-Kidd* , 563

U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (citations omitted); *See Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1167 (9th Cir. 2011) ("the relevant inquiry is whether the state of the law at the time of the official conduct complained of was such as to give the defendants 'fair warning' that their conduct was unconstitutional"). *Dominguez v. City of Scottsdale*, 587 F. Supp. 3d 914, 925 (D. Ariz. 2022) In making this determination, the Court still must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650 (2014); *Wilkins*, 350 F.3d at 951 The issue of qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514 (1994). The court defers ruling on qualified immunity where there is a genuine dispute of material facts. *Estate of Lopez v. Gelhaus, supra*, 871 F.3d 998 at 1021.

"[D]eference to the jury's view of the facts persists throughout each prong of the qualified immunity inquiry." Courts must deal with the underpinning facts differently once the jury has rendered a verdict. *A.D. v. California Highway Patrol*, 712 F.3d 446 (9th Cir. 2013) (affirming denial of qualified immunity to officer, after the jury rendered a verdict in favor of finding liability against the officer on the constitutional due process claim). *Morales v. Fry*, 873 F.3d 817 (9th Cir. 2017) (district court properly denied qualified immunity to officer after jury found in favor of Plaintiff for excessive force).

Jury can legitimately access punitive damages for conduct they find reprehensible, anti-social or malicious and Court may not displace their findings by substituting its views over those of jury. See *BMW v. Gore*, 517 U.S. 559, 576-577 (1996); *Gryger v. Burke*, 334 U.S. 728, 732 (1948); *McCoy v. Alfrey*, 2010 WL 4366120 (E.D.Ky 2010).

Even when no prior Supreme Court or circuit case presents facts that are "fundamentally similar" or "materially similar" to those presented before the court, the salient question is still whether, at the time of the encounter with police, "the

state of the law . . . gave defendants fair warning that their alleged treatment of plaintiff was unconstitutional." "In excessive force cases, the inquiry remains whether,` under circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and [whether] any mistake to the contrary would have been unreasonable." *Blankenhorn v. County of Orange*, 485 F.3d 463 (9th Cir. 2007), (denying qualified immunity to officer on excessive force claim, citing to *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003)

*Hopkins v. Bonvicino*, 573 F.3d 752,776 (9th Cir. 2009) (clearly established law that pointing a gun at unarmed misdemeanor arrestee officer knew was not a threat to officer safety, who was outnumbered by officers, was excessive): *Black v. Stevens*, 662 F.2d 181 (3d Cir. 1981) (brandishing a revolver and threatening to shoot violated the plaintiffs constitutional rights); "We have found similar uses of force unreasonable in other cases. For example, we held that gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." See *Jacobs v. City of Chicago*, 215 F.3d 758, 773-74 (7th Cir.2000) (pointing a gun at an elderly man's head for ten minutes even after realizing that he is not the desired suspect and when he presents no resistance is "out of proportion to any danger that Jacobs could possibly have posed to the officers or any other member of the community"); *McDonald v. Haskins*, 966 F.2d 292, 294-95 (7th Cir. 1992) (pointing a gun at a nine-year-old child during a search and threatening to pull the trigger was "objectively unreasonable"). In a slightly different context, we observed that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). *Robinson v. Solano County* (9th Cir. 2002) 278 F.3d 1007, 1013-1015

When officers violate state law, policy or training, they are on notice that their conduct is unreasonable and are not entitled to qualified immunity. *Hope v.*

*Pelzer*, 122 S.Ct. 2508, 2519 (2002) (Policy guidance may also be relevant to establishing notice); *Ludwig v. Anderson*, 54 F.3d 465, 473-473 (8th Cir. 1995) (Although these police department guidelines do not create a constitutional right, they are relevant to the analysis of qualified immunity and whether a constitutional violation occurred); *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 732 Footnote 8 (5th Cir. 2018) (We also find relevant, but not dispositive, the fact that Officer Romero's alleged conduct appears to have violated Fort Worth Police Department policies requiring officers to exercise "[e]xtreme caution" when arresting "a prisoner that is obese . . . since cuffing behind the back and laying the prisoner in a prone position could lead to positional asphyxia"); *Tennessee v. Garner*, 471 U.S. 1, 18–19 (1985) (looking to policies adopted by police departments to inform its analysis on the reasonableness of using deadly force to prevent the escape of unarmed suspected felons); *Martin*, 712 F.2d at 951 (violation of policy on restraints relevant to reasonableness of officers' actions); *Drummond v. City of Anaheim*, 343 F.3d1052, 1062 (9th Cir. 2003) (training was relevant to whether force was unlawful and whether a reasonable officer would have been on notice); *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1131 (9th Cir. 2002) (no qualified immunity where officers violated regional and statewide police protocol); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 499 (5th Cir. 1998) ("[I]t may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers in these circumstances they had been warned"); *See, e.g., Gantt v. Akron Corr. Facility*, 73 F.3d 361 (Table), 1 (6th Cir. 1996) ("Moreover, as the district court noted, the officers were in violation of the established police policy, as set out in the Akron Corrections Facility's procedural manual. It specifically provided that certain alternative measures (verbal persuasion, verbal warnings of the consequences of non-compliance, and intimidation through a 'show of force,' i.e.,

the use of additional personnel) must be tried prior to the imposition of 'compliance holds.' Aside from asking Gantt to move along, the defendants used none of these alternative methods of compliance.") *See Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *6 (6th Cir. Feb. 2, 2009) (noting, while analyzing subjective component, that defendant did not comply with jail policy). "The more a statute or regulation clearly mandates a specific course of conduct, the more it furnishes a plausible basis for inferring deliberate indifference from a failure to act, even without any specific knowledge of harm or risk. This is because failure to undertake a specific course of action in vindication of a general duty can reasonably be attributed to a bona fide difference of opinion as to how the duty should be performed. However, no such alternative explanation for nonfeasance can be raised where the task mandated is specific and unequivocal." *Doe v. NY City Department of Social Services*, 649 F.2d 134, 146 (2d Cir. 1981).

In *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) the Ninth Circuit, in a case involving the use of force by officers to subdue a person by methods which cause injury or death by compression asphyxia stated the long standing principle that although training materials are not dispositive, the court "may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable." *Id.* at 1059. In *Drummond* the circuit also accepted as evidence the declaration of an expert witness who concluded that:

> [R]easonable police officers could not believe that they were acting appropriately [for reasons which include] the facts that there were numerous and egregious violations of standard police practice, violations of a number of Anaheim's own policies and procedures, the numerous protestations of Mr. Drummond witnessed by at least two independent witnesses that he was unable to breathe, the fact that he was not being stopped for a serious crime but because of his mental disturbance . . . .
> *Id.* at 1060, fn. 6.

*Drummond*'s holding on excessiveness of the force was consistently applied as clearly-established law despite some variation in the application of the force. Bodyweight before someone is placed in handcuffs may under certain circumstances constitute deadly force and is in violation of the clearly-established law. *Scott v. Smith* 109 F.4th 1215 (9th Cir. 2024) (officers used their bodyweight on Scott while he was restrained with his hands behind his back, which is the functional equivalent of being handcuffed. And more critically, the officers received fair notice that their force was constitutionally excessive despite the timing of the handcuffing.) See also *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004) the Sixth Circuit upheld a jury verdict against the officers for killing someone, in part based on finding that officers violated their own use of force policies.

> In addition to prior precedent, the Officers' training demonstrates that they were aware of Champion's clearly established right to be free from this type of excessive force. The Officers were taught that pepper spraying a suspect after the individual was incapacitated constitutes excessive force. *Champion*, 380 F.3d at 902-903, internal citations omitted.

The Court in *McKinney v. Mangino, supra*, 873 F.3d 75 at 83 denied qualified immunity to the officers, finding: "the threat presented lacked immediacy and alternatives short of lethal force remained open. Seen in that light, this was a case in which the feasibility of a more measured approach was apparent…

Officers may not continue to use force once an individual is subdued and no longer resisting. *Hyde v. City of Wilcox*, 23 F.4th 863, 871 (9th Cir. 2022); *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003); and *Watkins v. City of Oakland*, 145 F.3d 1087, 1090 (9th Cir. 1998) (emphasis added)). "The law is clear that use of force where no force is necessary amounts to a

violation of one's Fourth Amendment right to be free from excessive force. This right is clearly established." *Kassim Abdulkhalik v. City of San Diego*, No. 08CV1515-MMA (NLS), 2009 WL 4282004, at *7 (S.D. Cal. Nov. 25, 2009) (citing *P.B. v. Koch*, 96 F.3d 1298, 1304 (9th Cir. 1996)); *see also Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (noting cases dating back to 2001 have established that "[a] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"); *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) (it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to officer or public safety); *Myers v. Brewer*, 773 F. App'x 1032, 1038 (10th Cir. 2019), *cert. denied*, 2020 WL 129643 (U.S. Jan. 13, 2020) ("[I]t is clearly established that an officer uses excessive force when he executes a forceful takedown of a subject who at most was a misdemeanant, but otherwise posed no threat and did not resist arrest or flee.") (cited pursuant to Fed. R. App. P. 32.1).

**ARGUMENT**

Unfortunately, the Court's analysis of 'divide and rule' specific applications of force has made it very difficult for Plaintiff to prove his claims throughout this litigation. It is the combined effect of the use of force with guns drawn, a punch to the face with a takedown, a chokehold, kneestrikes to the head, combined bodyweight, the prone position with multiple applications of taser, was excessive in its combination. In fact, based on all the law cited above, taking Plaintiff's facts as true, this was under all standards brutal infliction of force and their own use of force expert Bob Fonzi agreed. Combined bodyweight on someone in a prone position alone is considered positional asphyxia and is deadly, let alone being

struck in the head and tasered to top it. *Scott v. Smith* 109 F.4th 1215, 1227. It was only a miracle that bleeding Plaintiff survived this force. The jury had plenty of evidence at their disposal to assess punitive damages against these officers.

Plaintiff's theory of liability against Renegar remained the same at all trials, except Court instructed the jury at fourth trial that the initial application of the taser was not in violation of the policy and excluded the taser policy as evidence. Plaintiff's theory was always that the application of the taser on Plaintiff facedown on the ground, succumbed by multiple officers was excessive, as their own policy required imminent threat to justify taser. See **Exhibit F OCSD taser policy**. Gonzalez had testified at his deposition and a previous trial, that Plaintiff was a resistant subject only, without any evidence of violence against anyone, and the application of the taser would be inappropriate. Gonzalez also testified he did not use the taser, not was about to use it! See **Exhibit E**, **Gonzalez testimony excerpts**.

Plaintiff therefore, focused on Renegar's lies in reports to discredit him on his denials. He denied ever punching Plaintiff in the face or placing him in a chokehold. Thus his credibility was a key issue for jury to decide. Other aspects of the force became focal in determining his credibility, such as the claimed headlock by Holloway, grabbing of his ballistic vest, his kicks on the ground.

Liability against Gotts, as stated before, was not only on what he denied doing, but what he admitted doing! He admitted placing his bodyweight with knee on Holloway at the time Holloway was screaming from headstrikes, complaining of blood on his head, before the taser was applied and other officers already were holding him on the ground! The clearly established law cited above put Gotts on notice that using force, even bodyweight on someone who is already succumbed on

the ground by multiple officers, is excessive.[4] Gotts was the 5th officer, after 4 officers had Holloway pressed to the ground by their combined weight! There was absolutely no need for him to get involved especially when taser was being applied. He had a duty to intercede and stop, instead of getting involved. Justin Gunderson, his FTO who came to the scene with him, did not get involved and testified at previous trial and deposition that there was enough manpower holding Holloway down and there was no need for his involvement.[5] See **Exhibit H**. In addition Gotts admission twice to Rawlings at scene, 'I came in there with a knee!' and denial of bloodstained pants, was evidence that he was lying about his involvement. Jury had the opportunity to hear from Gotts and his lame excuse that he had fallen on the ground at the time he arrived to the scene before he joined in the force and that is how he stained his pants. It was for the jury to assess his credibility, not for Court in determining his involvement in the force. The jury spoke loud and clear by assessing punitive damages against him too in a reasonable amount. There was no need for Plaintiff to even identify him as the one he had

---

[4] Court's analysis in **Doc. 679**, pp. 12-13 takes officers' version of what happened, not Holloway's, because if his version is taken true, there was no need for multiple officers to place their bodyweight with knees on his back when he was only passively resisting, screaming for help and bleeding from his head. By his account, he was already under full submission of the officers, who had full control of his arms at the time these officers claimed he was fighting with his arms, and kicking them with his legs, trying to get up from the ground. Holloway testified from the beginning officers were holding him by his arms, and the only time he was able to free it was to cover his face and head from the blows. He never testified that he had his arms tucked underneath his body, because he had visible injuries on his torso and ribcage area.

[5] Gunderson also testified that he never saw Gotts fall to the ground and believed he might have stained his uniform with Holloway's blood. The use of this testimony was excluded from 4th trial to impeach Gotts' testimony.

previously described striking him in the head, because Plaintiff's theory at this trial there were multiple officers striking him in the head!

They were on notice not only of the constitutional and state law clearly-established precedent that force under these circumstances is unlawful and oppressive, but also of the Ca POST procedure and their own departmental policy that use of force with application of taser was not warranted when there was no *imminent* threat to their safety.

Plaintiff's case is very similar to the facts in *Blankenhorn v. City of Orange*, supra, 485 F.3d 463 (9th Cir. 2007), where the Court denied qualified immunity because found there was clearly established law putting officers on notice that gang-tackling, punching in the arms, placing hobbles on a misdemeanor suspect without first trying less violent means to arrest the suspect was in violation of that person's Fourth Amendment law. Here not only officers took Plaintiff down to the ground, and punched him in the ribs, and tasered him as they claimed, but according to Plaintiff, the version the Court is required to take at this stage, he was violently and without warning punched in the face before takedown, causing momentary loss of consciousness, was then placed in a chokehold, kneed and kicked in the head multiple times causing bleeding and laceration to his eye, punched on various parts of his body, and then rolled over and tasered multiple times. According to Plaintiff he was not actively resisting on the ground, nor was fighting to keep his arms tucked underneath his body. Meanwhile, the multiple officers by their own admission placed combined bodyweight on him with their knees and tasered him, after taking him down, and punching him in the torso. The force used here is more outrageous than in *Blankenhorn* but these officers would have been on notice that arresting a suspect of a crime they had not yet even identified and were still investigating, whether it was disturbance of the peace, or

trespass, or domestic violence, with a violent takedown and multiple applications of taser would be in violation of the Fourth Amendment law.

Plaintiff does not need to identify a case exactly factually similar to his, but has to identify the 'state of the law' at the time the incident happened in 2018 that gave these officers fair warning that their actions against Plaintiff were in violation of the Fourth Amendment. *Young v. County of Los Angeles*, 655 F.3d 1156, 1167 (9th Cir. 2011) Based on the cases cited in this Circuit and US Supreme Court, Plaintiff has met that burden in this brief.

These officers were also on notice that failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force. *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) *Young v. County of Los Angeles*, 655 F.3d 1156, 1165-1166. Yet they took Plaintiff down to the ground by force only because he was not complying with their command to get down to the ground with no other action that posed any threat to 3 armed defendants at scene. None of them testified that Plaintiff took any action to stop them from checking his campsite again, or pat him down for weapons like the first time they arrived minutes before, or speak with reporting party Joshua Gomez about the 911 call and investigate the call for service. They were on also on notice, that use of taser in dart mode or stun mode would be considered an intermediate significant level of force requiring justification of governmental interest. *Bryan v. MacPherson*, 630 F.3d 805, 810 (9th Cir. 2010). Yet Renegar used the taser on Plaintiff and other officers failed to stop him and continued applying more force against him even after he was placed in handcuffs when Borba stood up and placed his entire

bodyweight on Plaintiff's leg hurting him. [6] *Kaady v. City of Sandy*, CV. 06-1269-PK (D. Or. Nov. 26, 2008) (Holding that police officers had reasonable notice that they may not use a taser against an individual suspect who does not pose a threat and has merely failed to comply with commands).

These officers were also on notice of their own policy that headstrikes are generally disfavored and permitted only in very extreme situations if there is imminent danger to their safety. While Plaintiff did not have to identify which officer struck which blow consistent with principles laid down in *Rutherford* and *Lolli*, supra, he was able to provide sufficient proof at trial with his testimony coupled with defendants' admissions and the video recordings from their patrol cars, that both Renegar and Gotts were integral and active participants in the use of force, found to be excessive by jury. These officers were on notice that they had a duty to intercede if they witnessed an excessive force but failed in all regard. Both Gotts and Borba who arrived later were asked why did they believe, it was necessary for them to get involved and use more force on Plaintiff who was already succumbed on the ground by three officers and tasered by Renegar but could not provide any reasonable explanation. None of the involved officers, Renegar, Gonzalez or Pahel screamed for help, none of them testified that they

[6] Court completely missed this application of the force by Borba in granting qualified immunity to him. See **Doc. 679 pp. 12-13.** According to Holloway, the application of the force was continuous even after he was placed in handcuffs, evident from his screams on PVS recordings, the clicks of the taser, and complaint 'Don't stomp on my leg! I am not fighting!' Taser was clicking and Plaintiff was growling from pain even after Borba stated 'One in cuffs!' Moreover, merely because these officers claimed bodyweight was applied before handcuffs were placed is not dispositive, because being prone facedown under control of the officers was functionally equivalent to being in handcuffs. See analysis in *Scott v. Smith*, 109 F.4th 1215, supra, at 1227**.**

were in imminent danger. Not even Renegar ever screamed for help when he claims he was placed in a headlock by Plaintiff. In fact, based on testimony of all except Renegar, it was clear that Plaintiff was only passively resisting on the ground and there was no need for more force, but both Gotts and Borba admitted they placed their bodyweight with knees on the back of Plaintiff and attempted to use control holds allegedly to get control of his arms. These were the same arms that Gonzalez and Pahel had testified had control over, and this self-concocted identical scenario was soundly rejected by two sets of jury finding them liable for excessive force. All these officers were on notice of the policy and constitutional law they had a duty to reassess the threat before application of more force, but failed in that regard by continuously engaging in the described force without any pause or break until bleeding and passively resisting Plaintiff was placed in handcuffs. See *Hyde v. City of Willcox*, 23 F.4th 863, 871 (9th Cir. 2022); *Shippey v. Lovick*, No. C12-225RAJ (W.D. Wash. Mar. 18, 2013)(continuing to use force with repeated blows and taser after suspect was on the ground was in violation of Fourth Amendment); *Stauffer v. City of Casey*, No. 3:17-cv-01295-YY (D. Or. Mar. 20, 2020) Furthermore, even though Renegar initiated the use of force, all 4 officers were able and had the opportunity at various times to intervene and stop the gratuitous beating on Plaintiff, when he was screaming of pain and complaining he was bleeding, but failed. The facts and decisions in *Rutherford v. Berkeley*, supra, *Lolli v. County of Orange*, supra, similar to Plaintiff's would have put Officers Gonzalez, Pahel, Borba and Gotts on notice that even participating actively in the force can make them liable for violation of the Fourth Amendment rights to Plaintiff. This is despite the fact they did not initiate the first punch on Plaintiff, and were not the ones to taser him.

Thereafter, they willfully conspired to fabricate police reports and the probable cause declaration, where they deliberately lied about their actions during

the encounter to their supervisor Sgt Rawlings and in police reports. They were on notice of their own policy that required them to accurately report use of force to the arriving sergeant. When asked at trial if they did so, they all testified they did not understand the policy to mandate such reporting and they reported only their personal involvement in the use of force, which was minimized in the first place. None of these defendants accounted for Plaintiff's head injuries and or reported any headstrikes to Rawlings, and when asked during trial, if they ever saw someone strike/punch/kick Plaintiff in the head or face, they all denied it, because they knew it would have been in violation of their own use of force policy and state law. At trial in their defense they all propagated the false story line that Plaintiff must have sustained head injuries when he struck his face down on the ground, which was disproven by video recordings reflecting contemporaneous screams by Plaintiff, photographs and medical testimony. They also turned off their mikes from patrol car at various points in time to conceal their discussions among each other about the incident. Renegar turned off his mike right at the time when he was discussing police reporting of incident with Pahel and Gonzalez. Borba turned off his mike for the entirety of the investigation at scene on the excuse his battery was dead. All these officers were on notice of their own policy that they had a duty to record calls for service until they were closed, PVS policy that was introduced by defendants at trial.

Defendant Chad Renegar who was the primary officer handling the calls for service, fabricated and falsified police reports, as he had done before at least on three prior occasions, culminating in his prosecution for lying in reports, introduced at trial, by stating that Plaintiff had placed him in a headlock, was attempting to grab his ballistic vest and was kicking him with his legs, necessitating escalation of force. Despite the fact, none of them saw this claimed headlock on Renegar, this false story line to arrest Plaintiff was largely

corroborated by his co-defendants Joel Gonzalez, Kevin Pahel, Mark Borba, Jameson Gotts, in a malicious conspiracy to arrest and book Plaintiff on felony charges of Resisting Police and Battery on a Peace Officer. They neglected to accurately report the statements of the 911 callers Joshua Gomez and Brian Fuerbach at scene, about what they saw and heard on that day, and failed to resolve the domestic violence call by checking on the neighboring campsite 66 pointed out by Plaintiff as the source of the disturbance, that would have further showcased their plain incompetence investigating the call and lack of justification for use force against Plaintiff. This giant conspiratorial cover-up in police reports was then forwarded to the District Attorney's Office recommending filing of felony charges against Plaintiff. All of these officers were well aware of the clearly -established law that fabricating official reports and falsifying probable cause declaration was in violation of the state and federal law, and of the policy that required all of them to report use of force to their superiors truthfully and accurately.

Notably, the defendants' account minimizing the force they applied on various excuses was soundly rejected by the jury twice already in a finding that all named defendants used excessive force against Plaintiff finally assessing damages at the fourth trial. The Court is obligated to defer to the jury on the findings of fact. At this stage, the only issue for Court is to decide whether there was clearly-established precedent, decisional law, that placed these defendants on notice and fair warning that their actions were in violation of the Fourth Amendment and in doing so the Court has to construe the trial evidence in the light most favorable to Plaintiff. See *Morales v. Fry*, supra, note, 873 F.3d 817, at **826**, (denying qualified immunity, because the jury could have reasonably found that the use of the pepper spray against Morales was retaliatory, in violation of the clearly established law). Based on the case law cited, clearly these defendant officers are charged not only with knowledge of the decisional law existing at the time, but also of knowledge of

their own policy/procedure and training at Orange County Sheriff's Department and California POST that they violated. Qualified immunity has been expressly denied when officers were found to have been in violation of their own training, policies and procedures, according to the cases cited above.

Ninth Circuit authority "places the responsibility for keeping abreast of constitutional developments in criminal law squarely on the shoulders of law enforcement officials." *Ward v. San Diego County*, 791 F.2d 1329, 1332 (9th Cir. 1986). "We assume that officials are aware of available decisional law." *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1382 (9th Cir. 1989).

Police officers may not use their powers for the purposes of oppression. *Hurtado v. California* 110 U.S. 516, 527, 28 L.Ed. 232, 4 S.Ct. 111 (1984). See also *Sacramento v. Lewis*, 523 U.S. 833, 140 L.Ed.2d 1043, 118 S.Ct. 1708 holding that the due process clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression, quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126, 117 L.Ed.2d 261, 112 S.Ct. 1061 (1992).

When Plaintiff has proven that he was assaulted essentially because he delayed going down to the ground by verbally protesting the officers' actions and for his earlier attitude when they detained him the first time, liability is established under section 1983 for the deprivation of the plaintiff's rights. At the same time, qualified immunity protection is out of reach. "There can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment. *See, id.; Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998); see also *Barrett v. Harrington*, 130 F.3d 246, 264, (6th Cir. 1997)("[T]he First Amendment right criticize public officials is well established and supported by ample case law. Furthermore, it is well established that a public official's retaliation against an

individual exercising his or her First Amendment rights is a violation of §1983.") *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)("[G]overnment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely, anyone who takes an oath of office knows - or should know -that much.")"; *Gulliford v. Pierce County*, 136 F.3d 1345, 1350 (9th Cir. 1998). "Criticism of the police, profane or otherwise, is not a crime." *Houston* v. *Hill*, 482 U.S. at 462-63, 107 S.Ct. 2502.

Plaintiff's evidence at trial proved each of the co-defendants joined together to violate the plaintiff's constitutionally protected rights. That willful conduct bars the qualified immunity defense. *Carnell v. Grimm* 74 F.3d 977, 978-979 (9th Cir. 1996)(qualified immunity unavailable where material facts are disputed); *Mendecino Environmental Center v. Mendecino County*, 192 F.3d 1283, 1295 (9th Cir. 1999); *Del La Cruz v. Kauai County*, (2002) 123 S.Ct. 608, 154 L.Ed. 2d 531. See also, *Greenstreet v. County of San Bernardino*, 41 F.3d 1306, 1310 (9th Cir. 1994)(qualified immunity denied to deputy based on warrant issued by judge which was induced by deputy's misrepresentations of probable cause). An officer who manufactures probable cause for an arrest and conspires with other officers to suppress the truth of the events is *never* entitled to qualified immunity. *Harris v. Roderick*, 126 F.3d 1189, 1205 (9th Cir. 1997). It has long been the law that anyone, *especially* police officers, who provide false and misleading evidence against a person they know not to be guilty of the accusations, commit crimes. California Penal Code section 182, subdivision (2) criminalizes such conduct. Subdivision (1) criminalizes conspiracies to commit *any* crime. Penal Code section 146 criminalizes any unlawful arrest or detention of a person against his will under color of law. Penal Code section 118.1 criminalizes knowing and intentional falsehoods in police reports. Prohibitions against these forms of

behavior by peace officers have long been clearly established. Hence, evidence that defendants conducted themselves in intentional violation of these criminal prohibitions categorically requires the denial of qualified immunity. Qualified immunity is unavailable to "those who knowingly violate the law." *Malley v. Briggs* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Plaintiff was maliciously attacked, taken down and beaten only for verbal challenge and his justifiable lack of alacrity to get down to the ground when facing multiple deputies at gun point. *See Timas v. Klaser*, 23 Fed.Appx. 574, 580 (7th Cir. 2001)(quoting *McDonald v. Haskins*, 966 F.2d 292, 292–93 (7th Cir. 1992))("The excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger [s]he posed – to the community or to the arresting officers – if left unattended."); *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993)("Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of … force."); *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("The reasonableness inquiry in an excessive force case is an objective one: 'the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" . . . An officer's good intentions will not make an objectively unreasonable use of force constitutional.); *Phillips v. Community Insurance Group*, 678 F.3d 513, 527 (7th Cir. 2012)("Even when officers' goals are eminently reasonable, there are definite limits to the force officers may use to prod arrestees into obeying commands. A rule that pins reasonableness on whether officers used the force necessary to secure compliance would be a rule that *requires* officers to beat non-resisting arrestees into submission.").

## CONCLUSION

Because there was ample clearly-established precedent in constitutional decisional and state law, as well as in police training and departmental policy, putting these officer defendants on fair notice their actions against Plaintiff were unlawful, their pleas for qualified immunity after jury found them liable for excessive force, must fail.

Dated: May 29, 2025

**MKRTCHYAN LAW**

/s/ Narine Mkrtchyan
Attorney for Plaintiff